STATE OF MINNESOTA DISTRICT COURT

COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT
CASE TYPE: CIVIL

---

Eric Zajkowski, Jamilyn Kaminski, Breann Calderone, Aili Sathe, Amanda Elden, Tiffany Pollard, and Latoya Fuller, individually and on behalf of others similarly situated,

Plaintiffs,

vs. Court File No. 27-CV-07-26436

RCI Entertainment (Minnesota), Inc., d/b/a Rick's Cabaret,

Defendant.

---

COPY

30.02(f) DEPOSITION OF
RCI ENTERTAINMENT (MINNESOTA), INC.
CORPORATE REPRESENTATIVE
ERIC SCOTT LANGAN

Taken Tuesday, July 15, 2008
Commencing at 10:23 a.m

REPORTED BY: ANDREA J. TUNGLAND, RMR, CRR
PARADIGM REPORTING & CAPTIONING INC
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402-1331
(612) 339-0545





30 02(f) DEPOSITION OF RCI ENTERTAINMENT (MINNESOTA), INC., CORPORATE REPRESENTATIVE DEPOSITION OF ERIC SCOTT LANGAN, taken on the 15th day of July, 2008, commencing at 10:23 a.m., at the law firm of Nichols, Kaster & Anderson, PLLP, 4600 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota, before Andrea J. Tungland, Registered Merit Reporter, Certified Realtime Reporter and Notary Public of and for the State of Minnesota

**********

APPEARANCES

On Behalf of the Plaintiffs:

STEVEN ANDREW SMITH, ESQ.
NICHOLS, KASTER & ANDERSON, PLLP
4600 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 256-3200

On Behalf of the Defendant:

MALCOLM P. TERRY, ESQ.
MESSERLI & KRAMER PA
1800 Fifth Street Towers
150 South Fifth Street
Minneapolis, Minnesota 55402
(612) 672-3769

Also Present:

Brenda Stanfield
General Counsel, Rick's Cabaret
10959 Cutten Road
Houston, Texas 77066

NOTE: The original transcript will be filed with Mr. Smith as the taking party of the deposition





I N D E X


ERIC SCOTT LANGAN: Page:

EXAMINATION BY MR SMITH ..... 4
EXAMINATION BY MR. TERRY ..... 113
EXAMINATION BY MR. SMITH ..... 114
REPORTER'S CERTIFICATE ..... 116

OBJECTIONS: Mr. Terry: 17, 51, 63, 65, 74, 83, 87, 88, 100, 105

REQUESTS: None

INSTRUCTIONS NOT TO ANSWER: Mr. Terry: 51

CERTIFIED QUESTIONS: None

STUDEBAKER DEPOSITION EXHIBITS REFERRED TO: Page:

No. 5: Entertainer Checkout ..... 20
(Bates stamped RCI 000046)

No. 23: 4-20-00 Interoffice Memo from Loren ..... 25
(Bates stamped NKA 0000073)

No. 24: Where Does My Money Go? ..... 39
(Bates stamped NKA 0000074)

No. 8: 5-1-08 Employee Event Log ..... 57
(Bates stamped RCI 000032)







STUDEBAKER DEPOSITION EXHIBITS REFERRED TO: Page:

No. 15: Amanda Elden pay spreadsheet ..... 88
(Bates stamped RCI 000113-126)

No. 9: RCI Current Earnings Report ..... 101
(Bates stamped RCI 000033-35)

No. 19: Combined Payroll Report ..... 102
(Bates stamped RCI 000176)

No. 1: Employee Handbook ..... 108
(Bates stamped RCI 000001-17)

No. 6: Dances Paid Out ..... 110
(Bates stamped RCI 000048-55)


EXHIBIT
tabbies
11

Texas
Q Okay And what's your title?
A. President and CEO, chairman of the board.
Q. All right. You're the top officer in the organization; is that correct?
A. Yes.
Q. All right. Why don't you describe the Rick's corporate structure as best you can. Obviously you're the top person. If you could move on down from there to the next level of management to people that report to you.
A. Basically everyone reports to me, but I have several regional managers --
Q Okay.
A. -- that help oversee different clubs.
Q Who are those individuals?
A Ed Anakar
Q. And if you could also identify -- I'm sorry to interrupt you If you could also identify the region or area or club they're responsible for, that would be helpful.
A. Ed Anakar oversees New York and the Club Onyx and our Tootsie Cabaret in Florida Anderson Studebaker oversees Minnesota and helps with computer systems, any kind of systems, POS systems, camera systems, those types





of things, at several of the locations.
Q. But he works for the parent company?
A Yes
Q Okay
A. Bob -- Robert Glass oversees the XTC Cabarets in Houston, Texas.
I can't think of everyone's name. Wayne Finland oversees our Austin and occasionally our San Antonio operations Have I got everybody? Yes
Q And those -- the operations you've just identified for me, are they wholly-owned subsidiaries?
A Yes
Q. All right. Who handles human resources for you out of the parent company?
A. What do you mean?
Q Is there a human resource -- is there a vice-president of human resources?
A. No.
Q. Is there one individual in charge of human resources at the parent corporation or is that handled at the club level?
A. That's all handled on the club level
Q Okay. Do you have a legal department at the parent company level?
A. Well, we have a recent -- we've recently hired





general counsel
Q. And she's in the room today?
A Yes.
Q What's her name?
A Brenda Stanfield.
Q How recent was she hired?
A. December I don't remember.
MS. STANFIELD: December 1.
THE WITNESS: December I don't remember
Q (By Mr Smith) December 1 of '07?
A. '07, six months.
MS STANFIELD: Eight
THE WITNESS: Who's counting?
Q. (By Mr. Smith) Who's counting.
A. Time flies when you're having fun.
Q She reports directly to you?
A Yes.
Q Does she have any reports under her?
A No
Q. All right Is there an accounting department -- is accounting for the subsidiaries handled out of the parent corporation?
A. Is the accounting handled, some.
Q. What tasks? Payroll, for example?
A. Well --





Q Why don't you describe the general accounting structure for me.
A. Okay. The bookkeeping is done at our parent company on a parent company level.
Q. Meaning what?
A. Meaning the daily reports are prepared at each subsidiary, forwarded to the parent company to be booked into our accounting software, because we have to do consolidated financials because we're a publicly-traded company
Q. Sure Who's the top accounting or --
A Our chief financial officer.
Q Who would that be?
A Phil Marshall
Q All right And he is an employee of the parent company?
A. Correct
Q All right Are there any other VP-level employees or employees on his level that report directly to you?
A. Yes.
Q Who are they?
A. Travis Reese
Q What's he in charge of?
A. Information systems, our Internet. He runs our

Internet division.
Q. Internet division for?
A. Rick's Cabaret International, Inc.
Q. Who else?
A That's it.
Q. I'm sorry I interrupted you
A. That's no problem.
Q. I was asking about bookkeeping tasks and what bookkeeping tasks are handled out of the parent company
A. All the reconciliation for the subsidiaries to create, consolidate financials The actual paycheck processing is done through our corporate office.
Q. Okay And what -- using Rick's Minnesota as an example, what are they required to submit on a daily or weekly basis that will then go into this bookkeeping process you've been describing?
A. The cage system
Q What?
A A cage system, like casino cage, a cashier
Q Sure. Okay
A. Those are our accounting staff on site for Minnesota.
Q. Sure.
A. They basically run all the daily sales reports, reconcile all the cash, make the daily deposits, create





the daily banks for the cash registers
Q Okay.
A. They track and send in or pay any liquor, beer, wine invoices; they forward any other, like electric bills, phone bills, all the mail and stuff that doesn't get sent directly to our corporate office, they forward all that in on a weekly basis; and then they take all their -- they -- they do the payroll. In other words, they print the payroll reports, calculate the hours worked, everything, and send it to our corporate office for processing of the checks.
Q So when you say "they" in the example I've given you, Minnesota Rick's would do everything just described and then they forward to the parent company for processing?
A. Correct.
Q. Who's the person in charge of that at the Rick's Minnesota location?
A. Well, we have three cage staff employees --
Q Who are they --
A. -- that work there. You know, I don't know all their names.
Q. Do you know first names?
A. I know Mike I don't know the other two offhand.





