STATE OF MINNESOTA DISTRICT COURT

COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT
CASE TYPE: CIVIL

---

Eric Zajkowski, Jamilyn Kaminski, Breann Colderone, Aili Sathe, Tiffany Pollard, And Latoya Fuller individually And on behalf of others Similarly situated,

Plaintiffs,

EXHIBIT 15

V.

RCI Entertainment ( Minnesota), Inc., d/b/a Rick's Cabaret, and Rick's Cabaret International, Inc.,

Defendants. COURT FILE NO. 27 CV 07-26436

ORAL DEPOSITION

TRAVIS REESE

DECEMBER 10, 2008

ORAL DEPOSITION OF TRAVIS REESE, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on December 10, 2008, from 9:20 a.m. to 10:57 a.m., before Dana Richardson, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Merrill Legal Solutions, 315 Capitol Street, Houston, Texas 77002, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Job No. 1601-89710

Whatever it was, Eric -- Eric worked for that company.

Q. Okay. And what job responsibilities have you had during the time that you've worked for Rick's? Can you just kind of walk me through what positions you've held since you started working there?

A. My main job responsibilities have always been IT or computer related.

Q. Is that true today?

A. It is. In addition to that, I -- I also fly the company's aircraft.

Q. Okay. Tell me sort of what scope of IT slash computer related activities you're responsible for.

A. Basically anything that involves the corporate office with regards to IT.

Q. What kinds of things does that entail?

A. Managing the company's local area network, backups, local office PCs, the company's intranet and internet sites.

Q. What responsibilities do you have that might relate to Rick's Cabaret in Minnesota?

A. I do not have any that relate to Rick's Cabaret in Minnesota.

(Interruption)

Q. (By Ms. Drake) Okay. We just had a brief interruption to our video conference. And I believe before the interruption, the question I asked was: What

A. What specifically would you like to know?
Q. What kinds of things have you assisted him with?
A. Primarily issues with e-mail and issues with configuring routers.
Q. What were the issues with respect to configuring the routers? Were those for the Rick's club in Minnesota?
A. They were not.
Q. Okay. Have you provided him or anyone else with assistance on information technology at the Rick's club in Minnesota?
MR. HASKO: Objection, asked and answered.
A. Not other --
MR. HASKO: You can go ahead.
A. Yeah. None other than what I said earlier, which was setting up e-mail accounts for users in Minnesota.
Q. (By Ms. Drake) How do you set up e-mail accounts for users in Minnesota? Do you just get -- how do you get notified that someone new needs an e-mail account?
A. There is a new-hire form on our intranet that somebody would log into and make the request.
Q. And what employees get e-mail accounts?
A. Whichever employee's directors request to have e-mail accounts. And by directors, I'm talking about our regional managers.
Q. Who are -- is Andy Studebaker one of those regional

managers?

A. Yes.

Q. Okay. Does Andy Studebaker have responsibility for the Rick's in Minnesota?

A. I do not know.

Q. Do you know who does have responsibility for the Rick's in Minnesota?

A. I do not know.

Q. Okay. How many regional directors are there?

A. Just a second.

Four.

Q. Okay. And who are they?

A. Bob Glass, Andy Studebaker, Wayne Fenlon and Ed Anakar.

Q. And do you have any sense of what region those individuals are responsible for?

MR. HASKO: Object as irrelevant outside of --

MS. DRAKE: I'm trying to figure out who it is for Minnesota, if he knows some people or not. I just wanted to --

A. The only one that I know for sure what club he's responsible for is Wayne Fenlan.

Q. (By Ms. Drake) Okay. And what club is that?

A. Wayne Fenlan is responsible for XTC in Austin, Rick's in Austin and Rick's in San Antonio.

to communicate their -- their technical requests and graphics requests to the corporate office. For instance, currently a user that works at Club A has an e-mail address on the system and he suddenly starts working at Club B, a way for a regional director to basically let us know that that user has moved from Club A to Club B as opposed to simply sending an e-mail.

