UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
SABRINA HART, REKA FUREDI and
SUZIANE MOREIRA GUBLER
on behalf of themselves and all others
similarly situated, and the Proposed
New York Rule 23 Class,

Plaintiffs,

- against -

RICK'S CABARET INTERNATIONAL INC.,
RCII ENTERTAINMENT (NEW YORK) INC.,
PEREGRINE ENTERPRISES, INC.,

Defendants.

CASE NO.: 09-CV-3043 JGK/THK

---------------------------------------X

3 Park Avenue
New York, New York

October 7, 2009
9:57 a.m.

Deposition of Defendant, ERIC LANGAN, pursuant to Notice, before Melissa Gilmore, a Notary Public of the State of New York.



Ex. 40A

A P P E A R A N C E S:


NICHOLS KASTER, PLLP
Attorneys for Plaintiffs
4600 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
BY: E. MICHELLE DRAKE, ESQ.
STEVEN ANDREW SMITH, ESQ.
PHONE 877-448-0492
FAX 612-338-4878
E-MAIL drake@nka.com

MEISTER SEELIG & FEIN LLP
Attorneys for Defendants
2 Grand Central Tower
140 East 45th Street, 19th Floor
New York, New York 10017
BY: JEFFREY A. KIMMEL, ESQ.
PHONE 212-655-3500
FAX 212-655-3535
E-MAIL jak@msf-law.com




Ex. 40A

------------------- I N D E X -------------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| ERIC LANGAN | MS. DRAKE | 8 |

DIRECTIONS: PAGES 53, 55, 57, 120, 127

PORTIONS MARKED BY MS. DRAKE: PAGES 18, 25, 32, 33, 43, 149, 155, 181

---------------- E X H I B I T S ----------------

| PLAINTIFFS' | DESCRIPTION | FOR I.D. |
|---|---|---|
| Exhibit 1 | Declaration of Ed Anakar | 24 |
| Exhibit 2 | Form 10-KSB | 93 |
| Exhibit 3 | PowerPoint Presentation | 151 |
| Exhibit 4 | Stock Certificates | 156 |
| Exhibit 5 | Rick's Cabaret News & Updates, printed from ricks.com | 159 |
| Exhibit 6 | Career Opportunities, printed from ricks.com | 159 |
| Exhibit 7 | Entertainer Guidelines, Bates numbered H-NKA104 through 108 | 162 |

----------- E X H I B I T S (Cont'd) ------------

| PLAINTIFFS' | DESCRIPTION | FOR I.D. |
| --- | --- | --- |
| Exhibit 8 | Entertainer Guidelines, Bates numbered H-NKA109 through 113 | 166 |
| Exhibit 9 | Entertainer Guidelines, Bates numbered H-NKA100 through 103 | 166 |
| Exhibit 10 | Entertainer Guidelines, Bates numbered NY-NKA416 through 420 | 166 |
| Exhibit 11 | Entertainer Guidelines, Bates numbered NY-NKA421 through 425 | 166 |
| Exhibit 12 | Entertainer Guidelines, Bates numbered H-NKA94 through 99 | 166 |
| Exhibit 13 | Entertainer Guidelines, Bates numbered NY-NKA403 through 404 | 166 |
| Exhibit 14 | Entertainer Guidelines, Bates numbered NY-NKA412 through 416 | 167 |

----------- E X H I B I T S (Cont'd) ------------

| PLAINTIFFS' | DESCRIPTION | FOR I.D. |
|---|---|---|
| Exhibit 15 | Document entitled "Attention: All Entertainers," Bates numbered NY-NKA427 | 167 |
| Exhibit 16 | Document Bates numbered H-NKA114 | 167 |
| Exhibit 17 | Dance Dollars, Bates numbered H-NKA66 | 168 |
| Exhibit 18 | Printout from ClubTrax system, Bates numbered H-NKA175 | 171 |
| Exhibit 19 | Printout from ClubTrax database, Bates numbered H-NKA1 through 24 | 172 |
| Exhibit 20 | Printout of data from ClubTrax system, Bates numbered H-NKA196 through 198 | 173 |
| Exhibit 21 | Press Release, Bates numbered NY-NKA8 through 10 | 174 |



Ex. 40A

----------- E X H I B I T S (Cont'd) ------------

| PLAINTIFFS' | DESCRIPTION | FOR I.D. |
|---|---|---|
| Exhibit 22 | Article posted on ricks.com, Bates numbered NY-NKA5 through 7 | 177 |
| Exhibit 23 | Four-page printout of interview, Bates numbered NY-NKA1 through 4 | 178 |
| Exhibit 24 | Two-page printout of article, Bates numbered NY-NKA11 through 12 | 178 |
| Exhibit 25 | Newsweek article, Bates numbered NY-NKA13 | 178 |

(EXHIBITS TO BE PRODUCED)

FEDERAL STIPULATIONS

IT IS STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing, and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed to before the Court.

