A. There is not really a formulated plan. There is a provision of the IRS, Internal Revenue Service Code, that says if the Internal Revenue Service comes in and reclassifies our independent contractors as employees, that we can claim safe harbor for the past treatment, provided that's how we have always treated them.

So it's not really a plan. It's just a -- you know, it's a safe harbor provision of the code that will protect us from any huge liabilities from the IRS.

Q. So it's your testimony that it's not really a plan?

MR. KIMMEL: Objection to the form of the question.

You can a answer.

A. It's not a formal plan, not any formal written plan.

Q. I see. And are you aware that your 10-Ks contain a statement that the corporation has a plan or has prepared plans in the event that the company is required to recategorize entertainers as employees?

A. Yes, I'm aware.



Ex. 40B

Q. And so the plans to which the company is referring in its filings with the SEC is what you just referred to, namely, to seek safe harbor protection from the IRS?

A. Correct, just like what that says.

Q. Has the company prepared any plans in the event that recategorization is required by a court pursuant to the Fair Labor Standards Act?

MR. KIMMEL: Objection to form.

What company?

A. What type -- I don't understand what you are asking me.

Q. Have you, Eric Langan, prepared, in any capacity, any plan for the various corporate entities in the event that a court requires you to reclassify entertainers as employees pursuant to the Fair Labor Standards Act?

A. We haven't formulated a plan, but basically we will probably follow something somewhere to the RCI Minnesota pay structure.

Q. At any point prior to the inception of this lawsuit, did anyone at Rick's Cabaret International, Inc., or RCI Entertainment New



Ex. 40B

York seek legal advice with respect to the
propriety of classifying entertainers as
independent contractors under the Fair Labor
Standards Act or the New York labor laws?
DI MR. KIMMEL: Objection to the form
of the question. Actually, don't answer
that question.
THE WITNESS: Okay.
MS. DRAKE: Are you objecting on the
grounds of privilege, Counsel?
MR. KIMMEL: Attorney/client
privilege.
MS. DRAKE: Are you asserting
privilege as to all conversations
pertaining to legal advice prior to the
inception of this litigation regarding the
classification of entertainers?
MR. KIMMEL: I'm asserting an
objection based on attorney/client
privilege concerning specific
conversations concerning specific subjects
with legal counsel, correct.
MS. DRAKE: Okay. I'm asking, are
you asserting the privilege with respect
to conversations --

MR. KIMMEL: I'm asserting the privilege with respect to the question you just asked.

MS. DRAKE: Okay.

BY MS. DRAKE:

Q. Have you ever had a conversation with any lawyer about the propriety of classifying entertainers as independent contractors under the Fair Labor Standards Act?

MR. KIMMEL: You can answer that question with just a yes or no.

A. I don't recall.

Q. You understand that you are being sued for misclassifying entertainers under the Fair Labor Standards Act, correct?

MR. KIMMEL: Objection to the form of the question. Mr. Langan is not being sued.

You can answer.

A. I'm not exactly 100 percent -- I mean, I know it's regarding the Fair Labor Standards Act, but I mean, I have read several things, and I don't know if we misclassified or not.

Q. You understand that that's the

allegation in this lawsuit?
A. One of the allegations, yes.
Q. And it's your testimony that you don't recall if you have ever consulted with an attorney about the propriety of that classification?
MR. KIMMEL: Objection. Asked and answered. You can answer it again.
A. I talk to attorneys all the time. I don't recall every conversation I have had with an attorney.
Q. Do you recall if you ever talked to Mr. Kimmel about it?
A. Yes, I have talked to Mr. Kimmel about it.
Q. Tell me about those conversations.
DI MR. KIMMEL: Objection, attorney/client privilege. I'm directing you not to answer.
MS. DRAKE: For purposes of the record, I would like to put on the record that it's plaintiffs' opinion that the privilege has been waived. He answered the question about what he has spoken with you about and the substance of those

conversations.

MR. KIMMEL: No, he hasn't. He hasn't testified about the substance of those conversations. Show me in the transcript where he testified about the substance of those conversations.

MS. DRAKE: He did it right now. I asked him if he talked to you about the propriety of classification, and he said yes.

MR. KIMMEL: That's not the substance of the conversations. You can take the position you want. It certainly hasn't been waived.

BY MS. DRAKE:

Q. Aside from Mr. Kimmel, do you recall speaking with any other attorneys about the propriety of classifying entertainers as independent contractors under the Fair Labor Standards Act?

