UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x

SABRINA HART on behalf of herself, all similarly situated, and the Proposed New York Rule 23 Class,

Plaintiffs, Case No. 09-CV-3043 JGK/THK

V.

RICK'S CABARET INTERNATIONAL INC., RCI ENTERTAINMENT (NEW YORK) INC., PEREGRINE ENTERPRISES, INC.,

Defendants.
----------------------------------------x

VIDEOCONFERENCE DEPOSITION of KENNETH SISTRUNK, taken by Plaintiffs at the offices of Fink & Carney Reporting and Video Services, 39 West 37th Street, New York, New York, on Thursday, October 29, 2009, commencing at 10:12 a.m., before Androniki Samaras, a Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.



A P P E A R A N C E S:

(Via videoconference)
NICHOLS KASTER, P.L.L.P.
Attorneys for Plaintiffs
4600 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
BY: E. MICHELLE DRAKE, Esq.
STEVEN ANDREW SMITH, Esq.

MEISTER, SEELIG & FEIN, L.L.P.
Attorneys for Defendants
140 East 45th Street, 19th Floor
New York, New York 10017
BY: JEFFREY A. KIMMEL, Esq.

RICK'S CABARET INTERNATIONAL, INC.
Attorneys for Defendants
10959 Cutten Road
Houston, Texas 77066
BY: BRENDA STANFIELD, Esq.,
General Counsel



K E N N E T H S I S T R U N K, called as a witness, having been first duly sworn by Androniki Samaras, a Notary Public within and for the State of New York, was examined and testified as follows:

EXAMINATION
BY MS. DRAKE:

Q. Please state your name for the record.
**A. Kenneth Sistrunk.**
Q. What is your middle name, or do you have one?
**A. Wayne.**
Q. Mr. Sistrunk, have you ever had your deposition taken before?
**A. No, I have not.**
Q. I'm just going to go over a couple of ground rules so that you know how we will proceed today.
One is that this deposition is being taken by a videoconference. It's not actually being video recorded, so the only record that will exist of the deposition is the record that the court reporter is creating in the form of a transcript. For that reason, it's



important that when I ask you a question, you answer me out loud. It's also important that you answer questions yes or no, instead of uh-huh or uh-uh so that the court reporter can take down your answer, and that it's clear in the future.
Is that okay with you?
**A. Yes.**
Q. It's also important that we try to not talk at the same time as one another so that the court reporter can distinguish our answers. All right?
**A. Okay.**
Q. If at any point you want to take a break, that's fine, just let me know. And I may want to finish asking you a couple of questions, but I will be happy to take a break if and when you need one. Okay?
**A. Okay. Thank you.**
Q. Finally, if I ask you a question that's unclear or that you don't understand at any point, I would like you to let me know. If you answer my question, I'm going to assume that you understood what I asked you and that you've answered it truthfully. Okay?



Ex. 39A

**A. Okay.**
Q. Mr. Sistrunk, where do you live?
**A. Brooklyn, New York.**
Q. I'm sorry?
**A. Brooklyn.**
Q. And what is your address?
**A. 429 Third Street.**
Q. How long have you lived in New York?
**A. In Manhattan or New York State?**
Q. New York State.
**A. Since 1969.**
Q. How are you employed?
MR. KIMMEL: Objection to form.
You can answer.
A. I'm not quite sure what you're asking me.
Q. What is your job?
**A. I'm a general manager.**
Q. Where?
**A. Rick's Cabaret.**
Q. Rick's Cabaret in New York?
**A. Yes.**
Q. Who is your employer?



**A. Peregrine Enterprises.**
Q. Does it say Peregrine Enterprises on your checks?
**A. Yes, it does.**
Q. How long have you been employed as the -- well, let me ask this question: How long have you worked at Rick's Cabaret in New York?
**A. Since June 1, 2005.**
Q. Was that when the club first was acquired by Rick's Cabaret International?
**A. No.**
Q. How did you first come to work at Rick's Cabaret in New York?
**A. I answered an ad.**
Q. And where was the ad posted that you answered?
**A. I don't recall.**
Q. Who did you speak with, the first contact that you had, in response to your job inquiry?
**A. Ed Anakar.**
Q. And what did you understand Ed Anakar's role to be at that point?
**A. That was unclear.**
Q. What kind of position were you



applying for?
**A. Host.**
Q. What is the host position? What did you understand it to be?
**A. Greeting guests.**
Q. Anything else?
**A. Service to the guests in terms of hospitality.**
Q. Okay. And is that the job that you were initially hired for?
**A. That was unclear.**
Q. Approximately how long before you were hired did you first have contact with Mr. Anakar?
**A. I didn't.**
Q. Did you talk to Mr. Anakar before you were hired?
**A. No.**
Q. Did you e-mail with him?
**A. No.**
Q. Who hired you?
**A. Mr. Anakar.**
Q. How did he hire you if you didn't have any contact with him?
**A. I responded to the ad and appeared**



**at the address.**
Q. What happened between when you responded to the ad and when you appeared at the address?
**A. He reviewed my resumé, and then he decided from there.**
Q. And how did you learn that you had been hired?
**A. He said I'm hired.**
Q. And how did he tell you that, on the phone, or --
**A. In person.**
Q. So what did you mean when you said that you didn't have contact with him before you were hired? You just mean that you sent him the resumé and the first contact you had was when he hired you?
MR. KIMMEL: Objection to form.
You can answer.
A. No. I appeared at the address in the ad with my resumé, presenting it to him.
Q. What kind of things did you talk with him about during that initial meeting?
**A. My work history.**



Ex. 39A

Page 9

Q. Anything else?
**A. No.**
Q. Have you worked in the adult entertainment business before you worked at Rick's in New York?
**A. Yes, I have.**
Q. What other clubs have you worked at?
**A. Ten's Cabaret.**
Q. And where is that located?
**A. 21st Street.**
Q. New York City?
**A. Yes.**
Q. Where else?
**A. That's it.**
Q. So Ten's Cabaret and Rick's Cabaret in New York are the only adult entertainment clubs you've worked at?
**A. Yes.**
Q. What was your position at Ten's Cabaret?
**A. VIP host.**
Q. You said that it was unclear what position you were first hired for at Rick's in New York.

Page 10

What did you mean by that?
**A. The club was not open yet, so we needed to finish building the club, hire staff, order equipment, things of that nature, all things that go into the opening process.**
Q. And you were involved in those tasks that you just described personally?
**A. Yes.**
Q. Who else was involved in those tasks?
**A. Evan Darnell.**
Q. Anyone else?
**A. Ed Anakar.**
Q. What about Mr. Langan?
**A. No.**
Q. It's your testimony that Eric Langan was not involved in finishing building the club?
MR. KIMMEL: Object to form.
You can answer.
A. Finish the building, yes.
Q. He was involved in that aspect?
**A. Yes, he was.**
Q. Tell me about his involvement in that aspect.

Page 11

**A. He hired the construction company.**
Q. Did he participate in reviewing plans for the layout of the club?
MR. KIMMEL: Objection to form.
You can answer.
A. If -- that was prior to my arrival.
Q. Did Mr. Langan come to the club to ensure that the work was being carried out according to the plan, to monitor it or supervise it at all?
MR. KIMMEL: Objection to form.
You can answer.
A. Yes.
Q. Tell me about those occasions.
MR. KIMMEL: Objection to form.
You can answer.
A. He was there when I first arrived, speaking with the owner of the construction company and the various foremen, as well as the architect.
Q. What did you understand his role to be?

Page 12

MR. KIMMEL: Objection to form.
You can answer.
A. President of Peregrine Enterprises.
Q. Any other positions that you are aware that he held?
**A. No.**
Q. Did you have any affiliation with Peregrine Enterprises before you began working at Rick's in New York?
**A. No.**
Q. And do you have any -- aside from being an employee of Peregrine Enterprises, do you have a role as an officer or director in that company as of today?
**A. I do not.**
Q. Have you ever?
**A. No.**
Q. Do you have any ownership interest in Peregrine Enterprises?
**A. No.**
Q. You also indicated that one of the tasks that needed to be performed before the club could open was that staff needed to be hired.

Page 13

Tell me a little bit more about your role in that process.

MR. KIMMEL: Objection to form.

You can answer the question.

A. I hired waitresses, bartenders, hosts, doormen, interviewed --

Q. Well -- go ahead.

**A. That's it.**

Q. You were going to say you interviewed someone. Who did you interview?

**A. House moms.**

Q. Did you have any role in finding entertainers to work at the club?

**A. Yes.**

Q. Tell me about that.

**A. Well, entertainers came to us to audition, so I was responsible for conducting the auditions.**

Q. Were you aware of how entertainers knew to come in for auditions? Was there an ad placed, or how was it publicized that the club was looking for entertainers?

MR. KIMMEL: Objection; compound question.

