that you would feel comfortable making without getting approval?
MR. KIMMEL: Objection; calls for a hypothetical and speculation.
You can answer.
A. It depends on what it is. If I'm buying wine or some other beverages, I feel comfortable spending 30,000, 40,000. If I have to replace air conditioning units, then I will call for an opinion and consult with Ed on that, as well as Eric.
Q. Is part of the reason you feel comfortable making significant expenditures on things like alcohol because those are routine recurring expenses that you pretty quickly turn over for the club?
MR. KIMMEL: Objection to the form.
You can answer.
A. Yes. They are things that we turn over quickly, I have a lot of experience with those items.
Q. Who determines what liquor distributors you're going to deal with?
**A. I do.**



Q. And who determines what food distributors you're going to deal with?
**A. I do.**
Q. And how do you make those decisions?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I seek them out or they seek me out. We meet, I see what they have to offer and at what price point, and I determine from there if it's a relationship that I want to pursue.
Q. Do you ever negotiate any kind of bulk deal for both Rick's New York and other clubs?
**A. No, I don't.**
Q. Are you aware of such deals or do you benefit from that kind of bulk purchasing?
Does Rick's New York engage in any bulk purchasing with the other clubs?
**A. No, we don't.**
Q. It's your testimony that there is no bulk purchasing agreement with other clubs for any club supplies?
MR. KIMMEL: Objection; asked



and answered.
You can answer it again.
A. Not to my knowledge.
Q. What about the ASCAP license, who pays for that for the DJ?
**A. I don't know.**
Q. Do you know if a bulk deal has been negotiated for that licensing?
MR. KIMMEL: Objection to the characterization.
You can answer.
A. No, I don't.
Q. Does Peregrine employ an accountant?
**A. No.**
Q. Does Peregrine employ an attorney on either a routine or a full-time basis?
**A. No.**
Q. Who made the decision to retain Mr. Kimmel's law firm to represent Peregrine?
**A. I don't know.**
Q. Did you make that decision?
**A. No, I did not.**
Q. Who made the decision to retain Mr. Kimmel's law firm to represent you?



MR. KIMMEL: Objection to the form of the question.
He's here as a 30(b)(6) witness representing Peregrine, and I represent Peregrine.
Q. Well, does Mr. Kimmel represent you personally?
MR. KIMMEL: Objection; calls for a legal conclusion.
A. No, he does not.
Q. Have you retained counsel to represent you personally in this lawsuit?
**A. No, I have not.**
MR. KIMMEL: Is Mr. Sistrunk a party to this lawsuit, Michelle?
MS. DRAKE: I'm just asking if he has retained counsel to represent him.
MR. KIMMEL: In what capacity?
MS. DRAKE: In any capacity.
MR. KIMMEL: Oh, okay. Go ahead.
BY MS. DRAKE:
Q. Who made the decision to use the



Ex. 39B

Page 109

Club Trax system at Rick's in New York?
**A. Eric.**
Q. How do you know that that was who made the decision?
**A. He was present when the Club Trax technicians came into the club with the -- with all the equipment and was directing them as to what he needed and how he wanted it done.**
Q. Are you responsible for sending any data on a regular basis to Rick's Cabaret International, Incorporated?
**A. Yes.**
Q. What data is that?
**A. End-of-day sales.**
Q. And how is that transmitted?
**A. Fax.**
Q. And how do you access the end-of-day sales data?
**A. It's in Club Trax.**
Q. Is it like another report that you can print out of Club Trax?
**A. Yes.**
Q. Does Club Trax allow you to export data electronically, like into Excel or some other electronic format?

Page 110

**A. No.**
Q. How do you know that?
**A. Because the Club Trax people have told us that it's not possible.**
Q. Who have you spoken with at Club Trax?
**A. Kyriacos.**
Q. Is that a first name, a last name?
**A. First name.**
Q. Do you know the person's last name?
**A. I can't recall it at this time.**
Q. Anyone else at Club Trax that you've spoken to?
**A. No.**
Q. Do you have contact with general managers at other clubs which are wholly owned subsidiaries with Rick's Cabaret International, Incorporated?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Occasionally.
Q. About what?
MR. KIMMEL: Objection to the form of the question.

Page 111

You can answer.
A. We exchange promotional ideas. And, again, if they're sending people to New York, they could ask them to stop by Rick's in New York. If I'm sending people to Minnesota or Houston, I will ask them to look up the general manager of those locations.
Q. How do you communicate with those other general managers?
**A. I make a phone call.**
Q. Do you also communicate with them by e-mail?
**A. Yes.**
Q. Does Peregrine Enterprises operate any nightclubs other than Rick's New York?
**A. No.**
Q. Has it ever?
**A. No.**
Q. Has Peregrine ever loaned capital to any other subsidiary of Rick's Cabaret International?
**A. I don't know.**
Q. Has Peregrine ever benefited from a loan of capital from a subsidiary of another Rick's location?

Page 112

**A. I don't know.**
Q. How do entertainers indicate when or if they're going to work at Rick's? How does that process of scheduling work?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. They will sit down with the house mom and give her the schedule that they would like to work.
Q. And is that done verbally?
**A. Yes, it is.**
Q. And what, if anything, does the house mom do with that information?
**A. She then will type it into a system that she has.**
Q. What system does she use?
**A. It's a PC, and it's not clear to me what system that is.**
Q. Is the PC located on the premises of Rick's New York?
**A. Yes. It looks like an Excel spreadsheet.**
Q. And what information is on that spreadsheet?



**Ex. 39B**

Page 113

**A. Entertainer's name and the dates that she has scheduled herself to work and at what times she will be there.**
Q. How often are entertainers required to give that information to the house mom?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Weekly.
Q. Are those spreadsheets posted anywhere? What happens to them after the house mom enters them into the computer?
MR. KIMMEL: Objection to the form.
You can answer.
A. They remain in the computer.
Q. Does she start a new one for each day?
**A. No. It's done weekly.**
Q. Does she start a new spreadsheet for each week?
**A. Yes.**
Q. Do you know if the old ones are preserved?
**A. I don't know.**

Page 114

Q. To your knowledge, has anyone instructed the house mom to begin preserving the schedules since the inception of this litigation?
**A. I don't know the answer to that. I don't know if they did or not.**
Q. When you say "I don't know if they did or not," who are you referring to?
**A. Anyone.**
Q. Can you think of anyone who would have told the house mom to do that without your knowledge?
MR. KIMMEL: Objection to the form of the question; calls for speculation.
You can answer.
A. No, I don't know who would ask without my knowledge.
Q. You mentioned earlier -- when I was asking you about a situation in which an entertainer didn't take off her gown while she was dancing on stage, you said she would not be fined.
Are entertainers fined for different things at Rick's of New York?

Page 115

**A. No.**
Q. Are fees ever imposed on entertainers at Rick's of New York?
MR. KIMMEL: Objection to the form of the question; vague.
You can answer.
A. Yes.
Q. What kind of things cause an entertainer to be subjected to a fee?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Well, when I say "fee," there is the fee that goes to the DJ, there's a fee that goes to the house mom, there's a fee that goes to the management team. Those are the fees that I was referring to.
Q. Directing your attention back to Exhibit No. 7.
**A. (Perusing document.)**
Q. If you look at Paragraph No. 3, it says there's a 24-hour notice of cancellation or you will be subject to a fine up to $50 Tuesday through Friday, and up to a $100 fine Saturday through Monday.

Page 116

MR. KIMMEL: Is there a question?
Q. Is that accurate?
**A. Accurate in what sense?**
Q. Is it true?
**A. We've never imposed these fines.**
Q. It's your testimony that Rick's of New York has never imposed a fine on an entertainer for not providing 24-hour notice of cancellation?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I shouldn't say "never," but it's always -- it's removed. The idea is to have a discussion about why we need her to be there, and that's usually why it's put there.
Q. A second ago you said you've never imposed it, and then you said "I shouldn't say never," so I'm going to ask my question again.
Has Rick's New York imposed fines on entertainers for failing to provide 24-hour notice of cancellation?
MR. KIMMEL: Objection to the form of the question.

A. Yes.
Q. Is there some reason you were hesitant to admit that?
MR. KIMMEL: Objection to the form of the question.
You can answer.
Mischaracterizes the testimony.
Go ahead.
A. No. I wanted to be clear.
Q. Directing your attention to the third page of Exhibit No. 7, which has Bates number in the bottom right-hand corner -- or actually at the bottom, NKA 106.
**A. (Perusing document.) Yes.**
Q. At the very bottom of that page there is a subject or there is a bullet point which is called "Fines," and that sets out three different fines.
Have those fines ever been imposed on entertainers at Rick's New York?
**A. Yes.**
Q. Where are the fines reflected in the records of Rick's New York?
MR. KIMMEL: Objection to the form of the question.



