# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SABRINA HART and REKA FUREDI on behalf of themselves and all others similarly situated, and the New York Rule 23 Class, | ) ) ) ) ) | Case No. 09-CV-3043 PAE/RLE |
| Plaintiffs, | ) ) ) | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) ) | |
| RICK'S CABARET INTERNATIONAL, INC., RCI ENTERTAINMENT (NEW YORK) INC., PEREGRINE ENTERPRISES, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

## TABLE OF CONTENTS

INTRODUCTION...............................................................................................1

ARGUMENT....................................................................................................2

I.     LEGAL STANDARD FOR SUMMARY JUDGMENT.............................................2

II.    ENTERTAINERS AT RICK'S NY ARE EMPLOYEES UNDER FLSA & NYLL. ................................................................................................3

        A. LEGAL STANDARD FOR DETERMINING EMPLOYEE STATUS.................4

            1.  The Economic Realities Test................................................................4

            2.  The Common Law Test.........................................................................6

            3.  This Court should apply the Economic Realities Test to determine employee status under both the FLSA & NYLL ................................7

        B. RICK'S NY CONTROLLED ENTERTAINERS' WORK AT THE CLUB. ...............................................................................................8

            1.  Control through written guidelines........................................................8

            2.  Control over entertainers' schedules .................................................10

            3.  Control through mandatory house fees ..............................................11

            4.  Control over entertainers' appearance................................................12

            5.  Control over entertainers' job duties..................................................13

            6.  Control through mandatory tip-outs ...................................................14

            7.  Control through mandatory meetings ..................................................14

            8.  Control through monetary fines..........................................................15

            9.  Control through clock-out requirements.............................................15

            10. Additional indicia of control ............................................................16

        C. RICK'S NY CONTROLS ENTERTAINERS' PROFIT AND LOSS. .................18

        D. ENTERTAINING AT RICK'S NY IS NOT SKILLED WORK...........................19

ii

E. THERE IS NO PRESET DURATION OF EMPLOYMENT AT RICK'S NY.................................................................................................................20

F. ENTERTAINERS ARE INTEGRAL TO DEFENDANTS' BUSINESS.............20

III.  DEFENDANTS VIOLATED FLSA & NYLL MINIMUM WAGE PROVISIONS.........................................................................................................21

IV.  THE "OFFSET" DEFENSE & COUNTERCLAIM SHOULD BE DENIED. .........22

A. DEFENDANTS ARE NOT ENTITLED TO OFFSET WAGES THEY OWE.................................................................................................................23

    1.  Defendants do not include the amounts in their gross receipts .......................23

    2.  Additional factors show that the amounts in question are tips .......................27

B. DEFENDANTS' COUNTERCLAIM MUST BE DENIED...................................28

    1.  Any enrichment is not at Defendants' expense ................................................28

    2.  Equity and good conscience do not require restitution ....................................32

V.  DEFENDANTS VIOLATED THE NYLL'S DEDUCTIONS PROVISION.............32

VI.  ALL THREE DEFENDANTS ARE LIABLE AS EMPLOYERS. .............................33

A. RCII AND PEREGRINE ARE LIABLE AS JOINT EMPLOYERS...................35

    1.  Peregrine is liable as a joint employer ..............................................................35

    2.  RCII is liable as a joint employer ......................................................................36

        a.  RCII has the power to hire and fire entertainers at Rick's NY .......................36

        b.  RCII supervises and controls entertainers' employment. ...............................37

        c.  RCII determines entertainers' rate and method of payment............................39

        d.  RCII maintains employment records for entertainers .....................................39

B. ALL DEFENDANTS ARE LIABLE AS AN INTEGRATED ENTERPRISE........................................................................................................40

    1.  Defendants' operations are interrelated .............................................................40

2. Defendants share centralized control of labor relations .................................. 41

3. Defendants share common ownership and financial control ........................... 41

VII.  DEFENDANTS WILLFULLY VIOLATED THE FLSA AND NYLL. ..................... 42

VIII.  DEFENDANTS DID NOT ACT IN GOOD FAITH. .................................................... 45

CONCLUSION ........................................................................................................................ 45

## TABLE OF AUTHORITIES

**CASES**

303 West 42nd St. Enterprises, Inc., v. IRS,
181 F.3d 272 (2d Cir. 1999)......................................................................................................4

Alvarez v. IBP, Inc.,
339 F.3d 894 (9th Cir. 2003) ..................................................................................................42

Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.,
515 F.3d 1150 (11th Cir. 2008) ..............................................................................................45

Am. Broadcasting Cos., Inc., v. Roberts,
61 N.Y.2d 244 (1984) ..............................................................................................................31

American Dream Girls of Syracuse,
WCB Case #69411630 (Apr. 6, 1999)......................................................................................4

Angello v. Labor Ready,
7 N.Y.3d 579 (2006) ................................................................................................................33

Ansoumana v. Gristedes Operating Corp.,
255 F.Supp.2d 184 (S.D.N.Y. 2003)...........................................................................20, 34, 41

Barfield v. New York City Health and Hospitals Corp.,
537 F.3d 132 (2d Cir. 2008)...............................................................................................39, 45

Barrentine v. Arkansas-Best Freight Sys., Inc.,
450 U.S. 728 (1981)............................................................................................................30, 32

Berrios v. Nicholas Zito Racing Stable, Inc.,
No. CV 04-22, 2012 WL 1034053 (E.D.N.Y. Mar. 28, 2012) ......................................................43

Brock v. Superior Care, Inc.,
840 F.2d 1054 (2d Cir. 1988)..............................................................................5, 6, 20, 29

Brock v. Wilamowsky,
833 F.2d 11 (2d Cir.1987)........................................................................................................45

Bynog v. Cipriani Group, Inc.,
1 N.Y.3d 193 (2003) ...........................................................................................................6, 17

Cannon v. Douglas Elliman, LLC,
No. 06 Civ. 7092(NRB), 2007 WL 4358456 (S.D.N.Y. Dec.10, 2007)..........................................5

Cano v. DPNY, Inc.,
No. 10 Civ. 7100 (ALC)(JCF), 2012 WL 5471865 (S.D.N.Y. Nov. 8, 2012) ..............................39

Caserta v. Home Lines Agency, Inc.,
273 F.2d 943 (2d Cir. 1959).....................................................................................................32

Chan v. Sung Yue Tung Corp.,
No. 03 Civ. 6048(GEL), 2007 WL 313483 (S.D.N.Y. Feb. 1, 2007)..........................24, 25, 26, 28

Chan v. Triple 8 Palace, Inc.,
No. 03 Civ. 6048(GEL), 2006 WL 851749 (S.D.N.Y. Mar. 30, 2006) ...................................25, 28

Chaves v. King Arthur's Lounge,
No. 07-2505 (Mass. Super. Ct. July 30, 2009) ...............................................................................4

Chen v. TYT East Corp.,
No. Civ. 5288(PAC), 2012 WL 5871617 (S.D.N.Y. Mar. 21, 2012) ............................................37

Clincy v. Galardi South Enterprises, Inc.,
808 F.Supp.2d 1326 (N.D. Ga. 2011) .....................................................3, 8, 10, 11, 12, 13, 15, 19

Club Paradise, Inc. v. OK Employment Sec. Com'n,
213 P.3d 1157 (Okla. Civ. App. 2008) ...........................................................................................4

DiGiro v. Pall Corp.,
993 F. Supp. 1471 (M.D. Fla. 1998).............................................................................................41

DiPilato v. 7-Eleven, Inc.,
662 F.Supp.2d 333 (S.D.N.Y. 2009)...............................................................................................7

Donovan v. Tavern Talent & Placements, Inc.,
No. 84-F-401, 1986 WL 32746 (D. Colo. Jan. 8, 1986) ..................................................................3

Fowler v. Scores Holding Co. Inc.,
677 F.Supp.2d 673 (S.D.N.Y. 2009)............................................................................................33

Greathouse v. JHS Sec. Inc.,
No. 11 Civ. 7845 (PAE)(GWG), 2012 WL 5185591 (S.D.N.Y. Oct. 19, 2012)...........................35

Guepet v. International Tao Systems, Inc.,
110 Misc.2d 940 (N.Y. Sup. Ct. 1981) ........................................................................................33

Hanscom v. Carteret Mortgage Corp.,
No. 1:06-CV-2483, 2008 WL 4845832 (M.D. Pa. Nov. 5, 2008).................................................44

Harrell v. Diamond A Entertainment, Inc.,
992 F. Supp. 1343 (M.D. Fla. 1997)............................................................3, 8, 10, 13, 19, 21, 23

Hart v. Rick's Cabaret Int'l Inc.,
No. 09 Civ. 3043, 2010 WL 5297221 (S.D.N.Y. Dec. 20, 2010)............................8, 34, 37, 38, 39

Herman v. Palo Group Foster Home, Inc.,
183 F.3d 468 (6th Cir. 1999).........................................................................................44, 45

Herman v. RSR Sec. Servs. Ltd.,
172 F.3d 132 (2d Cir. 1999)........................................................................35, 37, 39, 45

Jeffcoat v. Alaska Dep't of Labor,
732 P.2d 1073 (Alaska 1987)...............................................................3, 12, 13, 19, 20

Jenks v. D.&B. Corp.,
28 Mass.L.Rptr. 579 (Mass. Super. Ct. 2011) .............................................................4

Jiao v. Shi Ya Chen,
No. Civ. 0165(DF), 2007 WL 4944767 (S.D.N.Y Mar. 30, 2007)............................................8, 34

Jones v. JGC Dallas, LLC,
No. 3:11-cv-02743-O-BH (N.D. Tex. Aug. 17, 2012) .........................................................23, 30

Kang v. Inno Asset Development, LLC,
No. 08-CV-4848, 2011 WL 1674554 (E.D.N.Y. Jan. 28, 2011) ....................................................45

Kuebel v. Black & Decker,
643 F.3d 352 (2d Cir. 2011).........................................................................................42

Lanzetta v. Florio's Enterprises, Inc.,
No. Civ. 6181(DC), 2011 WL 253961 (S.D.N.Y. Jan. 25, 2011)............................................31, 32

Martin v. Circle C Invest., Inc.,
No. MO-91-CA-43, 1991 WL 338239 (W.D. Tex. Mar. 27, 1991) ........................3, 12, 13, 14, 15

Martin v. Priba Corp.,
No. 3:91-cv-2786-G, 1992 WL 486911 (N.D. Tex. Nov. 6, 1992) ...........................3, 6, 10, 17, 19

Matter of App. Bd. No. 548382, (May 25, 2010) ............................................................................4

Matter of App. Bd. No. 548927, (May 3, 2010) ..............................................................................4

Matter of App. Bd. No. 542066, (Nov. 5, 2008)..............................................................................4

Matter of Club Mateem, Inc.,
ALJ #004-11787 aff'd Appeal Bd. #52409 (Feb. 4, 2005)............................................................4

Matter of Dawn Joy Fashions v. Commissioner of Labor of State of N.Y.,
90 N.Y.2d 102 (1997) ..................................................................................................................8

Matter of Double R Entertainment, LLC (T/A Rick's Tally-Ho),
No. PR 08-156 (NY Indus. Bd. App. June 7, 2011)
...............................................................1, 3, 4, 5, 7, 8, 10, 11, 13, 16, 17, 18, 19, 20, 21

Matter of Enjoy the Show Mgt.,
287 A.D.2d 822 (N.Y.A.D. 3d Dept. 2001)..................................................................................4

Matter of Gruber,
89 N.Y.2d 225 (1996) ..................................................................................................................8

Matter of Playtime Boutique, Inc.,
App. Bd. #521409 (March 22, 2005)............................................................................................4

Matter of PNS Agency, Inc.,
110 A.D.2d 1008 (N.Y.A.D. 3d Dept. 1985)................................................................................4

Matter of Pros Tavern,
App. Bd. #432051 ........................................................................................................................4

McGuiggan v. CPC Intern, Inc.,
84 F.Supp.2d 470 (S.D.N.Y. 2000) .............................................................................................6

McLaughlin v. Intrepid Holdings, Inc.,
No. H-08-798, 2009 WL 2900741 (S.D. Tex. Sept. 2, 2009).....................................................39

McLaughlin v. Richland Shoe Co.,
486 U.S. 128 (1988).....................................................................................................................44

McLean v. Garage Management Corp.,
Nos. 10 Civ. 3950, 09 Civ. 9325, 2012 WL 1358739 (S.D.N.Y. Apr. 19, 2012)................... 42, 45

Melton v. Round Table Restaurants, Inc.,
No. 14112, 1971 WL 900 (N.D. Ga. Nov. 8, 1971) ....................................................................24

Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc.,
14 F.Supp.2d 331 (S.D.N.Y. 1998) .............................................................................................30

Milano's Inc. v. KS Dept. of Labor, Contributions Unit,
43 Kan. App.2d 779 (Kan. Ct. App. 2010) ..................................................................................4

viii

Monteiro v. PJD Ent. of Worcester, Inc.,
29 Mass.L.Rptr. 203 (Mass. Super. Ct. 2011) ...............................................................4

Moras v. Marco Polo Network, Inc.,
No. 11 Civ. 2081(PAE)(DCF), 2012 WL 2025712 (S.D.N.Y. May 31, 2012) ..........................2-3

Morse v. Mer Corp.,
No. 1:08-cv-1389, 2010 WL 2346334 (S.D. Ind. June 4, 2010) ..........................4, 8, 15, 16, 19, 21

Mumby v. Pure Energy Services (USA), Inc.,
636 F.3d 1266 (10th Cir. 2011) ...............................................................43-44

Nakahata v. New York-Presbyterian Healthcare System, Inc.,
Nos. 11 CIV 6657, 6658, 6366 (PAC), 2012 WL 3886555 (S.D.N.Y. Sept. 6, 2012)....................5

NLRB v. 675 West End Owners Corp.,
304 Fed. Appx. 911 (2d Cir. 2008) ...............................................................41

NY DOL Opinion Letter, RO-11-0001 (Jan. 12, 2011)...............................................................33

Order to Comply with Articles 6 & 19 of NYLL, (Mar. 9, 2007) ...................................................4

Oregon v. Bomareto Ent., Inc.,
153 Or.App. 183 (Ore. Ct. of App. 1998)...............................................................3

People v. Sheffield Farms,
225 N.Y. 25 (1918)...............................................................7

