in this litigation. (ECF Nos. 90-24 through 90-30.)

## B. DEFENDANTS' CONTROL OVER ENTERTAINERS' PROFIT OR LOSS

### i. Defendants Limit Entertainers' Tips from Customers

276. Defendant Peregrine admits: "Rick's NY set the suggested price for a personal dance at $20, however entertainers had the ability to charge more or less in their discretion." (Stip. ¶ 180; Peregrine Supp. RFA Resp. No. 29.)

277. Entertainers understood this to be a fixed amount they were required to charge customers and that they could not charge less. (See e.g., Hart Decl. at ¶¶ 8-11; Furedi Decl. at ¶¶ 8-11; Royer Dep. at 110.)

278. Customers could but did not frequently tip entertainers above $20 for a personal dance. (Hart Dep. at 74; Furedi Dep. at 93; Bateman Dep. at 66; Chunikhina Dep. at 146-147; Dilag Dep. at 198; Finsterwald Dep. at 124-125; Hemmes Dep. at 194; Hernandez Dep. at 77-79; Jurman Dep. at 221-222; Lamb Dep. at 110-111; McCleary Dep. at 65-66; Mullen Dep. at 135-136; Romero Dep. at 75; see also Stip. ¶ 182.)

279. Customers of Rick's NY could give entertainers more than $20 or one dance dollar per dance. (Stip. ¶ 182; Defs.' Countercl. at ¶ 300, ECF No. 279.)

280. If entertainers have any problems with getting paid by customers or redemption of dance dollars, they can seek assistance from management. (Sistrunk Dep. at 30-31.)

281. Rick's NY also determines the cover charge customers must pay to enter the club. (See RCII000312 (emails between Mr. Anakar and Mr. Langan regarding prices in the industry and raising the cover charge at Rick's NY); see also Stip. ¶ 9.)

282. Entertainers have left their shifts at Rick's NY with no money or owing the club money. (See e.g., Furedi Dep. at 184 ("Yes, lot of times I went home without money but not just

because I was tired. Maybe it was not my night."); Jurman Dep. at 196, 200-201; Lamb Dep. at 140; McCleary Dep. at 72; Miller Dep. at 148-150; Mullen Dep. at 141; Romero Dep. at 88-89; Silk Dep. at 121.)

283. Rick's NY, through its agents, told entertainers not to inform customers that entertainers did not receive a full $20 for each dance dollar redeemed. (See e.g., Furedi Dep. at 100-103; Bashore-Canzoneri Dep. at 237; Daniels Dep. at 128-131 ("They didn't want you, you know, telling the customer, you know, about the surcharge they have to pay to get the money and the surcharge they get from us."); Dilag Dep. at 195-196; Jurman Dep. at 209-210; Lamb Dep. at 138; Miller Dep. at 145; Romero Dep. at 69-70; Venizelos Dep. at 112-113.)

284. Rick's NY does not inform guests that the entertainer will only receive $18 for a dance dollar when she exchanges it for cash at the end of the night. (Sistrunk Dep. at 122 ("[I]t is not necessary to inform [the guest] of back-of-the-house procedures.").)

**ii. Defendants Control the Advertising and Marketing of Rick's NY**

285. Rick's NY is in charge of all advertising for the club. (Hart Decl. at ¶ 15; Furedi Decl. at ¶ 15; N. Imbeault Decl. at ¶ 15; Cabrera Decl. at p. 11; Paula Decl. at p. 7.)

286. Mr. Sistrunk is in charge of marketing the club. (Stip. ¶ 69; Sistrunk Dep. at 66.)

287. Mr. Anakar has authority to approve promotions undertaken by Rick's NY. (Anakar Dep. at 79-80.)

288. Mr. Anakar must grant approval before at least some promotions can be undertaken at Rick's NY. (See PER005097-5098 (email from Mr. Sistrunk stating, "I need to know of planned promotions and events in advance so that I can submit them to Ed for approval.").)

289. Mr. Anakar can also just make decisions about where ads for Rick's NY will be

run. (See e.g., PER005164-5165 (stating, in response to an email from Mr. Sistrunk, "We will run ads on Extreme and other city's industry magazines, Craigslist as well.).)

290. Mr. Anakar also has the authority to approve graphics requests for Rick's NY. (Anakar Dep. at 103-104.)

291. Mr. Langan has the authority to determine the advertising budget for Rick's NY and the authority to determine how that budget is spent. (Anakar Dep. at 99-100.)

292. If the cost of the advertising in question is low (i.e., less than $500), Mr. Anakar makes the decisions on whether Rick's NY can spend that money. (Anakar Dep. at 101-102.)

293. Part of that marketing involves a "flier team," which is a set group of people that Rick's NY hires to go hand out fliers on the street. (Sistrunk Dep. at 66, 69.)

294. The club also does in-house marketing through posters and DJ announcements. (Sistrunk Dep. at 66.)

295. Mr. Langan directs Mr. Sistrunk to promote certain events and make sure flier teams are out on the street. (Sistrunk Dep. at 83.)

296. Rick's NY also advertises in publications. (Sistrunk Dep. at 70.)

297. Rick's NY relies on RCII for much of their marketing. (See Sistrunk Dep. at 67 ("We have in-house events and promotions that we want everyone to know about throughout the country. So if there is a potential guest in South Dakota and he's thinking about coming to New York City, we know that he can go on to the Rick's website, which is – you know, it's from the parent company. And they go in, and they can find the location that they are going to be visiting.").)

298. The photos for Rick's NY ads come from RCII. (Sistrunk Dep. at 72-73.)

299. RCII's subsidiary, RCI Internet, maintains a website where RCII subsidiaries are

able to advertise. (Langan 10/7/09 Dep. at 79-81.)

300. RCII's subsidiaries, including Peregrine, have access to RCI Internet's graphic design department. (Anakar Dep. at 103-105.)

301. To meet sales goals, the club also engages in promotion/marketing, patronage and creates food and drink specials. (Sistrunk Dep. at 83-84.)

302. Entertainers may have input in marketing; however, it is clear that any input is in the form of suggestion and whether or not it is implemented is the decision of management at Rick's NY. (See Sistrunk Dep. at 71-72 ("I don't remember what I may have turned down or accepted....").)

303. Management at Rick's NY makes decisions about which entertainers can participate in certain marketing events and how they are supposed to look while doing so:

Mr. Deangelo: I have 4 tickets for tonight's Rangers game at The Garden. We want to send 4 ent's over there, but inside to hang out at the bars on the first level.... not out in front handing out passes. We want girls who look presentable in street clothes and understand what we're trying to do....

Mr. Martinez: .... Who do you have their [sic] right now that you feel is responsible enough to go to ranger game?

(PER003502 (excerpt from email chain between management).)

304. Rick's NY prefers to attract professionals and avoid a "rough, rowdy audience." (Sistrunk Dep. at 66.)

305. In fact, most of Rick's guests are professionals of a certain education. (Sistrunk Dep. at 73-74.)

306. RCII's 10-K Reports, which include Rick's NY, state "Recognizing a void in the market for a first-class adult nightclub, we designed Rick's Cabaret to target the more affluent customer by providing a unique quality entertainment environment." (RCII 10-K and 10-KSB

Reports from 2005-2012, "Business Activities-Nightclubs" Section.[29])

307. One of the ways Rick's targets and maintains a customer base of "professionals" is to control the music that is played at the club in a way that ensures the music "appeal[s] to the broad range of guests that [the club] want[s] to attract…." (Sistrunk Dep. at 65.)

308. Rick's NY limits the amount of hip hop it allows to be played at the club and more severely limits the amount of rap it allows to be played at the club. (Chen Dep. at 77; Dilag Dep. at 244-245; Finsterwald Dep. at 162; Ginsberg Dep. at 91; Mullen Dep. at 171; Simon Dep. at 97.)

309. RCII's 10-K Reports further state: "Our consumer marketing strategy is to position our 'Rick's Cabaret' brand clubs as premiere entertainment facilities that provide exceptional adult topless entertainment in a fun, yet discreet, environment. We use a variety of highly targeted methods to reach our customers including hotel publications, local radio, cable television, newspapers, billboards, taxi-cab reader boards, and the Internet, as well as a variety of promotional campaigns. These campaigns ensure that the Rick's Cabaret name is kept before the public." (RCII 10-K and 10-KSB Reports for 2008-2011, "Advertising and Promotion" Section; accord RCII 10-K and 10-KSB Reports for 2005-2007, 2012, "Advertising and Promotion" Section.)

310. RCII's 10-K Reports state: "We continuously monitor trends in our customers' tastes and entertainment preferences so that, if necessary, we can make appropriate changes which will allow us to remain one of the premiere adult cabarets." (RCII 10-K and 10-KSB Reports for 2005-2012, "Risk of Adult Nightclubs Operations" Section.)

311. Mr. Sistrunk has told customers they were not allowed to return to the club.

[29] See Aff. of Cady C. Nicol.

(Sistrunk Dep. at 174.)

### iii. Defendants' Investment in the Business

312. Defendant Peregrine, directly or through reimbursement to RCII or RCIM, has spent in excess of [redacted] in each fiscal year from October 1, 2006 through September 30, 2012 to operate Rick's NY. (PERESI00295; PERESI00299.)

313. Defendant Peregrine, directly or through reimbursement to RCII or RCIM, spent in excess of [redacted] in each fiscal year 2009 and fiscal year 2011. (PERESI00295; PERESI00299.)[30]

314. The operating expenses for Rick's NY include, but are not limited to, the following:

- Wages for bartenders, barbacks, cashiers, DJs, waitresses, hosts, hostesses, cleaning crews
- Payroll taxes and employer-side payroll withholding
- Furniture and fixtures, including repairs and upholstery
- Liquor
- Food and beverages
- Liquor licenses
- Bar and kitchen supplies
- Cable services
- Glassware
- Cleaning products and services
- Linen

[30] Defendants did not produce electronic versions of the portions of Peregrine's general ledger from the fiscal year starting in 2005. Upon information and belief, Peregrine, directly or through reimbursement to RCII, spent in excess of [redacted] to operate Rick's NY during the fiscal year beginning in 2005.

- Club décor
- Advertising
- Music licenses
- Lease payments/rent
- Insurance, including workers' compensation
- Utilities, such as gas, electricity, and sanitation
- Plumbing services
- Phone service
- Sound and light equipment

(PERESI00295.)

**iv. Defendants' Control of the Premises**

315. Entertainers go to management to report perceived misbehavior by other entertainers. (See PER003625; see also PER005140-5142 (email stating, "I have also become aware that Ed is the person to speak to with regard to problems dancers may have in NYC with management.").)

316. House moms similarly report misbehavior to management. (See PER003729-30 (email from Ms. Trapani to Mr. Sistrunk describing entertainer's actions and also stating, "As you requested I will forward this to Tito and Ed....").)

317. Management has gotten involved in disputes between entertainers and has undertaken actions to settle the disputes. (See PER005125; Clark Dep. at 92-94.)

318. Entertainers also go to management when they have problems with customers at the club. (See e.g., PER005206-5207 (email from entertainer explaining a physically abusive interaction with a guest, with Mr. Sistrunk responding, "You have my word that I will address

and rectify the situation. You have my sincerest apologies for your experience with the guest, staff and management.").)

319. Management also addresses, with entertainers, theft at the club. (See PER005208-5209 (email chain about bartender's missing jacket, with Mr. Anakar stating, "We'll make this a topic during our entertainer meeting."); see also PER005211 ("If you have any susp[icion] at all, make them both inactive immediately.").)

320. Management at Rick's NY is also responsible for obtaining permits and complying with safety codes at the club. (See e.g., PER005160-5161 (regarding, in part, PA and open flame permits, fire extinguishers, fire guard/fitness certificates, and food handler's certificates).)

321. When Rick's NY opened in 2005, Mr. Langan was involved in the opening process, including hiring the construction company to finish the building and speaking with their workers. (Sistrunk Dep. at 10-12.)

322. In 2005, Mr. Sistrunk and Mr. Anakar were involved in finishing the building where Rick's NY operates, hiring staff, ordering equipment, and completing other tasks that go into opening a business. (Sistrunk Dep. at 9-10.)

323. Mr. Sistrunk was responsible for hiring waitresses, bartenders, hosts, doormen, and house moms to work at Rick's NY. (Sistrunk Dep. at 12-13; see Trapani Dep. at 21-22.)

324. Mr. Anakar made the decision to install hidden cameras at Rick's NY. (Anakar Dep. at 75-76.)

325. Mr. Anakar routinely receives reports about significant incidents that occur in the club. (Anakar Dep. at 79-80 (missing fur coat).)

326. Mr. Anakar routinely receives emails from management at Rick's NY informing

him of the daily sales numbers, including number of guest and number of entertainers that worked on a given night. (Anakar Dep. at 78-79.)

### C. ENTERTAINING IS UNSKILLED WORK

327. Defendants do not require that entertainers have formal dance training in order to work at Rick's NY. (Stip. ¶ 105; Sistrunk Dep. at 16; see e.g., Hart Decl. at ¶ 12; Furedi Decl. at ¶ 12; N. Imbeault Decl. at ¶ 12; Furedi Dep. at 16; Chunikhina Dep. at 72; Chen Dep. at 24; Hemmes Dep. at 56; Hernandez Dep. at 19; Jurman Dep. at 22; Kasper Dep. at 24; Lamb Dep. at 101; Rivers Dep. at 22; Silk Dep. at 79.)

328. Entertainers that do have formal dance training testified that they did not use skills from their formal training at Rick's NY. (Venizelos Dep. at 131 ("I don't think the dancing at Rick's involved any skills; whereas, professional dancing involved a lot of skill."); McCleary Dep. at 121-122; see also Bashore-Canzoneri Dep. at 67 ("You don't need any formal training for exotic dance.... You're just taking off your clothes.").)

329. When selecting entertainers to work at Rick's NY, Defendants do not have a preference for entertainers who had previously worked in the adult entertainment industry. (Sistrunk Dep. at 16 (testifying as to entertainers having any previous experience, "It wasn't necessary."); see e.g., Hernandez Dep. at 17, 19; Lamb Dep. at 66; Rivers Dep. at 31; Royer Dep. at 35, 38; Silk Dep. at 75 .)

