# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SABRINA HART and REKA FUREDI    )
on behalf of themselves and all       )     Case No. 09-CV-3043 PAE/RLE
others similarly situated, and the     )
New York Rule 23 Class,           )
                             )
                             )            **PLAINTIFFS'**
           Plaintiffs,       )   **MEMORANDUM OF LAW IN**
                             )        **OPPOSITION TO**
v.                         )  **DEFENDANTS' MOTION FOR**
                             )     **SUMMARY JUDGMENT**
                             )
RICK'S CABARET INTERNATIONAL, INC.,  )
RCI ENTERTAINMENT (NEW YORK) INC.,   )
PEREGRINE ENTERPRISES, INC.,       )
                             )
           Defendants.      )
_____)

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

PRELIMINARY ADMISSIBILITY ISSUES AND LEGAL STANDARD............................2

ARGUMENT...................................................................................................3

I.     ENTERTAINERS AT RICK'S NY ARE EMPLOYEES UNDER FLSA &
       NYLL. ................................................................................................3

       A. ENTERTAINERS ARE EMPLOYEES UNDER NYLL. ........................................4

          1.  Defendants misstate the standard for employee status under the
              NYLL. ............................................................................................4

          2.  Defendants exercised overwhelming control over entertainers at
              Rick's NY.......................................................................................5

              a. *Entertainers did not work at their own convenience and had fixed
                 schedules.* .................................................................................9

              b. *Employees can simultaneously work for two separate employers,
                 do not always receive fringe benefits; Defendants' payroll
                 arguments are circular.* ...............................................................10

              c. *Plaintiffs' tax filings are irrelevant.*.............................................11

       B. ENTERTAINERS ARE EMPLOYEES UNDER THE FLSA. ...........................12

          1.  Defendants exercised overwhelming control over entertainers at
              Rick's NY.......................................................................................12

          2.  Permanency and duration factor weighs in favor of employee status. ...........14

          3.  Defendants control entertainers' ability to profit or lose money. ...................15

          4.  Entertaining is not skilled work...............................................................16

          5.  Entertainers are integral to Rick's NY. .......................................................17

II.    THIS COURT MUST NOT ALLOW AN OFFSET AGAINST WAGES
       OWED.................................................................................................18

       A. DEFENDANTS APPLY INVALID REGULATORY LANGUAGE....................19

B. DEFENDANTS DID NOT INCLUDE THE MONEY IN GROSS
   RECEIPTS....................................................................................................20

C. MANDATORY CHARGES CAN BE CONSIDERED TIPS. ...............................21

D. THE MINIMUM WAGE MUST BE PAID ON A WEEKLY BASIS. .................22

E. THERE IS NOTHING UNJUST IN PLAINTIFFS' RECEIPT OF
   DAMAGES. ....................................................................................................23

F. ANY OFFSET CANNOT APPLY TO PLAINTIFFS' DEDUCTIONS
   CLAIMS.........................................................................................................23

III.   ALL THREE DEFENDANTS ARE EMPLOYERS. ....................................................23

A. DEFENDANTS' SELF-SERVING REPRESENTATIONS CANNOT BE
   CREDITED. ...................................................................................................23

B. DEFENDANTS ARE LIABLE AS AN INTEGRATED ENTERPRISE. ............26

C. RCII JOINTLY EMPLOYS ENTERTAINERS AT RICK'S NY. ......................28

CONCLUSION ...........................................................................................................30

iii

# TABLE OF AUTHORITIES

## CASES

Ansoumana v. Gristede's Operating Corp.,
255 F.Supp.2d 184 (S.D.N.Y. 2003).......................................................................15

Archie v. Grand Cent. P'ship, Inc.,
997 F. Supp. 504 (S.D.N.Y. 1998) ..........................................................................3

Auerbach v. Wells Fargo Home Mortg., Inc.,
No. 10 Civ. 2717(PAE), 2012 WL 1720620 (S.D.N.Y. May 16, 2012)........................................3

Baker v. Flint Eng'g & Const. Co.,
137 F.3d 1436 (10th Cir. 1998) ..............................................................................15

Barrentine v. Arkansas-Best Freight Sys., Inc.,
450 U.S. 728 (1981).............................................................................................13

Brock v. Mr. W. Fireworks, Inc.,
814 F.2d 1042 (5th Cir. 1987) ...............................................................................15

Brock v. Superior Care,
840 F.2d 1054 (2d Cir. 1988)..................................................................................14

Brown v. Kay,
No. 11 Civ. 7304(PAE), 2012 WL 408263 (S.D.N.Y. Feb. 9, 2012)..............................................3

Browning v. Ceva Freight, LLC,
No. 10-cv-5594, 2012 WL 3308112 (E.D.N.Y. Aug. 11, 2012) .............................5, 10, 12, 17, 18

Bynog v. Cipriani Group,
1 N.Y.3d 193 (2003) ...................................................................................4, 5, 8, 10, 12

Chan v. Sung Yue Tung Corp.,
No. 03 Civ. 6048(GEL), 2007 WL 313483 (S.D.N.Y. Feb. 1, 2007)...........................................20

Chan v. Triple 8 Palace, Inc.,
No. 03 Civ. 6048(GEL), 2006 WL 851749 (March 30, 2009) .........................................20, 21, 22

Chen v. TYT East Corp.,
No. 10 Civ. 5288 (PAC), 2012 WL 5871617 (S.D.N.Y. March 21, 2012) .............................26, 29

Christopher v. SmithKline Beecham, Corp.,
132 S.Ct. 2156 (2012)..............................................................................................3

Clincy v. Galardi South Enterprises,
808 F.Supp.2d 1326 (N.D. Ga. 2011) ...................................................................14, 16

Connor v. Pier Sixty, LLC,
29 Misc.3d 1120(A) (N.Y. Sup. 2010) .........................................................................5

Conzo v. City of New York,
667 F.Supp.2d 279 (S.D.N.Y. 2009)...........................................................................22

Deboissiere v. American Modification Agency,
No. 09-CV-2316 (JS)(MLO), 2010 WL 4340642 (Oct. 22, 2010)...............................12

Doe v. Cin-Lan,
No. 08-cv-12719, 2010 WL 726710 (E.D. Mich. Feb. 24, 2010)...........................21, 23

Edwards v. Publishers Circulation Fulfillment, Inc.,
268 F.R.D. 181 (S.D.N.Y. 2010) .................................................................................5

Fowler v. Scores Holding Co. Inc.,
677 F.Supp.2d 673 (S.D.N.Y. 2009)...........................................................................23

Gagen v. Kipany Productions,
27 A.D.3d 1042 (2006) ...............................................................................................12

Gayle v. Harry's Nurses Reg., Inc.,
CV-07-4672, 2009 WL 605790 (E.D.N.Y. March 9, 2009).........................................15

Godlewska v. HDA,
CV-03-3985, 2013 WL 25649 (E.D.N.Y. Jan. 2, 2013) ..............................................29

Gorey v. Manheim Servs. Corp.,
788 F.Supp.2d 200 (S.D.N.Y. 2011)......................................................................28, 29

Hai Ming Lu v. Jing Fong Rest., Inc.,
503 F.Supp.2d 706 (S.D.N.Y. 2007)...........................................................................20

Harrell v. Diamond A Entertainment, Inc.,
992 F. Supp. 1343 (M.D.Fla. 1997) ................................................................12, 14, 16

Hart v. Rick's Cabaret Int'l Inc.,
No. 09 Civ 3043, 2010 WL 5297221 (S.D.N.Y. Dec. 20, 2010).................................29

Herman v. RSR Sec. Servs. Ltd.,
172 F.3d 132 (2d Cir. 1999)...................................................................................26, 29

Hilborn v. Prime Time Club, Inc.,
11-cv-00197 (BMS) (E.D. Ark. July 12, 2012) ...................................................13, 14

Imars v. Contractors Mfg. Servs., Inc.,
No. 97-3543, 1998 WL 598778 (6th Cir. Aug. 24, 1998) ................................................4

In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.,
683 F.3d 462 (3d Cir. 2012)..........................................................................................28

In re Penthouse Exec. Club,
10-cv-1145 (S.D.N.Y. March 15, 2012) .........................................................................21

In re Stuckelman,
16 A.D.3d 882 (N.Y.A.D. 3 Dept. 2005) ........................................................................11

Jean-Louis v. Metro. Cable Commc'n, Inc.,
838 F.Supp.2d 111 (S.D.N.Y. 2011)..............................................................................29

Lanzetta v. Florio's Enters., Inc.,
No. Civ. 6181(DC), 2011 WL 253961 (S.D.N.Y. Jan. 25, 2011).....................................3

Madeira v. United Talmudical Acad.,
351 F.Supp.2d 162 (S.D.N.Y.2004)................................................................................2

Martin v. Circle C Invest., Inc.,
No. MO-91-CA-43, 1991 WL 338239 (W.D. Tex. Mar. 27, 1991) ................................14

Martin v. Priba Corp.,
No. 3:91-cv-2786-G, 1992 WL 486911 (N.D. Tex. Nov. 6, 1992) ...................11, 14, 15

Matson v. 7455, Inc.,
CV 98-788-HA, 2000 WL 1132110 (D. Or. Jan 14, 2000) .....................................13, 21

Matter of Double R Entm't, LLC (T/A Rick's Tally-Ho),
No. PR 08-156 (June 7, 2011) ......................................................................4, 7, 9, 11, 15

Matter of Ten's Cabaret (March 9, 2007)..........................................................................4

McFeeley v. Jackson Street Entm't, LLC,
12-cv-1019 (D. MD. Nov. 26, 2012) ........................................................................21, 23

Meng v. Ipanema Shoe Corp.,
73 F.Supp.2d 392 (S.D.N.Y. 1999) ...............................................................................28

Montoya v. S.C.C.P. Painting Contractors,
589 F.Supp.2d 569 (D.Md. 2008)..................................................................................14

Morangelli v. Chemed Corp.,
No. 10-Civ. 0876 (BMC), 2013 WL 432571 (E.D.N.Y. Feb. 4, 2013) .................................26, 28

Morse v. Mer Corp.,
No. 1:08-cv-1389, 2010 WL 2346334 (S.D. Ind. June 4, 2010) ...........................................14, 16

Nakahata v. New York-Presbyterian Healthcare Sys., Inc.,
11 Civ 6656, 2012 WL 3886555 (S.D.N.Y. Sept. 6, 2012)....................................................28, 29

