```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/14/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                     :

SABRINA HART and REKA FUREDI, *on behalf of*   :
*themselves and all others similarly situated, and the New*   :
*York Rule 23 Class*,                                     :

                           Plaintiffs,           :

                -v-                       :

RICK'S CABARET INTERNATIONAL, INC.,      :
RCI ENTERTAINMENT (NEW YORK), INC., and   :
PEREGRINE ENTERPRISES, INC.,            :

                         Defendants.       :

------------------------------------------------------------------------X

09 Civ. 3043 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

    This is the latest in a series of pretrial decisions in this case, in which a class of exotic

dancers seeks to recoup pay which they allege was denied them in violation of the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the New York Labor Law ("NYLL"),

§§ 190 *et seq.* & §§ 650 *et seq.* Plaintiffs bring claims for: (1) failure to pay minimum wages

under the FLSA ("Claim One"); (2) failure to pay minimum wages under the NYLL ("Claim

Two"); (3) unlawful requesting and receiving portions of wages under NYLL § 198-b ("Claim

Three"); (4) unlawful retention of gratuities under NYLL § 196-d ("Claim Four"); and

(5) unlawful deductions from wages under NYLL § 193(3)(a) ("Claim Five").

    The Court's prior decisions have held, most centrally, that plaintiffs were employees of

Rick's Cabaret NY strip club ("Rick's NY" or "the Club"), and thereby entitled to the

protections of the FLSA and NYLL. Today's decision resolves other, recently briefed issues,

and narrows to a discrete few the issues to be resolved at trial.

I.      **Recap of Prior Rulings and Summary of Today's Rulings**

To recap the Court's prior rulings:

On September 10, 2013, the Court held that plaintiffs were employees of Rick's NY, that they were therefore entitled to be paid a minimum wage under the FLSA and the NYLL, and that the Club's duty under the FLSA to pay such a wage was not discharged by the payment to the dancers, by customers, of "performance fees" for dances.  *See* Dkt. 460 ("September 2013 Decision"), reported at *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013). The Court also held that defendant Peregrine Enterprises, Inc. ("Peregrine") was an employer of plaintiffs and therefore liable to the extent of any finding of liability.  *Id.*  But, the Court held, whether the other two defendants—RCI Entertainment New York ("RCI NY") and Rick's Cabaret International, Inc. ("RCII")—were also plaintiffs' employers turned on material factual disputes and could not be resolved on summary judgment.  *Id.*  The Court also granted summary judgment to plaintiffs on defendants' counterclaim for unjust enrichment.  *Id.*

On November 18, 2013, the Court:  (1) denied defendants' motion for reconsideration of the Court's holding that, even after February 28, 2010, plaintiffs were employees of Rick's NY; (2) denied defendants' motion to set the class period end-date as February 28, 2010, or alternatively as December 20, 2010; the Court instead set the class period end-date as October 31, 2012; and (3) granted plaintiffs' motion for summary judgment on Claim Five, holding that the Club's fines, fees, and tip-out requirements violated NYLL § 193.  *See* Dkt. 487 ("November 2013 Decision"), *reported at Hart v. Rick's Cabaret Int'l, Inc.*, No. 09 Civ. 3043 (PAE), 2013 U.S. Dist. LEXIS 164354 (S.D.N.Y. Nov. 18, 2013).

Together, these decisions established that Peregrine is liable to plaintiffs on Claims One, Two, and Five.[1]

This decision resolves the following five additional pre-trial motions:

(1)  On the cross-motions for summary judgment on whether performance fees paid by customers to the dancers "offset" wages under the NYLL, and therefore reduce damages on Claim Two, the Court holds that, much as such fees do not offset defendants' minimum wage obligations under the FLSA, they do not offset defendants' minimum wage obligations under the NYLL.

(2)  On the cross-motions for summary judgment on whether Peregrine is liable on Claim Four for retaining gratuities in violation of NYLL § 196-d—specifically, the $2 that defendants systematically retained, without disclosure to customers, of each $24 "Dance Dollar" purchased by customers by means of a credit card—the Court holds that Peregrine is so liable.

(3)  The Court denies defendants' motion to strike the expert reports and testimony of plaintiffs' expert witness, Dr. David Crawford.

(4)  The Court denies defendants' motion to decertify the Rule 23(b)(3) class, which was initially certified by Judge Koeltl on December 20, 2010.  *See* Dkt. 253 ("December 20, 2010 Decision"), reported at *Hart v. Rick's Cabaret Int'l Inc.*, No. 09 Civ. 3043 (JGK), 2010 WL 5297221, at *1–2 (S.D.N.Y. Dec. 20, 2010).

(5)  The Court grants, in part, plaintiffs' motion for partial summary judgment against Peregrine as to damages on Claims One (FLSA minimum wage) and Two (NYLL minimum wage); grants in full plaintiffs motion for summary judgment as to damages on Claims Four

---

[1] On January 28, 2014, in a different Opinion & Order, the Court held that it has independent jurisdiction over plaintiffs' NYLL claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").  *See* Dkt. 504, *reported at Hart v. Rick's NY Cabaret Int'l, Inc.*, 967 F. Supp. 2d 955 (S.D.N.Y. 2014).

(NYLL unlawful retention of gratuities); and grants in part plaintiffs' motion for summary

judgment as to Count Five (NYLL unlawful fines and fees).

These, in conjunction with the Court's previous rulings, leave the following issues to be

resolved at trial:  whether (1) plaintiffs are entitled to additional damages on Claims One, Two,

and Five, beyond those which the Court holds can properly be awarded on summary judgment;

(2) the violations of the FLSA (Claim One) and the NYLL (Claims Two, Four and Five) were

willful and/or made other than in good faith; these respective determinations bear on the duration

of Peregrine's FLSA liability and whether additional, liquidated damages are available under the

FLSA and NYLL; and (3) RCI NY and RCII are, along with Peregrine, employers of plaintiffs

and, thus, jointly liable with Peregrine for all damages.[2]

## II.       Legal Standards for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a

question of material fact.  In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d

Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[2] A final set of unresolved issues involves liability and damages on Claim Three, in which
plaintiffs allege that defendants unlawfully "requested" portions of wages under NYLL § 198-b.
At argument on June 24, 2014, plaintiffs acknowledged that Claim Three was coextensive with
Claim Five, *see* Transcript ("Tr.") (Dkt. 541) at 84, such that, were the Court (having found
liability on Claim Five) to grant plaintiffs' motion for summary judgment as to damages on that
claim, plaintiffs might not pursue Claim Three at trial.  *See id.* at 87 ("Ms. Drake: . . . If we
prevail on claim 5, we might not pursue claim 3, even if it is not an issue for class
certification.").  The Court has now granted this motion, except as to damages for alleged "tip-
outs," which is an issue left for trial.  *See infra* Section VI.  The Court directs plaintiffs to decide
and disclose promptly whether they will continue to pursue Claim Three.

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Cross-Motions for Summary Judgment on "Offset" and Retention of Gratuities[3]

### A.    Defendants' Claim that Performance Fees "Offset" Its NYLL Obligations

The Court first addresses defendants' argument that the Club may use the performance fees that customers paid to its dancers to offset the Club's minimum-wage obligations under the

---

[3] In resolving these cross-motions, the Court considered:  Defendants' Memorandum of Law in Support of their Motion for Summary Judgment on NYLL § 196-d and Offset ("Def. Br.") (Dkt. 552); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Resp. Br.") (Dkt. 568); Defendants' Reply Memorandum of Law in Further Support of their Motion for Summary Judgment ("Def. Reply Br.") (Dkt. 579); Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment on Defendants' Offset Theory and Plaintiffs' Retention of Gratuities Claim ("Pl. Br.") (Dkt. 546); Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Resp. Br.") (Dkt. 571); and Plaintiffs' Reply Memorandum in Support of their Motion for Summary Judgment ("Pl. Reply Br.") (Dkt. 578).  The Court also considered the following factual submissions:  the parties' Stipulated Facts ("SF") (Dkt. 454); the Affidavit of Anna P. Prakash ("Prakash Aff.") (Dkt. 391); the Declaration of Anna P. Prakash ("Prakash Decl.") (Dkt. 522); the Declaration of Steven DeAngelo ("DeAngelo Decl.") (Dkt. 429); and Plaintiffs' Second 56.1 Statement ("Pl. 56.1") (Dkt. 545).

NYLL.  The Court previously rejected defendants' parallel argument under the FLSA.  *See*
September 2013 Decision, at 35–48.

> ### 1.    Facts

The pertinent facts are set out in full in the Court's September 2013 Decision, rejecting
the Club's parallel claim under the FLSA.  *See id.* at 35–38.  In brief, performance fees were paid
to dancers for time they spent with customers at Rick's NY.  Customers paid $20 to dancers for
each personal dance—*i.e.,* a lap dance or table dance—that they received from a dancer.  SF ¶¶
180–81.  Customers also paid dancers for spending time with them in one of the Club's semi-
private rooms—the fee was set by Rick's at $100 for 15 minutes, $200 for 30 minutes, and $400
for an hour.  DeAngelo Decl. ¶ 5. Customers also paid a separate fee to the Club for using the
rooms.  *Id.* ¶ 6.

Customers could pay performance fees in one of two ways:  If paying in cash, the
customer paid the dancer directly.  The dancer retained 100% of that cash payment, which was
not recorded in any way by the Club.  SF ¶ 220.  Alternatively, the customer could acquire from
the Club, by credit card, a "Dance Dollar" voucher.  Each voucher cost $24 and entitled the
customer to one personal dance.  SF ¶ 185.  At the end of each shift, dancers who had received
Dance Dollars from customers for performing dances could exchange these vouchers for cash
from the Club's cashier.  SF ¶ 190.  The dancer received $18 for each redeemed Dance Dollar,
and the Club retained the $6 balance.  *Id.* ¶¶ 185, 190.  Rick's did not record these payments in
its gross receipts.  Only by analysis of records undertaken after this litigation was initiated were
individual dancers' receipts from redeemed Dance Dollars reconstructed.  Prakash Decl. Ex. 1
("Dr. Crawford Expert Report").

2.      **Analysis**

Defendants, characterizing the performance fees paid to dancers by credit-card-using customers as "service charges," argue that the Club may use these fees to offset, or discharge altogether, its minimum wage obligations under the NYLL.  For two broad reasons, the Court rejects defendants' claim.

First, there is no charter under the NYLL for an employer to treat a performance fee as either a "wage" or as an offset to its statutory wage obligations.  The text of the NYLL—as well as its implementing regulations, its purpose, and the cases interpreting it—does not support defendants' interpretation.

Second, the line of cases beginning with *Samiento v. World Yacht, Inc.*, 10 N.Y.3d 70 (2008), on which defendants rely, is inapposite.  These cases address the distinction between a service charge, on the one hand, and a gratuity (or a purported gratuity), on the other.  They do so to determine who—as between the employer and the employee—is entitled to keep a customer payment.  But that is not at issue here—the dancers undisputedly were entitled to, and did, keep $18 of each Dance Dollar.[4]  And the *World Yacht* line of cases does not supply any authority for allowing an employer to use direct customer payments to employees after the fact to offset an employer's wage obligations.  And even if the *World Yacht* line did permit customer payments classified as service charges to be used retrospectively to offset an employer's wage obligations, the payments here are not properly so classified.  The *World Yacht* standard looks to a customer's reasonable expectations; here, a reasonable customer would have understood the performance fees which customers paid dancers as gratuities belonging to particular dancers, not as service charges belonging to the Club.

