```
                                                           ┌─────────────────────────────┐
                                                           │ USDC SDNY                   │
UNITED STATES DISTRICT COURT                               │ DOCUMENT                    │
SOUTHERN DISTRICT OF NEW YORK                              │ ELECTRONICALLY FILED        │
------------------------------------------------------X    │ DOC #:_____       │
                                                  :        │ DATE FILED: 12/17/2014      │
SABRINA HART and REKA FUREDI, on behalf of        :        └─────────────────────────────┘
themselves and all others similarly situated, and the New :
York Rule 23 Class,                               :
                                                  :        09 Civ. 3043 (PAE)
                          Plaintiffs,             :
                                                  :        OPINION & ORDER
                                                  :
                -v-                               :
                                                  :
RICK'S CABARET INTERNATIONAL, INC.,               :
RCI ENTERTAINMENT (NEW YORK), INC., and           :
PEREGRINE ENTERPRISES, INC.,                      :
                                                  :
                          Defendants.             :
                                                  :
------------------------------------------------------X
```

PAUL A. ENGELMAYER, District Judge:

Trial in this case—in which a class of exotic dancers seeks to recoup pay which they allege was denied them during their work at the Rick's Cabaret NY strip club ("Rick's NY" or "the Club"), in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the New York Labor Law ("NYLL"), §§ 190 *et seq.* & §§ 650 *et seq.*—is scheduled to begin April 27, 2015. This decision resolves four open pre-trial issues: whether (1) the "performance fees" that a dancer demonstrably received from customers on a given day may offset the Club's liability for imposing mandatory "tip-out" fees of $60 the same day; (2) plaintiffs' claims arising out of the imposition of mandatory tip-out fees can be resolved on a classwide basis; (3) as defendants recently requested, the Court should certify three questions for interlocutory appeal; and (4) one trial should be held to resolve all remaining claims, or whether some claims relating to mandatory tip-out fees should be tried separately.

I.      **Recap of Prior Rulings and Summary of Today's Rulings**

To recap the Court's prior rulings, as relevant here:

On September 10, 2013, the Court held that plaintiffs were employees of Rick's NY, that they were therefore entitled to be paid a minimum wage under the FLSA and the NYLL, and that the Club's duty under the FLSA to pay such a wage was not discharged by the payment to the dancers, by customers, of "performance fees" for dances. *See* Dkt. 460 ("September 2013 Decision"), *reported at Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013). The Court also held that defendant Peregrine Enterprises, Inc. ("Peregrine") was an employer of plaintiffs and therefore liable for any damages awarded. *Id.* The Court held that whether the other two defendants—RCI Entertainment New York and Rick's Cabaret International, Inc.— were also plaintiffs' employers turned on material factual disputes and could not be resolved at summary judgment. *Id.* On November 18, 2013, the Court granted plaintiffs' motion for summary judgment on Claim Five, holding that the Club's fines, fees, and tip-out requirements violated NYLL § 193. *See* Dkt. 487, *reported at Hart v. Rick's Cabaret Int'l, Inc.*, No. 09 Civ. 3043 (PAE), 2013 U.S. Dist. LEXIS 164354 (S.D.N.Y. Nov. 18, 2013).

On November 14, 2014, the Court: (1) held that performance fees paid by customers to dancers do not "offset" defendants' minimum wage obligations under the NYLL; (2) held Peregrine liable for retaining gratuities in violation of NYLL § 196-d—specifically, the $2 that defendants systematically retained, without disclosure to customers, from each $24 "Dance Dollar" purchased by customers using credit cards; (3) denied defendants' motion to strike the expert reports and testimony of plaintiffs' expert witness, Dr. David Crawford; (4) denied defendants' motion to decertify the Rule 23(b)(3) class; and (5) denied plaintiffs' motion for summary judgment on the tip-out fee issue, concluding that there was a material issue of

disputed fact as to whether plaintiffs paid $60 in mandatory tip-out fees during every shift worked.  *See* Dkt. 600 ("November 2014 Decision"), *reported at Hart v. Rick's Cabaret Int'l, Inc.*, No. 09 Civ. 3043 (PAE), 2014 WL 6238175 (S.D.N.Y. Nov. 14, 2014).

