```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/11/2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
SABRINA HART and REKA FUREDI, *on behalf of*                      :
*themselves and all others similarly situated, and the New*       :
*York Rule 23 Class*,                                             :
                                                                  :          09 Civ. 3043 (PAE)
                                        Plaintiffs,               :
                                                                  :          OPINION & ORDER
                                                                  :
               -v-                                                :
                                                                  :
RCI HOSPITALITY HOLDINGS, INC.,                                   :
f/k/a Rick's Cabaret International Inc.,                           :
RCI ENTERTAINMENT (NEW YORK), INC., and                           :
PEREGRINE ENTERPRISES, INC.,                                      :
                                                                  :
                                        Defendants.               :
                                                                  :
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       Trial in this case is scheduled to start on April 27, 2015. Dkt. 621. This decision

resolves a series of motions *in limine* filed by the parties.[1] The Court assumes familiarity with

the facts relevant to these motions, and provides the following rulings and guidance in advance

of this week's pretrial conference, set for March 13, 2015.

       These motions largely, although not exclusively, call upon the Court to apply Rules 401,

402, and 403 of the Federal Rules of Evidence. In resolving motions implicating these rules, the

Court has therefore been guided by the following familiar principles, which this decision applies

and elaborates upon in the course of resolving particular motions.

---

[1] A recent stipulation by the parties makes clear that, for purposes of the case caption, defendant
Rick's Cabaret International, Inc. ("RCII") is now known as "RCI Hospitality Holdings, Inc."
*See* Dkt. 712. For consistency with prior opinions in this case, though, the Court refers to three
defendants as Peregrine Enterprises, Inc. ("Peregrine"); RCI Entertainment New York ("RCI");
and RCII.

The "standard of relevance established by the Federal Rules of Evidence is not high." *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985) (citation omitted); *see also United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008) (calling the relevance threshold "very low"). Under Rule 401, "[e]vidence is relevant when 'it has any tendency to make a [material] fact more or less probable than it would be without the evidence.'" *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012), *as amended* (Sept. 28, 2012) (quoting Fed. R. Evid. 401) (footnote omitted). "A material fact is one that would affect the outcome of the suit under the governing law." *Arlio v. Lively*, 474 F. 3d 46, 52 (2d Cir. 2007) (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 579 (2d Cir. 2006)). Under Rule 402, "all '[r]elevant evidence is admissible' . . . unless an exception applies." *White*, 692 F.3d at 246 (quoting Fed. R. Evid. 402). Irrelevant evidence is inadmissible. Fed. R. Evid. 402.

Under Rule 403, the Court may exclude relevant evidence where its probative value is substantially outweighed by the risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See generally United States v. Gupta*, 747 F.3d 111, 131–32 (2d Cir. 2014); *Gerber v. Computer Assocs. Int'l, Inc.*, 303 F.3d 126, 136 (2d Cir. 2002). Evidence is considered prejudicial if it "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008) (quoting *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995)).

Furthermore, "[d]istrict courts analyzing evidence under Rule 403 should consider whether a limiting instruction will reduce the unduly prejudicial effect of the evidence so that it may be admitted." *United States v. Ferguson*, 246 F.R.D. 107, 117 (D. Conn. 2007) (citing *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) (noting presumption that "juries

understand and abide by a district court's limiting instructions" "[a]bsent evidence to the contrary")). "As the Supreme Court has recognized, limiting instructions are often sufficient to cure any risk of prejudice." *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998) (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Schneider*, 551 F. Supp. 2d at 176 (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)); *see generally Luce v. United States*, 469 U.S. 38, 41–42 (1984). Evidence should not be excluded on a motion *in limine* unless such evidence is "clearly inadmissible on all potential grounds." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996) (citation omitted). Courts may reserve deciding a motion *in limine* until trial, *see id.*, and a court's ruling on such a motion is "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in [a party's] proffer," *Luce*, 469 U.S. at 41.

## I.     Plaintiffs' Motion *in Limine* No. 1

Plaintiffs move to exclude all evidence and arguments regarding the amounts of money earned by dancers at the Club. Dkt. 643–44. The Court understands this motion to refer to the performance fees paid to the dancers by customers. Plaintiffs argue that such evidence is categorically irrelevant and is potentially inflammatory and therefore prejudicial. Dkt. 644. Defendants counter that evidence of the performance fees paid to the dancers is relevant, in particular, to whether defendants acted willfully in (1) not paying plaintiffs a minimum wage, and (2) deducting fees, fines, and "tip-outs" from these performance fees. Dkt. 693.

The Court denies plaintiffs' motion, while imposing significant restrictions on the manner in which such evidence can be elicited and on the arguments that the defense can make based on such evidence.

Contrary to plaintiffs' claim, the fact that dancers at the Club were compensated, and indeed arguably well compensated, by customers is relevant to whether defendants acted willfully, or not in good faith, in denying the dancers a minimum wage.  The Court expects that Club officials will testify that they believed in good faith that the dancers were independent contractors.  The fact that the dancers were receiving compensation from customers—which was not only well known to, but to some degree facilitated by, the Club, insofar as it set minimum payments for dances and facilitated such payments through the issuance of Dance Dollars—is obviously relevant to defendants' claim of non-willfulness.  *See* Dkt. 460, *reported at Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 941 (S.D.N.Y. 2013).  Simply put, defendants' awareness that the dancers were receiving meaningful pay for their performances from a source independent of the Club makes it more reasonable for them to have concluded that the dancers were independent contractors.

The alternative account of dancers' work arrangements that plaintiffs evidently prefer, under which the fact of such customer payments to dancers would be kept from the jury, would be grossly misleading.  It could lead the jury to believe, mistakenly, that the Club's dancers were receiving no pay, or only marginal pay.  The misleading impression that excluding this evidence would create—to wit, that the dancers stood to (or did) earn literally nothing for their work and that the Club's officials knew this—would necessarily make it more likely that the Club acted willfully in denying the dancers a minimum wage.  Excision of this central fact regarding the

dancers' work arrangements at the Club would leave the jury with an impermissibly distorted understanding of the big picture.

The Court will, accordingly, permit defendants to elicit testimony about the information known to them at the time they classified the dancers as independent contractors with respect to the performance fees that dancers, in general, tended to receive from customers.  The Court will permit defendants to explain their reasons for classifying the dancers as they did.  Such evidence is relevant insofar as it bears on whether defendants acted willfully in not classifying the dancers as employees and in not paying them a minimum wage.[2]  Similarly, because it is relevant to the element of willfulness, the Court will permit Club officials, in testifying, to explain their reasons for deducting money (including for fines, fees, and tip-outs) from the dancers' performance fees. If the fact of these performance fees were kept from the jury, defendants' practice of making those deductions would leave the jury with the incorrect, improbable, and prejudicial impression that the dancers *lost money* by working at the Club, insofar as they received pay neither from the Club nor its customers but were assessed deductions nonetheless.

It is no answer for plaintiffs to note that Club officials, in their depositions, apparently did not affirmatively and specifically point to dancers' receipt of customer pay as a basis for their decision to classify the dancers as independent contractors.  Plaintiffs have not pointed to any deposition testimony in which a Club official denied that the fact that the dancers were receiving

---

[2] *See, e.g.*, *Hart*, 967 F. Supp. 2d at 912 (addressing and applying Second Circuit's "economic realities" test for determining whether an individual is an employee or an independent contractor for purposes of the FLSA; pursuant to this test, the following factors are relevant: (1) the degree of control exercised by the employer over the workers, (2) *the workers' opportunity for profit or loss and their investment in the business*, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business) (emphasis added) (citing *Brock v. Superior Care*, 840 F.2d 1054, 1058–59 (2d. Cir. 1988)).

pay (and substantial pay at that) from an alternative source, customers, was relevant to the Club's decision to classify them as independent contractors and not pay them a minimum wage. Defendants proffer that Club officials would reference that fact as supporting their classification, and such a claim is quite plausible.  Accordingly, the Court will permit evidence to be received as to Club officials' understandings of the performance fees, in general, that dancers received, insofar as that evidence is elicited in the course of explaining the bases for the Club's decision to classify the dancers as independent contractors and to deduct sums from their fees.  Plaintiffs' counsel, of course, will be at liberty to cross-examine Club officials as to whether the fact that the dancers stood to receive compensation from customers did, in fact, influence their decision to classify the dancers as independent contractors and not to pay them a minimum wage.

However, the Court will not permit the defense to elicit, for purposes other than showing defendants' state of mind, evidence of the amounts paid by customers to dancers.  There is, for example, no basis for defendants to elicit testimony as to the performance fees in fact paid to any individual dancer, whether in the aggregate or on any particular night.  Nor is there any basis for the jury to receive evidence—which defendants indicate in their pretrial submissions that they intend to elicit—of the specific 1099 forms that the Club issued to individual dancers, the tax returns of individual dancers, the "earnings breakdown" of individual dancers, or the earnings that individual dancers received at other clubs.  *See, e.g.*, Dkt. 640, Ex. D, 11–24.  Such evidence is excluded.

Indeed, the circumstances relating to individual dancers are relevant at trial only insofar as particular dancers are part of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, collective action that pursues minimum-wage claims on Count One.  And the dancers'

6

particular performance fees are irrelevant to the issues—minimum-wage damages and defendants' state of mind—that remain to be decided as to that claim.

Accordingly, unless plaintiffs' examination or conduct of the trial opens the door to this subject, the Court will not permit questioning of individual dancers as to the amount of their performance fees.  Such evidence, except as linked to defendants' state of mind, is irrelevant. *See* Fed. R. Evid. 401.  And even if such evidence had some limited relevance, it would be substantially outweighed, under Rule 403, by the high risk of unfair prejudice and confusion that such evidence invites.  Quantification of individual dancers' performance fees would invite, and have an obvious potential to induce, the jury to render rulings against the plaintiffs, potentially on all the issues to be tried, not on the merits, but out of anger, resentment, or indignation that plaintiff dancers stand to receive performance fees *and* court-awarded minimum-wage payments. *See, e.g.*, Fed. R. Evid. 403 advisory committee's note (permitting courts to exclude evidence based on "unfair prejudice" and defining that term to mean an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"); *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987) ("Statements designed to appeal to the jury's emotions or to 'inflame the passions or prejudices of the jury,' American Bar Association Standard 3–5.8(c), are improper.") (citing *United States v. Marrale*, 695 F.2d 658, 667 (2d Cir. 1982); *United States v. Modica*, 663 F.2d 1173, 1178–81 (2d Cir. 1981)); *Schneider*, 551 F. Supp. 2d at 177.  The Court, however, has already ruled on the Club's minimum-wage liability. Any such emotional reaction or policy judgment which such evidence might induce from a juror would have no proper bearing on the discrete and narrow issues left to be tried: (1) the calculation of the hours worked by the plaintiff dancers; (2) the incidence of tip-outs; (3) whether the Club acted willfully, in good faith, or otherwise; and (4) the identity of the dancers' corporate

employers.  *See* Dkt. 600, *reported at Hart v. Rick's Cabaret Int'l, Inc.*, No. 09 Civ. 3043 (PAE), 2014 WL 6238175, at *27 (S.D.N.Y. Nov. 14, 2014).

Defendants, accordingly, are directed not to attempt to elicit such evidence except as tethered to the issue of willfulness.  And the Court will instruct the jury that evidence bearing on the payment and scale of dancers' performance fees is received and may be considered solely for the limited purpose of helping determine defendants' state of mind.  *See United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) ("[T]o the extent there was any risk of unfair prejudice, the district court satisfactorily reduced that possibility with a thorough and carefully worded limiting instruction.").  Any attempt to offer such evidence for other purposes, or to make improper arguments based on the evidence that is received, will be met with an appropriate and forceful instruction to the jury to disregard such evidence or arguments.