Q. All right.
A. I haven't been directly involved that much with them
Q. All right. Do you know what --
A. I probably know when I see them but I can't remember names
Q Do you know what their titles are?
A Cage staff
Q Is there a --
A I don't know
Q Is there a top accounting person at the Rick's Minnesota location?
A. Probably Mike would be.
Q Okay.
A. He's the one that deals with the corporate office on most cases
Q. Okay.
A He's been there the longest
Q All right. Now, you have given me some examples of things that Rick's Minnesota would provide to corporate Excluding payroll, I'd like a little more detail about the types of information that Rick's Minnesota would give to the parent on a daily basis.
A. They print out the POS and daily sales, basically.





Q. And what would that be comprised of?
A POS report
Q The category --
A Bank deposit. I'm sorry?
Q Category. I'm sorry I'm just looking for the types of categories that would be in that daily report.
A. All the employee information, packages, when somebody is new hired so they could be entered into the payroll systems Like I said, all invoices, any checks that they've cut from the manager's account, day-to-day operations, anything that has to be tracked and kept to run a business.
Q Would corporate receive numbers for Dance Dollars sold on a given day?
A On a -- well, yeah. They'll have -- I mean, that has to be tracked every day. That's part of the sales, anything has to do with our sales
Q. Okay. Now, besides the daily numbers, are there other reports that are provided in a routine fashion like that? Is there a monthly report that Minnesota would be required to send to corporate?
A No We have every day we can run a consolidated through our accounting systems
Q. When you say our accounting systems, you mean parent company?

STATE OF MINNESOTA DISTRICT COURT
COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT
CASE TYPE: CIVIL

- - - - - - - - - - - - - - - - - - - - - - - - -

Eric Zajkowski, Jamilyn Kaminski, Breann Calderone, Aili Sathe, Amanda Eiden, Tiffany Pollard, and Latoya Fuller individually and on behalf of others similarly situated,

Plaintiffs,

vs. Court File No. 27-CV-07-26436

RCI Entertainment (Minnesota), Inc. d/b/a Rick's Cabaret, and Rick's Cabaret International, Inc.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

CAROLINE EBERT

Taken December 3, 2008

Commencing at 10:10 a.m.

REPORTED BY: JAYNE M. SEWARD, RPR

PARADIGM REPORTING & CAPTIONING INC
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402
(612) 339-0545





Deposition of CAROLINE EBERT taken on the 3rd day of December, 2008 commencing at 10:10 a.m. at the law firm of Nichols Kaster, PLLP, 4600 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota, before Jayne M. Seward, Registered Professional Reporter and Notary Public of and for the State of Minnesota.

* * APPEARANCES * *

On Behalf of the Plaintiff:

E. Michelle Drake, Esquire
Nichols Kaster, PLLP
4600 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 256-3200

On Behalf of the Defendant:

Joshua A. Hasko, Esquire
Messerli & Kramer, P.A.
1800 Fifth Street Towers
150 South Fifth Street
Minneapolis, Minnesota 55402
(612) 672-3665

EXHIBIT 12
tabbies.

NOTE: The original transcript will be delivered to E. Michelle Drake, Esquire pursuant to the applicable Rules of Civil Procedure.





I N D E X


WITNESS: CAROLINE EBERT

EXAMINATION: By Ms. Drake: 4 - 99

OBJECTIONS: By Mr. Hasko: 6, 9, 11, 12, 14, 16, 17, 18, 19, 20, 21, 22, 24, 25, 29, 35, 38, 45, 49, 53, 56, 59, 62, 64, 66, 68, 76, 78, 80, 81, 82, 84, 86, 90, 91, 93, 94, 97

EXHIBITS MARKED AND/OR REFERRED TO:

EXHIBIT 34: Entertainer Acknowledgement......87, 98
NKA0000138 - NKA0000140
RCI 000040 - RCI 000042

PREVIOUSLY MARKED EXHIBITS REFERRED TO:

EXHIBIT 1: Rick's Cabaret Employee Handbook - Revised: September, 2004..................86
RCI 000001 - 000017

EXHIBIT 2: Customer signoff re Dance Dollar purchases.............................46, 59
RCI 000038

EXHIBIT 5: Entertainer Checkout..............30, 52
RCI 000046

EXHIBIT 6: Dances Paid Out...................55, 58
RCI 000048 - 000055

REQUESTS:

Current Dance Dollar design currently in use.....13
Entertainer Checkout form currently in use......30
Records kept re feature dance sales.............72

QUESTIONS/INSTRUCTIONS NOT TO ANSWER:

Page 14, line 23 - page 16, line 9
Page 94, line 5 - page 95, line 17






P R O C E E D I N G S

CAROLINE EBERT,

called as a witness, being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. DRAKE:

Q. Will you please spell your last name for the court reporter?
A. E-B-E-R-T.
Q. Ebert?
A. Yes.
Q. Did you used to work for Wendy's International?
A. No.
Q. Have you ever been deposed before?
A I have.
Q. When was that?
A. 19 -- maybe '87.
Q. What kind of case was that in?
A. Auto accident
Q. I just want to go over a couple of quick ground rules for depositions with you. Obviously there's a court reporter here. She's typing everything that we say, so it's important that you and I don't talk at the same time. People all the

Q. Do you know if there are managers who are not Minnesota managers on the list?
MR. HASKO: Objection, asked and answered and argumentative.
THE WITNESS: I would say the same thing. I already answered that question.
BY MS DRAKE:
Q. I don't believe that you did, and I'll ask it again Do you know if there are nonMinnesota managers on the list?
A. No. I'm not aware.
Q. Have you ever received an email from an individual who you did not recognize as a Minnesota manager in your Rick's account?
A. I receive emails from Ed Anakar, who's a director of operations. Eric Langan.
Q. Anyone else?
A Anderson Studebaker.
Q. Anyone else?
A. Travis Reese.
Q. Who is Travis Reese?
A. I believe his position would be vice president.
Q. And what kinds of things does Ed Anakar email you about?





A. The last was happy Thanksgiving, have a wonderful holiday, something of that nature.
Q. What else?
A. Focus on guest service and talking about the downturn in business and the economy.
Q. What else?
A. That's about it On occasion inventory issues.
Q. How is Ed Anakar familiar with your inventory issues?
A. He's director of operations.
Q What does that mean?
MR. HASKO: Objection, lack of foundation.
THE WITNESS: I understand, as director of operations, that he's the one who's responsible for inventory after I send it out.
BY MS. DRAKE:
Q. What does that mean?
A. What does what mean?
Q. I don't know what it means that he's responsible for inventory after you send it out. Maybe you can break it down for me. When you send out inventory, what are you actually doing?
A. I take inventory for the bar and bar supplies, and then it gets emailed to -- actually I





don't know who it gets emailed to. I give it to Mike Marr, and he sends it out in an email. I understand that it goes to corporate, and Ed Anakar being director of operations is with corporate.
Q Does corporate manage your inventory? In other words, based on the count that is sent are you then sent back a certain amount of items to bring your inventory back up to where it's supposed to be?
A. I send them information. They don't give me information.
Q. Do they conduct any duties related to the inventory for you?
A. No.
Q. Are you instructed with respect to who you should purchase your inventory from?
A No.
Q. So you have complete independence as to that decision?
A. Correct.
Q. What about merchandise purchases?
A. What merchandise?
Q Any Rick's merchandise, T-shirts, hats --
A. I don't deal with that.
Q. -- golf balls? Okay. Who does?
A. I believe the cage staff.