Q. Okay. Who makes the decision about what kinds of things are available on the intranet?

A. I do.

Q. Has there ever been any discussion that you've been involved in about making human resources documents available on the intranet?

A. Making human resources documents available on the intranet?

Q. Yes.

A. To whom?

Q. To the people who have access to the intranet with e-mail addresses.

MR. HASKO: I'll object to the form of the question.

A. No. There has been no discussion for providing HR data or documents from the corporate office to any of the users. There --

Q. (By Ms. Drake) And -- I'm sorry, I didn't mean to cut you off. Go ahead.

A. In other words, no information flow from corporate office to the users.

Q. What about in the reverse direction?

A. Yes.

Q. Okay. Tell me about those discussions.

A. We have talked about putting some of the -- again, it's an elimination of paperwork, is what we're looking at. For instance, incident reports, as opposed to filling those out on paper and faxing them in, giving the managers a way to transmit that information electronically through the intranet. Also, like I said before, graphics requests from club employees to our graphics department as opposed to using e-mail for that kind of stuff.

Q. Where do -- for example, the incident report that you just talked about, I -- it's my understanding that's sort of a uniform -- a blank form that people at Rick's clubs use whenever an incident report is appropriate, and then they fax it or e-mail it to the corporate office; is that right?

MR. HASKO: I'll object to the form of the question. It assumes evidence not in -- testimony not in evidence -- evidence not in the record. Sorry.

Q. (By Ms. Drake) I'm sorry. Is that correct?

A. I'm not familiar -- I'm sorry, ask the question one more time.

Q. Well, here's what I -- here's the question I really

want to know: Where does -- how do clubs sort of get things like the incident report form?

A. That, I don't know.

Q. Okay. But -- but you -- it sounds like you do know that there are certain forms of that nature that are being filled out and either faxed or e-mailed to the corporate office on a regular basis.

A. I know for --

MR. HASKO: Object to the form of the question.

Q. (By Ms. Drake) Go ahead.

A. Yeah, I know for a fact that we have incident report forms.

Q. Okay.

A. And, so, we -- we were trying to do those electronically.

Q. Just --

A. We are also -- you know, I have made a request to find out what other forms we have out there that we might be able to submit electronically, but I don't know --

Q. And what --

A. -- I don't know what those are yet. I've not learned anything other than the incident report form thus far.

Q. Who did you make that request to?

A. Ed Anakar.

Q. Why did you make that request to him?

A. As opposed to who?

Q. I don't know what Ed Anakar's job is. I'm not -- so, why -- why is he the person that you asked? Does he have some responsibility in that regard or what's the --

A. Yeah. Ed, for all practical purposes, is the central point of contact for the clubs.

Q. So, is he the one that you've been working with on -- on your efforts to try to streamline this process?

A. Yes.

Q. Okay. How long have you been working on that project?

A. About a month now.

Q. What -- what sort of spurred your interest in that project?

A. You know, again, this is -- it's a project that we've -- that I've had on my -- my agenda for -- for quite some time and am only now finding the time to -- to work on implementing some of this stuff.

Q. Okay. Are there any other -- go ahead.

A. I mean, it's just kind of a logical -- you know, being in my position, I sit there and go, you know, "How can we streamline operations?" It's not a tough -- it's not a revelation to come to that conclusion.

Q. Right. What -- are there any other projects you're working on that relate to the clubs or streamlining things?

A. Just the replication of -- of data and facilitating -- or eliminating paperwork that's faxed in and turning it into electronic, you know, uploaded transmission somehow.

Q. The incident report that you just referred to, who do those go to?

A. We don't have it on -- as far as I know, we don't have it actually online and running yet. So, currently, they don't go to anybody. In other words --

Q. Well, when they get faxed -- when they get faxed in or e-mailed in, where do they go now?

MR. HASKO: Objection, lack of foundation.

A. That, I don't know. I don't know where they go currently, only that they go from the clubs to the corporate office somehow.