- oOo -

E R I C L A N G A N, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MS. DRAKE:

Q. State your name for the record.

A. Eric Langan.

Q. I know you have had your deposition taken before. I just want to go over a couple of basic ground rules.

One is that you need to answer my question audibly so the court reporter can take down your answers. Another is that it's important that you and I not speak at the same time so that she can record what each of us is saying.

If at any point I ask you a question that you don't understand or that's confusing or vague, I want you to tell me. If you answer my question, I'm going to understand that you knew what I was asking and that you answered it truthfully. Okay?

A. Okay.

Q. Finally, if you want to take a break at any point, that's fine, just let us know and

we will do that.
A. Okay.
Q. Mr. Langan, you understand that you are here to give testimony as the corporate representative on behalf of Rick's Cabaret International, Incorporated, correct?
A. Yes.
Q. You are also giving testimony on behalf of RCI Entertainment New York, correct?
A. Yes.
Q. Have you had -- you are the CEO of both corporations; is that correct?
A. The CEO of Rick's Cabaret International, Inc., the president of RCI New York.
Q. Does RCI New York have any corporate officers other than you?
A. No.
Q. And just for purposes of clarity during this deposition, let's call Rick's Cabaret International, Inc., Rick's Cabaret International, Inc., and we will refer to RCI Entertainment New York, just as RCI New York. Is that appropriate?
A. That's fine.

Q. Who, aside from yourself, has a position with RCI New York?
A. No one.
Q. Does RCI New York have any employees?
A. No.
Q. What are the sources of income for RCI New York?
A. It's a shareholder of Peregrine Enterprises, Inc.
Q. The sole shareholder of Peregrine?
A. Yes.
Q. When was RCI Entertainment New York incorporated?
A. I don't recall.
Q. Was it incorporated at the same time that Peregrine was purchased?
A. Sometime before that.
Q. Shortly before that?
MR. KIMMEL: Object to form. You can answer.
A. Sometime before. I don't recall.
Q. Who made the decision to create RCI New York?
A. I did.

Q. Why did you decide to create it?
A. Why did I decide to create it?
Q. Yes.
A. So we could make a purchase.
Q. And was that purchase Peregrine Enterprise, Incorporated?
A. Yes.
Q. Why did you believe you needed to incorporate RCI in order to purchase Peregrine Enterprises?
MR. KIMMEL: Object to the form of the question, mischaracterizes the testimony.
You can answer.
A. I don't recall.
Q. You have not made a decision to unincorporate RCI New York, correct?
A. Correct.
Q. Why not?
A. It has assets.
Q. What function does it serve?
A. It's a holding company.
Q. And what function does it serve?
MR. KIMMEL: Objection to the form of the question, asks for a legal

conclusion.
You can answer.
A. It's a holding company.
Q. Why is it important to own Peregrine through a holding company?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I don't know. Attorneys advised me to form a subsidiary, so I did.
Q. What attorneys advised you to form a subsidiary?
A. Our securities attorney.
Q. And is that Ms. Stanfield?
A. No. Robert Axelrod.
MR. KIMMEL: Don't testify to any more concerning any conversations with counsel concerning the formation of RCI New York.
Q. When did your conversation with Mr. Axelrod occur?
A. I don't recall.
Q. Who else was present?
A. I don't recall.
Q. Where did that conversation take

place?
A. I don't recall. Probably Houston.
Q. Did that conversation occur shortly before RCI New York was incorporated?
A. I don't recall. This was years ago.
Q. What steps did you personally take in order to incorporate RCI New York?
A. I don't recall.
MR. KIMMEL: Speak up a little bit for the court reporter.
THE WITNESS: Sorry.
Q. Who maintains the corporate books and records for RCI New York?
A. Bobby Axelrod.
Q. And what is involved in those books and records?
MR. KIMMEL: Objection to the form of the question.
A. I don't understand what you mean.
Q. What kinds of books and records are maintained for RCI New York?
A. Corporate minutes, stock certificates, typical books and records of a corporation.
Q. You are the sole officer. What is

involved in the corporate minutes for RCI New York?

MR. KIMMEL: Objection to the form of the question.

Do you understand the question?