MR. KIMMEL: Now, I'm going to direct the witness not to answer that question if you are going to take the position that answering that question about general subjects of conversations



Ex. 40B

with attorneys waives the attorney/client privilege. So I'm directing the witness not to answer any questions about any conversations, general or specific, with counsel, if that's your position, that such an answer would waive the privilege.

MS. DRAKE: Are you conceding that my position is right? I mean, it's one or the other.

DI MR. KIMMEL: Oh, it's absolutely wrong, but if you are going to take that position, then I'm directing him not to answer.

Q. When was your first conversation with Mr. Kimmel?

DI MR. KIMMEL: Don't answer.

MS. DRAKE: And what's the basis for that objection?

MR. KIMMEL: Attorney/client privilege, if you are going to assert that's a waiver of attorney/client privilege if he answers that question.

MS. DRAKE: That the timing of questions with attorneys -- of conversations with attorneys is

privileged? That's the position you are taking?

MR. KIMMEL: You are asking about timing of conversations with counsel concerning certain subject matters, and it's your position that --

MS. DRAKE: That's wasn't my question.

MR. KIMMEL: You are interrupting me, as usual.

If it's your position that his testimony concerning conversations with counsel concerning general subject matters is a waiver of attorney/client privilege, then, certainly, questions regarding the dates of such conversations would, under your theory, result in a waiver of attorney/client privilege. Therefore, I'm directing him not to answer.

If you would like to change your theory, then we can discuss parameters of what he can testify to concerning conversations with counsel without waiving the privilege.

MS. DRAKE: I will just ask my

question again.

MR. KIMMEL: And I'll direct him not to answer again.

BY MS. DRAKE:

Q. When was your first contact with Mr. Kimmel, period?

A. I don't recall.

Q. Was it before the inception of this lawsuit?

MR. KIMMEL: You can answer that.

A. With Mr. Kimmel directly himself?

Q. Yes.

A. I do not believe so.

Q. Did you have contact with his law firm before the inception of this lawsuit?

A. Yes.

Q. In what capacity?

A. One of the attorneys in his office represented us in the acquisition of Peregrine Enterprises.

Q. Had they represented you on any other matters aside from the acquisition?

A. Not that I recall.

MS. DRAKE: I need just a moment.

Can we go off the record for just a

second?

(Discussion off the record.)

BY MS. DRAKE:

Q. Rick's Cabaret International, Incorporated, through its subsidiaries, owns clubs that operate under several different tradenames.

What are the names under which those clubs operate?

A. XTC Cabaret, Rick's Cabaret, Club Onyx, Divas Latinas, Tootsies, and Cabaret North.

Q. Divas Latinas is closed, correct?

A. Correct.

Q. And Cabaret North was recently acquired; is that correct?

A. Correct.

Q. Who owns those tradenames?

MR. KIMMEL: Objection, calls for a legal conclusion.

You can answer.

A. Rick's Cabaret International, Inc., owns the tradenames Rick's, and then Rick's stars logo's trademark. And I believe Club Onyx is also owned by Rick's. Miami Garden



Ex. 40B

Square One, Inc., owns the Tootsies trademarks.
I don't think anything else is trademarked.
Q. XTC Cabaret is not trademarked?
A. It's generic.
Q. Are there any other -- aside from the trademarks to which you just referred, namely, Rick's and Onyx, are there any other trademarks that are owned by Rick's Cabaret International, Inc.?
A. Not that I recall.
Q. Does Rick's Cabaret International, Inc., have assets other than stock and the trademarks to which you just referred?
A. Cash.
Q. Anything else?
A. Office furniture, some vehicles. That's it.
Q. Do the vehicles include a jet?
A. Yes.
Q. And who uses --
A. Actually, no, that's owned by a subsidiary.
Q. Which subsidiary?
A. RCI Leasing, LLC.

Q. Did you fly here on that jet?
A. No. It's short range.
MR. KIMMEL: Just answer the question.
Q. For what purposes is that jet used?
A. The purpose to use a jet for? For travel.
Q. For whom?
A. Myself, other corporate officers.
Q. Who pays the operating expenses of that jet?
A. It depends on where we fly. Subsidiaries are billed through RCI Leasing.
Q. What other assets does RCI Leasing hold?
A. None.
Q. What are the assets of RCI Holdings, Inc.?
A. Real estate.
Q. What real estate does it own?
A. A lot.
Q. Does it own all of the real estate -- let me ask the question this way so it's more clear.
Does RCI -- is RCI Holdings, Inc.,