Page 14

You can answer.

A. The entertainers came in response to an ad.

Q. Where was the ad posted?

**A. I do not know.**

Q. Did you have any role in posting or composing the ad?

**A. No, I did not.**

Q. Who did?

**A. I don't know.**

MS. DRAKE: Can we mark that section?

Q. Do you know what the ad said?

**A. I don't.**

Q. How were you first contacted by entertainers who were interested in auditioning? Or were they just told the specific time to come to the club, how did the process work?

**A. They came to the club.**

Q. And what was the audition process?

**A. The young lady would fill out an application. Then she would change into her gown. And with music accompaniment, they would dance a short song, disrobe, and that would be the audition.**

Page 15

**Then once they were dressed, we would sit down, and we would talk for approximately two minutes. And that would be it.**

Q. How would you decide whether or not a given entertainer was appropriate to dance at Rick's or not?

MR. KIMMEL: Objection to form.

You can answer.

A. The criteria was based on appearance and personality.

Q. Was the two-minute conversation kind of geared at making sure that the entertainer had a personality which would be attractive and welcoming to guests?

**A. Yes.**

Q. What kind of things would you talk about in that conversation, or what would you say to the entertainers during that conversation?

**A. I would ask where she's from, what her short-range goals were, long-range goals, other interests outside of this occupation.**

Q. Did you also inquire about previous

Page 16

history working as an entertainer?

**A. Yes, I did.**

Q. Anything else that you asked about?

**A. Not that I can recall.**

Q. Was formal dance training a prerequisite for that position?

MR. KIMMEL: Objection to form; vague.

You can answer.

A. No.

Q. Do you understand that by "formal dance training," I'm referring to classes or experience in a professional dancing environment?

**A. Yes, I understand.**

Q. Was there a preference for entertainers who had some experience working as entertainers in the adult entertainment industry before coming to Rick's?

**A. No.**

Q. Why not?

**A. It wasn't necessary.**

Q. Why not?

**A. I can't say.**

Q. Is it fair to say that someone can



Ex. 39A

be a very good entertainer the first time that they work as an entertainer, it's not something where acquiring skills over time necessarily makes you better?

MR. KIMMEL: Objection to form; calls for speculation.

You can answer.

A. I would say that the applicant's personality could carry them a long way in the environment. If it was an open, warmer, welcoming personality, if they had a natural salesmanship quality about them, as well as a vivacious, warm, sexy personality.

Q. In addition to personality, you indicated that one of the other criteria was appearance.

What things about entertainers' appearance were important in the hiring process?

**A. Sophisticated, sexy, wholesome to some degree, approachable.**

Q. When you say that someone's appearance is "sophisticated," what does that mean?

**A. I'm not sure how to answer that question.**



Q. Do the best you can. It's a word that you used. I'm not trying to -- there's no trick. I'm just truly trying to understand what you mean when you use that word.

MR. KIMMEL: Objection.

Q. Maybe you can give an example of something that would be more or less sophisticated.

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. Okay. Someone with a look such as Cameron Diaz would be sophisticated. Catherine Deneuve would be sophisticated. Someone who would be well put together in terms of how their hair was maintained, makeup, along the classic lines.

Q. Can you give any examples of people who are -- sort of women who are in pop culture who you would not describe as being appropriately sophisticated?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. I'm a little out of touch, so I



would say Britney Spears, that look; Miley Cyrus, that look.

Q. Another word that you used was the word "sexy." Again, I understand that that's subjective, but are there things that you can describe that you would look for in particular that would make an entertainer's appearance more or less sexy?

**A. No. It wouldn't go to appearance; more personality, mannerisms.**

Q. Was it important that entertainers were physically fit?

**A. Yes.**

Q. Was it important that they were not overweight?

**A. Yes.**

Q. Is it important that they didn't have cellulite?

**A. I'm hesitating because that's an issue that women can't get around no matter what, and I can't say that you can't be hired because you have cellulite. I can't do that.**

Q. Is it fair to say that it's a matter of degree?

**A. Yes.**



Q. What about tattoos?

**A. Tattoos can be covered.**

Q. Were tattoos required to be covered for entertainers at Rick's?

**A. Yes.**

Q. What about body piercings?

**A. If it wasn't excessive.**

Q. Then it was acceptable?

**A. Yes. If it was a naval piercing, ears pierced, then it was acceptable.**

Q. But nipple piercings were not okay?

**A. No.**

Q. Sometimes when I ask a question in the negative and then you respond in the negative, it makes for a weird transcript. I'm not trying to confuse you. I want to make sure I'm on the same page, so I'm going to ask the question again.

Do you agree with me that nipple piercings were not acceptable?

**A. Nipple piercings were not acceptable.**

Q. And presumably other piercings on the body were also not acceptable?

Basically it -- let me re-ask the



Ex. 39A

question this way: Anything that wasn't the ears or the naval was not acceptable, correct?

**A. Correct.**

MR. KIMMEL: Michelle, somebody just walked into your room. Is that Steve Smith?

MS. DRAKE: It is.

MR. KIMMEL: Hi, Steve. I'm sure the court reporter wants to know who is present.

BY MS. DRAKE:

Q. In describing what was important about entertainers' appearance, you said to some degree they needed to be approachable. What did you mean by that?

**A. That they have a pleasant disposition.**

Q. So that isn't so much an appearance factor as a personality factor?

**A. Yes.**

Q. What kind of things were you evaluating during the performance that the entertainer would do on stage?

**A. Confidence in movements.**

Q. I'm sorry. Did you say "confidence



and movements" or "confidence in movements"?

**A. In movements. How comfortable she felt.**

Q. I believe when you were describing the audition process, you indicated that the entertainer would put on her gown, dance on stage and then she would disrobe; is that correct?

**A. Yes.**

Q. In practice, when entertainers at Rick's dance on stage, do they disrobe while they're on stage?

**A. Yes.**

Q. How does that system work, when an entertainer is dancing on stage?

MR. KIMMEL: Objection to the form; vague.

You can answer.

A. They will start dancing at the beginning of a song, and they can take the dress off at whichever pace they feel most comfortable within that song.

Q. By the end of the song, does their dress need to be off?

MR. KIMMEL: Objection to the



form.

You can answer.

A. No.

Q. It's your testimony that it would be fine if an entertainer went up on stage and kept her dress completely on for the entire song?

MR. KIMMEL: Objection; asked and answered.

You can answer it again.

A. No.

Q. That would not be acceptable?

MR. KIMMEL: Objection; asked and answered.

You can answer it again.

A. She would not be fined.

Q. I don't -- I'm not sure what you meant by that or that you answered my question. I am trying to understand -- I asked you if that would not be acceptable, and you said no.

What did you mean by that?

**A. Patrons are there to see a lady disrobe on stage. If she does not disrobe, then the patron is not getting what they came to see.**

Q. So the expectation is that when



entertainers dance on stage, they'll take their clothes off, right?

**A. Yes.**

Q. And has it ever occurred that an entertainer has not taken her clothes off while she was dancing on stage, to your knowledge?

**A. Yes, it has.**

Q. And what happened in those situations?

**A. I can't recall.**

Q. Is it fair to say that that was extremely rare?

**A. Yes.**

Q. How many occasions would you guess that that happened on, during the time that you've worked at Rick's?

MR. KIMMEL: Objection to form; calls for speculation.

You can answer.

A. Four.

Q. Have you been involved in the process of determining which entertainers would perform at Rick's since you started at Rick's in 2005?

**A. Yes.**

Page 25

Q. Has the process from 2005 to today remained substantially the same?
**A. Yes.**
Q. Have there been any changes to the process that you just described?
**A. No.**
Q. Have there been any changes to the criteria that are used in determining whether an entertainer is appropriate to perform at Rick's?
**A. No.**
Q. After an audition occurs, how is it conveyed to an entertainer that she is able to work as an entertainer at Rick's?
**A. She goes through an orientation process.**
Q. How is she notified to appear for the orientation process?
**A. It follows the audition.**
Q. Like, it's immediately after?
**A. Yes.**
Q. And who conducts that orientation process?
**A. It's two phases. The first phase is with the house mom.**
Q. And who is the second phase with?