You can answer.
A. Club Trax.
Q. Is there a way to run a report of all the fines that have been imposed on a given entertainer?
**A. No.**
Q. Is there a way to access information on the fines that have been imposed over a particular period of time?
**A. No.**
Q. How could you access the information on fines that's in Club Trax?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. It won't be specific to fines.
Q. What else would be included?
**A. Other fees and credits.**
Q. And is that going to be on the report called an "Entertainer Charge Summary"?
**A. Yes.**
Q. How do you access the entertainer charge summary for a given entertainer?
**A. I access the entertainer file, I go into credit summary or credit history, enter her**



**name or ID number, and then I bring up her information.**
Q. So it's just a matter of pressing a few buttons?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Yes.
Q. Have you had the ability to access those entertainer charge summaries since the Club Trax system was implemented in New York?
**A. Not from the beginning.**
Q. When did you gain that ability?
**A. December 2005.**
Q. So no special program had to be written in order to allow you to access that data; is that correct?
MR. KIMMEL: Objection to the form of the question; mischaracterizes the testimony.
You can answer.
A. No.
Q. What is incorrect about what I just said?
**A. No special data had to be written**



**in.**
Q. I think we're having a miscommunication. Are you agreeing with me? Did any special program have to be written in order to allow you to access the entertainer charge summary data?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. How I was able to gain access, I don't know how they make it happen in Club Trax.
Q. But my question is: Since December 2005, you've been able to do that, correct?
**A. Yes.**
Q. So nothing special had to be written after December 2005, to your knowledge, correct?
**A. Correct.**
Q. Directing your attention to page 4 of the entertainer guidelines of Exhibit No. 7, they have Bates No. 107 in the bottom. There's a section called "VIP rooms."
Can you describe the process that is employed for a guest who wants to spend time



Ex. 39B

Page 121

with an entertainer in a VIP room at Rick's in New York?

**A. The entertainer and guest agree that they will spend time together in the VIP room. They will determine how much time they want to spend together. They will then ask a host to escort them upstairs to the VIP rooms. They are then handed off to another host who will explain in greater detail the fees that the entertainer receives and the room charge that the guests will have to pay to the club.**

Q. Has that process, the general process that you just described, been the case since Rick's opened in New York in 2005?

**A. Yes.**

Q. And if a customer wishes to pay the entertainer's portion of the -- let me rephrase.

If a guest wishes to use a credit card to pay for the entertainer's time, is the guest required to purchase dance dollars?

**A. Yes.**

Q. And then they can use those dance dollars to pay the entertainer for her time; is that correct?

**A. Yes.**

Page 122

Q. And for that purpose, are dance dollars attributed -- an equal value to $20?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. For that purpose, yes.

Q. So it's either $200 or ten dance dollars for a half an hour; is that correct?

**A. That's correct.**

Q. Are guests informed that the entertainer will only receive $18 for that dance dollar when she exchanges it for cash at the end of the evening?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. No.

Q. Why not?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. Because the guest is buying a set amount with his credit card for time, and it is not necessary to inform him of back-of-the-house procedures.

Page 123

MR. KIMMEL: Michelle, I need to take a two-minute break to use the men's room.

MS. DRAKE: Sure.

(Whereupon at 2:06 p.m., a recess was taken 2:14 p.m.)

(The deposition resumed with all parties present.)

K E N N E T H S I S T R U N K, resumed and testified further as follows:

BY MS. DRAKE:

Q. Are the entertainer guidelines an accurate description of the guidelines that govern entertainer conduct at Rick's?

MR. KIMMEL: Objection to the form of the question and to the characterization.

You can answer.

A. Yes.

Q. And have they been since you -- since Rick's opened, have the guidelines been accurate?

MR. KIMMEL: Objection to the form of the question.

You can answer.

Page 124

A. Yes.

Q. I want to talk about some of the fees that are described in the guidelines. The guidelines -- different versions of the guidelines since 2005 have talked about a music fee. What is that for?

**A. It's for the DJ's services.**

Q. And who receives that money?

**A. The DJ.**

Q. Is it accounted for in any way in Rick's books or on the Club Trax system, the amounts that are paid to the DJ by the entertainers?

**A. No.**

Q. Where is that fee paid to the DJ?

**A. At the DJ booth.**

Q. And when is it paid?

**A. At the end of the entertainer's shift.**

Q. And then there's also a management fee which is mentioned. What is that?

**A. That is a fee paid to management at the end of each entertainer's shift.**

Q. And is that fee accounted for on the Club Trax system?

Page 125

**A. No, it's not.**
Q. How is that fee paid?
**A. It's paid when the entertainer clocks out at the cage.**
Q. What I mean is, is it paid in cash?
**A. Cash or a dance dollar.**
Q. And what happens to that money after it's collected by the cage?
**A. It is then put together, and then it goes to the management of the facility.**
Q. And who is included in that group?
**A. The managers.**
Q. Does that include the general manager?
**A. Yes.**
Q. And the other managers -- is it split up each night? In other words, do the entertainers pay the management fee on Monday, and then all the managers who work on Monday get a portion, or how is it divided?
**A. Yes, that's correct.**
Q. And if you, as the general manager, did not work on Monday, does that mean you also would not receive any part of that night's management fees?

Page 126

**A. That's correct.**
Q. Is it divided equally among the management personnel who work on that particular shift?
**A. Yes.**
Q. For accounting purposes, are those payments included in the wages of management?
**A. No.**
Q. How are they accounted for?
MR. KIMMEL: Objection to the form; vague.
Do you understand the question?
A. I think I understand your question. Let me revise my answer.
Yes. It does go towards the wage because we have to claim it at the end of our shift.
Q. Is the money that you receive in management fees money that you receive in addition to your regular salary?
**A. Yes.**
Q. And the managers who work for you, are the fees that they receive for management fees money that they receive in addition to

Page 127

their regular salary?
**A. Yes.**
Q. And when they claim it at the end of the night, are they also claiming at that same time tips that they may have received from customers at the club?
**A. Yes.**
Q. So when you say it's included in wages, is what you mean that it's reported on a W-2?
**A. Yes, it's reported.**
Q. Do you understand the difference between income which is reported and income which is wages as opposed to tips?
**A. Yeah. I mean, I was unclear at first, but yes, I understand.**
Q. So is it fair to say that the management fees are treated as tips --
MR. KIMMEL: Objection.
Q. -- but they are reported tips?
MR. KIMMEL: Objection to the form of the question; calls for a legal conclusion.
You can answer.
A. Yes, that's correct.

Page 128

Q. And, in fact, is the management fee often referred to as a "management tip-out"?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. No.
Q. Have you ever referred to it as tipping out management?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I may have.
Q. Have you heard other people refer to it that way?
**A. Yes, I have.**
Q. The dressing room fee, what is that?
**A. That is a fee paid to the house mom working that shift for her services in the dressing room.**
Q. Who pays that?
**A. The entertainer.**
Q. And when do they pay it?
**A. At the end of their shift.**
Q. And is that money that the house



Ex. 39B

Page 129

mom receives in addition to her regular wages?
**A. She doesn't receive a regular wage.**
Q. Is the house mom also an independent contractor?
**A. Yes.**
Q. And I think I forgot to ask that question when we were talking about the DJ fees. DJs don't receive wages either, right, they are also independent contractors?
**A. No. They are employees very much like a waitress.**
Q. I see. So they receive a base wage, and then the DJ fees are tips?
**A. That's correct.**
Q. What about the hair and makeup fee, who is that paid to?
**A. That is paid to the hairdresser and makeup artist per shift.**
Q. Is that something that's required to be paid regardless of whether the entertainer utilizes those individual's services?
**A. Yes.**
Q. And if they use that individual's services, they pay an additional amount, correct?