Perfect Dental, PLLC v. Allstate Ins. Co.,
538 F.Supp.2d 543 (E.D.N.Y. 2007) ...............................................................6

Petition of Paul Coppa & Ten's Cabaret, Inc.,
No. PR 08-072, NY DOL Answer (NY Indus. Bd. App. Apr. 30, 2009)............3, 4, 10, 12, 14, 15

Prime Med. Associates, P.C. v. Ramani,
781 N.Y.S.2d 450 (N.Y. Sup. Ct. 2004) ...............................................................17

Pro Bono Investments, Inc. v. Gerry,
No. 03 Civ. 4347(JGK), 2005 WL 2429777 (S.D.N.Y. Sept. 30, 2005) ...............................28, 30

Reich v. ABC/York-Estes Corp.,
157 F.R.D. 668 (N.D. Ill. 1994)...............................................................4, 23

Reich v. ABC/York-Estes Corp.,
No. 91 C 6265, 1997 WL 264379 (N.D. Ill. 1997)...............................................................3, 23, 24

Reich v. Circle C. Invest., Inc.,
998 F.2d 324 (5th Cir. 1993) ...............................................................................3, 13, 14, 19, 21

Reich v. Priba Corp.,
890 F. Supp. 586 (N.D. Tex. 1995) ........................................3, 8, 10, 18, 19, 20, 21, 23, 24, 27

Reich v. So. New England Telecomm. Corp.,
121 F.3d 58 (2d Cir. 1997)...................................................................................................45

Reyes v. Altamarea Group, LLC,
No. 10 Civ. 6451(PMB), 2011 WL 280799 (S.D.N.Y. Jan. 11, 2011)...........................................41

Rogers v. Savings First Mtg., LLC,
362 F.Supp.2d 624 (D. Md. 2005) .........................................................................................45

Schwind v. EW & Associates, Inc.,
357 F.Supp.2d 691 (S.D.N.Y. 2005).........................................................................................5

Scott v. City of New York,
No. 02 Civ. 9530(SAS), 2009 WL 1138719 (S.D.N.Y. Apr. 27, 2009).......................................45

Smith v. Tyad,
351 Mont. 12 (Mont. 2009).....................................................................................................4

Solis v. Cindy's Total Care, Inc.,
No. 10 Civ. 7242(PAE), 2012 WL 28141 (S.D.N.Y. Jan. 5, 2012)..............................................44

Solis v. General Interior Systems, Inc.,
No. 5:08-CV-0823, 2012 WL 1987139 (N.D.N.Y. June 1, 2012) ...............................................43

Tennessee Coal Co. v. Muscoda Local No. 123,
321 U.S. 590 (1944)..............................................................................................................31

Thompson v. Linda and A., Inc.,
779 F.Supp.2d 139 (D.D.C. 2011) .......................................................................4, 10, 15, 19, 20

Thornton v. Crazy Horse, Inc.,
No. 3:06–cv–00251–TMB, 2012 WL 2175753 (D. Alaska June 14, 2012)...........................23, 28

Tony & Susan Alamo Found. v. Sec'y of Labor,
471 U.S. 290 (1985)..............................................................................................................31

Trejos v. Edita's Bar and Restaurant, Inc.,
No. CV-08-1477(ARR), 2009 WL 749891 (E.D.N.Y. Mar. 17, 2009)..........................................6

U.S. v. Rosenwasser,
323 U.S. 360 (1945)......................................................................................................7, 16

Velasco v. XTC Cabaret, Inc.,
No. 4:12-CV-03295, ECF. No. 14 (S.D. Tex. Jan. 21, 2013)........................................44

Velu v. Velocity Exp., Inc.,
666 F.Supp.2d 300 (E.D.N.Y. 2009) ................................................................................6

Wright v. Carrigg,
275 F.2d 448 (4th Cir. 1960) .........................................................................................45

Xue Lian Lin v. Comprehensive Health Management, Inc.,
No. 08 Civ. 6519(PKC), 2009 WL 976835 (S.D.N.Y. Apr. 9, 2009) ...........................35

Yard Bird, Inc. v. VA Employment Com'n,
28 Va. App. 215 (Va. Ct. App. 1998) ..............................................................................4

Zhong v. Zijun Mo,
No. 10-CV-0806 (RER), 2012 WL 2923292 (E.D.N.Y. July 18, 2012) .........................5

## REGULATIONS

29 C.F.R. § 531.1 ...........................................................................................................21

29 C.F.R. § 531.52 .........................................................................................................24

29 C.F.R. § 531.55.....................................................................................................23, 24

29 C.F.R. § 791.2(b) .......................................................................................................39

29 C.F.R. § 791.2(b)(3)...................................................................................................35

N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.1...........................................................21

N.Y. Comp. Codes R. & Regs., tit. 12, § 146-2.7(a)(4) ................................................33

N.Y. Comp. Codes R. & Regs., tit. 12, § 146-2.7(b)......................................................32

N.Y. Comp. Codes R. & Regs., tit. 12 § 146-3.2.............................................................7

## RULES

Fed. R. Civ. P. 23 .............................................................................................................2

Fed. R. Civ. P. 68.............................................................................................................43

**STATUTES**

29 U.S.C. § 203(e)(1).................................................................................................7

29 U.S.C. § 203(g) ....................................................................................................7

29 U.S.C. § 206........................................................................................................21

29 U.S.C. § 255(a) ...................................................................................................42

Age Discrimination in Employment Act ...................................................................7

Fair Labor Standards Act....................................................................................*passim*

New York Labor Law .........................................................................................*passim*

New York Labor Law § 2 ..........................................................................................7

New York Labor Law § 21 ........................................................................................7

New York Labor Law § 100 ......................................................................................7

New York Labor Law § 193 .....................................................................................33

New York Labor Law § 193(1) ................................................................................33

New York Labor Law § 193(2) ................................................................................32

New York Labor Law § 651(5) .................................................................................7

New York Labor Law § 652 .....................................................................................21

## INTRODUCTION

*Courts outside of New York have found, without exception, that dancers are employees and not independent contractors.... In New York, state courts have affirmed determinations of the Unemployment Insurance Appeal Board that found dancers employees.... [T]he Second Circuit Court of Appeals has found dancers to be employees for federal tax purposes..... We find... that the dancers working at the petitioner's club are employees and not independent contractors.*

> - New York Industrial Board of Appeals, <u>Matter of Double R Entertainment, LLC (T/A Rick's Tally-Ho)</u>, No. PR 08-156 (June 7, 2011) (affirming New York Department of Labor's determination that exotic dancers at petitioner's club are employees under New York Labor Law)

This case, like those referenced above, is about a strip club's flagrant misclassification of its entertainers[1] as independent contractors. Rick's Cabaret ("Rick's NY" or "the club") is a strip club in New York, which is owned and operated by the three Defendants in this case. Through the managers and staff who work at Rick's NY, Defendants exercise extreme control over the entertainers who work there. Defendants dictate the minutiae of their entertainers' work through rules governing everything from the heel height of their shoes and length of their dresses to the order and timing by which entertainers must remove their clothing. What is more, Defendants threaten and impose monetary fines for violations of their rules. Despite this control, which often exceeds that found in a typical employment relationship, and despite their clear awareness that their misclassification has violated the law, Defendants have continuously classified all of their entertainers at the club as independent contractors. In self-serving reliance on this misclassification, Defendants pay their entertainers no wages whatsoever and instead charge them "house fees" as a condition of employment and fines for violating Defendants' rules.

Defendants' practices are brazenly illegal. The overwhelming body of case law holds

---

[1] "Entertainer" is the preferred word for "stripper." "Entertainer," "exotic dancer," and "dancer" are used interchangeably in the case law cited herein.

that entertainers are employees.  Defendants have acknowledged potential liability in public filings, have bought off a past proposed class representative, and have implemented arbitration agreements with class action waivers at all of their clubs outside of New York in an effort to avoid additional litigation on these issues.  Despite Defendants' awareness and attempts to evade liability, they have steadfastly refused to reclassify entertainers as employees and pay wages.

Plaintiffs now move for summary judgment that they and the other entertainers at Rick's NY (collectively "Plaintiffs" or "entertainers") are employees under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").[2]  Plaintiffs also move for summary judgment on the following issues, all stemming from misclassification: Defendants (1) violated the minimum wage requirements of the FLSA and NYLL; (2) are not entitled to an offset against wages owed; (3) violated the NYLL's prohibition against deductions; (4) are all liable as employers; (5) willfully violated the law; and (6) had no good faith basis for their violations.

In sum, the instant motion for summary judgment asks for affirmation of this universally-acknowledged requirement: When companies suffer and permit individuals to work, those companies are legally employers.  They must pay their employees the minimum wage and cannot charge money as a condition of employment.  These wage responsibilities are the employers' alone and cannot be passed on to employers' customers.  Based on this and the undisputed facts of this case, the Court should grant Plaintiffs' motion for summary judgment.

## ARGUMENT

## I.     LEGAL STANDARD FOR SUMMARY JUDGMENT.

"To prevail on a motion for summary judgment, the movant must show... that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[2] The Named Plaintiffs, both of whom are Class Representatives, move on behalf of themselves, the conditionally certified FLSA collective, and the certified Rule 23 Class.

law." Moras v. Marco Polo Network, Inc., No. 11 Civ. 2081(PAE)(DCF), 2012 WL 2025712,

*2 (S.D.N.Y. May 31, 2012) (citations omitted). The parties agree this case should be decided at

summary judgment.[3]

## II.    ENTERTAINERS AT RICK'S NY ARE EMPLOYEES UNDER FLSA & NYLL.

Courts and tribunals have long held that entertainers are employees of the strip clubs

where they work. As the New York Industrial Board of Appeals ("Board") stated, "Courts

outside of New York have found, without exception, that dancers are employees and not

independent contractors." Matter of Double R Entertainment, LLC (T/A Rick's Tally-Ho), No.

PR 08-156, p. 12 (NY Indus. Bd. App. June 7, 2011) (hereinafter cited as "Double R").[4] The

Board cited a host of cases in which entertainers were found to be employees under the FLSA

and/or state wage law: Harrell v. Diamond A Entertainment, Inc., 992 F. Supp. 1343, 1347-1348

(M.D. Fla. 1997); Reich v. Circle C. Invest., Inc., 998 F.2d 324 (5th Cir. 1993); Reich v. Priba

Corp., 890 F. Supp. 586 (N.D. Tex. 1995); Martin v. Priba Corp., No. 3:91-cv-2786-G, 1992 WL

486911 (N.D. Tex. Nov. 6, 1992); Martin v. Circle C Invest., Inc., No. MO-91-CA-43, 1991 WL

338239 (W.D. Tex. Mar. 27, 1991); Donovan v. Tavern Talent & Placements, Inc., No. 84-F-

401, 1986 WL 32746 (D. Colo. Jan. 8, 1986); Reich v. ABC/York-Estes Corp., No. 91 C 6265,

1997 WL 264379 (N.D. Ill. 1997); Oregon v. Bomareto Ent., Inc., 153 Or.App. 183 (Ore. Ct. of

App. 1998); Jeffcoat v. Alaska Dep't of Labor, 732 P.2d 1073 (Alaska 1987).

In addition to the opinions cited by the Board, numerous other courts have also held that

entertainers are employees under both the FLSA and parallel state wage laws. See e.g., Clincy v.

---

[3] Plaintiffs explicitly incorporate by reference the parties' previously submitted Stipulated Facts ("Stip.") and Plaintiffs' 56.1 Statement of Facts ("Pl.'s 56.1"), submitted with this Memorandum.

[4] The Double R opinion is attached as Ex. 1 to the Affidavit of Anna P. Prakash. The opinion is also available at the NY DOL's website: http://www.labor.ny.gov/iba/decisions/pdf/pr-08-156.pdf, last accessed 1/17/13. Additional unpublished court and agency opinions without Westlaw citations are attached as Exs. 2-16, including the Order, Appeal, Answer, and Dismissal in the Matter of Ten's Cabaret cited herein.

Galardi South Enterprises, Inc., 808 F.Supp.2d 1326 (N.D. Ga. 2011); Thompson v. Linda and

A., Inc., 779 F.Supp.2d 139 (D.D.C. 2011); Morse v. Mer Corp., No. 1:08-cv-1389, 2010 WL

2346334 (S.D. Ind. June 4, 2010); Reich v. ABC/York-Estes Corp., 157 F.R.D. 668 (N.D. Ill.

1994); Jenks v. D.&B. Corp., 28 Mass.L.Rptr. 579 (Mass. Super. Ct. 2011); Monteiro v. PJD

Ent. of Worcester, Inc., 29 Mass.L.Rptr. 203 (Mass. Super. Ct. 2011); Chaves v. King Arthur's

Lounge, No. 07-2505 (Mass. Super. Ct. July 30, 2009); Smith v. Tyad, 351 Mont. 12 (Mont.

2009).[5]

The New York Department of Labor ("NY DOL") has found that entertainers are

employees for the purpose of the NYLL's minimum wage and payment of wages provisions.   In

Double R, the Board affirmed the NY DOL's finding that entertainers are employees under the

NYLL's minimum wage provision.   Double R, p. 15.   In 2007, the NY DOL found that the

entertainers at Ten's Cabaret were employees under the NYLL, entitled to more than $9 million

in back wages.   See Order to Comply with Articles 6 & 19 of NYLL, (Mar. 9, 2007); Petition of

Paul Coppa & Ten's Cabaret, Inc., No. PR 08-072, NY Dept. Labor Answer at ¶ 4 (NY Indus.

Bd. App. Apr. 30, 2009) (Answer hereinafter cited as "Ten's Cabaret").[6]

Notably, the facts in the vast majority of wage cases cited above are, in many respects,

identical to the facts in this case.   These facts warrant summary judgment for Plaintiffs.