330. Rather, entertainer hiring at Rick's NY criteria is based on appearance, personality—specifically, a personality that is perceived by management as being attractive and welcoming to guests. (Sistrunk Dep. at 15-22; see also Sistrunk Dep. at 18-19 (in hiring entertainers, Mr. Sistrunk looks for women who are "[s]ophisticated [in reference to appearance], sexy, wholesome to some degree, [and] approachable.").)

331. It is also important that entertainers be perceived by management as being physically fit and not overweight and as personally feeling comfortable with their movements on stage. (Sistrunk Dep. at 19, 22.)

332. Appearance and comfort are evaluated by management through an audition during which the entertainer dances on stage and disrobes. (Sistrunk Dep. at 21-22; see e.g., Hart Dep. at 46-47; Furedi Dep. at 88 ("Yeah, I was there for him maybe five minutes on stage"); Miller Dep. at 65 ("Ken [Sistrunk] gave me my audition. And then he told me that I needed to tone my stomach before I could work there and to come back after I had worked out or something to that effect."); Bashore-Canzoneri Dep. at 162-163; Bateman Dep. at 57-59; Chunikhina Dep. at 103-104; Clark Dep. at 76; Daniels Dep. at 116-120; Dilag Dep. at 134-135; Finsterwald Dep. at 75-76; Hemmes Dep. at 117; Hernandez Dep. at 29; Jurman Dep. at 58-60; Kasper Dep. at 78-81; Lamb Dep. at 67-68; McCleary Dep. at 35; Miller Dep. at 75; Mullen Dep. at 92-96; Pestova Dep. at 115-119; Rivers Dep. at 33-36; Romero Dep. at 45-47; Shulman Dep. at 54-56; Silk Dep. at 76-80; Simon Dep. at 94-96; Venizelos Dep. at 72-73.)

333. Personality is evaluated during a two-minute conversation that follows the audition. (Sistrunk Dep. at 14-17.)

334. The orientation process that takes place immediately after an entertainer is hired and before she starts working at Rick's NY does not involve any dance training. (See Sistrunk 10/29/09 Dep. at 25-26, 29-31; Trapani Dep. at 15-32.)

**D. PERMANENCE AND DURATION OF ENTERTAINERS' WORK**

335. Employment as an entertainer at Rick's NY does not have a pre-specified or contractual termination date and there is no evidence in the record to the contrary. (See generally Hart Dep.; Furedi Dep.; Bashore-Canzoneri Dep.; Bateman Dep.; Chen Dep.; Chunikhina Dep.;

Clark Dep.; Daniels Dep.; Dilag Dep.; Finsterwald Dep.; Ginsberg Dep.; Hemmes Dep.; Hernandez Dep.; Jurman Dep.; Kasper Dep.; Lamb Dep.; McCleary Dep.; Miller Dep.; Mullen Dep.; Pestova Dep.; Rivers Dep.; Romero Dep.; Royer Dep.; Shulman Dep.; Silk Dep.; Simon Dep.; Venizelos Dep.; see also Stip. ¶ 106.)

**E. ENTERTAINERS ARE INTEGRAL TO THE BUSINESS OF RICK'S NY**

336. "The most important thing to the [Rick's Cabaret] brand is that [it has] entertainers." (Langan 10/7/09 Dep. at 76; see also Langan 10/7/09 Dep. at 182 ("I always say without the girls, we're just selling overpriced beers at a sports bar with bad TV's.").)

337. The primary reason Rick's NY has customers is because there is an opportunity to see the entertainers and interact with them. (Sistrunk Dep. at 172, 23 ("Patrons are there to see a lady disrobe on stage. If she does not disrobe, then the patron is not getting what they came to see.").)

338. On its homepage, in big bold letters, Rick's NY touts itself as having "The most beautiful women in the world featured daily." (Rick's NY Homepage.[31])

339. Defendants' website is replete with images of scantily clad women. (Rick's NY Homepage;[32] Rick's main webpage.[33])

340. Entertainers posing suggestively and performing lap dances are featured on the video advertisement that runs on the Rick's NY homepage. (Rick's NY Homepage Video Ad.[34])

341. Defendants' paper marketing materials for Rick's NY by and large feature scantily-clad women and/or phrases referencing adult entertainment, such as "Featuring 3 Floors of Gorgeous Entertainers Daily!," "Come Party with Over 50 of the Finest Ladies in the [sic]

[31] Available at www.ricksnewyork.com, last accessed January 17, 2013.
[32] Available at www.ricksnewyork.com, last accessed January 17, 2013.
[33] Available at www.ricks.com, last accessed January 17, 2013.
[34] Available at www.ricksnewyork.com, last accessed January 17, 2013 (submitted via disc).)

NY!," "New York City's #1 Gentlemen's Club!." "The Most Beautiful Women in the World Featured Daily," "Over 100 Beautiful Entertainers Daily," and "Over 100 Gorgeous Entertainers Daily." (See e.g., PER3925; PER3956; PER4045; PER4237; PER4348; PER4350; PER4357.)

342. Advertisements for Rick's Cabaret are also frequently run in Exotic Dancer's Club Bulletin magazine, which self-proclaims that it serves the adult nightclub industry. (See e.g., CLUB BULLETIN, p. 43 (Oct./Nov. 2008); CLUB BULLETIN, p. 53 (May 2009); CLUB BULLETIN, p. 49 (July 2009); CLUB BULLETIN, p. 27 (Sept. 2009); CLUB BULLETIN, p. 17 (May 2010); CLUB BULLETIN, p. 21 (Sept. 2011); CLUB BULLETIN, p. 25 (Sept. 2012); CLUB BULLETIN, p. 13 (March 2012).)

343. RCII's 10-K Reports discuss RCII's subsidiary clubs' competitiveness in the "sexually oriented business industry" (RCII 10-K and 10-KSB Reports for 2005-2012 "Competition" Section) and "adult topless entertainment" business. (RCII 10-K and 10-KSB Reports for 2005-2011 "Competition" Section; see RCII 10-K Report for 2012.)

344. Mr. Sistrunk smiled and laughed in response to a question about whether customers would come to Rick's NY without entertainers and testified that, without entertainers, Rick's NY "would have to promote something different" and undertake a very different marketing campaign than they have undertaken to date. (Sistrunk Dep. at 172-174.)

345. Mr. Sistrunk was a VIP host at another strip club in New York, Ten's Cabaret, for approximately 11 years before he was hired by Mr. Anakar. (Stip. ¶¶ 63, 64; Sistrunk Dep. at 9, 150.)

## III. ENTERTAINERS ARE PAID TIPS, NOT SERVICE CHARGES

### A. DEFENDANTS' GROSS RECEIPTS

346. RCII and its subsidiaries each have a general ledger, which contains numerous

accounts that are numbered and named, as well as balance sheets and income statements. (Stip. ¶ 208.)

347. RCII and its subsidiaries maintain a single set of account codes such that the same account numbers and titles are used for both RCII and all of its subsidiaries. (Marshall 2/23/12 Dep. at 23-27.)

348. For RCII and at the subsidiary level, the account numbers are grouped into topical subcategories of either revenues or expenses on each company's income statements. (Stip. ¶ 209.)

349. For example, the category of "Revenues" on Peregrine's income statement, includes but is not limited to several subcategories such as "Alcoholic Beverages," "Food and Non-Alcoholic Beverages," and "Service." Within each such subcategory, there are specific accounts. For example, under the "Service" subcategory, there are the following accounts: 5210-00 Cover Charges; 5220-00 Dancers/Floor Fees; 5230-00 Dances; 5245-00 Room rental; and 5250-00 Tip Commissions. (Stip. ¶ 210.)

350. Defendants have established on the revenue side of their general ledger (1) some contra (or debit) accounts; and (2) some accounts that contain contra (or debit) entries. (See Marshall 2/23/12 Dep. at 29-33; 36-37; see e.g., Marshall 2/23/12 Dep. Ex. 14; PERESI00026 (all tabs following the "General Ledger" tab), PERESI00279, PER3379-3403, PER3408, and PERESI00300.)

351. A contra *account* is an account with a unique account code which general contains entries that are debits from a revenue account; whereas, a contra *entry* is a negative entry in a revenue account which results in a debit being made from the account. (See Marshall 2/23/12 Dep. at 29-33; 36-37; see e.g., Marshall 2/23/12 Dep. Ex. 14; PERESI00026 (all tabs

following the "General Ledger" tab), PERESI00279, PER3379-3403, PER3408, and PERESI00300.)

352. Both contra accounts and contra entries allow for debits and credits to be made on the revenue side of Defendants' ledger. (See Marshall 2/23/12 Dep. at 29-33, 36-37; see e.g., Marshall 2/23/12 Dep. Ex. 14.)

353. One example of a contra *account* utilized by Defendants pertains to complimentary alcoholic beverages given to customers ("comped beverages") (Account 5010-02, "Complimentary Liquor"). (See Marshall 2/23/12 Dep. at 29-33, 41-42; see e.g., Marshall 2/23/12 Dep. Ex. 14.)

354. The contra account for alcoholic beverages offsets the account for actual alcoholic beverage sales. (See Marshall 2/23/12 Dep. at 29-33, 41-42; see e.g., Marshall 2/23/12 Dep. Ex. 14.)

355. That is, Defendants account for comped beverages by recording a sale (credit amount equal to the price) of the beverage in one account (Account 5010-01, "Liquor Revenue"). (See Marshall 2/23/12 Dep. at 41-42; see e.g., Marshall 2/23/12 Dep. Ex. 14.)

356. This amount recorded for the comped beverage is then offset by recording the same amount of (i.e. the price of the beverage) as a debit amount in the associated contra account. (See Marshall 2/23/12 Dep. at 41-42; see e.g., Marshall 2/23/12 Dep. Ex. 14.)

357. As Defendants' CFO testified:

> Q: [I]f a subsidiary of RCII gives a customer a complementary beer they would show $10 coming into account 5010-01; correct?
> [objection interposed]
>
> A: Correct.
>
> Q: $10 going out in account 5010-02, correct?

[objection interposed]

A: Correct.

Q: Zero dollars in that liquor revenues, correct?

A: Correct.

Q: And that zero net liquor revenues would be the number that would feed into gross receipts for purposes of filing the consolidated income tax return; correct?

[objection interposed]

A: That's correct.

(Marshall 2/23/12 Dep. 41-42.)

358. This practice accounts for the fact that a beer was provided to a customer while also accounting for the fact that Defendants never received any money in connection with the provision of the beer. (Marshall 2/23/12 Dep. at 31-43 (testifying as to liquor and dances, "the net is what we pay the taxes on or what we record as revenue.").)

359. The manner in which an ***actual beverage sale for money***, however, is accounted for, is different because no contra entry is recorded in any revenue account; instead, the full amount of the sale is recorded in the liquor-revenue account 5010-01 and the associated expenses are recorded in expense accounts. (See Marshall 2/23/12 Dep. at 41-51; see e.g., Marshall 2/23/12 Dep. Ex. 14.)

360. As Mr. Marshall testified:

Q: Let's talk about liquor. If a subsidiary sells a beer, let's say it costs $10 and they don't comp it, they actually sell it and they actually get the ten bucks, that full $10 is recorded in the gross receipts of RCII for corporate tax recording purposes; correct?

[objection interposed]

A: Correct.

Q: Now, presumably the subsidiary had to buy the beer from someone, correct?

[objection interposed]

A: Right.

Q: And whatever the amount is that they actually paid for that beer from the liquor distributor presumably would be recorded under cost of goods in 5710-00; correct?

A: The beer actually being 5720, but yes.

Q: Right. 5720 beer purchases, okay. The subsidiary would also have to pay the bartender who served the beer; correct?

A: Yes.

Q: And the amount that the bartender was paid would be recorded in 600[0-0]4, bar bartending; correct?

A: That's correct.

Q: So using just the example of say a beer which is sold for $10, if the beer cost $2 to buy from the distributor and the bartender, let's say that was the only beer he sold, and he was paid $3 in wages to serve that beer, that would mean that the $10 beer cost $2 to buy and $3 to serve; correct?

A: In that hypothetical, yes.

Q: So the net profit on that beer, assuming these hypothetical expenses were the only ones that the club incurred, would be $5; right?

[objection interposed]

A: Before income taxes, yes.

Q: For purposes of the corporate consolidated tax filing of RCII for the reporting of gross receipts the full $10 for the beer would be included, not the $5 net?
[objection interposed]

A: For gross receipts, yes.

(Marshall 2/23/12 Dep. at 49-51; see also Marshall 2/23/12 Dep. Ex. 14 (Ex. A, listing Account

6000-04 under "Expenses).)

361. Account "5230-00 Dances" pertains to the sale of dance dollars. (Stip. ¶ 211.)

362. Account 5230 Dances is an example of an account with contra *entries* that allows for credits and debits to the same account. (See Marshall 2/23/12 Dep. at 35-38; see e.g., PERESI00026 (all tabs following the "General Ledger" tab), PERESI00279, PER3379-3403, PER3408, and PERESI00300.)

363. Account 5230-00 is credited $24 for each dance dollar that is sold to a customer at Rick's NY. There is an $18 debit to Account 5230-00 for each dance dollar that is redeemed by an entertainer at Rick's NY. The net amount of $6 (the amount for which the dance dollar was sold ($24) less the amount for which it was redeemed ($18)) stays in Account 5230-00. (Stip. ¶ 211.)

364. The net amounts from Account 5230-00 are listed on Peregrine's income statements as Revenue, under the category labeled "Service." (Stip. ¶¶ 211, 217.)

365. The gross amounts from Account 5230-00 are not listed on Peregrine's income statements as Revenue. (See id.; Marshall 2/23/12 Dep. at 33-46, 53-55; compare PERESI00026, PER003120, PERESI00277, PER3404-3420, PERESI00297 with PERESI00026, PERESI00279, PER3379-3403, PERESI00300.)

366. As an example, the sum of the monthly totals of ***net*** revenue in Peregrine's Account 5230-00 for the quarter ending September 2009 is [redacted]. (PERESI00026 at "General Ledger" Column I [sum of Rows 2253, 2191, and 2127].)