Perfect Dental, PLLC v. Allstate Ins. Co.,
538 F.Supp.2d 543 (E.D.N.Y. 2007) ................................................................................................5

Pineda v. Masonry Const., Inc.,
831 F.Supp.2d 666 (S.D.N.Y. 2011)..............................................................................................27

Raskin v. Wyatt Co.,
125 F.3d 55 (2d Cir. 1997)................................................................................................................2

Reich v. ABC/York-Estes Corp.,
91 Civ. 6265(BM), 1997 WL 264379 (N.D.Ill. May 12, 1997) ....................................................22

Reich v. Circle C. Invest., Inc.,
998 F.2d 324 (5th Cir. 1993) .........................................................................................................14

Reich v. Priba Corp.,
890 F. Supp. 586 (N.D. Tex. 1995) ....................................................................................14, 20, 22

Reiseck v. Universal Commc'ns of Miami,
No. 06 Civ 0777 (TPG), 2012 WL 3642375 (S.D.N.Y. Aug. 23, 2012) ......................................26

Ruffin v. Entm't of the E. Panhandle,
3:11-CV-19, 2012 WL 1435674 (N.D. W. Va. April 25, 2012).............................................21, 23

Scruggs v. Skylink,
3:10-0789, 2011 WL 6026152 (S.D. W. Va. Dec. 2, 2011) .....................................................16, 18

Sheet Metal Workers' Nat. Pension Fund v. AUL Sheet Metal Works Inc.,
10 CIV 1371 KBF, 2012 WL 32237 (S.D.N.Y. Jan. 5, 2012).........................................................2

Talbert v. Am. Risk Ins. Co.,
405 F.App'x 848 (5th Cir. 2010) ...................................................................................................11

Terry v. Sapphire Gentleman's Club,
No. A602800 (D.Nev., Clark Cnty, Aug. 18, 2011) .................................................................5, 21

<u>Thompson v. Linda and A.,</u>
779 F.Supp.2d 139 (D.D.C. 2011) ........................................................................14

<u>Thornton v. Crazy Horse, Inc.,</u>
No. 3:06-cv-0025, 2012 WL 2175753 (D. Alaska June 14, 2012) ..........................22

<u>Vanskike v. Peters,</u>
974 F.2d 806 (7th Cir. 1992) ...............................................................................18

<u>Velu v. Velocity Exp., Inc.,</u>
666 F.Supp.2d 300 (E.D.N.Y. 2009) ................................................................5, 10

<u>Walling v. Helmerich & Payne,</u>
323 U.S. 37 (1944) ..............................................................................................18

<u>Wicaksono v. XYZ 48 Corp.,</u>
No. 10 Civ. 3635(LAK)(JCF), 2011 WL 2022644 (S.D.N.Y. May 2, 2011) ............19

<u>Wilk v. VIP Health Care Srvs.,</u>
10-Civ 5530, 2012 WL 560738 (E.D.N.Y. Feb. 21, 2012) ...................................29

<u>Wolman v. Catholic Health Sys. of Long Island,</u>
853 F.Supp.2d 290 (E.D.N.Y. 2012) ...................................................................27

<u>Zheng v. Liberty Apparel Co., Inc.,</u>
355 F. 3d 61 (2d Cir. 2003) ............................................................................29, 30

## **REGULATIONS**

29 C.F.R. § 776.4 ................................................................................................22

29 C.F.R. § 778.104 .............................................................................................22

## **RULES**

Fed. R. Civ. P. 56(c) ..............................................................................................2

## **STATUTES**

29 U.S.C. § 203(m) ..............................................................................................19

29 U.S.C. § 203(s)(1) ...........................................................................................24

29 U.S.C. § 213(a)(1) .............................................................................................3

Fair Labor Standards Act ............................................................................. *passim*

Minn. Stat. § 177.24(4) .................................................................................23

New York Labor Law ............................................................................ *passim*

## **OTHER AUTHORITIES**

155 Cong. Rec. S13253 (Dec. 15, 2009) (Sen. Kerry) ..................................18

*Employee Misclassification as Independent Contractors,*
United States Department of Labor .............................................................18

B.F. Skinner, *The Experimental Analyses of Behavior,*
AMERICAN SCIENTIST (1957) ........................................................................6

President Franklin D. Roosevelt, Democratic Party Primaries,
FIRESIDE CHAT (June 24, 1938) ....................................................................3

IRS Publication 529, Miscellaneous Deductions (2012) .............................12

Updating Regulations Issued Under the Fair Labor Standards Act; Final Rule,
76 Fed. Reg. 18839 (April 5, 2011) .............................................................20

## INTRODUCTION

While completely failing to address the overwhelming weight of authority holding that entertainers are employees, Defendants ask this Court to adhere to a rigid test for determining employee status that *no court* has endorsed. Defendants fail to acknowledge that this Court must examine Defendants' control over entertainers in light of the totality of the circumstances in order to determine classification under *both federal and New York law*. Defendants repeated efforts to identify various freedoms entertainers had (such as the ability to choose the color of the long dresses the club requires them to wear) to support their claim that entertainers were meaningfully independent fall flat. A caged bird is not free, even when its cage allows it to stretch its wings. While entertainers exercised a modicum of judgment, they were subject to a baseline level of control far exceeding that found in even traditional employment relationships. Here, when viewing the totality of the circumstances, it is plain that there is no meaningful independence. The entertainers at Rick's NY are employees.

To avoid the consequences of willfully misclassifying entertainers as independent contractors, Defendants also request an offset against wages owed. If granted, Defendants would not face any damages for failing to pay entertainers, would not have to pay payroll taxes on amounts that would nonetheless count as wages, and could continue to rely on entertainers' labor without having to spend a dime on actual wages or even make sure that the minimum wage is received on a weekly basis as required by law. Defendants would gain an unfair advantage in the marketplace by relying on their customers to pay employees, would never have to claim that money for tax purposes, and could continue to profit at their employees' expense. Entertainers would continue without a guaranteed wage or the benefits of employer-provided wages, such as social security savings. Defendants' offset theory is illegal, unsound, and should be rejected.

Finally, all three Defendants are employers. Defendants operate as one entity with agents of all three directing and participating in key operations—including control over entertainers—at Rick's NY. For all of these reasons, Defendants' motion should be denied in its entirety.

## PRELIMINARY ADMISSIBILITY ISSUES AND LEGAL STANDARD

The parties have briefed the standard for summary judgment. However, Defendant relies on evidence which is not appropriately considered. Evidence considered at summary judgment must be admissible. Fed. R. Civ. P. 56(c). Admissibility is appropriately resolved at this stage. Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997). The February 15, 2013 Declarations of Eric Langan, Ed Anakar, and Steven DeAngelo are inadmissible because they are self-serving and conclusory, submitted solely for the purpose of creating disputes that do not exist, and are contradicted by the record—including Defendants' own testimony. (See Pl.'s Resp. ¶¶ 41, 92, 106, 145, 213, 234, 246, 248, 251, 261-263; see also pp. 24-28, *infra*.) The declarations are inadmissible, and this Court should not consider them. See Sheet Metal Workers' Nat. Pension Fund v. AUL Sheet Metal Works Inc., 10 CIV. 1371 KBF, 2012 WL 32237 (S.D.N.Y. Jan. 5, 2012) ("It is well-settled that conclusory and self-serving allegations set forth without evidentiary support are insufficient to create a genuine issue of fact."); accord Madeira v. United Talmudical Acad., 351 F.Supp.2d 162, 167 (S.D.N.Y. 2004) (The court "could not grant summary judgment" based solely on "the self-serving affidavit of an officer of [defendant].").[1]

Regardless, when viewing the record and parties' respective statements of fact, the inferences allowed are those that could "***rationally***" be drawn and those that "***a reasonable jury***

---

[1] Nor should the Court consider the numerous immaterial facts or facts that rely on speculation cited by Defendants, addressed in Plaintiffs' response to Defendants' 56.1 Statement. Plaintiffs here incorporate: Plaintiffs' 56.1 Statement ("Pl.'s 56.1") dated February 15 and submitted on February 20; Plaintiffs' Response to Defendants' 56.1 Statement ("Pl.'s Resp."); the parties' Stipulated Facts ("Stip.") submitted on February 1, 2013; and Plaintiffs' Memorandum in Support of their Motion for Summary Judgment ("Plaintiffs' Motion" or "Pl.'s SJ Mem.") dated February 15 and submitted on February 20.

*could*" decide in the non-movant's favor. Auerbach v. Wells Fargo Home Mortg., Inc., No. 10 Civ. 2717(PAE), 2012 WL 1720620, *2-3 (S.D.N.Y. May 16, 2012); Brown v. Kay, No. 11 Civ. 7304(PAE), 2012 WL 408263, *9 (S.D.N.Y. Feb. 9, 2012). The Declarations of Mr. Langan, Mr. Anakar, and Mr. DeAngelo contain statements that are simply irrational in light of the record in this case, which includes earlier admissions by Defendants and their agents. Indeed, any reasonable jury would conclude that Defendants controlled entertainers' work at Rick's NY and that agents of all three Defendants were intimately involved in that control.

## ARGUMENT

### I.   ENTERTAINERS AT RICK'S NY ARE EMPLOYEES UNDER FLSA & NYLL.

"Except perhaps for the Social Security Act, [the Fair Labor Standards Act] is the most far-reaching, the most far-sighted program for the benefit of workers ever adopted here or in any other country." President Franklin Roosevelt, FIRESIDE CHAT (June 24, 1938).[2] The New York Labor Law ("NYLL") is also "liberally construed" to allow as many workers as possible to enjoy its benefits. Archie v. Grand Cent. P'ship, Inc., 997 F. Supp. 504, 535 (S.D.N.Y. 1998) (citations omitted). These statutes cannot be subverted or disregarded merely because an otherwise protected employee earned more than others might,[3] voluntarily worked for free, or consented in any way to working for less than the minimum wage. See Lanzetta v. Florio's Enters., Inc., No. Civ. 6181(DC), 2011 WL 253961 (S.D.N.Y. Jan. 25, 2011) (awarding minimum wages under Fair Labor Standards Act ("FLSA") and NYLL where plaintiff allegedly earned more than 10 times the minimum wage in tips and "testified that defendants 'told me no

---

[2] Attached as Ex. 269 to the Affidavit of Anna P. Prakash, as are all exhibits cited here and not previously submitted.
[3] Defendants point to the Supreme Court's decision in Christopher v. SmithKline Beecham, Corp. to support their position. (Defs.' Mem. p. 2.) The opinion is inapposite. SmithKline involved "outside salesman" as defined under 29 U.S.C. § 213(a)(1), who were thus entirely exempt from the FLSA's overtime requirements and who were paid directly by the defendants in that case. 132 S.Ct. 2156 (2012). Accordingly, the Court's passing comment that they were not the type of employees the Act was meant to protect made sense. Here, in contrast, there has been no determination that any exemption applies—indeed, no party here is even moving for summary judgment on an exemption defense—and the entertainers were paid by Defendants' customers, not Defendants.