---

[4] A *World Yacht* issue *is* presented by the Club's retention of $2 of each Dance Dollar.  That is the subject of Claim Four.  *See infra*, § III-B.

> **a.** **The NYLL does not allow an employer to treat a performance fee as a wage or as an offset to its statutory wage obligations.**

Most fundamentally, there is no charter under the NYLL for an employer to treat such a performance fee, or any other non-gratuity charge paid by customers, as either a "wage" or as an offset to its statutory wage obligations. The NYLL defines "wage" as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." NYLL § 190(1). "'Wage' includes allowances, in the amount determined in accordance with the provisions of this article, for gratuities and, when furnished by the employer to employees, for meals, lodging, apparel, and other such items, services, and facilities." NYLL § 651(7). The NYLL also requires employers to treat wages in certain ways, including paying wages with frequency and regularity, *see* NYLL § 191, and to give employees notice of these wages and to keep records of them, *see* NYLL § 195.

Defendants—who have taken the position that the dancers were not employees—do not claim that the performance fees were themselves "wages," and under the statute, they manifestly were not. The performance fee paid by a customer to the dancer for a dance can certainly be viewed as a form of "earnings . . . for services rendered." But, otherwise, these performance fees lack the characteristics of wages as defined by the NYLL. Most critically, the performance fees were not "furnished by the employer to employees." NYLL § 651(7). Instead, whether paid in cash or in Dance Dollars purchased by means of a credit card, they were made directly by the Club's customers to its dancers. Only by happenstance was the Club momentarily involved, in some circumstances: where the customer paid by credit card to acquire Dance Dollars, the dancer needed to convert that scrip into cash, which led the Club to play a minimal role in the dancer's receipt of money. *See* September 2013 Decision, at 46 ("[T]he performance fees were paid

8

directly by the customer to the dancer, either in the form of cash or Dance Dollars; only the process of converting these vouchers into liquid currency brought Rick's NY, fleetingly, into the transaction.").

And, in redeeming these Dance Dollars, the Club did not treat the $18 per Dance Dollar that it remitted to the dancers consistent with their being wages. It did not keep any record of these payments; it did not give employees notice that it was treating them as wages (*e.g.,* by giving them a wage statement listing these amounts); it did not take the dancer's $18 share of the performance fee into gross receipts; and it did not make any mandatory wage deductions (*e.g.*, for Social Security and Medicare) from these payments. The Club also failed to comply with NYLL § 191, which requires that wage payments be made with frequency and regularity; the Club instead redeemed Dance Dollars episodically and non-systematically, doing so only when the dancer presented Dance Dollars for redemption. And, in failing to keep any record of these performance fees save via the credit-card payment process, the Club breached NYLL § 195, which imposes mandatory notice and record-keeping requirements with respect to wage payments. Finally, these payments do not fit within any of the limited categories of payments by an employer on an employee's behalf, *e.g.* for meals or clothing, for which, under NYLL § 651(7), a wage "allowance" may be taken. There is no other provision of the NYLL that supports treating a performance fee paid by a customer to a dancer as a wage or an offset to her employer's NYLL minimum-wage obligation.

The regulations implementing the NYLL likewise provide no support for defendants' notion that they may use money paid by customers to workers as an offset to their statutory minimum-wage obligation. Amplifying on the wage allowances authorized by NYLL § 651(7), these regulations do allow employers, under specified conditions, to apply a "tip credit" and to

apply some of its payments for meals and lodging towards wages.  *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 137–1.5, 1.9; *id.* § 146–1.3; NYLL § 652(4)-(6); *see also Padilla v. Manlapaz*, 643 F. Supp. 2d 302, 309 (E.D.N.Y. 2009).  Defendants do not claim that these allowances apply here.  And they plainly do not.  There is no authority for treating customer-paid service charges as an offset to wages where the Club did not treat them as wages.  And, assuming *arguendo* that the $18 portion of each Dance Dollar were treated as a "tip" (as opposed to a service charge), the Club would not satisfy the NYLL's requirements under which an employer may apply a "tip credit" against its wage obligations.  These include "furnish[ing] to each employee a statement with every payment of wages listing . . . allowances . . . claimed as part of the minimum wage. . . ."  N.Y. Comp. Codes R. & Regs. tit. 12, § 137–2.2; *see also id.* at § 146–1.3 ("An employer may take a credit towards the basic minimum hourly rate if a service employee or food service worker receives enough tips *and if the employee has been notified of the tip credit as required in section 146-2.2 of this Part*.") (emphasis added); *id.* at § 146–2.2 ("Prior to the start of employment, an employer shall give each employee written notice of the employee's regular hourly pay rate, overtime hourly pay rate, the amount of tip credit, if any, to be taken from the basic minimum hourly rate, and the regular payday. The notice shall also state that extra pay is required if tips are insufficient to bring the employee up to the basic minimum hourly rate.").  It is undisputed that defendants did not provide the dancers with any such statement.  Instead, the Club's bid to treat $18 from each Dance Dollar as a wage offset arose much later, during this litigation, to limit the Club's damages exposure.

Notably, insofar as it lacks any mechanism to use service charges as an offset to wages, the NYLL contrasts with the FLSA.  As explained in the Court's September 2013 Decision, the regulations implementing the FLSA provide for narrow, defined circumstances under which a

"compulsory charge for service . . . imposed on a customer by an employer's establishment," 29 C.F.R. § 531.55(a), and distributed by the employer to its employees, "may be used in their entirety to satisfy the monetary requirements of the Act," 29 C.F.R. § 531.55(b).  As the Court has explained, for such a charge to constitute a service charge that may be applied against an establishment's FLSA minimum-wage duty, the establishment must have included this charge in its gross receipts.  *See* September 2013 Decision, at 39 (collecting cases); *see also McFeeley v. Jackson St. Entm't, LLC*, No. 12 Civ. 1019 (DKC), 2012 WL 5928769, at *4 (D. Md. Nov. 26, 2012) ("'[A]n employer must include payments in its records as gross receipts as a prerequisite to 'service charge' classification under the FLSA.'" (quoting *Reich v. ABC/York-Estes Corp.*, No. 91 Civ. 6265 (BM), 1997 WL 264379, at *5 (N.D. Ill. May 12, 1997))).  Otherwise, the charge is treated, under the FLSA, as a "tip" and may not be applied against the establishment's minimum-wage obligations.  As the Court further explained, this bright-line requirement of inclusion in gross receipts serves important goals.  It advances the FLSA's goal of assuring that the employee is paid, and with mandatory deductions (*e.g.*, Social Security, Medicare) taken from the employee's wages.  By contrast, permitting an employer's FLSA minimum-wage obligation to be satisfied by payments not included in gross receipts but shown only later (*e.g.*, in litigation) to have been made to a worker by customers would diminish these protections and invite "intolerable problems of proof."  September 2013 Decision, at 40–42.

Rick's NY failed to satisfy these standards.  The only part of the $24 credit-card payment for each Dance Dollar that the Club had included in its gross receipts was the $6 portion that the Club kept for itself.  The $18 balance at issue here, which the Club passed along to the dancer after the customer's credit card was charged, was unrecorded, and was not included in the Club's gross receipts.  These payments, and the aggregate amounts paid to each dancer, were

reconstructed only later, during this litigation.  The Court therefore held that Rick's NY could

not apply any part of the performance fees paid by customers to reduce its minimum wage

obligation under the FLSA.[5]  *Id.* at 42.

In asking the Court to recognize an offset to their NYLL minimum-wage obligations,

defendants thus not only ask the Court to rewrite that statute to include an offset unsupported by

the NYLL's text, implementing regulations, and the case law.  Defendants also ask the Court to

devise an offset only loosely patterned on federal law.  Defendants cherry-pick the one aspect of

the FLSA regime that favors them (the broad concept of a wage offset for service charges) while

airbrushing out the FLSA's strict limitations for when such an offset may lawfully be made.  The

Court declines this invitation to so legislate from the bench.  Should defendants wish to revise

the NYLL to provide the offset they seek, their proper audience is the New York State

Legislature.

Defendants' notion that an offset against minimum wages ought be allowed here would

also undermine key purposes of the NYLL, such that, even if it were open to the Court to impute

such an offset to the statute, the Court would not do so.  The Club has not kept records of these

charges, paid taxes on them, included them on any wage statement or information returns (*e.g.*,

Forms W-2 or 1099), or used them to calculate deductions for Social Security and Medicare.

Under these circumstances, allowing such charges to offset an employer's statutory wage

obligations would undermine these important programs and facilitate non-payment of taxes to

---

[5] Recognizing that the case law is not uniform as to whether the failure of an employer to record charges in gross receipts is alone determinative of whether such fees represent a service charge deductible under the FLSA, the Court also considered the FLSA-offset question in light of the multi-factor inquiry which some courts have utilized.  In this multi-factor inquiry, an employer's failure to include the charges among gross receipts is a factor but is not invariably dispositive. The multi-factor inquiry yielded the same result: that the $18 portions of the Dance Dollars retained by the dancers were not service charges that could offset the Club's FLSA wage obligation.  *Id.* at 42–46.

federal and state authorities.  It would also put employers like the Club at an undeserved

advantage over competitors who pay workers lawfully by means of paychecks, with wages fully

subject to taxes and payroll deductions.  And it would undermine the NYLL's guarantee that the

required minimum wage be paid in full and on a regular basis.  *See* N.Y. Comp. Codes R &

Regs. tit. 12, § 146-2.6 ("The minimum wage provided by this Part shall be required for each

week of work, regardless of the frequency of payment."); *Karic v. Major Automotive Cos.*, 992

F. Supp. 2d 196, 201  (E.D.N.Y. Apr. 16, 2014) ("NYLL indisputably requires that employers

pay minimum wage and overtime on a *weekly* basis . . . .") (emphasis in original).

      To be sure, under the NYLL, there is a line of authority, beginning with the decision of

the New York Court of Appeals in *Samiento v. World Yacht, Inc.*, 10 N.Y.3d 70 (2008), under

which courts from time to time are called upon to differentiate between service charges, on the

one hand, and gratuities or purported gratuities.  Defendants seize on these cases in support of

their offset claim.  But the inquiry conducted pursuant to this line of authority serves a wholly

different purpose.  It determines, as between the employer and the employee, who is entitled to

keep these customer payments.  Under NYLL § 196-d, "[n]o employer or his agent . . . shall

demand or accept . . . any part of the gratuities[] received by an employee, or retain any part of a

gratuity or any charge purported to be a gratuity for an employee."  Courts examining under this

provision whether a mandatory payment is a gratuity or a "charge purported to be a gratuity," as

opposed to a "service charge," therefore inquire, based on the totality of the circumstances, how

a reasonable customer would have viewed the payment.  *See, e.g.*, *World Yacht*, 10 N.Y.3d at 79;

*Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 328–29 (S.D.N.Y. 2010) ("Under the *World Yacht*

standard, '[w]hether a charge purports to be a gratuity is measured by whether a reasonable

patron would understand that a service charge was being collected in lieu of a gratuity.'"