On November 17, 2014, the Court, *sua sponte*, directed briefing on two issues arising out of plaintiffs' claims that each dancer was unlawfully required to pay $60 per shift in tip-out fees ($20 each to the disc jockey ("DJ"), the "house mom," and Club management):  (1) With the Club's minimum-wage violation having been remedied by the Court's earlier ruling, is there a basis for allowing the performance fees that a dancer demonstrably received on a given day to offset the Club's liability under the NYLL for imposing mandatory tip-out fees the same day? And (2) Can plaintiffs' claims relating to tip-out fees properly be resolved on a classwide basis? Dkt. 602.

This decision resolves these two issues raised by the Court.  In brief:

(1) The Court holds—as the parties have agreed—that in light of the Court's previous rulings that the performance fees were gratuities belonging to the dancers, there is no legal basis for allowing such fees to offset the Club's liability under the NYLL for mandating that dancers pay tip-out fees to the Club's management and staff.

(2) The Court holds that plaintiffs' claims under the NYLL as to mandatory tip-out fees are properly resolved on a classwide basis, because common issues relating to this claim predominate over individualized ones.  The Court, therefore, declines to de-certify the class as to this claim.

This decision also addresses two other issues.  First, on December 5, 2014, Rick's NY moved for certification of three questions for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b).  Dkt. 616.  Rick's NY seeks certification of the Court's November 2014 rulings that

3

(1) a class was properly certified as to plaintiffs' minimum-wage claims; (2) under New York's "reasonable customer" standard, the dancers' performance fees were gratuities, not service charges; and (3) under the NYLL, the performance fees received by dancers from customers may not be used to offset the Club's liability for failing to pay the dancers a minimum wage. *Id.* The Court denies Rick's motion, holding that these issues do not meet the standards for certification of an interlocutory appeal. Second, at the December 9, 2014 conference, the Court raised the issue with counsel whether all open jury issues should be tried together, or bifurcated. The Court holds, as counsel agreed, that the interests of efficiency and expedition favor a single trial, and therefore the April 27, 2015 trial will resolve all open jury issues.

## II.     The Offset and Class Certification Questions Raised by the Court as to Tip-Out Fees

### A.     The Court's *Sua Sponte* Order

The Court's November 17, 2014 Order invited briefing on two questions. First, may performance fees received by a dancer offset the damages owed by the Club to the dancer to the extent the Club was found to have required the dancer to pay $60 per-shift tip-out fees? And second, are plaintiffs' claims relating to tip-out fees susceptible to resolution on a classwide basis? Dkt. 602. In raising these issues, the Court noted that it had globally resolved (1) the Club's claim that it could use the performance fees to offset its liability under the NYLL, *see* Dkt. 600, at 5–21, and (2) the appropriateness of class certification, *see id.*, 32–41. However, it noted, the Court and the parties had not given focused attention to these issues in the specific context of plaintiffs' claims regarding mandatory tip-out fees.

### B.     Analysis as to the Offset Question

As to the offset question, the Court's premise was that there assuredly must be a lawful way in which a club that pays its dancers a minimum wage could also require them, as a

condition of eligibility to receive generous performance fees from customers, to pay daily fees to the club personnel (*e.g.*, the DJ or "house mom") whose work supports the dancers.  Rick's NY, of course, had not paid the dancers a minimum wage, but the Court's prior rulings had now assured that the dancers would receive one.  The Court therefore posed the question whether, given its minimum-wage ruling, the performance fees received by a dancer on a given day from customers should be allowed to offset the Club's liability for any mandatory tip-out fees paid by the dancer that day.

Notably, both parties agree that such an offset is *not* available in this case, given the Court's findings that the performance fees here were gratuities belonging to the dancers.  *See* Dkt. 608 ("Def. Br."), 12–13; Dkt. 612 ("Pl. Br."), 2–4.  As counsel together explained at the December 9, 2014 conference, there is indeed a way in which an adult-entertainment club could require its dancers to pay fees to club personnel as a condition of earning performance fees from customers.  However, it would require the club to organize itself differently than Rick's NY had.  Specifically, performance fees from customers would need to be received by the club and recorded in its books and records before being distributed to the dancers; and the club would need to inform customers that a given amount of the customer-paid performance fees to a particular dancer (*e.g.*, the first $60 per day) would in fact be distributed to other club personnel such as the DJ or house mom.  In other words, there would need to be sufficient notice to enable a reasonable customer to understand that the amount the Club withheld from the dancers and distributed to other personnel was not a gratuity belonging to the dancers.