## II.    Plaintiffs' Motion *in Limine* No. 2

Plaintiffs move to exclude evidence that dancers agreed, in forms signed before they commenced work at the Club, to be classified as independent contractors.  Dkt. 645–46. Plaintiffs note that under the FLSA and the New York Labor Law ("NYLL"), §§ 190 *et seq.* & §§ 650 *et seq.*, an employee cannot contract out of the right to a minimum wage.  Plaintiffs further express concern that defendants will argue, or imply, that the dancers "waived" their rights to a minimum wage.  Dkt. 646.  Defendants oppose this motion.  Dkt. 694.

As with plaintiffs' Motion *in Limine* No. 1, the Court denies the motion to exclude such evidence categorically, while imposing restrictions to ensure that such evidence is considered solely for the limited purpose for which it is relevant: to establish defendants' state of mind, and in particular, to shed light on whether defendants acted willfully, or not in good faith, in classifying the dancers as independent contractors.

8

Plaintiffs are correct that an employee may not contract away her legal right to be paid a minimum wage.  *See, e.g.*, *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) ("FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate.") (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945)); *Padilla v. Manlapaz*, 643 F. Supp. 2d 302, 311 (E.D.N.Y. 2009) ("[I]t is settled law that an employee may not waive the protections of the [New York] Labor Laws") (citations omitted).  It is also correct that a person's agreement to classify herself as other than an employee is not dispositive of her legal status.  *See, e.g.*, *O'Neil*, 324 U.S. at 707 ("No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act."); *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013); NYLL § 663(1) ("Any agreement between the employee, and the employer to work for less than such [minimum] wage shall be no defense" to an action to recover for failure to pay the minimum wage).  However, the worker's self-classification is not categorically irrelevant:  In the multi-factor inquiry into whether a worker is an employee, this classification is a factor to be considered.[3]

The Court has already held that the dancers at the Club were employees.  *See Hart*, 967 F. Supp. 2d at 922, 926.  That ruling is law of the case.  The Court will notify the jury of that

---

[3] *See, e.g.*, *Gagen v. Kipany Prods., Ltd.*, 812 N.Y.S.2d 689, 690–91 (3rd Dep't 2006) ("'[T]he critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results [and the] [f]actors relevant to assessing control include whether the worker (1) worked at [her] own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule.'  While the manner in which the relationship is treated for income tax purposes is certainly a significant consideration, it is generally not singularly dispositive." (quoting *Bynog v. Cipriani Group*, 770 N.Y.S.2d 692, 695 (2003)); *accord Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 598 (E.D.N.Y. 2012).

ruling.  And it will not be re-litigated at trial.  However, whether defendants acted willfully, and not in good faith, in wrongly classifying the dancers as independent contractors is an issue that the jury will resolve.  *See id.* at 937–38.  And defendants' awareness that individual dancers had signed forms designating themselves as independent contractors is relevant to defendants' state of mind.  *See, e.g.*, *Bynog*, 770 N.Y.S.2d at 695.  All else being equal, that the dancers executed forms agreeing to their treatment as independent contractors could make it more likely that defendants acted non-willfully, or in good faith, in so classifying them.  *See, e.g.*, *Tagare v. Nynex Network Sys. Co.*, 994 F. Supp. 149, 154–55 (S.D.N.Y. 1997) ("[C]ourts within the Second Circuit have considered contractual language as one factor among many in determining employment status."); *Araneo v. Town Bd. for Town of Clarkstown*, 865 N.Y.S.2d 281, 283–84 (2d Dep't 2008) (although not dispositive, "[t]he fact that a contract exists designating a person as an independent contractor is to be considered" in determining whether one is an employee or independent contractor).

Accordingly, the Court will permit the defense to elicit evidence at trial to the effect that the dancers executed forms with the Club designating themselves as independent contractors. Plaintiffs' counsel, of course, are at liberty, to attempt to establish that the Club had no basis to put weight on this self-designation and, as plaintiffs' motion implies, that the context in which the dancers self-designated as independent contractors was coercive.  As plaintiffs indicate, it may have been clear to a dancer that, if she did not execute the Club's form, she would not be allowed to work at the Club.  But the weight, if any, to attach to the forms completed by the dancers, in determining whether defendants acted willfully, is for the jury to decide.  For the same reason, the Court will permit the defense to elicit conversations, if any, between the Club

and dancers as to their classification.  Such communications, too, may bear on defendants' state of mind.

However, the Court will not permit evidence to be received, or arguments to be made, on this point other than as it bears on defendants' state of mind.[4]  Therefore, unless plaintiffs open the door to such evidence, there is no basis for receiving testimony as to the *dancers'* subjective state of mind as their classification, or to how the dancers were classified at other clubs, except to the extent, if any that these subjects were addressed in communications with defendants.  The Court will also preclude evidence of how the dancers classified themselves on their income tax returns.  Those tax returns have no bearing on whether defendants acted willfully (or not in good faith) in classifying the dancers as independent contractors and not paying them a minimum wage.  *See Kuebel*, 643 F.3d at 366; *Barfield*, 537 F.3d at 150.

Finally, as to evidence admitted on this point, the Court will give the jury an instruction limiting, to the issues of willfulness and good faith, the purposes for which this evidence can be considered.  *See, e.g.*, *Paulino*, 445 F.3d at 223.  The Court will not permit such evidence to be used to imply that the dancers waived their rights to minimum-wage relief or to otherwise invite jury nullification.  Any attempt to offer evidence regarding the dancers' self-classification for purposes other than illuminating defendants' state of mind, or to make improper arguments based

---

[4] The relevant issue (of those left for trial) is whether the defendants' misclassification of the dancers and failure to pay them minimum wages was "in good faith," "willful," or otherwise. These inquiries focus on the *employer*'s state of mind.  *See Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 366 (2d Cir. 2011) ("An employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act.") (citation and internal quotation marks omitted); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133–35 (1988); *see also Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) ("To establish the requisite subjective 'good faith,' an employer must show that it took 'active steps to ascertain the dictates of the FLSA and then act to comply with them.'") (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)).

on the evidence that is received, will be met with an appropriate and forceful instruction to the jury to disregard such evidence or arguments.

III.     **Plaintiffs' Motion** *in Limine* **No. 3**

Plaintiffs seek to exclude evidence of "industry standards"—which the Court understands to refer to evidence of how other strip clubs have classified their dancers.  Dkt. 648–49.  Defendants oppose this motion.  Dkt. 695.

The Court's ruling on this motion is consistent with its rulings on the first two motions *in limine*:  The Court will permit evidence on this point to be received only insofar as it bears on defendants' state of mind in deciding to classify the Club's dancers as independent contractors.  Therefore, to the extent that officials of Rick's NY, at the time they made this classification decision, were aware of and claim to have taken into account how dancers were classified at other strip clubs, such state-of-mind evidence may be received at trial.  *See, e.g.*, *S.E.C. v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012) (explaining scienter requirement as concerning defendant's state of mind "at the moment of" his alleged misconduct); *Lewis v. City of Albany Police Dep't*, 332 F. App'x 641, 643 (2d Cir. 2009) (summary order) ("Allegations concerning after-the-fact events are immaterial to . . . state of mind.") (citation omitted); *cf. Holloway v. United States*, 526 U.S. 1, 7 (1999) (explaining, in the criminal context, that "[i]f the defendant has the proscribed state of mind at th[e] moment [of his misconduct], the statute's scienter element is satisfied").

However, the Court will not permit evidence of other clubs' practices otherwise to be received in evidence.  Where such practices were not known to officials of Rick's NY at the time they decided how to classify the dancers, such practices are irrelevant to the issues to be tried.  They also have significant capacity for confusion and unfair prejudice.  As counsel are aware,

and as the Court's September 10, 2013 decision reflects, the legal determination whether a worker is an employee or an independent contractor is a multi-factor inquiry that turns on facts specific to the particular workplace. *See Hart*, 967 F. Supp. 2d at 911–26.  For example, the level of control that Rick's NY exerted over its dancers was a significant consideration in the Court's determination that the dancers at Rick's NY were employees.  *Id.*  Particularly given the variation among clubs as to facts bearing on the dancers' legal status, that some clubs classified their dancers as independent contractors, and others as employees, is irrelevant to any issue at trial, except insofar as knowledge of these classifications actually informed the Club's thinking at the time it made the classification decision.  Any attempt to put before the jury a tally of how other clubs classified their dancers, if unknown to the Club, has no bearing on whether Rick's NY was willful in classifying its dancers as independent contractors.  But such evidence could well confuse the jury.  It could lead the jury wrongly to resolve the issue of defendants' willfulness based on such a "nose count."

The Court therefore will preclude any evidence as to industry practices in general.  The Court will also preclude evidence as to the classification decisions at other clubs at which the plaintiff dancers may have worked.  To the extent that evidence of defendants' knowledge of how dancers were classified at other clubs is received, the Court will instruct the jury that such evidence is to be considered solely as it bears on defendants' state of mind.  *See, e.g.*, *Downing*, 297 F.3d at 59.  Any attempt to offer evidence regarding other clubs' practices other than as illuminating defendants' state of mind, or to make improper arguments based on the evidence that is received, will be met with an appropriate and forceful instruction to the jury to disregard such evidence or arguments.

**IV.     Plaintiffs' Motion *in Limine* No. 4**

Defendants have indicated that they intend to offer at trial, as to each of the 43 dancers who are members of the FLSA collective action, the dancer's income tax returns and 1099 forms. Dkt. 640, Ex. D, 11–24. Plaintiffs move to preclude admission of such evidence. Dkt. 650–51. Defendants oppose this motion. Dkt. 711. Plaintiffs' motion is granted.

The income tax returns have highly limited relevance. There is no claim that they were prepared by or in conjunction with the Club. They therefore have no bearing on the Club's state of mind. *See Kuebel*, 643 F.3d at 366; *Barfield*, 537 F.3d at 150. And the fact that the dancer may have characterized herself on these returns as an independent contractor also does not bear on defendants' state of mind. Further, any such designation is cumulative of the evidence that will be received on this point and that (unlike the tax returns) *does* bear on defendants' state of mind, to wit, the forms that the Club caused dancers to sign designating the dancer as an independent contractor. *See* Fed. R. Evid. 403; *see also supra*, pp. 8–10 (resolving plaintiffs' motion *in limine* No. 2). The fact that some plaintiffs may have taken business deductions on their tax returns for club or DJ fees is perhaps marginally relevant, insofar as the jury will be called upon to make a calculation, across the NYLL class, as to the incidence with which such fees were imposed. *See Hart*, 2014 WL 6238175, at *27. But there is no need for dancers' tax returns themselves to be admitted to establish the amount of such fees. In the unlikely event that the frequency with which such deductions were made as to a particular dancer is both relevant and disputed during that dancer's testimony, the Court can determine then whether the amount of such deductions is admissible; if so, the Court expects that the testifying witness would then acknowledge the amount listed on the tax return without any need to admit the tax return itself.

*See generally Luce*, 469 U.S. at 41 (motion *in limine* ruling subject to change "when the case unfolds").

On the other side of the Rule 403 balance, the tax returns have substantial capacity to cause unfair prejudice, confusion, and delay.  The tax returns are, at best, only marginally relevant to this trial.  But the dancer's recitation of her income from the Club—drawn, almost certainly, from the 1099 form supplied by the Club—is likely to provide a significant source of confusion and distraction.  It could prompt the jury to deny plaintiffs' minimum-wage damages, for the improper reasons that the performance fees the dancer received seemed to the jury "enough" and that payment of minimum wages would therefore represent over-compensation.  It could also prompt the jury to be angry at the dancer for not reporting the performance fees paid in cash, but only the subset of those fees reported by Rick's NY on her 1099 form (*i.e.*, those derived from Dance Dollars).  *See, e.g.*, *supra*, p. 7 (citing Fed. R. Evid. 403 advisory committee note; *Peterson*, 808 F.2d at 977; *Schneider*, 551 F. Supp. 2d at 177).  And inquiry into any aspect of the tax return could lead to undue delay, especially insofar as the dancer may be unable to explain certain entries, particularly if she was assisted by a tax accountant.  *See* Fed. R. Evid. 403.