Q And just to be clear, when I say who deals with that, I understand that to mean, and maybe I should just ask the question again, who's in charge of purchasing those items?
MR. HASKO: Objection, lack of foundation.
THE WITNESS: I understand it would be the cage staff.
BY MS. DRAKE:
Q. Okay. Do you know who those items are purchased from?
A. No
Q. Who informs entertainers how they'll be compensated for their work?
A. Our entertainers are employees When they are hired, they're told that they're an employee.
Q. Who informs them how they'll actually be compensated, how much money they'll make?
A. How much money they'll make? They're hired at minimum wage and they're commissioned salespeople.
Q. Who tells them that?
A. I would when I hire them.
Q. Tell me what -- let me ask you this first. Has the compensation plan or the way in which entertainers are compensated changed since

Page 1

STATE OF MINNESOTA

COUNTY OF HENNEPIN

ERIC ZAJKOWSKI, JAMILYN KAMINSKI, BREANN CALDERONE, AILE SATHE, TIFFANY POLLARD, and LATOYA FULLER, individually and on behalf of others similarly situated,

Plaintiffs,

vs.

RCI ENTERTAINMENT (MINNESOTA), INC., d/b/a RICK'S CABARET, and RICK'S CABARET INTERNATIONAL, INC.,

Defendants.

CASE TYPE CIVIL
DEPT. NO.

DEPOSITION OF ANDERSON STUDEBAKER

LAS VEGAS, NEVADA

MARCH 26, 2009

REPORTED BY: KRISTY L. CLARK CCR #708

Page 2

DEPOSITION OF ANDERSON STUDEBAKER, taken at 1640 West Alta Drive, Suite 4, Las Vegas, Nevada, on Thursday, March 26, 2009, at 9:28 a.m., before Kristy L. Clark, Certified Court Reporter, in and for the State of Nevada.

APPEARANCES:

For the Plaintiffs:

PRESENT THROUGH VIDEO CONFERENCE:
NICHOLS KASTER
BY: E. MICHELLE DRAKE, ESQ.
BY: MEGAN BRENNAN, ESQ.
4600 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 256-3200

For the Defendants:

PRESENT THROUGH VIDEO CONFERENCE:
MESSERLI & KRAMER
BY: NICHOLAS J. EUGSTER, ESQ.
1800 Fifth Street Towers
150 South Fifth Street
Minneapolis, Minnesota 55402-4218
(612) 672-3600

Page 3

I N D E X


WITNESS: ANDERSON STUDEBAKER

| EXAMINATION | PAGE |
|---|---|
| By Ms. Drake | 5 |

INDEX TO EXHIBITS

| PLAINTIFFS | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Documents Bates stamped RCI1031-1033 | 51 |
| 2 | Documents Bates stamped NKA95-96 | 58 |


EXHIBIT
tabbies
13

Page 4

LAS VEGAS, NEVADA, THURSDAY, MARCH 26, 2009;
9:28 A.M.
-oOo-

THE COURT REPORTER: This is the deposition of Anderson Studebaker. My name is Kristy Clark. My business address is Litigation Services & Technologies, located at 1640 West Alta Drive, Suite 4, Las Vegas, Nevada 89106. Today is Thursday, March 26, 2009, and the time is 9:28 a.m. This deposition is being taken at 1640 West Alta Drive, Suite 4.

Would all present please state their name and appearance for the record, beginning with the witness.

THE WITNESS: Anderson Addison Studebaker.

MR. EUGSTER: Nicholas Eugster -- last name spelled E-u-g-s-t-e-r -- counsel for defendants.

MS. DRAKE: Michelle Drake for the plaintiffs.

Thereupon--
ANDERSON STUDEBAKER,
was called as a witness, and having been first duly sworn, was examined and testified as follows:

MR. EUGSTER: Yeah. Okay. Number 3 on his order, "Plaintiff's motion to compel the deposition of Anderson Studebaker in his individual capacity is granted to the extent such deposition is not duplicative of testimony taken from Mr. Studebaker in his prior deposition in this case."

MS. DRAKE: Okay. So let's talk about specific dates of employment after 2003.

THE WITNESS: Okay.

MR. EUGSTER: Same objection. But go ahead, Andy. Same objection, though.

THE WITNESS: Be more specific, what you're asking me.

BY MS. DRAKE:

Q. Can you just tell me exactly where you have worked and what your titles have been since 2003?

**A. Since 2003, I have been -- I couldn't give you exact months. But I've been basically a regional manager.**

Q. Has your title been regional manager since 2003?

**A. Correct.**

Q. Okay. And you have been employed by Rick's Cabaret International, Incorporated, since 2003?

**A. Correct. Actually, wait. Let me back up**



**there. Sorry. Since 2004. In '03, I was the general manager of Rick's Cabaret, different location.**

Q. Okay. That's kind of what I'm trying to figure out. So in 2003 did your title change at some point from being general manager to being regional manager?

**A. Correct. It was actually in 2004 when it changed.**

Q. Okay. So in 2003, you were general manager of a Rick's Cabaret not located in Minnesota; is that correct?

**A. Correct.**

Q. Okay. And was your employer at that time Rick's Cabaret International?

**A. No.**

Q. Who was your employer at that time?

**A. It was Trump's -- Trump's North I believe.**

MR. EUGSTER: Objection to the extent it doesn't include Rick's Minnesota or Rick's Cabaret International. It's outside the scope of this -- the claims and allegations in this lawsuit.

BY MS. DRAKE:

Q. You can answer.

**A. I did. It's Trump's.**

Q. I didn't hear you.



**A. Sorry. It's Trump's -- Trump's North I believe.**

Q. And is that in Houston?

**A. Yes, it is.**

MR. EUGSTER: Same objection.

BY MS. DRAKE:

Q. Then in 2004, your title changed to regional manager?

**A. Correct.**

Q. And is that the time at which your employer became Rick's Cabaret International, Incorporated?

**A. Yes. Correct.**

Q. What -- what did you understand your job responsibilities to be as a regional manager beginning in 2004?

**A. Oversight.**

Q. Oversight over who?

**A. Of Rick's Minnesota. Actually, that was only one of my locations. Or sorry. Yeah, it was Minnesota in 2004.**

Q. In 2004, and let's just focus on the time period right after your title changed to regional manager, did you have oversight responsibilities initially over any Rick's locations aside from Rick's Minnesota?



MR. EUGSTER: Objection. That goes beyond the scope of this lawsuit. It has nothing to do with Minnesota. It has nothing --

MS. DRAKE: Are you instructing the witness not to answer?

MR. EUGSTER: I am.

MS. DRAKE: Okay. Let's call the judge.

MR. EUGSTER: Okay.

MS. DRAKE: We're going to take a break.

THE WITNESS: Okay.