Q. (By Ms. Drake) Okay.

A. And it's not -- not through electronic means, that I'm aware.

Q. You don't know who at the corporate office they go to?

A. I do not.

Q. Is there a human resources department at the corporate office or people who are the human resources people, or are they the same as the accounting people?

A. I don't know. I -- we -- we do not have -- I can

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT

CASE TYPE: CIVIL

- - - - - - - - - - - - - - - - - - - - - - - - - -

Eric Zajkowski, Jamilyn Kaminski, Breann Calderone, Aili Sathe, Amanda Eiden, Tiffany Pollard, and Latoya Fuller individually and on behalf of others similarly situated,

Plaintiffs,

vs. Court File No. 27-CV-07-26436

RCI Entertainment (Minnesota), Inc. d/b/a Rick's Cabaret, and Rick's Cabaret International, Inc.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

MICHAEL ADRAGNA

EXHIBIT
tabbies
16

Taken December 5, 2008

Commencing at 1:10 p.m.

REPORTED BY: JAYNE M. SEWARD, RPR

PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402
(612) 339-0545

A. He asked me.
Q. And when did you start working at Rick's?
A. That would have been I believe November of '05.
Q. What was your first position at Rick's?
A. Floor manager.
Q. And what's your current position?
A. General manager.
Q. When did you become general manager?
A. Approximately six months ago.
Q. So in about June of 2008?
A. Before that. May.
Q. Who made the decision to promote you from floor manager to general manager?
A. Andy Studebaker.
Q. Who do you work for?
A. RCI Minneapolis.
Q. How do you know that that's the entity you work for?
A. That's what it says on my paycheck.
Q. Who do you report to?
A. Andy.
Q. And what's his position?
A. Officer of Rick's Minneapolis.
Q. How do you know that that's his position?

A. I do not.

MR. TERRY: Can I make an observation? When you say "the club's," are you referring to RCI Minnesota?

MS. DRAKE: Yes.

MR. TERRY: Okay.

MS. DRAKE: I'm referring to Rick's Cabaret.

MR. TERRY: I just wanted to clarify the record because you've asked him questions about Rick's Cabaret International. "Club" was a new term you used.

BY MS. DRAKE:

Q. You indicated that you are in charge of the entertainers. What does that mean?

A. I hire them.

Q. Do you also have the authority to fire them?

A. I do.

Q. Let's talk about the hiring process for entertainers. How does that work?

A. They come and audition. Afterwards, if they are hired, I bring them down and interview them and fill their paperwork out.

Q. What criteria do you use in deciding

# ***ATTENTION ALL ENTERTAINERS***

PAST DUE FEES WILL NOW BE COLLECTED AUTOMATICALLY FROM YOUR DANCE DOLLARS WHEN YOU CASH OUT AT THE END OF THE NIGHT

*IF THERE IS A PROBLEM FEEL FREE TO DISCUSS YOUR ISSUE WITH KEN OR ED*

EXHIBIT
tabbies
17

P 0198

# No-Show Entertainers

# Will Be Fined

## $50 Tues. thru Fri.

and

## $100 Sat. thru Mon.

**As Per Ed**

EXHIBIT
tabbies
18

P 0202

STATE OF MINNESOTA DISTRICT COURT

COUNTY OF HENNEPIN FOURTH JUDICIAL DISTRICT
CASE TYPE: CIVIL

---

Eric Zajkowski, Jamilyn Kaminski, Breann Colderone, Aili Sathe, Tiffany Pollard, And Latoya Fuller individually And on behalf of others Similarly situated,

Plaintiffs,

v.