A. I can assume what I understand. I mean, what's in corporate minutes? We have an annual meeting every year to elect officers.

Q. Who attends the annual meeting?

A. I do.

Q. Anyone else?

A. I am the sole director, so...

Q. And you, at that annual meeting, elect yourself to be the corporate officer?

A. Yes.

Q. Do you ever consider electing anyone else?

A. Probably not.

Q. You referred to Bobby Axelrod. Is that the same as Robert Axelrod, the attorney?

A. Yes.

Q. What firm does he practice with?

A. Axelrod, Smith & Kirshbaum.

Q. Aside from the stock of Peregrine Enterprises, Incorporated, does RCI hold the

stock of any other corporations?
A. No, it doesn't.
Q. Does it have any other assets?
A. Not at this time.
Q. Has it ever?
A. No.
Q. Has anyone, besides yourself, ever acted on behalf of RCI New York?
A. Not that I recall.
Q. What, if any, actions have you taken as the president of RCI New York with respect to the operations of Peregrine Enterprises?
A. None.
Q. Is it your testimony that you have no say or control over the operations of Peregrine Enterprises?
MR. KIMMEL: Object to the form of the question.
You can answer.
A. As president of RCI New York? No.
Q. Do you have control over the operations of Peregrine Enterprises in some other capacity?
A. As president of Peregrine Enterprises.

Q. And what control do you exercise over Peregrine Enterprises as the president of Peregrine Enterprises?

MR. KIMMEL: Object to the form of the question, seeks a legal conclusion.

You can answer.

A. I don't understand the question.

Q. What do you do as president of Peregrine Enterprises?

A. Whatever needs to be done as president of Peregrine Enterprises.

Q. And what kinds of things?

A. What kind of things?

MR. KIMMEL: Objection, asked and answered.

A. Whatever a president does. I mean --

Q. That's what I'm asking you. As president, what do you actually do?

A. Let's see. I have done banking. I have done -- when we first opened, I hired management. That's what I remember.

Q. Do you have any ongoing communication with the present management of Peregrine?

A. I mean, I was at the club last night. I talked to them, yes.
Q. Do they report to you?
A. Yes, the general manager does.
Q. Who is the general manager?
A. Ken.
Q. Sistrunk?
A. Yes.
Q. Does he report to you directly or indirectly?
A. Both.
Q. And when he reports to you indirectly, does he report to you through Ed Anakar?
A. Yes.
Q. Is there anyone else to whom he reports directly aside from Mr. Anakar?
A. No.
MR. KIMMEL: Give me an opportunity to object before you answer questions.
THE WITNESS: Sorry.
Q. RCI Entertainment, Incorporated, currently owns 19 separate adult entertainment clubs; is that correct?
A. I believe so.

Q. Is there some doubt in your mind as to the number?
A. Well, we just purchased one, and we closed one September 30, so I believe it's 19. It may be 18. It may be 20.
*** MS. DRAKE: Mark that section.
Q. Entertainers at all of the clubs, outside Minnesota, are categorized as independent contractors, correct?
A. I'm sorry?
Q. Entertainers at all of the clubs outside Minnesota are categorized as independent contractors, correct?
A. RCI doesn't have any entertainers.
Q. I understand that RCI doesn't have any entertainers. I'm asking about the clubs. All of the entertainers at the clubs outside --
MR. KIMMEL: You are asking him, in his capacity as the CEO of RCI International and the president of RCI New York, how the entertainers are characterized at the various clubs?
MS. DRAKE: Yes.
MR. KIMMEL: You can answer.
A. RCI New York and Rick's Cabaret



Ex. 40A

International Inc., do not have entertainers.
Q. I understand that.
A. They are subsidiaries.
Q. Is it your testimony that you don't know if the entertainers at all the other clubs are categorized as independent contractors or not?
A. As my capacity as president and CEO, yes. As the president of Rick's Cabaret International, Inc., right, I don't know.
Q. So it's your testimony that, as the CEO of Rick's Cabaret International, Incorporated, you don't know how the entertainers at your clubs are categorized, correct?
A. Rick's Cabaret is only a holding company. We hold stock.
Q. I understand that. And as the owner of the stock in these corporations, it's your testimony that you do not know how the entertainers are categorized, correct? I just want be to be clear on what your testimony is.
In that capacity you don't know, correct?
I would like the record to reflect

that you are looking at your attorney for advice.

MR. KIMMEL: He is not looking at his attorney for advice. He is looking around the room. He can look to me all he wants.