the only subsidiary of RCI International, Incorporated, which holds real estate?
A. No.
Q. Which other subsidiaries own real estate?
A. Citation Land, LLC.
Q. Any others?
A. I believe TEZ Real Estate, LP.
Q. What real estate is owned by Citation Land Real Estate?
A. I don't recall all the properties.
Q. What about TEZ Real Estate?
A. That one only owns the Philadelphia real estate, and that's not a wholly owned. I know that for sure.
Q. TEZ Real Estate is not?
A. Right.
Q. Who else owns that?
A. I believe the name is Vince Piazza Family Trust.
Q. Does RCI Holdings -- sorry. Let me withdraw and ask it this way.
Aside from the real estate owned by -- well, does TEZ Real Estate own the real estate where the Philadelphia club operates?

A. Yes.
Q. Is that the only real estate that it owns?
A. Yes.
Q. Okay. Does RCI Holdings, Inc., own the real estate where the rest of the adult entertainment clubs operate?
A. No.
Q. Are you able to specify which club's real estate is owned by RCI Holdings, Inc.?
A. All of it, no.
Q. Are you able to specify which club's real estate is owned by Citation Land Real Estate?
A. All of it, no.
Q. Sorry?
A. Not all of them, no. I don't recall which ones were bought with which corporations.
Q. Is it fair to say that all of the real estate associated with all of the clubs, except for Philadelphia, is owned either by RCI Holdings, Inc., or Citation Land Real Estate, Inc.?
A. No. Some places are leased.
Q. Okay. But insofar as real estate is



Ex. 40B

owned that's associated with a club, it's owned by either RCI Holdings, Inc. or Citation Land Real Estate outside Philadelphia?
A. I believe so, yes.
Q. For the clubs that are leased, is it the -- actually, I will withdraw that question. Okay.
And you are the president of RCI Holdings, Inc.?
A. Yes.
Q. And you are also the president of Citation Land Real Estate, Inc.?
A. Managing member, yes, president.
Q. And what about TEZ Real Estate?
A. Yes.
Q. I notice that in March of 2008, RCI Entertainment Austin, Incorporated, acquired the remaining ownership of Playmates Gentlemen's Club in Austin; is that correct?
A. It sounds about the right time.
Q. And in RCI International's 10-K filing, the statement was made that this acquisition was made to give the company complete control over this entity.
What does that mean?

A. Well, if we were going to dispose of the asset, we had, you know, complete control to do so.

Q. Anything else?

A. Huh?

Q. Was there anything else that was meant by that statement?

A. Complete ownership.

Q. I also noticed that, on June 18, 2008, RCI Entertainment Northwest Highway purchased the assets of North by East Entertainment, Limited, which owned and operated the Platinum Club II.

Does that sound about right, June 18?

A. It sounds about right.

Q. And in the 10-K associated with that purchase, the club stated that, "The main factor that contributes to goodwill in the transaction is the company's ability to rebrand this operation as a Club Onyx to produce more revenues."

What does that statement mean?

MR. KIMMEL: Objection to the form, calls for a legal conclusion.

You can answer.

A. Exactly what it says.

Q. What does that mean?

A. That we feel that it would add value by rebranding that location Club Onyx.

Q. So you purchased a club that was called Platinum, and then it will be rebranded as Club Onyx, and you think that the rebranding process can add value. Is that the upshot?

MR. KIMMEL: Objection to the form, vague.

A. Yes.

Q. What's involved in that rebranding process?

A. Changing the signs.

Q. What else?

A. Changing the music format.

Q. What else?

A. That's the main things of the brand, and how we operate.

Q. What's changed with respect to how the club is operated when a club is rebranded as a Club Onyx?

A. We market in different places. We cater to a different clientele.

Q. Are the same -- is new management installed?
A. Sometimes.
Q. Who makes the decision about whether to install new management?
A. I do in my capacity as president of RCI Entertainment Northwest Highway.
Q. And did you install new management in that particular club?
A. Some.
Q. Who did you hire?
A. We brought in a guy named Junior, who is there now. I don't even know his real name. I should, but he just goes by Junior. He is the main manager there now.
Originally, I brought Joseph Kyle in. That's all I remember.
Q. Is there a blueprint or a business plan or any set of sort of coherent documentation that describes what kinds of steps, particular steps are undertaken when a club is rebranded?
A. No.
Q. How is the information about what is a part of a particular club brand conveyed to

club management?

MR. KIMMEL: Objection to form, lacks foundation.

You can answer if you can.