Page 26

**A. With a manager.**
Q. Tell me about the process for the house mom.
**A. The entertainer and the house mom sit together, and the house mom will go over certain criteria and guidelines for Rick's entertainers.**
Q. Are those guidelines written?
**A. Yes, they are.**
Q. Is the entertainer provided a copy of those guidelines?
**A. No.**
Q. Have entertainers ever been provided a copy of the written guidelines?
**A. Yes.**
Q. Starting at the time period when Rick's of New York opened in late 2005; is that correct?
**A. Yes.**
Q. At the time that the club opened, when the first entertainers were beginning to work there, were entertainers provided with written guidelines?
**A. Yes.**
Q. And when after that did the

Page 27

practice change so that entertainers did not receive written guidelines?
**A. Fall 2008.**
Q. Why did entertainers no longer receive written guidelines after the fall of 2008?
MR. KIMMEL: Objection to form.
You can answer.
A. Because they never kept them.
Q. How do you know that entertainers never kept them?
**A. I would see them scattered throughout the dressing room or in the garbage, used as cup holders, place -- you know, food stains on them.**
Q. Were the guidelines posted anywhere inside the club?
**A. No.**
Q. Did the house mom have a copy of them?
**A. Yes.**
Q. If an entertainer wanted to look at the guidelines, could she ask the house mom to see them?

Page 28

**A. Yes.**
Q. Has the same set of written guidelines been used since 2005?
**A. No.**
Q. How many sets of guidelines, of written guidelines, have there been from the time Rick's New York opened until today?
**A. Five.**
Q. Who drafted those written guidelines?
**A. I drafted them, along with the house mom.**
Q. Did anyone else participate?
**A. Yes.**
Q. Who?
**A. Tito Martinez.**
Q. Anyone else?
**A. No.**
Q. Did anyone review the guidelines after the three of you had participated in drafting them?
MR. KIMMEL: Object to the form of the question; mischaracterizes testimony.
You can answer.



Ex. 39A

Page 29

A. Yes.
Q. Who?
**A. Ed Anakar.**
Q. Anyone else?
**A. No.**
Q. Is it your testimony that Eric Langan never reviewed entertainer guidelines for Rick's in New York?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. No, he did not.
Q. Was there anything involved in the first phase of orientation, aside from the house mom going over the guidelines, that we were discussing, with the entertainer?
**A. Could you repeat the question, please?**
Q. Was there anything involved in the first phase of orientation, other than the house mom going over written guidelines with the entertainer?
**A. No.**
Q. What was involved in the second phase of orientation?

Page 30

**A. The manager would give a guided tour of the club, explain the different levels of the club and introduce the entertainer to all the staff.**
Q. What explanation was given of the different levels of the club?
**A. Well, the club has three floors, so we would take her to the third floor and tell her this is the VIP floor. The second floor, which is the restaurant level. Main floor, which is the main floor.**
**And throughout this process, we would then clarify the guidelines that she sat and went over with with the house mom and answer any further questions she might have.**
Q. How did entertainers understand how the financial aspect of their relationships with Rick's would work?
MR. KIMMEL: Objection to the form of the question; vague.
You can answer.
A. Can you be more specific?
Q. What, if anything, was told to entertainers during the process of establishing some kind of working relationship about how

Page 31

money would work?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. We would inform them that the fee for a dance is $20, that they are to be -- to get paid after each song. If they receive dance vouchers from guests who have purchased these vouchers with their credit card, that they can go downstairs to the cage and redeem them at any time during the night. And should they have any problems, that they can come to a manager for assistance.
Q. What, if anything, was told to entertainers about facility-use fees?
**A. Through the orientation process, we go over the house fees, as we call them.**
Q. And what were the house fees in 2005 when the club opened?
**A. The house fees are on a sliding scale. So if the entertainer arrived at 11:00 a.m., the house fee would be $10. And when they -- if they came in at 4:00 p.m., it would be $20; 6:00 p.m., $40; 8:00 p.m., $60 and 10:00 p.m., 80. After 10:00, it would be 100.**

Page 32

Q. The fee schedule that you just described, has that been the schedule since the club opened?
**A. That was the schedule when the club opened. It has changed.**
Q. How many times has it changed?
**A. Twice.**
Q. When was the first time that it changed?
**A. I don't recall the exact time.**
Q. What is your best estimate?
**A. January 2007.**
Q. And what change was made to the schedule at that time?
**A. The schedule remained the same.**
Q. Did the amounts charged for different times change?
**A. Yes.**
Q. Do you remember how they changed?
**A. No.**
Q. Would records in the Club Trax system of facility-use fees paid reflect those changes?
**A. Yes.**
Q. When was the second time that the



**Ex. 39A**

Page 33

schedule changed or that the shift fees changed?
**A. January 2008.**
Q. And what change was made at that time?
**A. We increased the fee by $10.**
Q. Across the board?
**A. Up until 10:00 p.m. After 10:00, it still remained 100.**
Q. It sounds like since the club opened, the after 10:00 o'clock fee has always been $100; is that correct?
**A. Yes.**
Q. And have the time slots always been the same; in other words, from 11:00 to 4:00, 4:00 to 6:00, 6:00 to 8:00, 8:00 to 10:00?
**A. We added a time slot.**
Q. What time slot was added?
**A. 12:00 to 2:00.**
Q. And when was that time slot added?
**A. I don't recall.**
Q. What is your best estimate?
**A. Mid-2008.**
Q. And what was the fee that was in place for that time slot?
**A. $25.**

Page 34

Q. When you say 12:00 to 2:00, are you referring to 12:00 noon to 2:00 o'clock p.m.?
**A. Yes.**
Q. Who made the decision as to what the fees would be at the time the club first opened in 2005?
**A. Ed Anakar.**
Q. Did anyone else participate in that decision?
**A. I did.**
Q. Anyone else?
**A. No.**
Q. It's your testimony that Eric Langan played no role in that decision?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. That's correct.
Q. Who made the decision to change the fee structure in approximately January 2007?
**A. I did.**
Q. Did anyone else participate in that?
**A. No.**
Q. Who made the decision to change the

Page 35

fee structure in approximately January 2008?
**A. I did.**
Q. Did anyone else participate in that decision?
**A. My day manager.**
Q. And who is that?
**A. Steven DeAngelo.**
Q. And then adding the 12:00-to-2:00 time slot in mid-2008, who was responsible for that decision?
**A. I was.**
Q. Did anyone else participate in that decision?
**A. No.**
Q. On the five occasions that the entertainer guidelines -- well, the five different sets of entertainer guidelines that have been in place, who was responsible for deciding that the entertainer guidelines would change?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I was responsible.
Q. Anyone else?

Page 36

**A. No.**
Q. Did anyone else participate in that decision-making process?
**A. No.**
Q. Did you use any documents from anywhere else as a basis for generating the first set of entertainer guidelines?
**A. Yes.**
Q. What documents did you use as a basis?
**A. It was a guideline from Rick's in Houston.**
Q. Do you know who drafted that?
**A. No, I don't.**
Q. How did you get the guideline from Rick's in Houston?
**A. It appeared in our club. I don't recall who brought it there.**
Q. It just showed up one day?
MR. KIMMEL: Objection to form; mischaracterizes testimony.
You can answer.
A. There were a lot of people coming in helping us set up. Someone brought them, I don't know who.



Ex. 39A

Q. Did you make any changes to those guidelines?
**A. Yes.**
Q. What changes did you make?
**A. I don't have it in front of me, so I can't be specific.**
MS. DRAKE: Do we have the exhibits at this point?
MR. KIMMEL: Yes, they're in the room.
Q. I would like to direct your attention to what has been previously marked as Plaintiff's Exhibit No. 7.
MS. DRAKE: Why don't we provide the witness with what had been previously marked as Exhibit Nos. 7 through 14.
MR. KIMMEL: This may take a minute to find. I have a big stack of non-segregated documents. I just need to go through and find the ones you want. I think it's easier for me than the court reporter.
(Pause.)
(Handing.) Okay.



THE WITNESS: (Perusing document.) This is the latest.
MR. KIMMEL: Let her ask the questions.
He has in front of him Nos. 7 through 14.
BY MS. DRAKE:
Q. Is one of those exhibits the guidelines as they were received from Houston?
**A. No.**
Q. I believe you said that Exhibit No. 7 are the latest guidelines?
**A. Yes, that's what I said.**
Q. Are these the guidelines that are in effect as of today?
**A. Yes.**
Q. When were these guidelines put into effect?
**A. I don't recall.**
Q. What is your best estimate?
**A. Early 2009.**
Q. Did you consult with anyone prior to putting these guidelines into effect?
MR. KIMMEL: Objection to the form of the question.