Page 130

**A. No, it's not additional. If they use the makeup artist's services, you know, if they sit in his chair and have their face done, they don't pay the $5 fee, they only pay for the services used.**
Q. So it's almost a fee for not using the hair and makeup services, is that an accurate way to describe it?
MR. KIMMEL: Objection to the form of the question.
A. It's a fee for the materials provided by the hair and makeup artist.
Q. But even if they don't use those materials, they still have to pay it?
**A. That's correct.**
Q. And if they do use the materials, they don't pay it?
**A. If they use the materials, they do pay it. If they use the hairdresser's services or they sit in his chair and have their hair done or the makeup artist services where they sit in his chair and have their makeup done, they don't pay that minimum fee. They only pay for the services that the hairdresser or makeup has provided.**

Page 131

Q. So you can either pay the $5 fee or you can have the hair or makeup done and pay whatever that costs?
**A. That's correct.**
Q. The music fee and the management fee are paid at the end of the night; is that correct?
**A. Yes.**
Q. And the house fee and the promo fee are paid at the beginning of the night; is that correct?
**A. Yes.**
Q. And the house fee and the promo fee are entered in Club Trax; is that correct?
**A. Yes.**
Q. Who is in charge of actually entering data into Club Trax?
(Telephone interruption.)
THE WITNESS: I'm sorry. My phone. I have to turn -- well, we'll just let the phone run.
A. We have cage personnel that enters that information.
Q. Is Club Trax also the point-of-sale system so bartenders can also enter information

Page 132

in there for liquor sales or whatever?
**A. Yes.**
Q. But in terms of information relating to the fees that are paid by entertainers, that's all done by the cage staff?
**A. That's correct.**
Q. How many people work in the cage?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Five.
Q. Five people at any one time or five people have that position and they work at different times?
**A. Five people have that position and work at different times.**
Q. At any given time, how many people work in the cage?
**A. One.**
Q. At any point since 2005 has it been the policy at Rick's New York that entertainers were supposed to sign the guidelines?
**A. Yes.**
Q. When did that stop?
**A. I believe 2008.**



Ex. 39B

Page 133

Q. Approximately when?
**A. Approximately midsummer.**
Q. And why did that stop?
**A. Because, as I stated earlier, they would leave the guidelines lying around or they wouldn't remember them, so it really had no point.**
Q. Does Rick's New York track the amount of money that entertainers make on a given night in any way other than tracking the amount of money they receive when they turn in dance dollars for cash?
**A. No.**
Q. Are you familiar with the method that is used to account for dance dollar sales by Peregrine Enterprises?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. The question is not clear. I don't understand.
Q. Are you familiar with the -- does Peregrine Enterprises have a general ledger?
**A. No. Not for entertainer dance dollars.**

Page 134

Q. But does it have a general ledger, one section of which is dance dollar related?
**A. In Club Trax.**
Q. At the time that a dance dollar is sold to a guest, is there a duplicate entry, an accounting entry, which is also made which records it as a liability to the entertainers?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. No.
Q. Why not?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. If a guest purchases dance dollars and he doesn't spend them all and he walks out with some, then they are unaccounted for.
Q. What do you mean "they are unaccounted for"?
**A. Well, they haven't been redeemed by anybody.**
Q. So at the time they're actually redeemed, is that when they're recorded as a liability?

Page 135

**A. Yes.**
Q. Do dance dollars expire?
**A. No.**
Q. Do they say they expire?
**A. Yes.**
Q. Why is what they say different than your answer?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. The expiration is to encourage the guest to spend all that he has purchased and to purchase wisely. We want him to spend all that he's purchased that night, as opposed to having them out, you know, for weeks on end.
And it makes it easier for us to reconcile the number at the end of the night in terms of what we sold. So if a customer comes back the next day or the day after with these dance dollars and he gives them to an entertainer, you know, they're going to go into the Club Trax system as saying expired. And then I have to override the system and make them valid, and it throws our numbers off for that given night.

Page 136

Q. Is it your testimony that any time a guest wants to use dance dollars which say on their face they're expired, that you will honor that request?
MR. KIMMEL: Objection to the form of the question; misstates the characterization of the testimony.
You can answer.
A. No.
Q. So on some occasions, in fact, dance dollars have been allowed to expire?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Yes, they have.
Q. What about with respect to entertainers who turn in a dance dollar which is expired, what is the policy with respect to that?
MR. KIMMEL: Objection to the form of the question; vague.
You can answer.
A. I honor them.
Q. Do you always honor them?
**A. Yes.**



Ex. 39B

Q. Have you ever not honored them?
**A. I have never refused an entertainer who has handed in dance dollars that had expired.**
Q. Are you the only person that has the authority to determine whether a dance dollar, which at least on its face has expired, should be allowed to be exchanged for cash?
**A. Yes.**
Q. Why does Rick's New York have all these different fees instead of just like having one big fee?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I don't know how we would create one big fee. Because we're dealing with such numbers, we need to be specific as to where the money is going.
Q. Is the DJ fee recorded as revenue to Peregrine Enterprises?
**A. No.**
Q. Is the management fee reported as revenue to Peregrine Enterprises?
**A. No.**



Q. Is the house mom fee recorded as revenue to Peregrine Enterprises?
**A. No.**
Q. Is the promotions fee recorded as revenue to Peregrine Enterprises?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Yes.
Q. Is the facility-use fee or the house fee?
**A. Yes, it is.**
Q. And what about the hair and makeup artist fee?
**A. No, it is not.**
Q. The accounting practices that you described during the course of this deposition, have those remained the same since the club opened?
MR. KIMMEL: Objection to the form of the question; vague.
You can answer.
A. When you say "the accounting practices," what are you referring to?
Q. Well, we just described accounting



practices. We can go through them.
The fees that we just described, whether they're accounted as club revenue or not, have those remained the same since December of 2005?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. That has remained the same.
Q. Have the accounting practices with respect to the way dance dollars are treated remained the same since the club opened in 2005?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Yes.
Q. Have the kinds of -- I asked you a question about whether Rick's New York maintains records of entertainer income other than the amount of money they receive when they turn in dance dollars, and you had said no.
Has that been the case since 2005 when the club opened?
**A. Yes.**
Q. Can you think of any changes that



have been made in the accounting practices of Peregrine Enterprises that's pertained to dance dollars since the club opened in 2005?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. There have been no changes.
Q. Have there been any changes with respect to the accounting information that the club maintains on the fees charged to entertainers since the club opened in 2005?
**A. Can you ask the question again, please?**
Q. Sure.
Have there been any changes to the accounting practices with respect to the fees charged to entertainers since the club opened in 2005?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. No, there's been no change.
Q. Earlier we discussed the, I think, five sets of entertainer guidelines which have been in place at different time periods since



Ex. 39B

Page 141

the club was opened. Understanding that -- sorry. Let me rephrase the question and try to ask it more cleanly.
At any given time, is there only one set of entertainer guidelines which applies to all entertainers at that time?
**A. One set at one time, yes.**
Q. And it applies to all the entertainers, correct?
**A. Correct.**
MR. KIMMEL: Objection to the form.
Q. What information is -- are there personnel files, paper personnel files maintained on entertainers by Rick's?
**A. Well, they're not personnel files, but we do have entertainer files.**
Q. What information is maintained in those files?
**A. Her application, photocopy of her I.D. and social security card and --**
Q. Anything else?
**A. And I-9 form. That's it.**
Q. I understand that to be the current practice at Rick's New York.

Page 142

Has that been the practice for entertainer files since the club opened in 2005?
**A. We added the I-9 -- I don't know exactly when, but we did add that later on. Oh, and I left out the W-4.**
Q. So there's also a W-4 in that file?
**A. Correct.**
Q. At any point since the club opened in 2005, have there been any additional documents?
**A. Added to their file, you mean?**
Q. Yes. Or has the file always contained the documents that you just described?
**A. Just that there was the addition of the I-9 form.**
Q. So the only thing that's changed since the club was opened is that you added an I-9?
**A. Correct.**
Q. Have entertainers ever been required to sign an agreement to be drug tested?
**A. Yes.**
Q. And was that maintained in that file?
**A. Yes, it was.**

Page 143

Q. Were there any other similar kind of agreements that were ever included in that file?
MR. KIMMEL: Objection to the form; vague.
You can answer.
A. No.
Q. Has Rick's stopped asking entertainers to agree to drug testing?
**A. Yes.**
Q. When did Rick's stop making that request?
**A. Midsummer 2008.**
Q. And why did Rick's stop making that request?
**A. It's hard to keep track of. Most -- we just -- we really can't -- you know, if there's an entertainer who is under the influence of some medication, you know, we can't test her for that. It's up to her to tell us that she's using it.**
Q. Does Rick's maintain records of which entertainer was in a private room with a customer at what time?
**A. Yes.**

Page 144

Q. How are those records maintained?
**A. They are written.**
Q. Can you describe them?
**A. It's a spreadsheet that will state the entertainer's name, time they enter the room, the host who is managing that room. And then it will state the time that they exit the room.**
Q. Does it also state the customer's name?
**A. No.**
Q. Is there a way that you could cross reference the sheet you just described with Club Trax's records to determine which customers were in private rooms at a given time?
**A. It wouldn't tell me what room they were in.**
Q. Understanding it wouldn't tell you which room they were in, could you tell which customers were in a room at a given time?
**A. Yes.**
Q. The spreadsheets you just described, where are those maintained?
MR. KIMMEL: Objection to the form of the question.