## A. LEGAL STANDARD FOR DETERMINING EMPLOYEE STATUS.

### 1. The Economic Realities Test.

---

[5] See also Milano's Inc. v. KS Dept. of Labor, Contributions Unit, 43 Kan. App.2d 779, (Kan. Ct. App. 2010); Club Paradise, Inc. v. OK Employment Sec. Com'n, 213 P.3d 1157 (Okla. Civ. App. 2008); Yard Bird, Inc. v. VA Employment Com'n, 28 Va. App. 215 (Va. Ct. App. 1998).
[6] See also Double R, p. 12 (citing Matter of Enjoy the Show Mgt., 287 A.D.2d 822 (N.Y.A.D. 3d Dept. 2001); Matter of PNS Agency, Inc., 110 A.D.2d 1008 (N.Y.A.D. 3d Dept. 1985); [ ] American Dream Girls of Syracuse, WCB Case #69411630; Matter of Club Mateem, Inc., ALJ #004-11787 aff'd Appeal Bd #52409 (Feb. 4, 2005); Matter of Playtime Boutique, Inc., App. Bd. #521409 (March 22, 2005); Matter of Pros Tavern, App. Bd. #432051; 303 West 42nd St. Enterprises, Inc., v. IRS, 181 F.3d 272 (2d Cir. 1999); Matter of App. Bd. No. 548927, (May 3, 2010); Matter of App. Bd. No. 548382, (May 25, 2010); Matter of App. Bd. No. 542066, (Nov. 5, 2008).)

Employee status under the FLSA and NYLL has been decided using the "economic realities test." Zhong v. Zijun Mo, No. 10-CV-0806 (RER), 2012 WL 2923292 (E.D.N.Y. July 18, 2012) (FLSA and NYLL); Double R, p. 11 (entertainer misclassification under NYLL); see also Nakahata v. New York-Presbyterian Healthcare System, Inc., Nos. 11 CIV 6657, 6658, 6366 (PAC), 2012 WL 3886555, *9 (S.D.N.Y. Sept. 6, 2012) ("Because the FLSA and New York Labor Law employ similar standards with respect to employment status, [the economic reality] test has been used to analyze both federal and state wage claims.") (quoting Cannon v. Douglas Elliman, LLC, No. 06 Civ. 7092(NRB), 2007 WL 4358456, *4 (S.D.N.Y. Dec.10, 2007)); Schwind v. EW & Associates, Inc., 357 F.Supp.2d 691, 702 (S.D.N.Y. 2005) (discussing economic realities factors and holding "that plaintiff is an 'employee' under the broad definition of the FLSA, and therefore may be entitled to overtime pay under the FLSA and New York Labor Law for the period in which he was treated as an independent contractor.").

The economic realities test adopted by the Second Circuit examines (1) the degree of control exercised by the putative employer over the workers; (2) the workers' opportunity for profit or loss and their investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship; and (5) the extent to which the work in as integral part of the putative employer's business. Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-1059 (2d Cir. 1988). Generally, "[n]o one of these factors is dispositive; rather, the test is based on a totality of the circumstances.... The ultimate concern is whether, as a matter of economic reality, the workers depend on someone else's business for the opportunity to render service or are in business for themselves." Id. at 1058-1059 (citing cases). Where the degree of control is so overwhelming as to shut out any possibility for true independence, the factor of control can be determinative. See

5

e.g., Martin v. Priba, 1992 WL 486911, *4 ("A dancer can only be considered an independent contractor if she exerts such control over a meaningful part of the business that she stands as a separate economic entity....") (internal citations and quotations omitted).

### 2. The Common Law Test.

Courts agree that the economic realities test should be used to determine employee status under the FLSA. See e.g., Superior Care, 840 F.2d at 1058-1059; McGuiggan v. CPC Intern, Inc., 84 F.Supp.2d 470, 479 (S.D.N.Y. 2000); Trejos v. Edita's Bar and Restaurant, Inc., No. CV-08-1477(ARR), 2009 WL 749891, *1 (E.D.N.Y. Mar. 17, 2009). Plaintiffs acknowledge, however, that some courts, in applying NYLL, have instead described the appropriate test as the "common law test." See e.g., Velu v. Velocity Exp., Inc., 666 F.Supp.2d 300, 306-307 (E.D.N.Y. 2009) (citing Bynog v. Cipriani Group, Inc., 1 N.Y.3d 193, 198 (2003)). The common law test and economic realities test are similar, "account[ing[ for some of the same factors." Velu, 666 F.Supp.2d at 306-307. Chiefly, under the common law test, the "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." Bynog, 1 N.Y.3d at 198; accord Velu, 666 F.Supp.2d at 307 (control is the "focus" under NYLL). Accordingly, the inquiry requires that courts "account for some of the same factors" under both tests. Courts have stated that factors relevant to control under the common law test include, but are not limited to, whether the worker (1) worked at her own convenience; (2) was free to engage in other employment; (3) received fringe benefits; (4) was on the employer's payroll; and (5) was on a fixed schedule. Perfect Dental, PLLC v. Allstate Ins. Co., 538 F.Supp.2d 543, 547 (E.D.N.Y. 2007). However, as with the economic realities test, the common law test examines the totality of the circumstances, with no one factor being

determinative as to the ultimate question of control.  <u>See id.</u> (also listing indicia of control that overlap with economic realities, such as whether work is part of employer's regular business).

### 3.   This Court should apply the Economic Realities Test to determine employee status under both the FLSA & NYLL.

Plaintiffs win under both tests.  However, to the extent that this Court is inclined to apply one test as opposed to the other, the Court should apply the economic realities test to both the FLSA and NYLL.  The FLSA and NYLL contain identical definitions governing employee status.  The FLSA states, "'Employ' includes to suffer or permit to work." 29 U.S.C. § 203(g). The FLSA further states, "employee means any individual employed by an employer." 29 U.S.C. § 203(e)(1).  The NYLL mirrors these definitions: "'employed' includes permitted or suffered to work," NYLL § 2, and "'Employee' includes any individual employed or permitted to work by an employer in any occupation...." NYLL § 651(5).[7]  These definitions are "expansive and [have] long been recognized as protecting workers who may not have been considered employees at common law."  <u>Double R</u>, p. 11 (as to NYLL) (citing <u>People v. Sheffield Farms</u>, 225 N.Y. 25 (1918)); <u>see</u> <u>U.S. v. Rosenwasser</u>, 323 U.S. 360, 362 (1945) (stating about the FLSA, "A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame.").  It makes no sense for different standards to be used.  Further, relying on this parallel statutory framework, the NY DOL has taken the position that the economic realities test should be applied to determine employee status under the NYLL's minimum wage provisions.[8]  <u>See</u> <u>Double R</u>, p. 11 (citing definitions).[9]  Moreover, this

---

[7] <u>See also</u> N.Y. Comp. Codes R. & Regs., tit. 12 § 146-3.2 (defining "employee" as "any individual suffered or permitted to work in the hospitality industry by the operator of the establishment or by any other employer....").)

[8] <u>Cf.</u> <u>DiPilato v. 7-Eleven, Inc.</u>, 662 F.Supp.2d 333, 347 (S.D.N.Y. 2009) ("As the ADEA does not have the same broad definition of "employ" as does the FLSA, the Second Circuit held that the common law agency test is the proper test to determine who is an employer under said act.").

[9] The NY DOL is charged with administering the NYLL; the Board is an independent arm of the NY DOL. NYLL §§ 21, 100. The Board is entitled to deference where its opinion is anchored in plain statutory language of the

7

District has acknowledged that *employer* status should be determined the same way under the FLSA as under the NYLL. <u>See e.g.</u>, <u>Jiao v. Shi Ya Chen</u>, No. Civ. 0165(DF), 2007 WL 4944767, n. 12 (S.D.N.Y Mar. 30, 2007). The law of this case also holds as much. <u>See Hart v. Rick's Cabaret Int'l Inc.</u>, No. 09 Civ. 3043, 2010 WL 5297221, *2 (S.D.N.Y. Dec. 20, 2010) (Koeltl, J.) ("Courts... have concluded that the standards by which a court determines whether an entity is an 'employer' under the FLSA also govern that determination under the New York labor law."). It is not logical that *employer* status should be decided the same way, using the same test, but that *employee* status should not. Accordingly, this Court should apply the economic realities test to examine the FLSA *and* NYLL claims in this case. That said, out of an abundance of caution, Plaintiffs address both tests below, with the common law test addressed within the discussion of control. Given the control present here, as well as the economic realities, Plaintiffs should be granted summary judgment under the FLSA and NYLL no matter which test is used.

## B. RICK'S NY CONTROLLED ENTERTAINERS' WORK AT THE CLUB.

The undisputed facts of the case show that Rick's NY exercised an immense degree of control over its entertainers. This control establishes an employment relationship.

### 1. Control through written guidelines.

The presence of club-imposed written guidelines for entertainer conduct indicates control and weighs in favor of employee status. <u>See e.g.</u>, <u>Clincy</u> 808 F.Supp.2d at 1344-1345; <u>Morse</u>, 2010 WL 2346334 at *3; <u>Harrell</u>, 992 F. Supp. at 1349-1350; <u>Reich v. Priba</u>, 890 F. Supp. at 592; <u>Double R</u>, pp. 3-6, 9, 13. For example, the club in <u>Double R</u> distributed written "rules and regulations" similar to the guidelines at Rick's NY. <u>Double R</u>, pp. 3-6, 9. In finding that the

---

NYLL. <u>See Matter of Dawn Joy Fashions v. Commissioner of Labor of State of N.Y.</u>, 90 N.Y.2d 102, 107-108 (1997). Further, where an opinion entails an evaluation of factual data and inference drawn therefrom, "courts regularly defer to the governmental agency" charged with administering the statute. <u>See Matter of Gruber</u>, 89 N.Y.2d 225 (1996) (internal citations and quotations omitted). This Court should defer to the Board's opinion here.

club "exercised such an extent of control over its dancers that they could not possibly be considered independent from the [club]" under the NYLL, the Board looked to the presence of the written rules, noting that the entertainers had no control over the terms. Id., p. 13.

And so it is here. Rick's NY has written guidelines that accurately depict the rules that apply to entertainer conduct at the club. (Pl.'s 56.1 ¶¶ 11-14, 28.) The guidelines govern the general topics of how entertainers are to dance on stage, what they are to wear, how they are to interact with customers, scheduling, access to the club and its facilities, and the method and manner in which entertainers are to perform personal dances. (Id. ¶ 29; see e.g., id. ¶¶ 58 ("We have a Three Day Minimum Commitment Requirement one of those days has to be a Friday, Saturday, Sunday, or Monday."), 80 ("Entertainers must give the club a 24 hour notice of cancellation."), 122 ("Long gowns are to be worn everyday [sic] except Sunday and NO TWO PIECES ALLOWED at all"), 176 ("No floor work, no splits, no pole work on pedestal stage."), 233 ("After you complete your 8 hour shift and you would like to leave you need to inform... an available manager that you would like to go."), 203 ("Do not approach the customer automatically with 'would you like a dance.'" (quotations added), 256 ("Entertainers are prohibited from using public bathrooms upstairs...."); see infra §§ II.B.2-II.B.10.)

Club management, including the house mom, goes over these guidelines with entertainers during orientation when an entertainer is first hired. (Id. ¶¶ 12-14.) Many of the guidelines that have been in effect have explicitly stated that entertainers' failure to comply will result in discipline and possible discharge. (Id. ¶ 30.) This statement reflects reality. Rick's NY enforces its guidelines through discipline such as warnings, fines, and suspension or termination (i.e., making an entertainer "inactive"). (Id. ¶ 31.) This indicates employee status.[10]

---

[10] That there may not always be strict enforcement or that not all listed guidelines are always enforced does not

## 2. Control over entertainers' schedules.

A club's control over when entertainers work and related scheduling requirements indicate control and employee status. See e.g., Clincy, 808 F.Supp.2d at 1344-1345; Thompson, 779 F.Supp.2d at 148; Reich v. Priba, 890 F. Supp. at 592; Harrell, 992 F. Supp. at 1350; Martin v. Priba, 1992 WL 486911, *4; Ten's Cabaret, ¶ 4.b.iii; Double R, pp. 6-7, 14. Again, the case of Double R is particularly instructive. In that case, the club made shifts available to entertainers and the entertainers chose which shifts to work. Double R, p. 6. Entertainers were required to call the club if they were unable to work when scheduled. Id., p. 13. The club's requirement that entertainers work one day shift may not have always been enforced. Id., pp. 7, 13. Further, the club threatened and sometimes imposed fines for lateness or failure to work a scheduled shift without calling ahead. Id., p. 13. Contributing to the Board's finding that the entertainers are employees was the fact that the club has "minimum scheduling requirements and the ability to fine dancers for absences or lateness, even if those fines are not often levied." Id., p. 14.

Here, the facts are nearly identical. As in Double R and as with almost any employer, Rick's NY determines the shifts that are available for entertainers to work. (Pl.'s 56.1 ¶¶ 41-47.) Entertainers are required to inform the club of the shifts they will work a week in advance. (Id. ¶ 34.)[11] The club maintains a typed schedule tracking these scheduled shifts for each entertainer and notes when an entertainer will be gone for vacation or the like. (Id. ¶¶ 35-39.) The club requires that entertainers work certain days, as well as a minimum number of days, per week. (Id. ¶¶ 48-62.) Whether entertainers are allowed exceptions or punished for violating the

undercut the club's control. See e.g., Clincy, 808 F.Supp.2d at 1344-1345 ("It appears from the record that while the rules may not be enforced consistently or uniformly, the Club's management has the authority to fine or otherwise discipline entertainers for not complying with the rules, and has done so."). Here, Rick's NY could have chosen to have no guidelines at all. However, they chose to have guidelines, the mere presence of which controls entertainers' behavior by listing rules and threatening discipline for infractions of the same.

[11] They may not be allowed to work if the just arrive at the club without scheduling ahead. (Pl.'s 56.1 ¶ 236.)

requirements are matters within the sole discretion of the club. (Id. ¶¶ 52-56, 59-62, 79-91.) Exceptions granted by management are noted on the typed schedule. (Id. ¶¶ 53, 60, 65.) Additionally, entertainers are expected to work a full shift and are not allowed to simply leave the club without permission. (Id. ¶¶ 66-68, 233-235.)