367. Only the [redacted] amount is reported as the total revenue from Account 5230-00 on Peregrine's Quarterly Statement. (PERESI00026 at "IS 9-30-09" Row 38, Column D.)

368. The net amounts from Peregrine's Account 5230-00 are included in the "Service"

revenue category of RCII's 10-K Report. (Marshall 2/23/12 Dep. at 33-35, 42-43, 46, 53-55.)

369. The gross amounts from Peregrine's Account 5230-00 are not included in the "Service" revenue category of RCII's 10-K Report. (Marshall 2/23/12 Dep. at 33-37, 42-43, 46, 53-55.)

370. Thus, despite the fact that Defendants use contra entries instead of a contra account to account for dance dollar redemptions, Defendants treat money given to entertainers' when entertainers redeem dance dollars in the same way that Defendants treat the revenue associated with comped beverages: namely, amounts that are recorded but immediately excluded through the use of a contra entry which results in their being excluded from Defendants' gross receipts. (See Marshall 2/23/12 Dep. at 34-55; see also Marshall 2/23/12 Dep. Ex. 14.)

371. No Defendant has included any portion of the $18 amount entertainers received for redeemed dance dollars in "gross receipts" reported or listed on any of its tax returns (including but not limited to corporate, sales, and income tax returns) filed from 2005 to the present. (Stip. ¶ 218.)

372. Customers pay to spend time in semi-private rooms with either cash or dance dollars. (Sistrunk Dep. at 121-122; Anakar Dep. at 119-120; see also Stip. ¶ 181.)

373. The portion the club retains is reflected in Defendants' books in the account for "room charges." (Sistrunk Dep. at 143-147; Anakar Dep. at 119-120.)

374. If a customer pays with dance dollars, the entertainer's redemption of those dance dollars is accounted for in the same way as any other dance dollar redemption. (Anakar Dep. at 119-120.)

375. If a customer pays to spend time in a semi-private room in cash, then the amount the entertainer receives in connection with that transaction is not recorded on the books and

records of Rick's NY. (Anakar Dep. at 119-120.)

376. Defendants do not track or record cash from customers to entertainers and do not maintain records of total amounts of money that entertainers receive from customers. (Stip. ¶ 220; Anakar Dep. at 119; Sistrunk 10/29/09 Dep. at 133, 139; Defs.' Am. Answer at ¶ 137, ECF No. 279.)

377. [redacted] (See Marshall 2/23/12 Dep. at 102-103.)

378. Defendants' CFO does not consider either the cash entertainers receive from customers or the $18 entertainers receive for each dance dollar redemption at Rick's NY to be Defendants' money:

> "But [in Account] 5230 the net is Peregrine's income, not the gross, the net. I mean, that's the amount that remains that's Peregrine's."
>
> "The entertainer keeps [payment by cash]. **It's not ours**… We have no idea how much cash the entertainer gets."
>
> "And the $18 belongs to the independent contractor, the entertainer as does the cash she gets…. **It's not our money when it's redeemed, no…. The $18 is not our money.**"

(Marshall 2/23/12 Dep. at 37, 45, 46-47 (emphases added).)

## B. DEFENDANTS' CUSTOMERS

### i. Entertainers' Receipt of Money from Customers

379. Customers directly hand entertainers cash or dance dollars in exchange for personal dances on the floor of the club. (Bashore-Canzoneri Dep. at 219; Chen Dep. at 154; Finsterwald Dep. at 167; Hernandez Dep. at 72; Rivers Dep. at 77; Royer Dep. at 117.)

380. Entertainers made no contract or agreement with any Defendant that the $20 from

personal dances or $18 from each dance dollar redeemed belonged or could belong to Defendants. (See generally Hart Dep.; Furedi Dep.; Jurman Dep.; Finsterwald Dep.; Silk Dep.; Rivers Dep.; Chunikhina Dep.; Lamb Dep.; Chen Dep.; Daniels Dep.; Bashore-Canzoneri Dep.; Kasper Dep.; Mullen Dep.; Hernandez Dep.; Shulman Dep.; Dilag Dep.; Royer Dep.; McCleary Dep.; Bateman Dep.; Miller Dep.; Romero Dep.; Venizelos Dep.; Pestova Dep.; Hemmes Dep.; Ginsberg Dep.; Simon Dep.; and Clark Dep.)

381. Rick's NY has never refused to redeem a dance dollar exchanged by an entertainer. (Stip. ¶ 191; Sistrunk Dep. at 136.)

**ii. Defendants' Representations to Customers**

382. Dance dollars are sold to customers by bartenders, floor hosts, hosts, and managers; entertainers are not allowed to sell dance dollars. (Sistrunk Dep. at 163-164.)

383. Mr. Langan made the decision to set the price of dance dollars at $24. (Anakar Dep. at 20.)

384. At all times from 2005 to the present, one dance dollar has a face value of $20. (Sistrunk Dep. at 225-226; Exs. A and B to the January 14, 2010 Declaration of Ken Sistrunk.)

385. At the time of purchase, customers are told that there is a 20% service charge of $4 to purchase a dance dollar. (Sistrunk Dep. at 162-163.)

386. Between the date the club opened and approximately May 24, 2011, there had only been three versions of dance dollars in use at Rick's NY.[35] (Stip. ¶ 193.)

387. With the exception of the date on which the club switched from using one dance dollar version to another, at no point has more than one version of dance dollars been in use at the club at a given time. (Stip. ¶ 194.)

[35] Per this Court's stipulated order of July 27, 2012, the dance dollar version used from approximately May 24, 2011 to the present is not to be referenced in the parties' first motions for summary judgment. (ECF No. 356.)

388. All versions of dance dollars used at Rick's NY are orange in color and have been the same size. (Stip. ¶ 195.)

389. The first dance dollar version used at Rick's NY ("First Dance Dollar Version") was used from approximately September 2005 to October 2005 and has not been produced in this litigation. (Stip. ¶ 196.)

390. The First Dance Dollar Version did not have the Rick's Cabaret star logo printed on it or bear the word "dance ticket." (Stip. ¶ 198.)

391. The First Dance Dollar Version had the number "20" and the word "twenty" printed on its face. (Stip. ¶ 199.)

392. The First Dance Dollar Version was replaced by the version identical to Document PER2647 ("Second Dance Dollar Version") in October or November of 2005. (Stip. ¶ 200.)

393. The Second Dance Dollar Version was used continuously at Rick's NY until August 2008. (Stip. ¶ 201.)

394. The dance dollar version identical to Document PER2648 ("Third Dance Dollar Version") replaced the Second Dance Dollar Version in August 2008. (Stip. ¶ 203.)

395. The Third Dance Dollar Version was used continuously at Rick's NY until approximately May 24, 2011. (Stip. ¶ 204.)

396. Neither Mr. Sistrunk nor his staff authorized the change to the Third Dance Dollar Version in August 2008. (Sistrunk Dep. at 258-259.)

397. In fact, the Mr. Sistrunk did not even learn of the switch to the Third Dance Dollar Version until he loaded them into the machine for printing. (Sistrunk Dep. at 254.)

398. The only change between the Second Dance Dollar Version and the Third Dance

Dollar Version was the appearance of the face of the dance dollar. (Sistrunk Dep. at 255.)

399. No policies at the club with respect to the redemption of dance dollars changed when the design of the dance dollar changed in August of 2008. (Sistrunk Dep. at 254.)

400. Cage staff were not trained to treat dance dollars any differently beginning in August 2008 than they had previously. (Sistrunk Dep. at 254.)

401. Cage staff were not instructed to do any part of their job differently in relation to dance dollars starting in August of 2008. (Sistrunk Dep. at 254-255.)

402. Entertainers were not instructed to do any part of their job differently that related to dance dollars in August of 2008. (Sistrunk Dep. at 255.)

403. No one who worked at Rick's NY in any capacity was instructed to do anything differently when the design of dance dollars changed in August 2008. (Sistrunk Dep. at 255.)

404. Mr. Sistrunk testified that no representations made to customers regarding dance dollars changed in any way since the club opened for business in September 2005. (Sistrunk Dep. at 262.)

405. Customers are also presented with a consent form when purchasing dance dollars. A true and correct copy of the forms used from the date the club opened until approximately May 24, 2011 have been produced in this litigation as P0147, PER003117-3118, and PERESI00011-13.[36] (Stip. ¶ 207.)

## IV. DEFENDANTS ARE AN INTEGRATED ENTERPRISE AND JOINT EMPLOYERS

406. In January 2005, the former owners of Peregrine entered into a five-year covenant not to compete with Peregrine, RCI New York or RCII. (Defs.' Am. Answer at ¶ 86, ECF No.

[36] Per the Court's stipulated order of July 27, 2012, the version used from approximately May 24, 2011 to the present, as well as consent forms used in connection with payment for additional time in private rooms at the club, are not to be used in connection with the parties' first motions for summary judgment. (ECF No. 356.)

279 (admitting same allegations contained in Plfs.' Third Am. Compl., ¶ 86, ECF No. 153.)

407. The non-compete contract was negotiated with the same lawyers acting on behalf of RCI New York, RCII, and the then recently-acquired Peregrine. (Defs.' Am. Answer at ¶ 86, ECF No. 279 (admitting same allegations contained in Plfs.' Third Am. Compl., ¶ 86, ECF No. 153).)

408. Peregrine and RCII each have had an annual gross volume of sales made or business done in excess of $500,000.00. (Stip. ¶ 39; Am. Answer at ¶ 204, ECF No. 279; see e.g., RCII 12/14/2012 Press Release.[37])

409. Other than Mr. Langan, there are not and have never been other officers of Peregrine or RCI Entertainment (New York), Inc. (Langan 10/7/09 Dep. at 9, 45; Sistrunk Dep. at 78; see also Stip. ¶¶ 46, 47.)

410. RCII currently directly employs only Mr. Langan, Mr. Marshall, and Travis Reese, who is Vice President of RCII. (Marshall 2/23/12 Dep. at 14; see Stip. ¶ 43.)

**A. BRANDING AND ASSOCIATED POLICIES**

411. A main component of RCII's business model is to buy existing strip clubs and rebrand them as part of the Rick's Cabaret brand of clubs. (See Langan 10/7/09 Dep. at 69-70; see also Langan 10/7/09 Dep. Ex. 22 (Dirk Smillie, *The 200 Best Small Companies: Wages of Sin*, FORBES, 27 Oct. 2008, stating, "Langan began building Rick's by acquiring small fixer-uppers with seller financing.... [I]n addition to raising standard debt and equity, Langan started selling put options to investors that could be exercised for $3.25 a share in 2005. He now sells them for $25 a share."); Langan 10/7/09 Dep. at 179-184 (testifying about article).)

412. From July of 2009 to December of 2012, RCII went from owning and operating

[37] Available online at http://www.ricksinvestor.com/345/pressrelease.aspx, last accessed 2/7/2013.

18 strip clubs to owning and operating 35 strip clubs nationwide. (Compare Anakar 7/6/09 Decl. with RCII 12/14/12 Press Release; see also RCII 10-K Report for 2012 at p. 32-33 (listing acquisitions from 2008 to the present).)

413. According to RCII's CEO Eric Langan, rebranding adds value to RCII's stock and business because of brand recognition. (See Langan 10/7/09 Dep. at 69-70 ("Why does rebranding add value? When you take a hammer to a joint and you put McDonald's arches on it, why do more people come there? It's because they know the brand.").)

414. As Mr. Langan put it, "That's the name of the game—branding.... What we'd like to do with Rick's is create a national brand, where if someone thinks of gentlemen's clubs, they'll think of Rick's. That's what we're in the process of doing and creating right now." (Langan 4/23/09 Dep. Ex. 67 (Dave Manack, *Eric Langan: The man behind the Rick's Cabaret brand*, EXOTIC DANCER MAGAZINE, blog archive); Langan 4/23/09 Dep. at 84-89 (testifying about article).)

415. RCII rebrands clubs by changing the signs, music format, installing new management in some cases, and making sure there is consistency in customer service. (Langan 10/7/09 Dep. at 67-74; see also Sistrunk Dep. at 110-111 (testifying as to contact with general managers of other subsidiary clubs, "And, again, if they're sending people to New York, they could ask them to stop by Rick's in NY. If I'm sending people to Minnesota or Houston, I will ask them to look up the general manager of those locations.").)

416. Mr. Langan is the person who decides whether and how to renovate the clubs. (See Fenlon Dep. at 33.)

417. New clubs may borrow capital to do remodeling as part of the rebranding from RCII's other subsidiaries or RCII itself. (Langan 10/7/09 Dep. at 116-117; see also Stip. ¶ 88.)

418. Notably, Mr. Langan distinguishes branding from franchising, stating that those who are franchising rather than branding are "not buying, building, and managing the clubs." (Langan 4/23/09 Dep. Ex. 67 (Dave Manack, *Eric Langan: The man behind the Rick's Cabaret brand*, EXOTIC DANCER MAGAZINE, blog archive); Langan 4/23/09 Dep. at 84-89 (testifying about article).)

419. At RCII's subsidiary clubs, however, there is uniformity in ownership and management, with all management and staff at RCII and each of its subsidiary clubs reporting to Mr. Langan. (See Langan 7/15/08 Dep. at 9-10 ("Basically, everyone reports to me...."); see also Langan 10/7/09 Dep. at 44 ("Everybody reports to me regardless of any hierarchy."), 45 (all regional and general managers at the clubs report to Mr. Langan).)

420. Mr. Langan being in charge of each of the clubs allows for uniformity in management and operational philosophy between the clubs. (See Langan 4/23/09 Dep. at 85 ("The philosophy that is at all of these subsidiaries is because Eric Langan is the president of all of those subsidiaries and Eric Langan's philosophies are the ones that are dictated through each of those locations as president of those subsidiaries."); see also Langan 10/7/09 Dep. at 91 ("I, Eric Langan, have a philosophy for this industry and how I think things should be, and so it's only natural, as president of all those subsidiaries, that some of that philosophy bleeds down into each one, yes.").)

421. One of the ways in which Mr. Langan's philosophy is conveyed to each of the clubs is through the entertainer guidelines. (Langan 10/7/09 Dep. at 91.)