[wages]. Just tips.'"); <u>Imars v. Contractors Mfg. Servs., Inc.</u>, No. 97-3543, 1998 WL 598778, *5 (6th Cir. Aug. 24, 1998) ("Even if employees freely *want* to work for below the minimum wage... even if their choices are moral and economically efficient - the FLSA does not allow this... [It] does not just purport to protect weakly-positioned employees.... It also prevents employers from contracting with more productive employees (who are...willing to contract away their FLSA rights) to the detriment of less productive ones.").

Against this statutory backdrop, the vast majority of courts to examine entertainers' employment status under the FLSA and/or state wage laws have held that the entertainers are employees of the clubs where they work. (<u>See</u> Pl.'s SJ Mem. pp. 3-4 (citing cases).) Additionally, the New York Department of Labor ("NY DOL") and its Industrial Board of Appeals have ruled that entertainers are employees under the NYLL. (<u>See</u> Pl.'s SJ Mem. pp. 3-4 (citing <u>Matter of Double R Entm't, LLC (T/A Rick's Tally-Ho)</u>, No. PR 08-156 (June 7, 2011) ("<u>Double R</u>"), p. 11 and <u>Matter of Ten's Cabaret</u> (March 9, 2007).)[4]  This Court should follow these decisions and hold that the entertainers at Rick's NY are employees.

## A. ENTERTAINERS ARE EMPLOYEES UNDER NYLL.

### 1. Defendants misstate the standard for employee status under the NYLL.

*If* the Court uses the common law test to determine employee status under the NYLL,[5] the Court should apply the test properly and not as articulated by Defendants. In describing the common law test, Defendants omit any mention of control and represent that the <u>Bynog</u> decision requires courts to apply "only" five exclusive factors. (Defs.' Mem. p. 7.) Neither <u>Bynog</u> nor any other case requires this. The <u>Bynog</u> court stated, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported

---

[4] The <u>Double R</u> and <u>Ten's Cabaret</u> decisions were previously submitted to the Court as Exs. 1-2 to the 2/15/13 Affidavit of Anna P. Prakash.
[5] The Court should use the economic realities, not common law test. (<u>See</u> Pl.'s SJ Mem. pp. 4-8.)

4

employer over the results produced or the means used to achieve the results." Bynog v. Cipriani Group, 1 N.Y.3d 193, 198 (2003); accord Edwards v. Publishers Circulation Fulfillment, Inc., 268 F.R.D. 181, 184 (S.D.N.Y. 2010) (describing control as the "critical determinant"); Velu v. Velocity Exp., Inc., 666 F.Supp.2d 300, 307 (E.D.N.Y. 2009) ("New York law focuses on the degree of control....").[6]   The Bynog court then went on to list five factors relevant to assessing control.  Id.  Nowhere did the Bynog court state that these factors were exclusive.  Nor have other courts.  For example, the Eastern District has described these factors as "additional" to other "nonexclusive factors" relevant to the control inquiry under the NYLL.  Perfect Dental, PLLC v. Allstate Ins. Co., 538 F.Supp.2d 543, 547 (E.D.N.Y 2007).  Others have described them as examples of what courts might consider.  See Browning v. Ceva Freight, LLC, No. 10-cv-5594, 2012 WL 3308112, *8 (E.D.N.Y. Aug. 11, 2012) ("factors *such as*") (emphasis added).  Courts agree the Bynog factors are non-exclusive.  "In effect, no single factor is determinative; instead New York courts consider the *totality of the circumstances*."  Perfect Dental, 538 F.Supp.2d at 548 (emphasis added); see also Connor v. Pier Sixty, LLC, 29 Misc.3d 1120(A), *1-2 (N.Y. Sup. 2010) (treating Bynog factors as nonexclusive, analyzing control, and denying motion to dismiss, noting that defendants "had the authority to send workers home for failing to follow instructions and/or for infractions of [defendants'] rules....").  (See also Pl.'s Mem. pp. 4-8.)  Here, the totality of the circumstances shows control in support of employee status.

### 2. Defendants exercised overwhelming control over entertainers at Rick's NY.

---

[6] Tellingly, Defendants ignore control for the purpose of determining *employee* status under the NYLL but acknowledge control in discussing the FLSA's and NYLL's identical tests for determining *employer* status. (Defs.' Mem. p. 13.) The centrality of control to the employment inquiry under both the NYLL and FLSA makes Defendants' reliance on the Nevada state court case of Terry v. Sapphire Gentleman's Club completely worthless. (Defs.' Mem. p. 7.)  In Terry, the court determined employee status using the test under Nevada's unemployment statute.  "The [Terry c]ourt note[d] that this represents a marked departure from the approach delineated in the federal FLSA standard, in which one single element – control – is frequently described as 'the most important factor.'" No. A602800, p. 12 (D.Nev., Clark Cnty, Aug. 18, 2011) (internal citations omitted).  Defendants did not attach the August 18 order to their brief; it is submitted here as Exhibit 270.

Defendants controlled entertainers' work in the numerous ways discussed in Plaintiffs' Motion. (Pl.'s Mem. pp. 8-19; Pl.'s 56.1 ¶¶ 11-326.)  Defendants' attempts to downplay control are belied by the record, including Defendants' own documents and admissions.

First, Defendants' arguments that they did not control, but merely "incentivized," entertainers through written guidelines or by charging higher house fees proves Plaintiffs' point. (Defs.' Mem. p. 18.)  Written rules and threats of discipline are ways to control behavior—even if the rules are not always enforced and the threats are not always carried out.  Defendants could have chosen to have no rules at all.  Defendants could have chosen to have a flat rate rather than "progressive" house fee schedule.  But they did not.  The threat of discipline for violating rules is a deterrent.  (See e.g., Pl.'s Resp. ¶¶ 55, 77, 79, 93, 96, 98, 100, 130 ("I was not fined. Because I was abiding by their rules."), 131.)  The knowledge that they will pay more for arriving later makes entertainers come to work earlier.  (Id. ¶ 98.)  The threat, without more, is sufficient to control behavior.  See *The Experimental Analyses of Behavior,*" B. F. SKINNER (1957) ("Much of what we do during the day is done not because of the positive reinforcements we receive but because of the aversive consequences we avoid.").[7]  The General Manager of Rick's NY has admitted that imposing these fines is a way of making entertainers conform to Defendants' rules:

> We ask that the entertainer follow the guidelines.  So if I ask repeatedly, and I talk with them, I will call down to the cage and ask them to place a fine so I get the entertainer's attention.  And then... I go down and I speak with her....  And then when we have the understanding, I remove the fine....  It goes to getting the attention of the entertainer....  When other means of communication fail, if whether written [posted notices] or verbal, then I have to put -- that I have to go that way for her to understand that this is not what we want here.

(Pl.'s 56.1 ¶ 231; see also Pl.'s 56.1 ¶ 225 (manager describing fines as a "necessary evil").)

Moreover, Defendants' testimony, the record of nearly *7,000* fines, and the numerous examples

---

[7] Reprinted in AMERICAN SCIENTIST. Available online: http://www.americanscientist.org/issues/id.14367,y.0,no., content.true,page.7,css.print/issue.aspx. (Ex. 271.)

cited by Plaintiffs show that the guidelines were not "effectively disregarded." (See e.g., Pl.'s Resp. ¶¶ 55; Pl.'s 56.1 ¶¶ 31, 230.) Plaintiffs do not dispute that each guideline was not always enforced; however, this is of no consequence. In virtually all workplaces with undisputed employees, employers do not always enforce every rule. Employers may be lenient in enforcing rules, or may grant more leniency to favored employees or when they determine not enforcing the rules otherwise suits the employer's interest. What matters is that on any given day whether an entertainer may be allowed to break one of Defendants' written rules or whether she will be disciplined for doing so is Defendants' decision. (See e.g., Pl.'s 56.1 ¶¶ 50-56, 59-68, 78-95, 230-231.) See Double R, p. 13 (discretion to enforce rules shows control under NYLL).

Second, Defendants effort to cast its rules as only stemming from concerns about safety and legality fails. Many restrictions on entertainers' performance had nothing to do with "ensur[ing] a safe and legal venue." (Defs.' Mem. p. 17.) For example, the club required entertainers to wear high heels when performing, as opposed to flats; perform in long dresses, as opposed to other attire; disrobe in a particular order; dance on stage to music chosen by Defendants; and dance on stage in a particular order. (Pl.'s 56.1 ¶¶ 117-122, 129-132, 152-186; see e.g., Pl.'s Resp. ¶ 116 "Oh yeah, [Rick's rules are] stylistic. I mean… like for example, you can't do floor work on stage at Rick's; you can't be on your knees or on the grounds for stage dancing. That has nothing to do with the rules of New York City; this has to do with them deciding that they don't like how that looks."); see also Pl.'s Resp. ¶ 58 (citing Anakar Dep. 93 ("I don't recall all of [the guidelines] having the local laws….").)[8]

Third, Defendants' own emails show management did "comment on, critique or review entertainers' performances." (Defs.' Mem. p. 17.) (Pl.'s 56.1 ¶ 180 (citing PER003866 ("Ed saw

---

[8] Tellingly, Defendants have not cited to a single vice law or ordinance. As to safety concerns, if entertainers were independent contractors, they would be able to take whatever risks they chose in order to maximize their income, such as performing pole tricks, which was not always allowed at Rick's NY. (Pl.'s 56.1 ¶ 175.)

her on stage and said it's time for her to go.")); see also Pl.'s 56.1 ¶ 209 (citing Jurman Dep. 149 ("Ken came up to me during the dance... he was, like, 'Get off your knees, you whore.'")).)