13

(quoting *Krebs v. Canyon Club, Inc.*, 880 N.Y.S.2d 873, 874 (N.Y. Sup. Ct. 2009))); *Maldonado v. BTB Events & Celebrations, Inc.*, 990 F. Supp. 2d 382, 390–91 (S.D.N.Y. Nov. 22, 2013). Where a reasonable customer would view a mandatory charge as a gratuity—making it less likely that the customer would give the employee a separate tip—the payment belongs to the employee.  Otherwise, the employer may retain it.

The *World Yacht* line of cases does not, however, hold that where an employer imposes a mandatory charge on customers but does not treat it as a wage, that this charge, if construed as a service charge rather than a tip, may be used after-the-fact to offset the employer's minimum-wage duty under the NYLL.  Defendants cite no authority for that proposition.  And, as noted, allowing an employer *post hoc* to treat these payments as offsets to its statutory wage obligation would disserve the statute's purposes.

### b.   Even if the *World Yacht* standard applies, it does not help defendants.

In any event, the Court is firmly persuaded that, under the *World Yacht* standard, a reasonable customer would have regarded the mandatory performance fees that customers paid to the dancer as gratuities belonging to the dancer, not as service charges belonging to the Club.[6] Therefore, even if a mandatory service charge could in theory be treated—long after the fact—as

---

[6] As noted, the Court has reached the same conclusion under the FLSA, both under the test set out in the Department of Labor's regulations that turns on whether the payments were taken into the establishment's gross receipts, and also based on a broader multi-factor test used by some courts that considers, but is not limited to, this factor.  *See* September 2013 Decision, at 39–46. The *World Yacht* standard overlaps significantly with the FLSA's multi-factor test.  However, these two standards are not fully synchronous, because whether an employer took a mandatory charge into its gross receipts is irrelevant to the NYLL's "reasonable customer" standard (except in the unlikely circumstance that a reasonable customer was somehow aware of whether his payments to employees were included in an establishment's gross receipts).  The Court therefore undertakes a separate analysis here of how a "reasonable customer" would view the performance fees he paid.

wages or an offset to wages, the customer payments to dancers here were not such service

charges.  The factors bearing on the reasonable expectations of the customer tilt heavily, in fact,

towards viewing the performance fees as tips.  Significantly, these fees were paid directly by

customers to dancers, and were largely paid in the form of cash, following a personalized service

(*e.g.*, a dance or a lap dance).  These cash payments, which were of varying size and were

completely unrecorded by Rick's NY in any form, undeniably were tips.  And as the Court

previously stated in its analysis under the FLSA:

> The accident that a subset of the performance fees happened to have been paid by
> credit card and took the form of vouchers, and therefore that these fees
> temporarily passed from the dancer to Rick's NY before being converted to cash,
> does not alter their essential character.  That Rick's NY maintained incomplete
> records of the total performance fees paid, with partial records being generated
> only by the happenstance that some customers chose to pay by credit card, does
> not make the recorded payments qualitatively different from the non-recorded
> ones.

September 2013 Decision, at 45.  As the Court further noted:

> [T]he performance fees (both the cash fees and the $18 portion of the credit-card-
> paid fees retained by the dancers) were understood by Rick's to be the property of
> the dancers. . . .  *There is no record evidence that customers perceived the money*
> *they paid the dancers (whether in cash or Dance Dollars) otherwise, and the*
> *circumstances would not support such an inference.*  F[inally], the performance
> fees were paid directly by the customer to the dancer, either in the form of cash or
> Dance Dollars; only the process of converting these vouchers into liquid currency
> brought Rick's NY, fleetingly, into the transaction.

*Id.* at 45–46 (emphasis added).

These factors, considered together, persuade the Court that a reasonable customer would

have understood the performance fees to be gratuities as opposed to service charges.  Notably,

the Club, in now arguing that these fees were service charges under the NYLL, has not pointed

to any evidence contradicting the Court's conclusion that "[t]here is no record evidence that

customers perceived the money they paid the dancers (whether in cash or Dance Dollars)" to be

anything other than the property of the dancers, and that "the circumstances would not support such an inference." *Id.* at 46.

That the credit-card paid performance fees were a substitute for cash-paid fees is particularly significant. A reasonable customer paying that dancer $20 (or more) in cash would have expected, *accurately*, that the dancer would keep the entire amount. There is no sound reason to conclude that a customer who chose to pay in Dance Dollars would have viewed these payments as any less a gratuity to be retained by the dancers. Indeed, customers who purchased Dance Dollars were told that the service charge associated with their credit card transaction was 20%. *See* Pl. 56.1 ¶¶ 620–21. A reasonable customer who could do basic math would deduce that, because the total cost to him of a Dance Dollar was $24, the service charge associated with his credit card transaction was $4—*i.e.*, 20% of $20. *See id.* ¶ 621 ("Q: What are customers told at the time they purchase a dance dollar? A: They're told that they are charged 20 percent and that the dance dollars expire at the end of the day. Q: When you say that they're told that they're charged 20 percent, is that like a 20 percent service fee on top of the dance dollar? A: Yes. Excuse me. They're told it's a 20 percent service charge. Q: And so that's the $4 which is 20 percent of $20? A: Yes."). The balance, or $20, would reasonably be viewed by a customer as a gratuity.

In the face of these factors, defendants make several arguments. Mostly, they emphasize that the Club set the price for lap dances and other performances. That factor does weigh in the Club's favor in considering the reasonable expectations of a customer. But defendants overreach when they assert that there is "no precedent for the common sense defying proposition that the actual price for the services being charged is a gratuity." Def. Br. 7. A number of cases, including *World Yacht* itself, have squarely held that an employer's mandatory charge may

16

constitute or purport to be a gratuity within the meaning of the NYLL.  *See World Yacht*, 10
N.Y.3d at 81 (stating that "the statutory language of Labor Law § 196-d can include mandatory
charges").  And in *Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048 (GEL), 2006 WL 851749
(S.D.N.Y. Mar. 30, 2006), also involving exotic dancers, Judge Lynch cited to a Northern
District of Illinois case, which had held that "five-dollar payments for 'table dances' at an exotic
dance club were 'tips,' despite the fact that they were fixed minimum payments, because the
payments were made directly to the dancers rather than as a portion of a payment made to the
employer, and because the employer did not include the payments in its gross receipts."  *Id.* at *3
(citing *Reich*, 1997 WL 264379, at *5–*7.  As Judge Lynch recognized, whether a service
payment is a tip turns on more than whether such a payment exceeds a base charge for a service.
*See id.; see also Thornton v. Crazy Horse, Inc.*, No. 3:06 Civ. 00251 (TMB), 2012 WL 2175753,
at *9 (D. Alaska June 14, 2012) (holding that payments to exotic dancers were tips, and
explaining that "[a]lthough the payments were not made 'voluntarily' in the sense that the
customers were obligated to pay some amount for the services they were receiving, the customer
could choose the dancer to request the dance from, and could pay more than the price set by the
club").  Notably, the DOL's definition of a gratuity under the FLSA—"a sum presented by a
customer as a gift or gratuity in recognition of some service performed for him," C.F.R.
§ 531.52—also permits treating a mandatory charge as a gratuity.

Defendants also rely on a printed disclaimer introduced on the third version of the Dance
Dollar, effective August 2008, which stated that the Dance Dollar was "not valid for gratuities."
*See* Pl. Ex. 60.  But even assuming that a customer in the sybaritic setting of an exotic nightclub
would choose or have the focus to read (let alone absorb) this disclaimer, this prose is far from
clear.  It does not state that the performance fee itself is not a gratuity.  A reasonable customer,

17

mindful that the Dance Dollar functioned as an alternative to paying the dancers in cash, could reasonably conclude that the disclaimer meant only that a Dance Dollar was not valid for use to pay gratuity for drinks or other items purchased in the Club.

Defendants also rely on the fourth version of the Dance Dollar, implemented in May 2011, to support their characterization of the Dance Dollars paid from that point forward. Those Dance Dollars stated, *inter alia*, that "Entertainers do not retain the full amount of fees paid for personal dances" and "Payments for personal dances are mandatory charges & not gratuities." *See* Pl. Ex. 295. The first of these statements is largely beside the point. Whether customers believed dancers retained only a subset (*e.g.*, $20) when customers paid $24 for a Dance Dollar would not change their expectations as to what this subset represented. The second statement, assuming it were read, would assist Rick's NY in the *World Yacht* analysis, but it is only one factor in that inquiry. *See Spicer*, 269 F.R.D. at 331 (stating, in reference to banquet service fees, that "even if a contract explicitly states that a service fee is not a gratuity, a reasonable customer might nonetheless believe otherwise depending on the totality of the circumstances."). Here, there is no assurance that a customer read the "fine print." And if the customer had done so, the totality of the circumstances surrounding the purchase of a private dance—particularly the fact that the Dance Dollar was handed directly to a dancer by the customer for a performance, in lieu of a cash payment for the same performance—would lead a reasonable customer to conclude that the Dance Dollar was a gratuity.

For these reasons, the Court holds, the performance fees paid by customers to the Club's dancers—whether paid in cash or by reimbursable Dance Dollars—would have been understood by a reasonable customer as a gratuity under the NYLL. Such a customer would have not viewed these fees as "being collected in lieu of a gratuity." *Spicer*, 269 F.R.D. at 330 (citations

omitted).  Thus, even if a fee judged a service charge under the *World Yacht* inquiry could be treated *post hoc* as an offset to an employer's minimum-wage obligation, the performance fees here could not be so treated.

This conclusion is, finally, reinforced by two relatively recent pronouncements by the New York State Department of Labor ("NYSDOL"), offering guidance on how NYLL § 196–d, the source of the *World Yacht* standard, is to be applied.  On March 11, 2010, the NYSDOL issued an opinion letter, setting out "illustrative" factors bearing on whether a reasonable patron would regard a particular fee as a gratuity or service charge.  These included: (1) the font size and prominence of the notice; (2) the label used to denote the charge and whether such a label would confuse patrons (noting that the label "administrative fee" is clearer than "service charge"); (3) whether the purpose of the charge and manner in which the charge is calculated are described on the bill; (4) whether the notice discloses the portion of the charge that is being distributed to the service staff and informs patrons to leave an additional payment as a tip; and (5) whether there exists a separate line for gratuity.  *See* Pl. Ex. 301 ("March 2010 Opinion Letter") at 3.  These factors are to be assessed under the "totality of the circumstances."  *Id.* at 2; *see also Spicer*, 269 F.R.D. at 331.  Although issued in the context of wait-staff working in banquets, the letter is not limited to that context.  The March 2010 Opinion Letter applies retrospectively and prospectively.  *See Maldonado*, 990 F. Supp. 2d at 390.

These factors undermine defendants' claim that the performance fees that Club customers paid were not "charges purported to be a gratuity."  To the extent customers paid in cash, they received no notice of any kind that these fees were intended as non-gratuities.  To the extent customers paid with Dance Dollars, the sole notice they received was the notation on the vouchers.  But the distracting context of a strip club makes it quite uncertain that customers saw

or read these notations; and the notations were too imprecise to give customers adequate notice that the fees were non-gratuities.  The Dance Dollar was not labeled as an administrative fee, the Club did not disclose how the fee would be allocated between the dancers and the Club, and customers were not invited to leave an additional payment as a gratuity.  Indeed, such a customer could add an additional gratuity when paying with a "Dance Dollar" only by paying in cash (which the customer had presumably already foregone in favor of buying a Dance Dollar by means of a credit card) or buying additional Dance Dollars for $24 apiece.