However, as the parties agree, these conditions do not exist here.  Customers' payments were made directly to dancers; they were not recorded in Rick's NY's books and records; and Rick's NY did not inform customers that $60 of a dancer's daily performance fees would be

relinquished to others in the form of mandatory tip-out fees.  Rather, as the Court has held, the circumstances under which customers paid performance fees to the dancers would lead a reasonable customer to view these payments as gratuities that the dancers were entitled to retain. *See* Dkt. 600, at 14–19.  For these reasons, the Court agrees with the parties that the defendants are not entitled to use these payments to offset their liability under NYLL § 193(3)(a) for requiring the dancers to pay tip-out fees.

### C.      Class Certification as to Plaintiffs' Tip-Out Fee Claims

As to the second issue raised by the Court, the parties' briefing on class certification had largely focused on the NYLL minimum-wage claim (Claim Two) that is plaintiffs' central claim in this lawsuit.  Less focused attention had been paid to whether class treatment was merited for plaintiffs' claims under NYLL § 193(3)(a) of unlawful mandatory tip-out fees (Claim Five).

The Court had previously held that Rick's NY's policy of mandating tip-out fees was unlawful.  *See* Dkt. 487, at 19 ("[T]he Club was prohibited under NYLL § 193(3)(a) from requiring plaintiffs to pay fees, fines, and tip outs by separate transaction.").  For this reason, *as to liability* on Claim Five, the Court had granted summary judgment to the plaintiffs.  *Id.*

And indeed, as the Court noted, the evidence of a mandatory tip-out policy is conclusive. Dkt. 460, at 51.  Various versions of the Club's Entertainer Guidelines explicitly stated that "There is a minimum $20 fee on the following: (1) Music fee collected by DJ[;] (2) Management fee collected at the Cage[;] (3) Dressing room fee collected by Housemom."  Dkt. 613 ("Prakash Decl."), Ex. 6, at 2, 5–6; *accord* Ex. 5, at 5; *Id.* Ex. 6, at 7, 10–11; *Id.* Ex. 6, at 12, 15–16.  The Guidelines further explained when, in what order, and where the dancer was to tip-out each of

the recipients.[1]  Prakash Decl. Ex. 6, at 5–6; *see also id.* Ex. 6, at 10–11; *Id.* Ex. 6, at 15–16.
And Rick's NY's general manager, Ken Sistrunk, gave deposition testimony to the effect that
tip-out payments were mandatory, and that they were regularly paid.  Prakash Decl. Ex. 1, at 3
("Well, when I say 'fee,' there is the fee that goes to the DJ, there's a fee that goes to the house
mom, there's a fee that goes to the management team.").[2]

However, *as to damages*, in November 2014, the Court ruled that there were disputed
issues of fact preventing the Court from awarding damages as to the tip-out claims.  That was
because some evidence could be taken to suggest that the $60 tip-out fees, while mandatory,
were not invariably paid; the parties disputed whether such fees were paid by every dancer on
every shift or only a subset.  Dkt. 600, at 46.  This ruling led the Court to commission briefing on
whether, as to plaintiffs' § 193(3)(a) claim relating to tip-out fees, common issues predominate
over individualized ones, as required for a class to be (and remain) certified as to this claim.  *See*
Fed. R. Civ. P. 23(b)(3).

---

[1] Although the Club ceased using written Guidelines in February 2010, whereas the class period
runs through October 31, 2012, the evidence, as previously canvassed by the Court, is that, after
February 2010, "[t]he Club's substantive expectations for the guidelines remained in place."
Dkt. 487, at 10.  Notably, Ed Anakar, the Club's director of operations and Rick's NY's regional
manager, testified that the Club continued after February 2010 to review the guidelines verbally
with newly hired dancers.  *See id.* at 7 (citing Dkt. 486, Ex. B: Anakar Dep. at 91).

[2] Other evidence corroborates that these payments were mandatory.  For example, for part of the
class period, Rick's posted a sign at the Club to "all entertainers," listing "mandatory tip-outs"
(which included "min $20" each to the DJ, house mom, and management), and stating, "It is
your responsibility to tip out every day you work.  If you don't tip out you will be made
inactive!!!"  Prakash Decl. Ex. 4.  And one dancer produced a copy of the Entertainer Guidelines
that she was provided when she started working at Rick's; there are handwritten notes in the
margins, including "$60" next to the list of the three $20 tip-out fees, with small circles around
the three crucial words regarding each tip-out fee: "DJ," "Housemom," and "Cage" (where the
management fee was collected).  The dancer testified that these notations were written by the
house mom.  *Id.* Exs. 9, 10.

After considering the parties' submissions and the evidence, the Court holds that common issues do predominate as to plaintiffs' § 193(3)(a) claim.