The Court is, further, unpersuaded by defendants' claim that the returns meaningfully shed light on dancers' credibility.  *See* Dkt. 711.  Given the discrete and largely defendant-centric issues to be tried, the dancers' testimony in general is of limited relevance at trial.  There is little important testimony by individual dancers to discredit.  And the dancers' understatement of their performance-fee income on their returns is itself a product of the Club's decision to structure itself so as to report to tax authorities only those fees that derive from Dance Dollars, no doubt well aware that many dancers would not report the performance fees they received in

cash.  This understatement says little, if anything, about whether the dancers who testify at trial are or are not credible in testifying about their hours worked (or about other limited subjects of proper testimony).  In sum, the risks of unfair prejudice, confusion, and delay presented by admission of the tax returns overwhelm any limited probative value that the tax returns would offer.  *See* Fed. R. Evid. 403.

The 1099 forms are similarly inadmissible under Rule 403.  The Court will permit the defendants to elicit, at a general level, the fact that it issued 1099 forms to the dancers, consistent with its asserted good-faith belief that the dancers were independent contractors.  The Court will also permit the method by which the Club tabulated dancer's income on the 1099 forms—*i.e.*, including only performance fees paid by Dance Dollars, but excluding those paid in cash—to be brought out in the testimony of Club officials, if defendants believe that point is necessary to give full color to the relationship between the Club and the dancers.  However, the content of any individual dancer's 1099 form is irrelevant.  And for the reasons stated above, the recitation of the dancer's performance fee income (as derived from Dance Dollars) has the capacity to create unfair prejudice and confusion.  *See supra*, pp. 68.  Defendants are reminded that the Court has already ruled that the dancers are employees.  *See Hart*, 967 F. Supp. 2d at 922, 926.  Beyond the fact that 1099 forms as a general matter were issued by the Club to the dancers, the 1099 forms do not bear on the issue of defendants' willfulness, and they do not bear at all on the other issues to be tried.[5]

---

[5] The fact that the 1099 forms were issued by Peregrine Enterprises, Inc. is relevant to the issue of which defendant(s) were plaintiffs' employers.  But there is no need to admit the individual 1099 forms to establish that discrete and undisputed point (to which plaintiffs offer to stipulate).

The Court, accordingly, grants this motion *in limine*.  Defendants are precluded from offering into evidence individual dancers' tax returns or 1099 forms or, without advance permission from the Court, to question witnesses about individual tax returns or 1099 forms.

## V.       Plaintiffs' Motion *in Limine* No. 5

Plaintiffs next move to bar defendants from making arguments or introducing evidence that undermine the various liability rulings the Court has made.  Dkt. 652–53.  Defendants oppose this motion.  Dkt. 703.  The Court is sensitive to plaintiffs' concerns.  The Court's intention is, prior to counsel's opening statements, to explain clearly to the jury the Court's relevant prior rulings in the case, as doing so is necessary to identify for the jury and put in context the discrete issues left for them to decide.  As the case proceeds, the Court will also be vigilant to ensure that the jury is instructed as to the distinct purposes for which evidence is being received.

Counsel are reminded, however, that certain evidence that might be viewed as undermining a prior ruling may have a separate, valid purpose.  *See, e.g.*, *United States v. Figueroa*, 548 F.3d 222, 229 n.9 (2d Cir. 2008) ("[T]here is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case.") (quoting *United States v. Abel*, 469 U.S. 45, 56 (1984)).  For example, evidence that might be taken to question the Court's determination that the Club's dancers were employees may instead be relevant to whether defendants acted willfully in classifying the dancers otherwise.  The Court will give limiting instructions to assure that the jury considers the evidence that is received only for proper purposes.  *See, e.g.*, *Walker*, 142 F.3d at 110.

There is no occasion to address here each example plaintiffs recite that gives rise to their concern. It is by no means clear to the Court that, in fact, there is a bona fide purpose for receipt of every such item of evidence. The Court, however, will make that judgment at trial, in the context of particular offers of proof. It suffices to say that the Court will be attentive to whether there is a proper purpose for all evidence offered and will give appropriate limiting instructions.

However, as to one issue, defendants' tip-out policy, elaboration is merited. Plaintiffs are correct that the Club had a mandatory "tip-out" policy—the evidence on that point, including the Club's own pronouncements, is "conclusive." Dkt. 628, *reported at Hart v. Rick's Cabaret Int'l, Inc.*, No. 09 Civ. 3043 (PAE), 2014 WL 7183956, at *4. The issue to be tried, which is relevant to damages on Count Five, instead involves the extent to which that policy was in fact enforced in practice. *See id.* The Court asks counsel to measure their statements to the jury accordingly.

## VI.    Plaintiffs' Motion *in Limine* No. 6

In this motion, plaintiffs seek to preclude defendants from making arguments that are inconsistent with the Court's rulings on class certification and as to classwide damages. Dkt. 654–55. Defendants oppose this motion. Dkt. 696. Plaintiffs' motion is framed at a conceptual level and does not appear to be addressed to specific evidence. This motion does not present a crystallized dispute ripe for resolution. *See National Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Group*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996) ("This motion *in limine* lacks the necessary specificity with respect to the evidence to be excluded."). The Court therefore denies plaintiffs' motion, without prejudice to plaintiffs' right to raise these concerns in the context of a concrete challenge to particular defense arguments.

As to plaintiffs' concern that the Court will permit its rulings to be undercut, the Court wishes, however, to make the following clear: It will not so permit. At the outset of trial, the

Court intends to clearly explain to the jury the present posture of the case and to summarize its relevant findings to the extent these findings are necessary to give context to the issues the jury will be asked to decide.  And with respect to the open issues on plaintiffs' claims as to which a class has been certified, it is appropriate, and the Court will instruct the jury, to return a verdict at a class level, rather than with respect to individual class members.

Thus, for example, on the issue of damages on plaintiffs' NYLL claim for failure to pay a minimum wage (Count Two), the Court will instruct the jury to return a verdict that finds, as a matter of just and reasonable inference, the aggregate hours worked by the class during each period for which a distinct statutory minimum wage existed (on top of the hours worked on the dancer-days for which summary judgment has been granted).  Similarly, the jury will be asked to determine damages on plaintiffs' tip-out claim on a classwide basis.  *See Hart*, 2014 WL 7183956, at *6–7; *cf. Hart*, 2014 WL 6238175, at *22.  The proper allocation within the class of the damages found is, however, not an issue for the jury.  But in litigating these issues—the number of hours worked by the class and the amount of tip-out damages—the defense is at liberty to make appropriate arguments as to findings the jury should make.  The defense may wish to argue, for example, that there are factual variations (*e.g.*, among the dancers, or over time, or among Clubtrax records) to which the jury should be sensitive in calculating aggregate damages.  The fact that the jury will be asked to return a verdict expressed in aggregate classwide terms does not, in any way, preclude the defense from arguing that factual nuances or variations are relevant to how the jury calculates aggregate hours worked across the class.

## VII.    Plaintiffs' Motion *in Limine* No. 7

Plaintiffs move to preclude the defense from arguing, in connection with the issue of the calculation of minimum-wage damages, that the dancers in the class were to blame for the gaps

in Rick's NY's Clubtrax records, in particular, the frequent lack of log-out times.  Dkt. 656–57. Defendants oppose this motion; they argue that the plaintiff-friendly *Mt. Clemens* framework (explained below) cannot apply unless plaintiffs first prove by a preponderance of the evidence at trial that the dancers were not to blame for the inaccurate Clubtrax data.  Dkt. 705.

Plaintiffs' motion is granted.  The issue for the jury with respect to damages will solely be to calculate such damages.  The jury's fact-finding assignment will not be concerned with fault.  It will be empirical.  The jury will be asked to arrive at a reasonable, reliable calculation of aggregate dancer hours on those dancer-days where the Club's records have been held not to conclusively reflect such hours.  The Court will not permit any argument—by either party—that attempts to distract the jury from this assignment by injecting issues of fault.

In opposing this motion, defendants argue that it is error to allow the jury to calculate dancers' hours as a matter of just and reasonable inference, because it was not the Club's fault that its records as to dancer hours were persistently deficient.  The Court has previously held that the Club was responsible for maintaining accurate records of its employees' hours and for the glaring deficiencies in its time records; the Court has also held that, under *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680 (1946) ("*Mt. Clemens*") and its progeny, the plaintiffs have come forward with evidence to reasonably determine the dancers' hours as a matter of just and reasonable inference.  *See Hart*, 2014 WL 6238175, at *16 ("[I]t is well-settled that, in wage-and-hour cases, employees are permitted to prove their hours worked as a matter of 'just and reasonable inference' in the absence of employer-maintained time records." (citing *Kuebel*, 643 F.3d at 362)); *see also id.* ("Dr. Crawford acknowledges that the data given to him—which of course was collected and maintained by the Club—is imperfect.").  Nevertheless, because defendants have returned to this issue in the course of opposing this motion *in limine*, the Court

explains here, in further detail, why the deficient records were the Club's responsibility, and why it is therefore appropriate to apply the *Mt. Clemens* framework.

Employers have a duty to keep accurate records of their employees' hours. *See* 29 U.S.C. § 211(c); *Kuebel*, 643 F.3d at 363; *Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 944, 946 (2d Cir. 1959) (Friendly, J.). Where an employer's records are inadequate, an evidentiary challenge arises; despite the employer's duty to maintain accurate records, the employee-plaintiff has the burden (in a lawsuit) of proving that she was insufficiently paid. To address this situation, the Supreme Court has held that where an employer's records are inaccurate or inadequate, an employee need only present "sufficient evidence to show the amount and extent of [the uncompensated work] as a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687. At that point, the burden "shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 687–88.

The rationale for this "relaxed" burden is apparent. Once "liability for wage violations has been established, '[t]he uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.'" *Hart*, 2014 WL 7183956, at *5 (quoting *Mt. Clemens*, 328 U.S. at 688). The alternative rule would incent employers to violate their statutory record-keeping duty.

21

It is an established fact in this case—indeed, an undisputed one—that "Rick's NY maintained incomplete records" with respect to, *inter alia*, dancers' hours. *Hart*, 967 F. Supp. 2d at 932. The parties, in fact, have stipulated that the Clubtrax data contains numerous "default" log-out time entries that do not reflect the time when a dancer actually left the Club. *Hart*, 2014 WL 6238175, at *13; *accord* Dkt. 454 (Stipulated Facts ¶ 266). It is similarly undisputed that defendants selected the Clubtrax system, maintained control over Clubtrax, had the capacity to monitor Clubtrax, and could adjust entries in Clubtrax. Dkt. 657 (collecting citations).

Under such circumstances, the *Mt. Clemens* framework clearly applies, as the Court has previously held. Further, as the Court has recognized, Dr. Crawford's methodology and model—which select reasonable, reliable proxies to fill the gaps in the Clubtrax data—is "sufficiently sound to satisfy *Mt. Clemens*' 'just and reasonable inference' standard." *Hart*, 2014 WL 6238175, at *17.[6] As the Court noted, Dr. Crawford's model was "aimed at a fundamentally mechanistic task—tabulating the hours worked. Had defendants' time records been complete, the task, in fact, would have been wholly mechanical." *Id.* Defendants of course are at liberty to rebut this showing by demonstrating that plaintiffs' approach is not reasonable or that dancers' hours can be determined in a more reasonable fashion[7]; defendants, however, have admitted that

---

[6] The Court has subsequently noted that another, simpler method would also satisfy *Mt. Clemens*' just and reasonable inference standard: The jury may simply "extrapolate from the substantial subset of overall dancer hours as to which the Court has already granted partial summary judgment," specifically the "57,823 dancer-days where the Clubtrax records are complete and conclusive," to derive the average hours worked on the dancer work-days for which the Club's records are incomplete. Dkt. 719.