(Whereupon a short recess was taken.)

MS. DRAKE: Okay. We are back.

BY MS. DRAKE:

Q. Okay. I think we were talking about when you became the regional manager in 2004.

**A. Correct.**

Q. And let me ask you this question: Who -- who made you the regional manager?

**A. Eric Langan.**

Q. And how did you learn that you were becoming a regional manager?

**A. He told me.**

Q. What did you understand your job responsibilities to be as a regional manager?

**A. Oversight.**

A. Yes, we did.
Q. And did you participate in making the decision to transition from Aloha to ClubTrax?
A. Made a recommendation to.
Q. And to whom did you make that recommendation?
A. To Mr. Langan.
Q. Was it Mr. Langan's ultimate decision to transfer to using ClubTrax?
A. I'm not sure if it was his decision. I'm not -- I don't know who the ultimate decision came from.
Q. If it wasn't him, who else would it be?
A. Well, I don't know who he would discuss it with. You'd have to ask him that question.
Q. Well, maybe you can just help me a little bit on the hierarchy. My understanding is that the general manager of Rick's Minnesota is Mike Adragna, correct?
A. That's correct.
Q. And he reports to you, correct?
A. That's correct.
Q. And you report to Mr. Langan, right?
A. That's correct.
Q. And there's nobody above Mr. Langan, right?
A. Not -- no, there's a board of directors. And keep in mind that I -- just like myself, I go to



Mr. Langan for guidance sometimes, not necessarily just to have him make a decision. So if he went to somebody else and said what do you think, I can't answer that question for him.
Q. Right. But my question is: Who actually had the decision-making authority to decide to use ClubTrax?
A. That --
MR. EUGSTER: He testified he didn't know.
THE WITNESS: Yeah, I don't know.
BY MS. DRAKE:
Q. Is it your belief that it was Mr. Langan's decision?
MR. EUGSTER: Objection. Asked and answered.
THE WITNESS: I mean, again, you're asking me to assume that you know --
BY MS. DRAKE:
Q. I'm asking you what you believe.
A. What do I believe? I guess I believe that Mr. Langan agreed to it.
Q. Did you participate in the negotiations with ClubTrax as to what the pricing would be on the point of sale system?
A. Sort of, yes.
Q. Why do you say "sort of"?



A. I've just -- when it comes to asking what things are needed, and what I know the fair market value of other things are, then I do help, you know. I've -- I did help negotiate, look, this is too much or too little. You know, we don't need this, we don't need that. Only because of my knowledge of the business and what we have at that location. So to some degree, that is negotiating.
Q. Okay. Who else participated in the negotiations with ClubTrax?
A. Nobody really. I mean, when it came to telling them what was needed, I told them what it was, so ...
Q. Did Mr. Adragna participate in those negotiations?
A. No.
Q. Did you consult with Mr. Adragna about ClubTrax?
A. Mr. Adragna wasn't general manager at the time, if that's what you're getting at.
Q. Did you consult with the -- okay.
Did you consult with whoever the general manager was at that time?
A. We talked about it, yeah.
Q. Was it the general manager's decision whether



to use ClubTrax?
A. No.
Q. When you were the regional manager over Rick's Cabaret Minnesota, did you participate in hiring decisions for the club?
MR. EUGSTER: Objection. That's -- that is duplicative of the previous deposition. You did talk to him about hiring practices already.
MS. DRAKE: Are you instructing him not to answer?
MR. EUGSTER: If you will give me a moment, I will find a page and see if you agree. Could we go off the record for a second?
MS. DRAKE: Sure.
(Discussion was held off the record.)
BY MS. DRAKE:
Q. When you were the general manager at Rick's Minnesota, did you hire anyone -- I'm sorry. Let me ask that again.
When you were the regional manager, did you hire anyone to work at Rick's in Minnesota?
A. Can you be more specific, please?
Q. When you were the regional -- I don't know how else to ask the question.
When you were the regional manager, so after

2004, did you ever hire anyone to work at Rick's Minnesota?

**A. You're saying anyone. Are you saying dishwashers, entertainers? I hired management.**

Q. Yeah. Okay. And what management in particular did you hire? And I don't need particular people's names if that's too hard. What positions did you personally hire for?

**A. Oh, managers and general managers.**

Q. Okay. Did you have any personal responsibility in the hiring process for employees other than the general manager and the managers?

**A. No.**

Q. Are you aware of whether ClubTrax in Minnesota will allow an entertainer to claim less than two dances?

**A. I'm sorry? Am I aware that -- I'm sorry. Say it again. I didn't hear you very well.**

Q. Are you aware of whether ClubTrax in Minnesota will allow an entertainer to claim less than two dances?

**A. Am I aware of it, or are you asking me does it?**

Q. I'm -- I'm asking either way.

**A. Yes, I'm aware that -- that it -- it does not**



**do it.**

Q. Okay. And why doesn't it do it?

**A. Because the first --**

MR. EUGSTER: Objection. Calls for speculation.

BY MS. DRAKE:

Q. Go ahead.

**A. I'm sorry. Because the first two dances are -- they -- they don't get paid commission on their first two dances.**

**Didn't we cover this already in my last deposition?**

Q. We talked about the commission structure generally. My question is specific to ClubTrax. Michael Marr testified that it literally won't let you put in a number less than two for the number of dances that a given entertainer did on a given night.

Were you responsible for having ClubTrax configured in that way?

**A. No.**

Q. Okay. Who was?

**A. I don't know. That was a system adopted from Aloha, from the previous POS system.**

Q. Were you responsible for determining what the commission structure would be for entertainers at



Rick's in Minnesota?

**A. No.**

Q. Who was?

**A. I don't know.**

Q. Who do you believe was responsible for that?

**A. I don't know.**

Q. If you had wanted to change it, could you have?

**A. I don't know. I didn't try.**

Q. So it's your testimony that -- well, let me ask this question: Who was responsible for setting the -- the wages of the employee -- the other employees at Rick's in Minnesota?

**A. They were established before I got there. I don't know.**

Q. Did you ever make changes to the compensation of employees at Rick's in Minnesota?

MR. EUGSTER: "You" being Andy Studebaker?

THE WITNESS: Only to managers.

BY MS. DRAKE:

Q. Did you have to get anyone's approval in order to make those changes?

**A. No.**

Q. And when you say managers, are you referring to the general manager and the various floor managers,



like the kitchen manager and the entertainer -- those -- those different managers?

**A. Well, typically there's only a general manager and then -- there's not really a kitchen manager or entertainer manager. They're all just managers, so ...**

Q. Okay.

**A. So the answer is yes.**

Q. Okay. And you were responsible for setting the compensation rates for those individuals, correct?

**A. Those -- that's correct.**

Q. Who did you understand to have responsibility for setting the compensation rates of other employees?

**A. Well, everybody else pretty much made minimum wage, so ...**

Q. To your knowledge, have there been any changes made in the compensation structure for entertainers since 2004?

**A. Not that I can think of.**

Q. To your knowledge, has the design of the dance dollars changed since 2004?

**A. I think it has. At least a couple of times. I'm -- I can't be for certain. I can't remember.**

Q. Has it changed in the last two years?

**A. I can't be certain. I can't recall.**

guess.

Q. Have you ever -- I'm not sure you answered my question.

Have you ever had a situation where you were concerned that there was not enough money in that account to cover a certain expense?