RCI Entertainment ( Minnesota), Inc., d/b/a Rick's Cabaret, and Rick's Cabaret International, Inc.,

Defendants. COURT FILE NO. 27 CV 07-26436

EXHIBIT 19

ORAL DEPOSITION

PHIL MARSHALL

DECEMBER 10, 2008

ORAL DEPOSITION OF PHIL MARSHALL, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on December 10, 2008, from 11:16 a.m. to 1:01 p.m., before Dana Richardson, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Merrill Legal Solutions, 315 Capitol Street, Houston, Texas 77002, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Job No. 1601-89710

Q. What employees do you supervise?
A. The accounting department.
Q. How many individuals are in the accounting department?
A. Approximately eight or nine, ten, somewhere in there.
Q. What are those people's job responsibilities?
A. We do the accounting for the publicly held company.
Q. Do you also do the accounting for Rick's wholly owned subsidiaries?
MR. HASKO: I'll object to the extent that's outside of Minnesota. It's irrelevant.
A. Could you ask the question again, please?
Q. (By Ms. Drake) Sure. I guess I should say something that I haven't said earlier. There will be times during the deposition when your counsel will make objections for the record. You can answer my questions unless he instructs you not to.
But my question was: Do you do the accounting for Rick's wholly owned subsidiaries?
A. Yes, yes. We -- we have many wholly owned subsidiaries which we consolidate in our -- in our reporting to the SEC, yes.
Q. Is one of those wholly owned subsidiaries RCI Entertainment, Minnesota?
A. Yes, it is.

returns?

A. I'm not sure.

Q. So, it's not you?

A. No.

Q. Okay. What is the source of the information relied upon for those returns?

A. Our payroll records.

Q. Who -- you also prepare the state liquor tax returns for RCI Entertainment, Minnesota, correct?

A. Correct.

Q. Who in your department prepares those?

A. Again, I'm not sure.

Q. Is there someone in your department besides you who is a CPA?

A. No.

Q. Are there other accountants in your department?

A. Well, I mean, our controller, I would consider an accountant, definitely. He's -- he's -- he's trained as an accountant, has a degree. Otherwise, we don't have any degreed accountants.

Q. Can you run through the identities of individuals in your department and what their responsibilities are?

A. We have three bookkeepers who -- who -- who upload the data from each club. They -- they're assigned different clubs. They -- for their clubs, they -- they record the

revenues and -- and the daily activity. They record the -- the -- the accounts payable, make sure items get paid. We have one -- we have two other non-degreed accountants -- but we'll call them accountants, if you like -- who oversee that -- that -- all of that and then we have a controller and we also have a payroll person.

Q. Okay. Who is the -- of the three -- I think you said that the three bookkeepers are -- individual clubs are assigned to one of the three bookkeepers; is that correct?

A. Right.

Q. What is the name of the bookkeeper to whom RCI Entertainment, Minnesota, is assigned? Is that Latifa Anakar?

A. No. She's payroll.

Q. Okay.

A. I'm not sure who has Minnesota. We have 19 clubs. I don't remember which one has Minnesota.

Q. What are the names of the three bookkeepers?

A. Ashley Langan, L-a-n-g-a-n; LaCheryl Hill; and Jennifer Knauss.

Q. How do you spell Jennifer's last name?

A. K-n-a-u-s-s.

Q. K-n, as in Nancy, a-u-s-s?

A. Right.

Q. And then you indicated that you have two non-degreed accountants who oversee the bookkeepers?

you about the word "we" under "Controls." Do you have that, Exhibit 50?

A. Yes.

Q. And page -- I think it was page 2.

A. Yes.

Q. Does "we" include the wholly owned subsidiaries, if you know?

A. Yes, of course it does. It's -- yes, that's -- it's the filing entity, which includes all -- all consolidated subsidiaries.

Q. Okay. Do the wholly owned subsidiaries operate independently of the other clubs at the locations that they're at?

MS. DRAKE: I'm going to object as to vague, calls for a legal conclusion, no basis for knowledge.

A. My understanding is that they operate independently, yes.

MR. HASKO: Okay. And that's the questions that I have. Thank you.

MS. DRAKE: I have a follow-up.

FURTHER EXAMINATION

BY MS. DRAKE:

Q. What do you mean when you say your understanding is that they operate independently?

A. They don't work together. I mean, they -- each