A. I was thinking.

Q. Do you or don't you know?

A. I personally know, yes.

Q. I'm asking in your capacity --

MR. KIMMEL: Objection, seeks a legal conclusion.

You can answer.

A. I don't know if I know in that capacity or not. I don't know what capacity I know in, but I know.

How's that? Is that clear?

Q. So what's the answer to the question? How are they categorized?

A. They are categorized as independent contractors.

Q. Is there some reason that you were hesitant to answer that question?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. Is there a reason I was hesitant to answer? Yeah --

MR. KIMMEL: Lack of foundation, assumes facts not in evidence, but go ahead.

A. I know things in different capacities. So, therefore, when you get to what I know as the president of a holding company, you know, what the holding company knows or doesn't know on a subsidiary level is different than my personal knowledge.

So what Rick's Cabaret International, Inc., needs to know or knows about operations of a subsidiary is different than my personal knowledge, because I am president of certain subsidiaries as well.

So I may know things, but I didn't learn those things in my capacity as president of Rick's Cabaret International, Inc. I learned those things as my capacity of the president of those subsidiaries.

Q. What are your job duties in your capacity as president of Rick's Cabaret International, Inc.?

MR. KIMMEL: Objection to the form.
You can answer.
A. I didn't catch the question.
Q. What are your job duties in your capacity as president of Rick's Cabaret International, Inc.?
MR. KIMMEL: Objection.
You can answer.
A. Asset management, public relations with -- investor relations with our investors, where it's a publicly traded company, cash management. Basically, that's it.
Q. What does asset management entail?
A. Making sure that, you know, the company is getting returns on its assets, our assets aren't being stolen, wasted, not used to the -- to the best benefit of the shareholders.
Q. And what steps do you take to ensure that an asset is being properly managed?
A. That's a very complicated question. You have to be a little more specific.
What steps do I take? I mean, you know, I review books and financials, go through the profit and loss statements, buy assets, sell them, sell underperforming assets.

Q. Aside from selling an underperforming asset, what steps might you take to improve an asset's performance?

MR. KIMMEL: Objection, asked and answered.

You can answer.

A. I would call the president of that corporation, which basically is myself, and say, you know, get down there and do something about the returns on this asset, or I would call, in the case of the subsidiaries where I'm not the president, I would call the president of that corporation and tell him to do the same.

Q. Would you ever say anything more specific than just get some returns on that asset?

A. I mean, I may, you know, brainstorm ideas on what could be done.

Q. Such as what?

A. I don't know. Whatever ideas the current management team at that location would, you know -- I would tell them, you know, go talk to your team, find out what they think we can do, get back with me, and we will make some

decisions.

MS. DRAKE: Let's mark this as Exhibit 1.

(Plaintiffs' Exhibit 1, Declaration of Ed Anakar, marked for identification.)

Q. I would like to direct your attention to the last page of this exhibit. It's Page 6.

A. Okay.

Q. Is this a list of all the wholly-owned subsidiaries of Rick's Cabaret International, Incorporated?

A. As of date of this declaration, yes.

Q. So this list is accurate and correct as of August 26, 2009?

A. I believe it is.

Q. Have any changes occurred since August 26, 2009?

A. Yes.

Q. What change is that?

A. We have purchased -- Rick's Cabaret International, Inc., purchased all the outstanding shares of Cabaret North, Inc.

Q. And where is that located?

A. In Fort Worth, Texas.

Q. Did Rick's Cabaret International, Inc., own some shares in that corporation prior to August 26, and simply purchased the remaining shares?

A. No.

Q. So this was an all out -- this was a new purchase of the stock of a corporation in which Rick's Cabaret International, Inc., had not previously owned stock; is that correct?

A. Correct.

Q. Let's go down this subsidiary list, and I would like you to identify for me all of the subsidiaries which are involved in the adult entertainment nightclub business.

A. Okay. I don't know if I can do that.

*** MS. DRAKE: Mark this section.

A. I could tell you which ones I know for sure are, but I can't tell you I'm naming them all.

MR. KIMMEL: Just answer the questions to the best of your ability.

A. XTC Cabaret, Inc., W.K.C., Inc., Trumps, Inc., Top Shelf Entertainment, LLC. Also, Texas S&I, Incorporated, is no longer a

corporation. I just noticed that on here. That corporation was sold, but I don't remember the exact date.

Spiros Partners Limited, RCI Entertainment Texas, Incorporated, RCI Entertainment San Antonio, Incorporated, RCI Entertainment Northwest Highway, Incorporated, RCI Entertainment Minnesota, Incorporated, RCI Entertainment Las Vegas, Incorporated, RCI Entertainment Fort Worth, Incorporated, Playmates Gentlemen's Club, LLC, Peregrine Enterprises, Inc., Miami Garden Square One, Inc., Joint Ventures, Inc. Those are the current.