A. I don't -- I don't know how to answer that question.

Q. Okay. Well, let me ask it more specifically.

You said one of the things that happens is that the music format in a club might be changed if it's being rebranded.

A. Right.

Q. Who would describe to new club management what the music format should be?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. I would or the general manager would.

Q. And would you have some sort of conversation with the general manager about the things that make a club Club Onyx as opposed to some other kind of club?

A. It's kind of common sense, but yes.

Q. Isn't it true that one of the ways

in which Rick's Cabaret International, Incorporated, markets its stock and its value is by promoting itself as a club or as a corporation which has the ability to successfully rebrand purchased strip clubs?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. I'm confused on the question. I mean, Rick's Cabaret International, Inc., is a holding company. We -- yes, we own -- we buy strip clubs. So, you know, through our subsidiaries, yes, we add value by branding -- by rebranding some of those clubs.

Q. And why is it that rebranding alone adds value?

MR. KIMMEL: Objection to the form of the question. Assumes facts not in evidence.

You can answer.

A. Why does rebranding add value? When you take a hammer to a joint and you put McDonald's arches on it, why do more people come there? It's because they know the brand.

Q. Is it important to any one of the

particular brands that there be consistency between the clubs with respect to the customer experience?

A. The consistency between the clubs is basically customer service. I mean, other than that -- and maybe music formats. Other than that, they are all laid out different, they are all separate, and they are all independently operated.

Q. What does that mean, that they are all independently operated?

A. Each club has its own general manager. Each general manager has their own flair, their own way of -- of how they operate a club.

Q. How are those individual flairs -- I don't know what the plural for that is -- how is that expressed?

MR. KIMMEL: Objection to the form.

You can answer.

A. I can't explain it in words. You just have to visit there. If you go to the clubs, you will see, and if you talk to different employees, you will see that each club has a different, you know, personality.



Ex. 40B

It generally comes from the general manager.
Q. Do all of the clubs branded as Rick's Cabaret employ dance dollars?
A. Yes.
Q. And are the dance dollars the same?
MR. KIMMEL: Objection to the form of the question, vague.
You can answer.
A. What do you mean, are they the same?
Q. Do they look the same?
A. I believe they do now, yes, since the lawsuit was filed in Minnesota.
Q. And who made the decision to have the dance dollars all be the same from club to club?
A. I did as my capacity of president of those subsidiaries.
Q. Do the clubs share a web site?
A. Do we share a web site?
Q. Yes. Are all the clubs advertised on a central web site?
A. They are advertised on a web site, yes.
Q. And who made the decision that each club would advertise on the same web site as

the other clubs?

A. I did in my capacity as president of those corporations.

Q. Do all of the clubs share a -- sorry. Let me rephrase this way.

Do all of the clubs make a purchase agreement with ASCAP and BMI for music rights together?

A. If we can save money, yes.

Q. Who made the decision to pool purchasing power?

A. I did.

Q. Do all of the clubs --

A. We would bring -- if someone from another club wanted to join in, we would welcome them in as well.

Q. One of the things that RCI International claims in its 10-K filings with the SEC is that their policy is to maintain high standards for both personal appearance and personality for the entertainers and waitresses.

How is that policy established?

MR. KIMMEL: Objection to the form of the question, characterization as RCII

doing anything.

A. No problem. This is easy.

When you read out of the 10-K and you say RCII, it's not just RCII. Anything that's stated in there says we or I or the company refers to, not just the -- not just RCII, but each and every one of its wholly-owned subsidiaries, and it doesn't mean that every one of those subsidiaries do. It means that maybe only one of the subsidiaries do, but as the company, we means any of those subsidiaries together or individually.

Q. Okay.

A. Because that's what the SEC requires. It has to be plain talk language for investors. So from a legal standpoint, it's different than from a plain talk standpoint.

Q. I understand that, and I read Ms. Stanfield's affidavit to that effect, and I thought that was interesting.

I would like to know, then, for that statement, that the policy is to maintain high standards for personal appearance and personality for the entertainers and waitresses, which subsidiaries does that --



Ex. 40B

which of the entertainment subsidiaries that we identified previously does that statement not apply to?

MR. KIMMEL: Objection to form.

You can answer.

A. It basically applies to all.

Q. How is that policy established for all of the clubs?

A. Through the general managers. It's kind of an arbitrary thing, right?

Q. How is it that the general managers know what are the appropriate standards for personal appearance and personality for the entertainers?