You can answer.
A. Yes.
Q. Who?
**A. The house moms, the other managers.**
MS. DRAKE: Jeff?
MR. KIMMEL: Yes.
MS. DRAKE: You're putting papers on, I think, the mic.
MR. KIMMEL: Oh, sorry about that.
MS. DRAKE: That's okay. If you could maybe just -- we're hearing a lot of paper shuffling noises since you're like one inch away from the mic. Is there a way you could do it on another --
MR. KIMMEL: I'll be done in one second. I'm trying to separate the documents so it's easier for the witness to reference.
MS. DRAKE: Okay.
MR. KIMMEL: (Handing.)
BY MS. DRAKE:
Q. So I believe you said that in implementing the most recent guidelines, which



were depicted in Exhibit No. 7, you consulted with the house moms and the other managers?
**A. That's correct.**
Q. What are those individuals' names?
**A. Melinda Trapani.**
Q. Melinda or -- "M" or "B"?
**A. "M," Melinda.**
**Tito Martinez, David Rios, Shawn Kevlin and Steven DeAngelo.**
Q. And in what way did you consult with them? Did you have a face-to-face meeting?
**A. Yes.**
MR. KIMMEL: Objection to the question.
You could answer.
THE WITNESS: Sorry.
A. Yes.
Q. Did you send them any e-mails or other written correspondence that pertains to the entertainer guidelines?
**A. No.**
Q. When did the meeting take place? Was it a singular meeting where all of those individuals attended?
**A. Yes.**



Ex. 39A

Page 41

Q. Where did the meeting take place?
**A. In our office.**
Q. Where is that office located?
**A. Basement level of the club.**
Q. What was discussed at that meeting?
**A. That there needed to be changes to the guidelines.**
Q. Why?
**A. They were long and confusing to the entertainer.**
Q. Any other reasons?
**A. No.**
Q. Did you personally draft Exhibit No. 7?
**A. (Perusing document.) Yes.**
Q. Did you do that on a computer?
**A. Yes.**
Q. What computer did you use?
**A. The office computer.**
Q. Are these guidelines maintained on that computer today in electronic form?
**A. No.**
Q. Why not?
**A. Well, we revise the guidelines, and we just do away with the original.**

Page 42

Q. So you kind of go in and change the same document, is that what you're saying?
MR. KIMMEL: Objection to form.
You can answer.
A. Yes.
Q. So if these are the most recent guidelines, is the file for these guidelines on the computer?
MR. KIMMEL: You're referring to Exhibit No. 14?
MS. DRAKE: Exhibit No. 7.
MR. KIMMEL: I'm sorry. Exhibit No. 7.
A. Yes.
BY MS. DRAKE:
Q. So these are in electronic form on the computer?
**A. Yes.**
MS. DRAKE: Can you mark that section, please.
Q. Are they a word document?
**A. Yes.**
Q. And if I understand your testimony correctly, you generated these guidelines by

Page 43

going in and editing the guidelines which had been in effect immediately prior, correct?
**A. That's correct.**
Q. Somewhere in Exhibit Nos. 7 through 14, is there a copy of the guidelines as they were in existence immediately before Exhibit No. 7?
**A. No.**
Q. Why not?
**A. Oh, Exhibit No. 7 is the most recent, correct.**
Q. That's what you said, yes.
**A. They're here in front of me.**
Q. Do you have the guidelines in front of you that were in place immediately before Exhibit No. 7?
**A. Yes, I do.**
Q. And what exhibit is that?
**A. Exhibit No. 8.**
Q. And approximately when did the guidelines, as depicted in Exhibit No. 8, go into effect?
**A. I don't recall.**
Q. What is your best estimate?
**A. I'm sorry. I couldn't tell you that.**

Page 44

Q. Was it in 2008, or was it 2005?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Late 2007.
Q. Who participated in the decision to change the guidelines in late 2007?
**A. The same individuals as I mentioned earlier; the house mom, Melinda, and the managers.**
Q. Were all the same managers working there in late 2007?
**A. Yes.**
Q. Did Ed Anakar participate at that time?
**A. No.**
Q. Did you notify anyone, aside from the house mom and the entertainers, when you changed the entertainer guidelines?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Yes.
Q. Who did you notify?



Ex. 39A

Page 45

**A. Ed Anakar.**
Q. And did you notify him in 2008 when you changed the guidelines?
**A. Yes.**
Q. Did you also notify him in 2007?
**A. Yes.**
Q. Why did you notify him?
**A. I sought his opinion.**
Q. Why?
**A. His experience in the business is equal to mine, but I respect his opinion and his outlook.**
Q. How did you communicate to him what the new guidelines were?
**A. I spoke with him over the phone. And when he did come to the club, I had shown them to him.**
Q. Did you ever send him any e-mails or faxes?
**A. No.**
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. No, I did not.
Q. What was the reason for changing

Page 46

the guidelines in late 2007?
**A. At that time I felt that they didn't say enough.**
Q. That the previous guidelines did not say enough?
**A. That's correct, that the previous guidelines did not say enough. And I wanted to be clear. It was overkill.**
Q. Your view now is that what you did in late 2007 was overkill?
**A. Yes.**
Q. What do you mean by that?
**A. It was too much information which just further confused the entertainer, as opposed to making things more clear.**
Q. Do you have in front of you the guidelines that were in place before the guidelines depicted in Exhibit No. 8?
**A. (Perusing document.) Yes.**
Q. And what exhibit number is that?
**A. Exhibit No. 9.**
Q. Approximately when did those guidelines go into place?
**A. Early 2007.**
Q. I'm sorry, I need to ask you one

Page 47

more question about Exhibit No. 8 before we move on to Exhibit No. 9.
You indicated that you were uncertain of when those guidelines were changed. Were you using the same computer in late 2007 that you used when you redrafted the guidelines in early 2008?
**A. Yes. Hold on. I will have to check that. We may have changed that computer. I'm not exactly sure what time we changed it.**
Q. Did you preserve the files when you changed computers?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Yes.
Q. Going back to Exhibit No. 9, I believe you testified that these guidelines went into effect in early 2007. Whose decision was it to implement these guidelines?
**A. Mine.**
Q. Did anyone else participate in making that decision?
**A. No.**
Q. Did you consult with anyone prior

Page 48

to implementing these guidelines in early 2007?
**A. No.**
Q. Where did you get the language for these guidelines?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. The previous guidelines, and they were my words.
Q. Did you create the guidelines that are depicted in Exhibit No. 9 by using an electronic version of whatever guidelines were in place before Exhibit No. 9?
**A. Yes.**
Q. Do you have the guidelines in front of you that were in place immediately before the guidelines depicted in Exhibit No. 9?
**A. (Perusing document.) Yes.**
Q. Which exhibit is that?
**A. Exhibit No. 13.**
Q. Approximately when were the guidelines in Exhibit No. 13 put into effect?
**A. These guidelines, 2005.**
Q. When the club first opened?
**A. Yes.**

Page 49

Q. So far we've looked at Exhibit Nos. 7, 8, 9 and 13. That's by my count, four sets of guidelines, but I thought you testified that there had been five in place.
**A. That's correct. What I'm looking at here are duplicates, so there are some things missing.**
Q. I'll represent to you that these are all the guidelines that were provided to us in the course of discovery.
**A. (Perusing documents.) It looks like these are roughly the same. Okay. So what I have in front of me is Nos. 7, 8, 9, 12 and 13. That would be accurate.**
Q. Okay. So were the guidelines that were in place immediately before Exhibit No. 9, Exhibit No. 12?
**A. Yes.**
Q. And when did those go into effect?
**A. Somewhere in 2006.**
Q. And, again, was that the same file on the computer that had just been modified from the previous version?
**A. Yes.**
Q. Do you know exactly when in 2006?

Page 50

**A. No, I don't.**
Q. Who was responsible for implementing a change in the guidelines in 2006?
**A. I was.**
Q. I'm sorry?
**A. I was.**
Q. Did anyone else participate in that decision?
**A. No.**
Q. Did you notify anyone when you implemented new guidelines in 2006?
MR. KIMMEL: Objection to the form.
You can answer.
A. Yes.
Q. Who?
**A. Ed Anakar.**
Q. Anyone else?
**A. No.**
Q. And what was the reason for modifying the guidelines in 2006?
**A. I don't recall.**
Q. Did anyone else, besides you, participate in evaluating or discussing the guideline changes in 2006?

Page 51

**A. No.**
Q. Now, the guidelines in Exhibit No. 13, are those the ones that were in place from the time the club opened until the guidelines in Exhibit No. 12?
**A. Yes.**
Q. And when you indicated earlier that these guidelines had shown up in the club, that someone had brought them in order -- I think you said someone had brought them in order to help with opening, from the Houston club, but you weren't sure who. Were they available to you in electronic form at that time?
MR. KIMMEL: Objection to the characterization.
You can answer.
A. No, they weren't.
Q. So they were in paper form?
**A. That's correct.**
Q. Did you type them into the computer?
**A. Yes.**
Q. And as you look at them now, do you recall what, if anything, on Exhibit No. 13 is different from the guidelines you received from

Page 52

Houston?
**A. Yes.**
Q. Can you tell me what that is?
**A. Number 1, No. 5, No. 6, No. 7, No. 8, No. 9, No. 10, No. 13. That's it.**
Q. What change did you make to No. 1?
**A. I asked that they use the employee entrance as opposed to the main entrance of the club that guests enter through.**
Q. Was there an equivalent to Guideline No. 1 in the Houston guidelines?
**A. No.**
MR. KIMMEL: Objection to the form.
You can answer.
A. No.
Q. What changes did you make to Guideline No. 5?
MR. KIMMEL: I'm going to object to the form of the question.
You can answer.
A. It was my idea that they dance a certain way in accordance with the standard here in New York City.
Q. What standard are you referring to?