Ex. 39B

Page 145

You can answer.
A. They are maintained on the third floor, VIP, and then they are brought to the office.
Q. How far back do they go?
**A. At least a year.**
Q. What happened to the ones that are older than a year?
**A. I don't know.**
Q. Is there any electronic records maintained in Club Trax, or anywhere else, of which entertainers were in a private room at a given time? Could you tell in 2007, if you didn't have those handwritten records, anything about entertainers and being in a private room?
**A. No.**
Q. When a host processes -- I want to talk about the situation in which a customer goes into a private room and elects to pay for both the room and the entertainer's time on a credit card.
How are those credit card charges run? Is it two separate transactions?
**A. Yes, two separate transactions. One transaction is strictly for dance dollars**

Page 146

**and the room charge, and there's a separate transaction for the bar tab.**
Q. So it's actually three transactions if there's a bar tab, correct?
**A. No, no. There's one transaction -- two transactions. The room charge and dance dollars are on one charge, and the bar tab is on the separate.**
Q. Are the room charge and the dance dollars running in as separate charges on one transaction?
**A. Yes.**
Q. So couldn't you tell by looking at those transactions that a given customer purchased time in a private room on a given evening?
**A. Yes.**
Q. How far back does the Club Trax data go?
**A. To 2005.**
Q. Are dance dollar purchases -- does each dance dollar have a unique serial number of some sort?
**A. Yes.**
Q. So if you knew that a given

Page 147

customer purchased certain dance dollars on a given night, could you then look to see which entertainer later cashed in those dance dollars?
**A. Yes, I could.**
Q. Do entertainers have a dancer name that's not necessarily the same as their legal name?
**A. Their entertainer name being different than their legal name, is that the question?**
Q. Yes.
**A. Yes.**
Q. Is that a requirement of Rick's, that entertainers use a name that's different than their legal name?
**A. No.**
Q. Do most entertainers use a name that's different than their legal name?
**A. Yes.**
Q. What percentage of entertainers would be your best estimate use a name which is different than their legal name in the club?
MR. KIMMEL: Objection; calls for speculation.
You can answer.

Page 148

A. Ninety-seven percent.
Q. So the vast majority?
**A. Yes.**
Q. Why do you believe that is?
**A. Because when they do come in to audition, if they have prior experience dancing, they will come in with a name that they've used in other places and they want it to carry over to the new place.**
**Sometimes they'll come in and want to be somebody completely new, and they'll just pick a new name. And they spend time thinking about what name feels right, you know, that suits their personality that they are when they put their dress on.**
**And there are others who are just more casual about it and say, oh well, you know, my name is Jean, and I'm just very comfortable with that, and I don't have a problem.**
Q. Does Rick's try to avoid having two entertainers working at the same time who have the same entertainer name?
**A. Well, yes. That creates a problem.**
Q. And how does the club deal with that issue?



Ex. 39B

Page 149

**A. We ask that one of the entertainers choose a new name.**
Q. And the dance dollar -- excuse me, the spreadsheet records that are maintained of time that entertainers spend with customers in private rooms, do those reflect entertainer names or their legal names?
**A. Entertainer names.**
Q. The Club Trax records are accessible by legal name, correct?
**A. It's easier by entertainer name.**
Q. Why is that?
**A. It's the name that comes to mind faster than the real name, the legal name.**
Q. But I guess what I mean is, for purposes of accessing the record, if you have the legal name, you can pull it up that way, correct?
**A. Yes, I can.**
Q. I want to talk a little bit about this entertainer name thing.
Do people call each other -- people who work together, you know, day after day in the club, do they refer to each other by their entertainer names?

Page 150

MR. KIMMEL: Objection to the form of the question; calls for speculation.
You can answer.
A. Yes.
Q. And how do you refer to entertainers in the club?
**A. By their entertainer name.**
Q. Do you know the legal name of most of the entertainers in the club on any given night?
**A. No.**
Q. How often do you actually work at the club?
**A. Four nights a week. I'm there at various times during the day, even on days I'm not scheduled to work.**
Q. And how long -- you may have told me this. How long did you work at Ten's Cabaret before coming to Rick's?
**A. A little over 11 years.**
Q. So in total you've worked in the adult entertainment industry for 15 years; is that right?
**A. Yes.**

Page 151

Q. About right?
**A. Yes.**
Q. What is your perception of the extent to which entertainers know each other's legal names?
MR. KIMMEL: Objection to the form of the question; calls for speculation.
You can answer.
A. They usually refer to each other by their stage names. Unless they have become close and get to know each other and spend time with each other outside the club, then they'll know their real names. But for the most part, they only know each other's entertainer name.
Q. What efforts has Peregrine undertaken to preserve electronic data since learning of this lawsuit?
**A. Well, we don't erase any e-mail that may have anything to do with this lawsuit in it.**
Q. What else?
**A. Well, nothing has changed. The records that we keep are as they are.**
Q. Have you received e-mails that you

Page 152

thought had something to do with this lawsuit which you decided not to delete as a result of that?
**A. Well, I don't delete any e-mails.**
Q. Have you had discussions with this lawsuit about anyone (sic)?
MR. KIMMEL: Objection to the form of the question.
Do you understand?
THE WITNESS: Yes, I understand the question.
A. Only the people in this room.
Q. Have you ever spoken with Eric Langan about the lawsuit?
**A. Yes.**
Q. Tell me about that conversation.
**A. Well, he wanted to know if I knew who the plaintiffs were, and I said yes. And he needed to get the information to Brenda.**
Q. Who is Brenda?
**A. I'm sorry. She's waving. Brenda is counsel for RCI.**
Q. What did you tell Mr. Langan what you knew about the plaintiffs in this case?
**A. That I remembered who they were.**



Ex. 39B

**As to why they left or don't work with us anymore, I had no idea why they left.**
Q. Did you tell him anything else?
**A. No.**
Q. Have you attempted to learn any additional information about the plaintiffs in this case?
**A. No.**
Q. So aside from Mr. Langan, Mr. Kimmel and Ms. Stanfield, have you spoken about this lawsuit with anyone else?
**A. No.**
Q. Have you expressed any opinions about this lawsuit?
**A. No.**
Q. Have you been involved at any time in any discussions about protecting the profitability of Peregrine Enterprises in the event that this sexually oriented business industry is required to re-categorize entertainers as employees?
**A. No.**
Q. What efforts has Peregrine Enterprises made to comply with the laws governing entertainer categorization as



independent contractors?
MR. KIMMEL: Objection to the form of the question; calls for a legal conclusion.
You can answer.
A. The entertainers have signed affidavits stating that they understand that they are independent contractors.
Q. In what context did the entertainers sign those affidavits?
MR. KIMMEL: Objection to the form of the question; vague.
You can answer.
A. The information was presented to them, and they had the choice to sign.
Q. How was the information presented to them?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Verbally.
Q. By whom?
**A. By myself, as well as Tito Martinez.**
Q. And what did -- when was this?



**A. This was earlier this year. I don't recall the exact date.**
Q. Approximately how many entertainers signed those affidavits?
**A. Approximately 90.**
Q. What did the affidavits say?
**A. It stated that they were independent contractors, and they were responsible for taking care of their own taxes and that -- well, I don't recall all of it.**
Q. Where are copies of those affidavits being kept?
**A. I don't know.**
Q. Who did you give them to?
**A. I put them in the cage.**
Q. You just put them in the cage? Did they have anyone's name on it, were they in an envelope?
**A. Each entertainer's name is on the affidavit.**
Q. Whose idea was it to have entertainers sign those affidavits?
MR. KIMMEL: Objection to the form of the question.
If you know. And if it's



counsel-related, don't answer the question.
A. I don't know whose idea it was.
Q. Who drafted the affidavit?
**A. I don't know who drafted it.**
Q. Who gave it to you?
**A. They were in the cage and --**
Q. How did you know -- go ahead.
**A. Well, when I arrived, the day manager said, "There are affidavits in the cage for you."**
Q. And they were just blank affidavits sitting in there or signed affidavits?
**A. They were blank.**
Q. And so you don't know who dropped them off, you just saw some blank affidavits and you thought you should go around and have people sign them; is that your testimony?
MR. KIMMEL: Objection to the form of the question; mischaracterizes the testimony.
You can answer.
A. I was asked to have the entertainers sign them.
Q. By whom?



Ex. 39B

**A. Eric Langan.**
Q. What did he say when he asked you to do that?
**A. That this is to help the entertainers understand that they are independent contractors and we would like them to sign them if that is their wish. So that's what I did.**
Q. Did anyone refuse to sign it?
**A. No.**
Q. Did you present these affidavits to the entertainers in a meeting?
**A. No.**
Q. How did you present them to them?
**A. As they entered the club for their shift.**
Q. And did you present them to them personally?
**A. Myself or Tito.**
Q. What did you personally say to entertainers as they entered the building for their shift with respect to those affidavits?
**A. I asked them to sign the affidavit and that was their choice. If they chose not to, that that was fine. If they wanted to bring**



**it to their lawyer to look it over, that was fine, as well.**
Q. Over the course of how many evenings did you present those affidavits to entertainers to sign?
**A. Three.**
Q. Why only three?
**A. Well, we chose the busiest nights and the nights entertainers were most signed on for, so we would give everyone the opportunity.**
Q. After you left the signed affidavits in the cage, who picked them up, do you know?
**A. I do not know.**
Q. Why did you leave them in the cage?
**A. It's a safe, secure area.**
Q. Did you have any understanding of where they would go after you put them in the cage?
**A. Yes.**
Q. Where did you believe they were going?
**A. In the entertainer file.**
Q. To your knowledge, have they gone anywhere besides the entertainer file?