Further, the club's discipline of entertainers for failure to abide by the schedule has the effect of imposing a "fixed schedule" on entertainers. If entertainers are unable to work a scheduled shift, they are to inform the house mom ahead of time. (Id. ¶¶ 64-65, 80.) When they do not, management can and has doled out punishment. (Id. ¶¶ 76-97.) Defendants' records show that they have imposed nearly *6,000* fines (totaling approximately $400,000) on entertainers for failure to arrive at work when scheduled. (Id. ¶¶ 84-85, 230.) Fines are only removed at the house mom's or management's request and, often, upon proof of a reason, such as illness. (Id. ¶¶ 86, 88-90; 231-232.) See Clincy, 808 F.Supp.2d at 1332 (finding employee status where, "Whether or not there is a concrete rule as to the minimum number of nights that an entertainer must work..., [the club] has admitted that some entertainers have been fined or otherwise disciplined for not working scheduled nights ..... [M]anagement sometimes requires proof that an entertainer had obligations preventing her from working...."). Rick's NY has also made entertainers inactive for not arriving when scheduled. (Id. ¶¶ 91-95.) Given this, there is no credible argument that entertainers at Rick's NY truly "work at their own convenience" or do not have "fixed schedules." They work as employees do—on pre-determined schedules.

### 3. Control through mandatory house fees.

Rick's NY further controls its entertainers by requiring that they pay "house fees." (Id. ¶¶ 98-102.)[12] See e.g., Clincy, 808 F.Supp.2d at 1334; Double R, p. 13.

---

[12] Whether house fees may be waived or whether entertainers may receive house fee credits are matters over which

### 4. Control over entertainers' appearance.

If entertainers were independent contractors, they would be able to choose what to wear, when to wear it, and how to otherwise present their chosen image to customers. Left to their own devices, entertainers might choose to appear sporty, grungy, dominatrix-like, as sexy schoolgirls or librarians, or in any other manner which embodies one or another of the many stereotypical (or not) fashions associated with female sexual availability. Entertainers might choose to display tattoos, to display various body piercings, to emphasize or display certain body parts, to pursue a waiflike body or, instead, to appear more *zaftig*. Rick's NY does not afford entertainers that discretion. Rather, it requires that entertainers fit the *club's* image. (Pl.'s 56.1 ¶¶ 114-150.) Entertainers risk being made inactive when they do not conform. (Id. ¶¶ 114-116, 142-147.) For example, Rick's NY has suspended or terminated entertainers for failing to maintain a certain weight. (Id. ¶¶ 142-147.) This is indicative of control. See Clincy, 808 F.Supp.2d at 1332. Rick's NY requires that entertainers wear dresses (as opposed to lingerie, swimwear, shorts, fetish wear, or other apparel entertainers might otherwise choose), dictates the length of those dresses, prohibits dresses made of certain materials, and determines whether and when exceptions to the dress code are permitted, such as on theme nights or "Lingerie Tuesdays." (Pl.'s 56.1 ¶¶ 117-126.) This, too, shows control. See Ten's Cabaret, ¶ 4.b.v.; Jeffcoat, 732 P.2d at 1076 ("The factors indicating control are quite persuasive.... The dancers were required to wear dresses on weekends, and country and western gear on Wednesdays."); Martin v. Circle C, 1991 WL 338239, *4 ("Although the dancers purchased and maintained their individual costumes, the costumes must have met certain standards in order to promote the desired atmosphere...."). Rick's NY does not even allow its entertainers to choose the style of

---

the club has complete control. (Id. ¶¶ 106-112.)

shoes or underwear they will wear, allowing only certain types of underwear and shoes. (Pl.'s 56.1 ¶¶ 127-132.) Rick's NY prohibits entertainers from working with certain piercings and tattoos visible. (Id. ¶¶ 133-141.) As a result, entertainers have changed aspects of their appearance at management's direction. (See e.g., id. ¶¶ 123-124, 126, 128, 134-138, 140-141, 148-149.) These examples of control limit entertainers' discretion to choose how to be attractive to customers. (See e.g., id. ¶ 148 ("But what if the guy's preference is a hot sweaty girl? You know, it could hurt me to prep myself up.").) All of this runs counter to independence. See e.g., Clincy, 808 F.Supp.2d at 1332; Reich v. Circle C, 998 F.2d at 327; Double R, pp. 10, 13.

### 5. Control over entertainers' job duties.

At Rick's NY, the manner and times at which entertainers "dance" are dictated by Defendants, not the entertainers. Independent contractors would have the freedom to choose how, when and whether to dance on stage. Entertainers at Rick's NY do not have this discretion. Rather, entertainers must dance on stage when called by DJ (the club's agent), on the particular stage the DJ selects (Rick's NY has several), to club-approved music, for a club-determined length of time, must disrobe as directed by the club, and cannot do "floor work," manipulate their underwear, stand idle, or dance on the pole. (Pl.'s 56.1 ¶¶ 152-186.) Entertainers who, absent club approval, do not abide by these rules are subject to discipline. (Id. ¶¶ 165-166, 180, 227-231.) These are examples of Rick's NY's control over its entertainers' method and manner of performing work. See e.g., Double R, pp. 7, 13; Clincy, 808 F.Supp.2d at 1333 ("[D]ancers may refuse to dance on stage when called, but may be fined…."); Harrell, 992 F. Supp. at 1349-1350 (stage rotation); Jeffcoat, 732 P.2d at 1076 (order of disrobing); Martin v. Circle C, 1991 WL 338239, *4 ("The dancers could express a preference for a certain type of music, but… did not have the final say… as they would if they were independent….").

13

Additionally, entertainers at Rick's NY must be out of the dressing room "working the floor" in order to perform personal dances for customers. (Pl.'s 56.1 ¶¶ 198-201.) Entertainers are prohibited from performing those dances as they see fit. (Id. ¶¶ 202-209.) Rick's NY direct entertainers on how to approach guests, requires that they be able to converse with guests in English, prohibits entertainers from moving guests to other areas of the club when performing a dance, prohibits entertainers from dancing on their knees, and requires that entertainers keep one foot on the floor. (Id.) Rick's NY monitors entertainers for compliance and disciplines them for noncompliance. (Id. ¶¶ 204, 206-207, 227-231.) Rick's NY, through its managers and other agents, also requires entertainers to spend time with the club's customers in semi-private rooms, has the authority to decide which entertainers will go in rooms with which customers, and monitors the rooms to watch out for the club's customers' best interests. (Id. ¶¶ 187-197.) This is precisely the opposite of independence. See e.g., Reich v. Circle C, 998 F.2d at 327 ("[N]o flat heels, no more than 15 minutes at one time in the dressing room, only one dancer in the restroom at a time, and all dancers must be 'on the floor' at opening time. [The club] enforces these rules by fining infringers.").

### 6. Control through mandatory tip-outs.

Rick's NY requires entertainers to pay $20 "tip outs" each shift to the DJ, house mom, and management, further demonstrating the club's control over its entertainers. (Pl.'s 56.1 ¶¶ 210-219.)[13] See e.g., Martin v. Circle C, 1991 WL 338239, *3; Ten's Cabaret, ¶ 4.b.ix.

### 7. Control through mandatory meetings.

Rick's NY also requires its entertainers to attend mandatory meetings. (Pl.'s 56.1 ¶¶ 223-226.) Through written guidelines, posted signs, and fines, Rick's NY makes clear that meeting

---

[13] At the club's discretion, entertainers have also been required to pay make-up artists. (Id. ¶¶ 220-221.)

attendance is mandatory.  (Id. ¶¶ 223-224, 225 ("Those entertainers have been fined $100 for missing meeting. We are scheduled to collect $10,300 in fines because of this...."), 230.)  This shows entertainers are not free to "work at their own convenience."

### 8. Control through monetary fines.

The authority to discipline is clear evidence of a club's control over its entertainers.  See e.g., Clincy, 808 F.Supp.2d at 1332; Thompson, 779 F.Supp.2d at 148; Morse, 2010 WL 2346334, *3; Ten's Cabaret ¶ 4.b.viii; Martin v. Circle C, 1991 WL 338239, *3 ("Numerous rules were promulgated by the defendants, and offenders were fined for infringements.").  At Rick's NY, management dispensed discipline through fines.  (Pl.'s 56.1 ¶¶ 227-231.)  In fact, Rick's NY has imposed nearly 7,000 fines on its entertainers since opening for business in 2005.  (Id. ¶ 230.)  These fines include fines related to scheduling, not dancing on stage when required, chewing gum, and other violations of the club's rules.  (Id. ¶ 230.)  Management retained the discretion to remove fines.  (Id. ¶¶ 231-232.)  Regardless of whether many of these fines were ultimately removed or the amounts sought were ultimately credited back to entertainers, it is clear that fines or the threat of fines are a way for Rick's NY to make entertainers conform to the club's rules; as Ken Sistrunk, the General Manager of Rick's NY explained:

> We ask that the entertainer follow the guidelines.  So if I ask repeatedly, and I talk with them, I will call down to the cage and ask them to place a fine so I get the entertainer's attention.  And then when she goes to clock out and she sees that she has a fine, I go down and I speak with her to help her understand.... And then when we have the understanding, I remove the fine.... It goes to getting the attention of the entertainer when all else fails.  When other means of communication fail... then I... have to go that way for her to understand that this [behavior] is not what we want here.

(Id. ¶ 231.)  In sum, entertainers are not free to work as they see fit—they must abide by Defendants' rules or suffer the consequences.

### 9. Control through clock-out requirements.

15

Absent permission, entertainers are not permitted to leave Rick's NY without working a full shift and following the club's clock-out procedures.  (Id. ¶¶ 66-68, 230, 233-235.)  These procedures include having the entertainers present a paper slip for signature to the DJ, house mom, and management, indicating payment of the mandatory tip outs.  (Id. ¶¶ 233-235.) Entertainers are not permitted to clock out during certain times.  (Id. ¶ 235.)  If entertainers were truly independent, they would be able to leave and return to complete a job at their convenience. That entertainers at Rick's NY cannot do so is indicative of control.  See e.g., Double R, p. 13.

### 10. Additional indicia of control.

Rick's NY further controls entertainers by limiting their choices as to the stage names under which they perform, prohibiting them from chewing gum or candy, and requiring that they only use certain entrances and restrooms at the club.  (Pl.'s 56.1 ¶¶ 238, 246-256.)  These examples of control weigh in favor of employee status.  See e.g., Double R, p. 13 (employee entrances); Morse, 2010WL 2346334, *3 (restroom and gum).

Other potential indicia of control commonly listed under the New York common law test include whether the workers were on a fixed schedule, worked at their own convenience, were on payroll, could engage in other employment, or received fringe benefits.  (See supra § II.A.2.) As discussed above, there is ample evidence showing that Rick's NY imposed a fixed schedule on entertainers on a weekly basis and that entertainers were in no way free to work at their own convenience.  (See supra §§ II.B.1-II.B.2, II.B.5, II.B.7-II.B.9.)

Obviously, entertainers are not on payroll at Rick's NY, but that is the very essence of the claims in this case and certainly cannot mean the entertainers are independent contractors.  See generally Double R; see also Rosenwasser, 323 U.S. at 364 ("If that were permissible, ready means for wholesale evasion of the Act's requirements would be provided.").  That said,

Defendant Rick's Cabaret International, Inc. ("RCII") prepared and printed Forms 1099 for the entertainers and Defendant Peregrine Enterprises, Inc. ("Peregrine") issued the forms. (Stip. ¶¶ 218-219.) This is a significant indicator of control. See Bynog, 1 N.Y.3d at 199 (Plaintiffs "were under the exclusive direction and control of MJA, [who] interviewed, hired and compensated the plaintiffs and from whom the plaintiffs received federal tax form 1099.").

That entertainers may have been permitted to engage in other employment while working at Rick's NY is not indicative of contractor status in this context. For example, the entertainers in Double R were permitted to work elsewhere, but were still employees under the NYLL. Double R, pp. 7-8; see also Martin v. Priba, 1992 WL 486911, *3 ("An ability to work at other establishments in not dispositive of the issue.").[14] Indeed, in employment relationships in general, non-compete agreements are rare, and are subject to scrutiny. See e.g., Prime Med. Associates, P.C. v. Ramani, 781 N.Y.S.2d 450, 452 (N.Y. Sup. Ct. 2004). While the presence of such an agreement might weigh in favor of employee status, its absence is probative of very little.

Finally, although entertainers were not given "fringe benefits" such as health insurance or retirement plans, this fact alone is overshadowed by the overwhelming evidence of control discussed above. Many common law employees work in positions where benefits are simply unavailable. Again, while the presence of benefits might weigh in favor of employment status, their absence is probative of very little. Importantly, the common law test examines the totality of the circumstances in evaluating the central question of control. (See supra § II.A.2.)

In light of the totality of the circumstances described above, there is no question that the entertainers at Rick's NY are employees as a matter of law. The most meaningful parts of the

---

[14] As another example, that a fry cook could work at McDonald's and Burger King simultaneously does not make the cook an independent contractor.

exotic dancing occupation—when and how long to work, appearance, and pay, as well as manner of dance and disrobing—are controlled by Rick's NY, not the entertainers. This Court should find that Rick's NY "exercised such an extent of control over its dancers that they could not possibly be considered independent" under the NYLL or FLSA. Double R, pp. 12-13.

### C. RICK'S NY CONTROLS ENTERTAINERS' PROFIT AND LOSS.

In order for entertainers to make any money on a given night at Rick's NY, there must be customers in the club with money to spend. (See Stip. ¶¶ 20, 181; Pl.'s 56.1 ¶¶ 205, 372, 379; see also Pl.'s 56.1 ¶¶ 276-284.) Because Rick's NY controls the factors related to customer volume and spending, it also controls entertainers' opportunity for profit or loss. For example, Rick's NY made the decision to market the club to affluent professionals and controls the aesthetics at the club in an attempt to attract those customers. (Pl.'s 56.1 ¶¶ 304-310.) Rick's NY is in charge of all advertising, hires people to advertise, and decides whether entertainers can participate in promotions. (Id. ¶¶ 285-303.) In contrast, an independent contractor would have control over these determinants of her profits. See Reich v. Priba, 890 F. Supp. at 593 ("The club controls all of the advertising, without which the entertainers could not survive.").

Rick's NY further limits or increases the customer base and customers' spending in the club by imposing cover charges. (Stip. ¶ 9; see Pl.'s 56.1 ¶¶ 349, 507, 537) Rather than allow customers to pay directly with credit cards, Rick's NY charges customers a $4 surcharge for dance dollars. (See Pl.'s 56.1 ¶ 383; see Stip. ¶ 185.) Entertainer disputes with customers and control of the premises—including whether customers are allowed to remain in the club—are controlled by Rick's NY. (Pl.'s 56.1 ¶¶ 311, 315-326.)