422. Additionally, RCII's 10-K Reports show this uniformity in philosophy by discussing controls and policies applicable to all of RCII's subsidiary clubs. (RCII 10-K and 10-KSB Reports for 2005-2012, "Business Activities- Nightclubs" Section; Langan 10/7/09 Dep. at

93-98.)

423. RCII's 10-K Reports states, "Our future success is dependent, in a large part, on retaining the services of Mr. Eric Langan, our President and Chief Executive Officer." (RCII 10-K and 10-KSB Reports for 2005 to 2012, "We are Dependent on Key Personnel" Section.)

424. For example, the 10-K Reports state that all of RCII's subsidiary clubs have a policy of maintaining high standards for personal appearance and personality for the entertainers and waitresses that work at the clubs. (Langan 10/7/09 Dep. at 74-77 (also stating, "The most important thing to the brand is that we have entertainers."); RCII 10-K and 10-KSB Reports for 2005-2012, "Female Entertainers" Section.)

425. All of RCII's subsidiary clubs share a central recruiting location on www.ricks.com. (Langan 10/7/09 Dep. at 80.)

**B. RCII'S PROVISION OF MANAGEMENT SERVICES**

426. RCII employs a Chief Financial Officer, Phil Marshall, who oversees accounting functions for RCII's various subsidiaries, including Peregrine and RCI New York. (Marshall 2/23/12 Dep. at 11-12, 22-24.)

427. Prior to January 1, 2011, RCII provided management services for the subsidiary clubs. (Langan 7/15/08 Dep. at 10-16; Langan 3/31/09 Dep. at 15-16; Langan 10/7/09 Dep. at 100, 142-143; see also Langan 7/15/08 Dep. at 9-10.)

428. Prior to January 1, 2011, the subsidiaries forwarded invoices and bills (including utility bills and liquor invoices), as well as daily sales from the point of sale ("POS") system Club Trax, new hire packages, and checks cut from managers' accounts to RCII on a daily basis. (Langan 7/15/08 Dep. at 13-16 (testifying that "anything that has to be tracked and kept to run a business" is forwarded from the subsidiaries to RCII); see also Langan 10/7/09 Dep. at 100

("Daily records are done at each subsidiary on a subsidiary level. Those daily records are then sent to our corporate office to be reconciled into monthly statements or quarterly statements."); Fenlon Dep. at 146-147.)

429. Prior to January 1, 2011, RCII employed "several office staff that do data entry from the information received from the cages of the [subsidiary] clubs [and] the person who processes all the payrolls that are sent in from all the [subsidiary] clubs." (Langan 7/15/08 Dep. at 12; Langan 10/7/09 Dep. at 128-129; see Marshall 12/10/08 Dep. at 38-39 ("We [RCII] have three bookkeepers who… upload the data from each club…. [T]hey're assigned different clubs…. [F]or their clubs… they record the revenues… and the daily activity. They record… the accounts payable, make sure items get paid. We have… two other non-degreed accountants… who oversee… all of that and then we have a controller and we also have a payroll person."); Crissman Dep. at 160 ("No payroll is cut from any of the clubs at all, period."); see also Langan 10/7/09 Dep. at 99 ("Cage staff is just an internal term of each particular club's accounting staff.").)

430. Mr. Anakar's sister Latifah used to work for RCII in payroll. (Anakar Dep. at 114.)

431. Mr. Langan's mother Bonnie did accounting at one time for RCII. (Anakar Dep. at 114.)

432. RCI Management Services, Inc. ("RCIM") is a wholly owned subsidiary of Defendant RCII and its only officers are its president, Mr. Anakar, and its director, Mr. Langan. (Stip. ¶¶ 48, 97, 98; Marshall 2/23/12 Dep. at 16; Anakar Dep. at 32, 33, 59.)

433. RCIM's sole source of revenue is the service fees its collects from RCII's subsidiaries. (Marshall 2/23/12 Dep. at 96; Anakar Dep. at 45-47; see also Stip. ¶ 100.)

434. RCIM evaluates its success based on how well RCII's subsidiaries are doing. (Anakar Dep. at 117.)

435. Since January 2011, RCIM has been performing the management functions described above as to RCII and with, largely, the same agents and employees that had worked at RCII. (Anakar Dep. at 37-41; see also Marshall 2/23/12 Dep. at 14-16, 23-24, 97-98, 101.)

436. For example, all regional managers that were previously employed by RCII are now employed by RCIM. (Stip. ¶¶ 85, 86; Anakar Dep. at 39-40.)

437. The regional managers, previously employed at RCII, did not have to fill out new hire paperwork or an application to work at RCIM. (Fenlon Dep. at 6.)

438. Rather, Mr. Anakar simply informed the regional managers that they would now be employed by RCIM. (Fenlon Dep. at 6.)

439. The regional managers of RCII's subsidiaries report to Mr. Anakar. (Anakar Dep. at 37; Amo Dep. at 16; Crissman Dep. at 168; Fenlon Dep. at 19-20; see also Stip. ¶ 60.)

440. With the exception of a couple new hires, the accounting staff at RCIM as of January 1, 2011 was made up of people who had previously been employed by RCII. (Anakar Dep. at 41.)

441. Ashley Langan now works for RCIM in accounting. (Anakar Dep. at 114-115.)

442. From January 1, 2011 to the present, the accounting staff at RCIM and Mr. Marshall have supervised the bookkeeper assigned to Rick's NY. (Marshall 2/23/12 Dep. at 22-24.)

443. Mr. Anakar maintains the same job duties over Rick's NY as president of RCIM that he had when he was employed by RCII. (Anakar Dep. at 37.)

444. RCIM does not have any formal objectives or measures of whether its "clients"

are satisfied. (Anakar Dep. at 116-117.)

445. There are no engagement contracts between any Defendant in this litigation and RCIM. (Defs.' Let. June 1, 2012.)

446. If RCIM needs cash, RCII makes sure to provide cash to RCIM. (Marshall 2/23/12 Dep. at 106-107.)

447. Peregrine has not and does not employ its own accountant or attorney. (Stip. ¶ 103; Sistrunk Dep. at 107; see also Langan 7/15/08 Dep. at 10-11 (testifying that the parent company hires general counsel).)

448. Rather, the general counsel employed by RCII and then RCIM provide legal services to Rick's NY and all of RCII's other subsidiary clubs. (Fenlon Dep. at 149; Amo Dep. at 125.)

449. Mr. Anakar hired Brenda Stanfield to work at RCIM to provide legal advice to Rick's NY. (Anakar Dep. at 58-59, 71.)

450. The legal department, first at RCII and then at RCIM, handles how Rick's NY gets permission to play music in the club. (Anakar Dep. at 109.)

451. Ms. Stanfield, along with defense counsel in this litigation, met with the regional managers who were deposed in this case to prepare for their depositions. (Amo Dep. at 4-5; Cirssman Dep. at 176; Fenlon Dep. at 153.)

452. Ms. Stanfield was also present at the deposition of Ken Sistrunk, when he testified as a 30(b)(6) designee for Peregrine. (Sistrunk Dep. at 2, 178.)

453. The subsidiary clubs "routinely make requests for graphics from the graphics department at the corporate office." (Reese Dep. at 46.)

454. RCII's corporate officers also use a private jet for travel. The jet is owned by

RCII's subsidiary RCI Leasing, LLC and the subsidiary on whose behalf the officers traveled is billed for the associate jet costs. (Langan 10/7/09 Dep. at 61-62.)

455. All of RCII's subsidiary clubs share the RCI Internet Services website where they advertise. (Langan 10/7/09 Dep. at 72-73; see generally Homepage at www.ricks.com (listing and linking to all subsidiary clubs and stating page maintenance by RCI Internet Services).)

456. RCI Internet Services, a subsidiary of RCII, through its employees, creates copy for the majority of advertisements that are run to promote the Rick's Cabaret brand of subsidiary clubs. (Langan 10/7/09 Dep. at 101-102.)

457. The general managers of the subsidiary clubs also exchange promotional ideas with each other. (Sistrunk Dep. at 110-111.)

458. Any reports of incidents at the clubs (including incidents involving entertainers) are sent to RCII through the internal upload page shared by RCII and its subsidiaries. (Fenlon Dep. at 134-135, 148-150; Crissman Dep. at 162-165; Amo Dep. at 108-109.)

459. All three Defendants in this action are represented by the same counsel. (See generally Am. Answer, ECF No. 279.)

460. Mr. Langan made the decision to use the Club Trax system at Rick's NY. (Sistrunk Dep. at 109.)

461. Club Trax is the POS system used at the other subsidiary clubs of which Mr. Langan is President. (Langan 10/7/09 Dep. at 100.)

462. Anderson Studebaker, a regional manager outside of New York who was employed by RCII and now employed by RCIM, assisted with setting up Club Trax at Rick's NY. (Anakar Dep. at 118; see also Stip. ¶ 79; Defs.' 6/16/2011 Let.)

463. RCII has the ability to access its subsidiaries' Club Trax records. (Langan

10/7/09 Dep. at 145-147.)

### C. RCII'S CONTROL OF ITS SUBSIDIARIES' MONEY

464. Mr. Langan's job duties as President of RCII include asset management, public relations, investor relations, and cash management. (Langan 10/7/09 Dep. at 22.)

465. Mr. Langan is responsible for establishing what the operational and accounting controls are at the clubs. (Langan 10/7/09 Dep. at 97-98; see also Langan 4/23/09 Dep. at 88-89 (operational decisions at the subsidiary level are made by Langan).)

466. Mr. Langan makes operational decisions in an effort to increase club profitability. (Langan 10/7/09 Dep. at 22-23 ("I would call the president of that corporation, which basically is myself, and say, you know, get down there and do something about the returns on this asset....Whatever ideas the current management team at the locations would, you know, go talk to your team, find out what they think we can do, get back with me, and we will make some decisions.").)

467. Mr. Langan decides when and how the clubs will pool purchasing power. (See Langan 10/7/09 Dep. at 73.)

468. Mr. Langan and/or RCII's Board of Directors (of which Mr. Langan is Chairman) make decisions about whether RCII will loan the subsidiary clubs money. (Langan 10/7/09 Dep. at 117-118.)

469. Mr. Langan decides whether the subsidiary clubs will loan each other money. (Langan 10/7/09 Dep. at 117.)

470. Mr. Anakar makes or participates in decisions about whether the subsidiary clubs will loan each other money. (See Amo Dep. at 123-124 (regional manager testifying that he needs Mr. Anakar's permission in order to transfer money between clubs).)

471. The subsidiary clubs loan each other money, as one example, to cover immediate cash shortages:

> Q: [on redirect] What would be an example of why one club would transfer money to another club instead of just, for instance, going to the bank and getting cash?
>
> A: If banks are closed, if it's a holiday, a Friday night and a club's just low on surplus of cash and it's going to be a busy night, often, you know, one club will be prepared and one will kind of let it be a little more relaxed, and they'll get into a bind, and those types of things happen every once in a while.

(Amo Dep. at 198-199.)

472. Borrowing and payments between RCII and its subsidiaries or between RCII's subsidiaries is done through general ledger entries (i.e., intercompany transfers) and not formal loan documents. (Stip. ¶ 87; Langan 10/7/09 Dep. at 117; see e.g., Anakar Dep. Ex. 10; Anakar Dep. at 38.)

473. The ledger for the intercompany transfer account between Peregrine and RCIM shows that some transfers between RCIM and Peregrine are for specific items, including such things as 35% of Mr. Anakar's salary and FedEx-related payments. (See RCIM General Ledger at RCII0365-366; Anakar Dep. at 37-39.)

474. The ledger for the intercompany transfer account between Peregrine and RCII shows that some transfers between RCII and Peregrine are for specific items, including but not limited to insurance, office supplies, Mr. Anakar's services, phone, promotional material, FedEx-related payments, dry cleaning, and liquor licenses. (See e.g., Marshall Dep. Ex. 4; see also Marshall 2/23/12 Dep. at 70-71 (stating as to the first entry on Marshall Dep. Ex. 4, "I suspect that RCII paid an insurance payment for Peregrine.... So Peregrine owes them for that payment."), 80-82.)

475. Mr. Marshall makes the decision about when Peregrine is going to send RCII money. (Marshall 2/23/12 Dep. at 84-85.)

476. Mr. Marshall bases the decision on when Peregrine is going to send RCII money on "[w]hen they [Peregrine] have too much money in their account." (Marshall 2/23/12 Dep. at 85.)

477. There is no set amount that Mr. Marshall decides is too much for Peregrine to retain; however, it does not appear that Peregrine retains its profits. Rather Mr. Marshall "just make[s] sure [he] believe[s] they [Peregrine] have enough money to operate." (Marshall 2/23/12 Dep. at 85.)

478. Peregrine does not have a litigation reserve in its accounts to cover liabilities arising from litigation such as the instant action. (See Marshall 2/23/12 Dep. at 85-90.)

479. The ledger for the intercompany transfer account between Peregrine and RCII shows a variety of unspecified monetary transfers. (Marshall 2/23/12 Dep. at 84-85; see e.g., Marshall 2/23/12 Dep. Ex. 4 at PER3373 (showing transfers from Peregrine to RCII of [redacted] over the course of three months).)

480. Numerous transfers of money between RCII and Peregrine occurred after January 1, 2011. In the fiscal year beginning September 2011, RCII transferred [redacted] to Peregrine, and Peregrine transferred [redacted] to RCII. (See PERESI00280; PERESI00296.)

### D. RCII'S MANAGEMENT OF ITS SUBSIDIARY CLUBS THROUGH MR. LANGAN AND MR. ANAKAR

#### i. Work Relationships Between Mr. Langan, Mr. Anakar, and Mr. Sistrunk

481. Since the time Mr. Langan hired Mr. Anakar to work for RCII in 2002, Mr. Anakar has reported to Mr. Langan, Mr. Langan has decided which job duties and positions to

offer Mr. Anakar within RCII and its subsidiary companies, and Mr. Langan has decided Mr. Anakar's compensation and how that compensation would or would not be billed to RCII's subsidiaries. (Anakar Dep. at 11-17, 32-37.)