Fourth, performing personal dances and spending time with customers in rooms was a job requirement. There may not have been a written rule requiring it, but it was a clear expectation that entertainers' job duties encompassed giving lap dances to Defendants' customers and spending time in rooms. (Pl.'s 56.1 ¶¶ 187-209.) In fact, Defendants advertise to customers that the club has entertainers that will spend time in private rooms with them. (Pl.'s 56.1 ¶ 193 ("Your wife will have many ladies to choose from"); see Pl.'s Ex. 252.) Moreover, Defendants' managers and other agents required that entertainers be out of the dressing room, "working the floor" and Defendants' own emails and guidelines show that they instruct entertainers on how to offer dances to guests. (Pl.'s 56.1 ¶¶ 200-204 ("they must be able to say more than 'dance?' or would you like dance.'").) Defendants point to the example of Sabrina Hart spending time only with her future husband at the club. (Defs.' Mem. p. 17.) Ms. Hart's full testimony shows that management did, in fact, ask her to go in a private room with a customer and that, to appease management, Mr. Hart took her to a room. (Pl.'s Resp. ¶ 164; see also Pl.'s Resp. ¶ 123.) Further, when entertainers perform in rooms, that process is overseen by Defendants and their agents. (See Pl.'s 56.1 ¶¶ 191-197, 192 (citing email from Sistrunk to Anakar stating, "I have asked [VIP room hostess] in the past to take a greater role in managing the entertainers.").)

Despite all of the above, and with an intentionally myopic fixation on the factors listed in Bynog, Defendants still argue that the entertainers are independent contractors. Defendants are wrong. The facts of the case show pervasive control over entertainers' work. The factors of whether entertainers worked at their own convenience and had fixed schedules decidedly weigh in Plaintiffs' favor and the others do not tip the scales in Defendants' favor.

### a. *Entertainers did not work at their own convenience and had fixed schedules.*

Here, entertainers worked at Defendants' convenience, not their own. Plaintiffs do not dispute that entertainers could choose days to work within each week. (Defs.' Mem. pp. 9-10.) However, the days available to them were subject to Defendants' approval and requirements about working certain days were enforced at Defendants' discretion. (Pl.'s Resp. ¶¶ 77-79, 82-84.) Those who did not work when scheduled without first notifying Defendants or obtaining permission could be and were fined. (Id.; Pl.'s 56.1 ¶¶ 69-97.) While those facts are sufficient to show control, see e.g., Double R p. 13, it is even more devastating to Defendants' arguments against control that Defendants keep copious rows and columns of entertainers' schedules. (Pl.'s 56.1 ¶¶ 35-38, 60, 65 (citing Trapani Dep. Ex. 7).) The schedules may have partly been used to determine how many entertainers were working, but that was not the sole purpose. The schedule also informed the house mom whether Defendants' managers had approved deviations from the scheduling requirements. (Id.) Absent permission from management or the house mom to deviate, entertainers who did not abide by the schedule were subject to fines. (Id. ¶¶ 50-56, 59-68, 78-95, 230-231.) It is fatal to Defendants' argument that the stipulated point-of-sale records show nearly *6,000* instances of fines related to not working when scheduled. (Pl.'s 56.1 ¶ 230.) In reality, once entertainers were on the schedule, their schedule was fixed.[9] Further, there is simply no tenable argument that entertainers worked at their own convenience given the above (*supra*, pp. 5-8) and Defendants' requirements regarding shift lengths, clock out requirements, appearance, dancing on stage, "tip outs," mandatory meetings, and control over such things as whether entertainers chewed gum. (Pl.'s 56.1 ¶¶ 66-68, 114-186, 210-226, 233-268.)

---

[9] Defendants' example regarding a Plaintiff living out of state (Defs.' Mem. pp. 9-10) is incomplete. She had permission from Defendants to work a special schedule because of where she lived. (Pl.'s Resp. ¶ 109; see also Pl.'s 56.1 ¶¶ 55 (citing email from entertainer to Sistrunk asking whether she "can work on a less strict schedule."), 232 (citing Club Trax records of fines removed for reasons such as "called to cancel" or "dentist note").)

Defendants cite cases about delivery drivers in arguing that entertainers worked at their own convenience and did not have fixed schedules. The cases are entirely distinguishable. In Velu, the plaintiff delivery driver did not perform the service at issue at the defendants' facility, nor did he wear attire or operate under signage indicating his affiliation with the defendant. 666 F.Supp.2d at 303, 307 ("Plaintiffs uses his own equipment [including delivery van] for work, and only visits Defendants' premises when he must be paid."). This allowed him to "establish[] a direct working relationship with [clients]." Id. Thus, to the extent he had restrictions on work those were dictated by the clients, not defendants. Id. at 303, 308. Velu did not even inform the defendant when he received a call from a client arranging a delivery. Id. at 304, 307. In contrast, here, entertainers work on Defendants' premises and Defendants determine when the club is open, when entertainers will dance on stage, require them to conform their image to the club's specifications, and dictate scheduling requirements. (Pl.'s 56.1 ¶¶ 34-97, 114-186.) Further, unlike Velu who decided his own breaks and routes, entertainers are subject to the club's stage rotation and are allowed breaks as approved by the club. (Compare id. ¶¶ 156-171 with 666 F.Supp.2d at 303.) Browning presents facts very similar Velu. Additionally, here, as opposed to Browning, there are actual penalties for declining assignments, such as fines for missing stage. (Id. ¶¶ 151-186, 230.) In this regard, Browning supports Plaintiffs' Motion. 2012 WL 3308112, *11 ("[I]f the Defendants did penalize the Plaintiffs for refusing assignments, this could support a finding that the Plaintiffs were... treated like employees.").

> b. *Employees can simultaneously work for two separate employers, do not always receive fringe benefits; Defendants' payroll arguments are circular.*

As explained in Plaintiffs' Motion, the remaining Bynog factors cannot be determinative of the employment inquiry here. (Pl.'s SJ Mem. pp. 16-18.) A worker can have two employers

and still be an employee under the NYLL. Double R, pp. 7-8.[10] Moreover, there is no requirement that an employer offer its employees fringe benefits. Finally, if Plaintiffs had been on payroll, they would not have brought this suit. See generally Double R (finding employee status under the NYLL where entertainers were paid no wages).

### c. *Plaintiffs' tax filings are irrelevant.*

The notion that a worker's subjective self-characterization can control employment status is flawed. A barista at Starbucks could represent to the world she was in business for herself, but that would never make her an independent contractor under the NYLL. That said, to the extent this Court delves into the question of characterization, Plaintiffs' tax returns are of no value.

First, it was Defendants' choice to issue Forms 1099 to entertainers. (Pl.'s Resp. ¶ 142.) Entertainers had no choice in the matter. (Id. ("Rick's is still going to claiming that, yes, we're independent contractors. So, how can I change my taxes if the situation didn't change?").) See also In re Stuckelman, 16 A.D.3d 882 (N.Y.A.D. 3 Dept. 2005) (holding that legal secretary was employee for unemployment compensation purposes and stating, "that the law firm considered claimant to be an independent contractor and claimant deduced expenses on her federal tax return as if she were self-employed does not compel a contrary result.").

Second, nearly all the testimony shows ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[10] An exclusive work relationship strongly indicates employment; however, a nonexclusive one does not mean that the worker must be an independent contractor. In Talbert, cited by Defendants in the FLSA context, the court looked at numerous factors, not just the plaintiff's ability to work for other companies. Talbert v. Am. Risk Ins. Co., 405 F.App'x 848 (5th Cir. 2010). See also Martin v. Priba Corp., No. 3:91-cv-2786-G, 1992 WL 486911, *3 (N.D. Tex. Nov. 6, 1992) ("An ability to work at other establishments is not dispositive of the issue.").

██████████████████████████ )

Third, employees can "take advantage" of deductions for unreimbursed employee expenses on their taxes, too. See IRS Pub. 529.[11] ████████████████████████

████████████████████████████████████████████

██████████████████████████████████.

The cases cited by Defendants are distinguishable. In Browning, the plaintiff-drivers had their own corporations for which the defendants issued Forms 1099. For example, Plaintiff Andrew Huggins's 1099 was issued to "AAH Trucking, Inc." along with Mr. Huggins, and the court's opinion states that Huggins contracted with the defendant through that corporation. In contrast, here, there is no evidence that Plaintiffs operated actual businesses like the plaintiffs in Browning. (See e.g., Defs.' Supp. Ex. A (Forms 1099 issued to each Plaintiff individually).) Additionally, that the Bynog plaintiffs received Forms 1099 was relevant to their employment status only insofar as it showed the defendant at issue was not the entity exercising control through issuance of tax forms—another entity was. Bynog, 1 N.Y.3d at 199 (plaintiffs "were under the exclusive direction and control of [the entity] from whom the plaintiffs received federal tax form 1099."). Thus, Bynog, like the vast majority of cases cited herein, supports the conclusion that entertainers at Rick's NY are employees under the NYLL.[12]

## B. ENTERTAINERS ARE EMPLOYEES UNDER THE FLSA.

### 1. Defendants exercised overwhelming control over entertainers at Rick's NY.

Plaintiffs incorporate their previous discussion of control here. (Supra, pp. 5-11.) See also Harrell v. Diamond A Entertainment, Inc., 992 F. Supp. 1343, 1349 (M.D.Fla. 1997) ("The

---

[11] IRS publication discussing employees' ability to take deductions for unreimbursed job expenses, online at: http://www.irs.gov/publications/p529/ar02.html#en_US_2012_publink100026911. (Ex. 272.)

[12] Deboissiere v. American Modification Agency, No. 09-CV-2316 (JS)(MLO), 2010 WL 4340642 (Oct. 22, 2010), incorrectly applies Gagen v. Kipany Productions. The primary significance of returns signed under penalty of perjury in Gagen was that it showed plaintiff's earlier statements to be untrue. 27 A.D.3d 1042 (2006).

mere fact that [the club] has delegated a measure of discretion to its dancers does not necessarily mean that its dancers are elevated to the status of independent contractors. Indeed, one could say that the nature of a dancer's job requires some measure of discretion and flexibility.... An employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under the F.L.S.A., by granting [her] some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have [her] operate.") (internal citations, quotations omitted).