On January 1, 2011, the NYSDOL issued new, prospective regulations that used more determinate terms to construe NYLL § 196–d.  These created "a rebuttable presumption that any charge in addition to charges for food, beverage, lodging, and other specified materials or services, including but not limited to any charge for 'service' or 'food service,' is a charge purported to be a gratuity."  N.Y. Comp. Codes R. Regs. tit. 12, § 146–2.18(b) ("the 2011 Regulations").  The 2011 Regulations further provided that:

(a) A charge for the administration of a banquet, special function, or package deal shall be clearly identified as such and customers shall be notified that the charge is not a gratuity or tip.

(b) The employer has the burden of demonstrating, by clear and convincing evidence, that the notification was sufficient to ensure that a reasonable customer would understand that such charge was not purported to be a gratuity.

(c) Adequate notification shall include a statement in the contract or agreement with the customer, and on any menu and bill listing prices, that the administrative charge is for administration of the banquet, special function, or package deal, is not purported to be a gratuity, and will not be distributed as gratuities to the employees who provided service to the guests. The statements shall use ordinary language readily understood and shall appear in a font size similar to surrounding text, but no smaller than a 12-point font.

(d) A combination charge, part of which is for the administration of a banquet, special function or package deal and part of which is to be distributed as gratuities to the employees who provided service to the guests, must be

20

> broken down into specific percentages or portions, in writing to the customer, in accordance with the standards for adequate notification in subdivision (c) of this section. The portion of the combination charge which will not be distributed as gratuities to the employees who provided service to the guests shall be covered by subdivisions (a), (b) and (c) of this section.

*Id.* § 146–2.19.

Like the 2010 Opinion Letter, these regulations were addressed to a particular context, that of banquets or special functions. But, consistent with the case law, they reflect an overall understanding of NYLL § 196-d under which mandatory charges to customers in connection with service employees are presumptively "charge[s] purported to be a gratuity," and under which it is the employer's duty to rebut this presumption by giving clear notice to customers if the charges are not gratuities. Here, for the reasons set out above, a reasonable customer would have regarded the performance fees, by whichever means paid, as gratuities, and the Club did not give adequate notice to customers to combat this understanding. The 2011 regulations thus reinforce (as to the period from January 1, 2011 through the end of the class period) the Court's holding that the $18 of each Dance Dollar were gratuities. For that independent reason, even if defendants were correct that they could use service charges retained by employees to offset their minimum-wage obligations under the NYLL, the performance fees here could not be used as such an offset.

The Court, therefore, grants plaintiffs' motion for summary judgment, and denies defendants', on defendants' theory that performance fees paid by customers to dancers offset defendants' minimum-wage obligations under the NYLL. Peregrine—and any other defendant held at trial to be plaintiffs' employer—is therefore liable on Claim Two to the full extent it is determined that plaintiffs were denied minimum wages.

**B.      Plaintiffs' Claim Four—for Retention of Gratuities under NYLL § 196-d**

The Court turns next to the parties' cross-motions for summary judgment on Claim Four. Under NYLL § 196-d, "[n]o employer or his agent . . . shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee." In Claim Four, plaintiffs assert that the Club violated NYLL § 196-d by retaining $2 more than they were entitled from every Dance Dollar that a dancer redeemed.

Claim Four is based on the uncontested facts that: (1) when paying in cash, the customer paid the dancer $20; (2) when paying for the same services by credit card, a customer paid $24 for each Dance Dollar voucher; and (3) when redeeming these vouchers, the Club paid the dancer  $18 (and kept $6 for itself), while not informing customers that it intended to keep $6 of the cost of the Dance Dollar for itself, rather than $4, which would have left the dancer with $20. Plaintiffs argue that $20 of each Dance Dollar was a gratuity that the customer intended for the dancer.  Plaintiffs therefore assert that NYLL § 196-d was violated each time the Club redeemed a Dance Dollar and retained $2 of the $20 that was intended for the dancer.

The Court agrees.  Given that the Club required customers to pay dancers $20 in cash for a performance such as a personal dance, a reasonable customer could only conclude that, when the dance was paid for via a Dance Dollar, that $20 of each Dance Dollar would be retained by the dancer.  The service performed by the dancer was the same; customers had no reason to infer that the net amount received by the dancer would differ based on the form of customer payment. And the Club's representation to customers that the purchase of a Dance Dollar was subject to a 20% service charge would tend to confirm this.  A reasonable customer would conclude that the $24 cost of each Dance Dollar would be divided with the customer retaining $20 and Rick's NY

retaining an additional $4 (*i.e.*, 20%) service charge.  Under the *World Yacht* standard, a customer would regard a $20 payment for a personal dance—regardless of the form that payment took—as "purported to be a gratuity."  The Club thus violated § 196-d when it retained $6, not $4, from each redeemed Dance Dollar.

Accordingly, the Court grants plaintiffs' motion for summary judgment on Claim Four, and denies defendants' cross motion.  Peregrine—and any other defendant determined at trial to have been plaintiffs' employer—is liable to plaintiffs for unlawfully retaining $2 in gratuities with respect to every Dance Dollar the Club redeemed.

## IV.   Defendants' Motion to Strike Dr. Crawford's Expert Report and Testimony[7]

The Court turns next to defendants' motion to strike the expert reports and the testimony of plaintiffs' expert witness, Dr. David Crawford.

### A.      Background

Dr. Crawford is a labor economist who holds a Ph.D in Economics.  *See* Prakash Decl. Exs. 1 ("Crawford Report"), 8 ("Second Crawford Report"), 10 ("Corrected Crawford Report"). For purposes of this case, he created a model designed to calculate damages across the entire class of dancers employed at the Club during the relevant period.  *Id.*  This model incorporates data from defendants' point-of-sale database, Clubtrax, which Dr. Crawford used to determine

---

[7] In resolving this motion, the Court considered the following memoranda of law:  Defendants' Memorandum of Law in Support of their Motion to Strike the Expert Reports and Testimony of Dr. David L. Crawford ("Def. Br.") (Dkt. 514); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Strike ("Pl. Br.") (Dkt. 520); and Defendants' Reply Memorandum of Law in Support of the Motion to Strike ("Def. Reply Br.") (Dkt. 529).  The Court also considered the following factual submissions:  the Declaration of Jeffrey A. Kimmel in Support of Motion to Strike the Expert Reports and Testimony of Dr. David L. Crawford ("Kimmel Expert Decl.") (Dkt. 513) and attached exhibits; the Declaration of Anna P. Prakash in Opposition to the Motion to Strike ("Prakash Decl.") (Dkt. 522) and attached exhibits; and the Reply Affirmation of Jeffrey A. Kimmel in Support of the Motion to Strike ("Kimmel Reply Aff.") (Dkt. 530).

the hours each dancer worked and the amounts that these dancers paid in fines and fees.  *Id.*; *see also* SF ¶ 257.  Clubtrax contains data pertaining to all dancers in the class and is capable of running three reports:  (1) a Log-in/Log-out report, which reflects the time that each dancer logged-in and logged-out of work; (2) a Dance Dollar report, which reflects the timing of each Dance Dollar redemption; and (3) a Charge Summary report, which reflects the amounts paid by dancers to the Club in fines and fees.  *See* Prakash Decl. Ex. 2; SF ¶¶ 260–67.  In discovery, defendants produced all three reports for each class member for the entire class period.

The Log-in/Log-out reports are based on data generated when the Club's dancers log in to and out of work each day by scanning their index fingers against an electronic reader.  This reader then feeds the resulting data directly into Clubtrax.  SF ¶¶ 108–09, 265.  Not every dancer, however, was diligent about logging in and out of work.  Because the Clubtrax data is therefore incomplete, "[i]n many situations, the recorded times" for log-ins and log-outs are "default times, not actual log-in or out times."  Pl. Br. 3–4 (citing SF ¶ 266); *see also* Crawford Report ¶¶ 16–20.  The second type of report—the Dance Dollar report—shows the date and time that each entertainer cashed in a Dance Dollar, SF ¶ 264, while the third type of report—the Charge Summary report—provides a record of each dancer's balance of charges owed to the Club, *id.* ¶ 263.  These Charge Summary reports showed all cash payments—specifically, the fines and fees discussed above—that each dancer made to the Club.

Dr. Crawford's model consists of 137,880 "records."  Each record reflects the Clubtrax data (log-in/log-out, payments, and/or dance dollar redemptions) associated with one dancer for one "day," except that one "day" in this context, given the Club's hours, may include logging in one day in the evening and ending work the following morning.  *See* Crawford Report ¶¶ 11–15.

Because the data provided by Clubtrax is of varying quality, Dr. Crawford separated the data into three groups, or "tranches." Each tranche is described below, in descending order of reliability.

Tranche One: This is the model's most reliable data—it contains the 81,567 records in which there was a valid log-in and log-out time. *Id.* ¶¶ 28–29. To determine which records belonged in this tranche, Dr. Crawford took the entire universe of data, and excluded records that had any of the following characteristics:

- Records with "default" log-out times of 7:05 a.m., 7:06 a.m., 8:05 a.m., 9:05 a.m., and 10:05 a.m. The parties stipulated that 7:05 a.m. and 8:05 a.m. were default log-out times, but Dr. Crawford's analysis showed that 7:06 a.m., 9:05 a.m., and 10:05 a.m. also occurred far more frequently than expected, and that these log-out times were clustered during certain times. Dr. Crawford therefore excluded all records with these five log-out times from tranche one.

- Records where 10 or more of the records had "matching" log-outs in a single day. Dr. Crawford concluded that it was unlikely that 10 dancers would log-out at the exact same time on a particular day, and that, therefore, these times should also be treated as "default" log-out times.

- Records where the reported log-out times were during periods when the club was closed (*i.e.*, 4 a.m. to 11 a.m.), except where a Dance Dollar redemption—either by the dancer in question or by another dancer—occurred after the recorded log-out time, thereby indicating that the Club was in fact open.

- Records where the log-in and log-out times spanned the time when the Club was closed (*i.e.*, data that showed dancers logging-in before 4 a.m. and logging-out after 11 a.m.).

After excluding records with the above characteristics, what remained were 81,567 records with log-in and log-out times that appeared reliable. From these records, Dr. Crawford calculated the number of hours worked by the dancers associated with those 81,567 records. He then multiplied that number by the applicable minimum wage in order to calculate damages on Claims One and Two (the minimum-wage claims) as to these records.

Tranche Two: The second tranche consists of the 32,098 records where there was a valid log-in time—indicating that the dancer came to work—but no valid log-out time. *Id.* ¶¶ 30–34.

For these records, Dr. Crawford treated each dancer's last Dance Dollar cash-in time as *that dancer*'s log-out time.  The theory behind this substitution is that these dancers were known to have come to work—they simply neglected to log out, or were assigned a "default" log-out time.  A reasonable proxy for the dancer's true log out time, however, is the time when she last redeemed a Dance Dollar, because it can be inferred that the dancer was still at work when she made that redemption.  In reality, substituting the last Dance Dollar redemption often would tend to *understate* the number of hours worked by that dancer on that day, because the dancer may have continued to work for some time after redeeming her last Dance Dollar.  However, for the purpose of calculating damages, Dr. Crawford treated the last Dance Dollar redemption time as a proxy for when the dancer had finished working.