Because the Court has already held that the Club's policy of mandatory tip-out fees violated § 193(3)(a) and that Rick's NY is liable, the sole issue to be tried in this case is one of damages:  How often were these payments in fact made?  Did dancers in fact pay tip-out fees to each of the three required recipients each shift?  Or were tip-out payments made sometimes, but not always, and if so, how often were such fees paid?

There is evidence on which a jury could find that tip-out fees were always paid.  *See, e.g.*, Prakash Decl. Ex. 4 (sign posted at Club for part of class period, which stated that tip-out fees were required "every day" or dancer would become inactive); *id.* Ex. 15 (testimony from dancer that the guidelines were enforced, in that the house mom and the Club manager had approached her to determine whether she had paid tip-out fees); Dkt. 620 ("Kimmel Reply Decl."), Ex. C (testimony from dancer that she paid fees to "Management, DJ and House Mom," and that hair and makeup fees were added later); Prakash Decl. Ex 3 (testimony from a house mom that dancers "tip out who[m]ever they need to tip out" after they complete their shift); *id.* Ex 15 (testimony from dancer that at "the end of the night, I would have to tip out.  I would have to pay everybody," and provided, seemingly as examples, the DJ, housemom, hairdresser, and makeup artist).

On the other hand, the Club has pointed to evidence suggesting that the policy was not universally enforced.  Some plaintiffs' depositions, for example, may be read to suggest that the Club management, DJ, and house mom were not each invariably paid tip-out fees, or were sometimes paid by Dance Dollars worth $18 rather than the full $20.  *See, e.g.*, Dkt. 609 ("Kimmel Decl."), Ex. G (testimony of dancer Desiree Hemmes that she paid tip-out fees to the

DJ and house mom); *id.* (testimony of dancer Gladys Romero that "sometimes the DJ would get very upset to receive the 18 -- the Funny Money -- the Dance Dollar" because he wanted "his full 20," so "occasionally" she would give him $2 more).  Defendants also suggest that, because certain dancers' shifts were quite short (493 of the shifts at issue were for 30 minutes or less), dancers may not have paid tip-out fees on such days.

In determining whether damages for a violation of § 193(3)(a) can be established on a classwide basis, or whether damages must be calculated on a dancer-by-dancer basis based, presumably, on testimony by individual dancers, it is relevant that Rick's NY was required to, but did not, keep records of such tip-outs.  Under NYLL § 195(3), a New York employer must maintain records of "deductions" from wages and provide employees a copy of such; a mandatory tip-out fee is such a deduction.  *See* NYLL § 195(3) (requiring employers to "furnish each employee with a statement with every payment of wages, listing," *inter alia*, gross wages, "deductions," and net wages); *see also* Dkt. 460, at 51 (holding that tip-out fees were deductions that could not properly be made from wages under NYLL § 193); Dkt. 487, at 15–17 (holding "Rick's NY liable for the deductions in question, and not allowing the Club's failure to pay *any* wages to the dancers to shield it from liability").  And as the Second Circuit has recognized, in wage-and-hour cases, where an employer was required but failed to maintain the records necessary to reconstruct an employee's precise wages, hours, or damages, it would be unfair to punish the employee for the employer's lapse.  *See Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 69 (2d Cir. 1997) ("A rule preventing employees from recovering for uncompensated work because they are unable to determine precisely the amount due would result in rewarding employers for violating federal [and state] law.") (citation omitted).

For these reasons, as the Supreme Court has held, it is appropriate to award damages under these circumstances "if there is a basis for a *reasonable inference* as to the extent of the damages." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) ("*Mt. Clemens*") (emphasis added).  As the Court has explained, once liability for wage violations has been established, "[t]he uncertainty lies only in the amount of damages arising from the statutory violation by the employer.  In such a case it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."  *Id.* (citation and internal quotation marks omitted).  Accordingly, under the *Mt. Clemens* line of cases, where plaintiffs have come forward with evidence sufficient to give rise to a "reasonable inference as to the extent of damages," the burden shifts to the employer to produce "precise" records or other evidence that negates "the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."  *Id.*

To be sure, in the "typical" wage-and-hour case in which the *Mt. Clemens* doctrine comes into play, the unresolved issue involves the number of hours an employee has worked.  These hours, and the damages that follow from them, are then established "as a matter of just and reasonable inference."  *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (quoting *Mt. Clemens*, 328 U.S. at 687).