[7] *See Hart*, 2014 WL 6238175, at *18 n.8 ("Of the various judgmental assumptions Dr. Crawford made in order to fill the voids in the ClubTrax data, the most subjective—and in the Court's view the one most susceptible to effective challenge before the jury—is the use of 'average log-out times' in connection with the 'third tranche' of data. . . . But which of these measures of damages is most persuasive is a jury question. There is nothing unreliable or misleading about Dr. Crawford's third-tranche methodology. . . . At trial, the defense will be at liberty to

they cannot rebut plaintiff's showing by proving the precise hours worked.  *See* Stipulated Facts ¶ 266.

Notably, as to the claim that defendants now raise—that plaintiffs, not the Club, were responsible for the Club's persistently deficient data—defendants failed to raise this claim in the course of litigating either of the two decisions in which this Court has addressed the *Mt. Clemens* line of cases and held it applicable.  *See Hart*, 2014 WL 6238175, at *16–17; *Hart*, 2014 WL 7183956, at *5.  Nor did defendants seek reconsideration of either opinion on the *Mt. Clemens* point.  Defendants, therefore, have waived the argument they now seek to advance.  *See, e.g.*, *Hart*, 2014 WL 6238175, at *24 n.15 ("[T]his argument, having never been raised, is untimely and thus waived.").

In any event, on the merits, defendants' attempt to shift blame to plaintiffs for the Club's errant hours is extremely unconvincing.  Defendants first argue that, as a matter of law, for plaintiffs to be entitled to prove damages under the relaxed *Mt. Clemens*' framework, rather than by proving specific hours worked for each dancer-day during the class period, the *jury* must first decide that plaintiffs are not to blame for the inadequacy of the Clubtrax records.  Defendants do not cite any authority so holding.  Defendants primarily rely on *Seever v. Carrols Corp.*, 528 F. Supp. 2d 159 (W.D.N.Y. 2007), in which plaintiffs sued a former employer seeking payment for off-the-clock work.  In *Seever*, the court declined to apply the *Mt. Clemens* framework because (1) the employer established that it used a FLSA-compliant record-keeping system, (2) plaintiffs controlled their "own time records . . . and in many cases corrected them to reflect work including off-the-clock tasks," (3) plaintiffs "never reported [their alleged off-the-clock] work on

---

vigorously cross-examine Dr. Crawford about alternative means of calculating third-tranche damages; and to argue to the jury that his methodology overstates or unpersuasively calculates such damages.").

their timesheets," (4) plaintiffs were unable "to provide specific facts" about their alleged off-the-clock work, and (5) viewing these facts together, plaintiffs had "voluntarily self-created" this evidentiary problem: "[A]ny inaccuracies in [the employer's] records are *solely due to the plaintiffs' deliberate failure to accurately report the time they worked*."  528 F. Supp. 2d at 169–70.

Seever, however, predated the Second Circuit's decision in *Kuebel*, which explicitly called *Seever* into question:

> Here, however, the district court determined that Kuebel was not entitled to *Anderson*'s lenient burden of proof.  Relying on *Seever v. Carrols Corp.*, 528 F. Supp. 2d 159 (W.D.N.Y. 2007), it held that because Kuebel was responsible for filling out his own timesheets and had admittedly falsified them, such that any inaccuracies were "self-created," a heightened standard applied under which Kuebel must "prove the amount of time he worked off-the-clock with specificity." *Kuebel II*, 2010 WL 1930659, at *11, 2010 U.S. Dist. LEXIS 46533, at *32. Because Kuebel could not prove his damages with precision, the district court concluded that summary judgment was appropriate.
>
> We disagree with this approach.  First, it is important to recognize that an employer's duty under the FLSA to maintain accurate records of its employees' hours is non-delegable.  *See* 29 U.S.C. § 211(c); *Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 944, 946 (2d Cir.1959) (Friendly, J.) (rejecting as inconsistent with the FLSA an employer's contention that its employee was precluded from claiming overtime not shown on his own timesheets, because an employer "cannot . . . transfer his statutory burdens of accurate record keeping, and of appropriate payment, to the employee" (citation omitted)); *see also Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998).  In other words, once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours.  Accordingly, the fact that an employee is required to submit his own timesheets does not necessarily preclude him from invoking *Anderson*'s standard where those records appear to be incomplete or inaccurate. *See Skelton v. Am. Intercontinental Univ. Online*, 382 F. Supp. 2d 1068, 1071 (N.D. Ill. 2005) ("The FLSA makes clear that employers, not employees, bear the ultimate responsibility for ensuring that employee time sheets are an accurate record of all hours worked by employees.").

*Kuebel*, 643 F.3d at 362–63.

24

Defendants overlook the critical fact that *Kuebel* described the employer's duty to maintain accurate records as "non-delegable."  The Second Circuit also cited, with approval, case law to the effect that an employer "*cannot* . . . transfer his statutory burdens of accurate record keeping, and of appropriate payment, to the employee."  *Caserta*, 273 F.2d at 946 (emphasis added).  These principles are inconsistent with the Club's argument here.

In any event, even assuming that *Seever* (or similar logic) might apply in some contexts—for example, where an employer's system was fully compliant and an employee's manipulative behavior was to blame for any shortcomings—the facts of this case are light years from that scenario (and from the facts of *Seever*).  By any reasonable measure, the flaws in the Clubtrax system were epidemic and systemic.  There was missing or concededly inaccurate log-out data as to more than half of the dancer days (more than 80,000) during the class period.  This is not, therefore, a case where a small cadre of willfully disobedient employees deliberately falsely presented their hours.  Rather, it is a case of an overall system failure.  Responsibility rightly falls on the Club, which controlled and was in position to monitor that data, not, as defendants posit, on coordinated misconduct by nearly 2,000 dancers over a seven-year period.

Moreover, in light of the Club's classification of the dancers as independent contractors, there was no financial incentive for dancers to electronically sign out.  The dancers' recorded hours did not have any impact on their compensation, which was paid by customers, not the Club.  The dancers were not on notice that their recorded hours mattered—and, under the compensation system designed by the Club, they did not.  Under this circumstance, *Seever* is particularly inapt, for a dancer who was unaware that a failure to record hours could affect her compensation cannot be said to be at fault for her inability years later to reconstruct her precise hours on a particular day.  Indeed, despite the extensive discovery taken in this case, defendants

cite no evidence that any dancers deliberately falsified anything as to their hours.  On the assembled record, the evidence instead is that the Club failed, throughout the class period, to have in place a system for recording hours that worked.

The Court therefore rejects defendants' bid to force the dancers to reconstruct their hours, years after the fact, on a day-by-day basis, as opposed to, under *Mt. Clemens*, by a matter of just and reasonable inference.  This bid reflects, in fact, uncommon chutzpah.  Having gambled that its classification of the dancers as customer-compensated independent contractors would go unchallenged or withstand scrutiny, the Club cannot now blame the dancers for failing to maintain their time records in a manner befitting time-compensated employees—a different compensation paradigm which the Club rejected.  Plaintiffs' hours, therefore, are to be established at trial as a matter of just and reasonable inference.  Defendants are at liberty to combat plaintiffs' proof on that point, *see, e.g.*, *Hart*, 2014 WL 6238175, at *18 n.8, but not by assigning blame to plaintiffs for the shortcomings in the Club's own records.

## VIII.   Plaintiffs' Motion *in Limine* No. 8

Plaintiffs next move to preclude evidence and arguments as to (1) the motivation and conduct of class counsel, and the fact that their geographical home-base is outside of New York; (2) the opt-out rate within the class; (3) advertising by class counsel; and (4) lawyer-driven lawsuits.  Dkt. 658–59.  Defendants, remarkably, oppose this motion as to the final three topics. Dkt. 697.  These subjects are categorically irrelevant and have no place in this lawsuit.  And even if evidence of them had any slight relevance, it would be substantially outweighed by the capacity of such evidence and lawyer arguments to confuse the jury and create unfair prejudice. The Court accordingly precludes evidence on these subjects and directs counsel, in no uncertain terms, neither to refer to these subjects nor to make arguments about them.

As to the first topic, defendants agree not to comment on the motivation or conduct of class counsel or the fact that class counsel is not from New York City. Dkt. 697. The Court agrees that these subjects are categorically irrelevant, as is, for that matter, the motivation, conduct, and geographic home-base of defense counsel. The Court directs counsel not to disclose, comment on, or seek to elicit evidence as to, any of these subjects, including the residence or geographic base of *any* counsel (plaintiffs' *or* defendants') in the case. There is no valid reason for the jury to know the residence or home-base of counsel. And defendants' proposed voir dire, which adverts to this issue, *see* Dkt. 640, Ex. L, 3, would improperly inject local bias into the case. *See, e.g.*, *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 539–41 (2d Cir. 1992) ("There is no doubt whatever that appeals to the regional bias of a jury are completely out of place in a federal courtroom. Appeals tending to create feelings of hostility against out-of-state parties are so plainly repugnant that the Supreme Court long ago stated their condemnation 'require[d] no comment.' This sort of argument improperly distracts the jury from its sworn duty to hand down a just verdict based on the evidence presented to it.") (quoting *N.Y. Cent. R.R. Co. v. Johnson*, 279 U.S. 310, 319 (1929)); *Hall v. Freese*, 735 F.2d 956, 960 (5th Cir. 1984); *cf. Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 111 (1945) ("Diversity jurisdiction is founded on assurance to non-resident litigants of courts free from susceptibility to potential local bias.").

As to the NYLL class opt-out rate, it, too, is irrelevant. Defendants argue that the jury is entitled to know the number of defendants in the NYLL class, for the purposes of calculating damages. Of course, that proposition is correct. But, to calculate such damages, there is no need for the jury to know the number of dancers who opted out of that claim, and who thus are not eligible for damages, or how that opt-out rate compares to the opt-out rate in other litigations.

Defendants speculate that some NYLL opt-out dancers might have done so believing that the class claims lacked merit, and/or that the Club had properly classified them as independent contractors.  Even if true, the subjective opinions of individual dancers about this legal subject are irrelevant to any issue to be tried, including whether the Club acted willfully in so classifying the dancers, just as the subjective opinions of the nearly 2,000 dancers who have not opted out on this legal issue are categorically irrelevant.

The jury must also, and will, know the number of plaintiffs, 41, who have opted in to the FLSA claim brought in Count One.  *See Hart*, 967 F. Supp. 2d at 909 (citing Stipulated Facts ¶ 30.)  That is because damages calculations must be made, for each of these plaintiffs, on that Count.  But it is irrelevant to the issues to be tried that, or why, the balance of the class has not joined in that FLSA claim.  *See* Fed. R. Evid. 401, 402.  As counsel are aware, there are good reasons for a dancer not to join in that particular claim, including that the dancers' minimum-wage rights stand to be vindicated already by virtue of the separate NYLL minimum-wage claim, and because an exotic dancer, or former dancer, might wish to avoid the publicity attendant to this lawsuit.  Those factors have no bearing on the discrete issues to be tried.  The Court accordingly directs counsel not to comment upon, or argue about, the difference between the number of FLSA opt-ins and the number of dancers in the NYLL class, except insofar as those distinct numbers are mathematically relevant for the purpose of tabulating damages.

As to plaintiffs' counsel's advertising efforts, this subject too is irrelevant.  And evidence as to it would serve, potentially, to alienate the jury, by converting the trial into a referendum on lawful practices by plaintiffs' counsel.  *See, e.g.*, *Bufford v. Rowan Cos.*, 994 F.2d 155, 157–58 (5th Cir. 1993); *In re Norplant Contraceptive Prods. Liab. Litig.*, No. MDL 1038 (RAS), 1997

28

WL 81087, at *1 (E.D. Tex. Feb. 21, 1997); *cf. Bates v. State Bar of Ariz.*, 433 U.S. 350, 383–84 (1977).

In opposing this motion, defendants state that if the jury is permitted to learn that the Club's parent entity, RCII, later entered into agreements with dancers at other Clubs that precluded class actions, such evidence would open the door to evidence as to plaintiffs' counsels' advertising practices as to Rick's NY. That argument does not logically follow. The Court addresses, *infra*, and grants, the Club's motion *in limine* to preclude evidence of these agreements with dancers at affiliated clubs. But whether or not such evidence were admitted, it would not make the professional conduct of plaintiffs' counsel, including in the area of advertising, probative of any issue to be tried. The Court accordingly orders that no comments or arguments as to this point be made at trial.