**A. Again, I've never been in a situation where I can say that I was -- thought about it.**

Q. What other kinds -- who else had signing authority on that bank account?

**A. Mike Marr.**

Q. Did he have a limit on his authority?

**A. He -- you know, I don't know. Oh, wait. I'm sorry. I'm sorry. Not -- not on the payroll account, no. He did not have signing authority on that.**

Q. Were there two separate accounts, a payroll account and another account?

**A. There was a manager account at the time, but I can't recall if it's still open or not. We had some fraud with it.**

Q. When you say there was a "manager account," was that an account that all the managers had authority over?

**A. No. That was just what we called it.**

Q. Who had authority over the manager account?



**A. Mike Marr. Who had signing rights on it or authority? Be more specific.**

Q. I'll -- I'll just see which between the two. Let me ask this question first, though.

To you, what's the difference between authority and signing rights?

**A. Well, somebody that can sign on the account -- I guess my question is: Are you asking me who originated the account or who can sign on the account?**

Q. Well, why don't we start with who originated the account.

**A. I don't know.**

Q. Okay. Who can sign on the manager account?

**A. And, again, I'm -- let me clarify here that I don't know for a fact that we still use that account, so I'm going to reference back when we did.**

**Who had authority was Mike Marr, and that's -- I can't recall. I may have -- I may have had signing authority. I don't recall. It's been a while since that account was around I believe.**

Q. Okay. Aside from the payroll account, presumably the payroll account's just used for payroll, right?

**A. Yeah, presumably.**



Q. Okay. Well, did you ever use the payroll account for anything else?

**A. No.**

Q. And, to your knowledge, you were the only person that had the authority to sign checks out of the payroll account, correct?

**A. Correct.**

Q. And then the other account that you talked about that belonged to RCI Entertainment Minnesota was what you referred to as the manager account, correct?

**A. Correct.**

Q. Okay. And that was the account where you know Mike Marr had authority and you're not sure, you may have had authority or not, it's been a while, correct?

**A. Yeah, I can't recall. Yeah.**

Q. Okay. Are there any other bank accounts that are maintained by RCI Minnesota?

**A. Not that I know of.**

Q. From 2004 to the present, have there been any other accounts that were maintained by RCI Minnesota?

**A. Not that I can recall. Keep in mind, we had some fraudulent stuff, so I can't remember if we opened another account for the manager account, replaced it.**

**So you understand what I'm saying?**



Q. Yeah. I understand there may have been more than one manager account and --

**A. Right.**

Q. -- and, you know, not -- it's not necessarily the same bank account, but my point is always a payroll account and some kind of manager account.

**A. Correct.**

Q. But no other kind of accounts --

**A. No, no.**

Q. -- correct?

**A. No other accounts.**

Q. Okay. Okay. How does the club currently pay its expenses without a manager account?

**A. Again, I'm not saying there's not a manager account. I'm assuming that it's shut down and we didn't open another one. I'm not sure if Mike Marr had it reopened or not. I can't recall.**

**So how does it currently pay its expenses? I don't know. I don't write expense checks.**

Q. Who does?

**A. I don't know who's writing them right now.**

Q. So you -- you're the regional manager. Your job is to consult with the club and make sure that expenses are being managed properly, but you don't know who pays the expenses, correct?

**A. That's correct.**
Q. And you don't know what account they're paid out of?
**A. No.**
Q. And you don't know where the money comes from to pay them?
**A. Correct.**
Q. Who would know those things?
**A. That, I'm not even sure. You'd have ask probably Eric Langan.**
Q. In your first deposition, I asked you some questions about the entertainer handbook.
**A. Okay.**
Q. About the employee handbook. Excuse me.
Do you remember that?
**A. Yes.**
Q. One question that I didn't ask you is: Do you know where that came from?
**A. Which -- can you -- which --**
Q. I think there's a copy of it the court reporter has there. It says Employee Handbook on the front.
MR. EUGSTER: What exhibit?
MS. DRAKE: It was Exhibit 1.
THE WITNESS: I don't know. I have Exhibit 1



is a form 10-K. I've got an Exhibit 8.
BY MS. DRAKE:
Q. I think the court reporter probably has remarked. It will have an old Exhibit 1 sticker on it.
**A. I don't see that. But I think this is -- I know what you're talking about. I know. I have it here.**
Q. Okay. You do have it there?
**A. Yeah, I believe.**
Q. Can you tell me what the exhibit number is on your end?
**A. Eight.**
Q. Okay. So Exhibit 8 in this depo was Exhibit 1 in your previous deposition.
Do you see the old exhibit sticker on there, or has it been covered up?
MR. EUGSTER: Do you have a copy of this, so we know what you're talking about?
MS. DRAKE: You have it in front of you. The one that says Studebaker Deposition Exhibit 1.
MR. EUGSTER: I understand. Just making sure what we talked about.
THE WITNESS: No, there's no old exhibit number on here.



BY MS. DRAKE:
Q. There's no old exhibit number. What's the old Bates number at the bottom?
**A. NKA0000079, which is an Equal Employment Opportunity statement.**
Q. I'm concerned that you may not have the whole thing, but let me --
MR. EUGSTER: Did you tell me NKA?
MS. DRAKE: Yeah. What I've got as NKA No. 514.
MR. EUGSTER: Which is our Bates.
MS. DRAKE: Your Bates is --
MR. EUGSTER: Yeah, I know.
THE WITNESS: Oh, wait a second. Here's something else. No, I don't have 514.
BY MS. DRAKE:
Q. What are -- sorry. We're trying to do this remotely, and it got a little confusing because we had changed locations at the last moment.
**A. Okay. I don't have that one.**
Q. Okay. Well, maybe what we will do is we'll take a break at some point, and we'll come back to that. Let me just ask you this question, and if you can answer instead of having it in front of you, we'll get it to you.



Did you participate in creating an employee handbook for Rick's Minnesota at any point in time?
**A. No.**
Q. Okay. Did you know that Rick's Minnesota had an employee handbook?
**A. Yes.**
Q. Okay. Do you know where it came from?
**A. I remember we had, actually, attorneys draw one up for us back around 2000. This -- this one is what the attorneys did I believe.**
Q. And what was your involvement in that?
**A. I just listened.**
Q. What were you doing in 2000? Can you just remind me.
**A. I was a manager.**
Q. At Rick's Minnesota?
**A. Yes.**
Q. Whose decision was it to have a handbook in Minnesota?
**A. I don't know.**
Q. Was it your decision?
**A. No.**
Q. I'm going to try again with another exhibit. I'm hoping that you have this one. At the top it says "Entertainer Feature Sales and Attendance Summary."

Page 57

Q. Was it you?
A. No.
Q. If I refer to the form that customers used when they purchased dance dollars, do you know what I'm referring to?
A. There's an old form, yes.
Q. Okay. Did you design that old form?
A. No.
Q. Do you know who did?
A. No.
Q. Do you know where that form came from?
A. No.
Q. You should have another exhibit in front of you which is called "Entertainer Guidelines" on the top, and it has a Bates No. NKA94 on the bottom.
A. I have one Entertainer Guidelines, but it's not 94. Actually, I have --
Q. I think you have --
A. -- two.
Q. You have two. And one of them will have NKA94 on the bottom and it will go through NKA96.
A. I have NKA287 and NAK355. One is marked Exhibit C. One is marked Exhibit D from old stickers. Oh, wait, wait.
Which one is it? NKA what?