There's also three corporations had past operations that no longer do, Hotel Development Texas, Limited, Broadstreets Cabaret, Inc. and Bobby's Novelty, Inc. have had past operations, but no longer do.

Q. Okay. Let's start with Bobby's Novelty, Inc. What were its operations?

A. A club in Houston, Texas. I believe it was called the Wild Horse. I don't recall. It has been several years.

Q. Did that operate as the Wild Horse



Ex. 40A

during the time that it was owned by Rick's Cabaret International, Incorporated?
A. For a very, very brief time.
Q. And then under what other names did it operate?
A. RCI Fort Worth, Incorporated, took over the operations there.
Q. And then what name was used for the club?
A. Several. It has been Rick's Cabaret, Rick's Sports Cafe. It has been XTC Cabaret. It has been Divas Latinas.
Q. Does it currently operate as Divas Latinas?
A. It was closed September 30.
Q. And what happened to Bobby's Novelty, Inc., the corporate entity, when the club was closed?
A. What do you mean, what happened to it?
Q. Does the corporation still exist, Bobby's Novelty, Inc.?
A. Yes.
Q. Has that been sold? It still exists as an ongoing entity?

A. Yes.
Q. Does it have other operations aside from Divas Latinas?
A. No, it doesn't have Divas Latinas. It ceased operations. It has no operations, but it hasn't been --
Q. Hasn't been unincorporated?
A. -- unincorporated.
Q. Okay. Broadstreets Cabaret. What were the operations of Broadstreets Cabaret?
A. Broadstreets Cabaret.
Q. And where is that located?
A. It was located in Houston, Texas.
Q. And when did that club operate?
A. Until May 5, 1998.
Q. And since that time, has it ceased operations?
A. Yes, it had a fire, actually, so it was put out of business.
Q. Hotel Development Texas, Limited, you indicated that that previously had operations, but it does not have them any longer.
What were its operations?
A. The Executive Club Dallas.

Q. Is that club still in operation?
A. No, it's not.
Q. When did it cease operations?
A. We had an ongoing legal battle with the Texas Alcoholic Beverage Commission, and we -- from the previous owners before we purchased it, and rather than fight that court battle, we gave them the liquor license back and dissolved their -- dissolved their lease.
MR. KIMMEL: Can you just read me back the question that was asked, please?
(Record read.)
A. I don't recall the exact date.
Q. What's your best approximation?
A. A year ago.
Q. What name did that club operate under? In other words, what was its name to the public?
A. The Executive Club.
Q. And were any other corporate entities, aside from Hotel Development Texas, Limited, involved in the management of that club or the ownership of that club?
A. Yes, I believe they had -- it was a strange setup. It was operated as a private

club before we purchased it. I don't remember. Obviously, HD Texas Management, LLC, had something to do with it. I think one corporation actually managed and one corporation held the liquor license or something. I can't remember exactly how it was set up.

Q. And who are the corporate officers of Hotel Development Texas, Limited?

A. I don't know.

Q. Are you one?

A. I know I was at one point, but I don't know if I still am or not. I don't recall.

Q. Joint Ventures, Inc., what operation -- what club operations is it involved in?

A. XTC South.

Q. And where is that located?

A. South Houston, Texas.

Q. Is that club still in operation?

A. It's closed for remodeling currently, but yes.

Q. Who are the corporate officers of Joint Ventures, Inc.?



Ex. 40A

A. I am.
Q. And what positions do you hold?
A. President.
Q. Is that a wholly-owned subsidiary?
A. Yes.
Q. Are all of the subsidiaries listed on this page wholly owned?
MR. KIMMEL: Objection to the form.
Do you mean by RCI International?
MS. DRAKE: Yes.
A. I'm not sure.
Q. Are there particular ones that you are not sure about?
A. TEZ Real Estate, LP.
Q. Any others?
A. There's a couple I'm not 100 percent familiar with, you know, I don't recall 100 percent today, so...
Q. Which are the other ones about which you are not sure?
A. Spiros Partners, Limited, Hotel Development Texas, Limited. I don't know about those 100 percent. I think the rest of them are, but...
Q. So with the understanding that the

particular corporations you just named are clubs about which you are uncertain, the rest of the clubs on this list are wholly-owned subsidiaries of RCI International, Incorporated, correct?