A. I mean, that's just common sense.

Q. Would you agree that it's important to the branding of the clubs that the entertainers be perceived as attractive?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. Beauty is in the eye of the beholder. I mean, it's an arbitrary word "beauty," or, you know, so what one person thinks is beautiful, someone else may not.

So when you say a standard, it's about being presentable. It's about, you know, not necessarily what I would -- I go to the clubs all the time. I see girls that I think are beautiful, and I see girls that I don't find attractive, but, you know, we have management teams that, you know, each of those subsidiaries that decide who is going to work there and who is not.

Q. My question is how is that -- well, let me just restate my question.

Would you agree that it's important to maintaining the brand that the entertainers be perceived as attractive?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. The most important thing to the brand is that we have entertainers.

Q. So why is it in the 10-K that the policy is to maintain high standards for entertainer appearance?

A. Because we want --

MR. KIMMEL: Objection to the form of the question.



Ex. 40B

You can answer.

THE WITNESS: Sorry.

A. Because we have subsidiaries like, for example, Rick's Cabaret New York has a much, you know, higher standard for entertainers than, say, the Rick's in San Antonio. So each club has its own -- own standards, but, overall, we would like to have, you know, a higher standard of, you know, that the girls are -- it's hard to explain in words. I can't tell you.

I mean, like I said, beauty is the in the eye of the beholder, so therefore --

Q. Does the Rick's brand aspire to have the most attractive entertainers of any of the clubs that compete with any particular club in any given location?

MR. KIMMEL: Objection to the form of the question, vague.

You can answer.

A. Once again, beauty is in the eye of the beholder. Do we like being known as having the prettiest girls? Yeah, probably we do.

Q. Another statement contained in the 10-K is, "We prefer that the performers who

work at our clubs be experienced entertainers."

Which of the entertainment subsidiaries does that statement not apply to?

A. All of them would prefer it. It doesn't mean it's a requirement.

Q. You stated in the 10-K, "At all clubs, except for our Minnesota location, the entertainers are independent contractors."

I notice in that particular sentence which uses the word "our," when something doesn't apply to a particular club, that club is singled out. Does that mean that the other times that "we" or "our" is used it applies to all of the clubs?

MR. KIMMEL: Objection to the form, calls for a legal conclusion.

You can answer.

A. Not necessarily but, you know, if we have a specific -- we know specifically that something is different, of course, we are going to put it in there.

Q. And, in fact, that would be your obligation, correct, to identify any particular subsidiaries to whom a given statement does not apply?



Ex. 40B

MR. KIMMEL: Objection to the form of the question, calls for a legal conclusion.

If you know.

A. I don't know.

Q. In the 10-K, it also states, "We often recruit staff from inside the topless industry as well as from large restaurant and club chains in the belief that management with experience in the sector adds to our ability to grow and attract quality entertainers. Management with experience is able to train new recruits from outside the industry."

Which of your entertainment subsidiaries do those statements not apply to?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. It applies to all of them.

Q. And how is the recruitment from within the industry carried out?

A. What do you mean?

Q. Who recruits from within the industry?

A. We run ads. People apply.



Ex. 40B

Q. And who runs those ads?
A. The general managers will run them. If we don't have a general manager, then I will go, in my capacity as the president of that corporation, and look for a general manager.
Q. The clubs that are owned and operated by Rick's -- sorry. Let me rephrase.
The various nightclubs have a central recruiting location on the Rick's Cabaret International web site, correct?
A. At ricks.com?
Q. Yes.
A. Yes. Our subsidiary owns the web site. The parent company doesn't own the web site.
Q. Which subsidiary is that?
A. RCI Internet Services, Incorporated.
Q. And does RCI Internet Services, Incorporated, do anything other than run the web site for Rick's Cabaret International, Inc.?
A. Yes.
Q. What else does it do?
A. It has several web sites that it operates.



Ex. 40B

Q. Such as?
A. CouplesTouch.com, NaughtyBids.com. I can't name all the domains that it owns. There's hundreds of them.
Q. Do the subsidiaries pay a fee to RCI Internet Services, Inc., for the advertising and career opportunities that are posted there?
A. Yes, they all do.
Q. And who is the president of RCI Internet Services, Inc.?
A. I am.
Q. Are there any other corporate officers?
A. I don't recall.
Q. Does RCI Internet Services, Inc., have employees?
A. Yes.
Q. Who is the manager of RCI Internet Services, Inc.?
A. Travis Reese.
Q. To whom does he report?
A. To me.
Q. Who is -- does Andy Studebaker have an e-mail address, andy@ricks.com?
A. I believe so.