Page 53

**A. The cabaret standards in New York City, the entertainers have to dance a certain way.**
Q. Is it your testimony that the cabaret standards in New York forbid entertainers from having both knees on the ground at the same time?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Both knees on the ground at the same time and both knees on the guest at the same time.
Q. And when you refer to "the cabaret standards," what exactly are you referring to?
**A. I don't know when they went in place, but it was taught to me through my experience working at Ten's Cabaret, that there were certain guidelines that entertainers had to adhere to while dancing.**
Q. Was it your understanding that these are legal guidelines?
**A. No.**
Q. So when you say entertainers had to adhere to them, according to whom?

Page 54

**A. It was an industry standard throughout New York City.**
Q. Who established the industry standard? What do you mean by "industry standard"?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I don't know who established them.
Q. What did you think would happen if an entertainer had both knees on the ground at the same time?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. During the Giuliani Administration, he had a task force that would go around to different clubs undercover, and the establishment would be fined for lewd and lascivious behavior. But the guidelines that established that were never presented to us, ever.
Q. So it's your testimony, that based on unwritten, un-presented guidelines, it was your belief that if an entertainer had both

Page 55

knees on the ground while dancing, the club could receive a ticket for lewd and lascivious behavior?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Yes.
Q. And where did that understanding come from?
**A. My years at Ten's Cabaret.**
Q. Have you ever witnessed anyone at Ten's Cabaret receiving a ticket for having both knees on the ground while dancing?
**A. No, it didn't happen.**
Q. So who told you that?
**A. My manager at the time.**
Q. And who was that?
**A. Paul Coppa.**
Q. How do you spell that person's last name?
**A. C-O-P-P-A.**
Q. And does Mr. Coppa still work at Ten's Cabaret?
**A. No, he does not.**
Q. Where does he live?

Page 56

**A. I have no idea.**
Q. Do you know if he is still in New York?
**A. No, I don't.**
Q. How old is he?
**A. I don't know.**
Q. What is your best approximation?
**A. 48.**
Q. Did you consult with anyone at the time that you were drafting the guidelines in Exhibit No. 13 to determine if your understanding of these unwritten laws was accurate?
MR. KIMMEL: Objection to the characterization.
You can answer.
A. No.
Q. During the time that you have worked with -- or that you have worked at Rick's Cabaret from 2005 until the present, with the exception of this litigation, have you ever consulted with an attorney?
MR. KIMMEL: Objection to the form of the question.
You mean regarding Rick's?



Ex. 39A

MS. DRAKE: Yes.
A. No.
Q. Have you ever conducted any legal research into what laws or regulations govern the operation of an adult entertainment nightclub in New York?
**A. No.**
Q. Aside from the attorneys representing the club in this litigation, have you ever consulted with any attorneys about the guidelines that govern the operation of an adult entertainment establishment in New York?
**A. No.**
Q. Who made the decision to categorize entertainers at Rick's in New York as independent contractors?
MR. KIMMEL: Objection to the form of the question; lacks foundation.
You can answer.
A. No one.
Q. No one made that decision?
MR. KIMMEL: Is there a question?
MS. DRAKE: Yes, that's my



question: "No one made that decision," question mark.
MR. KIMMEL: Asked and answered.
You can answer it again.
A. That's correct. No one made that decision.
BY MS. DRAKE:
Q. How did that come to be the practice?
**A. That's the practice in New York, in New York City.**
Q. Did you ever consult with anyone as to whether that practice is appropriate?
**A. No.**
Q. To your knowledge, did anyone else on behalf of Peregrine Enterprises consult with a legal professional as to whether that practice is appropriate?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. No.
Q. And I just want to clarify your answer. And I apologize because my question was



poorly worded for purposes of the transcript. I said to your knowledge, and then you said no.
I take your last answer to mean that, in fact, no one consulted with an attorney about that; is that correct?
MR. KIMMEL: Objection to the form of the question.
A. Not to my knowledge.
MR. KIMMEL: Make sure you give me an opportunity to object before you answer.
Q. Mr. Sistrunk, do you understand that you've been designated as the corporate representative on behalf of Peregrine Enterprises, Incorporated?
**A. Yes, I do.**
Q. Do you understand that that means that your testimony is given on behalf of the corporation?
**A. Yes, I do.**
Q. Have you had an opportunity to review the notice of deposition in this matter on the topics included therein?
**A. Yes.**
Q. Are you aware that one of the



topics included in the deposition was defendant's effort to comply with laws governing entertainer categorization as independent contractors?
**A. No.**
Q. So it's your testimony you didn't know that that was a topic you had been designated to testify about?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. No, I knew that we would be discussing it.
Q. What did you do in order to discern if anyone had ever sought legal advice on the appropriateness as categorizing entertainers as independent contractors?
MR. KIMMEL: Objection to the form of the question.
I'm directing you not to testify to any attorney communications. Can you answer that question without testifying to communications with counsel?
A. I was unaware if there was any.



Ex. 39A

Page 61

Q. And my question is: What did you do to find out if there had been any?
MR. KIMMEL: Same direction.
A. I did not do anything.
Q. So you knew you were supposed to testify on that topic, you knew you didn't know the answer, and you didn't do anything to find out the answer?
MR. KIMMEL: Objection to the form of the question.
You could answer.
A. That's correct.
MS. DRAKE: I would like to mark this section of the transcript, please.
Q. Who at Peregrine was responsible for legal compliance, ensuring that the club complied with the law?
**A. Eric Langan.**
Q. And he's the president of Peregrine?
**A. That's correct.**
Q. Has Rick's -- well, let me ask the question this way: Have you ever terminated a relationship with an entertainer?

Page 62

**A. Yes.**
Q. On what basis?
**A. Conduct in the VIP room that is illegal.**
Q. Any other basis?
**A. Yes.**
Q. What other reasons might Rick's decide they didn't want to work with a particular entertainer anymore?
MR. KIMMEL: Objection.
Q. I'm sorry. Let me withdraw and rephrase that question.
For what other reasons have you decided that a given entertainer would no longer be allowed to perform at Rick's?
**A. Fighting with other entertainers or staff, stealing, drug use, prostitution. That's it.**
Q. When you say "fighting with other entertainers or staff," are you referring to physical fights?
**A. Yes.**
Q. What about verbal altercations?
MR. KIMMEL: Objection to the form of the question.

Page 63

You can answer.
A. If the entertainer had numerous verbal altercations with several others over a course of time, then we would terminate the relationship.
Q. Have you ever terminated a relationship with an entertainer because she became too overweight?
**A. No.**
Q. What steps -- have you ever taken any steps to let an entertainer know that she needed to lose weight if she wanted to continue performing at Rick's?
**A. Yes.**
Q. Tell me about those. What steps have you taken?
**A. We would sit down together and talk about the weight that she was gaining and that she needed to lose the weight, in her own best interest, as well as for the club. She was allowed to -- sorry. She was allowed to continue working while she did.**
**And if we saw no improvement, then we would have another discussion about it. And she would be then asked to take some time off to**

Page 64

**do so, and she would be invited back.**
Q. Invited back once she had lost some weight?
**A. Yes.**
Q. Is there a written documentation of any of those kind of conversations?
**A. No.**
Q. Would a note ever be made in Club Trax as to why a given entertainer was no longer performing at Rick's?
**A. No.**
Q. Have you ever told an entertainer that she couldn't perform because what she was wearing was inappropriate?
**A. I don't recall.**
Q. You don't recall one way or another?
**A. That's correct.**
Q. Have you ever told an entertainer she couldn't perform because the way that she danced on stage was inappropriate?
**A. No.**
Q. Have you ever had a conversation with an entertainer where you've asked her to change the way that she was performing on stage?