**A. No.**
Q. So earlier when we were talking about what kind of documents are in the entertainer files, is there a reason you didn't mention these affidavits that you had them sign which are relevant to the lawsuit you're testifying in?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I was thinking about what you asked me at the time, and I wasn't thinking about the affidavit until you mentioned it.
Q. Have you done anything else since this lawsuit was filed which in any way pertains to this lawsuit?
MR. KIMMEL: Objection to the form of the question; vague.
Do you understand the question?
THE WITNESS: Yes, I understand the question.
A. No.
Q. Have you had any conversations with any entertainers about this lawsuit?



**A. No, I haven't.**
Q. Did you explain to any of the entertainers who were signing those affidavits that night that they were potential class members in this lawsuit?
**A. No.**
Q. Did you mention to them the possibility that they could consult with myself or Mr. Smith before they signed those affidavits?
**A. No, I did not.**
Q. Did you mention to them the possibility that they could be hindering legal rights when they sign those affidavits?
**A. No, I did not.**
Q. Did any of those things concern you at the time?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. They didn't come to mind.
Q. Did you wonder why Mr. Langan wanted entertainers to sign an affidavit so that they can understand something?
MR. KIMMEL: Objection to the

Page 161

form of the question.
You can answer.
A. We were always trying to help the entertainer understand their rights and their power. That's why we draw up guidelines and redraw them, so that they're clear so that they have a greater understanding of our business and their role in it.
Q. Do you find that entertainers are often confused about your business and their role in it?
MR. KIMMEL: Objection; calls for speculation.
You can answer.
A. No.
MS. DRAKE: Let's take a five-minute break or a ten-minute break.
MR. KIMMEL: Okay.
(Whereupon at 3:02 p.m., a recess was taken until 3:14 p.m.)
(The deposition resumed with all parties present.)

Page 162

K E N N E T H S I S T R U N K, resumed and testified further as follows:
BY MS. DRAKE:
Q. One of the things that you spoke about was kind of a two-phase orientation process for new entertainers.
Has that process remained the same from 2005 to now?
**A. Yes.**
Q. And since 2005, have dance dollars always been exchanged for $18 cash to the entertainer?
**A. Yes.**
Q. And has the price of a dance dollar for a guest been $24 from 2005 to now?
**A. Yes.**
Q. Has the design of the dance dollar changed since 2005?
**A. No.**
Q. So they have physically looked the same since 2005?
**A. Yes.**
Q. What are customers told at the time they purchase a dance dollar?
MR. KIMMEL: Objection to the

Page 163

form of the question.
You can answer.
A. They're told that they are charged 20 percent and that the dance dollars expire at the end of the day.
Q. When you say that they're told that they're charged 20 percent, is that like a 20 percent service fee on top of the dance dollar?
**A. Yes. Excuse me. They're told it's a 20 percent service charge.**
Q. And so that's the $4 which is 20 percent of the $20?
**A. Yes.**
Q. And is it the policy of Peregrine that that is what customers should be told by whomever it is that sells them, the dance dollars?
**A. Yes, it is.**
Q. Who can sell dance dollars?
**A. Bartenders, floor hosts, hosts, managers.**
Q. Is that it?
**A. Yes.**
Q. So entertainers cannot sell dance

Page 164

dollars to customers, correct?
**A. Correct.**
Q. Who designed the dance dollars, the actual pieces of paper?
**A. Club Trax.**
Q. Do the dance dollars look the same at all of the different Rick's Cabaret clubs throughout the country? Do you know?
**A. I don't know.**
Q. Have you seen the dance dollars in any other Rick's Cabaret clubs throughout the country?
**A. No, I haven't.**
Q. Have you ever been to another Rick's club?
**A. Yes, I have.**
Q. Which ones?
**A. Rick's in Minnesota and Houston.**
Q. Based on -- have you -- you testified earlier that you had spoken with general managers at other clubs.
Is it your understanding that the other clubs also charge a facility-use fee to entertainers who work?
**A. Yes.**



Ex. 39B

Q. Have you ever sent copies of the entertainer guidelines that are in place at the New York club to any general managers at any other clubs?
**A. No, I haven't.**
Q. Have you ever talked to any general managers at any other clubs about your entertainer guidelines or their entertainer guidelines?
**A. No, I haven't.**
Q. Have you ever exchanged any e-mail messages on that topic?
**A. No, I haven't.**
Q. You mentioned that the computer that you use at the club had been replaced at some point since 2005.
Approximately when was that?
**A. Early 2007.**
Q. And why did you get a different computer?
**A. We needed to update it, it was slow, didn't perform all the functions that we felt was necessary, fast enough.**
Q. What happened to that physical computer?



**A. I believe the hard drive was removed. I don't know where it is, but the body, the rest of it was just put out to trash.**
Q. Who removed the hard drive?
**A. Steven DeAngelo.**
Q. Was the data on that hard drive transferred to the computer that you use now?
**A. Yes.**
Q. Who did that data transfer?
**A. Steven DeAngelo.**
Q. Can you tell me about the procedure that entertainers use to clock in and out at Rick's in New York?
**A. Well, the entertainer enters the building and they go to the window outside of the cage, they -- there's a fingerprint scan. So they will put their finger on the scanner, and it shows that they are who they say they are. And it automatically tells them what time it is and what their fee is for that time. And then -- I'm sorry.**
Q. No. Go ahead.
**A. So they are then told what to pay and they pay it, and they receive a receipt for what they paid. And they present that to the**



**house mom, and they go to work.**
Q. Are entertainers supposed to be ready to work at the time that they clock in?
**A. No.**
Q. So they can come in in street clothes and no makeup on and then go upstairs to get ready?
**A. The way the club is designed, they will clock in, enter the dressing room, get ready, then go up.**
Q. What do you call -- do you use the term "private dances," "lap dances," what term do you use to describe personal dances that an entertainer does for a guest?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Table dance.
Q. Do you recognize that the terms table dance, private dance and lap dance are often used interchangeably?
**A. Yes.**
Q. Has the price for a table dance at Rick's always been 20 U.S. dollars or one dance dollar, in New York?



**A. Yes.**
Q. And who sets that price?
**A. It's industry standard here in New York.**
Q. But who has decided that Rick's is going to comply with the industry standard?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. I did.
Q. Do you ever run promotions like half-price table dances or anything like that?
**A. We had run two-for-ones about four times.**
Q. And who decided to run those promotions?
**A. I did.**
Q. Can you describe how the stage rotation works for entertainers at Rick's in New York?
**A. Once the entertainer checks in with the DJ, he then will put her on his roster. On his roster, there will be at the heading each stage where they'd be; main stage, pedestal stage, balcony stage.**



Ex. 39B

**So as the entertainer comes in, he adds her to the list along those lines. So once her name comes up, he will announce what stage she'll be on. He'll give her one song notice in case she's in the middle of doing a dance for a guest, she knows by the end of that song, she will be due on stage.**

**So then she will go to the stage, and she will dance two songs. And at the end of that two songs, the next entertainer will come up and replace her. Then she exits the stage and goes back to approaching guests on the main floor.**

Q. Is the general expectation that entertainers take their top of their dress down during the first song, and they take the entire dress off during the second song?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. Yes.

Q. And is that conveyed at any point to the entertainers that first song is top off, second song is everything off?

**A. What I tell them is first song,**



**dress on; second song, dress off. But they are free to undress as they see fit.**

Q. In other words, they can take it off in any manner that is appealing to them or appropriate for them?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. That's correct.

Q. In your experience working at Rick's for the last four years and working in the industry for 15 years, what are the factors that contribute the most to whether the club is busy on any given night?

MR. KIMMEL: Objection to the form of the question; calls for speculation.

A. Marketing and promotion.

Q. Does it also matter what night of the week it is?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. Yes.

Q. What nights are the busiest nights?



**A. Wednesday and Thursday.**

Q. They're busier than Friday and Saturday?

**A. Yes.**

Q. Why is that?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. Our guests predominantly come from the business districts. They're entertaining clients, they're coming in after work before they go home. The weekend audience is generally coming from the outer boroughs or they're tourists, and they don't come in in large numbers.

Q. Does an entertainer have to re-audition to continue working at Rick's after working there for a given period of time?

**A. No.**

Q. So if an entertainer starts working there today, she can work there for however long she likes and she doesn't need to re-audition or do anything along those lines?

MR. KIMMEL: Objection to the form of the question; vague, calls



for speculation.

You can answer.

A. That's correct.

Q. Would you agree with the proposition that the primary reason Rick's New York has customers is because there is an opportunity to see the entertainers and interact with the entertainers?

MR. KIMMEL: Objection to the form of the question.

You can answer.

A. Yes.

Q. Do you think anybody would show up if there were no entertainers there?

MR. KIMMEL: Objection; calls for speculation, hypothetical question.