Additionally, Defendants provide the millions of dollars necessary to operate the club, including providing the music to which entertainers dance, the stages on which they dance, and

18

the other furnishings that cater to the club's customers.  (Id. ¶¶ 312; see also Stip. ¶ 13.) This vast

capital outlay (in contrast to entertainers' costume expenses and fees and fines) shows that the

club, not the entertainers, puts profits and the potential for loss on the line.  As one court stated:

> Defendant would have us believe that a dancer [ ] could hang out her own shingle,
> pay nothing in overhead,-no advertising, no facilities, no bouncers,- and draw in a
> constant stream of paying customers. A dancer [ ] risks little more than her daily
> "tip out" fee, the cost of her costumes, and her time. That a dancer may increase
> her earnings by increased 'hustling' matters little. As is the case with the zealous
> waiter at a fancy, four star restaurant, a dancer's stake, her take and the control
> she exercises over each of these are limited by the bounds of good service;
> ultimately, it is the restaurant that takes the risks and reaps the returns.

Harrell, 992 F. Supp. at 1352; accord Double R, p. 14 ("[D]ancers' investment is limited to

paying a house fee… and buying clothes and shoes, whereas the [club's] investment… includes

providing lights, a sound system, a stage, maintaining the premises and other costs associated

with owning and operating a business. Indeed, because the dancers only work for tips, their

income depends on the petitioner's customers.").  In short, "but for [D]efendants' provision of

the lavish work environment, the dancers at the club likely would earn nothing." Martin v. Priba,

1992 WL 486911, *5.[15]  Here, this factor weighs in favor of employee status.

## D. ENTERTAINING AT RICK'S NY IS NOT SKILLED WORK.

Courts consistently hold that there is little to no skill required to be a nude dancer. See

e.g., Clincy, 808 F.Supp.2d at 1347-1348; Thompson, 779 F.Supp.2d at 150; Morse, 2010 WL

2346334, *5 (citing Reich v. Circle C, 998 F.2d at 328; Harrell, 992 F. Supp. at 1351; Reich v.

Priba, 890 F. Supp. at 593 and Jeffcoat, 732 P.2d at 1077); see also Double R, p. 14 (citing Reich

v. Circle C and Reich v. Priba).  The same is true here.  Rick's NY does not require that its

entertainers have any formal dance training or prior stripping experience. (Stip. ¶ 105; Pl.'s 56.1

---

[15] By charging entertainers money in order to work, by requiring tip-outs, and by suggesting a minimum tip price for personal dances, which entertainers believed was non-negotiable, Rick's NY controls individual entertainers' net nightly profits. (Stip. ¶¶ 127-131, 155-158, 180; Pl.'s 56.1 ¶¶ 276-277; see supra §§ II.B.3, II.B.6, II.B.8.)

¶¶ 327-334.) Rather, entertainer hiring at Rick's NY is based on appearance and on personality. (Pl.'s 56.1 ¶¶ 330-331.) These facts cut against a finding of specialized skill. See Thompson, 779 F.Supp.2d at 150 ("While the Court does not rule out the possibility of the rare case involving a form of nude dancing that reaches the level of high art, requiring extensive skill, training, and expertise, the defendants' argument barely merits consideration here because nothing in the record indicates that 'artistic ability' had anything to do with eligibility....").

### E. THERE IS NO PRESET DURATION OF EMPLOYMENT AT RICK'S NY.

"Generally employees are hired for indefinite periods, whereas independent contractors work for periods established by contract." Jeffcoat, 732 P.2d at 1077 (finding factor to weigh "only slightly" in favor of independent contractor status where entertainer signed a six-week contract with club). Unlike a contract for services, entertainers at Rick's NY work at the club with no pre-specified end date or contract completion date. (Pl.'s 56.1 ¶ 335.) As with any typical employment relationship, their employment is at will; Defendants could terminate the relationship at any point. (See Stip. ¶ 106; see e.g., Pl.'s 56.1 ¶¶ 91-95, 116, 166, 180.) Further, the scheduling requirements discussed above are far more like a continuing employment relationship than a contractual one. (See supra §§ II.B.2, II.B.7-II.B.9.)[16]

### F. ENTERTAINERS ARE INTEGRAL TO DEFENDANTS' BUSINESS.

Entertainers are integral to Rick's NY. No reasonable jury could ever conclude otherwise. Rick's NY is a strip club. Defendants have admitted that "the most important thing to the [Rick's Cabaret] brand is that [it has] entertainers." (Pl.'s 56.1 ¶ 336.) "Patrons are [at

---

[16] Generally speaking, entertainers are a transient population. Careers are short-lived given that it is not a job typically performed by older workers. In this context, work of a short duration should not weigh against employee status. See e.g., Superior Care, 840 F.2d at 1060-61 ("[E]ven where work forces are transient, the workers have been deemed employees where the lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative."); Ansoumana v. Gristedes Operating Corp., 255 F.Supp.2d 184, 191 (S.D.N.Y. 2003); Double R, p. 15; see also Reich v. Priba, 890 F. Supp. at 593.

Rick's NY] to see a lady disrobe on stage. If she does not disrobe, then the patron is not getting what they came to see." (Id. ¶ 337.) To put it bluntly, strippers are integral to strip clubs. Morse, 2010 WL 2346334, *6 ("[E]xotic dancers are obviously essential to the success of a topless nightclub.") (quoting Harrell, at 1352); accord Double R, p. 15.

Based on the foregoing, there is no question that entertainers are employees under the FLSA and NYLL. The economic realities overwhelmingly weigh in favor of employee status. Moreover, the facts of this case require that the critical question of control under New York common law be answered in favor of employee status. Summary judgment should be granted for Plaintiffs on the issue of misclassification under both the FLSA and NYLL.

### III.   DEFENDANTS VIOLATED FLSA & NYLL MINIMUM WAGE PROVISIONS.

Because the entertainers are employees, Rick's NY's failure to pay them any wages violates the FLSA and NYLL. Compare Stip. ¶ 20 (failure to pay wages) with 29 U.S.C. § 206; NYLL § 652.)[17] The fines and fees Rick's NY collected from entertainers also violate the minimum wage provisions of the NYLL and FLSA. (See supra § II.B.) The fines and fees brought entertainers' total wages down from $0.00 per hour to less than $0.00 per hour. See Reich v. Priba, 890 F. Supp. at 595 ("Cabaret Royale's practice of collecting a tip out fee [] violates the FLSA because the deduction further reduces the entertainers' wages below the minimum wage.") (citing Reich v. Circle C., 998 F.2d at 330); Double R, at 17 (affirming NYLL minimum wage award including reimbursement of fees paid to club).[18] Plaintiffs are entitled to summary judgment on their minimum wage claims for the minimum wage multiplied by all hours worked *plus* the amount of money paid to the club in the form of fines and fees.

---

[17] See also N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.1.
[18] See also 29 C.F.R. § 531.1 ("The wage requirements of the [FLSA] will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit....").

IV.     **THE "OFFSET" DEFENSE & COUNTERCLAIM SHOULD BE DENIED.**[19]

Defendants' substantial wage liability in this lawsuit cannot be offset by amounts entertainers received from Defendants' customers.   The amounts entertainers received are tips, not service charges.   At the suggestion or direction of Rick's NY, entertainers asked customers to pay a minimum of $20 for each dance.  (Pl.'s 56.1 ¶¶ 276-277; see Stip. ¶ 180.)  Customers paid this minimum and, sometimes, more directly to entertainers in the form of cash or dance dollars. (Pl.'s 56.1 ¶¶ 278-279; see Stip. ¶ 182.)  Defendants never tracked or claimed as theirs a single penny of any $20 minimum cash tip.  (Stip. ¶ 220; Pl.'s 56.1 ¶ 376.)  Entertainers received $18 for each dance dollar redeemed.  (Stip. ¶ 190.)  Defendants never claimed any portion of the $18 dance dollar amounts as theirs.  (Pl.'s 56.1 ¶¶ 347-378.)  There was never any agreement that these $20 or $18 amounts belonged or could ever belong to Defendants.  (Id. ¶ 380.)

Yet now, facing substantial wage liability, Defendants seek a do-over.  They seek to re-characterize each $20 cash and $18 dance dollar amount as a "service charge" that can offset unpaid wages. Defendants also argue that there was an "agreement" under which Defendants would be entitled to the $20 cash and $18 dance dollar amounts if entertainers were employees. There is no factual basis for this supposed "agreement."  There is no written agreement, there was no deposition testimony about a verbal agreement, and not a single document produced by Defendants mentions such an agreement.  (See id.)  Yet now, Defendants claim that entertainers would be unjustly enriched if allowed to keep the $20 cash and $18 dance dollar amounts and also back wages awarded in this lawsuit.[20]  Defendants' arguments should be rejected and their

---

[19] Plaintiffs move only on applicability of offset and counterclaim to the FLSA claims here.  (See ECF No. 356.)
[20] Defendants' 29th affirmative defense states, "Defendants are entitled to any and all offsets and/or set offs permissible by law."  Their 35th affirmative defense states, "Plaintiffs' claims are barred because money collected from the sale of dances were not a tip or gratuity, but rather were a mandatory service charge."  (ECF No. 279.) Defendants' counterclaim is for unjust enrichment.  (Id.)

defenses and counterclaims built on the same should be denied.

## A. DEFENDANTS ARE NOT ENTITLED TO OFFSET WAGES THEY OWE.

The FLSA regulation states that "service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the [FLSA]. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act." 29 C.F.R. § 531.55. The question, then, is whether the money entertainers receive from a strip club's customers falls within the category of "sums" that can be used to offset the FLSA's minimum wage requirements. Nearly every court to examine this issue on the merits has rejected the club's offset argument. See e.g., Harrell, 992 F. Supp. at 1358 ("monies that dancers receive from customers are tips, not wages, which cannot be applied to offset completely an employer's obligation to pay a minimum wage."); Reich v. ABC/York-Estes Corp., 1997 WL 264379, *5-7; Reich v. ABC/York-Estes Corp., 157 F.R.D. at 670; Reich v. Priba Corp., 890 F. Supp. at 594-595; Thornton v. Crazy Horse, Inc., No. 3:06–cv–00251–TMB, 2012 WL 2175753, *9 (D. Alaska June 14, 2012); see also Jones v. JGC Dallas, LLC, No. 3:11-cv-02743-O-BH (N.D. Tex. Aug. 17, 2012) (dismissing unjust enrichment counterclaim because "any set-off allowed would result in their final awards dropping below the statutory minimum.... [and] dance fees sought... do not represent wages pre-paid... or wage obligations already fulfilled."). This Court should do the same.

### 1. Defendants do not include the amounts in their gross receipts.

The FLSA does not permit an offset for service charges or other similar sums where the employer does not include those amounts in its gross receipts:

> [S]ervice charges and other similar sums *which become part of the employer's gross receipts* are not tips for the purposes of the [FLSA]. *Where such sums* are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the [FLSA].

29 C.F.R. § 531.55 (emphasis added); <u>Chan v. Sung Yue Tung Corp.</u>, No. 03 Civ. 6048(GEL), 2007 WL 313483, *14 (S.D.N.Y. Feb. 1, 2007) ("By contrast, a 'service charge' is a mandatory charge imposed by an employer on a customer that is the property of the employer, not the employees, ***and becomes part of the employer's gross receipts***.") (citing 29 C.F.R. § 531.55) (emphasis added); <u>Reich v. ABC/York-Estes Corp.</u>, 1997 WL 264379, *5 ("[A]n employer must include payments in its records as gross receipts as a prerequisite to 'service charge' classification under the FLSA.").   Where that money, however, does not enter into the employer's gross receipts and remains a tip, it is "the property of the employee... [and t]he employer is prohibited from using an employee's tips...for any reason other than that which is statutorily permitted...." <u>See</u> 29 C.F.R. § 531.52; <u>Melton v. Round Table Restaurants, Inc.</u>, No. 14112, 1971 WL 900 at *4 (N.D. Ga. Nov. 8, 1971) ([O]nly when there is a fixed service charge prescribed by the employer ***and which becomes a part of it's [sic] gross receipts*** that such charges may be converted into wages....") (emphasis added).  Here, it is plain that Defendants did not include the $18 dance dollar or $20 cash amounts in their gross receipts.

First, Defendants admit that they did not track entertainers' receipt of cash in any way whatsoever, let alone record that cash in Defendants' gross receipts.  (Stip. ¶ 220; Pl.'s 56.1 ¶¶ 376-378.)  This fact alone—without any consideration for how Defendants handled dance dollar amounts—defeats Defendants' service charge argument in its entirety, even as to the $18 dance dollar amounts. <u>Reich v. Priba Corp.</u>, 890 F. Supp. at 594-595 ("Entertainers keep 100% of all cash tips received without any accounting to Cabaret Royale. If a patron uses the voucher system to tip the entertainer, Cabaret Royale only credits 20% of the value of the voucher to gross receipts. The fact that ***all*** of the table dance fees are not reported as gross receipts is ***fatal*** to Cabaret Royale's claim that the tips are more properly classified as wages.") (emphasis added).

24

Defendant's treatment of cash is dispositive; money entertainers received from customers cannot change from being a "tip" to being a "service charge" based on whether the amounts were initially received in cash or by credit card.

Second, Defendants admit that they did not record the $18 dance dollar amounts in gross receipts on their tax filings. (Stip. ¶ 218.) If the money truly was part of Defendants' gross revenue, then Defendants would have reported it as such and paid the associated taxes. They did not. This complete failure to include these amounts for tax purposes also defeats Defendants' offset argument. See Chan v. Triple 8 Palace, Inc., No. 03 Civ. 6048(GEL), 2006 WL 851749, *8-9 (S.D.N.Y. Mar. 30, 2006); see also Sung Yue Tung, 2007 WL 313483, *8.

Third, irrespective of taxes, Defendants did not record the $18 dance dollar amounts in their gross receipts, even for internal accounting purposes. While Defendants internally *tracked* the $18 dance dollar amounts entertainers received; Defendants *subtracted* those amounts out of their *revenue accounts* prior recording total revenue for accounting purposes. (Stip. ¶¶ 211-217; Pl.'s 56.1 ¶¶ 361-369.) The money literally never entered Defendants' gross *receipts*. See Sung Yue Tung, 2007 WL 313483, *8 (where payments were never included in total sales, "The defendants have never included the amount... in their records of the restaurant's gross receipts").