482. From 2003 until January 1, 2011, Mr. Anakar was employed by and received all of his paychecks only from RCII. (Anakar Dep. 12-16, 25-26, 28, 31-32; see also Stip. ¶ 55.)

483. From January 1, 2011 to the present, Mr. Anakar has been employed by and received all of his paychecks only from RCIM. (Anakar Dep. at 46.)

484. As Acting General Manager at Rick's NY from 2005 to October 2007, Mr. Anakar oversaw operations and marketing and hired managers and employees. (Anakar Dep. at 14-17.)

485. Mr. Anakar was at Rick's NY approximately three to four days a week during the time he was Acting General Manager. (Anakar Dep. at 25.)

486. As Director of Operations from mid-2009 to January 2011, Mr. Anakar answered to and worked at the direction of Mr. Langan. (Langan 10/7/09 Dep. at 37 ("Basically, he helps—he helps me in whatever capacity I need him to help me in."); Anakar Dep. at 31-32; see also Stip. ¶ 60.)

487. As Director of Operations for RCII, one of Mr. Anakar's responsibilities was to oversee the regional managers for RCII's other subsidiaries. (Stip. ¶ 60; Anakar Dep. at 32.)

488. Mr. Anakar has been Regional Manager over Rick's NY from October 2007 to the present. (Anakar Dep. at 25-26, 31-32, 37-38; Marshall 2/23/12 Dep. at 98; see also Stip. ¶¶ 58, 61.)

489. Part of Mr. Anakar's responsibility as Regional Manager, Director of Operations, and President of RCIM has been to provide leadership for the general manager at Ricks' NY.

(Anakar Dep. at 72-73.)

490. Mr. Anakar's services from October 2007 to October 2008 were billed by RCII to Rick's NY and Tootsie's Cabaret, split evenly, as decided by Mr. Langan, even though Mr. Anakar also had duties over other of RCII's subsidiary clubs. (Anakar Dep. at 27-29.)

491. Mr. Langan decided that 35% of Mr. Anakar's salary as Director of Operations would be billed by RCII to Peregrine. (Anakar Dep. at 31-32.)

492. Since January 1, 2011, Peregrine has been billed for 35% of Mr. Anakar's salary by RCIM. (Anakar Dep. at 38.)

493. Mr. Anakar does not track the hours he spends performing tasks for RCII's subsidiary clubs. (Anakar Dep. at 36.)

494. Mr. Anakar presently owns nearly $300,000 worth of stock in RCII. (Anakar Dep. at 51.)

495. Mr. Sistrunk was hired by Ed Anakar and began working at Rick's NY in June of 2005. (Stip. ¶ 63; Sistrunk Dep. at 5-7.)

496. Since 2005, Mr. Sistrunk has reported directly to Mr. Anakar and Mr. Langan. (Langan 10/7/09 Dep. at 16, 39.)

497. Mr. Sistrunk also reports indirectly to Mr. Langan through Mr. Anakar. (Langan 10/7/09 Dep. at 17.)

498. Mr. Sistrunk reported to Mr. Langan and Mr. Anakar both prior to and after Mr. Anakar became Director of Operations for RCII. (Sistrunk Dep. at 79, 85.)

499. At all times since October 2007, Mr. Anakar has communicated directly with the Mr. Sistrunk on a weekly basis. (Anakar Dep. at 37, 116.)

500. Mr. Langan determines how much Mr. Sistrunk gets paid, with input from Mr.

Anakar. (Sistrunk Dep. at 85-86.)

501. Mr. Sistrunk is required to get approval through consultation with Mr. Langan and Mr. Anakar to make certain expenditures. (Sistrunk Dep. at 104.)

502. Mr. Langan personally hired management for Rick's NY when the club first opened. (Langan 10/7/09 Dep. at 16-17.)

**ii. Day-to-Day Operations at Rick's NY**

503. Mr. Sistrunk has testified that everyone who works at Peregrine reports to him. (Sistrunk Dep. at 90-91.)

504. Mr. Anakar has the authority to determine agenda items for the staff meetings held at Rick's NY. (Anakar Dep. at 73.)

505. If managers at Rick's NY want to add a new item to the POS, for example a menu or price change, they would ask Mr. Anakar's approval and Mr. Anakar would have the authority to approve the request. (See Anakar Dep. at 85-86, 94-95.)

506. Mr. Sistrunk emails with Mr. Anakar about updates on new events, promotions, and questions regarding building structural concerns. (Sistrunk Dep. at 103.)

507. At Mr. Anakar's request, Mr. Sistrunk emails him information about Rick's NY:

> Mr. Anakar: Please send me the entertainer house fee schedule, cover charge and drink prices including our weekly specials. Try your best to send me this info no later than Monday.
>
> ***
>
> Mr. Sistrunk: [Providing attachment and information] I think that[']s everything you requested. [P]lease let me know if I missed anything or if you need additional information.

(PER003641-3642 (emails between Mr. Anakar and Mr. Sistrunk).)

508. Mr. Anakar has directed Mr. Sistrunk on the cage and management's

responsibilities regarding dance dollars and credit card receipts. (See PER003483.)

509. Mr. Sistrunk provides Mr. Anakar summaries of meetings held at Rick's NY. (See e.g., PER003659-3660.)

510. Mr. Anakar considers managers at Rick's NY part of his "team." (See PER005135; PER005169-5170 (stating, in response to Mr. Sistrunk's summary of a staff and entertainer meeting, "Excellent, I wish we had a team like that in every location.").)

511. Mr. Anakar has directed managers at Rick's NY to keep areas of the club clean. (See e.g., PER005137 ("Please check the DJ booth before you leave to assure that DJ's keep the booth clean, this place is a freaking mess again.").)

512. Notations in the paper entertainer files at Rick's NY indicate that Mr. Anakar has hired entertainers. (PER002776, PER2830, PER2835, PER2890, PER2929, PER2943, PER3075, PER3212, PER3284; see Stip. ¶ 268.)

**iii. Mr. Langan's and Mr. Anakar's authority over RCII's subsidiary clubs**

513. RCII's subsidiary clubs' general managers together with Mr. Langan are responsible for establishing what the consumer marketing strategy is for each club. (Langan 10/7/09 Dep. at 101.)

514. Mr. Langan also emails with regional managers and with general managers about day-to-day operations at the clubs. (Langan 10/7/09 Dep. at 92.)

515. Mr. Langan does not have separate email addresses associated with each subsidiary; rather, he generally only uses one email address: eric@ricks.com. (Langan 10/7/09 Dep. at 92.)

516. Mr. Langan has very likely consulted with general managers about whether they should fire entertainers at the clubs in certain situations; in fact, he gets calls in the middle of the

night about these types of things. (See Langan 10/7/09 Dep. at 98-99.)

517. Mr. Langan decided to which subsidiary clubs the regional managers would be assigned. (Fenlon Dep. at 10.)

518. At all times throughout the class period, Mr. Langan has been employed and paid by RCII, and there has been no direct billing to RCII's subsidiaries for Mr. Langan's services or time. (Langan 10/7/09 Dep. at 135-136; Peregrine Interrog. Response. No. 29.)

519. At all times since October 2009, Mr. Anakar has authority to approve or disapprove actions taken by a general manager at any of RCII's subsidiary club related to marketing. (Anakar Dep. at 29-30.)

520. At all times since October 2009, Mr. Anakar has also hired and overseen the regional managers that work at the various subsidiary clubs. (Anakar Dep. at 37, 45; see also Stip. ¶ 60.)

521. The regional managers report to Ed Anakar and Mr. Langan:

> Q: Okay. And is there anybody that you report to in your job as a regional manager?
>
> A: Yes, I pretty much report to Ed Anakar.

(Crissman Dep. at 168.)

> Q: Do [Mr. Langan and Mr. Anakar] oversee your work?
>
> A: Yes, ma'am.

(Amo Dep. at 16; see also Fenlon Dep. at 20 (testifying that he reports to Mr. Langan and Mr. Anakar.)

522. The regional managers need to ask for approval to authorize expenditures over a certain amount for RCII's subsidiary clubs. (Fenlon Dep. at 20; see Crissman Dep. at 37 ("If it was a large sum of money, I would seek approval, yes. From Mr. Anakar, I'm not sure it that's

who's making the decision or not."), 110, 150-151; Amo Dep. at 115-116, 122.)

523. As general manager, Mr. Sistrunk also requires approval for certain expenditures. (See Sistrunk Dep. at 104-105 ("If [as an example] I have to replace air conditioning units, then I will call for an opinion and consult with Ed [Anakar] on that, as well as Eric [Langan].").)

524. Mr. Anakar and Mr. Langan make requests to the managers to check on the clubs, including sales at the clubs. (Fenlon Dep. at 20-21.)

525. The general managers at the clubs ask the regional managers' permission to spend money for certain things such as advertising and repairs and, depending on the request, the regional managers then consult with Mr. Anakar and Langan to approve or disapprove the request. (Fenlon Dep. at 22; see also Crissman Dep. at 34 (testifying that he makes proposals to Mr. Anakar and Mr. Anakar informs Mr. Crissman whether the request was approved or denied).)

526. The regional managers review the general managers' performance and discuss the same with Mr. Langan and Mr. Anakar. (Fenlon Dep. at 26.)

527. Mr. Fenlon has fired general managers after approval to do so from Mr. Anakar and Mr. Langan. (Fenlon Dep. at 26-27.)

528. Mr. Fenlon can hire general managers only after getting approval to do so from Mr. Langan and Mr. Anakar. (Fenlon Dep. at 27.)

529. Regional managers attend meetings at RCII's corporate office in Houston, and those meetings are run by Mr. Langan and/or Mr. Anakar. (Fenlon Dep. at 43; Amo Dep. at 19; see also Fenlon Dep. at 43.)

530. General managers of the clubs have attended at least one of the meetings held at the corporate office. (Fenlon Dep. at 45.)

531. At those meetings, in order to secure resources or tools requested by the general managers at the clubs, regional managers present to Mr. Langan and Mr. Anakar:

> Q: Okay. So when you're discussing radio advertising, is that something that you are presenting in the meeting, having heard from general managers on that topic?
>
> A: Yeah. Yeah. I'm trying... to help them get tools so they can succeed at their locations.
>
> Q: Okay. And to get those tools, do you need to present them to Ed Anakar or Eric Langan at this meeting?
>
> A: Yes.

(Fenlon Dep. at 44-45.)

532. At these meetings, Mr. Anakar and Mr. Langan give the regional managers direction on increasing profits and decreasing losses at the clubs. (Fenlon Dep. at 47.)

533. Mr. Langan made the decision to require entertainers to pay promo fees at the clubs. (Fenlon Dep. at 67.)

534. Mr. Fenlon seeks Mr. Langan's permission to make changes to the hours of operation of RCII's clubs. (See Fenlon Dep. at 106-107 ("I will see if I can get permission, talk it through with Eric Langan, see if he approves.").)

535. Mr. Langan determines what the house fees will be at each of RCII's clubs overseen by Mr. Fenlon; Mr. Anakar and Mr. Crissman, together with the general manager, make those decisions at the clubs over which Mr. Crissman is the regional manager. (Fenlon Dep. at 71; Crissman Dep. at 80 ("The general manager consulted with me about it, and I consulted with Mr. Anakar. We all consulted together, and we made a decision about whether to change it or not."); see also Amo Dep. at 87 ("As a regional manager, I would have to have a discussion with Mr. Anakar and Mr. Langan about any credits or promos that we have. And they

would…let me know.").)

536. Mr. Langan determines the hourly wages of waitresses at RCII's clubs. (Fenlon Dep. at 84.)

537. Mr. Langan determines the cover charge at RCII's clubs:

Q: Okay. And who sets the cover charge?

A: That would be Eric Langan.

Q: And have you had discussions with anybody about changing the cover charge?

A: Management have – have asked or made suggestions about cover charge prices before.

Q: To you?

A: Yeah, they've suggested it to me.

Q: And what have you done in response?

A: I would talk through with Eric Langan to see whether he would agree to making any changes in those areas.

(Fenlon Dep. at 138-139.)

538. To decide whether a given club will be open on given night, Mr. Crissman consults with the general manager of the club and Mr. Anakar. (Crissman Dep. at 21-26; see also Amo Dep. at 61 (testifying to knowing that Anakar and Langan were involved in the setting of hours of operation because "[he] got a call from Ed [Anakar] telling [him] the new hours.").)

539. Mr. Crissman would not be allowed to change the cover charge at the clubs he oversees without first consulting with Mr. Anakar. (Crissman Dep. at 149.)

540. Mr. Anakar will visit the clubs to "observe guest traffic[. H]e likes to look at the property in itself, make sure it's operationally sound. He can troubleshoot the computer systems if there's any problems when he arrives on property…." (Amo Dep. at 22.)

541. At Mr. Anakar's instruction, Mr. Amo has taken photos of the clubs for the website. (Amo Dep. at 105.)

542. Mr. Anakar once requested that Mr. Crissman deliver a scanner from Texas to Rick's NY, and RCIM paid for Mr. Crissman's travel. (Crissman Dep. at 76-77, 151-152.)

543. Ms. Dilag worked at RCII's subsidiary club in Las Vegas before working at Rick's NY. (Dilag Dep. at 126-127.)

544. When Ms. Dilag was at RCII's subsidiary club in Las Vegas, Mr. Anakar told Ms. Dilag and some other entertainers that they could go to New York and work at Rick's NY if they wanted to. (Dilag Dep. at 130-131.)

545. Similarly, Rick's NY "posted a call for girls who wanted to volunteer to go and they drove us out there for a day to dance in their new Philly club." (Romero Dep. at 87.)

## V. <u>DEFENDANTS' WILLFUL VIOLATIONS OF THE LAW AND LACK OF GOOD FAITH</u>

546. Defendants are not relying on any attorney advice to defend against Plaintiffs' allegations that Defendants willfully violated the law or did not act in good faith. (Defs.' 7/18/2011 letter to Mag. J. Katz; Defs.' 7/25/2011 letter to Mag. J. Katz; <u>see also</u> Defs.' Resp. to Doc. Req. No. 72 (no responsive documents produced); Peregrine Supp. Interrog. Resp. No. 13.)