Defendants' citations to Matson v. 7455, Inc., CV 98-788-HA, 2000 WL 1132110 (D. Or. Jan 14, 2000) and Hilborn v. Prime Time Club, Inc., 11-cv-00197 (BMS) (E.D. Ark. July 12, 2012) do not undercut Plaintiffs' arguments. In Matson, the court erroneously concluded, "The written agreement that was signed by the plaintiff three different times... is the most telling indicator of her status as an independent contractor." 2000 WL 1132110, *3. However, the Supreme Court has unambiguously held parties cannot contract around the FLSA. Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 740 (1981). Matson is also distinguishable because, there, the only "house rule" relied on by the court in rejecting plaintiff's control argument was one concerning distance from the customer. In fact, the court described it as the Matson plaintiff's only particular objection to her treatment. 2000 WL 1132110, *2-4. Further, the Matson court could only cite to one singular instance of discipline for conduct unrelated to distance from the customer, and the opinion offered absolutely no reasoning or facts as to the club's actions or operations in analyzing the factor of profit and loss. Id. Here, in contrast, Defendants have many rules that have nothing to do with distance from the customer or purported attempts to avoid prostitution. (See supra, p. 7.) Additionally, the record is replete with examples of discipline in sharp contrast to the single example discussed in Matson. Id. The

13

Hilborn opinion is no more persuasive. Defendants cite it without bothering to note that the plaintiff never filed an opposition to the club's motion for summary judgment, which was filed *while* the case was stayed and *after* settlement had been reached. See Hilborn docket.[13]

Here, as in the majority of FLSA cases examining misclassification of entertainers, this factor favors employee status. See e.g., Clincy v. Galardi South Enterprises, 808 F.Supp.2d 1326 (N.D. Ga. 2011); Thompson v. Linda and A., 779 F.Supp.2d 139 (D.D.C. 2011); Morse v. Mer Corp., No. 1:08-cv-1389, 2010 WL 2346334 (S.D. Ind. June 4, 2010); Harrell, 992 F. Supp. 1343; Reich v. Circle C. Invest., Inc., 998 F.2d 324 (5th Cir. 1993); Reich v. Priba Corp., 890 F. Supp. 586 (N.D. Tex. 1995); Martin v. Priba Corp., 1992 WL 486911; Martin v. Circle C Invest., Inc., No. MO-91-CA-43, 1991 WL 338239 (W.D. Tex. Mar. 27, 1991).[14]

### 2. Permanency and duration factor weighs in favor of employee status.

This factor is to be evaluated in light of the characteristics of the industry in question. Brock v. Superior Care, 840 F.2d 1054, 1060-1061 (2d Cir. 1988) ("[E]ven where work forces are transient, the workers have been deemed employees where the lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative."). In Brock, this Circuit found the plaintiffs to be employees even though only 22% worked more than 13 weeks. Id. Here, assuming Defendants' approximation that 44% of class members worked over the course of more than three months, this Court should find no different.

---

[13] See Ex. 273 (Hilborn Dkt. No. 79 explaining that settlement had been reached, preliminary approval hearing conducted, and parties needed a stay to carry out settlement terms); Ex. 274 (Hilborn docket listing showing stay, defendants' summary judgment motion filed while case was stayed, and plaintiffs lack of response). Moreover, the Hilborn opinion provides two paragraphs of actual "analysis" of the claims and is based on only a mere five pages of stipulated facts. (Defs.' Ex. Q and R.) Further, unlike here, the Hilborn plaintiffs were only "periodically" asked to submit a schedule (compare Hilborn Stip. ¶ 6 with Pl.'s 56.1 ¶¶ 34-97) and all "creative elements" were left to the dancers as opposed to the club selecting music and restricting pole work as at Rick's NY (compare Hilborn Stip. ¶ 10 with Pl.'s 56.1 ¶¶ 151-186).

[14] Strangely, Defendants mention workers' subjective characterizations when discussing control. (Defs.' Mem. p. 17.) Subjective intent has no bearing on employment status under the FLSA. Clincy, 808 F.Supp.2d at 1349 (rejecting tax returns and other subjective characterizations in finding entertainers to be employees under the FLSA). Montoya v. S.C.C.P. Painting Contractors, 589 F.Supp.2d 569, 577 (D.Md. 2008) ("[N]either the subjective intent of the worker in forming the employment relationship nor the label affixed by the putative employer controls...").

(See Def.' 56.1 ¶ 168.)  Moreover, entertainers are generally regarded as a transient workforce, allowing courts to more liberally evaluate this factor.  See Martin v. Priba, 1992 WL 486911, *5 ("[Entertainers] tend to be itinerant, the court must focus on the nature of their dependence.... [E]ven if the freedom to work for multiple employers may provide something of a safety net... that freedom is hardly the same as true economic independence...."). Thus, "[a]lthough some of the [club's] dancers may be itinerant, this merely reflects the nature of the profession and does not demonstrate that the dancers are economically independent...." Double R, p. 15. See also Ansoumana v. Gristede's Operating Corp., 255 F.Supp.2d 184, 191 (S.D.N.Y. 2003) ("[T]he transience of the work force here says less about the status of the worker than about the nature of the job."); Gayle v. Harry's Nurses Reg., Inc., CV-07-4672, 2009 WL 605790 (E.D.N.Y. March 9, 2009) (employee status where work was "irregular and unstructured"); Baker v. Flint Eng'g & Const. Co., 137 F.3d 1436, 1442 (10th Cir. 1998) (employee status where workers rarely worked more than 3 months per year); Brock v. Mr. W. Fireworks, Inc., 814 F.2d 1042 (5th Cir. 1987) (employee status where 80% turnover between seasons).  Given this and the "at will" nature of entertainers' work (see Pl.'s SJ Mem. p. 20), this factor weighs in favor of employee status.

### 3. Defendants control entertainers' ability to profit or lose money.

Defendants control the customer base at Rick's NY through targeted marketing and control of the premises, spending millions to operate the club and maintain the aesthetics Defendants have chosen.  (Pl.'s SJ Mem. pp. 18-19.)  Defendants also control entertainers' ability to negotiate the minimum amount they receive from customers and, to a certain extent, control the amount of money customers are able to spend.  (Id.)  For these reasons, as explained in Plaintiffs' Motion, Defendants control entertainers' opportunity for profit or loss.  (Id.)

Defendants' arguments on this factor have been rejected by courts to examine this issue

in the context of adult entertainers. As to working hard and showing initiative, "[a]s is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns." Harrell, 992 F. Supp. at 1352.[15] Although some plaintiffs have regular customers, no reasonable jury could conclude that the types of word-of-mouth invitations that resulted in, at best, a sporadic one or two repeat customers could outweigh Defendants' marketing campaign. (Compare Pl.'s Resp. ¶¶ 139 with Pl.'s 56.1 ¶¶ 285-326.) See Morse, 2010 WL 2346334, *4 ("The Defendant also emphasizes that the Plaintiffs were allowed to advertise and market themselves by using... Facebook, and simple word of mouth.... This may be true, but the simple fact remains that... the Defendant is primarily responsible for drawing customers into the club...."). Plaintiffs' "investments" for clothes and other things pale in comparison to the Defendants' capital investments. (See Pl.'s 56.1 ¶¶ 312-314.) See also Clincy, 808 F.Supp.2d at 1346 (N.D.Ga. 2011) (citing cases about clubs' capital investment in premises). This factor weighs in favor of employee status.

### 4. Entertaining is not skilled work.

Defendants' arguments about initiative and salesmanship boil down to an argument that "hustling" is skilled work. (Defs.' Mem. p. 21.) It is not. "The 'hustling' argument has been universally rejected by every court to consider it." Clincy, 808 F.Supp.2d n.12 (citing Harrell, 992 F. Supp. at 1352.) As to gaining experience over time, any employee does. Moreover, the idea that experience equals skill or was even necessary is wrong where, here, Defendants hired entertainers with no experience. (Pl.'s 56.1 ¶¶ 327-335.) Those that gained experience, at best,

---

[15] In Scruggs v. Skylink, cited by Defendants, the court noted this factor did not weigh strongly in either way given that, although the cable techs could control whether they accepted work, the defendant controlled the extent of work given out. 3:10-0789, 2011 WL 6026152, *6 (S.D. W. Va. Dec. 2, 2011). Here, Defendants' control the schedule, shifts available, stage rotation, and, thus, when entertainers can receive work. (Pl.'s 56.1 ¶¶ 34-97, 151-186.)

gained comfort with dancing or hustling, and did not use any purported "skill" in such a way as to truly be independent of the club. (See Pl.'s Resp. ¶¶ 133-141, 133 ("[L]uck plays as a factor…. Some of it is up to me and then some of it is up to the management and the host… They are – it's a big determining factor with how much money you're making.") 135 ("[I]f you were on stage and you happened to be someone's, I don't know, type … then they would notice you and, you know, they would kind of seek you out…."); see also Pl.'s 56.1 ¶ 328 (trained dancer testifying "I don't think the dancing at Rick's involved any skills; whereas, professional dancing involved a lot of skill.").[16]   Entertaining is not skilled work.

### 5.  Entertainers are integral to Rick's NY.

Rick's NY is a strip club and strippers are integral to it.  (Pl.'s SJ Mem. pp. 20-21.) While Defendants may have food and beverage, as well as TVs in the club, entertainers are how Defendants draw customers to their club.   Indeed, Defendants' marketing materials are replete with images of scantily clad women, as is Defendants' website which proclaims that "the most beautiful women in the world [are] featured daily" and links to a video advertisement showing entertainers performing lap dances.  (Pl.'s 56.1 ¶¶ 338-342.)  Without the entertainers, Rick's NY would have TVs—albeit, bad ones, as Defendants' CEO has stated—and Defendants would be forced to undertake a very different marketing campaign.  (Id. ¶¶ 336, 334.)  As it stands, Defendants' customers "are there to see a lady disrobe on stage. If she does not disrobe, then the patron is not getting what they came to see."  (Id. ¶ 337.)  In this way, Defendants' argument that no one entertainer is integral to Rick's NY proves the point: customers are there to see naked women; which naked women does not matter.  Further, while having a particular entertainer present may not be necessary on a given night, having a sufficient volume of

---

[16] Browning is distinguishable.  That case had scheduling facts not present here, and the court pointed out that the plaintiff had knowledge of the DOT regulations and freight handling requirements.  2012 WL 3308112, *20.

entertainers is. (Id. ¶ 68 ("Sometimes the[re] weren't enough girls. They didn't think there were enough girls in the club [to] let another one go."); see also supra, pp. 5-7 (management "incentivizing" entertainers to arrive to work earlier).)[17]    In sum, no reasonable jury could conclude that entertainers are not integral to Rick's NY.  Defendants cannot prevail on this factor.  The entertainers at Rick's NY are employees.[18]