<u>Tranche Three</u>:  The third tranche consists of the 24,215 records where there were both missing log-out times *and* no valid Dance Dollar redemption time.  *Id.* ¶¶ 38–47.  For these records, Dr. Crawford had to substitute "average log-out times."  For 12,770 of these records, Dr. Crawford substituted the specific dancer's average log-out time for the particular day of the week of the particular month of the year where the data was missing.  *Id.* ¶¶ 39–40.  For the other 11,445 records, Dr. Crawford substituted the average log-out time for *all* dancers who worked on that particular day of the week of that particular month of the year.  *Id.* ¶ 41.  To validate this step, Dr. Crawford performed a variety of statistical tests aimed at assuring the reliability of these substitutions.

### B.    Legal Standards

Trial courts serve as "gatekeepers," responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  "Federal Rule of Evidence 702 grants an expert

witness testimonial latitude unavailable to other witnesses, provided that (1) 'the testimony is based on sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably applied the principles and methods to the facts of the case.'" *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, No. 11 Civ. 6188 (DLC), 2012 WL 6000885, at *6 (S.D.N.Y. Dec. 3, 2012) (quoting Fed. R. Evid. 702).

"The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). The Court's task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). A "trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). Additionally, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd on other grounds*, 552 U.S. 312 (2008). Pursuant to Rule 403, the Court may also exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Important here, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Amorgianos*

*v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  "The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions."  *Id.* (citations omitted).  "This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony."  *Id.*

   **C.    Analysis**

   Defendants have moved to strike Dr. Crawford's expert report and his expert testimony from trial.  They assert that Dr. Crawford's methodology is unreliable because he makes a number of "arbitrary assumptions" not justified by the evidence.  Def. Br. 2.  Defendants object, in particular, to five aspects of Dr. Crawford's methodology:  (1) his decision, while treating 10 matching log-outs as default log-outs that must be excluded from tranche one, not to similarly exclude nine or eight or seven matching log-outs; (2) his decision to credit certain log-outs that occurred when the Club's schedule indicated that it was closed, specifically, log-outs that occurred on days when Dance Dollars were later redeemed (on the theory that these redemptions indicated that the Club was still open); (3) treating 7:06 a.m., 9:05 a.m. and 10:05 a.m. as default log-out times that must be excluded; (4) treating 7:05 a.m., 8:05 a.m. and 9:05 a.m. as default log-in times that must be excluded; and (5) with respect to tranche three, replacing missing log-out times, generally, with Dance Dollar redemption times, or with averages calculated at the individual, or collective, level.  Def. Br. 16–23.

   Dr. Crawford acknowledges that the data given to him—which of course was collected and maintained by the Club—is imperfect.  But it is well-settled that, in wage-and-hour cases, employees are permitted to prove their hours worked as a matter of "just and reasonable

inference" in the absence of employer-maintained time records.  *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) ("Thus, at summary judgment, if an employer's records are inaccurate or inadequate, an employee need only present 'sufficient evidence to show the amount and extent of [the uncompensated work] *as a matter of just and reasonable inference.*'") (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)) (emphasis added).  It would be manifestly unfair to allow employers to avoid, or reduce, their liability simply because they kept shoddy records.  *See Mt. Clemens*, 328 U.S. at 687 (penalizing employee by "denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work" would "allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the [FLSA]").  It is against this backdrop that the Court must assess the admissibility of Dr. Crawford's report and testimony under Rules 702 and 403.

After careful review of Dr. Crawford's expert reports, it is the Court's judgment that his methodology is sufficiently sound to satisfy *Mt. Clemens*' "just and reasonable inference" standard, and that his testimony and expert report should, therefore, not be excluded under Rules 702 or 403.  On balance, Dr. Crawford's report is evenhanded, reasonable, and intellectually rigorous.  It is aimed at a fundamentally mechanistic task—tabulating the hours worked.  Had defendants' time records been complete, the task, in fact, would have been wholly mechanistic.  The gaps in the records, however, called upon Dr. Crawford to exercise judgment as to what reliable proxies would be for the missing data (*e.g.*, log-out times).  The issue for the Court is whether Dr. Crawford's methodology to fill these lacunae is reliable.  It is.

Indeed, although defendants object to Dr. Crawford's analysis, it is striking that most of the assumptions he makes in his damages model are conservative, and redound to defendants' benefit.  He broadly excluded categories of data based on his concerns about their potential

unreliability.  For instance, rather than accept all of the log-out time data as valid and calculate damages accordingly, Dr. Crawford observed that, in some instances, log-out times were clustered such that 10 or more dancers were shown to have logged out at the exact same time, or that multiple dancers were shown to have logged out at improbably consistent times, such as 9:05 a.m. or 10:05 a.m.  He concluded, fairly, that such clustering indicated, from a statistical standpoint, that those log-out times were most likely "default" times chosen by Clubtrax.  He therefore opted to exclude such records from "tranche one"—his category reciting the most reliable data.  Defendants criticize this statistical adjustment as "arbitrary."  But in the Court's view, they reflect due care, and an attempt to tabulate damages as accurately as possible in the face of defendants' imperfect data.  *See Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346, 376 (E.D.N.Y. 2011) ("Clearly, however, defendant will suffer no prejudice as a result of Dr. Crawford's conservative assumptions, and those assumptions are not a basis for excluding Dr. Crawford's testimony.").  The choice to treat 10 or more common log-outs as indicative of use of a default time chosen by ClubTrax, as opposed to an authentic group departure, is a reasonable assumption, and defendants offer no basis on which to assume that a different cut-off (*e.g.*, 8 or 9 contemporaneous log-outs) would be more reliable.  *See Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 129 (S.D.N.Y. 2014) ("The Court has discretion 'to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.'") (quoting *Boucher*, 73 F.3d at 21).

Indeed, strikingly, defendants, for their part, have not come forward with any alternative method for calculating damages.  Defendants' expert, Dr. Paul White, instead devotes his expert report to criticizing Dr. Crawford's methodology and his client's own Clubtrax data.  However, he makes no effort to make his own calculation for class-wide damages.  *See* Kimmel Aff. Ex. 1

("Review of Plaintiffs' Economic Expert Report by Peter White").  The fact that defendants have failed to offer an alternative, let alone a superior, methodology is a relevant consideration under *Mt. Clemens*.  *See* 328 U.S. at 687–88 (finding that defendant whose recordkeeping is deficient bears the burden of "com[ing] forward with evidence" to contradict any estimate based upon just and reasonable inferences offered by plaintiff; if defendant fails to do so, "the court may then award damages to the [plaintiff], even though the result be only approximate").  Here, defendants have failed to provide any good reason to discredit Dr. Crawford's estimate of damages as other than "just and reasonable."  On the contrary, the absence of any alternative methodology is a telling indication that defendants, in attacking Dr. Crawford's report, can do no more than spot imperfections that would exist in any damages methodology given the imperfect Clubtrax data.

Importantly, contrary to defendants' apparent premise, Dr. Crawford's analysis need not be perfect to be received in evidence—it need only rest on a reliable foundation that is relevant to the task at hand.  *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) ("As the Supreme Court explained in *Daubert*, Rule 702 requires the district court to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.") (citation and internal quotation marks omitted).  Plaintiffs easily meet that standard.  They have shown, by a preponderance of the evidence, that Dr. Crawford has based his expert report on sufficiently reliable facts and data, and that he has applied reliable principles and methods to that data.  Moreover, the probative value of Dr. Crawford's testimony at trial would be quite high.  Based on the current record, that testimony would be the only available evidence from which a reasonable factfinder could calculate damages.  The Court has further considered whether this probative value would be substantially outweighed by the risk of unfair prejudice or confusion of the issues.  It would not.  Indeed, the Court views the risk of unfair prejudice as virtually zero

and the risk of jury confusion as slight given the easily understood nature of the data, which is focused on quotidian matters such as the time a worker ceased work for the day.  Accordingly, defendants' motion to strike Dr. Crawford's expert report and his testimony under Rules 702 and 403 is denied.[8]

## V.      Defendants' Motion to Decertify the Class[9]

Defendants have also moved to decertify plaintiffs' class action.  On December 20, 2010, Judge Koeltl, in a detailed Opinion & Order, certified a class consisting of the following individuals:

---

[8] Of the various judgmental assumptions Dr. Crawford made in order to fill the voids in the ClubTrax data, the most subjective—and in the Court's view the one most susceptible to effective challenge before the jury—is the use of "average log-out times" in connection with the "third tranche" of data.  Unable to use actual log-out times or Dance Dollar redemptions to calculate when the individual dancer's shift ended on a given day, Dr. Crawford proposes to use average log-out times to calculate hours worked with respect to these 24,215 records (*i.e.*, days worked).  There are certainly arguments that more conservative measures could be used to calculate damages for this tranche, including measures that might more conservatively ascribe to the dancer not an "average" departure time but an earlier than average time, in the interest of minimizing the risk of overstating damages.  But which of these measures of damages is most persuasive is a jury question.  There is nothing unreliable or misleading about Dr. Crawford's third-tranche methodology.  Average log-out time is one plausible, and an easily understood, way of gauging damages for the days of work at issue, where no evidence exists on which one could reconstruct the employee's actual departure time on a given day.  At trial, the defense will be at liberty to vigorously cross-examine Dr. Crawford about alternative means of calculating third-tranche damages; and to argue to the jury that his methodology overstates or unpersuasively calculates such damages.  The Court is confident that the jury will be able to understand, and reach its own considered judgment, as to which of these methodologies is the most persuasive.

[9] In resolving this motion, the Court considered the following memoranda of law:  Defendants' Memorandum of Law in Support of Motion for Decertification of Rule 23 Class and Conditionally Certified FLSA Collective ("Def. Br.") (Dkt. 511); Plaintiffs' Memorandum of Law in Opposition to Motion for Decertification ("Pl. Br.") (Dkt. 521); and Defendants' Reply Memorandum of Law in Support of Motion for Decertification ("Def. Reply Br.") (Dkt. 527).  The Court also considered the following factual submissions:  the Declaration of Jeffrey A. Kimmel in Support of Motion for Decertification ("Kimmel Decert. Decl.") (Dkt. 516) and attached exhibits; the Declaration of Anna P. Prakash in Opposition to Motion for Decertification ("Prakash Decl.") (Dkt. 522) and attached exhibits; and the Reply Affirmation of Jeffrey A. Kimmel in Support of the Motion for Decertification ("Kimmel Reply Aff.") (Dkt. 528).

> All persons who worked at Rick's New York or were employed by Defendant
> Rick's Cabaret International Inc., RCI Entertainment (New York) Inc. and/or
> Peregrine Enterprises, Inc. in the state of New York as "entertainers" at any time
> six years prior to the filing of the Complaint to the entry of judgment in this case.

2010 WL 5297221, at *1–2.  Under Federal Rule of Civil Procedure 23(c)(1)(C), however, class

certification orders are conditional; "[a]n order that grants or denies class certification may be

altered or amended before final judgment."  It is well-settled that "a district court may decertify a

class if it appears that the requirements of Rule 23 are not in fact met."  *Sirota v. Solitron

Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982).