The open factual issue as to damages in this case is slightly different: the frequency with which mandatory tip-out fees were paid, so as effectively to serve as a deduction from dancers' pay.  But there is no reason why the *Mt. Clemens* burden-shifting approach, permitting damages to be found where the evidence supplies a "just and reasonable inference" as to an employee's

hours, subject to the employer's right to rebut this inference, ought not equally apply to the issue of how often unlawful deductions were made.  The effect of each practice is unlawfully to reduce the employee's pay.  And defendants, tellingly, do not dispute that the *Mt. Clemens* approach is logically suitable here.  Were that approach to establishing damages unavailable, an employer-defendant could all too easily benefit from its failure to maintain required wage records.

It is well-settled that, where the *Mt. Clemens* doctrine applies, employee plaintiffs may use representative, as opposed to individualized, proof, provided that such evidence gives rise to a "just and reasonable inference" as to the hours or wages of the employees at issue.  This evidence may, for example, consist of testimony from representative employees as to their hours (or wages), which may then be used as a basis upon which to infer the hours (or wages) of co-workers.  *See, e.g.*, *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1278–79 (11th Cir. 2008) (courts have interpreted *Mt. Clemens* "to authorize some employees to testify about the number of hours they worked and how much they were paid so that other non-testifying plaintiffs could show the same thing by inference."); *accord Reich*, 121 F.3d at 66–68; *Donovan v. Simmons Petrol. Corp.*, 725 F.2d 83, 86 (10th Cir. 1983); *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 168 (S.D.N.Y. 2014).

It is further well-settled that a *Mt. Clemens* approach to fixing damages, where liability to the class has been or can be determined based on common proof, satisfies Rule 23(b)(3).  *See, e.g.*, *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 798–99 (8th Cir. 2014) (affirming class damages verdict where verdict form asked jury to list aggregate amount of damages for the class; court held that "[s]ufficient evidence existed to support a 'reasonable inference' of classwide liability," in particular, the "us[e of] employee time records to establish individual damages"); *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *44 (N.D.

Ohio Nov. 17, 2014) (permitting approximation of aggregate damages proven as a matter of just and reasonable inference in antitrust class action, where damages were "susceptible to computation using a 'mathematical or formulaic' calculation"); *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009) ("The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself.") (citing 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10.5, at 483–86 (4th ed. 2002) ("Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages . . . .")); *cf. In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013) (upholding, against *Daubert* challenge, "district court's reliance on the plaintiffs' damages expert [], who testified that individual damages could be calculated on a class-wide basis with a simple formula using data extracted from [the employer]'s databases").

Such an approach is similarly merited here. The Court expects that it will ask the jury to find how often (*e.g.*, on what percentage of dancer shifts) tip-out payments were in fact made.[3] Consistent with the *Mt. Clemens* doctrine, this damages determination would be submitted to the jury provided—as strongly appears to be the case—that there is an evidentiary basis on which a "just and reasonable inference" as to such damages could be made.

Accordingly, a class is properly certified, and remains certified, as to Claim Five, alleging violations of NYLL § 193(3)(a) based on the claim that the Club required dancers to make tip-out payments to management, the DJ, and the house mom.

---

[3] Depending on the proof at trial, there may, or may not, be a basis for asking the jury to resolve these questions collectively as to all three categories of tip-out recipients (management, the DJ, and the house mom) or separately for each of the three. The Court invites counsel to address the working of such questions in their proposed verdict forms, due February 6, 2015. *See* Dkt. 621.

### III.     Rick's NY's Application for Certification of Questions for an Interlocutory Appeal

#### A.     Rick's NY's Motion

On December 5, 2014, defendants submitted a motion asking the Court to certify for interlocutory appeal the following three questions:

(1)   Whether common damages to a class of plaintiffs could be presumed despite that different methods of calculating damages were required to address all available (and unavailable) records for each member of the class;

(2)   Whether the Court properly applied the New York "reasonable customer" standard when holding that certain mandatory fees paid by customers were tips;

(3)   Whether the New York Labor Law prohibits an employer from offsetting wage obligations to employees with payments made to those employees for services rendered for the benefit of the employer.

Dkt. 616.

Defendants filed an accompanying memorandum of law, arguing that each question met the conditions in 28 U.S.C. § 1292(b) for certification, *see* Dkt. 617, which would permit (but not oblige) the Second Circuit to hear an interlocutory appeal, *see Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 81 (2d Cir. 2002).  Defendants argued that a Second Circuit ruling overturning this Court's ruling on these questions would dramatically change the case.  For example, overturning certification of the minimum-wage class would have significant ramifications for the upcoming trial.  Therefore, defendants argued, certification is merited to prevent the risk that the trial will result in wasted time and resources.