Finally, plaintiffs seek to preclude commentary or arguments generally as to lawyer-driven lawsuits. Dkt. 658–59. The Court grants this motion, too. *See, e.g.*, *Koufakis v. Carvel*, 425 F.2d 892, 904 & n.16 (2d Cir. 1970) (remanding for new trial in part because of attacks on opposing counsel); *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 761 (7th Cir. 2013) (stating that "argument aimed at a party's counsel is improper and risks depriving the party of a fair trial" and remanding for new trial). The jury will be charged with resolving the discrete issues left open by the Court's prior rulings, to wit, the minimum-wage damages due to the FLSA plaintiffs and the NYLL class, whether defendants acted willfully or not in good faith, the tabulation of tip-out damages, and whether RCI and RCII were plaintiffs' employers. The jury's attitudes about class actions generally, or employment class actions specifically, or the business model, role, or ethics of class-action counsel, have no bearing on these issues. And commentary on this issue can serve only to confuse, inflame, and introduce unfair prejudice.

**IX.     Plaintiffs' Motion *in Limine* No. 9**

At trial, plaintiffs state that they intend to call as witnesses, *inter alia*, the two named plaintiffs and seven of the 25 opt-in plaintiffs who were deposed in this case.  Dkt. 640, Ex. C.  The defendants state that they intend to call the two named plaintiffs and all 25 of those opt-in plaintiffs.  *Id.* Ex. D.  With respect to the nine dancers whom both sides intend to call as witnesses in their respective cases-in-chief, plaintiffs move "to prevent defendants from reserving cross-examination" of those nine dancers.  Dkt. 660–61.  Plaintiffs explain that "it would be inefficient, potentially redundant, and certainly unduly burdensome and harassing to require the entertainers at issue to testify more than once at trial."  Dkt. 661, at 2.  Defendants oppose plaintiffs' motion, on the ground that plaintiffs have not demonstrated a witness-specific inconvenience for each to testify in plaintiffs' case and later in the defense case, and that defendants have a right to conduct a direct examination of each of these dancers.  Dkt. 698.

Notwithstanding the infelicitous manner in which plaintiffs' motion is labeled, *i.e.*, as a motion "to prevent defendants from reserving cross-examination," Dkt. 660, it is clear from plaintiffs' articulation of it in their memorandum of law that the motion at its heart aims to avoid having these dancers called to testify at different stages of the trial: once in plaintiffs' case, and later in the defense case.  *See* Dkt. 661, at 2 ("[I]t would be inefficient . . . and . . . burdensome . . . to require the entertainers at issue to testify more than once at trial.").  The Court agrees that there are compelling reasons, sounding in trial efficiency, avoidance of redundancy, and in avoiding needless inconvenience to the nine plaintiffs that plaintiffs' counsel intends to call, to avoid recalling them on a later date in this trial.  Accordingly, assuming that these nine witnesses testify, plaintiffs' motion is granted:  The Court intends to structure trial so that these witnesses need only take the stand once.  However, the Court will modify plaintiffs' request—

which on its face is blind to defendants' trial rights—so as to ensure that defendants can exercise their right to conduct a full direct examination of these witnesses.

Under Federal Rule of Evidence 611, "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."  The Court has "wide latitude" in controlling the mode and order of evidence under Rule 611.  *Ladenburg Thalmann & Co. v. Modern Cont'l Const. Holding Co.*, 408 F. App'x 401, 404 (2d Cir. 2010) (summary order) (quoting *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 148 (2d Cir. 2001)).

A recent decision by Judge Nathan, cited by defendants, helpfully summarizes the law in this area.  "To prevent unfairness and avoid wasting time, numerous courts have held that a party may not limit a witness that the party intends to call at trial from testifying only during its own case in chief.  Instead, the party must either permit its opponent to directly examine the witness, so that both parties may elicit the witness's live testimony during their cases in chief, or rely itself on the witness's deposition testimony, so that neither party may elicit the witness's live testimony during its case in chief."  *Buchwald v. Renco Grp., Inc.*, No. 13 Civ. 7948 (AJN), 2014 WL 4207113, at *1 (S.D.N.Y. Aug. 25, 2014) (citing *R.B. Matthews, Inc. v. Transam. Transp. Servs., Inc.*, 945 F.2d 269, 273 (9th Cir. 1991); *Maran Coal Corp. v. Societe Generale de Surveillance S.A.*, No. 92 Civ. 8728 (DLC), 1996 U.S. Dist. LEXIS 172, at *4–5 (S.D.N.Y. Jan. 9, 1996); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 776 F. Supp. 838, 839 (S.D.N.Y. 1991); *Iorio v. Allianz Life Ins. Co.*, No. 05 Civ. 633 (JLS), 2009 WL 3415689 (S.D. Cal. Oct. 21, 2009)).  As *Buchwald* held (in the context of witnesses who were outside the Court's subpoena power), a party must either let its adversary "elicit live testimony from the [nine] witnesses or

instead forc[e] both parties to rely on the witnesses' depositions." *Id.* "In light of the importance that each side attaches to the witnesses in question and the preference for live testimony dictated by both common sense and Second Circuit case law, the Court hopes and expects that [plaintiffs] will opt to make the witnesses available for trial." *Id.* at *2 (citing *Napier v. Bossard*, 102 F.2d 467, 469 (2d Cir. 1939)). These principles are well-established and concern *who* will testify.

But these principles are distinct from the question of trial structure—in essence, *when* those witnesses will testify. As Judge Nathan further explained in *Buchwald*, in a portion defendants notably omit to cite, "to spare the witnesses the burden of remaining at trial for any longer than necessary, the Court intends to structure trial such that each witness will take the stand only once, at which time both the [plaintiffs] and Defendants will have the opportunity to elicit their testimony for their cases in chief." *Id.* There is firm support for this approach in Federal Rule of Evidence 611, which gives district courts authority to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence," as well as Federal Rule of Civil Procedure 1, which states that the Federal Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." *See, e.g.*, *id.*

The facts here compellingly lead the Court to adopt the same approach as did Judge Nathan—which is, furthermore, a "standard trial practice[]." *Id.* at *3. Defendants have not articulated any valid reason to force nine former employees to inconvenience themselves by traveling to this courthouse and testifying on multiple days, potentially a week or more apart, in this case. It is inherently inconvenient to force a witness to travel to court and re-arrange her ordinary work and home schedule to testify. And defendants fail to articulate any concrete harm to them presented by consolidating such witnesses' testimony at a common time so as to avoid

this inherent inconvenience.  Indeed, it is apparent from defendants' submissions that defendants insist that these nine witnesses be called both during plaintiffs' case and later on their case for non-substantive strategic advantage:  Should such a witness fail or be unable to appear on both occasions, defendants would seek, for example, adverse-inference instructions or other remedies. *See* Dkt. 698 (citing *In re Gulf Oil*, 776 F. Supp. at 839).

The Court looks askance at such tactics.  And the Court reminds the defense that, given the Court's summary judgment rulings and the resulting discrete issues to be tried, the dancers' testimony is of limited relevance at trial.  This testimony certainly bears on damages issues.  But there has been no proffer as to why this testimony has any relevance to whether defendants' classification decision was willful or as to which of the corporate defendants were plaintiffs' employers.  The testimony of these plaintiffs ought to be brief and targeted to the discrete issues to which it is relevant; the Court will ensure that such testimony does not become an occasion for distraction, bullying, or creating unfair prejudice.  The practical reality of the limited relevance of these witnesses' testimony strongly reinforces the argument that they not be recalled to testify on a day distant from their initial testimony.  And defendants have long been aware of the issues to be tried and of the facts and record developed during the extensive discovery taken in this case.  Defendants have also had the opportunity to depose these witnesses.  Defendants therefore cannot credibly claim an inability to fully examine these witnesses on all relevant issues at the time they are called.

The Court, accordingly, will structure trial to assure that the plaintiff witnesses in question testify only once, but that, at the time these witnesses are called, defendants have a full opportunity to examine the witness.  At the conference to be held on March 13, 2015, the Court will solicit from counsel their views as to the appropriate mechanism for achieving this end.  One

possibility is to permit defense counsel to expand the scope of cross-examination to encompass the full direct examination of the witness that the defense intends.  Another is to permit defense counsel, immediately after completion of questioning of the witness as called by plaintiffs' counsel, to then call that witness out of turn and conduct a plenary direct examination of that witness.  Counsel, particularly defense counsel, should be prepared to state their views (at the March 13, 2015 conference) as to which of these approaches they prefer.[8]

## X.      Defendants' Motion *in Limine* No. 1

Defendants seek to preclude evidence of court decisions pertaining to whether dancers at exotic clubs should be classified as employees or independent contractors.  Defendants argue that these decisions are irrelevant to the issues of defendants' willfulness and/or lack of good faith, and are also inadmissible under Rule 403 because they would tend to confuse the jury and impair the Court's ability to instruct the jury on the law.  Dkt. 664–65.  Plaintiffs counter that such cases, if handed down before or during the class period, are relevant to defendants' state of mind, either because defendants were aware of a body of case law that included many cases holding exotic dancers to be employees, not independent contractors, or because defendants' reckless disregard for this body of law itself is evidence of their willfulness and lack of good faith.  Dkt. 685.

The Court denies defendants' motion *in limine*.  Defendants have claimed that the Club did not act willfully, or other than in good faith, when it classified its dancers as independent contractors, and on that basis denied them a minimum wage.  *See, e.g.*, *Hart*, 967 F. Supp. 2d at 938.  Defendants propose, in fact, to corroborate that claim as to their state of mind by eliciting

---

[8] In so ruling, the Court recognizes that, in the event of a truly unexpected development, to assure fairness, there could be a need to recall a witness on the defense case.  The Court does not categorically rule out this possibility.  *See Buchwald*, 2014 WL 4207113, at *3.

testimony by Club officials as to norms within the strip club industry, presumably meaning their awareness of other strip clubs that similarly classified their dancers.  Dkt. 640, Ex. D.

Plaintiffs, for their part, are entitled to test those claims of non-willfulness and good faith. "To establish the requisite subjective 'good faith,' an employer must show that it took active steps to ascertain the dictates of the FLSA and then act to comply with them."  *Hart*, 967 F. Supp. 2d at 938 (quoting *Barfield*, 537 F.3d at 150); *see also id.* at 937 ("The willfulness standards for the FLSA statute of limitations and NYLL liquidated damages do not differ to any appreciable extent.") (quoting *McLean v. Garage Mgmt. Corp.*, No. 10 Civ. 3950 (DLC), 2012 WL 1358739, at *7 (S.D.N.Y. Apr. 19, 2012)).  Plaintiffs are entitled to question Club officials as to their knowledge of the substantial body of case law in effect during the class period. Although each case turned on case-specific facts, "the clear majority" of such cases held, as the Court has previously noted, that dancers were employees.  *Id.* at 913.  This body of law is potentially significant.  Plaintiffs are at liberty to ask defendants about their assessment of this body of law when they determined, and while they maintained, the independent contractor classification.

It is relevant and likely highly probative to willfulness and good faith what the Club's reasoning was, in the face of this case authority, in classifying the dancers as independent contractors.  Did the Club not research the case law?  Did it research the law and fail to spot any of these cases?  Did the Club find the cases but remain unpersuaded by them?  Or, did it find the cases persuasive on their facts but believed that the circumstances at Rick's NY were distinct from the cases holding dancers to be employees?  Plaintiffs may reasonably ask the jury to assess defendants' state of mind in light of Club officials' answers, under oath, to these questions. Plaintiffs may also reasonably ask the jury to make credibility findings about such testimony.  To

the extent defendants may disclaim any knowledge of court decisions in this area, plaintiffs may argue that this claim of ignorance is unworthy of belief, particularly given the statements in RCII's Forms 10-K dating back to 2005 that acknowledge that the Club might be "required in all states to convert dancers who are now independent contractors into employees."  Dkt. 692 Ex. 62, at 2.  As with the subject of industry standards, the Court will instruct the jury that this evidence is being received solely as it bears on defendants' state of mind.