Page 58

Q. Ninety-four.
A. Yeah. It's in with another stack of stuff.
Q. Do you have pages 94, 95, and 96?
A. Yes, I do.
MS. DRAKE: Okay. Let's staple those together and mark those as Exhibit 2 if we could.
(Plaintiffs' Exhibit 2 was marked.)
THE WITNESS: Okay.
BY MS. DRAKE:
Q. These are the entertainer guidelines for entertainers in Minnesota, correct?
A. That's correct.
Q. Who came up with these?
A. I don't remember who originally came up with them.
Q. Where did you get them from?
A. Again, they were there before I got there. I know that these are actually -- I'm fairly certain that these are something that the attorneys did originally came up with, but I think there were guidelines already set in place before and they restructured everything.
MR. EUGSTER: Do you know if this is Exhibit 4 from the original deposition? Is this what we got from them?
MS. DRAKE: Yes. Yep.

Page 59

BY MS. DRAKE:
Q. To your knowledge, did you ever make any changes to these from the time that you worked at Rick's in Minnesota?
A. I may have, but I can't recall 100 percent.
Q. Did you ever communicate these to anyone other than the employees of Rick's Minnesota?
A. No.
MS. DRAKE: I think we're almost finished. So why don't we take maybe a ten minute break, and then I'll come back and we can finish.
THE WITNESS: Okay.
(Whereupon a short recess was taken.)
BY MS. DRAKE:
Q. Okay. I just -- can you hear me?
A. Yep.
Q. Okay. Good. So I just have a couple more questions for you.
A. Okay.
Q. You said that one of your responsibilities as a regional manager is to ensure that expenses are kept under control. Tell me what steps you have taken to ensure that expenses are kept under control.
A. Simple things like making sure the air-condition -- or, you know, making sure management

Page 60

knows that the air-conditioner is -- you know, tell them to turn them down at night or whatever. Trying to think specifics. Figuring out pour costs, p-o-u-r.
Q. What does that mean?
A. When we serve liquor, if somebody pours too much liquor in a drink, they're supposed to pour a specific amount. Sometimes you have bartenders that pour too much or if -- if they're giving away free drinks, your pour cost will go up. Your cost of sales basically is what it is. So you can tell those things through a P&L or, you know, your invoices, and relaying that information to management so they can make sure that the bartenders aren't stealing, giving away drinks, that type of thing. That's usually the biggest one you watch.
Q. You talked about an issue that you had, I think, with the water bill.
A. Yeah. Just as an example -- for example, not necessarily direct issue. I was just using that as an example as one of the things that would be watched.
Q. Okay. Do -- have you made any determinations or decisions or participated in any decisions about minimizing the cost associated with payroll?
A. No.
Q. Do you know why Rick's decided to -- and I'm

referring again to the feature sales report that we looked at.

Do you know why Rick's decided to track feature sales specifically?

A. I can't recall why.

Q. Okay.

A. I don't know why. I mean, it's -- it's just information.

Q. Is it fair to say that feature sales are a good revenue stream for the club?

A. I wouldn't say that that's -- I mean, it's a revenue stream. I wouldn't say it's a good revenue stream.

Q. It's just one among many?

A. Yeah. I mean, there's -- I mean, there's so many -- yeah, there's different revenue streams, so it's just another one.

Q. Do you have any responsibilities on the accounting side?

A. No.

Q. In terms of tracking the general ledger or anything?

A. No.

Q. I think one of the other things that you talked about was -- as a regional manager was ensuring



that the club is doing its scheduling appropriately.

What were you referring to?

A. Again, more of an information thing. So if I happen to notice that, you know, a football game's coming up, just to make sure that, you know, letting the managers know, you know, make you're well scheduled, make sure you have enough people for the extra people going to be in town. You know, again, you know, we work as a team, so relaying information of, hey, this is coming up if you didn't know, make sure you're -- you got enough staff on.

Q. Okay. And the person or people that you would be relaying that information to is the managers?

A. Yes. Specifically more -- more than anybody else Mike Adragna.

Q. Okay. And you also said that you -- one of the things that you were in charge of as the regional manager is ensuring that the club is appropriately advertising.

A. Correct.

Q. Tell me about that.

A. I'll give you an example. Right now they're doing an anniversary party. So they called me and asked me, you know, my advice on what -- you know, what would you recommend -- how would you recommend we



advertise it. That kind of thing.

Q. Okay. And do they have an advertising budget for each of the clubs? How does that work?

A. Each of the clubs? You mean for Minnesota?

Q. I'm sorry, for -- yeah.

A. There's no real set budget. They just -- you know, again, it's more of information. So they -- they bring me an idea, and it's either okay yes or no, or, you know, well, let's look at different avenues, that kind of thing. There's no real set --

Q. Who --

A. I'm sorry. Go ahead.

Q. Who pays for advertising for Rick's Minnesota?

A. RCI Minnesota.

Q. And who do they pay for that?

A. I'm sorry. Who -- who do they pay for it?

MR. EUGSTER: Objection. Vague.

BY MS. DRAKE:

Q. Yeah. Do they -- do they make any payments to Rick's International for advertising?

A. No. We pay whoever --

Q. Does Rick's International -- I'm sorry. Go ahead. I'm sorry.

A. We pay like City Pages or whoever the



advertiser is.

Q. Okay. Does Rick's International undertake to do any advertising on behalf of Rick's in Minnesota.

A. Directly?

Q. Yes.

A. No.

Q. Does Rick's of Minnesota pay Rick's International for anything related to Rick's International's Web site?

A. Not that I know of.

Q. To your knowledge, does Rick's International -- well, let me just -- let me restate this.

Is it fair to say, as far as you know, Rick's International doesn't undertake any advertising on behalf of Rick's Minnesota?

A. As far as I know, no. Actually, can you restate that? As far as -- be more specific. Is that -- that's kind of vague. I mean, do they -- do they market --

Q. Well, does Rick's International pay for any advertising for Rick's Minnesota?

A. Oh, no.

Q. You indicated that you had a conversation with Mr. Langan about the fact that you needed to

STATE OF MINNESOTA DISTRICT COURT
COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT
CASE TYPE: CIVIL

- - - - - - - - - - - - - - - - - - - - - - - - -

Eric Zajkowski, Jamilyn Kaminski, Breann Calderone, Aili Sathe, Amanda Eiden, Tiffany Pollard, and Latoya Fuller individually and on behalf of others similarly situated,

Plaintiffs,

vs. Court File No. 27-CV-07-26436

RCI Entertainment (Minnesota), Inc d/b/a Rick's Cabaret,

Defendant.

COPY

- - - - - - - - - - - - - - - - - - - - - - - - -

30.02(f) DEPOSITION OF DEFENDANT DESIGNEE

ANDERSON STUDEBAKER

Taken June 10, 2008

Commencing at 10:10 a.m.

REPORTED BY: JAYNE M. SEWARD, RPR

PARADIGM REPORTING & CAPTIONING INC
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402
(612) 339-0545





Deposition of ANDERSON STUDEBAKER taken on the 10th day of June, 2008 commencing at 10:10 a.m. at the law firm of Nichols Kaster & Anderson, PLLP, 4600 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota, before Jayne M. Seward, Registered Professional Reporter and Notary Public of and for the State of Minnesota.

* * APPEARANCES * *

On Behalf of the Plaintiff:

E. Michelle Drake, Esquire
Steven A. Smith, Esquire
Nichols Kaster & Anderson, PLLP
4600 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 256-3200

On Behalf of the Defendant:

Malcolm P. Terry, Esquire
Messerli & Kramer, P.A.
1800 Fifth Street Towers
150 South Fifth Street
Minneapolis, Minnesota 55402
(612) 612-3769

NOTE: The original transcript will be delivered to E. Michelle Drake, Esquire pursuant to the applicable Rules of Civil Procedure.