A. I'm fairly certain of that, yes.

*** MS. DRAKE: Mark this section, please.

Q. Back to Joint Ventures, Inc. You are the sole corporate officer of that corporation, correct?

A. Correct.

Q. And who is in charge of management at XTC South?

A. No one right now. It's closed.

Q. When did it close for remodeling?

A. Sometime around the end of September.

Q. Prior to that time, who was responsible for management?

A. Bob Glass, Robert Glass.

Q. By whom is Mr. Glass employed?

A. I'm unsure.

Q. Sorry?

A. I don't know.

Q. Who hired Mr. Glass?

A. I don't recall. He worked for the company for -- worked for different subsidiaries, I should say, for -- before I worked for Rick's, he worked for Rick's so...

Q. Do you know if Mr. Glass' e-mail is bob@xtccabaret.com?

A. I believe it was at one time.

Q. And you are uncertain by whom or by which corporation Mr. Glass is employed?

MR. KIMMEL: Objection, compound question.

You can answer.

A. Yes. Yes, I'm unsure.

Q. How could you determine that information, where would it reside?

A. In the payroll records.

*** MS. DRAKE: Mark this section, please.

Q. Does Mr. Glass have management responsibility for clubs other than XTC South?

A. XTC North.

Q. Any others?

A. Well, now he is not at either of those locations, and he is the general manager

of Rick's North in Houston.

Q. Aside from XTC South, XTC North and Rick's North in Houston, does Mr. Glass have management responsibilities for any other clubs?

MR. KIMMEL: Objection to the form of the question, mischaracterizes client's testimony.

You can answer.

A. At this time, no.

Q. Has he during the three years prior to the filing of this lawsuit?

A. I don't recall.

Q. How could one determine whether he has had management responsibilities for other clubs during the three years prior to the filing of this lawsuit?

A. Three years? Payroll records, I guess.

Q. How would the payroll records show what his management responsibilities were?

A. Show where he was paid from. If he was paid from a place, and he is the manager, I would assume he had responsibilities there.

Q. What is Mr. Glass' title?

A. Today, general manager of Rick's Cabaret -- I mean -- yeah, of Rick's Cabaret North of Houston.

Q. Has he held any other titles during the time of his employment?

A. He was regional manager for Houston XTC Cabarets.

Q. Do you know by whom he was employed when his title was regional manager?

A. No, I don't know if he was paid directly from the two subsidiaries, or if he worked for the parent and we billed the subsidiaries for his time.

Q. To whom does he report?

A. Me.

Q. Let's talk about Miami Gardens Square One, Incorporated. What clubs?

A. It owns Tootsies Cabaret in Florida.

Q. And where is Tootsies located?

A. Miami Gardens, Florida.

Q. Does that have any involvement with any other clubs other than Tootsies in Florida?

MR. KIMMEL: Objection to the form.

A. No.

Q. And who are the corporate officers

of Miami Gardens Square One, Incorporated?
A. I am.
Q. Are there any other officers?
A. No.
Q. Who is in charge of management at Tootsies in Florida?
A. Mike Gasperac.
Q. Can you spell the last name?
A. G-A-S -- I don't know. I'm not sure.
Q. Gaspari?
A. Gasperac. It's like, I'm going to guess G-A-S-P-E-R-A-C, something along those lines.
Q. What is Mr. Gasperac's position?
A. General manager.
Q. By whom he is employed?
A. Miami Gardens Square One, Inc.
Q. Who hired him?
A. I did or Ed did.
Q. When you say Ed, are you referring to Ed Anakar?
A. Yes, Ed Anakar. When we opened in 2007, Ed Anakar was the general manager of that location.



Ex. 40A

Q. You referred a couple times to the position of general manager at different locations.

What's the general manager's job responsibility?

A. What's his responsibility? It's too long of a list. He is responsible for the operation of the business; hiring, firing, ordering, marketing, basically everything to do to run a business.

Q. To whom does Mr. Gasperac report?

A. Myself and I guess now Ed Anakar as well.

Q. What is Mr. Anakar's position in Miami Gardens Square One, Inc.?

A. Currently, he doesn't have one.

Q. What is Mr. Anakar's position?

A. His title is director of operations. Basically, he helps -- he helps me in whatever capacity I need him to help me in.

Q. And by whom is he employed?

A. Rick's Cabaret International, Inc.

Q. Does Mr. Glass also report to Mr. Anakar?

A. If I ask Ed to fill in for me to

help me out, he would, but normally, no. I deal directly with the Houston operations myself.