Ex. 40B

Q. And who has the e-mail address, anna@ricks.com, do you know?
A. I guess Anna.
Q. Do you know who that is?
A. Anna.
Q. In Florida?
A. Oh, she is a promotions -- promotions girl in Florida.
Q. And who does she work for?
A. Miami Gardens Square One, Inc.
Q. Do you know who she reports to?
A. To Mike.
Q. Who is Sean in New York?
A. Sean in New York? Oh, he is a manager.
Q. And to whom does he report?
A. To Ken.
Q. What about Kate in North Carolina?
A. Kate in North Carolina. I think she is one of the office girls, does the bookkeeping there.
Q. To whom does she report?
A. At the club level? Ken. I don't know Ken's last name.
Q. Not Ken Sistrunk?

A. Not Ken Sistrunk, no.
Q. Is he the general manager of the club in North Carolina?
A. Yes.
Q. To whom does he report?
A. I'm sorry?
Q. And he reports to you?
A. To me, yes.
Q. What about Jennifer M. in Philadelphia?
A. I don't know.
Q. Who has the e-mail address, wayne@ricks.com?
A. Wayne Fenlon.
Q. He is one of the regional managers?
A. Yes.
Q. Does he also have an e-mail address of wayne@xtccabaret.com?
A. I believe he did at one time.
Q. How about robertb@ricks.com?
A. Can you tell me what city?
Q. Dallas.
A. Oh, Robert, okay. Yes, Robert Benella -- Benilla. I don't know how to say his last name.



Ex. 40B

Q. Is he a general manager there?
A. No.
Q. Who is he?
A. He is a manager at the XTC in Dallas.
Q. To whom does he report?
A. To Aaron Frye.
Q. And who is that?
A. The general manager.
Q. And who does Aaron report to?
A. To me.
Q. What about darrell@ricks.com at Fort Worth?
A. He is the general manager.
Q. And to whom does he report?
A. To me.
Q. What about Bob at XTC Cabaret in Houston, is that Bob Glass?
A. That's Bob Glass.
Q. And then how about Ian at Onyx Houston?
A. Ian at Onyx Houston.
Q. Or Rick's Houston.
A. Ian is in Dallas now, I think.
Q. Sorry?

A. I think Ian went to Dallas. They need to update that or that's an old list you got there.
Q. What's his position?
A. He is at Onyx Dallas, and he is also helping me out at XTC in Dallas.
Q. And what is his position at Onyx Dallas?
A. I guess he is kind of becoming a regional manager for Dallas.
Q. What's the difference between what a regional manager does and what a GM does?
A. GM will be specific at one location, and a regional manager may work specifically at one location in a general manager capacity, but then I will also, from time to time, call them to help me out with my duties at individual subsidiaries at other locations. It's tough to be in 19 places at one time.
Q. One of the statements in the 10-K is, "We have a policy of ensuring that our business is carried out in conformity with local, state and federal laws. In particular, we have a no tolerance policy as to illegal drug use. Posters placed throughout the

nightclubs reinforce this policy as to periodic unannounced searches of the entertainers' lockers."

Are there any clubs at which those statement do not apply?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. No.

Q. Entertainers -- the 10-K goes on, "Entertainers and waitresses who arrive for work are not allowed to leave the premises without the permission of management. If an entertainer does leave the premises, she is not allowed to return to work until the next day. We continually monitor the behavior of entertainers, waitresses and customers to ensure that proper standards of behavior are observed."

Are there any clubs for which the statements I just read do not apply?

MR. KIMMEL: Object to the form of the question.

You can answer.

Q. What's your answer?

A. No.
Q. Who is responsible for implementing the policy that entertainers who arrive for work are not allowed to leave without permission of management?
A. The general manager.
Q. How is it that the general manager of each and every club came up with the same policy?
A. I'm sorry. That's not what you -- I thought you meant who was enforcing the --
Q. I think you are right, and I should ask a better question.
Who created the policy?
MR. KIMMEL: Objection to the form of the question.
A. It was created over time. I don't remember.
Q. Did you establish it as president of each of the subsidiaries?
A. On each -- as we added subsidiaries, yes.
Q. Are there guidelines for entertainer conduct in place at -- written guidelines for entertainer conduct in place at each of the



Ex. 40B

clubs?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I don't know.
Q. As president of the subsidiaries which are affiliated with different clubs, do you have any role in determining or establishing entertainer guidelines?
A. If a general manager of that location wants to put together some written guidelines, I will review them, yes.
Q. Have you reviewed the guidelines in place at Rick's in New York?
A. At some point in the past, yes.
Q. Are you aware of which guidelines were in effect during particular time periods?
A. I don't recall.
Q. You don't -- you don't recall whether you are aware or you are not sure which guidelines were in effect when?
A. Exactly.
Q. Okay. Sorry. That's going to make a messy transcript, so let me ask the question again.