Ex. 39A

Page 65

**A. No.**
Q. Who chooses the music that's played at Rick's?
**A. The entertainer consults with the DJ, and they choose music. I have laid out a format for the DJ to follow, and the entertainers choose music that falls within the format.**
Q. What is the format that you've laid out?
**A. Classic rock, classic R&B, some disco, pop music, limited hip hop, limited heavy metal.**
Q. As a former metal fan, I'm tempted to ask you why you would ever want to limit it, but I won't.
**A. Well, I'm a metal fan, too. However, our -- not all our guests can appreciate it the way you and I can.**
Q. Fair enough.
What was the basis for establishing that as the appropriate format for the club?
**A. It appealed to the broad range of guests that we want to attract and those that do come in.**

Page 66

Q. Does Rick's have a particular kind of customer that it wants to attract?
**A. Not so much that it wants to attract, but that it would prefer to not attract.**
Q. Okay. Can you describe that to me?
**A. A rowdy, rough audience.**
Q. Does Rick's prefer to attract professionals?
**A. We prefer to attract professionals, yes.**
Q. Does Peregrine have a marketing department?
**A. No.**
Q. Who is in charge of marketing the club?
**A. I am.**
Q. And how do you do that?
**A. We put together -- we have flier -- a flier team, and they go on the street and promote and market through handing out fliers. We ask entertainers to participate in promoting the club during sporting events. And we do in-house marketing and promotion through posters and DJ announcements.**

Page 67

Q. Does Rick's of New York have a website?
**A. Yes.**
Q. Who maintains that website?
**A. That is maintained through the club and RCI.**
Q. When you say "RCI," who are you referring to?
**A. Rick's Cabaret International.**
Q. What do you mean that the website is maintained through the club and Rick's Cabaret International?
**A. We have in-house events and promotions that we want everyone to know about throughout the country. So if there is a potential guest in South Dakota and he's thinking about coming to New York City, we know that he can go on to the Rick's website, which is -- you know, it's from the parent company. And they go in, and they can find the location that they are going to be visiting. But it's Peregrine that maintains the Rick's Cabaret website here in New York.**
Q. What do you mean that "it's Peregrine that maintains the Rick's Cabaret

Page 68

website here in New York"? What actions does that maintenance entail?
**A. That we -- I'm not really computer savvy, so bear with me. All that happens within Rick's New York is put on the website.**
Q. Who puts it on the website?
**A. Steven DeAngelo.**
Q. And how does he do that?
**A. I don't know. He's computer savvy, I'm not.**
MS. DRAKE: We've been going for about an hour, almost two hours. Why don't we take a quick, I don't know, ten-minute break.
MR. KIMMEL: That's fine.
(Whereupon at 11:43 a.m., a recess was taken until 11:56 a.m.)
(The deposition resumed with all parties present.)
K E N N E T H S I S T R U N K, resumed and testified further as follows:
BY MS. DRAKE:
Q. Mr. Sistrunk, when we left off before the break I had been asking you some questions about marketing, and we were talking

about the internet. Does Rick's in New York track the success of any of its marketing efforts in any way?

**A. Only with what comes back in through the door in terms of fliers.**

Q. Can you describe what you mean by that?

**A. Well, if I have a flier person, his or her name is on the flier, like on the corner of the flier, and we track how many have come back in a day, in a week, from that individual.**

Q. Do entertainers just -- I'm sorry. I didn't mean to interrupt.

**A. They are given a set amount, and we see how many of those have come back.**

Q. Do entertainers distribute fliers, or is it someone else that you hire to do that?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. We have a set group of people that we hire to hand them out. But on special events, we do ask entertainers to volunteer to hand them out. And in return, they are rewarded.



Q. How are they rewarded?

**A. With house fee credit.**

Q. How would that be reflected in Club Trax? Would it say something like "house fee waived, promo"?

**A. It would say "credit."**

Q. Would it indicate the reason why the credit had been given?

**A. It would say "promo credit."**

Q. I notice in some of the guidelines there's also a reference to a promotion fee of $6, I think, at different points in time. What is that?

**A. That fee goes to the creation of the fliers and passes that are handed out, all printed material, posters and things of that nature.**

Q. Does Rick's also advertise, like in publications?

**A. Yes.**

Q. And does the promotions credit also cover the costs of those advertisements?

**A. I couldn't say.**

Q. Is the entirety of Rick's advertising budget covered by that



$6 promotional fee by paid the entertainers?

**A. I don't know.**

Q. Do the entertainers participate in any way in the decision-making process with respect to Rick's marketing campaigns?

**A. We ask what they think would work.**

Q. And when do those conversations occur?

**A. Sometimes an entertainer will approach me with an idea at any given time throughout the day, and we have meetings once a month where they are free to express their ideas and opinions in more of an open forum.**

Q. What ideas have entertainers expressed about ways in which the club should be marketed?

**A. They have -- actually, there's been a few that have said they would prefer to go and promote at different locations dressed, you know, in their street clothes, talk with potential guests and invite them back to the club.**

Q. And have they been allowed to do that?

MR. KIMMEL: Objection to the



form of the question.

You can answer.

A. Yes.

Q. Have there ever been a time when entertainers have proposed an idea and it has not been implemented?

**A. I can't recall.**

Q. You can't recall either way?

**A. Yes.**

Q. You cannot think of a single example of an idea that an entertainer had that was not implemented, as you sit here?

MR. KIMMEL: Objection; asked and answered.

You can answer it again.

A. That's correct. I don't remember what I may have turned down or accepted, not at this time.

Q. Often the advertisements for Rick's New York will feature a photograph of a woman. Are those women who actually work at Rick's?

**A. No.**

Q. Who are they?

**A. It's stock photographs.**

Q. That are purchased through a



Ex. 39A

marketing agency or whatever; is that correct?
**A. I don't know where they come from.**
Q. Who provides them? Who selects them?
**A. They come from RCI.**
Q. Does Rick's New York have feature entertainers?
**A. No.**
Q. Do you understand -- can you just describe what a feature entertainer is?
**A. A feature entertainer is an entertainer who performs a specific performance -- for lack of a better term -- for a portion of the door or a set fee. It's usually some elaborate production.**
Q. Almost like someone who has their own marketing potential? Well, maybe that's a bad way to describe it, I don't know, but someone who has a name. I mean, is it fair to say that a lot of feature performers in the adult entertainment industry are also porn stars or who have developed a reputation?
MR. KIMMEL: Objection to the form of the question.
You can answer.



A. This is -- yes, quite often.
Q. Why doesn't Rick's in New York have feature entertainers?
**A. Our audience is not the audience that is going in for that sort of entertainment.**
Q. What do you mean?
**A. Well, they are professionals predominantly, and they -- you know, we have a diverse guest profile. But most of them are professionals of a certain education, and they come to unwind and blow off steam and spend more time one on one or with their friends in a group, as opposed to sitting and watching such a performance on stage by one lady for 15 or 20 minutes.**
MR. KIMMEL: Michelle, can you just tell me what this line of questioning has to do with either the Rule 23 elements to -- as the basis of a class action or for the elements of collective action under the Fair Labor Standards Act?
I think that's the phase of discovery we're supposed to be in, as opposed to merits discovery. So



I'm not quite clear what this line of questioning has to do with that.
MS. DRAKE: Do you want to bring him back later? I thought that it was very clear from our conversation with Magistrate Katz that we were taking one set of depositions.
MR. KIMMEL: I think it was pretty clear from the conversation with Magistrate Katz, that at this phase of discovery, he agreed that this would be limited to the class elements.
MS. DRAKE: I completely disagree. We had a conversation about depositions where I thought it was crystal clear that we were taking one set of depositions, we weren't going to do one round of depositions before certification motions and then another round of depositions after certification motions.
MR. KIMMEL: That's not my



recollection.
MS. DRAKE: Okay. Well, we have different understandings, then. Maybe over the break we can take a look at the transcripts.
MR. KIMMEL: Okay.
BY MS. DRAKE:
Q. Does Rick's in New York make available to the public a list of which entertainers are performing on a given night?
**A. No, we don't.**
Q. At any time since Rick's in New York opened -- well, sorry.
Let me rephrase and ask it this way: Entertainers have been categorized as independent contractors at Rick's of New York since the club opened, correct?
**A. Yes.**
Q. Have you ever participated in any conversations where the categorization of entertainers as independent contractors was discussed?
MR. KIMMEL: Objection to the form of the question.
You can answer.



Ex. 39A

Page 77

A. Yes.
Q. Who did you have those conversations with?
**A. Various entertainers.**
Q. Anyone else?
**A. The managers.**
Q. Anyone else?
**A. No.**
Q. What was the nature of your conversations with entertainers?
**A. More to what it means and how it benefits them, and also their responsibility in terms of paying their taxes.**
Q. And what were your conversations with the managers about?
**A. The same.**
Q. And what is your view of how the categorization as independent contractors benefits entertainers?
**A. It gives them a great deal of freedom, but it also means that they need to find their own discipline in order to make the most out of this occupation.**
Q. What kind of freedom does it afford them?

Page 78

MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Well, they virtually make their own hours. They can make a great deal of money, but they have to have discipline. They have to be smart so that they save it or put it to work for them somehow so that they are not dancing forever.
Q. Who are the officers of Peregrine Enterprises?
**A. We don't have officers.**
Q. Who are the directors?
**A. We don't have directors.**
Q. Who are the executives?
**A. Eric Langan.**
Q. And what is his position?
**A. He is president.**
Q. Of the individuals who are categorized as employees who work at Rick's New York, are all of those individuals employees of Peregrine Enterprises?
MR. KIMMEL: Objection to the form of the question.
You can answer.