You can answer.

A. Yes.

Q. You do think people would show up?

MR. KIMMEL: Same objections.

You can answer.

A. Yes, people would still come.

Q. Would it be very many people?

You're smiling and kind of laughing



Ex. 39B

while you answer my question.
MR. KIMMEL: For the record, he's not laughing.
You can answer.
A. Yes.
MS. DRAKE: Would you agree he's smiling, Mr. Kimmel?
MR. KIMMEL: I would agree, as are you, as am I.
A. Yes, they would still come. Not in the same numbers, we would have to promote something different.
Q. Would you expect that if there were no entertainers, that the customer base would be significantly smaller?
MR. KIMMEL: Objection to the form of the question; hypothetical, calls for speculation.
You can answer.
A. I would say it would be different.
Q. And it certainly would involve a very different marketing campaign than what you've undertaken to date, correct?
MR. KIMMEL: Objection; hypothetical question, calls for



speculation.
You can answer.
A. Correct.
Q. Who owns the premises where Rick's New York is located?
**A. Peregrine Enterprises.**
Q. Do they actually own the premises, or do they have a lease?
**A. They have a lease.**
Q. Who is the lease with?
**A. I don't know.**
Q. Has Peregrine or Rick's New York ever banned someone from entering the premises?
Do you have a list of people who are not allowed to come on the property?
**A. We do not have a list.**
Q. Have you told people that they were not allowed to return to the club?
**A. Yes, I have.**
Q. Have you made that representation to entertainers in the past?
MR. KIMMEL: Objection to the form of the question; vague.
You can answer.
A. Yes, I have.



Q. Who made the decision that entertainers would dance on stage for sets consisting of two songs, as opposed to another number of songs?
**A. Eric Langan.**
Q. Are all entertainers -- sorry.
Let me ask the question this way: Is there a way for the DJ to know if an entertainer is in a private room with a guest?
**A. Yes.**
Q. How is the DJ notified of that?
**A. The host that has put the entertainer in the room will notify the DJ.**
Q. How?
**A. Over a two-way radio, as well as in Club Trax.**
Q. How is that denoted in Club Trax?
**A. It's a new screen specifically for the VIP rooms that states when an entertainer is "off rotation," as we say.**
Q. I think you said it's a new screen?
**A. Yeah. It's something we had developed earlier this year.**
Q. Earlier in 2009?
**A. Correct.**



Q. Prior to that screen on Club Trax being available, was the only way that the DJ would know if an entertainer was in a VIP room was over the two-way radio?
**A. Yes.**
Q. Have entertainers been fined in the past for not appearing on stage when it was their turn to be on stage in the stage rotation?
**A. Yes, they have.**
Q. It's my understanding that you were just named general manager of the year at the Adult Entertainment Expo in Vegas?
**A. That's correct.**
Q. How did you receive that award? In other words, who did you receive that award from?
**A. Exotic Dancer Magazine hosted the expo and presented me with the award.**
Q. Are you a member of the Association of Club Executives?
**A. Yes, I am.**
Q. Tell me about that organization.
**A. It has different chapters throughout the country, but it allows club executives and managers to get together and**



Ex. 39B

Page 177

**discuss issues and ideas that pertain to our business.**
Q. Is there a newsletter affiliated with membership in that club?
**A. Not to my knowledge.**
Q. Do you receive any newsletters from that club?
**A. I do not.**
Q. Do you attend meetings?
**A. I attended one meeting.**
Q. When was that?
**A. August 2009.**
Q. And what was the subject matter of that meeting?
**A. Getting more members in New York State.**
Q. Was that the only subject matter?
**A. Yes.**
Q. Who else was at that meeting?
**A. There were club owners from -- I'm sorry, I don't recall their names, club owners from a few other clubs here in Manhattan, as well as some from Upstate New York and Queens.**
Q. How long have you been a member of ACE?

Page 178

**A. Since August 2009.**
Q. I'd like to direct your attention to what has been marked as Exhibit No. 6.
MR. KIMMEL: What is the exhibit, Michelle? Because we just have a big stack of documents here.
MS. DRAKE: It's a printout from the website. It says "Career opportunities" at the top.
MS. STANFIELD: Here you go.
MR. KIMMEL: (Handing.)
A. Okay. I have it. (Perusing document.)
Q. I'll represent to you that this is a page that I printed off the ricks.com website earlier this month, I think, around October 6th.
Are you familiar with this page?
**A. No, I'm not. I haven't seen it.**
Q. Do you know how openings for wait staff and entertainers at Rick's New York came to be posted on this page?
**A. Steven DeAngelo posted them on this page.**
Q. And who is the individual who has the e-mail address shawn@ricks.com?

Page 179

**A. Shawn Kevlin. He's the manager that oversees wait staff.**
Q. And if someone e-mails Shawn seeking a position as an entertainer, what is he supposed to do with that information?
**A. He will then forward that information to Tito Martinez and CC Ken Sistrunk.**
Q. Who has the authority to engage in relationships with entertainers at Rick's New York? In other words, who conducts the audition and decides if someone can perform at Rick's or not?
**A. I give the final say if there is question. However, Tito Martinez will be the primary person to hire the entertainer.**
Q. And in the past you described a few different circumstances in which entertainers were no longer allowed to perform at the club.
Who makes those decisions?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. The management team will make that decision.

Page 180

Q. Do you have the final say on the decision?
**A. If I object with what everyone else has said, yes.**
Q. I'd like to direct your attention to Exhibit Nos. 15, 16, 17 and 18. We're not going to look at them all at once, but it sounds like they're not in great shape on your end, so --
MS. STANFIELD: I've got them.
MR. KIMMEL: (Handing.)
Okay. He has No. 15.
Q. Okay. Exhibit No. 15 starts with the page which has the Bates number at the bottom, 427.
**A. Okay.**
Q. Do you see that?
**A. Yes.**
Q. What is this?
**A. Entertainers often at times come in and don't have their house fee, and they ask if they can work, make some money and then come and pay the fee. Well, quite often they forget to come and pay the fee. And then the next day**



Ex. 39B

Page 181

**they come in, it's the same issue. And, you know, we want them there, we want them to know that we understand what they're going through, but then these fees accumulate, so we had to post this sign.**
Q. I see.
And go ahead -- and was this, in fact, what the practice became, was to collect the fees out of the dance dollars at the end of the night?
**A. Not -- it's not a practice.**
Q. So you put up the sign, but you didn't do it?
**A. We only had to do it with a few entertainers.**
Q. Okay. But for the entertainers that fell into this category, you did it, right?
**A. Yes, we did.**
Q. And do you continue to do it?
**A. No, we don't.**
Q. When did the practice stop?
**A. I don't know exactly when it stopped.**
Q. When did it start?
**A. 2008, September.**

Page 182

Q. So it started in September of 2008.
And what is your best estimate of when it stopped?
**A. Mid-June of 2009.**
Q. The second page of Exhibit No. 15 has Bates No. 428.
**A. Okay.**
Q. What is this?
**A. This was a notice posted because entertainers were continuing to pay their DJ fee at the cage, and we would ask them to give it strictly to the DJ.**
Q. Why did you care? Why did it matter to you?
**A. Because it wasn't the cage's responsibility to collect the DJ's fee, it interfered with their duties when they had to keep track of who was paying the DJ's fee and who wasn't. It was the DJ's responsibility, not that of the cage.**
Q. And is this policy still in effect as of today?
**A. Yes, it is.**
Q. And it looks like this started on November 4, 2008, correct?

Page 183

**A. Correct.**
Q. But even prior to that time when the cage would collect the fee on the DJ's behalf, the cage would then give that money to the DJ, correct?
**A. Correct.**
Q. Drawing your attention to the third page of this exhibit, which has No. 429 at the bottom.
**A. Okay.**
Q. When was this posted?
**A. The same time, late November 2008.**
Q. And did you make the decision to post this?
**A. Yes, I did.**
Q. What does it mean to make someone inactive?
**A. It means they will not be allowed to clock in until they clear up their fees or speak with the manager about these fees.**
Q. Who has the authority to make someone inactive in the system?
**A. I do.**
Q. Does anyone else have that authority?

Page 184

**A. No.**
Q. Who has the authority to switch someone from being inactive to being active again?
**A. I do.**
Q. Does anyone else have that authority?
**A. Eric.**
Q. And prior to the time that you were the general manager at Rick's, was it Ed Anakar who had the same authority with respect to those active/inactive transactions that you did?
**A. Yes.**
Q. Turning your attention to the next page in Exhibit No. 15, which has No. 118 at the bottom.
**A. Okay.**
Q. Who put this sign up?
**A. I did.**
Q. And approximately when was that?
**A. This was -- I don't know for sure.**
Q. What is your best estimate?
**A. November 2008.**
Q. And did you, in fact, ever impose a fine for gum chewing?