Defendants literally treat the $18 dance dollar amounts in the exact same way that they treated complimentary ("comped") alcoholic beverages given to customers at Rick's NY. (Pl.'s 56.1 ¶¶ 350-360, 370.) When Defendants give away a *free* drink and receive literally *nothing* from a customer in return, they record the stated sales price in their account for "Liquor Revenue," but subtract the same amount from the contra account, "Complimentary Liquor." (Id. ¶¶ 353-358.) The entry and the contra entry both happen prior to the inclusion of "Liquor Revenue" in Defendants' total sales. (Id.) Thus, zero dollars of Defendants' revenue is ever

25

attributable to the comped beverages or reported in Defendants' gross receipts. (Id.) This makes sense; Defendants never received money for a free beverage.

Critically, Defendants' accounting treatment of the $18 dance dollar amounts entertainers received when they exchanged dance dollars was the exact same as their treatment of the sales price of a free beverage. Customers pay Defendants $24 for one dance dollar. (Stip. ¶ 185.) The $24 is recorded in Defendants' revenue account for "Dances," but the $18 amount entertainers receive for turning in the dance dollars is subtracted out by making a contra-entry in the account prior to including "Dances" in Defendants' total sales. (Id. ¶¶ 211-216; Pl.'s 56.1 ¶¶ 361-369.) Thus, precisely zero dollars of Defendants' revenue is ever attributable to the $18 dance dollar amount. Zero dollars is reported in Defendants' gross receipts. (Id. ¶¶ 361-369, 371, 378.) In short, there is no "meaningful distinction"[21] between the way Defendants treat comped beverages (money they never received in any way whatsoever) and the $18 dance dollar amounts entertainers receive in exchange for dance dollars. For accounting purposes, the $18 dance dollar amounts are equivalent to money Defendants never received at all. (Id. ¶ 370.)

Notably, Defendants account for actual beverage sales for money by including the full amount of the sale in "Liquor Revenue" without any corresponding debit for associated expenses, such as the cost of the alcohol or the wages of the bartender serving the beverage. (Id. ¶¶ 359-360.) Thus, the total price of the beverage is recorded as revenue to Defendants and reported in Defendants' gross receipts. (Id.) Deductions for the cost of the beverage and the bartender's wages are ultimately made, but they are made on the expense side of the ledger, and ultimately reflected in net revenues. (Id.) Obviously, Defendants know how to include actual sales revenue in their gross receipts. They just did not do so with the $18 dance dollar amount

---

[21] Sung Tue Tung, 2007 WL 313483, *8.

because they knew that money was never theirs to claim.   (Id. ¶ 378 ("And the $18 belongs to the [ ] entertainer as does the cash she gets…. **It's not our money when it's redeemed, no…. The $18 is not our money.**" (quoting Defendants' Chief Financial Officer) (emphasis added).)

Defendants' complete failure to include the $20 cash and $18 dance dollar amounts in their gross receipts is "fatal" to their offset argument. Reich v. Priba Corp., 890 F. Supp. at 594-595. This reasoning makes perfect sense. An employer may not satisfy its wage obligations merely by directing its customers to pay its employees; rather, the payments must come from the employer's own accounts. If this were not the case, employers in any service industry would simply direct their customers to pay the employees directly under the guise of a "service charge." Such a scheme would be tremendously beneficial to employers, who could avoid paying both corporate and payroll tax on such amounts, while at the same time still claiming to satisfy their wage obligations. Here, Defendants did just that. They admittedly never treated the $20 cash or $18 dance dollar amounts as their own, or paid any taxes on those amounts. The money never belonged to Defendants and Defendants never acted like it did. Defendants cannot now claim the money as their own in an after-the-fact attempt to manufacture an escape hatch from their liability in this lawsuit. The money is a tip, not service charge, and cannot offset wage liability.

### 2.  Additional factors show that the amounts in question are tips.

Gross receipts aside, the other undisputed facts of this case militate towards finding that the $20 cash and $18 dance dollar amounts are tips, not service charges that can offset wages. At Rick's NY, customers choose which entertainer to receive a dance from and pay that entertainer directly. (Stip. ¶ 16; Pl.'s 56.1 ¶ 379.) Moreover, customers can pay and have paid entertainers more than $20 per dance. (Stip. ¶¶ 182, 180 ( "Rick's NY set the suggested price for a personal dance at $20 or one dance dollar/dance ticket, however entertainers had the ability

to charge more or less in their discretion."); Pl.'s 56.1 ¶¶ 276-279.)[22]  Further, Defendants keep

no record of the number of dances each entertainer performs.   (Stip. ¶ 110.)   All of these facts

indicate that the money in question is a tip.   See Triple 8, 2006 WL 851749, *8-9; Thornton,

2012 WL 2175753, *9.   Accordingly, the Court should grant summary judgment for Plaintiffs.

## B. DEFENDANTS' COUNTERCLAIM MUST BE DENIED.

Defendants' counterclaim alleges that it would be unjust for entertainers to retain the

$20 cash and $18 dance dollar amounts and also receive unpaid minimum wages through

judgment in this lawsuit. (ECF No. 279.) "The elements for a claim of unjust enrichment under

New York law are: (1) that the defendant was enriched; (2) the enrichment was at the plaintiff's

expense; and (3) the circumstances were such that equity and good conscience require the

defendants to make restitution.... To prove unjust enrichment, the plaintiff must show that it

conferred a benefit upon the defendants without adequate compensation."   Pro Bono

Investments, Inc. v. Gerry, No. 03 Civ. 4347(JGK), 2005 WL 2429777, *9 (S.D.N.Y. Sept. 30,

2005) (internal citations omitted).   Here, enrichment through receipt of back wages would be

mandated by judgment and enrichment through retention of tips would not be at Defendants'

expense.   Equity and good conscience do not require restitution.

### 1. Any enrichment is not at Defendants' expense.

The $18 dance dollar and $20 cash amounts entertainers received came from Defendants'

customers, not Defendants. (Stip. ¶ 181; Pl.'s 56.1 ¶ 379.) As established above, the money was

a tip, not service charge. (See supra § IV.A.) It was never Defendants' money. (Id.) It was

---

[22] To the extent the $20 amount was considered a mandatory amount to be paid, Plaintiffs note that this District has
recognized that such a mandatory amount may still be more properly characterized as a tip. See Triple 8, 2006 WL
851749, *3-4, 8-9, n. 10 (citing exotic dancer cases); see also Sung Yue Tung, 2007 WL 313483, *14 ("Although
the messy realities of the restaurant's operation do not fit neatly into the simple binary conceptual structure of the
regulations, the overwhelming weight of the evidence establishes that...[the amount]...was a tip.").

customers' money, and those customers gave it to the entertainers.   Nonetheless, Defendants claim that the money comes at their expense pursuant to a non-existent "arrangement" that entertainers would be independent contractors.   (ECF No. 279.)   Based on this "arrangement," Defendants claim they: (1) let entertainers keep the $18 dance dollar and $20 cash amounts that Defendants would have otherwise kept; and (2) ceded to entertainers control over their work that Defendants would have otherwise retained.   (Id.)   Defendants claim that these are "benefits" conferred at Defendants' expense, sufficient to create unjust enrichment.   (Id.)   Defendants' argument is flawed.

First, there is no evidence that there was ever any arrangement that the money would be Defendants' money if the entertainers were employees.   (Pl.'s 56.1 ¶ 380.)   Defendants are not allowed to just make a counterclaim based on their own representation of what they would have done differently had they properly classified entertainers from the outset.   If counterclaims like Defendants' counterclaim were allowed to proceed, all employers would have to do to avoid payment of damages for statutorily owed wages is aver that, had they honored their statutory wage obligations, they would have done things differently.   Employers could simply state that they would not have allowed their employees any benefits (including payments from third parties) had they followed the law in the first place and that those benefits should now satisfy judgment for wages.   Imagine the perverse outcomes.   For example, the defendant-employer in Superior Care misclassified its nurses as independent contractors and failed to pay them overtime wages.   840 F.2d 1054.   The nurses were allowed to engage in other employment while they worked for Superior Care.   Id. at 1057.   After having been found guilty of misclassification and liable for unpaid overtime, should Superior Care now be allowed to avoid paying judgment by claiming that it would not have allowed the nurses to engage in other employment?   Or to claim

29

that the value of that other employment satisfies Superior Care's overtime obligations? Of course not. Lawsuits do not work that way. When an employer breaks the law, it must pay the consequences. Defendants must pay here.

Second, Defendants have asked the Court to impose legal obligations on the parties that are expressly forbidden by the applicable laws. Unjust enrichment is an equitable remedy which is quasi-contractual in nature. See Pro Bono Investments, Inc., 2005 WL 2429777, *8. In order to avoid situations where one party receives a benefit from another without receiving just compensation for that benefit, courts will imply a contract where none in fact exists. See Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc., 14 F.Supp.2d 331, 338 (S.D.N.Y. 1998). By seeking to recover on a theory of unjust enrichment, Defendants have asked this court to infer a contract under which the entertainers allegedly agreed that they were only allowed to keep the money because they were independent contractors; agreed that they would be allowed total income of only the minimum wage; and agreed that they need to pay Defendants any amounts earned in excess of the minimum wage upon a successful verdict in a wage and hour case such as this one. (See ECF No. 279.) Not only is there absolutely no evidence supporting any of these alleged agreements (see Pl.'s 56.1 ¶ 380), but Defendants are asking the Court to infer a contract that is void against public policy and contrary to law.

Because Defendants' counterclaim seeks the end result of Defendants having to pay no money damages despite their misclassification and failure to pay wages, the counterclaim asks the Court to infer a contract whereby entertainers give up their right to damages under the FLSA and NYLL. Counterclaims like this that reduce an FLSA plaintiff's total award below minimum wage are not allowed. See Jones, No. 3:11-cv-02743-O-BH, pp. 6-7. These types of contracts are also void as against public policy. Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S.

728, 740 (1981); Tennessee Coal Co. v. Muscoda Local No. 123, 321 U.S. 590, 602-603 (1944) ("Any custom or contract…like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights."); Am. Broadcasting Cos., Inc., v. Roberts, 61 N.Y.2d 244, 249 (1984).   Further, the entertainers cannot be held to any agreement to not challenge Defendants' classification of their status.   See Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 302 (1985).   Nor can they be held to any agreement to only work for tips.   See Lanzetta v. Florio's Enterprises, Inc., No. Civ. 6181(DC), 2011 WL 253961, *5 (S.D.N.Y. Jan. 25, 2011) (awarding minimum wages where plaintiff earned only tips and "testified that defendants 'told me no [wages]. Just tips.' [ ] When asked why she agreed to work at Florio's anyway, she testified that the tips were substantial enough to justify the arrangement….'") (internal citations omitted).   Thus, even if the Court credits Defendants' self-serving representation that they "would have" done things differently, Defendants may not ask the Court to impose a remedy that relies on a judicially-created contract which would have been unenforceable if agreed to by the parties outright.

Third, Defendants' argument is circular.   They allege that entertainers will be unjustly enriched by retaining tips and having been allowed to work under conditions that Defendants characterize as more consistent with those of independent contractors.   Ironically, Defendants cite examples of these working conditions that are completely contradicted by the factual record in this case, such as the ability to choose one's own costume and control over one's schedule. (Compare Countercl., ¶ 308 with §II.B., supra.)   Here, no "non-monetary benefit" associated with independent contractor status has actually been conferred.[23]   If it had been, Plaintiffs would

---

[23] Moreover, while certain working conditions might arguably constitute a "benefit" conferred by Defendants, it is not a benefit that Defendants can maintain "unjustly enriched" entertainers in this context.   Defendants cannot coherently argue that the wages they owe to entertainers should be offset by the value of work they would have had

31

not have won, and there would be no need for an offset.

### 2. Equity and good conscience do not require restitution.

Defendants' counterclaim should also be denied because there is nothing inequitable about entertainers receiving unpaid wages and retaining their tips or making more than minimum wage in any form. See e.g., Lanzetta, 2011 WL 253961, *3-6. "[E]mployees are not to be deprived of the benefits of the [FLSA] simply because they are well paid." Barrentine, 450 U.S. at n. 18 (internal quotations omitted); see also Caserta v. Home Lines Agency, Inc., 273 F.2d 943, 946 (2d Cir. 1959) (internal citation omitted) ("[The obligation to comply with the FLSA] is the employer's and it is absolute.  He cannot discharge it by attempting to transfer his statutory burdens [ ] of appropriate payment, to the employee.").  In sum, any enrichment that may arise from Plaintiffs winning this case and damages is, by definition, not "unjust."  This is not a "windfall" as Defendants claim but, rather, the legal outcome of Defendants' misclassification and failure to pay wages.  Reducing or negating damages to which the entertainers are legally entitled would be contrary to law.  Defendants' counterclaim should be denied.

## V.  DEFENDANTS VIOLATED THE NYLL'S DEDUCTIONS PROVISION.

Separate from their minimum wage violations, Defendants' imposition of house fees, fines, and mandatory tip-outs blatantly violates the NYLL's prohibition on deductions.  "No employer shall make any charge against wages, or require an employee to make any payment by separate transaction unless such charge or payment is permitted as a deduction from wages." NYLL § 193(2).  Except for optional meal purchases, employers may not charge employees separately from wages for items prohibited as deductions from wages.  N.Y. Comp. Codes R. & Regs., tit. 12, § 146-2.7(b).  Permitted deductions are only those deductions authorized by the

---

entertainers perform had they classified entertainers as employees in the first place.

employee in writing and are limited to deductions authorized by law or government regulation or deductions for insurance premiums, health benefits, or other similar payments. See NYLL § 193(1). Examples of prohibited deductions include "fines or penalties for lateness, misconduct, or quitting by an employee without notice" as some examples of prohibited deductions. N.Y. Comp. Codes R. & Regs., tit. 12, § 146-2.7(a)(4); see also NY DOL Op. Let., RO-11-0001 (Jan. 12, 2011) (quoting Angello v. Labor Ready, 7 N.Y.3d 579 (2006) for the proposition that payments that go "directly to the employer or its subsidiary violate[s] both the letter of the statute and the protective policy underlying it."); Guepet v. International Tao Systems, Inc., 110 Misc.2d 940, 941 (N.Y. Sup. Ct. 1981) ("Nowhere does this section permit an employer to make contemporaneous deductions from wages because an employee failed to perform properly.").