547. Mr. Sistrunk has never conducted any legal research into what laws or regulations govern the operation of adult entertainment clubs in New York. (Sistrunk Dep. at 57.)

548. Aside from this litigation, Mr. Sistrunk has never consulted with attorneys about the guidelines that govern the operation of the adult entertainment establishment in New York. (Sistrunk Dep. at 57.)

549. No one at Peregrine Enterprises consulted with a legal professional regarding the propriety of classifying entertainers at independent contractors prior to opening Rick's NY.

(Sistrunk Dep. at 58.)

550. Mr. Anakar has never talked to anyone about the possibility of liability arising from the misclassification of entertainers but is aware that this lawsuit is about misclassification of entertainers. (Anakar Dep. at 49-50, 109-110.)

**A. DEFENDANTS' RECLASSIFICATION PLANS, DECISIONS, AND RELATED LITIGATION**

551. At all times since at least 2005, Defendants have been aware that they may be required to reclassify entertainers as employees:

> "We believe that the adult entertainment industry standard of treating entertainers are independent contractors provides us with safe harbor protection to preclude payroll tax assessment for prior years. We have prepared plans that we believe will protect our profitability in the event that the sexually oriented business is required in all states to convert entertainers who are now independent contractors into employees."

(10-K Reports.)

552. All of Defendants' 10K and 10KSB reports from 2005 to the present contain above statement that RCII has prepared plans to protect profitability in the event they are required to reclassify their entertainers. (10-K Reports.)

553. Rick's NY has classified entertainers at the club as independent contractors at all times since the club opened in 2005. (Stip. ¶ 19.)

554. Mr. Langan made the decision to classify entertainers at Rick's NY as independent contractors. (Peregrine's Supp. Response to Interrog. No. 13.)

555. Since at least 2005, entertainers at RCII's subsidiary club in Minnesota have been classified by the club as employees. (RCII 10-K and 10-KSB Reports from 2005-2012, "Female Entertainers" Section.)

556. Mr. Langan made the decision to classify entertainers at the Minnesota club as

employees. (Langan 10/7/09 Dep. at 49.)

557. Non-defendant RCI Entertainment (Minnesota), Inc. was sued in state court in Minnesota in December 2007 on allegations of violations of Minn. Stat. § 177.24 relating improper retention of employees' gratuities. (Eric Zajkowski, et al. v. RCI Entertainment (Minnesota), Inc. and Rick's Cabaret International, Inc., Hennepin County District Court File No. 27-CV-07-26436, Compl. (12/7/2007).)

558. The complaint in the Zajkowski case was later amended to include Defendant Rick's Cabaret International, Inc. (Zajkowski, Sec. Am. Compl. (10/27/2008).)

559. The defendants in the Zajkowski case were all represented by the same counsel. (Zajkowski, Answer to Sec. Am. Compl. (11/14/2008).)[38]

560. Prior to the instant action, Rick's Cabaret International, Inc., RCI Entertainment (New York), Inc., and Peregrine Enterprises, Inc. were sued in the Southern District of New York in 2008 by a former entertainer, Nicole Imbeault. Nicole Imbeault v. Rick's Cabaret International, Inc., RCI Entertainment (New York) Inc., Peregrine Enterprises, Inc., Case No. 08-CV-5458 (GEL), Am. Compl. (8/19/2008).)

561. The Nicole Imbeault case involved misclassification and minimum wage claims substantively identical to those in the instant action. (Nicole Imbeault, Am. Compl. (8/19/2008).)

562. Defendants made Ms. Imbeault an offer of judgment, which she accepted on February 18, 2009. (Nicole Imbeault, Notice of Acceptance of Offer of J. (2/18/2009).)

563. Judgment was then entered against Peregrine in the Nicole Imbeault case. (Nicole Imbeault, Proposed J. (2/20/2009).)

[38] The Zajkowski case settled.

564. The defendants in the Nicole Imbeault case were all represented by the same counsel. (Nicole Imbeault, Answer (9/29/2008).)

565. Counsel for defendants in the Nicole Imbeault case represented to Ms. Imbeault's counsel that Peregrine was the correct entity to be named as a defendant in the suit. (Emails of 7/25/2008 between Counsel.)

566. Rick's Cabaret International, Inc., RCI Entertainment (New York), Inc., and Peregrine Enterprises, Inc., Ed Anakar, and Ken Sistrunk, were sued in the Southern District of New York in May 2009 by a former disc jockey who worked at Rick's NY. (William Imbeault v. Rick's Cabaret International, Inc., RCI Entertainment (New York) Inc., Peregrine Enterprises, Inc., Ed Anakar and Kenneth Sistrunk, Case No. 09-CV-4425 (PKC/AJP), Compl. (5/6/2009).)

567. William Imbeault alleged misclassification, minimum wage violations under the FLSA and NYLL, unlawful "kick-back" violations under NYLL, violations relating to gratuities under NYLL, race discrimination and defamation. (William Imbeault, First Am. Compl. (5/27/2009).)

568. All of the defendants in the William Imbeault case were represented by the same counsel. (William Imbeault, Answers (Corporate Defs.' Answer 6/8/2009; Sistrunk Answer 6/29/2009; Anakar Answer 6/30/2009).)

569. The William Imbeault case settled on August 14, 2009. (William Imbeault, Order of Dismissal on Consent (8/14/2009).)

### B. DEFENDANTS' ABILITY TO MEASURE ENTERTAINERS' DANCE DOLLAR PAYMENTS AGAINST HOURS WORKED

570. Rick's NY, through Club Trax, has the capability to track whether entertainers would make at least the minimum wage if dance dollar redemptions counted as wages. (See e.g., PER003509-3543 (email attaching entertainer file, including at PER003520-3521 a log-in/out

report that has a column entitled "wage" which divides dance dollars redeemed by hours worked on a weekly basis).)

571. Rick's NY, through Club Trax, can automate tracking of whether entertainers would make at least the minimum wage if dance dollar redemptions counted as wages. (See e.g., PER003509-3543.)

572. Rick's NY, through its agents including Mr. Anakar, know that it can, through Club Trax, automate tracking of whether entertainers would make at least the minimum wage if dance dollar redemptions counted as wages. (See e.g., PER003509-3543.)

573. Rick's NY, through Club Trax, has tracked whether a certain entertainer would make at least the minimum wage if dance dollar redemptions counted as wages and is aware that she has not, in fact, made the minimum wage in certain weeks even if dance dollars counted as wages. (See e.g., PER3520-3521 (showing wage of $0.00 for certain weeks).)

### C. DEFENDANTS' CONSCIOUS EFFORTS TO EVADE LIABILITY WITHOUT RECLASSIFYING

574. Defendants chose to limit their liability under federal and state wage law, not by reclassifying entertainers as employees, but by distributing arbitration agreements (called "entertainer license agreements") at their clubs outside of New York:

| | |
|---|---|
| Private RCII Investor: | [O]n the Hart case in New York, it seems like clubs all over the country keep losing these cases or end up settling. Can you talk about why we haven't just converted all the independent contractors over to employees and made the economics work? |
| Mr. Langan: | Technically – well, I mean, no --other clubs around the country have not necessarily lost these cases. There's been a lot of settlement in these cases but there haven't been very many of these cases actually tried. A lot of people have taken the easy route out and settling with their current base and putting in new contracts that Rick's, of course, put in that all of our clubs except for |

> New York location shortly after the lawsuit was filed here. That basically stopped the class actions and forced arbitration if an independent contractor decides that she should be an employee

(Rick's Cabaret Second Quarter 2012 Conference Call Transcript.[39])

575. Mr. Anakar distributed those "entertainer license agreements" to the regional and general managers at all of RCII's subsidiary clubs outside of NY. (Fenlon Dep. at 50-57; Crissman Dep. at 46, 69; Amo Dep. at 156-157 ("I had a conversation with Mr. Anakar and directed me to get [the agreement] out to the management teams and have them start using them.").

576. The license agreements were to be distributed to entertainers for signature at each of the clubs. (Fenlon Dep. at 50-57.)

577. Regional managers were to follow up to make sure that the clubs were using the license agreements. (Crissman Dep. at 70.)

578. Other than the club name, the agreements are identical and, among other things, include an arbitration agreement, class waiver, and provision that states the relationship between the entertainer and club is not an employee/employer relationship. (See RCII0006 – RCII0083; RCII0085 – RCII0091; RCII0102 – RCII0143; RCII0147 – RCII0152; RCII0154 – RCII0159; RCII0168 – RCII0179; RCII0181 – RCII0203; RCII0218 – RCII0220; and RCII0245 – RCII0255.)

579. Following this lawsuit, Rick's NY also undertook to remove the word "must" from signs pertaining to entertainer conduct posted in the club. (See PER003468-3472 (email from Mr. Deangelo to Mr. Anakar asking, "I remember that at one time, we couldn't use the

[39] Available at http://www.ricksinvestor.com/default.aspx as of October 16, 2012 via www.ricks.com. (See Aff.of Anna P. Prakash; Aff. of Heather J. O'Neil.)

word 'must'. Is that still the case? Should I take [the signs] down?"); PER003507-3508; PER003568-3569; PER003713; PER005120-5121 (email chain with Mr. Anakar stating, "what we don't want to use is the word must.").)

580. Despite Defendants' attempts to avoid a paper trail by removing the word "must" from signs following the filing of this lawsuit, Defendants continued to inform entertainers of the club's rules and requirements and enforce those rules and requirements at the club's discretion. (Anakar Dep. at 61, 89-92; PER003473-3474, PER003507-3508, PER003545-3546, PER003659-3660, PER003720, PER005104-5105; see also PER003560-3563.)

**D. DEFENDANTS' CONNECTION TO THE ASSOCIATION OF CLUB EXECUTIVES**

581. The Association of Club Executives ("ACE") is a 501(c) trade organization, nonprofit trade organizations for the adult gentlemen's club industry. (Langan 10/7/09 Dep. at 154.)

582. ACE defines its mission, in part, as follows:

> ACE helps to protect and serve its member clubs and affiliate state club owners associates by providing and sharing relevant political and legal information, education, resources and referrals.

(Declaration of ACE Executive Director Angelina Spencer ("Spencer Decl.") at ¶ 3.)

583. "To meet its mission, ACE provides various services to its members. These services include, but are not limited to, legislative bill tracking, [and] a bi-weekly newsletter…." (Spencer Decl. at ¶ 8.)

584. "ACE's primary source of communication with its membership is electronic and consists of information published in its newsletter, which is distributed bi-weekly to its membership. In addition, ACE provides its members with updates of pending legislation related to the adult industry." (Spencer Decl. at ¶ 10.)

585. In 2011, Plaintiffs in this case subpoenaed ACE for communications between, on the one hand, ACE and, on the other hand, Mr. Langan, Mr. Anakar, Mr. Sistrunk, and other managers at and agents of Rick's NY. (Subpoena.)

586. Plaintiffs' subpoena was limited to communications regarding (1) classification of entertainers as independent contractors and/or employees; (2) lawsuits and/or legal issues involving entertainers; and (3) the topic of how entertainers are compensated for their work. (Subpoena.)

587. ACE, through its Executive Director, has admitted, "[t]he topics of Plaintiffs['] subpoena have been discussed in ACE newsletters and in Board of Directors meetings. (Spencer Decl. at ¶ 12; see e.g., "*West VA Dancers File Action Against Club for Wages & Tip Fees*," ACE Newsletter (Nov. 16, 2011).)[40]

588. Mr. Langan is on ACE's Board of Directors. (Stip. ¶ 49; Langan 10/7/09 Dep. at 154-155.)

589. During a May 2012 conference call with RCII's investors, Mr. Langan was asked by a private investor, "[O]n the Hart case in New York, it seems like clubs all over the country keep losing these cases or end up settling. Can you talk about why we haven't just converted all the independent contractors over to employees and made the economics work?" (Rick's Cabaret Second Quarter 2012 Conference Call Transcript.)

590. In responding to the private investor's question about reclassifying rather than continuing to litigate this lawsuit, Mr. Langan responded, in part, as follows:

> "We have not really considered settling this case. We want to see what happens as we move this case forward and I really can't talk about a lot of the fundamentals of course because its ongoing litigation, which makes it very difficult in a public realm to discuss all of our beliefs. But at this time, we believe that we are right.

---

[40] See 12/15/11 Aff. of Anna P. Prakash at ¶¶ 6-8.

> We believe we will prevail. And at some point, that may change, it may not. We're watching. We're watching what other clubs are doing. We're watching what other – what else is going on out there in the country. I'm on the ACE National Boards so I'm very in tune with a lot of other club owners, talked to them a lot. And, like I said, we're watching it and we'll just have to wait and see exactly where this goes. But I could tell you, the entertainers don't want to be employees.... They don't want to see the arrangement changed so that's one of the reasons we're not really interested in changing."

(Rick's Cabaret Second Quarter 2012 Conference Call Transcript.)

591. The ACE Board of Directors meetings two to three times a year and are open to Board members and ACE advisory attorneys. (Declaration of ACE president Michael Ocello ("Ocello Decl.") at ¶ 23.)

592. ACE also generally conducts one general meeting, open to general members and invited guests. (Ocello Decl. at ¶ 25.)

593. Mr. Sistrunk is a member of ACE. (Stip. ¶ 70; Sistrunk 10/29/09 Dep. at 176.)

**E. DEFENDANTS' CONNECTION TO EXOTIC DANCER'S CLUB BULLETIN**

594. At all times since April 2008, RCII, through its subsidiary RCI Entertainment (Media Holdings), Inc. has owned ED Publications since 1998. (RCII 10-K and 10-KSB Reports for 2008-2009, "Recent Media Acquisitions" Sections; RCII 10-K and 10-KSB Reports for 2010-2012, "Business Activities- Media Group" Section; Don Waitt, "*Publisher's Note: Staying with the family*," CLUB BULLETIN (Nov. 2010) (discussing RCII's purchase of ED Publications and picturing Mr. Langan, Mr. Anakar, and Club Bulletin's publisher, Don Waitt).)