## II.    THIS COURT MUST NOT ALLOW AN OFFSET AGAINST WAGES OWED.

In addition to securing wages for individual workers themselves, the FLSA is meant to benefit the economy as a whole by spreading employment and creating an even playing field for businesses.  See Walling v. Helmerich & Payne, 323 U.S. 37, 40 (1944).  Vanskike v. Peters, 974 F.2d 806, 810 (7th Cir. 1992) ("[T]he FLSA was intended to prevent unfair competition in commerce from the use of underpaid labor.").  When companies misclassify their workers, these goals are undercut.    See 155 Cong. Rec. S13253 (Dec. 15, 2009) ("When workers are misclassified, businesses that play by the rules lose business to competitors that do not play by the rules and workers lose valuable rights and protections.") (Sen. Kerry proposing legislation to close tax loophole in Revenue Act of 1978)).[19]  Moreover, "[e]mployee misclassification also generates substantial losses to the Treasury and the Social Security and Medicare funds, as well as to state unemployment insurance and workers compensation funds." U.S. Dep't of Labor.[20]

Here, Defendants want this Court to rule in a manner that flouts these crucial policy and economic goals.  Defendants have not paid class members a single penny of actual wages over the course of the nearly seven-year class period in this case.  Yet, they want this Court to rule

---

[17] In this way, Browning is also distinguishable. A single driver performs each delivery and can be replaced; whereas, creating an environment where "100 of the most beautiful women" are featured requires volume.
[18] Scruggs, cited by Defendants, actually states that "[g]enerally, the more integral the work, the more likely the worker is an employee, not an independent contractor."  2011 WL 6026152, *8.
[19] (Ex. 275.) Defendants are well aware of the IRS's "safe harbor" provision and have prepared plans to utilize it to escape tax penalties in the event they are found to have misclassified their entertainers. (Pl.'s SJ Mem. pp. 42-43.)
[20] Available at: http://www.dol.gov/whd/workers/misclassification/#whd. (Ex. 276.)

that their wage obligations have nonetheless been satisfied. Defendants want this Court to rule that it is good enough for an employer to rely on its customers to pay its employees. Such a ruling would in no way be just or in furtherance of the FLSA's goals and policies. Defendants could continue with their practice of misclassifying *and failing to pay employees* with absolutely no consequences. Even if forced to reclassify, Defendants could continue to ignore the FLSA's minimum wage requirements by claiming that their customers have paid their employees for them. Defendants would never have to spend any of their own money on wages and could ███████████████████████████████████████████████████. Defendants want to continue to profit off of their employees' labor and their customers' pocketbooks without having to make the employer-side contributions to the economy that law-abiding businesses make. The Court cannot sanction this.

Critically, if Defendants prevail as to offset, entertainers would still be left without benefits associated with employer-provided wages. For example, there would be no automatic withholding for social security or other benefits to claim upon retirement or in the event of disability. In this industry, where youth is prized and entertainers cannot continue to work into old age, these benefits are crucial. Further, Defendants' own arguments are equally flawed:

### A. DEFENDANTS APPLY INVALID REGULATORY LANGUAGE.

Defendants are asking for an offset; *not* to pay a reduced wage by taking a "tip credit" pursuant to the 1974 amendments to FLSA.[21] For this reason, Defendants' arguments about amounts "turned over" to the employer are irrelevant. The "turned over" language Defendants cite (Defs.' Mem. pp. 27-28) was superseded by the 1974 statutory amendments and was deleted

---

[21] An employer is allowed to pay employees a reduced wage of $2.13 if the employee makes up the different in tips. 29 U.S.C. § 203(m). However, in order to avail itself of this "tip credit" an employer must follow strict notice requirements and management cannot take a share of the tips. Wicaksono v. XYZ 48 Corp., No. 10 Civ. 3635(LAK)(JCF), 2011 WL 2022644, *4-5 (S.D.N.Y. May 2, 2011). Defendants would not be able to take a tip credit because no notice was given and because it required "tip outs" to management. (See Pl.'s 56.1 ¶ 210-222.)

when the regulations were updated in 2011. See 76 Fed. Reg. 18839 (April 5, 2011).[22]

## B. DEFENDANTS DID NOT INCLUDE THE MONEY IN GROSS RECEIPTS.

Defendants cannot claim an offset because they did not include the $18 and $20 amounts in their gross receipts. (Pl.'s SJ Mem. pp. 22-28.) Courts have determined that failure to record money in gross receipts is fatal to the offset argument. (See id. (citing cases).) This District recognizes that sums must become part of the employer's gross receipts in order to be service charges. Chan v. Sung Yue Tung Corp., No. 03 Civ. 6048(GEL), 2007 WL 313483, *14 (S.D.N.Y. Feb. 1, 2007) ("By contrast, a 'service charge' is a mandatory charge imposed by an employer on a customer that is the property of the employer, not the employees, **_and becomes part of the employer's gross receipts_**.") (emphasis added) (Lynch, J.). Defendants cite Judge Lynch's earlier decision in Chan v. Triple 8 to argue that gross receipts do not matter. In that case, the employer had a "more generalized failure to comply with tax reporting requirements," making the failure to report specific amounts in gross receipts non-dispositive. Chan v. Triple 8 Palace, Inc., No. 03 Civ. 6048(GEL), 2006 WL 851749, *8-9 (March 30, 2009). In other words, if an employer generally fails to report its gross receipts, then any specific failure is merely suggestive of overall failures to report, not of a specific method of treating certain monies. Here, there is no indication Defendants generally failed to report their gross receipts. Therefore, the failure to include amounts entertainers received in exchange for dance dollars is probative and definitive evidence of Defendants' choice not to treat these amounts as their money.[23]

Moreover, Defendants do not dispute that they did not record the $20 **_cash amounts_** in their gross receipts. (Defs.' Mem. p. 29.) This seals Defendants' fate on this issue. See Reich v. Priba Corp., 890 F. Supp. at 594-595 ("Entertainers keep 100% of all cash tips received

---

[22] (Ex. 277 (entire April 5, 2011 Federal Register Notice of Final Rule, Vol. 76, No. 65).)

[23] In Hai Ming Lu v. Jing Fong Rest., Inc., cited by Defendants, the amounts this District found to be service charges were included in the defendants' gross receipts. 503 F.Supp.2d 706, 710 (S.D.N.Y. 2007).

without any accounting to Cabaret Royale. If a patron uses the voucher system to tip the entertainer, Cabaret Royale only credits 20% of the value of the voucher to gross receipts. The fact that *all* of the table dance fees are not reported as gross receipts is *fatal* to Cabaret Royale's claim that the tips are more properly classified as wages.") (emphasis added).

Defendants claim they include the $18 dance dollar amounts in gross receipts; however, these amounts are subtracted out before income is actually tallied and reported. (Pl.'s 56.1 ¶¶ 361-371; Defs.' 56.1 ¶ 27 (admitting to "reduced" gross receipts); Stip. ¶¶ 208-218.) In this way, Defendants treat the amounts in the exact way as money they literally never received. (See Pl.'s SJ Mem. pp. 25-27 (comparing how Defendants account for free drinks with how they account for dance dollars).) Just as Defendants could never claim in their receipts the value of drinks they gave away for free, they cannot claim the dance dollar redemptions. (See id.) As Defendants' CFO testified, "**It's not ours**... And the $18 belongs to the independent contractor, the entertainer as does the cash she gets.... **It's not our money**...") (Pl.'s 56.1 ¶ 378.)[24]

## C. MANDATORY CHARGES CAN BE CONSIDERED TIPS.

Defendants and the court in <u>Matson</u> fixate on the idea that the amounts at issue were set amounts. Defendants are correct that this District has stated that such mandatory fees will only be deemed tips in "unusual circumstances." <u>Triple 8</u>, 2006 WL 851749, n.10. However, the "unusual circumstance" cited in <u>Triple 8</u> is the *precise circumstance* found here—payments

---

[24] <u>Doe v. Cin-Lan</u>, No. 08-cv-12719, 2010 WL 726710 (E.D. Mich. Feb. 24, 2010) and <u>Ruffin v. Entm't of the E. Panhandle</u>, 3:11-CV-19, 2012 WL 1435674 (N.D. W. Va. April 25, 2012) are poorly decided. They are nonetheless distinguishable because they show that the clubs at issue treated the dance money as partially theirs from the outset. In both cases, the clubs always retained a portion of the dance fees. 2010 WL 726710, *1-2; 2012 WL 1435674, *1-2. In both cases, the club tracked dances and had entertainers sign receipts regarding the same at the end of each shift. 2010 WL 726710, *1-2; 2012 WL 1435674, *1-2. This also distinguishes <u>McFeeley v. Jackson Street Entm't, LLC</u>, 12-cv-1019 (D. MD. Nov. 26, 2012), in which the club took a set amount of money entertainers received for certain dances, as in <u>Ruffin</u>. <u>McFeeley</u>, p. 2. Further, in <u>Ruffin</u>, the court viewed the retention of records showing the number of dances as the key determinant in deciding offset. 2012 WL 1435674, *2. Here, Defendants admittedly never tracked the number of dances entertainers performed. (Stip. ¶ 110.) Further, <u>Cin-Lan</u> and <u>McFeeley</u> were decisions on motions to dismiss, not the merits. <u>In re Penthouse Exec. Club</u>, 10-cv-1145 (S.D.N.Y. March 15, 2012) (Ex. 278) and <u>Terry</u>, No. A602800 (D. Nev. Clark Cnty., June 24, 2010) are one-line orders about leave to amend and a motion to dismiss. Neither is remotely instructive.

made by a strip club's customers to entertainers for dances. See id. n.10 (citing Reich v. ABC/York-Estes Corp., 91 Civ. 6265(BM), 1997 WL 264379, *5-6 (N.D.Ill. May 12, 1997)).

Additionally, here, the amounts at issue are suggested minimums. (Stip. ¶ 180.) Customers could and did pay more. (Pl.'s 56.1 ¶¶ 278-279; Stip. ¶ 182.) Customers could choose the entertainer or entertainers from whom they received dances and paid entertainers directly. (Stip. ¶16; Pl.'s 56.1 ¶ 379.) This further supports Plaintiffs' position that the amounts in question were tips, not service charges. Triple 8, 2006 WL 851749, *8-9; Thornton v. Crazy Horse, Inc., No. 3:06-cv-0025, 2012 WL 2175753, *9 (D. Alaska June 14, 2012).