## A.  Legal Standards

Class certification is governed by Federal Rule of Civil Procedure 23.  Under Rule 23(a),

the party seeking certification must demonstrate, by a preponderance of the evidence, that:

> (1)  the class is so numerous that joinder of all members is impracticable ("numerosity");
>
> (2)  there are questions of law or fact common to the class ("commonality");
>
> (3)  the claims or defenses of the representative parties are typical of the claims or
>      defenses of the class ("typicality"); and
>
> (4)  the representative parties will fairly and adequately protect the interests of the class
>      ("adequacy").

The proposed class must also satisfy at least one of the three requirements listed in Rule

23(b).  Here, plaintiffs rely on Rule 23(b)(3), which states that a class action may be maintained

if "the questions of law or fact common to class members *predominate* over any questions

affecting only individual members," and if  "a class action is *superior* to other available methods

for fairly and efficiently adjudicating the controversy."  *Id.* (emphases added).  The

predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation."  *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 418 (S.D.N.Y.

2013) (citations omitted).

33

## B.    Discussion

Defendants argue that the class should be decertified because, *inter alia*, plaintiffs have failed to establish "commonality," *see* Fed. R. Civ. P. 23(a)(2), or the "predominance" of common issues over individual ones, *see* Fed. R. Civ. P. 23(b)(3).[10]  Judge Koeltl, in certifying the class, held both requirements satisfied.  *See* 2010 WL 5297221, at *7 ("[T]he propriety of the defendants' blanket categorization of the plaintiffs as independent contractors, and, if improper, the legal consequences of that categorization, by their nature *tend to predominate over* any individual issues.") (emphasis added).  In arguing for de-certification, defendants rely principally not on facts adduced in intervening discovery, but on two cases decided by the Supreme Court after Judge Koeltl certified the class:  (1) *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ("*Dukes*"); and (2) *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ("*Comcast*").

---

[10] Defendants also challenge the Rule 23 requirements of adequacy of representation, typicality, and superiority.  *See* Def. Br. 29–33.  But defendants' arguments as to these requirements are exceedingly unpersuasive.  It is not seriously disputed that the named plaintiffs were employed by the Club in a manner typical of all other dancers in the class—namely, they were classified as independent contractors and thus were not paid a minimum wage.  Moreover, the named plaintiffs were subjected to fines, fees, and "tip-outs," and received $18 for every Dance Dollar redeemed.  Accordingly, in relation to the causes of action in the Complaint, the named plaintiffs are typical and adequate class representatives.  Finally, as to superiority, adjudicating this controversy as a class action to date has served the interest in judicial economy.  With this decision, liability has been established with respect to four of the five causes of action on a class-wide basis; and damages (at least in part) have been awarded on these four causes of action, again, on a class-wide basis.  A class-wide resolution is also clearly superior than a series of individual adjudications as a means of resolving the remaining issues in the case:  (1) whether RCI NY and RCII were plaintiffs' employers; (2) whether defendants acted willfully or in bad faith; and (3) how to calculate damages with respect to dancer days worked to extent not covered by Dr. Crawford's first tranche (as to which tranche the Court grants, in part, summary judgment for plaintiffs, *see* Section VI, *infra*).  The first two of these inquiries do not require dancer-specific determinations.  And as to the third, it is not argued that individual dancers recall the hours she worked on particular days; the damages issue instead is how to most accurately calculate hours worked based on the assembled documentary record.  Resolution on a class-wide basis is clearly a superior means of adjudicating this controversy than engaging in repetitive inquiries across a series of individual lawsuits.

Specifically, defendants argue that *Dukes* raises the burden of proving commonality sufficient to maintain a class, and that plaintiffs can no longer meet that requirement of Rule 23(a)(2).  Defendants further argue that *Comcast* requires plaintiffs to prove they can establish damages on a class-wide basis, and that plaintiffs' expert, Dr. Crawford, is unable to do so. From this premise, defendants assert that common issues do not predominate over individual issues, as Rule 23(b)(3) requires.  The Court addresses these arguments in turn.

### 1.      Commonality (Fed. R. Civ. P. 23(a)(2))

In *Dukes*, the Supreme Court reversed a decision to certify a class of 1.5 million former Wal-Mart employees.  Plaintiffs had claimed that local Wal-Mart supervisors had discriminated against female employees on the basis of their gender, in violation of Title VII.  In overturning the certification, the Court found a lack of commonality: it held that plaintiffs had failed to show "questions of law or fact common to the class," as required by Rule 23(a)(2).  Commonality, the Court explained, "requires the plaintiff to demonstrate that the class members have suffered the same injury," and that their claims "depend upon a common contention" that is "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  131 S. Ct. at 2551 (citations omitted).  Thus, the Court explained, class certification is appropriate if the class-wide proceeding has the capacity to "generate common *answers* apt to drive the resolution of the litigation."  *Id.* (citation omitted).

The *Dukes* class lacked commonality, the Court held, because there were "literally millions of employment decisions" made by mid-level managers at Wal-Mart with respect to female employees, and a determination whether any one of these decisions reflected gender discrimination would not yield answers common to the nationwide class.  *Id.* at 2552.  Because it

was "impossible to say that examination of all the class members' claims for relief [would]

produce a common answer to the crucial question *why was I disfavored*," the Court held that the

commonality requirement was not satisfied.  *Id.*  As the Court noted, the members of the *Dukes*

class "'held a multitude of different jobs, at different levels of Wal-Mart's hierarchy, for variable

lengths of time, in 3,400 stores, sprinkled across 50 states, with a kaleidoscope of supervisors

(male and female), subject to a variety of regional policies that all differed . . . .  Some thrived

while others did poorly.  They have little in common but their sex and this lawsuit.'"  *Id.* at 2557

(quoting *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 652 (9th Cir. 2010) (en banc) (Kozinski,

J. dissenting)).

        At the risk of stating the obvious, this case is a far cry from *Dukes*.  The wage and hour

practices challenged in this class action were not implemented nationwide across thousands of

stores.  These practices, as challenged, were confined to a single New York City nightclub.

Legally, these practices were not subject to a multitude of conflicting state laws.  They were

governed by a single federal law (the FLSA) and a single state's labor laws (the NYLL).  And

the practices that the plaintiff class here challenges, by their nature, bear no resemblance to the

subjective and often inherently individualized practices (*e.g.*, hiring, promotion, firing and

discipline) at issue in *Dukes*.  Rather, as alleged, Rick's NY systematically implemented a series

of across-the-board policies with regard to dancer pay:  to classify all dancers as independent

contractors; to not pay dancers a minimum (or any) wage; to leave the dancers' compensation

instead to customers; to allow dancers to retain only $18 (rather than $20) where customers paid

for performances by means of Dance Dollars; and to charge dancers fines and fees for breaching

Club rules.

Further, at this stage of this lawsuit, plaintiffs' claim that the Club engaged in a common, unlawful practice with respect to all dancers is more than an allegation. It is a judicial finding. The Court, in entering judgment against Peregrine and in favor of the class on Claims One (FLSA minimum wage), Two (NYLL minimum wage), Four (NYLL illegal retention of gratuities), and Five (unlawful deductions from wages), all involving classwide allegations, has so found. There has been no serious claim made that the Club's policies towards dancers were anything other than uniform.

Thus, there are numerous common questions of law and fact. Indeed, it is fair to say that, at least as to liability, *every* significant question of law and fact in this lawsuit is "common to the class."

*Dukes*, therefore, does not assist defendants, at all. It does not support decertification. Defendants' motion to decertify the class on "commonality" grounds is, accordingly, denied.

### 2.    Predominance (Rule 23(b)(3))

In *Comcast*, the Supreme Court overturned certification of a class "of more than 2 million current and former Comcast subscribers who [had sought] damages for alleged violations of the federal antitrust laws." 133 S. Ct. at 1429–30. The Court held that common issues did not predominate over individualized ones, as required by Rule 23(b)(3). *Id.* at 1432. The district court in *Comcast* had approved just one of the theories of antitrust impact argued by the plaintiffs—the "reduced overbuilder competition" theory. But plaintiffs' expert witness had calculated damages based on all four theories of asserted antitrust impact, and was unable to extract which portion of the damages estimate was attributable to the single theory approved by the district court. Because the damages model was deficient, in failing to "measure only those damages attributable to that theory," the Supreme Court held that the model could not "possibly

establish that damages are susceptible of measurement across the entire class for purposes of

Rule 23(b)(3)." *Id.* at 1433.

Since the Supreme Court decided *Comcast*, "district and circuit courts alike have

grappled with the scope, effect, and application of *Comcast*'s holding, and in particular, its

interaction with non-antitrust class actions." *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 581

(S.D.N.Y. 2013). As Judge Oetken has summarized:

> [C]lass-certification decisions applying *Comcast* can be divided into three,
> distinct groups: (1) courts distinguishing *Comcast*, and finding a common
> formula at the class certification stage, and thus predominance, satisfied;
> (2) courts applying *Comcast* and rejecting class certification on the ground that no
> common formula exists for determination of damages; and (3) courts embracing a
> middle approach whereby they employ Rule 23(c)(4) and maintain class
> certification as to liability only, leaving damages for a separate, individualized
> determination.

*Id.* at 581–82 (internal citations omitted); *see also Leyva v. Medline Indus. Inc.*, 716 F.3d 510,

514 (9th Cir. 2013) (holding that *Comcast* requires only that plaintiffs "show that their damages

stemmed from the defendant's actions that created the legal liability"; if class members prove

liability, "damages will be calculated based on the wages each employee lost due to Medline's

unlawful practices"); *Cowden v. Parker & Assocs., Inc.*, No. 09 Civ. 323 (KKC), 2013 WL

2285163, at *7 (E.D. Ky. May 22, 2013) (where insurance-agent plaintiffs alleged that their

employer withheld commissions and charged excessive fees, damages were too individualized to

support class certification, because the "only way to resolve those issues is to analyze each

agent's account and those individual analyses will overwhelm any of the common issues in this

matter"); *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 676 (D. Kan.

Apr. 5, 2013) (certifying, as to liability, a consumer class against motor fuel retailers for breach

of the duty of good faith and fair dealing; court bifurcates liability and damages determinations

where damages calculations were too individualized to be resolved at the class-wide level).

Although the long-term doctrinal effect of *Comcast* in limiting the permissible reach of class certification under Rule 23(b)(3) is as-yet unknown, this case does not present hard issues under that decision.  Both before and after *Comcast*, classes were properly certified under Rule 23(b)(3) where liability could be determined classwide and either (1) damages were capable of class-wide determination, or (2) individual damage calculations are simple and mechanical, so as not to overwhelm questions common to the class.  *Comcast* has not disturbed those precepts.  *See Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013) ("Although individualized monetary claims belong in Rule 23(b)(3), predominance may be destroyed if individualized issues will overwhelm those questions common to the class. . . . That said, there are ways to preserve the class action model in the face of individualized damages. . . . But we believe the district court is in the best position to evaluate the practical difficulties which inhere in the class action format, and is especially suited to tailor the proceedings accordingly.") (internal citations omitted); *see also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ("[W]hile the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification . . . it is nonetheless a factor we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues."); *Jacob*, 293 F.R.D. at 595 ("*Comcast* brings damages to the forefront of the class certification inquiry—a holding that, when combined with *Dukes*' discussion of trial by formula, suggests that where individualized damages questions so predominate over damages questions capable of class-wide proof, certification is inappropriate and raises due process concerns for defendants.").