At a conference on December 9, 2014, the Court permitted plaintiffs to respond briefly to defendants' motion.  *See* Dkt. 618.  The Court also invited an opposition brief, which plaintiffs submitted on December 12, 2014.  Dkt. 622 ("Pl. Interl. Br.").  Plaintiffs oppose certification of any of the three questions.

**B.     Applicable Legal Standards**

Title 28 U.S.C. § 1292(b) provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.  The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order:  *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

A district court, in its discretion, may certify an interlocutory appeal where the decision at issue (1) involves a controlling question of law (2) as to which there is substantial ground for a difference of opinion and (3) as to which an immediate appeal may materially advance the ultimate termination of the litigation.  *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995) ("Congress . . . conferr[ed] on district courts first line discretion to allow interlocutory appeals.").  "Additionally, certification is appropriate only when a case presents exceptional circumstances warranting interlocutory review." *Laurent v. PricewaterhouseCoopers LLP*, No. 06 Civ. 2280 (JPO), 2014 WL 251986, at *1 (S.D.N.Y. Jan. 22, 2014); *accord Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 25 (2d Cir. 1990) ("[I]t continues to be true that only 'exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978))).

"The movant bears the burden of demonstrating that all three of the substantive criteria are met." *Al Maya Trading Est. v. Global Exp. Mktg. Co.*, No. 14 Civ. 275 (PAE), 2014 WL

3507427, at *12 (S.D.N.Y. July 15, 2014) (citation omitted).  "When a ruling satisfies these [three] criteria and 'involves a new legal question or is of special consequence,' then the district court 'should not hesitate to certify an interlocutory appeal.'"  *Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (quoting *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009)).

With respect to the first requirement, the question presented for certification must be "a controlling question of law."  A question is "controlling" if it would either "terminate the action" or at least "materially affect the litigation's outcome."  *Consub Del. LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007) *aff'd*, 543 F.3d 104 (2d Cir. 2008), *abrogated in part on other grounds by Shipping Corp. of India, Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 67 (2d Cir. 2009).  A question is "not controlling if Plaintiffs have independent and alternative grounds for pursuing their claims."  *Laurent*, 2014 WL 251986, at *1.  The question must also be "a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record."  *Consub Del.*, 476 F. Supp. 2d at 309 (citation omitted).

As to the second requirement, § 1292(b) requires "substantial ground for difference of opinion" regarding the controlling question of law.  "A substantial ground for difference of opinion exists when '(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit.'"  *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 539 (S.D.N.Y. 2014) (quoting *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. Dec. 31, 2013)).  "[T]he mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion."  *In re Flor,* 79 F.3d 281, 284 (2d Cir. 1996).

Finally, as to the third requirement, the "use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation."  *Koehler v. Bank of Bermuda*

*Ltd.*, 101 F.3d 863, 865–66 (2d Cir. 1996).  District courts should hesitate to certify where "many of the same . . . issues . . . would still have to be litigated" irrespective of the Court of Appeals' decision on the certified question.  *Westwood Pharms., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 964 F.2d 85, 88 (2d Cir. 1992).

### C.    Analysis

Measured in light of these familiar standards, there is no basis here for certification of an interlocutory appeal as to *any* of the three questions defendants identify.

The first of these questions is whether the method of calculating minimum-wage damages in this case is suitable for determination on a classwide basis.  The pertinent facts are set out in the Court's September 2013 and November 2014 Opinions, with which familiarity is assumed. Defendants argue that plaintiffs' expert, Dr. Crawford, used "three separate damages models" to calculate minimum wages damages, rather than "a single damages model, as required under *Comcast*" *Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  Dkt. 617 ("Def. Interl. Br."), 1.

But this characterization is disingenuous—and wrong.  Dr. Crawford used only one damages model.  It, in turn, is based on a single computer system—Rick's NY's Clubtrax system.  The model, however, is nuanced.  The model takes into account the incomplete records as to dancer hours that Rick's NY maintained; it uses different methods for calculating damages based on the state of the Club's records for a particular dancer-day.  Dkt. 600, at 23–26.  Thus, for days where there are clear records of the hours the dancer worked, damages can be—and have been—awarded as a matter of summary judgment.  *Id.* at 44.  For days as to which departure time records are missing from Rick's NY's records, this figure must be reconstructed as best as possible; the issue is what methodology to use to infer the dancer's departure time.  Dr. Crawford's model takes a reasoned approach to this question.  It proposes ways of inferring

missing departure times, based on, for example, other evidence in the Club's database that the dancer was present at the Club at a particular hour (*e.g.*, redemption by the dancer of a Dance Dollar) or the dancer's historical log-out times.