To be sure, the means by which the jury is notified of the state of the law as to the status of exotic dancers during the relevant period must comport with Rule 403.  Plaintiffs propose to introduce the actual, physical court decisions—some 20 in total—into evidence.  *See Hart*, 967 F. Supp. 2d at 912 (collecting cases).  Rule 403 requires exclusion of this evidence.  These decisions are certainly highly relevant.  The state of the law on the general question at issue provides a very important backdrop against which the Club's claims of good faith and non-willfulness must be evaluated.  But putting the text of court decisions before the jury runs a substantial risk of engendering confusion and—although the direction of this prejudice cannot be predicted in advance—unfair prejudice.  The jurors in this case are not likely to be lawyers.  *See United States v. Desnoyers*, 637 F.3d 105, 111 (2d Cir. 2011) ("Jurors are fact finders, not lawyers or judges . . . .").  They will not have been chosen for their legal acumen.  Plaintiffs' proposal that 20 court decisions be put before the jury would effectively ask the jury to decode these lengthy, nuanced, precedent-laden documents whose meaning and subtleties are meant for lawyers, not lay readers.  There is a great risk that these cases would be read out of context, with individual snippets either misread or assigned undue importance, to the prejudice of one or both parties and to the detriment of the trial's truth-seeking function.

However, it is imperative that the jury be given a fair, and neutral, portrait of the state of the law in this area during the class period.  Such knowledge is important to enable the jury to assess fairly defendants' claims of non-willfulness and of good faith, and plaintiffs' claims that defendants either flouted or consciously disregarded adverse precedents.  Further, were the jury left unaware as to the actual state of the law regarding dancer classifications, counsel's questioning of Club officials as to their assessment of this law, as relevant to the issues of willfulness and good faith, might leave the jury with a badly skewed impression as to the state of this law.  Without such guidance, the jury would be hamstrung in objectively assessing defendants' professed state of mind to the extent that the jury found defendants' assessments of the existing legal background to be probative.

The Court's present judgment is that the proper means to educate the jury on this point is for the Court to take judicial notice of the body of precedent in this area.  *See, e.g.*, Fed. R. Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) ("A court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings." (quoting *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992))); *Veg-Mix, Inc. v. U.S. Dept. of Agriculture*, 832 F.2d 601, 607 (D.C. Cir. 1987) ("Courts may take judicial notice of official court records . . . ." (citing, *inter alia*, *Freshman v. Atkins*, 269 U.S. 121, 123–24 (1925); *In re Aughenbaugh*, 125 F.2d 887, 890 (3d Cir. 1942)).  The Court's present intention is to develop a neutral and balanced statement that accurately, and with fair nuance, describes to the jury the state of the law in this area.  The Court will issue an order shortly directing counsel to confer and

to jointly prepare such a neutral, clear statement for the Court's review.  This exercise is not an occasion for advocacy.  The Court is confident that counsel, based on their deep familiarity with these precedents, can prepare a balanced and helpful such statement for the Court's consideration.

## XI.    Defendants' Motion *in Limine* No. 2

Defendants next move to exclude evidence and arguments concerning the defendants' financial information and/or financial circumstances since the close of discovery.  Dkt. 666–67.  Plaintiffs oppose this motion.  Dkt. 686.  Defendants' motion is granted.

Unlike the other motions that the parties filed *in limine*, the Court has already addressed, in an earlier order, most of the issues raised by this particular motion.  Specifically, on the day they filed their motions *in limine* (February 6, 2015), plaintiffs also filed a letter seeking an order directing defendants to "update their production of intercompany transfers" for the period of October 31, 2012 through January 2015.  Dkt. 642.  Plaintiffs argued that the intercompany transfers were relevant, *inter alia*, to willfulness, because they might reveal that the defendants were seeking to avoid the effect of a judgment by transferring money from Peregrine to its corporate parents.  *Id.*  On February 11, 2015, defendants submitted a letter in response, arguing that the Court should not reopen discovery, that plaintiffs were effectively seeking prejudgment discovery, and that defendants' state of mind after the class period (which ends October 31, 2012) is irrelevant.  Dkt. 683.

On February 13, 2015, the Court issued an order denying plaintiffs' request to reopen discovery, but directing defendants to preserve all the evidence sought by plaintiffs, noting that such evidence might become discoverable and relevant following trial.  Dkt. 704.  The Court noted that the records plaintiffs sought did not speak to defendants' state of mind at the relevant

time for the issues to be tried—the class period.  *Id.* (citing *Lewis*, 332 F. App'x at 643

("Allegations concerning after-the-fact events are immaterial to . . . state of mind." (quoting *EED*

*Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 514 (S.D.N.Y. 2005))).

     The Court's earlier order resolves the vast majority of the parties' arguments on this

motion *in limine*.  The only as-yet unaddressed issue is defendants' motion to preclude plaintiffs

from asking Eric Langan, president of RCII, RCI, and Peregrine, about "defendants' litigation

reserve (or lack thereof) to pay a judgment in this case and defendants' intention (or lack thereof)

to place Peregrine in bankruptcy and transfer business to Vivid [a separate club owned by RCII]

in the event of a judgment."  Dkt. 667 (citing Plaintiffs' Witness List).  The Court grants

defendants' motion.

     First, there is no basis for allowing plaintiffs to ask about defendants' litigation reserve.

It is not relevant to defendants' state of mind at the time of the events at issue.  And to the extent

it speaks to defendants' state of mind as of the time this lawsuit was filed (which was within the

class period), it logically addresses the monetary risk presented by this lawsuit rather than the

actual assessment of the whether the classification was correct, or believed to be correct, at the

time made.  *See, e.g.*, *Mirarchi v. Seneca Specialty Ins. Co.*, 564 F. App'x 652, 655 (3d Cir.

2014) (affirming exclusion of litigation reserve evidence in case raising issues of bad-faith;

district court had explained that "a loss reserve is 'the insurer's own estimate of the amount

which the insurer could be required to pay on a given claim.'" (quoting 17A Couch on Ins.

§ 251:29)); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 117 F.R.D. 283, 288 (D.D.C.

1986) (holding that defendant's litigation reserve was "information of very tenuous relevance, if

any relevance at all. . . .  [A] reserve essentially reflects an assessment of the value of a claim

taking into consideration the likelihood of an adverse judgment and . . . such estimates of

potential liability do not normally entail an evaluation . . . based upon a thorough factual and legal consideration . . . .").

Furthermore, under Rule 403, such evidence would have significant capacity both to confuse the jury and to unfairly prejudice defendants.  In the event that defendants' litigation reserve is substantial, admission of such evidence would essentially hold against defendants their own business prudence; in the event that defendants' litigation reserve is insubstantial, admission of such evidence would present a risk of distracting the jury and might impermissibly lead the jury to make a "joint-employer" decision not on the merits, but as a matter of result-orientation, to help ensure that plaintiffs actually recover the amount that the jury (or the Court) awarded.  To the very limited extent that a litigation reserve might be relevant, therefore, it is overwhelmed by the risk of confusion, improper considerations, and unfair prejudice.  *See, e.g.*, *Estate of Mali v. Fed. Ins. Co.*, No. 06 Civ. 01475 (EBB), 2011 WL 2516246, at *2 (D. Conn. June 17, 2011) ("[T]he loss reserve information is minimally probative, and may create the erroneous perception that the defendant had conclusively determined the value of the Plaintiffs' claim.  Moreover, the speculative nature of loss reserves makes it almost certain that allowing such evidence would result in confusion amongst the jury and lead to a wasteful and unnecessary debate regarding the nature and accuracy of loss reserves.").

For the same reasons, the Court similarly precludes evidence and argument about the defendants' alleged intention to place Peregrine in bankruptcy and transfer business to Vivid in the event of a judgment.  This topic is irrelevant to all issues at trial, and inflammatory; it, too, would invite a decision based on impermissible considerations.  And the Court has already made quite clear that *it* will look askance at, and forcefully respond to, any fraudulent conveyances, if

established after trial, so as to assure that the judgment against Peregrine is not improperly

frustrated.  *See* Dkt. 704.

## XII.    Defendants' Motion *in Limine* No. 3

Defendants next move *in limine* to exclude evidence of the operations of clubs affiliated

with RCII other than Rick's NY.  Dkt. 669–70.  In particular, defendants move to exclude

evidence plaintiffs propose to adduce of agreements which those affiliated clubs entered into in

2011, following the onset of this litigation, which required dancers at those clubs to sign

arbitration agreements containing class-action waivers.  Defendants argue that such evidence is

both non-probative and unfairly prejudicial.  Plaintiffs take the opposite view and construe the

arbitration agreements as evidencing defendants' "knowledge—or at least awareness of the

risk—that they were violating the law by classifying entertainers as independent contractors."

Dkt. 687.

The Court grants defendants' motion *in limine*.  The Court concludes, emphatically, that

this evidence—indeed, all evidence as to the conduct of such affiliated clubs as it relates to the

status and employment conditions of dancers—must be excluded.  The Rule 403 balance as to

such evidence lopsidedly favors its exclusion.

To begin with, these agreements do not, as plaintiffs posit, *see* Dkt. 687, reflect

awareness by the Club that the practice at Rick's NY of classifying dancers as independent

contractors was illegal.  On the contrary, these agreements self-evidently reflect a business

reality: the fact that the Club had been sued in this case and foresaw the risk of future lawsuits.

In the face of such litigation, it made eminent business sense for RCII to try, by agreement, to

preclude dancers at other establishments from litigating in court or initiating a class action.  Such

arbitration agreements, containing class-action waivers, have widely been upheld, including by

41

the Supreme Court, *see AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748 (2011), the

Second Circuit, *see In re Am. Express Merch. Litig.* ("*Amex III*"), 667 F.3d 204, 219 (2d Cir.

2012), and courts in this District, including this Court, *see Crewe v. Rich Dad Educ., LLC*, 884 F.

Supp. 2d 60, 83 (S.D.N.Y. 2012); *see also Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559,

563 (S.D.N.Y. 2013).

The Court has carefully reviewed the exemplars of the 2011 agreements, as provided to

the Court by counsel.  There is nothing in these agreements that can be fairly read as admitting

that it was unlawful to treat the dancers at RCII's clubs in general, or Rick's NY in particular, as

independent contractors.

And the snippets of testimony about the class-action waivers on which plaintiffs rely,

including that of Eric Langan, president of RCII, RCI, and Peregrine, do not do so either.  Mr.

Langan's quoted testimony merely reflects that RCII's business response to plaintiffs' lawsuit

was not to re-classify strippers at RCII's other clubs as employees.  Instead, Mr. Langan states,

RCII elected to attempt to deter future challenges to the clubs' classifications of their dancers as

independent contractors by forcing dancers at these clubs, as a condition of future work, to enter

into arbitration agreements with class-action waivers.  Plaintiffs' counsel may disdain this

hardball response to litigation, and they may regard the case law upholding such waivers as

wrong-headed.  But it is simply incorrect to characterize defendants' introduction of such

agreements as admitting wrongdoing or evidencing the Club's willfulness or lack of good faith.

In any event, even if this response by RCII to this litigation could be interpreted as a form

of admission of wrongdoing—and it cannot—the countervailing considerations under Rule 403

would clearly compel exclusion of such evidence.  Introduction of such evidence would occasion

the classic "trial within a trial" that Rule 403 seeks to prevent.  *See, e.g.*, *United States v.*

*Aboumoussallem*, 726 F.2d 906, 912–13 (2d Cir. 1984) (affirming exclusion of otherwise relevant similar act evidence under Rule 403 on the ground that confusion and delay caused by likely trial within a trial would have substantially outweighed probative value of evidence); *Ricketts v. City of Hartford*, 74 F.3d 1397, 1414 (2d Cir. 1996) (upholding exclusion of prior act evidence because of risk of unnecessary trial within a trial and citing *Aboumoussallem*); *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 407 (S.D.N.Y. 1999) ("The probative value of such an exercise is vastly outweighed by the confusion and delay that would inevitably result from conducting a trial within a trial.").