EXHIBIT 14 tabbies

I N D E X

WITNESS: ANDERSON STUDEBAKER

EXAMINATION:


By Ms. Drake: 6 - 187, 189 - 190
By Mr. Terry: 187 - 189

OBJECTIONS:

By Mr. Terry: 9, 35, 38, 47, 56, 58, 74, 82, 83, 84, 97, 101, 125, 138, 183, 186

EXHIBITS MARKED AND/OR REFERRED TO:

**(Exhibits 11, 16, 17, 25 and 26 to be marked in upcoming depositions)**

EXHIBIT 1: Rick's Cabaret Employee Handbook - Revised: September, 2004..............102, 126
RCI 000001 - 000017

EXHIBIT 2: Customer signoff re Dance Dollar purchases..........................................89
RCI 000038

EXHIBIT 3: Dance Dollars Redeemed During Employment.................................93, 94, 95
RCI 000039

EXHIBIT 4: Entertainer Acknowledgment..........108, 113, 116, 130, 131
RCI 000040 - 000042

EXHIBIT 5: Entertainer Checkout.........50, 57, 61, 150, 161, 178, 190
RCI 000046

EXHIBIT 6: Dances Paid Out.. 45, 47, 48, 50, 94, 95
RCI 000048 - 000055







EXHIBIT 7: Login Report 11-1-06 - 5-31-07.......134
RCI 000026 - 000031

EXHIBIT 8: Employee Event Log 5-1-08 ... .......138
RCI 000032

EXHIBIT 9: Current Earnings Report 1-1-07 to 5-31-07..........................139
RCI 000033 - 000035

EXHIBIT 10: Manager Accounts form...............140
RCI 000036 - 000037

EXHIBIT 12: Current Earnings Report 1-1-07 to 12-31-07..........................145
RCI 000063 - 000064

EXHIBIT 13: Login Report of Employees 12-25-06 - 1-8-07.....................142, 157
RCI 000065

EXHIBIT 14: Payroll records.....................144
RCI 000066 - 000070

EXHIBIT 15: Payroll records. .........146, 156, 157
RCI 000113 - 000126

EXHIBIT 18: Labor Report (payroll) 5-15-06 - 5-28-06................152, 155, 156
RCI 000175

EXHIBIT 19: Combined Payroll Report 5-29-06 - 6-11-06...........................155, 189
RCI 000176

EXHIBIT 20: Entertainment Revenue Report 10-17-05 - 10-30-05.......................156, 158
RCI 000221

EXHIBIT 21: Monthly Wage Income form...........159
RCI 000316

EXHIBIT 22: Proper Entertainer Conduct.....116, 120
RCI 000396 - 000397

A. I believe it was December of '99 I came here, '03 went back to Houston, '05 came back here.
Q. Now, you have described yourself as working for Rick's. It's my understanding that there are two separate corporate entities. One is RCI Entertainment (Minnesota), the other is Rick's Cabaret International, Incorporated. Which company or both have you worked for?
A. I currently work for Rick's Cabaret International -- how did you describe it?
Q. It's my understanding there are two separate corporate entities. One is Rick's Cabaret International, Incorporated and one is RCI (Minnesota). Which one do you currently work for?
A. I get paid out of one and I work for the other.
Q. Which one pays you?
A. Rick's Cabaret International.
Q. What do you mean when you say you work for the other when you work for RCI (Minnesota)?
A. I'm the regional manager for that location.
Q. How do you understand that relationship to work between those two entities?
A. One pays me. The other one is the one I'm





over.
Q. The other one you are --
A. Over.
Q. When you say that's the one you are over, do you mean that's the one that you manage?
A. Correct.
Q. Do you manage the operations of Rick's (Minnesota) location on a day-to-day basis?
A. Yes.
Q. And you've been doing that since 2005?
A The second time, yes.
Q. Okay.
A. But also '99 to '03.
Q. When your title I assume from '99 to '03 was general manager or manager, what was entailed in your promotion from general manager to regional manager? What does that mean?
A. At the time we were doing some expanding, so I was given a choice if I wanted to move back to Houston to explore other opportunities. That's kind of what led to that.
Q. That was in 2003?
A. Correct.
Q. Okay. I'm not sure I fully understand your answer. I'm just trying to understand the





difference between a general manager and a regional manager.
A. In my position there's not much difference. I go help open other clubs, that type of thing. That's about the only difference that my position holds.
Q. That's something that a regional manager would do, but a general manager would not?
A. Correct. General manager stays at this location only.
Q. Got it. Very good. What's your educational background?
A. High school -- actually GED.
Q. Okay.
A. I went to another technical school for computer programming, but never finished.
Q. And where do you currently live? What's your address?
A. 13343 91st Place North, Maple Grove, Minnesota.
Q. What's the zip code there?
A. 55369.
Q What's your date of birth?
A. 3-17-74.
Q. Have you ever gone by any names other than





the name you gave today?
A. Andy.
Q. I want to talk a little bit about some different terms that are used in your industry so that we're kind of on the same page when we talk about different things today.
The first thing I'd like to do is just talk about some job titles that I understand are used at Rick's. And maybe actually we should just start by saying when I refer to "Rick's," I'm talking about the Rick's club located in Minneapolis. Is that what you understand?
A. Absolutely.
Q. Okay. What I'd like to do is talk about different job titles and have you kind of give me a job description. Tell me what it is that entertainers do at Rick's.
A. They perform dances for guests.
Q. Okay. Are there other words that are commonly used in your industry to refer to entertainers?
A. Yes.
Q. What are they?
A. Dancer.
Q. What else?

A. Yes, there is.
Q. Where are the stages located? Are they both on the floor?
A. Yeah.
Q. What's in the basement?
A. Dressing room and offices and storage.
Q. Is there a VIP area?
A. Yes.
Q. Where is that located? Is that part of the floor?
A. Correct.
Q. Are there private rooms at Rick's?
A. Not private.
Q. Are they semi-private? Is there some areas where customers can go that's not part of the floor with an entertainer?
A. It's all part of the floor, but it's -- they're partitioned walls. They're six feet tall.
Q. Tell me a little bit about that area and sort of what activities or what's that area for.
A. Some people just don't want to have everybody watch them getting dances, so it's perceived privacy.
Q. What do you call that partitioned area?
A. The Harem Room.