Q. Okay. So is it fair to say, sort of in the hierarchy of things, yes, he reports to Mr. Anakar, but as a practical matter, he really only deals with you?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. No, it's fair to say that if I ask Ed to do something for me, then, you know, he would handle whatever that specific situation is. Not -- in other words, it's not a broad report.

In other words, if I ask Ed to handle, because I'm not able to get down there -- you know, I'm the president of that corporation, so if I'm doing the marketing, for example, and I need ads approved and I don't have time to review them, I may call Ed and say, Ed, hey, can you review these ads and make sure there's no errors and make sure they are okay to go, check the ad rates, make sure we are fine, but that doesn't mean that Bob can

then ask Ed, oh, by the way, can I do this or this or this.

Q. I see.

A. Because Ed would say no, that's not what I'm -- I'm just reviewing these ads, you need to call Eric.

Q. I see. So occasionally, you delegate your authority to Ed, but that's the extent of it with respect to Mr. Glass?

A. Yes.

Q. Peregrine Enterprises, Inc., what operations does that club have?

A. Rick's Cabaret New York.

Q. Any others?

A. No.

Q. And who is the management of Rick's Cabaret in New York?

MR. KIMMEL: Objection to the form.

Q. Who manages the club?

A. Ken.

Q. And that's Mr. Sistrunk?

A. Yes.

Q. Does Mr. Sistrunk report to Ed?

A. Yes. Ed was the general manager of this location prior.

Q. When did Ed cease being the general manager of the Rick's Cabaret New York location?
A. November 2007.
Q. And was it at that time that he became director of operations?
A. No. That's when he became the general manager of Tootsies in New York -- I mean Tootsies in Miami.
Q. Okay. And when did he become the director of operations for Rick's Cabaret International, Inc.?
A. I don't recall the exact date, but sometime after that.
Q. What's your best estimate?
A. Maybe end of 2008.
Q. Who hired Ed to be the general manager of Rick's in New York?
A. I did.
MR. KIMMEL: Before you ask your next question, I just need to take a quick men's room break, so let's take a two-minute break.
MS. DRAKE: Okay. Sure.
(Recess taken.)

BY MS. DRAKE:
Q. Mr. Langan, during the break, you indicated that there was something in your testimony that you wanted to correct.
Do you remember when you said that?
A. Yes, I do.
Q. And you also were discussing whether or not it might be helpful to you to have a piece of paper so that you can sketch out whatever it was that you wanted to correct; is that accurate?
A. I don't need the paper.
Q. Okay. What is it that you wanted to correct?
A. When you were asking me earlier about whether these subsidiaries were wholly-owned subsidiaries of Rick's Cabaret International, Inc., I got confused on it because I was answering yes, they are wholly-owned subsidiaries, but some of them are wholly-owned subsidiaries of wholly-owned subsidiaries.
Q. I see.
A. Not actually wholly owned by the parent company.

Q. They are not direct?
A. They are not direct, right.
Q. I see.
A. And so I wanted to clarify that.
Q. Thank you for your clarification.
Why don't we talk about the ones we have been discussing, specifically Bobby's Novelty, Inc. Is that owned directly by Rick's Cabaret International, Inc., or is that owned by another subsidiary?
A. I believe that is, yes.
Q. It's directly owned?
A. Yes.
Q. Do you understand when I say directly owned, I mean it's owned directly by the --
A. Right, the stock is held by Rick's Cabaret International, Inc.
Q. Okay. Very good.
And what about Broadstreets Cabaret, Inc.?
A. I believe that stock is also held directly by Rick's Cabaret International.
Q. What about Hotel Development Texas, Limited?

A. I'm unsure. On the limited partnerships, I'm unsure exactly how those are all structured.
*** MS. DRAKE: Can you mark this section?
Q. And what about Joint Ventures, Inc.?
A. It is wholly owned.
Q. By Rick's Cabaret International, Inc.?
A. Yes.
Q. And Miami Gardens Square One, Incorporated?
A. It is wholly owned by Rick's Cabaret International, Inc.
Q. And Peregrine Enterprises is owned by RCI Entertainment New York, correct?
A. Correct. Before you go further --
Q. Sure.
A. Also, I'm aware of another corporation that's not listed here.
Q. Oh, great. Okay.
A. It's called End Zone, Inc.
Q. Okay.
A. It's a wholly-owned subsidiary of RCI Entertainment Philadelphia, Inc. Since I



Ex. 40A

testified this was all of them, I wanted to make sure that...

Q. Before the break, I had asked you some questions about the job responsibilities of the general managers at the various clubs.

A. Uh-huh.

Q. I'm trying to get a sense of the corporation hierarchy and sort of how it works.

Does a general manager report either to a regional manager or report directly to you?