I understand you to say that you are not sure which guidelines were in effect at Rick's New York during particular periods of time; is that correct?
A. Correct.
Q. Are you aware that written guidelines have been in place, some form of written guidelines have been in place during the entirety of the operation of Rick's in New York?
A. Yes, I put the first ones in in 2005.
Q. And where did you get the guidelines that you put into place in 2005?
A. I don't remember. I think we just wrote most of them.
Q. Did you get them from another club?
A. I don't recall.
Q. It's possible?
A. I don't recall. I don't remember.
Q. Would it have seemed odd to you to just sit down and start writing them from scratch if you had guidelines in place in other clubs?
MR. KIMMEL: Objection to the form

of the question.
You can answer.
A. No, because it's in my head, what's right and wrong. It's pretty easy.
Q. Is it pretty -- given that they are in your head, is it fair to say that there is a standard set of guidelines for entertainers that you think make for the operation of a successful strip club?
A. The guidelines -- most of the guidelines are more of on a legal basis of what we can -- you know, every city and every municipality, every state all has different rules and different enforcement of those rules or different interpretations of the same rule. And so, therefore, you know, really, we have to kind of write a lot of those guidelines based on -- on what's going on in the local market.
So, you know, it's not necessarily a uniform set of guidelines.
Q. Understanding that the portions of the guidelines which pertain to legal requirements in different locations vary from location to location, is there also a portion of the guidelines which has more to do with the

way that entertainers should conduct themselves in order to make the experience enjoyable for customers?

A. Probably.

Q. And are those principles that you believe apply sort of regardless of location because they define the kind of experience that you would like customers to have at clubs?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. Like I said in my previous deposition with you, is that I, Eric Langan, have a philosophy for this industry and how I think things should be, and so it's only natural, as president of all those subsidiaries, that some of that philosophy bleeds down into each one, yes.

Q. And one of the ways that that philosophy is conveyed to each of the clubs is through the establishment of entertainer guidelines, correct?

A. In some instances.

Q. In your capacity -- well, let me just ask the question this way.



Ex. 40B

Do you use e-mail?
A. Do I use e-mail? Yes.
Q. And do you e-mail with the regional managers?
A. What do you mean?
Q. Do you send them e-mails and do they send you e-mails?
A. From time to time, yes.
Q. Are some of those e-mails about the day-to-day operation of various clubs?
A. Could be, yes.
Q. Do you e-mail with the general managers of the clubs?
A. Yes.
Q. And are some of those e-mails about the day-to-day operations of the clubs?
A. Yes.
Q. Do you, as Eric Langan, have multiple e-mail addresses or just one?
A. I generally just use one e-mail address.
Q. And what is that?
A. Eric@ricks.com.
Q. One of the other statements contained in your 10-K has to do with

compliance policies and credit cards. You know, why don't we mark this and I think it will be a little bit easier for us to do.

MS. DRAKE: Mark this as Exhibit 2.

(Plaintiffs' Exhibit 2, Form 10-KSB, marked for identification.)

Q. This is a copy of the 10-KSB that was filed by Rick's Cabaret International, Incorporated, on September 30, 2008. You will notice the way that these print out, there are page numbers at the bottoms of some of the pages, but not all of them. So I would like to focus your attention to the bottom of the page that bears the page number one. It's the fourth page in of the actual exhibit.

A. Okay.

Q. Do you see that page?

A. Yes.

Q. Okay. I would like you to look at the section at the bottom of the page that states "Compliance Policies/Employees" and is underlined. Do you see that paragraph?

A. Yes.

Q. I would like you to read that paragraph, and I would like to ask you some

questions about it.

A. "We review all credit card charges made by our customers. We have in place a formal policy requiring that all credit card charges must be approved, in writing, by management before any charges are accepted."

Q. I don't need you to read it out loud. I just want you to read it to yourself.

A. Sorry.

Q. The way that I said it, that was a perfectly reasonable thing to do.

A. Okay.

Q. But if you can just read that paragraph to yourself, and just to be clear, we are on the paragraph that says Compliance Policy/Credit Cards.