Page 79

A. Yes.
Q. Who is responsible for paying Peregrine's taxes?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I don't know.
Q. Who do you report to?
MR. KIMMEL: Objection to the form of the question; lacks foundation.
You can answer.
A. I report to Ed Anakar and Eric Langan.
Q. And what is Mr. Anakar's position?
**A. He is director of operations.**
Q. For whom?
**A. For RCI.**
Q. And by "RCI," do you mean Rick's Cabaret International?
**A. Yes.**
Q. And who is Mr. Langan?
**A. He is the CEO of Rick's Cabaret International.**
MR. KIMMEL: Objection to the form.

Page 80

Q. How do you report to them? In other words, how are they apprised of your job performance?
MR. KIMMEL: Objection to the form of the question; lacks foundation.
You can answer.
A. Through visual evaluation, verbal communications. They also will see the daily sales, quarterly sales, feedback from guests.
Q. What opportunities does Mr. Langan have to observe you visually?
MR. KIMMEL: Objection to the form of the question; vague.
You can answer.
A. When he is in New York, he comes into the club.
Q. And what does he do while he's there?
**A. He will meet with investors, have dinner, talk with staff members and entertainers.**
Q. How often is Mr. Langan in the club, would you say, on average?

Page 81

MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Average, ten times a year.
Q. And how often -- what opportunities does Mr. Langan have for verbal communication? How often do you talk to him?
MR. KIMMEL: Objection to the form.
You can answer.
A. I can't say how often, but when he's in town or if he's sending a guest in, he will call.
Q. What do you mean "if he's sending a guest in"?
**A. If there's someone that he knows or he met somewhere and they tell him they're going to be in New York City, he will say visit the Rick's Cabaret there, ask for Ken Sistrunk, and then he'll call me and let me know that this person is coming in.**
Q. Are those primarily investors, or who are those people?
MR. KIMMEL: Objection to the form.

Page 82

You can answer.
A. They're not primarily investors. Some of them are investors, some could be potential investors or acquaintances.
Q. What is your best estimate of how many times in a given month you speak with Mr. Langan?
**A. Less than once a month.**
Q. How many times per year?
MR. KIMMEL: Objection to the form of the question; asked and answered.
You can answer it again.
A. Ten times a year, when he's in the club.
Q. Well, if he comes to the club ten times and you also talk to him when he is sending a guest, couldn't that be more than ten times?
MR. KIMMEL: Objection to the question.
You can answer.
A. Yes, it would be, but there's no set time that he sends people in, and there's no set time that he comes to the club.

Page 83

Q. Do you ever exchange e-mails with Mr. Langan?
**A. No.**
Q. Have you ever received an e-mail from him?
**A. Yes, I have.**
Q. Have you ever replied to an e-mail from him?
**A. Through phone call.**
Q. What kinds of things has he e-mailed you about?
**A. Make sure you're promoting certain events, make sure you're getting your flier teams out on the streets.**
Q. What else?
MR. KIMMEL: Objection to form.
You can answer.
A. More in terms of direction as to what quarterly sales goals that we're going for.
Q. What actions do you undertake to meet certain quarterly sales goals? In other words, how can you improve the club's sales?
**A. Through promotion/marketing efforts we could increase patronage, creating food**

Page 84

**specials, drink specials, as well as other sale item specials within the club to get, you know, the guests to buy into those specials. That is a promotional way to drive sales up. It's really getting out on the street and getting more people to come in.**
Q. What opportunities does Mr. Anakar have to observe you visually?
**A. When he is in town and he comes in.**
Q. You know, I should ask a couple other questions about him.
Ed Anakar used to be the general manager at Rick's, correct?
**A. Correct.**
Q. And when he was the general manager, he was actually the general manager when you started working there; is that right?
**A. Yes.**
Q. When did he stop being the general manager at Rick's in New York?
**A. October 2007.**
Q. During the time that he was the general manager, did he have the same duties and job responsibilities that you have as the general manager now?



Ex. 39A

Page 85

**A. Yes.**
Q. And what did Mr. Anakar's position become in October of 2007?
**A. Director of operations.**
Q. For Rick's Cabaret International?
**A. Yes.**
Q. Prior to October of 2007, did you report to Mr. Anakar?
**A. Yes.**
Q. And then after October 2007 you also reported to him, right?
MR. KIMMEL: Objection to form.
You can answer.
A. Yes. As a consultant.
Q. What do you mean "as a consultant"?
**A. If I needed his opinion on a given decision that I had to make, then I would call him and ask him what he thought. If I needed to spend a large amount of money on something, I sought his opinion.**
Q. Who determines how much you get paid?
MR. KIMMEL: Objection to the form of the question.

Page 86

You can answer.
A. Eric Langan.
Q. To your knowledge, does Mr. Anakar have input into that decision?
**A. Yes.**
Q. How do you know that Mr. Anakar has input into that decision?
**A. He told me.**
Q. In what context did he tell you that?
**A. That I would be receiving a raise.**
Q. And when did he tell you that?
**A. October 2007.**
Q. Have you received any raises since October 2007?
**A. No.**
Q. Have you ever understood Mr. Anakar to have the role of regional manager?
**A. Yes.**
Q. And what did that position entail?
MR. KIMMEL: Objection to form of the question.
You can answer.
A. That he had to go to other locations throughout the country and oversee

Page 87

their functions.
Q. What did you understand him to be doing at those other locations?
MR. KIMMEL: Objection to the form of the question; lacks foundation.
You can answer.
A. Hiring and training management and staff.
Q. Did you understand him to also have some role in establishing relationships with entertainers at those other locations?
**A. No.**
Q. Do you know whether he had any role in that at other locations?
**A. No, I don't know.**
Q. You don't know one way or the other?
MR. KIMMEL: Objection; asked and answered.
You can answer it again.
A. No, I don't know.
Q. Who made the decision to incorporate Peregrine Enterprises?
**A. I don't know.**

Page 88

Q. Are you aware that one of the topics that you were designated as the corporate representative on is defendant's corporate-wide organizational history?
**A. I don't recall.**
Q. You don't recall knowing that that's a topic you were designated on?
MR. KIMMEL: Objection; asked and answered.
You can answer again.
A. Yes, that's correct.
Q. When was Peregrine Enterprises incorporated?
**A. I don't know.**
Q. Who incorporated Peregrine Enterprises?
MR. KIMMEL: Objection to the form of the question. It asks for a legal conclusion.
You can answer.
A. I don't know.
MS. DRAKE: I would like to mark this section.
Q. What role did Peregrine Enterprises play in raising funds for the renovation of

Page 89

Rick's, which took place in 2005?
**A. I don't know.**
Q. Did Peregrine Enterprises have any assets prior to it being acquired by Rick's, by RCI Entertainment New York?
**A. I don't know.**
Q. Did it have any corporate officers or directors or executives before being acquired by RCI Entertainment New York?
MR. KIMMEL: Objection to the form of the question; calls for legal conclusion.
You can answer.
A. I don't know.
Q. What did you do to prepare to testify about the corporate structure and history of Peregrine Enterprises Corporation before your deposition today?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. To speak on what I knew and what I don't know.
Q. Does Peregrine Enterprises make any payments to Ed Anakar or for Ed Anakar's

Page 90

services?
**A. Yes.**
Q. Tell me about those.
**A. I don't have details on that.**
Q. To whom do they make the payments?
**A. I don't have details on that.**
Q. Does that mean you don't know?
**A. Yes, that's correct.**
Q. Is Ed Anakar on the payroll of Peregrine Enterprises?
**A. No.**
Q. Who determines the amount of money that will be paid for Mr. Anakar's services?
MR. KIMMEL: Objection to the form.
You can answer.
A. I don't know.
Q. Do you determine that?
**A. No, I don't.**
Q. Who determines the -- to your knowledge, does anybody else who is an employee of Peregrine Enterprises determine how much to pay for Mr. Anakar?
**A. I don't know the answer to that.**
Q. Does everyone who works at

Page 91

Peregrine Enterprises ultimately report to you?
**A. Yes.**
Q. So of the people who report to you, is there anyone whose job responsibilities include deciding how much to pay Mr. Anakar?
**A. No.**
Q. How many individuals have performed as entertainers at Rick's New York since it opened?
**A. I don't have an exact number.**
Q. What is your best estimate?
**A. 4500.**
Q. How many individuals perform as an entertainer at Rick's on any given night?
**A. Average per day, 60.**
Q. What is the 4500 estimate that you just made based on?
**A. Based on looking at some information in Club Trax and files.**
Q. What information did you look at in Club Trax?
**A. How many entertainers were still with us, as opposed to how many were not when we update the files.**
Q. And then some of those numbers were

Page 92

somewhere around 4500?
**A. To the best of my recollection, yes.**
MS. DRAKE: We should break for lunch.
MR. KIMMEL: Okay.
MS. DRAKE: So it's about 11:30 now, or 12:30 your time. Come back like around quarter after one.
Is that going to be enough time?
MR. KIMMEL: Yes, that should be okay.
(Whereupon at 12:30 p.m., a recess was taken until 1:24 p.m.)
(The deposition resumed with all parties present.)
K E N N E T H S I S T R U N K, resumed and testified further as follows:
MR. KIMMEL: We went back and took a look at the transcript for the proceeding before Magistrate Katz. And I think it's pretty clear that the parameters that we were discussing, that there



Ex. 39A

Page 93

would be a bifurcation between the merits-based discovery and the class discovery, although it was agreed that there might be circumstances in which there was crossover and that we would try to work with each other to the extent that was the case.