Ex. 39B

Page 185

**A. No.**
Q. Did anyone at Rick's?
**A. No.**
Q. Who has the authority to impose a fine on an entertainer?
**A. The management team.**
Q. Any member of the management team?
**A. Yes.**
Q. Do you know if any other members of the management team have imposed fines for gum chewing?
**A. They have not.**
Q. How do you know that?
**A. Because I need to know about it before it can go into the system.**
Q. How does a fine get put in the system? What is the actual process for putting it in there?
**A. The fine is brought to my attention by the manager who would like to impose this fine, and then I notify the cage.**
Q. And then what happens?
**A. Then we post the fine in the entertainer's file in Club Trax.**
Q. And what is the process for posting

Page 186

it in an entertainer's file in Club Trax, like what mechanically do you do?
**A. They type it in.**
Q. So they pull up the entertainer's file and then they -- then what?
**A. They pull up the entertainer's file, and then they put the fine into her account.**
Q. And are those fines reflected on the entertainer log-in reports?
**A. Yes. Not the log-in report, the -- their fee summary.**
Q. The entertainer charge summary?
**A. Yes.**
Q. Let's look at the next page in Exhibit No. 15.
**A. (Perusing document.)**
Q. When was this posted?
**A. Early 2006.**
Q. And who posted this?
**A. Ed Anakar.**
Q. When these things have been posted at the club, where are they actually posted, like where does the piece of paper go?
**A. They're posted outside of the cage**

Page 187

**where the entertainer goes to clock in, as well as the entrance into the dressing room.**
Q. Are there bulletin boards in those locations?
**A. There's a bulletin bored outside of the cage, but entry into the dressing room are doors.**
Q. And are they taped up to the door?
**A. Yes, taped to the door.**
Q. Do entertainers generally know that those are places that they should look for announcements from management?
MR. KIMMEL: Objection to the form of the question.
You can answer.
A. Yes.
Q. Is there any other way that management communicates with entertainers in writing on a regular basis?
**A. Yes.**
Q. What is that?
**A. We post promotions as to how they can earn house fee credit, whether it be a promotion sponsored by a distributor, a liquor company or an in-house promotion for them to**

Page 188

**earn credit. Also, we post special events so everyone knows what's going on in the club.**
Q. And are those postings in the same two locations that you just identified?
**A. Yes.**
Q. Do you ever send e-mails to the entertainers as a group?
**A. No.**
Q. What about, like, text message blasts where you would text all the entertainers?
**A. No, we haven't done that.**
Q. Do entertainers have individual mailboxes or lockers or anywhere where you could put something for each entertainer?
**A. They have lockers. We have posted notices on lockers.**
Q. Is that where, if something was really important and critical, you might post it on their locker?
**A. Throughout the dressing room, as well as the locker, yes.**
Q. The final page -- oh, I'm sorry. Let's -- I think we're at the beginning of Exhibit No. 16.



Ex. 39B

Page 189

MR. KIMMEL: (Handing.)
A. (Perusing document.) Okay.
Q. What is this?
**A. This is a notice stating that the entertainer has to tip the hair and makeup -- you know, pay the hair and makeup fee before midnight, which is when hair and makeup artists leave.**
Q. And when was this posted?
**A. I don't remember.**
Q. Did you -- I'm going back to Exhibit No. 15.
Did you draft these notices with the exception of the one that says "as per Ed"?
**A. (Perusing documents.) And the first one.**
Q. So you drafted all of the ones in Exhibit No. 15 except for the last one?
**A. Yes.**
Q. Did you do those on your computer?
**A. Yes.**
Q. And did you save them?
**A. No.**
Q. You just made a document, typed it in and then printed it out and closed it?

Page 190

**A. Yes.**
Q. Going back to Exhibit No. 16, let's talk about the second page.
Who posted this notice?
**A. (Perusing document.) This is the house fee scale we're looking at?**
Q. Yes.
**A. Ed Anakar posted it.**
Q. And when you testified earlier that the first change to the entertainer fee scale came sometime in 2007, does this refresh your recollection that that actually happened September 1, 2007?
**A. Yes, it does.**
Q. And is this an accurate reflection of what the fees were as of September 1, 2007?
**A. Yes.**
Q. Was anything similar posted when the fees changed in 2008?
**A. Yes.**
Q. Would you have created the document that set forth in writing what the fee changes were?
**A. I would have asked the house mom to make the changes and then post them.**

Page 191

Q. And to the best of your knowledge, would the house mom have done that on her computer?
**A. No. She would have used the office computer.**
Q. And would she have saved that document?
**A. Yes, she would have.**
Q. So it should be on the office computer?
**A. Yes.**
MS. DRAKE: I would like to mark that section of the transcript, please.
Q. Let's take a look at Exhibit No. 17.
MR. KIMMEL: (Handing.)
Q. Is this a copy of the form that's provided to guests when they purchase dance dollars?
**A. Yes.**
Q. And what goes in that little box?
**A. Thumbprint.**
Q. What is done with these? Like, what happens to these forms after the guests

Page 192

signs it?
**A. They are attached to the guest's -- a copy of the guest's receipts. And then they are sent to Rick's Cabaret International.**
Q. How are they sent to Rick's Cabaret International?
**A. FedEx.**
Q. Let's take a look at Exhibit No. 18.
What is this?
MR. KIMMEL: (Handing.)
A. (Perusing document.) This is a profile of the entertainer when she clocks in Club Trax.
Q. When you say it's "a profile," is this information which is accessible in electronic form in the Club Trax system?
**A. Yes.**
Q. So you knew an entertainer's -- well, let me ask the question this way: Would it be possible for you to pull up this sheet for every entertainer who has ever worked at Rick's in New York with the exception of whatever data was lost in the data crash?
**A. Yes.**



Ex. 39B

Page 193

Q. And what do you have to actually do in Club Trax in order to pull up this data?
**A. Log into the entertainer file, search for the entertainer name, bring that up, and this information will come up.**
Q. As a matter of course, does Rick's keep a record of the name of the people who perform there as entertainers, their legal name?
**A. Yes.**
Q. And do you also keep affiliated with that what their stage name is?
**A. Yes.**
Q. And does each entertainer receive a unique entertainer ID number?
**A. Yes.**
Q. And do you also get each entertainer's address?
**A. Yes.**
Q. And also their phone number and cell phone number?
**A. Yes.**
Q. Does Rick's ever ask entertainers for their e-mail address?
**A. Yes, we have.**
Q. Do you also ask for their date of

Page 194

birth and their social security number?
**A. It's on their driver's license and their social security card when they present it to us when we hire them.**
Q. And what about this "hired by," what does "manager" refer to?
**A. It means that they are hired by a manager.**
Q. So that could refer to any manager who had hiring authority?
**A. Yes.**
Q. And what does "hire date" mean?
**A. That is the date that she auditioned and started working.**
Q. And what does "shift" refer to?
**A. An entertainer will request that she would like to work the evening shift or nightshift, or she might say "I prefer to work dayshift." And in that case, we make a note of it.**
Q. And what does it mean where it says "Position: Female"?
**A. This is a form that we get out of Club Trax. Why that's there, I don't know.**
Q. I get maybe it's not like the

Page 195

greatest name, but would anybody who had that position be an entertainer?
**A. Yes.**
Q. And then it says "Status: Inactive."
What does that mean?
**A. That means that this entertainer had been made inactive, that she is not allowed to clock in.**
Q. Does the system default to an inactive status at any point?
**A. No.**
Q. So someone had to go in and a person had to make her status inactive; is that correct?
**A. Correct.**
Q. And do you know who did that in the case of this particular individual?
**A. I do not.**
Q. And then what does "Re-audition June 10, 2009," refer to?
**A. She came back after being away an extended period of time and re-auditioned.**
Q. Did she audition for you, do you recall?

Page 196

**A. No, she did not.**
Q. Directing your attention to Exhibit No. 19.
MR. KIMMEL: (Handing.)
A. (Perusing document.) Okay.
Q. This is a dance dollar report, correct?
**A. Yes.**
Q. What information is in the first column, the amount information?
**A. That is the -- that is one dance dollar.**
Q. And then what information is in the next column, in the paid column?
**A. That is what the customer paid for the dance dollar.**
Q. And then what information goes in the purchaser column?
**A. Well, that is the paid purchaser, that is the $24.**
Q. So there's not like someone's name that's on here?
**A. No.**
Q. So to your knowledge, this record hasn't been redacted in any way, there's just



Ex. 39B

Page 197

paid purchaser in one column?
**A. Correct.**
Q. And then the next column is redeemed.
And what is that information?
**A. This states that the dance dollar was redeemed minus the processing fee of $2.**
Q. And the next column is location.
What goes in that column?
**A. Well, because this is in New York, it says "RCI New York" at the top, so we just don't have anything in that column.**
Q. So it's always blank.
And then what is in the serial number column?
**A. That is the number that is on the ticket.**
Q. And what is in the final column, "ref number"?
**A. Reference number is the same as the serial number.**
Q. It looks to me like the reference number is the same as the first serial number of dance dollars exchanged on that day; is that accurate?