Here, Defendants did not pay the entertainers at Rick's NY any wages whatsoever, charged them fees and fines, and required them to pay "tip outs" to management, the DJ, and the house mom. (See supra §II.B.) None of these charges are the types of deductions allowed under the NYLL. In fact, the fines Defendants charged for lateness and misconduct are explicitly listed in the NYLL regulations as prohibited deductions. N.Y. Comp. Codes R. & Regs., tit. 12, § 146-2.7(a)(4). Thus, because the entertainers are employees under the NYLL, Defendants' imposition of house fees, fines, and "tip-outs" violates the NYLL. Plaintiffs should be granted summary judgment on their deductions claim under NYLL § 193.[24]

## VI.    ALL THREE DEFENDANTS ARE LIABLE AS EMPLOYERS.

The FLSA contemplates there being several simultaneous employers who may be held

---

[24] Plaintiffs will recover these amounts as either minimum wages or deductions. That said, even if Defendants are permitted an offset against wages owed, Plaintiffs would still be entitled to recover all of the money they paid to Defendants in the form of house fees, fines, and tip outs. The NYLL does not prohibit deductions only where such money reduces total compensation below the minimum wage; rather it prohibits deductions in general. See NYLL § 193; see also Fowler v. Scores Holding Co. Inc., 677 F.Supp.2d 673 (S.D.N.Y. 2009) (where deductions claim survived a motion to dismiss without corresponding minimum wage allegation).

liable for noncompliance. Hart, 2010 WL 5297221, *2; Ansoumana v. Gristede's Operating

Corp., 255 F.Supp.2d 184, 188-189 (S.D.N.Y. 2003). This District interprets the definition of

'employer' under the New York Labor Law coextensively with the definition under the FLSA.

Jiao, 2007 WL 4944767 *9, n. 12. Here, all three Defendants employ the entertainers at Rick's

NY. Though nominally separate entities, Defendants Peregrine, RCII, and RCI Entertainment

New York ("RCI New York") are part of a vast integrated enterprise helmed by Eric Langan.

(Pl.'s 56.1 ¶¶ 406-545.) Peregrine is wholly owned by RCI New York, which is wholly owned

by RCII. (Stip. ¶¶ 31-33.) And Mr. Langan is President of all three, with ultimate decision-

making authority over Defendants' affairs resting with him. (Pl.'s 56.1 ¶¶ 416-423; see Stip. ¶¶

44-47.) RCII employs Mr. Langan, as well as the accounting staff and others who provide

management services to Peregrine and RCI New York. (Pl.'s 56.1 ¶¶ 426-463; see Stip. ¶¶ 89-

103.) Importantly, these management services include the direction of Ed Anakar. (Pl.'s 56.1 ¶¶

481-499.) Mr. Anakar, as an employee of RCII, was the acting general and regional manager at

Rick's NY, Director of Operations, and who now still retains and exercises management

authority over Rick's NY as president of RCII's management company.[25] (Id.) Directly and

through managers at Rick's NY, Mr. Anakar and Mr. Langan control entertainers' working

conditions and club operations. (Id. ¶¶ 406-545; see infra §§ VI.A-VI.B.) As discussed below,

[25] Mr. Anakar and many former RCII employees are now employed by RCI Management Services, Inc. ("RCIM"). (Pl.'s 56.1 ¶¶ 435-443, 449.) RCIM is nothing more than a company created in the middle of litigation for the sole purpose of outsourcing RCII's employer functions to a middleman company. (See id. ¶¶ 426-463.) Since its formation, RCIM has been performing the management functions over Rick's NY that RCII had performed prior and with, largely, the same agents and employees. (Id.) Mr. Anakar maintains the same job duties over Rick's NY as president of RCIM that he had when he was employed by RCII. (Id. ¶ 443.) Importantly, Mr. Langan is also the director of RCIM and is the person that offered Mr. Anakar the position of president at RCIM. (Id. ¶¶ 432, 481.) Beyond Mr. Langan and Mr. Anakar, there are no corporate officers of RCIM. (Id. ¶¶ 432.) Further, RCIM's revenue is comprised solely of the money it receives from the subsidiaries for the services it provides them. (Id. ¶ 433.) RCIM's formation does nothing to change RCII's status as an employer because RCII formed RCIM simply in an unsuccessful effort to move liability in this lawsuit away from Defendant RCII and onto a non-Defendant subsidiary. Through RCIM, RCII exercises control over Rick's NY in the same way that RCII did through its other agents prior to RCIM's formation in January 2011. Mr. Anakar may be technically employed by RCIM, but he is still an agent of RCII.

these relationships demonstrate that all three Defendants are employers.

## A. RCII AND PEREGRINE ARE LIABLE AS JOINT EMPLOYERS.

[A] joint employment relationship generally [exists]...[w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share **control** of the employee, directly or indirectly, by reason of the fact that one employer **controls**, is **controlled** by, or is under common **control** with the other employer.

29 C.F.R. § 791.2 (b)(3)) (emphasis added); see Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132 (2d Cir. 1999). The key question with respect to joint employer status is whether the company "possessed the power to control the workers in question." Xue Lian Lin v. Comprehensive Health Management, Inc., No. 08 Civ. 6519(PKC), 2009 WL 976835, *2 (S.D.N.Y. Apr. 9, 2009); see also Greathouse v. JHS Sec. Inc., No. 11 Civ. 7845 (PAE)(GWG), 2012 WL 5185591 at *1 (S.D.N.Y. Oct. 19, 2012) (affirming finding of employer status where Magistrate "found that [defendants] exercised sufficient control over [plaintiff] to qualify as his employer under both the FLSA and NYLL."). "Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA...." RSR Sec. Servs. Ltd., 172 F.3d at 139 (internal citations and quotations omitted). With control as the focus, courts utilize the economic realities test to determine employer status. Relevant factors include whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records....No one of the four factors standing alone is dispositive....Instead, the "economic reality" test encompasses the totality of circumstances...." RSR Sec. Services Ltd., 172 F.3d at 139.

### 1. Peregrine is liable as a joint employer.

Defendants have refused to stipulate that Peregrine would be an employer under the

FLSA and NYLL in the event that Plaintiffs prevail on the threshold question of misclassification. This refusal flies in the face of common sense, the undisputed facts of this case, and Defendants' own admissions. When Defendant RCII and Defendant RCI New York were first sued for misclassification at Rick's NY in 2008, defense counsel represented that Peregrine was the correct entity to sue. (Pl.'s 56.1 ¶¶ 560-565.) Defendants admit that Peregrine is the entity that employs and issues Forms W-2 to the bartenders, waitresses, and other undisputed employees at Rick's NY and also admit that Peregrine is the entity that owns and operates Rick's NY. (Stip. ¶¶ 8, 21.) Peregrine is the entity that directly (or through reimbursement from RCII) pays for the sanitation, utilities, building lease, and other items necessary for Rick's NY to operate. (Id. ¶¶ 22; see Pl.'s 56.1 ¶¶ 312-314.) Peregrine is the employer of record for the General Manager who has the authority to hire and fire entertainers. (Stip. ¶ 68; Pl.'s 56.1 ¶ 3; see also supra §§ II.B.) Peregrine is the entity that issues the Forms 1099 to entertainers. (Stip. ¶ 218.) Peregrine has also produced records of entertainers' log-in and out times at Rick's NY, as well as paper files with entertainers' initial hire paperwork. (Id. ¶ 268.) There is no question that Peregrine is the entertainers' employer.

### 2. RCII is liable as a joint employer.

#### a. RCII has the power to hire and fire entertainers at Rick's NY.

RCII, through Mr. Anakar and Mr. Langan, has the power to hire and fire entertainers at Rick's NY. From 2005 to the present, RCII has directly employed Mr. Langan. (Pl.'s 56.1 ¶ 518.) Mr. Langan hired management to work at Rick's NY. (Id. ¶ 502.) Mr. Langan hired Mr. Anakar to work for RCII in 2002; since that time, Mr. Anakar has reported to Mr. Langan, Mr. Langan has decided which job duties and positions to offer Mr. Anakar at RCII and its subsidiaries, and Mr. Langan has decided Mr. Anakar's compensation and how it would be billed

to subsidiaries. (Id. ¶ 481.) From 2005 to 2011, RCII directly employed Mr. Anakar. (Pl.'s 56.1 ¶ 482.) From 2011 to the present, RCII's shadow company, RCIM, has employed Mr. Anakar. (See supra n.25; Pl.'s 56.1 ¶ 483.) Mr. Anakar hired Mr. Sistrunk to work at Rick's NY in 2005. (Stip. ¶ 63.) As entertainer manager and now general manager, Mr. Sistrunk reports to Mr. Anakar and Mr. Langan. (Stip. ¶¶ 65-66; Pl.'s 56.1 ¶¶ 495-498.) At all times since October 2007, Mr. Anakar and Mr. Sistrunk have communicated weekly. (Pl.'s 56.1 ¶ 499.) Other managers and staff that are employed by Peregrine and/or supervise entertainers at Rick's NY report to Mr. Anakar. (See e.g., Pl.'s 56.1 ¶¶ 8, 17, 26-27, 29, 43, 50, 81, 87, 103, 106, 108-109, 197, 211, 221, 239, 242-243, 287-290.)

Additionally, Mr. Sistrunk hires entertainers and has the authority to make them inactive. (Pl.'s 56.1 ¶¶ 3, 95.) Mr. Langan also has the authority to make them inactive. (Id. ¶¶ 95.) Mr. Anakar has hired entertainers to work at the club, participated in decisions to make them inactive, and requires that managers send him documentation of why entertainers are made inactive. (Id. ¶¶ 95-96; see e.g., id. ¶ 180 ("Ed saw her on stage and said its time for her to go."), 267.) Entertainers also appeal to Mr. Anakar to seek reinstatement. (See e.g., id. ¶ 181.)

These facts indicate that RCII maintains control sufficient to make it an employer. See e.g., Chen v. TYT East Corp., No. Civ. 5288(PAC), 2012 WL 5871617, *5 (S.D.N.Y. Mar. 21, 2012) ("The hiring of managerial staff strongly indicates control."); accord RSR Sec. Servs. Ltd., 172 F.3d at 140 ("Although this hiring involved mainly managerial staff, the fact that he hired individuals who were in charge of the guards is a strong indication of control."); see also Hart, 2010 WL 5297221, *3 (Plaintiffs sufficiently alleged RCII was employer based on facts above).

### b. RCII supervises and controls entertainers' employment.

This Court held that Plaintiffs had sufficiently pled RCII's joint employer status by,

among other things, alleging that "both the regional and general managers report to Eric Langan, who is the CEO of RCII and the president of each of the subsidiary clubs...and that RCII, through the regional and general managers, supervises entertainers by distributing rules and guidelines and ensuring their enforcement through the imposition of fines and other disciplinary actions." Hart, 2010 WL 5297221, *3. These facts are now proven by the record in this case: Mr. Anakar and Mr. Sistrunk report to Mr. Langan, the CEO of RCII and president of Rick's NY. (Pl.'s 56.1 ¶¶ 481, 496-498.) Mr. Anakar supervises entertainers at Rick's NY by, among other things: approving written guidelines for use at the club (id. ¶¶ 17, 26-27), participating in hiring and firing decisions (supra § VI.A.2.a.), determining whether house fee credits will be given (Pl.'s 56.1 ¶¶ 106-110), approving work shifts available to entertainers (id. ¶ 43), approving, disapproving, and lending his name to signs governing entertainer conduct at the club (id. ¶¶ 100, 211, 242, 579), determining whether fine amounts should be raised (id. ¶ 87), setting the house fee schedule (id. ¶ 103), determining when to waive house fees (id. ¶ 106), reviewing minutes for meetings where entertainer conduct was discussed (id. ¶¶ 192, 197, 509), weighing in on issues involving entertainer conduct and discipline (id. ¶¶ 87, 96, 180, 267), receiving reports from managers on issues at the club, including those involving entertainers (id. ¶¶ 325-326, 507), deciding whether entertainers are to tip out (id. ¶ 221), fining entertainers (id. ¶¶ 87, 203), waiving fines (id. ¶ 232), providing managers direction (id. ¶¶ 439, 489, 511, 541-542), and determining who is allowed in the entertainer dressing room (id. ¶ 243). For his part, Mr. Sistrunk also hires, fires, disciplines, warns, and instructs entertainers on their conduct, including through revision of the written entertainer guidelines. (Pl.'s 56.1 ¶¶ 3, 20, 32, 203, 206, 208-209, 230-232, 260-262.) Mr. Langan also controls the conditions of employment at Rick's NY. (Id. 419-420, 465.) Mr. Langan also put in place the first set of guidelines used at Rick's NY and

emails with managers about day-to-day club operations. (Id. ¶¶ 19, 514.) This all shows joint employment. See Barfield v. New York City Health and Hospitals Corp., 537 F.3d 132, 144 (2d Cir. 2008) ("[That other entity] may have exercised "ultimate" authority... does not alter the fact that Bellevue also exercised some authority which helps establish... joint employer [status]."); Cano v. DPNY, Inc., No. 10 Civ. 7100 (ALC)(JCF), 2012 WL 5471865, *7 (S.D.N.Y. Nov. 8, 2012).

### c. RCII determines entertainers' rate and method of payment.

Mr. Langan made the decision to classify entertainers at Rick's NY as independent contractors and, in doing so, set the policy of not paying entertainers any wages. (Pl.'s 56.1 ¶ 554.) This weighs in favor of RCII's employer status. See Hart, 2010 WL 5297221, *3 (allegations of the same sufficiently allege employer status); RSR Sec. Servs. Ltd., 172 F.3d at 140 (employer exercised control over payment when he ordered company to stop issuing 1099s).

### d. RCII maintains employment records for entertainers.

Peregrine and RCII, through the Club Trax point of sale database, maintains and has access to entertainers' names and contact information, as well as log-in and log-out information, records of dance dollar exchanges, and fines and fees charged and paid or not paid. (Pl.'s 56.1 ¶¶ 460-463; see Stip. ¶¶ 257-267.) Additionally, given the fact that Mr. Langan is the head of RCII and Peregrine, any argument that RCII does not maintain entertainer records is specious.