595. ED Publications publishes Exotic Dancer's Club Bulletin magazine and has at all times since at least April 2008. (See ED Publications Webpage, "Exotic Dancer Magazine Turns 20";[41] RCII 10-K and 10-KSB Reports from 2010-2012, "Business Activities- Media Group" Section; Don Waitt, "*Publisher's Note: Staying with the family*," CLUB BULLETIN (Nov. 2010).)

[41] Available at: http://www.edpublications.com/the-magazine/ed-turns-20, last accessed January 18, 2013.

596. Mr. Langan is the President of RCI Entertainment (Media Holdings), Inc. (See Tex. Sec. State filed corporate registration for RCI Entertainment (Media Holdings), Inc.[42])

597. Exotic Dancer's Club Bulletin magazine frequently publishes articles about employment cases alleging misclassification of entertainers. (See e.g., Clyde DeWitt, "*Why everyone should be concerned about the dancer class action lawsuits in California*," CLUB BULLETIN, pp. 92-94 (Sept. 2009) ("The potential of damages in these cases is dramatic.... Run the numbers for one hypothetical dancer who works five shifts a week.... On the numbers, the entertainers will own the owners' clubs—and isn't it supposed to be the other way around?"); Clyde DeWitt, "*Ten Legal items you need to address RIGHT NOW*," CLUB BULLETIN, pp. 24-26 (Mar. 2011) ("With all of the dancer class action lawsuits going on around the country regarding their employment classification status, this obviously is a hot topic. Your 2005 stage rental agreement, therefore, is likely to be outdated.... Please consult your attorney on this critical issue."); Bradley J. Shafer, "*Dancer class action suits....*," CLUB BULLETIN, pp. 16-18 (Sept. 2010); "*Expo Legal Panel 1: Upon Further Review . . . Legal tips for your staff*," CLUB BULLETIN, pp. 32-34 (Jan. 2010).)

598. ED Publications also holds an annual convention in Las Vegas referred to as "the Expo" for members of the industry. (See "*About the Expo*," ED Publications Website[43] ("The Annual Gentlemen's Club Owners EXPO is the only national convention and tradeshow for the multi-billion-dollar adult nightclub industry, and is produced by ED Publications, the industry's trade magazine for the past 20 years.").)

599. In August of 2008, Mr. Langan invited all the general and regional managers, "and even some secondary managers" to the Expo. (See Langan 10/7/09 Dep. at 106-108.)

[42] See Aff. of Heather J. O'Neil.
[43] Available at: http://www.edpublications.com/expo, last accessed: January 17, 2013.

600. Mr. Sistrunk was named general manager of the year in 2009 at the Expo. (Sistrunk Dep. at 176.)

601. The 2009 Expo featured a legal panel that Club Bulletin advertised would address the following: "What are the huge legal developments that you must know regarding the dancers' status as independent contractors? [T]hese industry attorneys… will each address one of these four topics, and will explain how a club owner or GM can make sure they are handled properly." (CLUB BULLETIN, p. 38 (Sept. 2009).)

602. In fact, at the 2009 Expo, entertainer misclassification cases were discussed, and the moderator "reiterated the importance of clubs having current contracts with their entertainers and explained that there are protections that can be built into such contracts to protect against class actions." ("*Expo Legal Panel 1: Upon Further Review . . . Legal tips for your staff,*" CLUB BULLETIN, p. 34 (Jan. 2010).)

603. Legal issues facing the adult entertainment industry are frequently addressed at the Expo. (CLUB BULLETIN, pp. 32-33, 100 (Oct./Nov. 2008); CLUB BULLETIN, Expo Agenda, pp. 31, 38 (Sept. 2009); CLUB BULLETIN, Expo Agenda, p. 21 (Sept. 2010); CLUB BULLETIN, Expo Agenda, p. 28 (Sept. 2011); CLUB BULLETIN, Expo Agenda, p. 32 (Sept. 2012).)

Date: February 15, 2013

NICHOLS KASTER, PLLP

s/Anna P. Prakash
Michele R. Fisher (MF 4600)
Steven Andrew Smith, MN Bar No. 260836
(*admitted pro hac vice*)
E. Michelle Drake, MN Bar No. 0387366
(*admitted pro hac vice*)
Anna P. Prakash, MN Bar No. 0351362
(*admitted pro hac vice*)
4600 IDS Center, 80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
ATTORNEYS FOR PLAINTIFFS

---

FINES COUNTED, *supra* ¶ 230:

[i] Includes fines listed in Club Trax as "[date] NO SHOW THUR," "24 HR NO SHOW [date]," "called in too late, no show [date]," "CALLED TOO LATE, NO SHOW," "cNO SHOW-FRI-4/10c," "DID NOT SHOW UP FOR WORK," "N/S MON-[date]," "N/S SAT-[date]," "N/S WEDN.-SWITCHED&CANCEL," "NO HOW [date]," "NO SHO SAT [date]," "NO SHOW," "NO SHOW [date]," "NO SHOW - [date]," "NO SHOW - [date]- KEN," "NO SHOW - FRI [date]," "NO SHOW - SAT [date]," "NO SHOW - SUN [date]," "NO SHOW THUR-[date]," "no show [date]," "NO SHOW [date] – ED," "NO SHOW [date] – KEN," "no show [date] - per ken," "NO SHOW [date] & [date]," "NO SHOW [date] FRI," "NO SHOW [date] FRI.," "NO SHOW [date] MON," "NO SHOW [date] MONDAY," "NO SHOW [date] SAT," "no show [date] saturday," "NO SHOW [date] SUN," "NO SHOW [date] SUNDAY," "NO SHOW [date] THUR," "NO SHOW [date] TUE," "NO SHOW [date] WED," "no show [date], no excuses," "NO SHOW [date]/SAT," "NO SHOW [date]/SUN," "NO SHOW [date]/THUR," "NO SHOW [date]-FRI," "NO SHOW [date]MON," "no show -[date]-mon," "no show [date]-needs mke up 4th July," "NO SHOW [date]-THUR," "no show [date]tuesday," "NO SHOW [date]WEDN," "NO SHOW 100," "NO SHOW 102/08," "NO SHOW 3/190," "NO SHOW 4/7/20009," "NO SHOW 8\05," "NO SHOW ADJ. FOR SUN," "NO SHOW DY SHIFT-[date]," "no show fri [date]," "no show friday [date]," "NO SHOW FRIDAY, [date]," "NO SHOW MEETING [date]," "NO SHOW MON [date]," "NO SHOW MON. [date]," "NO SHOW MON-[date]," "NO SHOW MOND [date]," "NO SHOW MOND. [date]," "NO SHOW MOND-[date]," "NO SHOW MONDA-[date]," "NO SHOW MONDAY [date]," "NO SHOW ON [date]," "NO SHOW ON [date] & [date]," "No show on [date].," "No Show On Monday.," "NO SHOW RMVD-DAVID-[date]," "NO SHOW SAT [date]," "NO SHOW SAT. [date]," "NO SHOW SAT-[date]," "NO SHOW -SAT-[date]," "NO SHOW- SAT-[date]," "no show saturay [date]," "NO SHOW SATURDAY [date]," "NO SHOW SUN [date]," "NO SHOW SUN, [date]," "NO SHOW SUN. [date]," "NO SHOW SUN-[date]," "NO SHOW -SUN-[date]," "NO SHOW SUNDAY [date]," "NO SHOW THU [date]," "NO SHOW THU-[date]," "NO SHOW THUR [date]," "NO SHOW THUR-[date]," "NO SHOW THUR2/28," "NO SHOW THURS [date]," "NO SHOW THURSDAY [date]," "NO SHOW TUE [date]," "NO SHOW TUE [date]-ADJUST," "NO SHOW TUES [date]," "no show tues. [date]," "NO SHOW -TUES-[date]," "NO SHOW TUESDAY [date]," "NO SHOW WED [date]," "NO SHOW WED. [date]," "NO SHOW WED-[date]," "NO SHOW

WEDN [date]," "NO SHOW -WEDN. [date]," "NO SHOW WEDN-[date]," "NO SHOW WEDNESDAY [date]," "NO SHOW[date]," "NO SHOW-[date]," "NO SHOW-[date] CORRECT," "NO SHOW[date] MON," "NO SHOW-[date]-FRI," "NO SHOW-[date]-FRIDAY," "NO SHOW-[date]-MON," "NO SHOW-[date]-PER MELINDA," "NO SHOW-[date]-SAT," "NO SHOW-[date]-SUN," "NO SHOW--[date]-SUN," "NO SHOW-[date]-THURS," "NO SHOW-[date]-TUES," "NO SHOW-[date]-WED," "NO SHOW=FRI-[date]," "NO SHOW-FRI-[date]," "NO SHOW-FRIDAY-[date]," "no showm [date]," "NO SHOW-MON-[date]," "NO SHOW-SAT.-[date]," "NO SHOW-SAT-[date]," "NO SHOW-SAT-[date]-SAT," "NO SHOW-SUN*-[date]," "NO SHOW-SUN-[date]," "no show-sun-[date]-sun," "NO SHOW-SUN-4/5/09c," "NO SHOW-SUNDAY-[date]," "NO SHOW-THURS-[date]," "NO SHOW-TUES-[date]," "NO SHOW-WED-[date]," "NO SHW-PHILLY-[date]-SHAUN," "NO SUN [date]," "noNO SHOW [date]," "NOSHOW [date]," "NO-SHOW FRI [date]," "NO-SHOW FRI 02/20//09," "NO-SHOW MON [date]," "NO-SHOW SAT [date]," "NO-SHOW SUN [date]," "NOSHOW-FRI-[date]," "NOSHOW-SUN-[date]," "NOSHOW-TUES-[date]," "PER ED - NO SHOW [date]," "per ken - no show [date]," "SAT NO SHOW IS $100," "MISSED WORK," "missed work 06/14/06," and "MISSED WORK SUN"

[ii] Includes fines listed in Club Trax as "LATE FOR SHIFT," "LATE FOR SHIFT - 1/20/09," "LATE FOR SHIFT - 11AM STEVEN," "LATE FOR SHIFT - 4:00 PM," "LATE FOR SHIFT – STEVE," "LATE FOR SHIFT – STEVEN," "LATE FOR SHIFT 01/02/09," "LATE FOR SHIFT 01/06/09," "LATE FOR SHIFT 01/09/09," "LATE FOR SHIFT 1/16/09," "LATE FOR SHIFT 1/19/09," "LATE FOR SHIFT 10/9/09," "LATE FOR SHIFT- 11 AM STEVE," "LATE FOR SHIFT -11:00 AM," "LATE FOR SHIFT 11AM," "LATE FOR SHIFT 5/29/2009," "LATE FOR SHIFT 9/10/09," "LATE FOR SHIFT 9/23/09," "LATE FOR SHIFT- STEVEN," and "LATE FOR SHIFT-8/12 WED"

[iii] Includes fines listed in Club Trax as "AS PER KEN FOR MOVING A GUEST [date]," "FOR MOVING A GUEST PER KEN," "FOR MOVING GUEST [date]," "MOVE CUST TBL [number] -> [number]," "MOVE CUST TBL[number] --> TBL[number] [time]," "MOVE CUSTOMER TBL [number] -> [number]," "MOVE GUEST - TBL [number] -> TBL [number]," "MOVE GUEST [number]- [number] / [time]," "MOVE GUEST [number]-[number] [time]," "MOVE GUEST [number]-[number] [time] [date]," "MOVE GUEST [number]-[number]/ [time]," "MOVE GUEST [time] TBL [number]->[number]," "MOVE GUEST FROM TBL [number]--> [number]," "MOVE GUEST T[number] - T[number]," "MOVE GUEST T[number] - T[number] [time]," "MOVE GUEST TBL [number] -> [number]," "MOVE GUEST TBL [number] -> TBL [number]," "MOVE GUEST TBL [number]->[number] [time]," "Moved a 2nd customer – SA," "Moved a customer," "Moved a customer – SA," "Moved a customer - SA.," "Moved a customer [date] – SA," "Moved a customer to the side – SA," "Moved a Customer to the Wall for a Dance.," "MOVED A GUEST 2ND TIME [date]," "MOVED A GUEST-[date] KEN," "MOVED A GUEST-PER KEN [time]," "Moved another customer to back of room.," "MOVED COSTUMER," "MOVED CUSTOMER," "MOVED CUSTOMER – KEN," "MOVED CUSTOMER – STEVE," "MOVED CUSTOMER [time]," "MOVED CUSTOMER AS PER KEN," "MOVED CUSTOMER PER STEVE," "Moved customer to side of room.," "Moved customer to side wall. As per Steve.," "Moved customer to the back of the room.," "Moved customer. Steve," "MOVED GST T[number]-T[number] 1050P PER STEVEN," "MOVED GUEST," "MOVED GUEST – KEN," "MOVED GUEST - T[number] - TO T[number] SD," "MOVED GUEST @[time]-SHAUN," "MOVED GUEST [date]," "MOVED GUEST [number]-[number] / [time]," "MOVED GUEST 2ND TIME – KEN," "MOVED GUEST T [number] - [number]," "MOVED GUEST T [number] – VIP," "MOVED GUEST T [number]- T[number] [time]," "MOVED GUEST T.- [number] TO T- [number]," "MOVED GUEST T[number] - T[number," "MOVED GUEST T[number] - T-[number] [time]," "MOVED GUEST T[number] - T-[number] SD.," "MOVED GUEST T-[number] T-[number] [time]," "MOVED GUEST T[number] TO T[number]," "MOVED GUEST T[number] TO T-[number],"