### D. THE MINIMUM WAGE MUST BE PAID ON A WEEKLY BASIS.

Even if the amounts in question could count as wages, they cannot be applied "cumulatively." Conzo v. City of New York, 667 F.Supp.2d 279, 289 (S.D.N.Y. 2009).[25] Yet, that is exactly what Defendants seek to do. Defendants make great hay over the total amount of dance dollar redemptions from 2005 to the present and over Plaintiffs' dance dollar redemptions throughout their employment. (Defs.' Mem. p. 23.) These calculations are meaningless because the minimum wage must be paid on a weekly basis. See 29 C.F.R. §§ 776.4, 778.104 ("The Act takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks."). The whole point is that workers have a guaranteed, reliable wage. Defendants have not provided this. Assuming *arguendo* that dance dollars could count as wages, more than 87% of the class members in this case would still not have received the minimum wage in at least one week of their work at Rick's NY. (Pl.'s Resp. ¶ 194.) This number increases to more than 92% when the "tip outs" and fees and fines are considered. (Id.) See Reich v. Priba, 890 F. Supp. at 595 ("[T]he deduction further reduces the entertainers' wages below the minimum wage.").

---

[25] In Conzo, cited by Defendants, offsets were only allowed on a weekly basis and, regardless, the employer paid overtime irrespective of whether work exceeded 40 hours, thereby guaranteeing pay. 667 F.Supp.2d at 279-292.

Assuming *arguendo* that both dance dollars and cash could count as wages, five of the six Plaintiffs whose cash estimates Defendants cite would all have earned less than minimum wage in at least one week, and all six would have when tip outs and fees are considered. (Pl.'s Resp. ¶¶ 198, 200-204.) Even with an offset, there are rampant minimum wage violations.

## E. THERE IS NOTHING UNJUST IN PLAINTIFFS' RECEIPT OF DAMAGES.

Defendants claim that Plaintiffs would be unjustly enriched if allowed to recover damages and retain the tips they received from customers. For the reasons discussed above and in Plaintiffs' Motion, Defendants counterclaim must be denied. (See Pl.'s SJ Mem. pp. 28-32.)[26]

## F. ANY OFFSET CANNOT APPLY TO PLAINTIFFS' DEDUCTIONS CLAIMS.

Defendants mention in passing that Plaintiffs seek a return of the fees they paid to work. (Defs.' Mem. pp. 22-23.) However, Defendants fail to address how their offset argument could apply to Plaintiffs' deductions claims. Even where employees earn more than the minimum wage, employers cannot demand payment as a condition of employment. Thus, even in the unlikely event Defendants prevail on their offset argument, it cannot apply to Plaintiffs' deductions claims. (See Pl.'s SJ Mem. n.24.) To allow it to do so would turn the statute into one which applied only when deductions reduced wages below the minimum, something the legislature did not intend. See Fowler v. Scores Holding Co. Inc., 677 F.Supp.2d 673 (S.D.N.Y. 2009) (deductions claim survived motion to dismiss without corresponding minimum wage allegation); cf. Minn. Stat. § 177.24(4) (MN statute prohibiting certain deductions only where the deduction "when subtracted from wages would reduce the wages below the minimum wage").

## III.  ALL THREE DEFENDANTS ARE EMPLOYERS.

### A. DEFENDANTS' SELF-SERVING REPRESENTATIONS CANNOT BE

---

[26] Cin-Lan, Ruffin, and McFeeley are also distinguishable on this point because there was actual evidence of an agreement in all three and not a post hoc "arrangement" as Defendants claim here. Compare Pl.'s SJ Mem. pp. 28-32 (discussing Defendants' request for a do-over) with Cin-Lan, *1, McFeeley p. 2, Ruffin, *1.

**CREDITED.**

Defendants' arguments on the issue of whether Defendants Rick's Cabaret International, Inc. ("RCII") and RCI Entertainment (New York), Inc. ("RCI NY") are employers primarily rely on self-serving declarations and conclusory statements. These statements are belied by the record, including Defendants' own admissions. The statements most relevant to the question of employer status are addressed here, proving that there is no **genuine** dispute. The facts of this case undercut Defendants' arguments and show that RCII and RCI NY are employers.

First, Defendants are subject to the FLSA despite Defendants' sudden claim to the contrary. (Defs.' Mem. n.27.) Defendants' Answer from 2011 admits that RCII has at least $500,000 in sales or business done, making it subject to the FLSA. (Compare Pl.'s Resp. ¶ 212 with 29 U.S.C. § 203(s)(1)).[27]

Second, Defendants cite to Mr. Langan's declaration to make the claim that, as President of RCI NY, he has not taken any actions with respect to the operations of Defendant Peregrine. However, nothing in the record shows that any actions he takes are meaningfully attributable to a particular role. (See Pl.'s Resp. ¶ 252; see also Pl.'s Resp. ¶¶ 214-215.) Mr. Langan is the CEO and President of all three Defendants in this case. As he explained, when it comes to increasing RCII's returns on an asset (i.e., a club like Rick's NY), Mr. Langan stated, "I would call the president of that corporation, **which basically is myself**, and say, you know, get down there and do something about the returns on this asset...." (Id. ¶ 252.) (emphasis added). This verbal chicanery makes Defendants' arguments about RCII and RCI NY not maintaining paper files or Club Trax records for entertainers even more ludicrous. (See Defs.' Mem. p. 38.) Not only does RCII have electronic access to Club Trax (see Pl.'s 56.1 ¶ 463), but if Mr. Langan wants to

---

[27] Further, RCII has recently advertised revenue in excess of $90MM and has received more than ▮▮▮▮ in transfers from Peregrine alone. (Id. (discussing just three months of accounting records).) As to RCI NY, it is part of a covered enterprise and, thus, subject to the FLSA as well. 29 U.S.C. § 203(s)(1). (See infra pp. 26-28.)

access a record "on behalf of" RCII or RCI NY, all he has to do is ask himself. Moreover, Mr. Langan maintains the same email address regardless of whether one or all Defendants are the subject of an email, and at all times has been paid directly by RCII with no billing to the subsidiaries for anything he does. (Id. ¶¶ 515, 518.) Any distinction between roles Mr. Langan is purportedly acting in is fictional. When Mr. Langan acts, he acts on behalf of RCII, as well as its subsidiaries. And Mr. Langan undertakes numerous acts in relation to operations and entertainers at Rick's NY. (See Pl.'s Resp. ¶¶ 214-215 (discussing Langan's actions, including the fact that he decided to classify entertainers as independent contractors, put the first set of written guidelines in place at Rick's NY, and sets the operational controls for the clubs).)

Similarly, the record is clear that Ed Anakar (who was employed by RCII from 2005 to 2011 and is now employed by its shadow company) had and continues to have control over operations at Rick's NY. Defendants boldly state that he never hired entertainers. (Defs.' Mem. p. 36.) Mr. Anakar's testimony and Defendants' personnel files show that he did. (Pl.'s Resp. ¶ 214.) Further, contrary to what Defendants claim (Defs.' Mem. pp. 36-44), Mr. Anakar's own emails show that he requests that managers at Rick's NY send him documentation when entertainers are made inactive and that no signs can go up at the club without his approval. (Pl.'s Resp. ¶ 214, 215 ("Make sure everyone understands that no signs go up without my approval.").) The record contains numerous other examples of Mr. Anakar's control over day-to-day operations at Rick's NY. (See Pl.'s Resp. ¶¶ 214-215, 224, 226.) Mr. Anakar has also made marketing decisions. (Compare Defs.' Mem. p. 43 with Pl.'s Resp. ¶ 226; Pl.'s 56.1 ¶ 281.)

Defendants also state that neither RCII nor RCI NY are involved in issues such as when or whether entertainers come to work or entertainers' performance. (Defs.' Mem. pp. 37, 40.) In truth, Defendants' own documentation and testimony shows that they are involved. (See e.g.,

Pl.'s 56.1 ¶¶ 81 ("No-Show Entertainers Will Be Fined… As Per Ed."), 230 (fines "per Ed"), 43 (authority to approve shift times), 106 (waiving house fees), 87 (advising as to fines), 103 ("To make our entertainers happy, I've also decided not to raise house fees yet.") (quoting Anakar).)

Finally, Defendants' conclusory statements such as "RCII does not operate any adult entertainment clubs, so it would have no use for entertainers" (Defs.' Mem. pp. 39-40) are not supported by actual facts. RCII is intimately involved in the creation and branding of its subsidiary clubs, which depend on entertainers. (See Pl.'s 56.1 ¶¶ 411-425, 1 ("We [in reference to RCII] – yes, we own – we buy strip clubs."), 336 (quoting Langan, "The most important thing to the [Rick's Cabaret] brand is that [it has] entertainers.").)[28]

## B. DEFENDANTS ARE LIABLE AS AN INTEGRATED ENTERPRISE.

Given the foregoing facts and those discussed below and in Plaintiffs' Motion, all three Defendants are an integrated enterprise. (See Pl.'s SJ Mem. pp. 40-42.) Companies—including parent companies—can and have been held liable as employers under an integrated enterprise theory. See e.g., Chen v. TYT East Corp., No. 10 Civ. 5288 (PAC), 2012 WL 5871617, *4 (S.D.N.Y. March 21, 2012) (concluding there was sufficient evidence in the record to grant summary judgment for Plaintiffs and hold parent company liable under the single employer doctrine); see also Reiseck v. Universal Commc'ns of Miami, No. 06 Civ. 0777 (TPG), 2012 WL 3642375, *5 (S.D.N.Y. Aug. 23, 2012) (denying parent company's motion for summary judgment where plaintiff alleged that parent company and direct employer constitute a single employer under the FLSA, "since the two companies, while superficially, distinct, are in fact an

---

[28] Cf. Morangelli v. Chemed Corp., No. 10-Civ. 0876 (BMC), 2013 WL 432571, *4 (E.D.N.Y. Feb. 4, 2013) ("[A] jury could not reasonably infer that [the parent and subsidiary] have coextensive business purposes."). Morangelli is also distinguishable because, there, the court held that plaintiff only had "a handful of facts" to suggest integrated enterprise. *5. Further, Morangelli places undue emphasis on whether a parent company had final decision-making authority; whereas, the Second Circuit has held, "Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA…." Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999). Regardless, here, Mr. Langan, RCII's CEO is the final authority. (See Pl.'s 56.1 ¶ 419 ("Everybody reports to me regardless of any hierarchy.").)

integrated enterprise"); Pineda v. Masonry Const., Inc., 831 F.Supp.2d 666, 685 (S.D.N.Y. 2011) (holding that defendants' qualified as plaintiffs' "employer" for purposes of the FLSA and NYLL and entering default judgment against them).[29]  Defendants are liable here.