39

Measured under those standards, the class action here comfortably accords with Rule 23(b)(3).  The damages inquiries here do not turn on individualized, dancer-specific proof.  As to the claims of unpaid minimum wages at the heart of this case, the sole disputed factual issue as to which the damages inquiry turns are the hours worked by dancers each day.  Plaintiffs seek to resolve that question not via individual dancers' testimony—there is no claim that dancers recall their daily hours from years ago—but instead collectively based on Dr. Crawford's computerized model, which in turn is based on the Club's "computerized payroll and time-keeping database." *See Leyva*, 716 F.3d at 514 (approving class certification based on computerized damages model using employer's database).  That model sorts the days worked by all dancers into several categories (or "tranches"), based on the surviving documentary evidence.  As to each tranche, the finder of fact will be called upon to decide whether to accept, or not, Dr. Crawford's calculation of damages.  Whichever decision the finder of fact reaches, the decision will be made collectively on a tranche-by-tranche basis, not based on data specific to individual dancers.[11]  On their other two claims—for improper retention of gratuities with respect to $2 for each Dance Dollar, and of unlawful deduction of wages in connection with fines, fees, and tip-outs— plaintiffs would similarly prove damages, if at all, class-wide and mechanistically, via a computerized tabulation model utilizing Club data.

*Comcast* therefore has no bearing on this case.  To the extent that *Comcast* holds merely that class-wide damages must be linked to the plaintiffs' specific theory of liability, such is the case here, as to each of plaintiffs' four claims.  To the extent that *Comcast* may be read more broadly to preclude class certification in certain cases where damages require individualized and

---

[11] As discussed in Section VI, *infra*, the Court grants summary judgment, in part, to plaintiffs on Tranche One, finding no dispute of material fact as to the hours worked for dancer-days covered by that tranche.

complex determinations, that holding is beside the point, as damages here would be resolved on a class-wide basis.  The *Comcast* majority, indeed, reaffirmed the use of a class-wide model to calculate class damages.  *See* 133 S. Ct. at 1433 ("Calculations need not be exact , . . . but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case.") (citations omitted).

Accordingly, the Court rejects defendants' claim that, under *Comcast*, plaintiffs cannot satisfy the Rule 23(b)(3) predominance requirement.

The Court therefore denies defendants' motion to decertify the class.[12]

## VI.   **Damages**[13]

---

[12] Defendants also moved to decertify the FLSA collective.  *See* Def. Br. 33–35.  Such decertification is only appropriate, however, where the Court determines that the plaintiffs who have opted–in are not similarly situated to the named plaintiffs.  *See Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010).  The named plaintiffs  here are similarly situated to the FLSA collective, including because, as noted, defendants are liable to the named plaintiffs on Claim One for the same reasons (failure to pay a minimum wage) as they are to the collective; and the damages due to the named plaintiffs would be established by the same model used for the collective.  The Court therefore denies defendants' motion to decertify the FLSA collective.

[13] The Court's account of the facts underlying the damages' calculations herein is drawn from plaintiffs' submissions in support of their motion for summary judgment, including:  Plaintiffs' Local Rule 56.1 Statement ("Pl. 56.1") (Dkt. 555); the Affidavit of Anna P. Prakash in Support of Motion for Summary Judgment ("Prakash Aff.") (Dkt. 557) and attached exhibits; the Declaration of David L. Crawford, Ph.D. in Support of Motion for Summary Judgment ("Crawford Decl.") (Dkt. 558) and attached exhibits; the Declaration of Reka Furedi in Support of Motion for Summary Judgment ("Furedi Decl.") (Dkt. 559); the Declaration of Sabrina Hart in Support of Motion for Summary Judgment ("Hart Decl.") (Dkt. 560); the Declaration of Nicole Imbeault in Support of Motion for Summary Judgment ("Imbeault Decl.") (Dkt. 561); the Declaration of Yaira Paula in Support of Motion for Summary Judgment ("Paula Decl.") (Dkt. 562); the Declaration of Kaiesha Thompson in Support of Motion for Summary Judgment ("Thompson Decl.") (Dkt. 563); the Reply Affidavit of Anna P. Prakash in Support of Motion for Summary Judgment ("Prakash Reply Aff.") (Dkt. 589) and attached exhibits; the Reply Affidavit of Plaintiffs in Support of Motion for Summary Judgment ("Pl. Reply Aff.") (Dkt. 590); the Declaration of David L. Crawford, Ph.D. (Second) in Support of Motion for Summary Judgment ("Crawford Second Decl.") (Dkt. 591); the Declaration of Lissette Cabrera in Support of Motion for Summary Judgment ("Cabrera Decl.") (Dkt. 592); Defendants' Response to Plaintiffs' Local Rule 56.1 Statement ("Def. Resp. 56.1") (Dkt. 585); the Declaration of Jeffrey

Finally, plaintiffs have moved for partial summary judgment with respect to the damages associated with Claims One, Two, Four, and Five. Plaintiffs seek $18,839,195, with the balance of their claims for damages to be resolved at trial. For the reasons that follow, the motion is granted in part and denied in part. Specifically, the Court grants summary judgment as to damages in the amount of $10,866,035, with the balance of plaintiffs' damages claims to be resolved at trial.

## A.    Legal Standards

District courts may grant summary judgment as to damages for which there exist no disputed issues of material fact. *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 740 (2d Cir. 2010) ("[C]ourts . . . routinely award damages that are readily calculable based on the undisputed facts on summary judgment.") (collecting cases); *GCCFC 2006-GG7 Westheimer Mall, LLC v. Okun*, No. 07 Civ. 10394 (NRB), 2008 WL 3891257, at *3

---

A. Kimmel in Opposition to Motion for Summary Judgment on Damages ("Kimmel Decl.") (Dkt. 586) and attached exhibits; and the Declaration of Paul F. White, Ph.D in Opposition to Motion for Summary Judgment on Damages ("White Decl.") (Dkt. 587) and attached exhibits. References herein to a paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials cited therein. Where facts stated in a party's Statement of Material Facts are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The following abbreviations are used herein for the parties' memoranda of law: (1) Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment on Damages ("Pl. Damages Br.") (Dkt. 556); (2) Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment on Damages ("Def. Damages Br.") (Dkt. 584); and (3) Plaintiffs' Reply Memorandum of Law in Support of Motion for Summary Judgment on Damages ("Pl. Reply Damages Br.") (Dkt. 588).

(S.D.N.Y. Aug. 21, 2008) ("Summary judgment may be granted on damages where there is no

fact dispute as to the amount of damages.") (citing *In re Livent, Inc. Noteholders Securities

Litig.*, 355 F. Supp. 2d 722, 738 (S.D.N.Y. 2005)).

If one portion of damages is undisputed while other portions remain in dispute, the court

may grant summary judgment as to the undisputed portion.  *See* Fed. R. Civ. P. 56(a) ("A party

may move for summary judgment, identifying each claim or defense—or *the part of each claim

or defense*—on which summary judgment is sought.") (emphasis added); *see also Travelers Ins.

Co. v. Mark Ross Servs. Corp.*, No. 03 Civ. 2464 (MGC), 2004 WL 232144, at *2 (S.D.N.Y.

Feb. 6, 2004) (granting summary judgment "with respect to . . . the undisputed portion of

damages sought" and denying it "with respect to the disputed portion of damages owed by

defendants"); *Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 307 (E.D.N.Y. 2010).

### B.    Analysis

#### 1.    Minimum Wage Damages—Claims One (FLSA) and Two (NYLL)

At the outset, the Court notes that plaintiffs' motion for summary judgment with respect

to FLSA and NYLL minimum wage damages is based on only a subset of the Clubtrax data.

Specifically, plaintiffs seek summary judgment on damages with respect to 57,823 out of the

81,567 "records" (*i.e.*, dancer work-days) contained in tranche one.

As noted above, *see supra* Section IV, tranche one excludes time records with:

(1) "default" log-in or log-out times; (2) log-in or log-out times during periods when the club

was closed, except when a Dance Dollar was redeemed after the closing time; and (3) *10 or more

"matching" log-outs*.  For purposes of their summary judgment motion, plaintiffs have narrowed

the field even further:  Their present motion excludes all records with *any* "matching" log-out

time.  This exclusion respects, or at least responds to, defendants' argument that Dr. Crawford

erred in excluding records with only 10 or matching log-outs from tranche one; defendants argue that some lower number of matching log-out times signifies that a default log-out time was used. Plaintiffs therefore have excluded from their motion for summary judgment on damages *all* records with any matching log-out times. Further, on this motion, plaintiffs seek summary judgment within tranche one of only those records that reflect log-out and log-in times occurring during the Club's business hours. (Thus, plaintiffs' present motion excludes days in which a dancer evidenced her continued presence at the Club by redeeming a Dance Dollar after the official closing time.) The result is that plaintiffs seek only the damages associated with 57,823 records, which collectively account for 465,145 hours worked. *See* Pl. 56.1 ¶ 759.

Given the Court's prior determination that the dancers were employees entitled to be paid a minimum wage, and given that plaintiffs have restricted their request for summary judgment to days in which the Club's records unambiguously and reliably show that a dancer worked defined hours, there is no legal or factual basis for opposing this motion for partial summary judgment.[14] Accordingly, the FLSA and NYLL minimum wage damages calculations below are based on the hours associated with records that "do not contain default or invalid login or logout times *and* [that] do not contain logout times that match another logout time on the same day *and* [that] only contain logout and login times occurring during Defendants' business hours." Pl. Br. 8.

---

[14] Indeed, defendants' only objection to this motion is that plaintiffs' motion concerns only "a fraction of the total records," and that such an application somehow "defeats the whole purpose of class actions" by permitting a "piecemeal" recovery. Def. Br. 1. As a matter of law, that is wrong; the case law permits partial summary judgment, and as plaintiffs note, the subset of claimed damages to which their present motion relates is one as to which there are no genuine issues of disputed fact. Further, granting summary judgment as to these damages will promote economy by narrowing the issues to be tried.

### a.      Claim One—Minimum Wage (FLSA)

As to Claim One, plaintiffs seek a judgment for $105,376 in FLSA minimum wage damages.