The jury, in fixing damages, will decide whether to credit his methodology, and if so, to what extent. But whatever the jury decides as to this, its decision will be rendered on a global basis, as is done in all wage-and-hour cases where a jury is asked, pursuant to *Mt. Clemens*, to make a "just and reasonable inference" as to employees' hours. There will be no need for individualized proof. *Compare Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011). Indeed, there is no suggestion that individualized proof is even available: Plaintiffs do not contend, for example, that individual dancers can reliably recall their log-out times on particular shifts worked years ago. Further, as *Comcast* requires, the classwide damages here are tightly linked to the theory of liability: It is because defendants failed to pay *all* plaintiffs the minimum wage that an inquiry into hours worked during each day of the class period is necessary. *See Comcast*, 133 S. Ct. at 1433 ("[A]ny model supporting a plaintiff's damages case must be consistent with its liability case . . . .") (citation and internal quotation mark omitted).

The first question that defendants seek to certify therefore fails §1292(b)'s test on at least two grounds. First, it is a mixed question of law and fact, rather than "a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record." *Consub Del.*, 476 F. Supp. 2d at 309 (citation omitted). To critically analyze this issue, a reviewing court would need to delve meaningfully into the factual record, including as to the operation of Rick's NY's Clubtrax system, and into Dr. Crawford's expert report. *Compare Century Pac., Inc. v. Hilton Hotels Corp.*, 574 F. Supp. 2d 369, 371–72 (S.D.N.Y. 2008) (finding "mixed question of law and fact" inappropriate for interlocutory appeal), *with Laurent*, 2014 WL

251986, at *1 (certifying for interlocutory appeal the pure question of law whether ERISA "determine[s] whether 'normal retirement age' may be defined as five years of service").

Second, there is not "substantial ground for difference of opinion" as to whether a minimum-wage damages class is properly certified. Whether a jury agrees with Dr. Crawford's methodology or not, it is a question common to the class whether that model supplies a persuasive basis for inferring dancers' departure times and thus the amount of unpaid wages.

Put differently, the nuanced nature of Dr. Crawford's model does not mean that it does not commonly apply across the class. Common questions here thus predominate—indeed there are *only* common questions. Defendants do not identify any questions that turn on facts particular to individual dancers. And a class resolution is vastly superior, *see* Fed. R. Civ. P. 23(b)(3), to the alternative of having 1,900 separate proceedings in which individual dancers were questioned about their hours on days years ago on which their departure times went unrecorded by Clubtrax, *see, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013). Accordingly, the Court declines to certify defendants' first question for interlocutory review.[4]

---

[4] In a notice of supplemental authority filed last Friday, *see* Dkt. 624; *see also* Dkt. 627, defendants cite to *Howard v. CVS Caremark Corp.*, 13 Civ. 04748 (SJO) (C.D. Cal. Dec. 9, 2014), which declined to certify a class seeking overtime wages. But *Howard* is inapposite. It does not support decertifying the minimum-wage class, let alone certifying the class-certification issue for an interlocutory appeal. The *Howard* decision turned on the quirks of a particular employer's software system. Plaintiffs sought to rely on that system to prove off-the-clock work, but that system neither tracked employee time nor accurately tracked which employee had logged into the system. The opposite is true here. *Howard* is further distinguishable in that the employees there had sometimes been paid overtime wages, potentially necessitating individualized inquiries into circumstances in which that had not occurred, and *Howard* involved overtime-approval practices, which varied from manager to manager, across 850 CVS stores.

The second question on which defendants seek immediate appellate review is "[w]hether the Court properly applied the 'reasonable customer' standard."  Def. Interl. Br. 1.  There are three distinct reasons why that issue is not properly certified to the Second Circuit.

First, how a reasonable customer would have understood the performance fees that he paid to a dancer by means of cash or Dance Dollars is a far cry from a "pure question of law."  It is a classically fact-bound application of a multi-factor standard.  *See Stone v. Patchett*, No. 08 Civ. 5171 (RPP), 2009 WL 1544650, at *2 (S.D.N.Y. June 3, 2009) ("[T]he questions presented for interlocutory appeal by plaintiffs would require the Second Circuit to review this Court's application of the law to the facts presented by the parties.  Under these circumstances, such questions do not present issues of pure law and therefore are not appropriate for interlocutory review.").