It would require the jury, first, to assess whether the conditions of employment at RCII's other clubs were akin to those at Rick's NY, so as to make relevant to *this* case the Club's 2011 actions with respect to dancers at its other Clubs. It would then require the presentation of evidence as to the business decision to require dancers at RCII's other clubs, going forward, to enter into arbitration agreements with class-action waivers. This evidence would potentially be protracted. Not only would the jury need to receive and understand these agreements: To assess whether the agreements were an admission of prior wrongdoing, as plaintiffs claim, or a hardheaded business decision aimed at reducing litigation risk presented by RCII's other clubs, the parties would invariably have to present extended evidence from decision-makers as to the evolution and reasons behind this decision. The Court would also be called upon to explain, as relevant, the applicable legal principles and to give the jury limiting instructions.

In the end, in the Court's assessment, this exercise into examining a collateral decision by RCII, made late in the class period as to other clubs but not the one at issue here, would carry a substantial risk of confusing the jury. It would add palpable delay. And it would present a great risk of truly unfair prejudice to Rick's NY. *See* Fed. R. Evid. 403. There would be a real risk

that the jury, notwithstanding the Court's instructions, would simplistically treat RCII's decision to deter lawsuits like this one as admitting liability in this suit, as opposed to a recognition of the cost and legal risk presented by such suits, whether or not ultimately meritorious. These considerations overwhelmingly outweigh the minimal, if not non-existent, probative value of this business practice.

For all these reasons, the Court grants defendants' motion. The parties are precluded from offering any evidence as to the classification or treatment of dancers at any other club run by RCII, including specifically RCII's 2011 agreement with dancers at other clubs which bound those dancers to arbitrate, in a non-class context, their disputes with RCII and its affiliates.

## XIII. Defendants' Motion *in Limine* No. 4

Defendants next move to preclude evidence concerning their assets and liabilities, accounting practices, business plans and transactions, and private ownership of stock, including Peregrine's general ledger and intercompany transfer ledger, as well as RCI's general ledger. Dkt. 672, 674. Plaintiffs oppose this motion, arguing that these records are relevant to defendants' willfulness and to whether defendants RCI and RCII were joint employers, with Peregrine, of the plaintiff dancers. Dkt. 688.

The Court grants this motion in part, denies it in part, and reserves in part, depending on the specific category of evidence at issue. The Court evaluates each category of evidence with the same threshold principles in mind—including the principles for determining whether an entity is an employer. *See generally Hart*, 967 F. Supp. 2d at 938–43 (citing, *inter alia, Herman*, 172 F.3d at 135 ("[C]ontrol of employees is central to deciding whether appellant should be deemed an employer."); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 76 n.13 (2d Cir. 2003) (noting "fact-intensive character of the joint employment inquiry")); *see also id.* at 940 ("The

statutory standard for employer status under the NYLL is nearly identical to that of the FLSA.") (citing, *inter alia*,  29 U.S.C. § 203(d); N.Y. Lab. Law § 190(3); *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010)).

To the extent plaintiffs propose to introduce evidence of inter-corporate transfers of money, or the assets or wealth of the various corporate defendants, following the close of the class period, that evidence is excluded.  *See* Dkt. 704.  The Court has previously addressed this issue in the course of addressing defendants' second motion *in limine*.  *See supra*, pp. 37–40. This evidence does not bear on the relationship between the corporate entities during the class period.  It would only slightly help establish bias of defendants' witnesses, a point that can readily be made by other means.  And such evidence would have significant potential to lead the jury to resolve the joint employer issue not based on the legally relevant factors, but on assuring that defendants with sufficient assets to fund the judgment in this case are found liable.

The Court will, however, permit evidence of transfers of money among the corporate entities *during* the class period, insofar as such evidence is relevant to the joint employer issue. For avoidance of doubt, this evidence will not be received to prove an attempt to drain Peregrine of money to make it judgment-proof, and plaintiffs are not permitted to so argue.  But the ordinary economic arrangements of the corporate defendants, like their personnel overlaps, are relevant to whether Peregrine's parents functioned as joint employers of the Club's dancers, and such evidence therefore will be permitted.  Plaintiffs are admonished, however, to present such evidence in an efficient manner.  It is unnecessary for extended proof of these points to be received.  The Court authorizes admission of such evidence under Rule 403 on the premise that it will not lead to undue delay.

Similarly, to the extent plaintiffs propose to offer evidence of defendants' corporate structure, and the roles played by officials with connections to multiple defendant entities, such as Mr. Anakar or Mr. Langan, such evidence is admissible.  Such evidence is helpful to the jury in explaining the relationship among the corporate defendants, which is important both as a matter of enhancing the jury's understanding of these entities, and to resolving the joint employer issue—whether the non-Peregrine defendants were also plaintiffs' employers.  *See Hart*, 967 F. Supp. 2d at 939–40.  Defendants have not made any credible argument that efficiently-presented evidence of the defendants' corporate structure and overlaps is likely to lead to unfair prejudice, confusion, or delay.

To the extent plaintiffs propose to introduce evidence of defendants' "accounting practices," such evidence may prove admissible; some of defendants' accounting practices may well bear on the joint-employer question.  However, plaintiffs have not made a specific proffer as to what such evidence is, and therefore have failed to demonstrate to the Court, at this point, that such evidence has any bearing on any issue to be tried.  Accordingly, the Court reserves on this issue, pending a more specific articulation by the plaintiffs of the concrete accounting practices at issue.  *See Nat'l Union*, 937 F. Supp. at 287.  The Court notes, however, that to the extent such evidence is admitted at trial, it must be presented efficiently.  The Court will not permit lengthy detours into accounting principles.

Finally, to the extent plaintiffs propose to introduce evidence of statements in any of defendants' Forms 10-K or 10KSB (or other public filings or publicly disseminated documents) with respect to the Club's practice of treating dancers as independent contractors, such evidence is admissible, as the Court's summary judgment decision implicitly recognized.  *See Hart*, 967 F. Supp. 2d at 938.  Such statements bear, potentially quite significantly, on the issue of willfulness,

in that they appear to reflect awareness of the risk that this classification would be held incorrect. These statements about the business practice at the heart of this case are an appropriate area for examination of defendants' officials at trial.  These statements also are relevant to the joint-employer issue.  Defendants fail to identify any substantial countervailing factor under Rule 403; any prejudice the defendants may experience as a result of admission of these statements and testimony about them is, on the present record, not *unfair* prejudice, but instead derives from the probative value that these statements have for aspects of plaintiffs' case.  *See Old Chief v. United States*, 519 U.S. 172, 193 (1997) ("[T]he question under Rule 403 is one of 'unfair' prejudice—not of prejudice alone.") (citation omitted); *see also id.* ("'[U]nfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party.  Virtually all evidence is prejudicial or it isn't material.  The prejudice must be 'unfair.'") (citation omitted).

## XIV.   Defendants' Motion *in Limine* No. 5

Defendants also move *in limine* for a ruling that plaintiffs cannot obtain liquidated damages under both the FLSA and the NYLL.  Dkt. 677–78.  The Court denies that motion as premature.  Unless and until the jury renders a verdict supporting both forms of damages, there will be no occasion to address the compatibility of such damages.  *See, e.g.*, *Torah Soft Ltd. v. Drosnin*, No. 00 Civ. 0676 (JCF), 2003 WL 22024074, at *2 (S.D.N.Y. Aug. 28, 2003) ("[T]he plaintiff's motion [*in limine*] is premature and, as such, is denied."); *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 Civ. 8294 (PKL), 2003 WL 21998985, at *3 (S.D.N.Y. Aug. 22, 2003).  And that issue will be one for the Court to resolve.  Further, based on plaintiffs' submission opposing defendants' motion as premature, *see* Dkt. 689, it is unclear how much, if at all, the parties' positions on these issues differ.  In the event that the jury's verdict requires attention to these

issues and the parties do not agree, the Court will welcome and resolve a motion along these lines.

## XV.   Defendants' Motion *in Limine* No. 6

Defendants next move to preclude evidence and arguments regarding settlement offers and offers of judgment made to various plaintiff dancers which plaintiffs, in the joint pretrial order (Dkt. 640, Ex. C), indicate they intend to offer in evidence.  Dkt. 679–80.  In brief, the evidence at issue concerns offers of judgment to dancer Nicole Imbeault, which resulted in a settlement, and to named plaintiffs Sabrina Hart and Reka Furedi, which did not.  Plaintiffs also seek to solicit testimony from defendants' president Eric Langan about "the decision to make Rule 68 offers of judgment in the Nicole Imbeault matter and in this matter and the amount of those offers."  *Id.*  Defendants also seek to preclude their offers of settlement in other cases. Plaintiffs oppose this motion.  Dkt. 690.

The Court grants defendants' motion *in limine* in its entirety.  For the reasons that follow, these settlement offers are clearly inadmissible.  There is a strong argument that these settlement offers are all inadmissible under Federal Rule of Evidence 408 and Federal Rule of Civil Procedure 68.  And even if they were not, the pertinent factors under Rule 403 overwhelmingly dictate that this evidence be excluded.  The Court accordingly directs that plaintiffs not seek to introduce, or in any way refer, to any settlement position, discussions, or offer made by defendants in this or any other case.

Federal Rule of Civil Procedure 68 provides, in relevant part:  "[A] party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. . . .  An unaccepted offer is considered withdrawn, but it does not preclude a later offer.  *Evidence of an unaccepted offer is not admissible except in a proceeding*

48

*to determine costs.*"  Fed. R. Civ. P. 68(a)–(b) (emphasis added).  "Rule 68 is a cost-shifting rule designed to encourage settlements without the burdens of additional litigation."  *Stanczyk v. City of New York*, 752 F.3d 273, 280 (2d Cir. 2014) (quoting *Reiter v. MTA N.Y. City Transit Auth.*, 457 F.3d 224, 229 (2d Cir. 2006)); *see also Marek v. Chesny*, 473 U.S. 1, 5 (1985) ("The plain purpose of Rule 68 is to encourage settlement and avoid litigation.").  "A rejected Rule 68 offer becomes part of the written record of the case and is used to determine attorneys' fees and costs awards at the close of the suit.  If the judgment or settlement ultimately obtained by plaintiff is less than the Rule 68 offer, plaintiff cannot recover attorneys' fees or costs from the date the offer was made to the end of the suit."  *Wallert v. Atlan*, No. 14 Civ. 4099 (PAE), 2015 WL 518563, at *1 (S.D.N.Y. Feb. 5, 2015) (quoting *Boorstein v. City of New York*, 107 F.R.D. 31, 33 (S.D.N.Y. 1985)).  "Rule 68's policy of encouraging settlements is neutral, favoring neither plaintiffs nor defendants; it expresses a clear policy of favoring settlement of all lawsuits."  *Id.* at *2 (quoting *Marek*, 473 U.S. at 10).

Federal Rule of Evidence 408, in turn, furthers "the policy of promoting compromises."  *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 294 (2d Cir. 1999).  It provides in full:

> **(a) Prohibited Uses.**  Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> > (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
> > (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
>
> **(b) Exceptions.**  The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408.  Although Rule 408 is not "a blanket rule of inadmissibility," its obvious

purpose "is to facilitate open and wide-ranging settlement discussions."  *Carr v. Health Ins. Plan*

*of Greater N.Y., Inc.*, No. 99 Civ. 3706 (NRB), 2001 WL 563722, at \*4 (S.D.N.Y. May 24,

2001).  In furtherance of that goal, the Rule typically requires exclusion of settlement offers.

*See, e.g.*, *Pace v. Paris Maint. Co.*, 7 F. App'x 94, 96 (2d Cir. 2001) (summary order); *Levick v.*

*Maimonides Med. Ctr.*, No. 08 Civ. 03814 (CLP) (NG), 2011 WL 1673782, at \*2 (E.D.N.Y.