Q. Harem Room, H-A-R-E-M?
A. Yes.
Q. Okay. Is the partitioned area a separate room from the floor or --
A. I wouldn't consider that, no.
Q. Okay. One of the issues in this case is obviously about tips and gratuities. When we talk about those things today, it's important we're on the same page in terms of what we're referring to. Do you consider a tip and a gratuity to be the same thing?
A. Yes
Q. What is a tip?
A. When somebody provides you with money for some service.
Q. Do employees at Rick's receive tips?
A. Yes.
Q. Okay. Tell me how they receive tips.
A. If a server serves a drink, a bartender serves a drink, they generally get tipped on that.
Q. By customers?
A. Correct.
Q. What about entertainers?
A. There is an occasion where an entertainer will get tipped above what she's paid for a dance,





but it's rare.
Q. How does it work when entertainers spend time with a customer in the Harem Room?
A. The guest is charged an hourly fee or half-hour fee, and then the entertainer is also given a specific amount of money for the half hour or the hour.
Q. How does a guest pay for -- if I'm understanding, are there two separate charges for time in a Harem Room, one for the room and one for the entertainer?
A. Yes.
Q. Okay. Let's focus on the payment for the room.
A. Okay.
Q. How do guests pay for the time in the Harem Room?
A. Cash or credit card
Q. Can they use Dance Dollars to pay for that time?
A. No
Q. And what is the rate for that time?
A. For half hour it's 75, for an hour it's -- wait a minute. 150, I believe.
Q. Then you said there's also a charge for





the entertainer.
A. Correct.
Q. How do guests pay for the entertainer's time?
A. Again, with credit card or cash.
Q. Can they pay with Dance Dollars?
A. Yes.
Q. And what is the fee for that?
A. 160 for half hour, 300 for an hour.
Q. How many Dance Dollars?
A. Eight or 15.
Q. Eight if it's for a half hour, 15 if it's for a full hour?
A. Correct.
Q. We have talked about Dance Dollars, and I probably should have asked you this before we talked about them. What is a Dance Dollar?
A. It's basically a coupon to redeem for a dance.
Q. I'd like to show you an exhibit that I'd like to mark Exhibit 30.
MS. DRAKE: I don't know that I have a copy of this. It's an original Dance Dollar. I'd be happy to make you a copy at the break. I'm sure you've seen them before.

(Discussion off the record.)
(Deposition Exhibit No. 30 was marked for identification.)
BY MS. DRAKE:
Q. Showing you what's been marked as Exhibit 30, is that a Dance Dollar?
A. Yes.
Q. And that's a Dance Dollar from Rick's, correct?
A. Correct.
Q. Would you agree with me that the exhibit sticker has been placed in such a way that it doesn't block any text on the dollar itself; there's just white in that area?
A. Yes.
Q. How do customers purchase Dance Dollars?
A. They can get them from a server or bar staff, credit card, ID and tell them how many they'd like.
Q. Are servers and bar staff the only people who can sell Dance Dollars to customers?
A. If they prefer to get them from a manager, a manager could sell them, but the process would be the manager would have to go to the bartender or server.





Q. Do customers fill out any forms when they purchase Dance Dollars?
A. Yes.
Q. Would you refer to Exhibit 30 as a Dance Dollar or would you refer to it as 20 Dance Dollars or how do you refer to that?
A. This is a Dance Dollar.
Q. How much does a Dance Dollar cost?
A. The guest?
Q. Yes.
A. It costs $22.
Q. 22 U.S. dollars?
A. Correct.
Q. You indicated earlier that one of the occasions on which an entertainer might receive a tip is if she is paid something above the price for a dance. What do you mean when you refer to a dance?
A. I guess I don't understand how to explain a dance exactly. It's a performance for one song
Q. Okay. Well, let me try to see if I can do it this way. Do entertainers perform some dances on stage?
A Yes.
Q. Do customers pay entertainers to perform





dances on stage?
A. They can tip them for that.
Q. Is that another way an entertainer might receive a tip from a customer?
A. Correct.
Q. Can a customer also purchase a personal dance from an entertainer?
A. Yes.
Q. Is another word for a personal dance a lap dance?
A. Yes.
Q. Are those dances also referred to as table dances?
A. They can be, yes.
Q. Table dance, lap dance, personal dance, those are all the same thing?
A. Yes
Q. How would a customer go about purchasing a personal dance?
A. Get an entertainer to come over, ask her to do a dance, and at the end of the dance they give them either a $20 bill or a Dance Dollar.
Q. Okay. When you refer to a dance, you're referring to a personal dance, correct?
A Correct.





Q. Not a dance that's performed for everyone in the club from the stage?
A. Right.
Q. What is a shift fee?
A. I have no idea.
Q. Have you ever heard employees refer to a shift fee?
A. No.
Q. Have you ever heard the phrase "shift fee" used in your industry?
A. Yes.
Q. What does it refer to in your industry?
A. Typically if you work at a club where you're an independent contractor, you would have to pay a fee when you walk in the door or at some point to essentially rent the space so you could perform dances. It's also called rent, tip out, house fee.
Q. Has Rick's ever charged a shift fee --
A. No.
Q. -- to your knowledge?
What is a theme night?
A. A theme night would be a special event of some sort, dress up, similar to like Halloween or something, but a specific theme to whatever it is that the event is

Q. Now, there are two columns. One is titled "Number of Dances," and the next one is "$ Amount." Can you kind of walk me through how those columns are supposed to be filled in?

A. Number of dances is the actual physical number of dances they do. If they did two dances, five dances, ten dances. The cash amount is the actual amount. So if they did five dances, $100, six dances, $120.

Q. Okay. So in the number of dances column, the column on the left, there's a blank that says "Cash," colon, and a blank. Are they supposed to fill in the number of dances for which they receive $20 in cash?

A. Correct.

Q. And then the space below that says "Dance$," colon. Are they supposed to say the number of dances they did for Dance Dollars?

A. Correct.

Q. And then the total is the number of dances for cash and plus the number of dances for Dance Dollars?

A. Correct.

Q. Dollar amount, will that always be the number in the number of dances column multiplied





by 20?

A. Yes.

Q. Then there's a space for tips. How is that supposed to be filled in?

A. That's any random tips they might have received from on stage, for example.

Q. How are tips which were received as Dance Dollars supposed to be incorporated into the tips?

A. Well, an entertainer wouldn't receive a Dance Dollar as a tip.

Q. Why not?

A. Because it's in trade for a dance.

Q. Actually it's a what for a dance?

A. In trade for a dance. You're trading a Dance Dollar for a dance.

Q. So an entertainer would never dance on stage and receive a Dance Dollar in her garter?

A. I suppose it's possible, but I have never seen it happen.

Q. Would an entertainer ever perform a private dance for a customer and receive two Dance Dollars from customer?

A. That's possible.

Q. Would you agree with me that that second Dance Dollar could be a tip?





A. Or used as a future dance. Theoretically, yes.

Q. What about the Dance Dollar received in the garter; you would agree that could be a tip as well for a stage dance?

A. Or used for a dance later on too. It should never be a tip. Put it that way.

Q. Are customers informed in some way that a Dance Dollar cannot be used as a tip?

A. On the Dance Dollar it states that. It states that it's -- it states that it has no cash value, so typically you would think of a tip being cash, but not necessarily.

Q. I understand that there's language on the Dance Dollar itself. Are customers told anything about the way they can use Dance Dollars aside from what is written on the Dance Dollars themselves?

A. When they're handed the Dance Dollars, they're told that they're used for dances.

Q. Okay.

A. And on the sheet that they sign.

Q. Okay. What are employees instructed to tell customers when they sell them a Dance Dollar about how Dance Dollars may be used?

A. Exactly what I just said. That they're





used for dances. That if they don't use them all, they can be taken off the tab.

Q. Could a customer give an entertainer -- well, let me start that question again. A customer who has spent time with an entertainer in the Harem Room, could a customer give that entertainer Dance Dollars in excess of the charge for her time as a tip?

A. Yes.

Q. Can entertainers exchange Dance Dollars at the cage for U.S. currency?

MR. TERRY: Objection, speculation.

BY MS. DRAKE:

Q. You can answer.

A. No.

Q. Why not?

A. Because legally they have to claim all their dances to pay their taxes.

Q. I don't understand your answer. And it's my fault, not yours. So an entertainer ends the night. She has, say, ten Dance Dollars in her hand. What does she do with those?

A. She fills out this form, goes to the cash cage, they go through the process of what's explained here on the bottom, and they are given