A. It's not that simple.

Q. Why don't you explain it to me.

A. Well, some regional managers are general managers of specific locations. Everybody reports to me regardless of any hierarchy, and there is really not a set -- there is really not a set hierarchy other than, in my capacity as president of the subsidiaries, that everyone has to report to me.

Other than that, I will delegate different responsibilities to different people because, as you can imagine, wearing that many hats, I need help when you run this many



Ex. 40A

businesses.
Q. Is it fair to say that all of the regional managers report directly to you?
A. It's fair to say that all the general managers and all the regional managers report to me in my capacity as president of those subsidiaries.
MR. KIMMEL: Can you read back the question and answer for me, please?
(Record read.)
Q. Are you the president of each of the subsidiaries that operates adult entertainment nightclubs?
A. Yes.
Q. Are there any of the subsidiaries which you identified as being involved in the adult entertainment nightclub part of the business that you are not the president of?
A. No.
Q. Do any of those subsidiaries have corporate officers besides you?
A. No.
Q. Are you responsible for hiring all of the regional managers?
MR. KIMMEL: Objection to form.

You can answer. It's vague.
A. I would say yes.
Q. Who is responsible for hiring general managers in the circumstances where the general manager is not also a regional manager?
A. In my capacity as president of the corporations of the subsidiaries, I -- and the operating companies, I hire all general managers.
Q. Who is responsible for determining whether entertainers will be categorized as independent contractors or employees?
MR. KIMMEL: Objection to form, lacks foundation.
You can answer.
A. I don't understand the question. You don't make a decision to hire an independent contractor. I mean, they come in. They say they want to perform services in your business. And you either contract them or you don't.
Q. I'm not sure you answered my question.
A. I'm not sure I understand it then.
Q. Fair enough. My question is who's



Ex. 40A

responsible for deciding that entertainers will be categorized or treated as independent contractors as opposed to employees?

MR. KIMMEL: Again, objection to form, lacks foundation.

You can answer.

A. Again, it's just the industry standard, whatever.

Q. Well, you operate one club where entertainers are categorized as employees, correct?

A. Correct.

Q. So in one instance --

MR. KIMMEL: Before you continue, I'm sorry to interrupt your question.

Can we just have a clarification, you use the term "you," what capacity you are referring to him as? You, are you saying you have one club or you operate one club? Can we just get a clarification what capacity you are referring to?

MS. DRAKE: From my viewpoint, they are all the same. So I'm referring to you. That's what I'm referring to.

MR. KIMMEL: Well, he is here in his



Ex. 40A

capacity as corporate officer of Rick's International, so --

MS. DRAKE: Okay. You can object to my question if you think it's vague.

MR. KIMMEL: And I will, but I assume that you want a clean record, but maybe you don't.

Okay. Go ahead and ask your question.

MS. DRAKE: I think it's perfectly clean.

BY MS. DRAKE:

Q. One of the Rick's Cabaret locations categorizes entertainers as employees, correct?

A. Correct.

Q. And the others do not, correct?

A. Correct.

Q. So in at least one instance, someone made a determination to deviate from the industry standard, correct?

A. No.

MR. KIMMEL: Objection to form of the question.

A. We follow the industry standard.

Q. Is it your testimony that the



Ex. 40A

industry standard varies from location to location?

A. From locale to locale, the laws are different, yes.

Q. Whose responsibility is it to determine which laws are applicable in a given location?

A. The president of the operating subsidiary.

Q. And that would be you, Eric Langan?

A. Yes.

Q. So Eric Langan has determined that, under the laws which are applicable at all of the subsidiaries, except Minnesota, entertainers should be categorized as independent contractors, correct?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. The president of each of those subsidiaries did, yes.

Q. And each -- that person is Eric Langan, correct?

A. Correct.

Q. So to be clear, Eric Langan has

determined that at each location, outside Minnesota, it is appropriate to categorize entertainers as independent contractors?

MR. KIMMEL: Objection to the form of the question, mischaracterizes the testimony.

You can answer.

Q. Correct?

A. In my capacity as the corporate president of those subsidiaries, yes.

Q. What factors did you, Eric Langan, consider in determining whether that classification was appropriate?

A. I don't recall. I'm doing this for 20 years.

Q. Did you consult with counsel?

A. I don't recall.

Q. What plans have you prepared in the event that the industry is required to recategorize entertainers as employees and not independent contractors?

MR. KIMMEL: Objection to the form of the question, assumes facts not in evidence.

You can answer.