My first question is, in that paragraph, Compliance Policy/Credit Cards, from the part that says, "We review all credit card charges," to the end where it says, "Management is trained to review credit card charges to ensure that the only charges approved for payment are for food, drink and entertainment."

Are there any clubs at which those statements are not true?

A. Only clubs that wouldn't take credit cards, but I believe that all of them do, so, no.

Q. Who is responsible for training management to review credit card charges?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. I'm responsible.

Q. And where does the formal policy requiring that all credit card charges must be approved in writing reside, in other words?

MR. KIMMEL: Objection to the form of the question.

You can answer.

Q. What does it mean, that that's formal?

A. I don't know. This was written ten years ago. I have reviewed it every year, but --

MR. KIMMEL: Just answer the question.

A. I don't know.

Q. You were starting to say that you review this every year, but you are not sure?

A. I don't remember. I don't know where the formal policy is kept.

Q. Is that something that you convey to the managers of each of your clubs, that that is one of the ways in which the clubs are required to operate?

A. Yes.

Q. I would like you to read the next paragraph which is titled "Food and Drink," and for purposes of the record, this is on the page which bears the number 2 at the bottom, and I believe it's the sixth page into the exhibit.

A. (Witness complying.) Okay.

Q. Are there any clubs at which this is not accurate or for which this is not accurate?

A. It's not that it's not accurate. It just doesn't apply.

Q. Which clubs does it not apply to?

A. The XTCs have no beverage services. Quality wines are available at most locations, but not all locations. Not all of our clubs have restaurants.

Q. Which clubs do not have restaurants?

A. The XTCs only have like frozen foods. I don't know all of them. The Rick's

in Austin doesn't have a restaurant. In clubs that have these things, it's true. In clubs that don't, it's not applicable, so...

Q. What about the next paragraph titled "Controls"?

MR. KIMMEL: You want him to read it?

Q. Yes, I would like you to read it to yourself, and let me know if there are clubs at which it does not apply.

A. (Witness complying.) Okay.

Q. Sorry?

A. Okay. I have read it.

Q. Are there any clubs at which those operational and accounting controls that are described do not apply?

A. No.

Q. And who's responsible for implementing those operational and accounting controls?

MR. KIMMEL: Object to the form.

You can answer.

A. What do you mean by implementing?

Q. Who's responsible for establishing what the controls would be?

A. Oh, I am.
Q. What steps would you take in the event that you learned some of the operational or accounting controls were not being followed?
A. Typically, I fire somebody or I change -- you know, I make changes to make sure that they are followed going forward.
Q. Who have you fired?
A. Nobody recently.
Q. What are the positions of the people who you have fired?
A. Oh, generally, cage staff. We have fired bartenders.
Q. Have you ever fired entertainers?
A. No. I mean, when you say ever, what time frame do you mean? Obviously, I operated clubs 20 years ago myself. I was the only person in the building. So, yes, I have fired entertainers, but not in the last three years.
Q. Have you consulted with general managers about whether they should fire an entertainer in a particular situation?
A. Probably.
Q. Why are you hesitant?
A. I was trying to think of phone calls

that I have gotten in the middle of the night, because, generally, if there is a problem like that, I'm getting a phone call in the middle of the night. So I'm trying to go through my groggy sleep memory and try to remember a specific instance or not. I don't recall anything right off the top of my head, but it is likely.

Q. And you use the term "cage staff." Can you describe who -- what does the cage staff do?

A. Cage staff is just an internal term for each particular club's accounting staff.

Q. And those individuals are not actually accountants, correct?

A. Some have accounting backgrounds.

Q. Actually, I should ask the question differently.

Those individuals are not CPAs, correct?

A. They could be. I don't know. They don't have to be.

Q. The ultimate -- the corporate books for each subsidiary are in accordance with SEC policy maintained and created by RCI

International, correct?
MR. KIMMEL: Objection to the form of the question, calls for a legal conclusion.
You can answer.
A. Daily records are done at each subsidiary on a subsidiary level. Those daily records are then sent to our corporate office to be reconciled into monthly statements or quarterly statements.
Q. And the daily records are what the cage staff is in charge of, correct?
A. Correct.
Q. Do all of the adult entertainment clubs use ClubTrax?
A. Yes.
Q. Who was responsible for making the decision that they would all use ClubTrax?
A. I was.
Q. I would like to direct your attention to the "Advertising and Promotion" paragraph.
A. (Perusing.)
Q. Are there any Rick's Cabaret clubs to which that paragraph does not apply?



Ex. 40B