That being said, we've already conducted half a day deposition, and I haven't really been limiting your testimony in any way, so, you know, for the purpose of this deposition, you know, I'm not going to make objections on that basis.

But I'm reserving the defendant's rights to continue to take the position that this phase of discovery is with respect to class elements and not merits.

MS. DRAKE: But you're not -- and I understand that you're reserving the right to do that in the future, but you're not asserting that objection today; is that

Page 94

correct?

MR. KIMMEL: That's correct.

BY MS. DRAKE:

Q. I believe before the break I had asked you some questions about the number of entertainers who have worked at Rick's New York since the club opened. You indicated that you had reviewed some information in Club Trax.

What exactly was the information that you reviewed in Club Trax?

**A. I was looking to see which entertainers were active versus inactive, which means those that were still with us on the roster and those that we haven't seen within the last -- the previous six months.**

Q. And how did you access that information?

**A. By going into the Club Trax system and accessing the entertainer files.**

Q. Was there a way that you could have Club Trax actually pull those numbers?

**A. It wouldn't be accurate because --**

Q. Why not?

**A. -- entertainers would leave, and then they might come back four months later or a**

Page 95

**month later or six months later or a year later.**

**So we would still have to go through those records with, you know, a fine-tooth comb and determine, you know, are there duplicate entries.**

Q. I guess part of what I'm getting at is, what did what you were looking at look like? Was it a list of every entertainer that ever performed at Rick's New York with dates next to it? What did it look like?

**A. It was an endless list of entertainer log-ins with the dates next to it.**

Q. With the first log-in date and last log-in date for that entry?

**A. Yes.**

Q. What did you have to do in order to pull up that information?

**A. Punch in my access code and go to the entertainer file, and that was it.**

Q. Did you play any role in pulling up entertainer log-in reports for this case?

**A. No.**

Q. Who did that?

**A. One of our cage personnel.**

Q. Do you know how to pull up an

Page 96

entertainer log-in report?

**A. Yes, I do.**

Q. How do you do that?

**A. I put in my access code, I press the entertainer icon on the screen. And then we get another screen that has different information regarding entertainers' log-in and records.**

**So there is one that says entertainer's log-in by date, entertainer's last log-in report, and there's a few others that don't come to mind right now.**

Q. Do you know how to pull up a report that shows the dance dollars exchanged for cash by a given entertainer?

**A. Yes, I do.**

Q. How do you do that?

**A. I go into the Club Trax system, into backup house reports, and there is a button that will bring up that information for me.**

Q. And you can push that same button regardless of which entertainer you're pulling it up for?

**A. It will bring up a list of entertainers by date, or I can access it by**



Ex. 39A

**dance ticket number or check number.**
Q. But if you wanted to pull up all of the dance dollar exchanges that a given entertainer did during the entirety of the time she worked at Rick's New York, that would just be a matter of pressing a few buttons?
**A. Pressing a few buttons and entering her name or ID number.**
Q. Would it be possible for you to print out from Club Trax a list of all the entertainers who have worked in New York, along with their address and phone number and other identifying information?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. No.
Q. Why not?
**A. Our Club Trax system had crashed more than once.**
Q. So you're worried that trying to do that would crash the system?
**A. No. That the information --**
MR. KIMMEL: I think she's not asking if you could do it right



now, but --
THE WITNESS: No.
MR. KIMMEL: Oh, okay. I'm sorry. Please continue. Maybe I misheard.
A. The information, we weren't able to save all that information.
Q. Of the information that you have, which wasn't hurt in some kind of a computer crash, would you be able to print out a list of all the entertainers with their name, address, phone number, whatever information you have on them?
**A. Yes, I could do that.**
Q. And would that just be a matter of pressing some buttons?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Yes.
Q. When did the system crash?
**A. Numerous times. I can't give you specific dates.**
Q. Is that data backed up anywhere, the Club Trax system data?



**A. It's backed up in the server which has gone down again numerous times.**
Q. Are there any backup tapes or discs or drives that are maintained?
**A. No.**
Q. So if the server crashes and information is lost, it's just gone; is that your testimony?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. It's not completely gone. We will call our Club Trax technician, and he tries to save as much data as he can.
Q. Since the inception of this lawsuit, has Rick's New York adopted any new data backup procedures?
**A. No.**
MS. DRAKE: The record should reflect that Steve Smith just rejoined the deposition.
Q. Is the system set to show some type of default log-out time if an entertainer actually don't log out?
**A. Yes.**



Q. What time does Rick's New York close?
**A. 4:00 a.m.**
Q. And what time do entertainers who worked for the entire evening actually end up leaving the club, as a general rule?
**A. Leaving, 4:30.**
Q. Have there been occasions on which Rick's have continued to serve customers after 4:00 a.m.?
**A. When you say "serve," can you be more specific?**
Q. Continue to have customers on the premises after 4:00 a.m.
**A. Yes.**
Q. Has Rick's provided alcoholic beverages to customers after 4:00 a.m. since it's been open?
MR. KIMMEL: Objection to the form of the question.
What is the relevance in the question as to any of the issues in this lawsuit?
MS. DRAKE: We're trying to figure out what the hours are the



Ex. 39A

Page 101

entertainers work and if the system has a default. I'm trying to figure out how late they were there.

MR. KIMMEL: So ask questions about that, not if they serve alcohol to the patrons.

MS. DRAKE: I'm going to ask my question.

MR. KIMMEL: Okay. Well, I'm going to direct you not to answer.

It's completely irrelevant. This lawsuit's got nothing to do with any of the issues and won't lead to any admissible evidence.

BY MS. DRAKE:

Q. Have the entertainers continued to work at times after 4:00 o'clock in the morning at Rick's?

**A. Yes.**

Q. Does Rick's keep a time stamp of sales that are made through the register? In other words, can you look at the point-of-sale data and tell what time a given sale was made?

**A. It will state what time it was closed.**

Page 102

Q. What time the sale was closed?

**A. Yes.**

Q. How is your performance evaluation communicated to you? And what I mean by that is, how do you know if your supervisors think you're doing a good job or not?

MR. KIMMEL: Objection to the form of the question.

You can answer.

And by the way, also lack of foundation.

Go ahead.

A. It's been verbalized.

Q. Have you ever received a written performance review?

**A. No.**

Q. Do you e-mail with Ed Anakar?

**A. On occasion.**

Q. What is your e-mail address?

**A. Ken@ricks.com.**

Q. And what is Ed's e-mail address?

**A. Ed@ricks.com.**

Q. And what is Mr. Langan's e-mail address?

**A. Eric@ricks.com.**

Page 103

Q. I'm sensing a trend.

What kind of things do you e-mail with Mr. Anakar about?

**A. Updates on new events, promotions, questions regarding structural concerns.**

Q. What else?

MR. KIMMEL: Objection to the question.

You can answer.

A. That's -- well, hold on. You know, there are certain -- I mean, that's essentially it. You know, when I say promotions or events, it might be a liquor promotion or a champagne promotion or some new marketing event that we're staging.

Q. You said "structural concerns." What do you mean by that?

**A. If there is -- an example would be replacing the carpet throughout the building or if the elevator is failing us, air conditioning concerns, things like that.**

Q. And what kind of e-mails would you send him about those issues?

**A. If you recalled some data, let's say with the elevator, if you recalled certain**

Page 104

**data when the elevator was going in, or if in regards to carpeting, what he felt -- what sort of carpet he felt would be durable and keeping with the decor.**

Q. Do you have to get approval from anyone before making expenditures over a certain amount?

**A. Yes.**

Q. What is that amount?

**A. It varies depending on what it is.**

Q. Can you describe that in more detail?

**A. If I'm replacing the carpet, such an expenditure could be over $15,000, then I would need to consult and get approval.**

Q. So is that a $15,000 limit across the board?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. No.

Q. How do you know when you need to get approval for something or not?

**A. I use my best judgment.**

Q. What is the biggest expenditure



Ex. 39A