Page 198

**A. Yes. This reference number and these are all the dance dollars that were attached to that reference number.**
MS. DRAKE: Let's take another short break. And then I think that if we're not done, we'll be very close to being done. Ten minutes.
(Whereupon at 4:05 p.m., a recess was taken until 4:10 p.m.)
(The deposition resumed with all parties present.)
K E N N E T H S I S T R U N K, resumed and testified further as follows:
BY MS. DRAKE:
Q. I just have one final question or a couple of very brief final questions for you.
One is, have you been convicted of any felonies in the last ten years?
**A. No.**
Q. Have you ever been convicted of any crimes?
**A. No.**
Q. Have you testified in any court proceedings?

Page 199

**A. No.**
Q. And aside from the William Embeault case, have you ever been a party in any other court proceedings?
**A. No, I have not.**
MS. DRAKE: I do not have any more questions for you, but there is one additional matter that I think we would like to take up on the record, Jeff.
MR. SMITH: Jeff, this is Steve, obviously. There apparently are 90 signed statements from entertainers regarding they're independent contractor status.
Can we expect those to be produced?
MR. KIMMEL: I'm not sure if that number is correct or not, but I will look at them, and then we'll take it under advisement.
MR. SMITH: All right. Because I mean, obviously, to the extent that there are signed -- I was thinking about this way: If you

Page 200

were sitting on 90 statements or however many statements, approximately 90 statements, from other individuals on the issues on point in this matter and my clients were holding them and we knew of them, we certainly would be devoting a followup in the discovery rules.
So I think to the -- certainly I can't see any reason why those wouldn't be relevant. And so we would expect that they would be produced certainly before any sort of motion.
So when you say you're "going to take it under advisement," what do you mean by that, exactly? Is this the first that you've learned of that?
MR. KIMMEL: Well, first that I've learned of what?
MR. SMITH: That these statements exist.
MR. KIMMEL: I don't know what the number of statements exist



Ex. 39B

Page 201

are. I don't know if they've been requested in discovery by you. And I'm not sure of the circumstances of which any statements may have been obtained. So, you know, we'll take it under advisement, and we'll address it.

MR. SMITH: Well, you know about it now. And to the extent that there's a statement on the exact point in dispute in this case, it would certainly be something you need to produce or your client needs to produce in the Rule 26 disclosures anyway. Obviously I don't have my discovery request handy, but I'm sure we have the typical statement request.

So to the extent that the deponent here today knows where they are, we expect that those be produced fairly shortly, unless there's some reason that they wouldn't be relevant. I can't envision such reason, but -- so I

Page 202

guess we'll follow up with you on that shortly.

MR. KIMMEL: Okay.

MR. SMITH: That's all we have.

MR. KIMMEL: Okay. We're going to take five minutes. I'm just going to review my notes and see if there's anything I want to follow up with.

(Whereupon at 4:13 p.m., a recess was taken until 4:17 p.m.)

(The deposition resumed with all parties present.)

K E N N E T H S I S T R U N K, resumed and testified further as follows:

EXAMINATION

BY MR. KIMMEL:

Q. Mr. Sistrunk, my name is Jeff Kimmel. My firm represents the defendants in this case, including Peregrine Enterprises. I just have a couple of follow-up questions for you.

You stated earlier that -- two people that you report to. You identified Eric

Page 203

Langan and Ed Anakar.

Do you currently report to both those people?

**A. No, I don't. I misspoke earlier when I said that I report to Ed Anakar. He's more of a consultant. So when I do call him, you know, talk with him, it's more from a consultant standpoint.**

Q. You also testified a bit about fines being imposed against entertainers. And I believe at one point you testified that fines are not charged to entertainers. And at another point you said that charges are imposed.

Could you clarify that discrepancy?

MS. DRAKE: Objection; mischaracterizes his testimony.

Q. You can answer.

**A. We ask that the entertainer follow the guidelines. So if I ask repeatedly, and I talk with them, I will call down to the cage and ask them to place a fine so I get the entertainer's attention. And then when she goes to clock out and she sees that she has a fine, I go down and I speak with her to help her understand that it's not fair to the other**

Page 204

**entertainers that she is creating a problem for them. And then when we have the understanding, I remove the fine.**

Q. Is that generally your practice with respect to fines with entertainers?

**A. That is the practice.**

MR. KIMMEL: No further questions.

MS. DRAKE: I just have one follow-up.

EXAMINATION

BY MS. DRAKE: (Continued.)

Q. Has it ever not been the practice? In other words, have you ever just let an entertainer pay the fine?

**A. No.**

Q. So it's your testimony that no entertainer has had a fine put on her charge summary and then not had it later taken off by you?

MR. KIMMEL: Objection; mischaracterizes the testimony.

You can answer.

A. If she has paid the fine without my knowledge, I will -- later, when I do find out,

Page 205

I give her a credit for the amount of that fine. And, again, we speak, and we have an understanding.
Q. Well, what is the point of putting a pretend fine on somebody if then you're just going to go back and waive it? Doesn't everybody know these fines are just going to get waived?
MR. KIMMEL: Objection; calls for speculation, mischaracterizes the testimony.
Go ahead.
A. No, they don't. It goes to getting the attention of the entertainer when all else fails. When other means of communication fail, if whether written or verbal, then I have to put -- that I have to go that way for her to understand that this is not what we want here.
Q. What kind of written communications do you have with entertainers who are not following the guidelines?
**A. When I referred to "written," I mean these notices that we post.**
Q. So you don't write something down about a particular entertainer and then show it

Page 206

to her and put it in her file?
**A. No.**
MR. KIMMEL: Objection to the form.
Q. And just to be clear, it's your testimony that every fine you know about that has been imposed on an entertainer has ultimately been waived or refunded?
MR. KIMMEL: Objection to the --
A. Correct.
Q. Is that correct?
**A. That's correct.**
Q. And that should be reflected in the Club Trax data, correct?
**A. Correct.**
Q. Do you think it's weird that someone who is a consultant has the authority to control your salary?
MR. KIMMEL: Objection to the form of the question. He never stated that he controls his salary.
You can answer.
A. Do I think it's weird? That was the question?

Page 207

Q. Yes.
**A. No, I don't think it's weird.**
Q. Do you pay him to be a consultant?
MR. KIMMEL: Objection to the form of the question; asked and answered.
You can answer.
A. Peregrine Enterprises pays a fee for his services. I do not.
Q. When did you learn that Peregrine Enterprises pays a fee for his services?
**A. I don't recall when I learned that.**
Q. Was it today?
**A. No, it was not today.**
Q. How much does Peregrine Enterprises pay him for his services?
MR. KIMMEL: Objection; asked and answered.
You can answer again.
A. I do not know.
Q. Who made the decision to pay him for his services?
MR. KIMMEL: Objection; asked and answered.
You can answer one more time.

Page 208

A. I do not know.
Q. Did you make that decision?
MR. KIMMEL: Objection; asked and answered.
You don't have to answer it again. We can move on.
Q. Did anyone who works for you make that decision?
MR. KIMMEL: Objection. You asked that exact same question before.
You don't have to answer it again. Don't answer the question.
Q. Who do you report to --
MR. KIMMEL: Do you have any new questions, Michelle, since this is a redirect?
MS. DRAKE: I do have a new question, and I'm getting ready to ask it.
Q. My question is: If you misspoke when you said that you report to Eric Langan and Ed Anakar, who do you report to?
**A. I report to Eric Langan.**
Q. So the misspeaking wasn't saying it



Ex. 39B

was both of them, but there's no doubt in your mind that, in fact, you report to Eric Langan, correct?

**A. Correct.**

MS. DRAKE: I don't have anything else.

(Whereupon at 4:23 p.m., the deposition was concluded.)



I N D E X


| Witness: KENNETH SISTRUNK | Page |
|---|---|
| Examination by MS. DRAKE | 3 |
| Examination by MR. KIMMEL | 202 |
| Examination by MS. DRAKE | 204 |


M A R K E D S E C T I O N S

| PAGE | LINE |
|---|---|
| 14 | 11 |
| 42 | 20 |
| 61 | 13 |
| 88 | 22 |
| 191 | 12 |



Ex. 39B

C E R T I F I C A T E

STATE OF NEW YORK )
) ss.
COUNTY OF KINGS )

I, Androniki Samaras, a Shorthand (Stenotype) Reporter and Notary Public for the State of New York, do hereby certify that the foregoing Deposition, of the witness, KENNETH SISTRUNK , taken at the time and place aforesaid, is a true and correct transcription of said Deposition.

I further certify that I am neither counsel for nor related to any party to said action, nor in any wise interested in the result or outcome thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of November, 2009.

____________________________

ANDRONIKI SAMARAS