There is no possibility that Peregrine and RCII are completely disassociated with respect to the entertainers at Rick's NY. They are joint employers. See 29 C.F.R. § 791.2(b); see also McLaughlin v. Intrepid Holdings, Inc., No. H-08-798, 2009 WL 2900741 at *4 (S.D. Tex. Sept. 2, 2009) (parent company was employer where one person was president and CEO of parent and subsidiary and "all assets were under the sole management and operating structure" of parent.).

## B. ALL DEFENDANTS ARE LIABLE AS AN INTEGRATED ENTERPRISE.

Nominally separate entities can be considered a single employer subject to joint liability when they form a single integrated enterprise. TYT East Corp., 2012 WL 5871617, *3. Under the integrated enterprise or single employer theory, courts look to four factors in determining liability: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. Id., *3. Courts are to look at the totality of the circumstances, with control of labor relations as the central concern. Id. "This emphasis reflects the policy underlying the single employer doctrine [of] the fairness of imposing liability for labor infractions where two nominally independent entities do not act under an arm's length relationship." Id. (internal citations and quotations omitted). Here, Defendants do not act under an "arm's length relationship." Rather, they function as one entity.

### 1. Defendants' operations are interrelated.

In addition to the interrelation discussed above, Mr. Langan is also president of RCII's 35 other subsidiary clubs that operate strip clubs around the country. (Pl.'s 56.1 ¶¶ 1, 420.) As Defendants have stated in all of their 10K reports from 2005 to the present, the success of their business is dependent on Mr. Langan. (Id. ¶ 423.) Mr. Langan's control over the Defendants— as well as RCII's other clubs—has resulted in uniform philosophies, policies, and practices at each of the clubs, cementing Rick's NY as part of the Rick's Cabaret "brand." (Id. ¶¶ 411-425, 464-469, 513-518.) This shows interrelation. TYT East Corp., 2012 WL 5871617, *3-4.

Defendants' interrelation is made all the more apparent by the management and financial controls that RCII wields over Peregrine and RCI New York. RCII, through its employees and subsidiaries, performs the bookkeeping and accounting for the clubs, and provides legal services, graphics, and a website. (Pl.'s 56.1 ¶¶ 299-300, 426, 440, 442, 448-450, 453, 455.) Mr. Langan

provides oversight over daily affairs. (See e.g., id. ¶ 466 (Langan explaining, "I would call the president of that corporation, which basically is myself, and say, you know, get down there and do something…."). Mr. Anakar's authority over Peregrine is discussed above, and Defendants' shared financial controls below. (See supra § VI.A.2.a-b, infra § VI.B.3.)[26]

### 2. Defendants share centralized control of labor relations.

Defendants share centralized control of labor relations through Mr. Langan's authority over all personnel at Rick's NY, as well as his authority over Mr. Anakar. (Pl.'s 56.1 ¶¶ 419 (Langan stating, "Everybody reports to me regardless of any hierarchy."), 481, 497.) Mr. Anakar's authority over Mr. Sistrunk and other club personnel is further evidence of centralized control. (See supra § VI.A.2.a.) See Reyes v. Altamarea Group, LLC, No. 10 Civ. 6451(PMB), 2011 WL 280799, *3 (S.D.N.Y. Jan. 11, 2011) (sufficient interrelation pled where one defendant "had the power to put in place employee policies at" another and where one defendant had "management authority over" the other.); Ansoumana, 255 F.Supp.2d at 199-200 ("[A]lthough it left it to Hudson/Chelsea to directly hire and fire…, [Duane Reade] had no hesitation in asking Hudson/Chelsea to remove a worker…."). Recruiting and advertising is done through a centralized website, run by one of RCII's subsidiaries. (Pl.'s 56.1 ¶¶ 299-300, 425, 455-456.)

### 3. Defendants share common ownership and financial control.

Defendants share common ownership. (Stip. ¶ 31-33.) Mr. Langan decides when and how much money the subsidiaries will pool or borrow from each other or RCII. (Pl.'s 56.1 ¶¶ 464-469.) RCII's CFO unilaterally decides when Peregrine "has too much money in their

---

[26] Further, the Defendants share a corporate address, have entered into a non-compete with each other, have been and are represented by the same counsel, and Mr. Langan's and Mr. Anakar's family members have performed work at and for Rick's NY. (Pl.'s 56.1 ¶¶ 74-75, 441, 430-431.) This is significant. See e.g., NLRB v. 675 West End Owners Corp., 304 Fed. Appx. 911, 913 (2d Cir. 2008) ("The common usage of office facilities and family relationships between persons involved in the purportedly discrete companies is also relevant."); DiGiro v. Pall Corp., 993 F. Supp. 1471, 1474 (M.D. Fla. 1998) (same counsel).

account" and has to send that money to RCII.  (Id. ¶¶ 475-477.)  There is no question that Defendants share common ownership and financial control.  The Court should find all three Defendants liable as employers.  They may be nominally separate, but they function as one.[27]

## VII.   DEFENDANTS WILLFULLY VIOLATED THE FLSA AND NYLL.

Plaintiffs are entitled to a three-year statute of limitations on their FLSA claims and liquidated damages on their NYLL claims accruing prior to November 24, 2009, because Defendants willfully violated the law.[28]  "An employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act."  Kuebel v. Black & Decker, 643 F.3d 352, 366 (2d Cir. 2011).  "Reckless disregard of a fact requires 'subjective awareness' of the probability of the existence of the fact."  McLean, 2012 WL 1358739, *7 (citations omitted).  An employer's awareness and disregard of the danger or mere possibility that it is violating the law is sufficient to prove willfulness.  See id.; Alvarez v. IBP, Inc., 339 F.3d 894, 908-909 (9th Cir. 2003) ("[A]n employer need not knowingly have violated the FLSA; rather, the three-year term can apply where an employer disregarded the very possibility that it was violating the statute.") (internal citations and quotations omitted).

Here, Defendants absolutely knew of the possibility that entertainers should be classified as employees.  Defendants' 10K filings from 2005 to the present have all contained the statement, "We have prepared plans that we believe will protect our profitability in the event that the sexually oriented business is required in all states to convert entertainers who are now

---

[27] Defendants unquestionably share common management through RCII, RCIM, Mr. Langan, and Mr. Anakar as discussed above.  (See supra § VI.A.2.)

[28] Willful violations of the FLSA are subject to a three-year statute of limitations.  29 U.S.C. § 255(a).  Liquidated damages are awarded for NYLL claims accruing prior to November 24, 2009, where the defendant willfully violated the law.  McLean v. Garage Management Corp., Nos. 10 Civ. 3950, 09 Civ. 9325, 2012 WL 1358739, *7 (S.D.N.Y. April 19, 2012).  "The willfulness standards for the FLSA statute of limitations and NYLL liquidated damages do not differ to any appreciable extent."  Id. (citations omitted).  The NYLL was amended in 2009 to change the standard for liquidated damages from willfulness to good faith.  Id.

independent contractors into employees." (Pl.'s 56.1 ¶¶ 551-552.)[29]  Further, RCII's investors have pointed out the possibility of reclassification at Rick's NY to Mr. Langan.  (Id. ¶ 574.) Through Mr. Langan's membership in the Association of Club Executives, associated newsletters, and RCII's own subsidiary publication, Defendants are aware of case law holding that entertainers are employees.  (Id. ¶¶ 581-603.)  Defendants were also sued for entertainer misclassification at Rick's NY at least once before the instant lawsuit, and following acceptance of a Rule 68 offer, judgment was entered against Peregrine in that case.  (Id. ¶¶ 560-563.) Defendants are also aware that their entertainers at Rick's NY may not even be making the minimum wage when dance dollar payments are counted as wages and have utilized an electronic method of tracking this.  (Id. ¶¶ 570-573.)  Despite the above, Defendants took no steps to reclassify and pay entertainers at Rick's NY.  (Id. ¶ 553; Stip. ¶ 19.)

Defendants' awareness of potential liability combined with their lack of diligence constitutes a willful violation of law—even in the face of industry-wide misclassification. Berrios v. Nicholas Zito Racing Stable, Inc., No. CV 04-22, 2012 WL 1034053, *16 (E.D.N.Y. Mar. 28, 2012) ("[Defendant] maintains that it had never been informed that its pay practices violated any law.  However, this passive/reactive approach will not preclude a plaintiff from seeking a three-year statute of limitations pursuant to a defendant's alleged willfulness. Likewise, Defendants' contention that their payroll practices were consistent with the industry norm does not foreclose this avenue for Plaintiffs either."); Solis v. General Interior Systems, Inc., No. 5:08-CV-0823, 2012 WL 1987139 at *5 (N.D.N.Y. June 1, 2012) ("[F]ailure to make inquiries into the relevant law or seek legal counsel regarding compliance with the FLSA may be enough to establish willfulness....") (internal citations and quotations omitted); Mumby v. Pure

---

[29] RCII has classified entertainers at its Minnesota club as employees since 2005.  (Pl.'s 56.1 ¶ 555.)

43

Energy Services (USA), Inc., 636 F.3d 1266, 1270 (10th Cir. 2011) ("[O]perative inquiry focuses on the employer's diligence in the face of a statutory obligation....") (citing McLaughlin v. Richland Shoe Co., 486 U.S. 128, 134 (1988)); Herman v. Palo Group Foster Home, Inc., 183 F.3d 468, 474 (6th Cir. 1999) ("He had been investigated for violations twice in the past, paid unpaid overtime wages, received explanations of what was required to comply with the Act...."); Hanscom v. Carteret Mortgage Corp., No. 1:06-CV-2483, 2008 WL 4845832 at *3 (M.D. Pa. Nov. 5, 2008) ("[C]ourts will find FLSA violations to be willful if an employer knows a payment plan to be questionably legal or undeniably illegal and fails to take any action").

Even more blatant are Defendants' attempts to evade liability in this and other lawsuits. After this suit was filed, rather than reclassify or even actively determine whether they need to reclassify, Defendants implemented arbitration agreements that, as Mr. Langan put it, "stopped the class actions and forced arbitration." (Pl.'s 56.1 ¶ 574.)[30] After this case was filed, Defendants also attempted to mask the control they exercise over entertainers at Rick's NY by rewording the signs they post in dressing rooms to omit the word "must." (Id. ¶¶ 579.) Also telling is the fact that, two months after Defendants were sued in 2008 on minimum wage claims identical to those in this case, Defendants inserted language on dance dollars at Rick's NY that stated, "NOT VALID FOR GRATUITIES." (Stip. ¶¶ 193-207.) Defendants further attempted to shift liability away from RCII in 2011 by creating a new entity to employ Mr. Anakar and staff with accounting and other controls over Rick's NY. (See supra n.25.) These actions are further evidence that Defendants acted willfully. Solis v. Cindy's Total Care, Inc., No. 10 Civ. 7242(PAE), 2012 WL 28141, *13 (S.D.N.Y. Jan. 5, 2012) ("[I]ndicative of willfulness is the evidence that, once alerted... Cindy's abruptly changed its recordkeeping practices."). For all of

---

[30] Defendants have cited these agreements to move to dismiss claims brought in other cases following the instant action. See e.g., Velasco v. XTC Cabaret, Inc., No. 4:12-CV-03295, ECF. No. 14 (S.D. Tex. Jan. 21, 2013).

these reasons, the Court should grant summary judgment for Plaintiffs.

## VIII.   DEFENDANTS DID NOT ACT IN GOOD FAITH.

Plaintiffs are entitled to liquidated damages under the FLSA and NYLL claims accruing after November 24, 2009, because Defendants cannot meet their burden of showing good faith.[31] A willfulness finding "precludes the court from finding that the employer acted in good faith." Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1166 (11th Cir. 2008); Palo Group Foster Home, 183 F.3d at 474.[32]  Willfulness aside, liquidated damages are the "norm and single damages the exception." McLean, 2012 WL 1358739, *5 (quoting RSR Sec. Services Ltd., 172 F.3d at 142). The Court simply cannot decline to award liquidated damages unless Defendants meet their "plain and *substantial* burden" of proving that they had a good-faith and reasonable basis for their actions. Rogers v. Savings First Mtg., LLC, 362 F.Supp.2d 624, 638 (D. Md. 2005) (citing Wright v. Carrigg, 275 F.2d 448, 449 (4th Cir. 1960)) (emphasis added). Defendants' burden is heavy. Reich v. So. New England Telecomm. Corp., 121 F.3d 58, 71 (2d Cir. 1997). "To establish... good faith, an employer must show that it took active steps to ascertain the dictates of the FLSA and... comply...." RSR Sec. Services Ltd., 172 F.3d at 142. Here, there is no evidence supporting good faith.  Defendants cannot meet their burden.

## CONCLUSION

Based on the foregoing, the Court should grant Plaintiffs' motion for summary judgment.

---

[31] Liquidated damages are to be awarded on FLSA claims and NYLL claims accruing after November 24, 2009 where a defendant cannot show that it had a good faith and reasonable basis for its violations of law. Brock v. Wilamowsky, 833 F.2d 11, 20 (2d Cir.1987); see also Barfield, 537 F.3d at 150. The standards for determining liquidated damages after November 24, 2009, do not "appreciably differ" under the FLSA and NYLL. Shin Won Kang v. Inno Asset Development, LLC, No. 08-CV-4848, 2011 WL 1674554 at *4 (E.D.N.Y. Jan. 28, 2011).
[32] See also Scott v. City of New York, No. 02 Civ. 9530(SAS), 2009 WL 1138719 at *1 (S.D.N.Y. April 27, 2009) (Court may not find good faith "after a jury has concluded that the employer willfully violated the FLSA.").

Date: February 15, 2013                    NICHOLS KASTER, PLLP

                                           s/Anna P. Prakash
                                           Michele R. Fisher (MF 4600)
                                           Steven Andrew Smith, MN Bar No. 260836
                                             (*admitted pro hac vice*)
                                           E. Michelle Drake, MN Bar No. 0387366
                                             (*admitted pro hac vice*)
                                           Anna P. Prakash, MN Bar No. 0351362
                                             (*admitted pro hac vice*)
                                           4600 IDS Center, 80 South Eighth Street
                                           Minneapolis, MN 55402
                                           Telephone: (612) 256-3200
                                           ATTORNEYS FOR PLAINTIFFS