"MOVED GUEST T-[number] TO T[number]," "MOVED GUEST T-[number] TO T-[number]," "MOVED GUEST T-[number] TO T-[number] SD," "MOVED GUEST T-[number]TO T-[number]," "MOVED GUEST T[number]TO VIP," "MOVED GUEST TBL [number] - TBL [number]," "MOVED GUEST TBL [number] TO [number]," "MOVED GUEST TWICE – KEN," "MOVED GUEST-[date]-KEN-[time]," "MOVED TWO GUESTS – KEN," "MOVING A CUSTOMER," "MOVING A CUSTOMER – KEN," "MOVING A GUEST," "moving a guest – david," "MOVING A GUEST – KEN," "MOVING A GUEST - PER KEN," "MOVING A GUEST @ [time]-KEN," "MOVING A GUEST TWICE," "MOVING A GUEST-STEVEN," "MOVING COSTUMER," "MOVING CUSTOMER – KEN," "MOVING CUSTOMER [time]," "MOVING CUSTOMER TBL [number]-->[number]," "Moving customer to back.," "MOVING GST-[date]-[time]-KEN," "MOVING GUEST [date]," "MOVING GUEST [date] [time]," "MOVING GUEST [time] [date]," "MOVING GUEST -> TBL [number]," "MOVING GUEST 2ND FLR," "MOVING GUEST FRI [date]," "MOVING GUEST FRIDAY [date]," "MOVING GUEST FRM TBL [number]->[number]," "MOVING GUEST FROM TBL. [number]-[number]," "MOVING GUEST PER KEN," "MOVING GUEST SAT [date]," "MOVING GUEST T [number] TO T [number]," "MOVING GUEST T[number] PER STEVEN [time] [date]," "MOVING GUEST T[number]- T[number]," "MOVING GUEST TBL [number]->[number]," "MOVING GUEST TBL.[number] - TBL.[number]," "MOVING GUEST TUES [date]," "MOVING GUEST[time] [date]," "MOVING GUEST-[time] PER KEN," "MOVING GUEST-[time]-KEN," "MOVING GUEST-SHAUN-[date]," "MV'D Guest-T[number]-T[number]-[time]-[date]," "MVE GST-[time]-2ND FLR-KEN," "MVG GST TBL [number]->[number]-STEVEN," "MVG GUST T[number]-T[number]-[time]-[date]," "MVING GST TBL [number] TO [number]-FRED," "PER KEN - MOVED CUSTOMER," "PER KEN MOVED CUSTOMER," "per ken- moved guest twice," and "REPEAT, MOVE A GUEST"

[iv] Includes fines listed in Club Trax as "Fine for missing pedistal [sic] stage, Steve," "MISS STAGE PERFORMANCE 3 TIMES AS PER ED," "MISSED MN STGE 6/28/SUN PER FREDDIE," "Missed Pedastal [sic] Stage," "MISSED PEDESTAL," "MISSED PEDISTEL," "MISSED STAGE," "MISSED STAGE – KEN," "MISSED STAGE @ 10:35-KEN," "MISSED STAGE @ 11:55PM-TITO," "MISSED STAGE @ 11PM-SHAUN," "MISSED STAGE @ 8:35-TITO," "MISSED STAGE @10:10PM," "MISSED STAGE 1:10AM-TITO," "missed stage 6/13," "MISSED STAGE 8:05OM-SHAUN," "MISSED STAGE AT 1:20-TITO," "MISSED STAGE PER KEN," "missed stage twice, per ken," "MISSED STAGE TWICE-1/17," "MISSED STAGE-02/27," "MISSED STAGE-10/20," "MISSED STAGE-12AM-KEN," "MISSED STAGE-3/20-TITO," "MISSED STAGE-3/7-KEN," "MISSED STAGE-3:15AM," "MISSED STAGE-AS PER KEN," "MISSED STAGE-PER KEN," "MISSED STAGE-PER SHAUN," "MISSED STAGE-PER TITO-1/10," "MISSED STAGE-SHAUN," "MISSED STGE-11:09PM-12/30," "MISSING MAIN STAGE," "MISSING STAGE," "MISSING STAGE – FREDDIE," "MISSING STAGE – KEN," "MISSING STAGE - PER KEN," "MISSING STAGE 11/08," "MISSING STAGE 11/09," "MISSING STAGE 12/01," "MISSING STAGE 12/20/07," "MISSING STAGE 12/5," "MISSING STAGE 2/29," "MISSING STAGE 3/28," "MISSING STAGE 3:02 PM 7/17/09," "MISSING STAGE 7/12/07," "MISSING STAGE 7:15PM," "MISSING STAGE 7:45PM-TITO," "MISSING STAGE 8/25/07," "MISSING STAGE 9/15/07," "MISSING STAGE 9/8/07," "MISSING STAGE AS PER SHAUN," "MISSING STAGE FRI 12/14/07," "MISSING STAGE FRI 12/21/07," "MISSING STAGE FRI. 12/7/07," "MISSING STAGE FRIDAY 1/11/08," "MISSING STAGE MON. 11/26/07," "MISSING STAGE SAT 2/2/08," "MISSING STAGE SAT. 10/27/07," "MISSING STAGE –STEVEN," "MISSING STAGE THURS 11/1/07," "MISSING STAGE-TITO-8PM," "MSD STGE-12AM-3/4-TITO," "MSNG STGE-TITO-1:20AM," "PER ED - MISS STAGE," and "per ken - miss stage"

[v] Includes fines listed in Club Trax as "AS PER KEN 3/21," "by ken," "PER KEN," "CHARGE PER

KEN," "CHARGE PER KEN DEDUCTED FROM CREDIT," "PER KEN – CHARGE," and "PER KEN CHARGE 6/10"

[vi] Includes fines listed in Club Trax as "MISD 1ST SNG-11:34PM-4/18," "MISD 1ST SNG-3:10AM-5/17/08," "MISD 1ST SONG-11:13PM-KEN," "MIS'D SONG-1:45AM-BRANDON," "MISS FIRST SONG 8:05PM-KEN," "MISSED 1ST SONG @ 11:50," "MISSED 1ST SONG @11PM-KEN," "MISSED 1ST SONG 3/28," "Missed 1st song -4/25," "MISSED 1ST SONG AS PER KEN 3/27," "MISSED 1ST SONG PER KEN," "MISSED 1ST SONG-12:06AM-5/18," "MISSED 1ST SONG-DAVID," "MISSED A SONG @ 12:45-DAVID," "MISSED A SONG @ 12-10 SHAUN," "MISSED A SONG @ 6:30PM," "MISSED A SONG @ 9:30PM," "MISSED A SONG @1:05-KEN," "MISSED A SONG @11PM-DAVID," "MISSED A SONG @12:30-KEN," "MISSED A SONG @7-50PM," "MISSED A SONG@7:30PM- KEN," "MISSED A SONG@9:20PM-DAVID," "MISSED A SONG-9:45-DAVID," "MISSED A SONG-DAVID," "MISSED A SONG-KEN," "MISSED A SONG-PEDESTAL," "MISSED SONG - 6:10 PM 5/9/08," "MISSED SONG @ 11:18PM-TITO," "MISSED SONG ON STAGE-KEN," "MISSED SONG/STAGE-12:19AM," "MISSED SONG-10/21-3:25AM," "MISSED SONG-TITO," "MISSING 1ST SONG 12/4," "MISSING FIRST STAGE SONG," "MISSING SONG 7:50 PM 6/3/08," "MSD 1ST SNG-KEN-6/23-12:38AM," "MSD 1ST SONG-11:13PM-KEN," "MSD 2 SNGS-9:15PM-PER SEAN," and "MSD SNG-7/25-12:09AM-DAVID"

[vii] Includes fines listed in Club Trax as "AS PER DAVID-MSD SET-3/21," "MIS'D SET-10:30PM-SHAUN," "MISSE A SET @12:20PM-KEN," "MISSED 2 SETS @ 11PM-SHAUN," "MISSED A SET @ 1:10AM-TITO," "MISSED A SET @ 1:30," "MISSED A SET @12:15-SHAUN," "MISSED A SET @2:20-DAVID," "MISSED A SET @3:20-SHAUN," "MISSED A SET @9:30PM," "MISSED A SET@12:40PM-SHAUN," "MISSED A SET@12:55-DAVID," "MISSED A SET-1:30AM-SHAUN," "MISSED A SET-2:44AM-SHAUN," "MISSED A SET-DAVID," "MISSED A SET-PER KEN," "MISSED A SET-PER KEN-9:50PM," "MISSED SET CORRECTION," "MISSED SET-10:35PM-11/15-TITO," "MISSED SET-12:00PM-SHAUN," "MISSED SET-7/25/08," "MISSED SET-9/27-FRED-1:24AM," "MISSING A SET -PER TITO," "MISSING A SET-PER KEN," "MISSING ENTIRE SET," "MISSING HALF SET - FRI 2/8/08," "MISSING PEDESTAL SET," "MISSING SET 7:30 PM SHAUN," "MISSING SET AS PER SD.," "MISSING SET-3/4-KEN," "MISSING SET5:00 PM – STEVE," "MISSING SET-8/19-KEN-1:05AM," "MISSING SET-8/26-PER SHAUN," "MISSING STAGE SET 5:10PM," "MSD SET 12:00PM AS P DAVID," and "MSD SET-10/14-1:55AM-SHAUN"

[viii] Includes fines listed in Club Trax as "CHEW GUM-KEN," "CHEWING GUM - KEN - 10/21/09," "CHEWING GUM 10:19 PM 10/6/," "CHEWING GUM 10:32 PM 10/6," "CHEWING GUM 5:25 PM 10/1," "CHEWING GUM 5:37 PM 10/1," "CHEWING GUM AS PER KEN," "CHEWING GUM ON MAIN ST-KEN," "CHEWING GUM PER KEN," "CHEWING GUM PER KEN-10/28," "CHEWING GUM/PEDESTAL STG," "CHEWING GUM-10/16," "CHEWING GUM-3/11-KEN," "CHEWING GUM-6/23-KEN," "CHEWING GUM-KEN," "CHEWING GUM-KEN-3/11-KEN," "CHEWING GUM-KEN-3/13," "CHEWING GUM-KEN-3/3/09," "CHEWING GUM-KEN-8/14," "CHEWING GUM-PER KEN," "CHEWING GUM-PER KEN-6/18," "chewing gum-tito-1:21am," "CHEWING GUM-TITO-10/13," and "CHWING GUM-1:39AM-BLCY STG"

[ix] Includes fines listed in Club Trax as "AFTER 11," "AFTER 11PM," "CAME IN AFTER 11," "CAME IN AFTER 11 PM," "HERE AFTER 11PM," "CAME AT 11;02," "CLOCKED IN @ 11:20," "2/28/12 CLOCKED IN AFTER 11P," "CLOCK IN AFTER 11 PM," "CLOCKED IN AFTER 11," "CLOCKED IN AFTER 11PM 3/21," "CLOCKED IN AFTER 11PM-1/14," and "got here at 11:45-10/5"

[x] Includes fines listed in Club Trax as "LATE 4 STAGE @ 1:15-SHAUN," "LATE 4 STAGE @ 2:10-

PER KEN," "LATE FOR STAGE," "late for stage – tito," "LATE FOR STAGE 1/3/ PER TITO," "LATE FOR STAGE 9/22/07," "LATE FOR STAGE PER TITO," "LATE FOR STAGE SAT 11/24/07," "LATE FOR STAGE@11:25-SHAUN," "LATE FOR STAGE-02/28," "LATE FOR STAGE-1/31 PER TITO," "LATE FOR STAGE-2/12," "LATE FOR STAGE-2/6/09-TITO," "LATE FOR STAGE-2AM-TITO," "LATE FOR STAGE-3/13," "LATE FOR STAGE-8/19," "late to stage – ken," and "LTE FOR STAGE-11:55-TITO"

[xi] Includes fines listed in Club Trax as "AS PER STEVE," "PER STEVEN," and "STEVE"

[xii] Includes fines listed in Club Trax as "CAME AT 7PM. DIDNT CLOCK IN," "FGT TO CLK IN AFTER 11PM," "FORGOT TO CLCOK IN-10/12," "FORGOT TO CLOCK IN," "FORGOT TO CLOCK IN-1/25," "FORGOT TO CLOCK IN-10/10," "FORGOT TO CLOCK IN-3/21," "FORGOT TO CLOCK IN-4/27," "forgot to clock in-5/18," "FORGOT TO CLOCK IN-9/26," "NEVER CLOCKED IN 9/30 – KEN," and "NEVER CLOCKED IN, 12/1"

[xiii] Includes fines listed in Club Trax as "DID NOT STAY FOR 8 HOURS," "DID NOT WORK 8HR SHIFT," "DID NOT WORK 8HRS," "DID NOT WORK 8HRS SUNDAY," "DIDN'T STAY 8 HRS," "DIDNT WORK 8 HOUR SHIFT," "DIDNT WORK 8HRS. NO CREDIT," "LEFT B4 8HR SHIFT," "SUN DID NOT WORK 8HRS," and "SUN DIDNT WORK 8HRS"

[xiv] Includes fines listed in Club Trax as "IN AFTER 10 PM CLOCKED IN AFTER 12 PM," "CLOCKED IN AFTER 12," "CLOCKED IN AFTER 12AM," "CLOCKED IN AFTER 12-TITO," "CLOCKIN IN AFTER 12AM," "CAME IN AT 12:12AM," "CAME IN AT 12:30-PER TITO," "CLCOKED IN AT 12:08PM-7/14," "clocked in @ 12:25-10/27," "clocked in at 12:16am-tito," "CLOCKED IN AT 12:23AM-4/9," "CLOCKED IN AT 12:58PM-4/16," "

[xv] Includes fines listed in Club Trax as "CLOCKED IN LATE," "CLOCKED IN LATE-12/9," "CLOCKED IN LATE-8/1," "CLOCKED IN LATE-8/16," "CLOCKED IN LATE-8/22," "CLOCKED IN LATE-8/23," "CLOCKED IN LATE-SHAUN," "CLOCKED IN LATE-TITO," "CLOCKIN IN AFTER 12AM," and "LOCKED IN LATE,"

[xvi] Includes fines listed in Club Trax as "DID NOT CHK IN WITH DJ-TITO," "DID NOT CK IN WITH DJ-9/27," "DID NOT CLK IN WITH DJ-10/22," "DID NOT CLOCK IN WITH DJ," "DIDN'T CHECK IN W/ DJ-TITO," "DIDN'T CK IN W/DJ-6/17," "DIDNT' CLOCK IN W/ DJ-TITO," "DIDNT CLOCK IN W/DJ-10/22," "NOT CHECKED IN WITH DJ," "NOT CHECKING IN W/ DJ," and "NOT CHECKING IN WITH DJ"

(Ex. 264; see also Charge Summaries.)