First, Defendants have highly interrelated operations as explained above and in Plaintiffs' Motion. (Pl.'s SJ Mem. 33-41.) Peregrine does not handle its own cash management, payroll, or marketing as Defendants' case cites imply. (Compare Defs.' Mem. p. 43 (citing cases) with Pl.'s 56.1 ¶¶ 467-469 (Langan decides whether clubs pool or loan money), 476 (RCII's CFO arbitrarily transfers money from Peregrine to RCII); Stip. ¶ 93 (RCII handles payroll) and Pl.'s Resp. ¶ 226 (regarding Anakar's marketing authority).)  Further, Defendants suggest that Peregrine paying for Mr. Anakar's services somehow negates the interrelation of operations amongst the entities.  Defendants do not cite any law in support of this proposition, nothing in the record shows that Peregrine pays for everything Mr. Anakar provides (or even pays proportionally), and, in any case, Peregrine does not pay for Mr. Langan. (Pl.'s Resp. ¶¶ 235, 252, 217 (Anakar does not track the hours he spends on tasks for RCII's subsidiaries and citing example where Anakar's services billed to 2 subsidiaries when he performed work for 4).)

Second, there is obviously centralized control over labor relations given Mr. Langan's and Anakar's roles, their authority over Mr. Sistrunk (id. ¶¶ 214-215, 224), RCII's and RCI NY's access to records, and Mr. Anakar's requests that all signs meet his approval and that documentation be sent to him when entertainers are made "inactive." (See supra, pp. 24-26.)

Third, Defendants' common financial control is plainly obvious from Mr. Marshall's testimony, as well as Mr. Langan's. (Pl.'s 56.1 ¶¶ 464-469 (Langan decides how to increase profitability and whether clubs and RCII loan each other money), 476 (Marshall bases the

---

[29] Wolman v. Catholic Health Sys. of Long Island is inapposite because the portions cited by Defendants concern the sufficiency of pleading the legal conclusions and joint ventures, not employment. 853 F.Supp.2d 290, 298 (E.D.N.Y. 2012).

decision on when Peregrine is going to send RCII money on when Peregrine has "too much.").)

Finally, Defendants do not dispute that they have common ownership and management. (Defs.' Mem. pp. 44-45.) These factors are important here where common ownership and management are not just mere results of a corporate structure.[30] They are the reason behind the uniformity in policies and operations at RCII's subsidiaries. (See Pl.'s 56.1 ¶¶ 411-425 (discussing branding), 420 ("Eric Langan's philosophies are the ones that are dictated through each of those locations as president of those subsidiaries.") (quoting Langan).)[31] Here, Defendants may be nominally separate entities, but they function as one.

### C. RCII JOINTLY EMPLOYS ENTERTAINERS AT RICK'S NY.

Plaintiffs' Motion discusses the "formal" control test for joint employer status in detail and those arguments are incorporated here. (Pl.'s SJ Mem. pp. 36-39.) Defendants' arguments on formal control are entirely undercut by their inaccurate portrayal of the facts here. (See *supra*, pp. 24-28.) Their cited cases, resultantly, support Plaintiffs' position. Compare Morangelli, 2013 WL 432571 ("[P]laintiffs have not proffered any evidence suggesting that [parent] exercised control over [employees'] work schedules or employment conditions.") with *supra*, pp. 5-10 (regarding, *inter alia*, RCII's employees approving shifts and implementing guidelines). Compare In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig., 683 F.3d 462, 468 (3d Cir. 2012) with *supra*, pp. 24-27 (regarding Anakar's hiring of Sistrunk and Langan's hiring of managers). Compare Gorey v. Manheim Servs. Corp., 788 F.Supp.2d 200 (S.D.N.Y. 2011) ("Here, there is no evidence that …the corporate parents… hired or fired any of

---

[30] Cf. Nakahata v. New York-Presbyterian Healthcare Sys., Inc., 11 Civ 6656, 2012 WL 3886555, *10-11 (S.D.N.Y. Sept. 6, 2012) (liability cannot depend "merely" on common ownership).
[31] Meng v. Ipanema Shoe Corp., 73 F.Supp.2d 392 (S.D.N.Y. 1999) is a distinguishable Title VII case in which the court found that there was no evidence of a "clandestine" effort on the part of one corporation to control the other. Here, there is an overt effort. RCII's process of rebranding to make a club part of the Rick's brand is intentional. (See Pl.'s 56.1 ¶ 413 ("Why does rebranding add value? When you take a hammer to a joint and you put McDonald's arches on it, why do more people come there? It's because they know the brand.") (quoting Langan).)

the Plaintiffs.... corporate-parent Defendants do not determine the Plaintiffs rate of pay....job descriptions for outside sales representatives prepared by the corporate-parent Defendants that leave the "Salary/Grade" field blank.") with *supra*, pp. 24-25 (regarding hiring and Langan deciding classification).[32] Compare Jean-Louis v. Metro. Cable Commc'n, Inc., 838 F.Supp.2d 111, 118 (S.D.N.Y. 2011) (no "evidence that Time Warner has ever instructed Metro to discipline or fire any individual technician.") with *supra*, pp. 7-8, 25-27.[33]

The "functional" control test only comes into play when plaintiffs cannot demonstrate formal control. See Nakahata, 2012 WL 3886555, *10. Here, the formal control factors alleged by Plaintiffs—and now proven—are sufficient to show RCII's employer status here. Hart, 2010 WL 5297221, *3. (See *supra,* pp. 5-10; Pl.'s SJ Mem. pp. 36-39.) Nonetheless, should this Court engage in an analysis of "functional" control, it should find that RCII is an employer. Functional control is examined with flexibility in order to answer this question: if the entity did not exercise formal control, did it functionally control? Here, the answer is yes. All of the control described above shows that RCII functionally controlled entertainers' work at Rick's NY. See Wilk v. VIP Health Care Srvs., 10-Civ 5530, 2012 WL 560738, *6-7 (E.D.N.Y. Feb. 21, 2012) (discussing flexibility and using formal control factors to analyze functional control).

Defendants focus their functional control arguments on the Second Circuit's decision in Zheng v. Liberty Apparel Co., Inc., 355 F. 3d 61 (2d Cir. 2003). The factors set out in Zheng are of limited value because that case involved subcontractors within the manufacturing industry. In

---

[32] To the extent Gorey stands for the proposition that a parent company cannot exercise sufficient control through the hiring of managers, it is inconsistent with the order denying Defendants' motion to dismiss in this case, more recent law from this District, and this Circuit's decision in Herman. TYT East Corp., 2012 WL 5871617, *5 (hiring of managerial staff "strongly indicates" control); Herman, 172 F.3d at 140; Hart, 2010 WL 5297221, *3 ("RCII, through the regional and general managers, supervises entertainers by distributing rules and guidelines and ensuring their enforcement through the imposition of fines and other discipline[e]...Taken as a whole, these allegations raise a reasonable expectation that discovery will reveal evidence that RCII is an employer.") (quotations omitted).

[33] Godlewska v. HDA, CV-03-3985, 2013 WL 25649, *10 (E.D.N.Y. Jan. 2, 2013) stressed the diminished value of control when control is to ensure compliance with the law. Here, Defendants controlled aspects of entertainers' performance that had nothing to do with the law. (See *supra*, pp. 5-10.)

fact, the Zheng court articulated six factors that it thought "the [district] court will find illuminating" in the circumstances of that case and noted that the district court was free to consider others. Id. at 72. To the extent the six Zheng factors can be molded to this case, they compel the same result. *First*, the RCII and Peregrine share a corporate office and paperwork concerning entertainers is processed there. (Stip. ¶¶ 36-37, 93.) The premises where entertainers work are jointly controlled by Defendants given, among other things, Mr. Anakar's insistence on unilateral authority regarding postings and his receipt of reports on staff meetings. (*Supra*, pp. 25-26; see e.g., Pl.'s 56.1 ¶¶ 197, 207, 211, 235, 316, 579.) *Second*, entertainers worked at Rick's NY and were under the direction of both RCII and Peregrine. (See id. ¶ 100 ("If there is a problem feel free to discuss your issue with Ken or Ed."); see *supra*, pp. 25-28.) In this, way, their work shifted seamlessly between Defendants. (See also id. ¶¶ 543-545 (Anakar telling entertainers at Vegas club they could go work at Rick's NY and Rick's NY posting a call for entertainers to work at RCII's Philadelphia club.).) *Third*, entertainers are integral to RCII's operations. (Id. ¶ 336.) *Fourth*, the parties agree the subcontracting factor of Zheng is not applicable. (Defs.' Mem. p. 40.) *Fifth*, RCII's supervision of the entertainers is discussed above. (See *supra*, pp. 5-10.) *Finally*, exclusive employment is not necessary to an employment relationship. (See id. pp. 10-11.)[34] RCII is an employer. All three Defendants are liable for misclassification, failure to pay wages, and the deductions discussed above.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment should be denied.

---

[34] That said, in Zheng, the undisputed employer was a contractor that hired workers to work on manufacturers' garments. The question was whether a specific manufacturer jointly employed the workers. In examining exclusivity, the question was whether the workers solely worked on the manufacturer's garments when they were working for the contractor. If Zheng is to be applied here, then Peregrine is, by analogy, the contractor and RCII is the manufacturer. There is no question that, when entertainers worked at Rick's NY, they worked exclusively at an RCII subsidiary club, and Peregrine did not send them to other non-RCII affiliated clubs.

Date: March 14, 2013                    NICHOLS KASTER, PLLP


                                        s/Anna P. Prakash
                                        Michele R. Fisher (MF 4600)
                                        Steven Andrew Smith, MN Bar No. 260836
                                            (*admitted pro hac vice*)
                                        E. Michelle Drake, MN Bar No. 0387366
                                            (*admitted pro hac vice*)
                                        Anna P. Prakash, MN Bar No. 0351362
                                            (*admitted pro hac vice*)
                                        4600 IDS Center, 80 South Eighth Street
                                        Minneapolis, MN 55402
                                        Telephone: (612) 256-3200

                                        ATTORNEYS FOR PLAINTIFFS

31