This amount is derived by multiplying: (1) the applicable minimum wage rate for the relevant time period—*i.e.*, beginning two years before this case was filed and continuing through the end of the class period, and (2) the number of hours worked by the opt-in plaintiffs, as calculated above.[15]  In addition, because the fines, fees, and "tip outs" taken from plaintiffs had the effect of reducing the opt-in dancers' wages below zero, plaintiffs seek to add these amounts into the FLSA minimum wage judgment.  *See Reich v. Priba Corp.*, 890 F. Supp. 586, 595 (N.D. Tex. 1995) ("To fully compensate the entertainers in the amounts required by the FLSA, Cabaret Royale must pay them the full minimum wage for all time worked during the limitations period. In addition, the club must return all tip out fees collected from the entertainers.").  Therefore, plaintiffs seek damages in the amount of minimum wages for each hour worked by a member of

---

[15] In their opposition brief, defendants for the first time argue that dancers in the class engaged in various "non-compensable" activities—such as smoking, drinking, and sitting in the dressing room—and that, therefore, the amount of "compensable" time can only be determined on an individualized basis.  *See* Def. Br. 13.  The Court agrees with plaintiffs that this argument, having never been raised, is untimely and thus waived.  In any case, however, the argument fails on the merits.  Under the FLSA, and by extension the NYLL, all of the time worked during a continuous workday is compensable, save for bona fide meal breaks.  *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005).  The "integral and indispensable" analysis defendants seek to use here is not to the contrary; that inquiry is used to determining whether to compensate employees for activities *before* or *after* the workday.  The activities defendants cite, by contrast, undisputedly took place *during* the dancers' workday.  Accordingly, there is no issue of fact with respect to the amount of time for which dancers are entitled to be compensated.  They are entitled to be compensated for all hours worked between the time they logged in until the time they logged out. With respect to the records covered by the present motion, there is no basis for disputing the accuracy of defendants' Clubtrax data as to these times.

the FLSA collective, *as well as* the value of the fines, fees, and "tip outs" that these members

paid to the club during their relevant shifts.[16]

Within the subset of the data covered by plaintiffs' summary judgment motion, the opt-in

members of the FLSA collective worked 657 shifts.  The total number of hours associated with

these shifts was 5,336.  Pl. 56.1 ¶ 763; *see also* Crawford Decl. ¶¶ 13–14.  Minimum wage

damages therefore amount to $35,002—*i.e.*, the hours in question (5,336) multiplied by the

applicable federal minimum wage for the year in which hour was worked (that rate ranged from

$5.15 to $7.25).  The data also reflects that these opt-in plaintiffs paid $30,954 in fines and fees,

*see* Pl. 56.1 ¶¶ 703, 757, 767; Crawford Decl. ¶¶ 14–15, and, purportedly, paid $39,420 in "tip-

outs" ($60 multiplied by 657 shifts).  Plaintiffs therefore seek summary judgment with respect to

$105,376 in FLSA minimum wage damages.  *See* Crawford Decl. ¶14.

Defendants have not cited any basis in evidence to challenge the data associated with the

minimum wage damages or the payment of fines and fees.  However, there is a material issue of

disputed fact concerning whether plaintiffs were *required* to pay $60 in "tip-outs"—specifically,

$20 to the disc jockey, $20 to the house mom, and $20 to club management—for every shift

worked.  There is certainly ample record evidence supporting plaintiffs' claim that these tip-outs

*were* required.  *See generally* Pl. 56.1 ¶¶ 697–708.  But defendants have adduced admissible

evidence to the contrary.  *See, e.g.*, Prakash Reply Aff. Ex. 55:  Deposition of Melinda Trapani,

17–18 (testifying that dancers were not *required* to pay a minimum tip to the DJ, house mom, or

---

[16] These fines, fees, and "tip-outs" are also covered by Claim Five, *infra*.  Plaintiffs, however, do not seek a double recovery.  As they explain, they pursue the fines, fees, and "tip-outs" in both their minimum wage and Claim Five damages so as to "preserv[e] judgment on the monetary amount of damages for each separate claim," presumably in the event that one of these bases for recovery is later invalidated.  Pl. Br. 4 n.3.  Plaintiffs have, however, calculated "what their net recovery should be when double recovery is eliminated."  *Id.*  As discussed below, the net recovery amount sought is $18,839,195.

management—Q: "Entertainers are required to tip out; is that correct?" A: "They are required, no.  They should, yes.").  Moreover, many shifts worked by dancers lasted for short periods—for instance, 493 of the shifts covered by plaintiffs' present motion were for 30 minutes of less.  *See* White Decl. ¶ 12.  It is plausible that even if dancers were required to pay a $60 "tip-out" in most instances, they were not required to do so when working such a short shift.  And there appear to exist no records confirming the payment, on a day by day basis, of these house fees.  Accordingly, plaintiffs' motion for summary judgment as to damages traceable to the $60 mandatory "tip-out" is denied.  Plaintiffs are at liberty to seek to establish this aspect of their damages claim at trial.

However, plaintiffs' motion concerning damages from the Club's failure to pay minimum wages under the FLSA and from the payment of fines and fees is granted.  Together, these FLSA damages total $65,956.

### b.     Claim Two—Minimum Wage (NYLL)

The analysis as to Claim Two largely parallels that for Claim One, with two changes in the inputs:  There are many more Rule 23 class members than members of the FLSA collective action, and the applicable New York State minimum wage was higher than the federal analogue.  Accordingly, plaintiffs seek a much larger judgment—$9,110,346—for minimum wage damages under the NYLL.

This amount comes from multiplying: (1) the applicable minimum wage rate at each point during the relevant time period—*i.e.*, beginning the day the club opened and continuing through the end of the class period, and (2) the number of hours worked by the relevant class members.  As with the FLSA claim, plaintiffs seek to incorporate the fines, fees, and "tip outs" into their NYLL minimum wage judgment.  *See Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d

47

240, 257 (S.D.N.Y. 2008) ("[T]he fines must be deducted from wages paid to the plaintiffs for purposes of minimum-wage and overtime calculations," and granting NYLL liquidated damages on the amount of such fines).  Therefore, plaintiffs, again, seek damages in the amount of minimum wages for each hour worked by a class member, *as well as* the value of the fines, fees, and "tip outs" that each class member paid to the club during her relevant shifts.

As noted, the dancer-days as to which plaintiffs move for summary judgment includes 57,823 records, or "shifts."  The total number of hours associated with these shifts was 465,145. Pl. 56.1 ¶ 759; *see also* Crawford Decl. ¶¶ 13–14, Ex. 4.  Minimum wage damages therefore equal $3,324,151—the product of calculating minimum wages due under New York law (which vary depending on the year; New York's rate ranged from $6.00 to $7.25) times 465,145 hours. These plaintiffs also undisputedly paid $2,316,815 in fines and fees, *see* Pl. 56.1 ¶¶ 703, 756, 764; Crawford Decl. ¶¶ 14, 16, and claimed to have paid $3,469,380 in "tip-outs" ($60 multiplied by 57,823 shifts).  Plaintiffs' motion for summary judgment therefore seeks $9,110,346 in NYLL minimum wage damages.  *See* Crawford Decl. Exs. 4–5.

For the same reasons as set out above, the Court denies plaintiffs' motion for summary judgment with respect to damages traceable to the $60 "tip-out."  The extent to which such tip-outs were paid is to be resolved at trial.   Otherwise, however, defendants failed to point to any evidence to challenge the convincing data on which plaintiffs rely in pursuing minimum wage damages, taking into account the payment of fines and fees.  Plaintiffs' motion for summary judgment as to these damages—which totals $5,640,966—is, therefore, granted.

### 2.    Claim Four—Retained Gratuities

As to Claim Four, plaintiffs seek a judgment for $3,577,032 in unlawfully retained gratuities under NYLL § 193.

The calculation of damages associated with Claim Four is entirely mechanical.  As noted above, Clubtrax is capable of generating a Dance Dollar report, which reflects each instance where a dancer redeemed a Dance Dollar.  This report reflects that there were 1,788,516 Dance Dollar redemptions during the class period.  Pl. 56.1 ¶ 774.  Moreover, it is undisputed that the Club reimbursed the dancers $18 for each Dance Dollar and, thus, retained $2 each time a Dance Dollar was redeemed.  Therefore, damages for Claim Four are calculated simply by multiplying the 1,788,516 redemptions by $2.

Because defendants have not identified any evidence refuting this calculation, plaintiffs' motion for summary judgment with respect to Claim Four damages—$3,577,032—is granted.

### 3.      Claim Five—Fines, Fees, and "Tip-Outs"

As to Claim Five, plaintiffs seek a judgment for $11,938,012 in unlawful fines, fees, and "tip-outs" under the NYLL § 196-d.

For the same reasons discussed above with respect to minimum wage damages, the Court denies plaintiffs' motion for summary judgment as to damages traceable to the $60 "tip-out."  As to the fines and fees, however, defendants have not identified any evidence refuting plaintiffs' calculations.  As noted above, Clubtrax includes a record of all fines and fees paid by each class member, and Dr. Crawford calculated that the total amount paid was $3,964,852.  *Id.* ¶¶ 770–72; Crawford Decl. ¶¶ 19–22, Ex. 6.  Accordingly, plaintiffs' motion for summary judgment is granted in that amount.

### C.      Conclusion

To summarize, plaintiffs' motion for summary judgment with respect to damages is granted in the following amounts:

- Claim One (FLSA minimum wage)—$65,956;

- Claim Two (NYLL minimum wage)—$5,640,966;

- Claim Four (retained gratuities under NYLL § 196-d)—$3,577,032; and

- Claim Five (fines and fees under NYLL § 193)—$3,964,852.

Plaintiffs' net recovery, however, is not the sum of these amounts, because the damages in these four categories overlap in two ways.  First, the NYLL and FLSA minimum wage claims overlap completely.  Each member of the FLSA collective is also a member of the Rule 23 class; at all times, the NYLL minimum wage rate was either higher than, or identical to, the federal minimum wage; and the NYLL statute of limitations was longer than the FLSA's.  The FLSA recovery is, therefore entirely subsumed by the NYLL recovery.  Second, the recovery for fines and fees is included both in calculating the minimum wage awards (under the NYLL and the FLSA), and in the award for Claim Five.

Dr. Crawford's calculation of the net recovery from the award of summary judgment today takes account of these two areas of overlap.  The net award is therefore:

- Unpaid minimum wages:  Using the New York minimum wage rate, but excluding any recovery based on imposition of fines and fees, plaintiffs' recovery is $3,324,151;

- Improperly retained gratuities (NYLL § 196-d):  Plaintiffs' recovery is $3,577,032; and

- Improperly imposed fines and fees (NYLL § 193):  Plaintiffs' recovery is $3,964,852.

These three areas of recovery total $10,866,035.

The remaining damages issues will be resolved at trial.  These include:  (1) minimum wage damages for the records in Dr. Crawford's tranche one not covered by plaintiffs' summary judgment motion, the records in tranche two, and the records in tranche three; (2) minimum wage damages for the third year of FLSA claims, if the Club's violation of that statute is held at

trial to have been willful; this figure, however, would appear wholly subsumed by the NYLL minimum wage damages; (3) liquidated damages under the FLSA and under the NYLL, if the Club's underpayment of wages is found to justify such additional damages under the applicable statutes; and (4) any damages associated with the $60 daily "tip-outs" that the dancers claim to have been required to pay during each shift.

## CONCLUSION

For the foregoing reasons, the Court holds that: (1) performance fees do not "offset" wages under the NYLL; and (2) Peregrine is liable on Claim Four for retaining gratuities in violation of NYLL § 196-d. The Court also denies defendants' motions to strike Dr. Crawford as an expert witness and to decertify the class. Finally, the Court grants, in part, plaintiffs' motions for summary judgment (or partial summary judgment) to the extent of $10,866,035 in damages.

The Court intends shortly to set a trial date. An order with respect to trial will issue shortly.

The Clerk of Court is directed to terminate the motions pending at docket numbers 509, 512, 544, 550, and 554.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: November 14, 2014
       New York, New York