Second, this question is not "controlling."  As the Court's November 2014 Decision made clear, the Court's finding as to how the reasonable customer standard applied was an *alternative* basis for its holding that performance fees could not offset the Club's NYLL minimum-wage liability.  The primary basis for this holding, which defendants ignore in their brief, is that, as a matter of statutory interpretation, there is no charter to allow performance fees to be used to offset an employer's minimum-wage duty.  Thus, a Second Circuit ruling for defendants on the question defendants seek to certify would not change the outcome.  *See Laurent*, 2014 WL 251986, at *1 ("[L]egal questions are not controlling if Plaintiffs have independent and alternative grounds for pursuing their claims.").

Third, on the merits, defendants fail to demonstrate that there are substantial grounds for a difference of opinion.  Defendants offer no cases—or reasons—that a reasonable person would

view the performance fees paid by customers (largely paid in untraceable cash) as anything other than gratuities belonging to the dancer.[5]

The third question that defendants seek to certify for interlocutory appeal is whether the NYLL prohibits an employer from offsetting wage obligations to employees "with payments made to those employees" by customers.  Def. Interl. Br. 1.  Defendants note that this is an issue of first impression.  But "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion."  *In re Flor*, 79 F.3d at 284.  In its November 2014 Decision, the Court explained at length why the NYLL's text, purpose, and regulations all point to the same outcome—that the NYLL simply does not allow customer-paid performance fees to offset an employer's statutory duty to pay a minimum wage.  Defendants fail to address, let alone undermine, this analysis.

Further, even if defendants were to prevail on this issue, every currently pending claim would still need to be tried, as the plaintiffs explain in their brief.  *See* Pl. Interl. Br. 12–13.  The only issue affected would be the mathematical computation of damages, in that defendants would

---

[5] In challenging the Court's November 2014 Decision that the performance fees were gratuities, defendants also argue that the Court "improper[ly] relied" on a 2011 New York Department of Labor regulation and memo on banquet fees.  Def. Interl. Br. 13.  Defendants distort the Court's decision.  The Court's analysis proceeded as follows: first, on pages 8–13, the Court analyzed the text of the NYLL, its implementing regulations, its purpose, and the cases interpreting it, finding no statutory basis for permitting an offset; next, on pages 13–19, it found that the "reasonable customer" standard was inapposite given the lack of a statutory basis for an offset, but that even if it applied, a reasonable customer would find the performance fees to be a gratuity, *see id.* at 18 ("For these reasons, the Court holds, the performance fees paid by customers to the Club's dancers—whether paid in cash or by reimbursable Dance Dollars—would have been understood by a reasonable customer as a gratuity under the NYLL."); and only *then*, on pages 19–22, did the Court consider "two relatively recent pronouncements by the New York State Department of Labor ('NYSDOL'), offering guidance on [the application of] NYLL § 196–d."  The Court explicitly recognized that these recent pronouncements concerned a different context (banquets) than the one at issue.  *Id.* at 21.  But, the Court observed, these pronouncements "reinforced" its conclusion.  *Id.* at 19.  Defendants' depiction of the Court as having "relied" on these two pronouncements is simply untrue.

be allowed to offset these damages by proving receipt of performances fees from customers. Interlocutory resolution of this issue in defendants' favor thus would not materially advance the litigation or enable the parties to "avoid protracted litigation." *Koehler*, 101 F.3d at 866. Accordingly, the Court denies defendants' motion to certify this question, and thus denies the certification motion in its entirety.

## CONCLUSION

For the foregoing reasons, the Court holds that (1) performance fees cannot be used to offset defendants' liability under NYLL § 193(3)(a) for mandating that dancers pay $60 in daily tip-out fees; (2) a class was properly certified on the NYLL § 193(3)(a) claim of unlawful mandatory tip-out fees; and (3) none of the questions that defendants seek to certify for interlocutory appeal meets the standards of 28 U.S.C. § 1292(b).

Further, in light of the Court's determination that damages on plaintiffs' NYLL § 193(3)(a) mandatory tip-out claim are properly resolved on a classwide basis, there is no need to bifurcate trial, as might have been advisable had the tip-out claims of individual dancers been tried individually. The class's claims on that issue can, and in the interests of efficiency should, be resolved in the same trial as the class's other claims. Accordingly, there will be a single trial on all jury issues in this case, commencing April 27, 2015.

The Clerk of Court is directed to terminate all pending motions in this case.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: December 17, 2014
       New York, New York