May 3, 2011) ("Under Rule 408 of the Federal Rules of Evidence, settlement agreements are also

generally held to be inadmissible at trial.").[9]

Plaintiffs argue that they here "intend to use the offers of judgment and settlement

communications to prove [d]efendants'" state of mind, rather than to prove liability or damages.

Dkt. 690.  On this ground, plaintiffs argue, Rule 408 does not preclude admission of defendants'

offers.  This distinction is unpersuasive.  The relevant state of mind here concerns defendants'

awareness of "the validity or amount of a disputed claim."  Fed. R. Evid. 408.  Thus, permitting

the settlement offers to be admitted as proof of willfulness would necessarily mean construing

these offers to reflect an admission of liability—precisely the circumstances under which Rule

---

[9] *See generally* Fed. R. Evid. 408 (advisory committee note) ("As a matter of general agreement, evidence of an offer to compromise a claim is not receivable in evidence as an admission of, as the case may be, the validity or invalidity of the claim.  As with evidence of subsequent remedial measures, dealt with in Rule 407, exclusion may be based on two grounds.  (1) The evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position.  The validity of this position will vary as the amount of the offer varies in relation to the size of the claim and may also be influenced by other circumstances.  (2) A more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of disputes.  McCormick §§ 76, 251.  While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto.  This latter situation will not, of course, ordinarily occur except when a party to the present litigation has compromised with a third person. . . .  The same policy underlies the provision of Rule 68 of the Federal Rules of Civil Procedure that evidence of an unaccepted offer of judgment is not admissible except in a proceeding to determine costs.").

408 compels exclusion.  The Court therefore holds that Federal Rule of Civil Procedure 68 and Federal Rule of Evidence 408 compel exclusion of such evidence.

Even if this were not so, exclusion would be required on other grounds.  First, the settlement offers and agreements at issue all *explicitly* state that they are not admissible except in extremely limited circumstances not present here.  For instance, the Nicole Imbeault offer of judgment, which Ms. Imbeault accepted, stated:

> Peregrine Enterprises, Inc., a defendant in this action, offers to allow judgment to be taken against it by the plaintiff for the sum of Thirty-Six Thousand Dollars ($36,000.00), plus costs, including reasonable attorneys' fees, accrued to this date. **This offer is made pursuant to Rule 68 of the Federal Rules of Civil Procedure, and evidence of this offer is *not* admissible except in a proceeding to determine costs.  This offer is not to be construed either as an admission that the Defendants are liable in this action, or that the Plaintiff has suffered any damage**.  If this offer is not accepted in writing within ten (10) days after it is served, it will be deemed withdrawn.

Dkt. 680 (citing *Nicole Imbeault v. Rick's Cabaret Int'l, Inc.*, No. 08 Civ. 5458 (GEL), Dkt. 17 Ex. A) (emphasis added).  Plaintiffs' counsel in this case cannot disclaim knowledge of these limitations:  They represented Ms. Imbeault.  *See id.*  Defendants' offers to the named plaintiffs in this case, Hart and Furedi, are identical to the above-quoted offer in all material respects; they differ only in the amount offered.[10]  The text of these offers is clear; they are all inadmissible except in a proceeding to determine costs.

---

[10] Defendants' offer to Hart was:

> Peregrine Enterprises, Inc., a defendant in this action, offers to allow judgment to be taken against it by the plaintiff for the sum of Thirty Thousand Dollars ($30,000.00), inclusive of all attorneys' fees accrued to this date, plus costs, in full and final resolution of all claims asserted by Plaintiff in this action against all Defendants.  **This offer is made pursuant to Rule 68 of the Federal Rules of Civil Procedure, and evidence of this offer is *not* admissible except in a proceeding to determine costs.  This offer is not to be construed either as an admission that the Defendants are liable in this action, or that the Plaintiff**

Moreover, even if admission of defendants' offers of judgment and the settlement of the Imbeault matter were otherwise permitted, the Court would—without any difficulty—hold this evidence inadmissible under Rule 403. As to the disputed issue of willfulness, the fact of a settlement offer has only limited probative value. It certainly reflects awareness by defendants of the fact that a dancer might make or had made a claim for relief based on an asserted entitlement to minimum wages. Arguably, the fact of such an offer might be said to reflect a determination by defendants that such a claim was non-frivolous, or at least sufficiently likely to result in protracted litigation to merit a settlement offer in the interest of avoiding legal risk and expense.

However, the fact of such an offer is a far cry from an acknowledgment by the Club that it had misclassified dancers. As plaintiffs' counsel are assuredly aware, settlement offers are commonly made where both parties adhere to their positions on the merits, but where settlement nonetheless makes sense as a business matter. *See, e.g.*, *In re Arotech Sec. Litig.*, No. 07 Civ. 1838 (RJD) (VVP), 2010 WL 2301195, at *6 (E.D.N.Y. June 7, 2010) ("[A]s the parties made

---

**has suffered any damage.** If this offer is not accepted in writing within ten (10) days after it is served, it will be deemed withdrawn.

Dkt. 680 (citing Dkt. 14) (emphasis added). Defendants' offer to Furedi was:

Peregrine Enterprises, Inc., a defendant in this action, offers to allow judgment to be taken against it by plaintiff Reka Furedi ("Furedi") for the sum of Twenty One Thousand Dollars ($21,000.00), plus costs, including reasonable attorneys' fees incurred by Furedi, accrued to this date. **This offer is made pursuant to Rule 68 of the Federal Rules of Civil Procedure, and evidence of this offer is _not_ admissible except in a proceeding to determine costs. This offer is not to be construed either as an admission that the Defendants are liable in this action, or that the Plaintiff has suffered any damage.** If this offer is not accepted in writing within ten (10) days after it is served, it will be deemed withdrawn.

*Id.* (emphasis added).

quite clear at the Fairness Hearing, the settlement was entirely a business decision, both sides having determined that the cost of pursuing the dispute to final judgment outweighed any compromise in their position reflected in the settlement figure."); *Playboy Enters., Inc. v. Chuckleberry Pub., Inc.*, 486 F. Supp. 414, 423 n.10 (S.D.N.Y. 1980) ("[T]hat plaintiff settled with PLAYGIRL does not in fact establish what a court would have decided had the parties proceeded to trial.  A host of factors may affect a litigant's decision to settle."), *aff'd*, 687 F.2d 563, 564 (2d Cir. 1982).  That defendants attempted to limit their litigation risk by making these offers does not make it materially more likely that, at the time they classified the dancers as independent contractors, they knew that this was wrongful.  This decision could equally reflect a candid awareness that courts could come out either way on this issue, and that it was worth making settlement offers to try to avoid the business risk—as indeed has materialized—presented by allowing a large class action to proceed to summary judgment and verdict.

The case law that has sometimes permitted the fact of prior lawsuits, incidents, and regulatory claims to be admitted as proof of knowledge of illegality is inapposite.  To begin with, those cases principally involved earlier claims against a defendant, which were said to put defendants on notice as to the potentially unlawful nature of its practices or products.  *See, e.g.*, *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 688–89 (11th Cir. 1984) (allowing evidence of prior litigation to show defendant's notice of a similar product defect) (citing *Atlantic Coast Line R. Co. v. Hadlock*, 180 F.2d 105 (5th Cir. 1950)); *Schmelzer v. Hilton Hotels Corp.*, No. 05 Civ. 10307 (JFK), 2007 WL 2826628, at *1 (S.D.N.Y. Sept. 24, 2007) (admitting "evidence of prior accidents involving defendant['s]" product "in order to prove that [defendant] had notice of a defect in its product").  The settlement offers made to Imbeault, Hart, and Furedi, however, are of a different character.  Imbeault's lawsuit seeking, *inter alia*, unpaid minimum wages was the

immediate predecessor to this lawsuit; it was dismissed upon Imbeault's acceptance of defendant's settlement offer.  And Hart and Furedi are the named plaintiffs here.  Their lawsuit immediately followed the Imbeault settlement and challenged the same business practices.

Under these circumstances, plaintiffs' counsel's bid to use their filing of (and defendants' effort to settle) this lawsuit and its immediate predecessor against defendants on the issue of knowledge is a far cry from the circumstance presented by a prior lawsuit, regulatory action, or legal ruling.  On the contrary, permitting the fact of the Imbeault, Hart, and Furedi claims and settlement offers to be admitted as evidence of knowledge on the grounds that the challenged practices continued after the filing of their lawsuits would be an invitation to bootstrapping.  It would allow plaintiffs to file suit, solicit settlement offers, and perhaps receive them; define the class period to extend past the filing date of the lawsuit; and then use the fact of the suit or the settlement offers as proof at trial of defendants' willfulness for not changing course after the suit was filed.  This practice, in turn, would be a sure deterrent to pretrial settlement.  None of the cases on which plaintiffs rely supports, let alone compels, admission of the evidence at issue here.

Furthermore, any limited relevance presented by the fact of these lawsuits and settlement offers would be overwhelmed by the possibility of confusion, unfair prejudice, and delay.  There would be a very significant risk that a jury would misunderstand the fact of a settlement offer as an admission of liability, even though, by its terms and viewed in its context, it is not.  It would also open the door to evidence and argument about defendants' motivations in seeking an early settlement of this and the Imbeault action, so as to enable defendants to explain why the settlement offer did not bespeak an admission of liability.  This subject would, in turn, invariably open the door to questioning about the economics of class litigations.  It goes without saying that

these subjects have enormous capacity to introduce unfair prejudice—primarily to defendants, but also potentially to plaintiffs—and also delay.  *See* Fed. R. Evid. 403.

In light of these factors, permitting plaintiffs to introduce this evidence would create a large and unacceptable risk of inviting a "trial within a trial," as the parties sought to help the jury decode the meaning of defendants' prior settlement offers.  *See, e.g.*, *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 358–59 (S.D.N.Y. 2014) (collecting cases as to the "trial within a trial" that Rule 403 seeks to avoid).  This inquiry is unnecessary to help the jury resolve the disputed issue of willfulness.  The need to avoid unfair prejudice, delay, and confusion overwhelms any limited probative value to the fact of the settlement offers in the Imbeault suit and this one.

The Court, accordingly, precludes any party from introducing or referring to the fact of the Imbeault suit or to the settlement offers made to Imbeault, Hart, and Furedi, or any other employee at any club.  The Court also precludes plaintiffs' counsel from arguing that the fact that defendants persisted in classifying dancers as independent contractors after the filing of this suit is evidence of willfulness, and defense counsel from arguing the contrary.  Nor, finally, may any party question any witness (including for purposes of impeachment) about settlement offers made to any dancer.  For avoidance of doubt, the entire subject of settlement is, categorically, off limits at trial.

## XVI.   Defendants' Motion *in Limine* No. 7

Finally, defendants move to exclude evidence and argument concerning two email exchanges that plaintiffs have listed as trial exhibits.  Dkt. 640, Ex. C.  Defendants argue that these emails are both irrelevant under Rule 401, and inflammatory and unfairly prejudicial under Rule 403.  Dkt. 681–82.  Plaintiffs oppose this motion as to both grounds.  Dkt. 691.

The Court denies defendants' motion, but orders the emails at issue to be redacted in accordance with plaintiffs' pretrial submissions (specifically, Dkt. 692, Exs. 92–93). The emails are clearly relevant to the joint-employer issue. The redacted aspects of the emails, however, do not speak to that issue, but instead contain prejudicial material, including commentary that could lead a juror to view Club officials as cynical or heartless. Because these portions do not add to the probative value of the emails and could prove unfairly prejudicial, *see* Fed. R. Evid. 403, redaction as proposed by plaintiffs is appropriate.

## CONCLUSION

The parties motions *in limine* are resolved as addressed herein. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 643, 645, 648, 650, 652, 654, 656, 658, 660, 664, 666, 669, 672, 677, 679, and 681.


SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: March 11, 2015
       New York, New York

56