# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SABRINA HART and REKA FUREDI<br>on behalf of themselves and all<br>others similarly situated, and the<br>New York Rule 23 Class,<br><br>   Plaintiffs,<br><br>v.<br><br>RCI HOSPITALITY HOLDINGS, INC. F/K/A<br>RICKS'S CABARET INTERNATIONAL, INC.<br>RCI ENTERTAINMENT (NEW YORK) INC.,<br>PEREGRINE ENTERPRISES, INC.,<br><br>   Defendants. | Case No. 09-CV-3043 PAE/RLE |

## PLAINTIFFS' <u>UNOPPOSED</u> MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR FINAL SETTLEMENT APPROVAL

## TABLE OF CONTENTS

**INTRODUCTION**..................................................................................................1

**RELEVANT BACKGROUND**................................................................................1

**I.    OVERVIEW OF THE PARTIES' SETTLEMENT**...................................2

    **A.  SETTLEMENT CLASS DEFINITION AND RELEASE PROVISIONS**............2

    **B.  GROSS SETTLEMENT AMOUNT AND ALLOCATIONS**................................3

    **C.  FRAUD-PREVENTION PROCEDURES**.............................................................3

**II.   PRELIMINARY APPROVAL, THE NOTICE PROGRAM, CLASS MEMBERS' RESPONSE, AND RESULTANT ANTICIPATED PAYMENTS TO CLASS MEMBERS**........................................................4

    **A.  THE COURT GRANTED PRELIMINARY SETTLEMENT APPROVAL**........................................................................................4

    **B.  THE ROBUST NOTICE PROGRAM WAS EXECUTED AS AUTHORIZED BY THE COURT**.................................................5

        **1.  The parties and Class Administrator worked towards ensuring that Class Members would receive notice of this settlement**......................5

        **2.  The Pre-Notice Postcard was sent to all Class Members who were required to submit a Verification Form, informing them of the deadline to submit a Verification Form**.........................6

        **3.  The Long Form Notices were mailed to all Class Members**.......................6

        **4.  A reminder postcard was mailed to class members who were required to submit verification forms**.........................7

        **5.  A reminder text message was sent to class members who were required to submit verification forms**.........................8

        **6.  Corrective notice was sent to certain class members**................................8

        **7.  Phone and email support, as well as a settlement website, were made available to class members**.................................9

**C. CLASS MEMBERS' RESPONSE TO THE SETTLEMENT HAS BEEN FAVORABLE AND THE RESULTANT ANTICIPATED PAYMENTS TO CLASS MEMBERS IS HIGH** ..................................................10

    **1. No Class Member has objected to this settlement** ......................................10

    **2. The exclusion rate is minimal** ..................................................... 10

    **3. The rate of claims (i.e., Verification Form submitted) is strong, and resultant anticipated total payments to class members is high** .........11

**III.   AGREED UPON PAYMENT PROGRAM FOLLOWING FINAL SETTLEMENT APPROVAL** ...............................................................12

**ARGUMENT** ..................................................................................13

**I.   LEGAL STANDARDS** ...............................................................13

**II.   THE SETTLEMENT IS PROCEDURALLY FAIR** .........................13

**III.   THE SETTLEMENT IS SUBSTANTIVELY FAIR** ........................14

    **A. THE POSITIVE REACTION OF THE CLASS TO THE SETTLEMENT SUPPORTS FINAL SETTLEMENT APPROVAL** .................15

    **B. THE COMPLEXITY, EXPENSE AND LIKELY DURATION OF LITIGATION SUPPORT SETTLEMENT APPROVAL** ......................17

    **C. THE ADVANCED STAGE OF PROCEEDINGS AND COMPLETION OF THOROUGH DISCOVERY SUPPORT SETTLEMENT APPROVAL** ...............................................................17

    **D. THE RISKS OF ESTABLISHING REMAINING LIABILITY AND DAMAGES ISSUES SUPPORT SETTLEMENT APPROVAL** ...........18

    **E. THE QUESTION OF DEFENDANTS' ABILITY TO WITHSTAND A GREATER JUDGMENT SUPPORTS SETTLEMENT APPROVAL** ...............19

    **F. THE RANGE OF REASONABLENESS OF SETTLEMENT FUND IN LIGHT OF BEST POSSIBLE RECOVERY AND THE ATTENDANT RISKS OF LITIGATION SUPPORT SETTLEMENT APPROVAL** .................20

**CONCLUSION** ...............................................................................21

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Chambery v. Tuxedo Junction Inc.*,
No. 12-CV-06539 EAW, 2014 WL 3725157 (W.D.N.Y. July 25, 2014) ...................................21

*Chavarria v. New York Airport Serv., LLC*,
875 F. Supp. 2d 164 (E.D.N.Y. 2012) ................................................................. 15, 16

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ...........................................................................14, 17

*Deylii v. Novartis Pharm. Corp.*,
No. 13-CV-06669 NSR, 2014 WL 2757470 (S.D.N.Y. June 16, 2014) ........................................2

*Flores v. One Hanover, LLC*,
No. 13 CIV. 5184 AJP, 2014 WL 2567912 (S.D.N.Y. June 9, 2014) .........................................16

*Frank v. Eastman Kodak Co.*,
228 F.R.D. 174 (W.D.N.Y. 2005) ......................................................................13

*Glatt v. Fox Searchlight Pictures, Inc.*,
Nos. 13-4478-cv, 1304481-cv, 2015 WL 4033018 (July 2, 2015) ...............................................19

*Henry v. Little Mint, Inc.*,
No. 12 CIV. 3996 CM, 2014 WL 2199427 (S.D.N.Y. May 23, 2014) .........................................16

*In re "Agent Orange" Prod. Liab. Litig.*,
597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).......................................20

*In Re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...................................................................13

*Joel V. v. Giuliani*,
218 F.3d 132 (2d Cir. 2000) ...........................................................................13

*Johnson v. Brennan*,
No. 10 CIV. 4712 CM, 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011) .........................................15

*Lizondro-Garcia v. Kefi LLC*,
300 F.R.D. 169 (S.D.N.Y. 2014) .......................................................................13, 21

*Maley v. Del Global Tech. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ...................................................................15

*Matheson v. T-Bone Restaurant, LLC*,
No. 09 Civ. 4214 DAB, 2011 WL 6268216 (S.D.N.Y. Dec. 13, 2011) ......................................16

*Meredith Corp. v. SESAC, LLC*,
No. 09 CIV. 9177 PAE, 2015 WL 728026 (S.D.N.Y. Feb. 19, 2015) .................13, 14, 17, 18, 20

*Odom v. Hazen Transp., Inc.*,
275 F.R.D. 400 (W.D.N.Y. 2011)...........................................................................................21

*RMED Int'l, Inc. v. Sloan's Supermkts., Inc.*,
No. 94 Civ. 5587, 2003 WL 21136726 (S.D.N.Y. May 15, 2003)..............................................15

*Rubin v. Assicurazioni Generali S.P.A.*,
290 F. App'x 376 (2d Cir. 2008) ............................................................................................16

*Sylvester v. CIGNA Corp.*,
369 F. Supp. 2d 34 (D. Me. 2005) .........................................................................................16

*Tiro v. Pub. House Investments, LLC*,
No. 11 CIV. 7679 CM, 2013 WL 4830949 (S.D.N.Y. Sept. 10, 2013)........................................15

*Tyson Foods, Inc. v. Bouphakeo*,
No. 14-1146, 83 U.S.L.W. 3765 (June 8, 2015)........................................................................19

*Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96, 107 (2d Cir. 2005)...................................................................................3, 13, 20

*Wolinsky v. Scholastic Inc.*,
900 F. Supp. 2d 332 (S.D.N.Y. 2012).....................................................................................21

## RULES

Fed. Rule Civ. P. 23 .........................................................................................................2, 21

Fed. R. Civ. P. 23(e) .............................................................................................................13

## STATUTES

Fair Labor Standards Act .............................................................................1, 13, 16, 19, 21

New York Labor Law .......................................................................................................1, 19

## TREATISES

2 McLaughlin on Class Actions § 6:24 (11th ed.) .....................................................................16

## INTRODUCTION

Plaintiffs bring this unopposed motion for final settlement approval after an extensive and thorough notice process in this long-running and heavily-litigated class and collective action under New York Labor Law ("NYLL") and the Fair Labor Standards Act ("FLSA"). The members of the NYLL class and FLSA collective have been informed of and have responded favorably to the parties' settlement in this action. Importantly, *none* of the 2,208 class and collective members on whose behalf the settlement was reached have objected to any portion of the settlement, only a mere 18 members have requested exclusion, and, as of the date of this filing, nearly 60% of the 288 members who were required to submit claim forms to participate in the settlement have done so. These results are tremendous in a wage and hour class and collective such as this—particularly in light of the seven year class period running from 2005 to 2012, the transient nature of the class and collective members, and the nature of the adult entertainment industry in which they worked. What is more, the settlement provides significant monetary compensation while avoiding the delay and costs associated with a trial and likely appeal. Indeed, the gross settlement amount of $15,000,000 represents approximately 66% of out-of-pocket damages as calculated by Plaintiffs' expert. For these reasons, as well as those discussed herein, the parties' settlement is a fair, reasonable, and adequate resolution of this bona fide dispute. The Court should grant final settlement approval.

## RELEVANT BACKGROUND

The Court is familiar with lengthy factual and procedural history of this case and the parties' settlement, as discussed in detail in Plaintiffs' brief in support of their unopposed motion for preliminary approval (ECF No. 731) and Plaintiffs' brief in support of the pending fee petition (ECF No. 744), both incorporated here by reference. Accordingly, Plaintiffs here

1

summarize the parties' settlement and update the Court on events following preliminary settlement approval.

## I.   OVERVIEW OF THE PARTIES' SETTLEMENT

The parties' settlement agreement was provided to the Court with Plaintiffs' Motion for Preliminary Settlement Approval.  (ECF No. 732-1.)  A summary of the key provisions is provided here and the provisions related to notice are discussed below in Section II and those related to post-approval processes in Section III.

### A.  SETTLEMENT CLASS DEFINITION AND RELEASE PROVISIONS

The Settlement Class consists of:

> All persons who worked at Rick's New York or were employed by Defendant Rick's Cabaret International Inc., RCI Entertainment (New York) Inc. and/or Peregrine Enterprises, Inc. in the state of New York as 'entertainers' at any time from September 10, 2005 through October 31, 2012, other than Nicole (Coleman) Imbeault and any entertainer who opted out of or was dismissed from the Rule 23 Class.

(Agreement, ¶¶ 81, 83, ECF No. 732-1.)  Settlement Class Members who have not excluded themselves from this settlement, shall be deemed to have, and have actually, knowingly and voluntarily, released, acquitted and forever discharged all Released Parties[1] from all Released Claims, defined as any and all claims, actions, or causes of action of whatever nature, character or description, whether known, unknown, suspected or unsuspected, which arise out of, or are in any way based on, connected with or related to the matters alleged in the Third Amended Complaint in this action arising and accruing prior to November 1, 2012.  (*Id.*, ¶ 79.)[2]

---

[1] Defendants, including their directors, officers, employees and affiliates. (*Id.*, ¶¶ 81, 83.)

[2] This scope of the release is consistent with Second Circuit law.  *See Deylii v. Novartis Pharm. Corp.*, No. 13-CV-06669 NSR, 2014 WL 2757470, at *6 (S.D.N.Y. June 16, 2014) ("The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct

## B.  GROSS SETTLEMENT AMOUNT AND ALLOCATIONS

The settlement creates a common fund of $15,000,000 (the "Gross Settlement Amount"), inclusive of any awarded Attorneys' Fees, Litigation Expenses, Administrative Costs, Class Representative Service Payments, and Discovery Participant Service Payments.  (*Id.*, ¶ 55.)

The allocations to members of the Settlement Class are based on the calculations of Dr. Crawford, Plaintiffs' expert.  (*See id.*, ¶¶ 27, 50-51, 57-80.)  Specifically, Dr. Crawford has calculated the entire Settlement Class' maximum out-of-pocket damages[3] to be $22,852,841, and has determined each Class Member's portion of that $22,852,841. (*See id.*, ¶¶ 27, 57.)   Dr. Crawford then reduced each Class Member's portion on a pro rata basis assuming a total amount of $9,395,000 that would remain for distribution to the class should the pending fee petition be granted in full. (*See* Agreement, ¶¶ 27, 50-51, 57-80; *see also* Allocations, ECF No. 737.)

The agreement further provides that Class Counsel may petition the Court for up to $5,500,000 in Attorneys' Fees and Litigation Expenses from the Gross Settlement Amount, as well as $2,000 for each Class Member who participated in discovery and $15,000 for each of the two Named Plaintiffs—all to be paid from the Gross Settlement Amount.  (*See* Agreement, ¶¶ 22, 31, 152-153, ECF No. 732-1.)  This request has been made and is pending.  (ECF No. 744.)

## C.  FRAUD-PREVENTION PROCEDURES

Given the itinerary and general makeup of the Class, Counsel believed there was a risk that mail sent to Class Members would not always be received by Class Members.  To prevent settlement money being claimed by or diverted to people who are not part of the Class, the

---

arises out of the 'identical factual predicate' as the settled conduct.") (quoting *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005)).

[3] Including a damage amount of $60 per entertainer per log-in for "tip-outs" paid to the house mom, DJ, and club management.  (*See* Agreement, ¶ 27, ECF No. 732-1.)

parties' settlement agreement provided that any address or name change requests be accompanied by a valid social security number provided by the Class Member. (Agreement, Pt. V, ECF No. 732-1.)

Additionally, the 288[4] individuals slated to receive over $10,000 under the parties' agreed upon allocations ("Verification Class Members") would be required to submit a "Verification Form" within 111 days of preliminary settlement approval. (*Id.*, ¶¶ 88, 102.) The Verification Form simply required the Class Member to provide the last four digits of her social security number (or reasonably equivalent proof of identify as listed on the Verification Form) and sign under penalty of perjury that she is, in fact, the Class Member for whom the settlement allocation is intended. (*See* Verification Forms, ECF Nos. 732-8, 732-21.) The remaining 1,920 Class Members ("Non-Verification Class Members") were not required to submit a Verification Form; rather, they will simply receive checks following final settlement approval. (Agreement, ¶ 145, ECF No. 732-1; *see infra* Relevant Background, Pt. III.)

## II.   PRELIMINARY APPROVAL, THE NOTICE PROGRAM, CLASS MEMBERS' RESPONSE, AND RESULTANT ANTICIPATED PAYMENTS TO CLASS MEMBERS

### A. THE COURT GRANTED PRELIMINARY SETTLEMENT APPROVAL

On April 2, 2015, this Court granted preliminary approval of the parties' settlement and approved the proposed settlement notices and authorized their distribution to Settlement Class Members. (ECF No. 735.)

---

[4] The parties' initial allocations listed 289 individuals. Due to the inadvertent inclusion of non-entertainers in the allocation list, the allocations were revised with Court approval. (*See* ECF No. 739.) As a result of the revisions, allocations shifted such that one less person was slated to receive over $10,000. (Declaration of Anna P. Prakash ("Prakash Decl."), ¶ 4.)

### B. THE ROBUST NOTICE PROGRAM WAS EXECUTED AS AUTHORIZED BY THE COURT

The parties structured their settlement such that there is a comprehensive, robust notice program that was designed to reach as many Class Members as possible and to make Class Members aware of applicable deadlines and requirements under the settlement. (*See* Agreement, Art. III, ECF No. 732-1.) The notice program was executed according to the parties' agreement and amended with permission of the Court so that additional notices could be distributed.

#### 1. The parties and Class Administrator worked towards ensuring that Class Members would receive notice of this settlement

Throughout the notice process, the Class Administrator and parties worked to update and verify Class Members' contact information. (Declaration of William W. Wickersham ("Wickersham Decl."), ¶ 3; Prakash Decl. ¶ 5.) Pursuant to the settlement agreement, on April 10, 2015, Class Counsel provided the Class Administrator with a list of all Class Members, their estimated settlement allocations,[5] and their contact information last known to Class Counsel. (Prakash Decl. ¶ 6; *see* Agreement, ¶ 96, ECF No. 732-1.) Where Class Counsel knew the contact information to be valid and current, they indicated that the Class Administrator was to defer to that contact information. (Prakash Decl. ¶ 8; *see* Agreement, ¶ 106, ECF No. 732-1.) On April 13, 2015, Defense Counsel provided the Class Administrator with a list of all Class Members and the contact information last known to Defendants, including any social security numbers Defendants had in their records. (Prakash Decl. ¶ 9.)

After receiving the parties' lists, the Class Administrator then used public records databases, such as the National Change of Address system through the United States Postal

---

[5] These allocations were subsequently updated with Court approval (*see supra* n.4) and transmitted to the Class Administrator. (Prakash Decl. ¶ 7.) The revised allocations are attached as Exhibit 1 to the Prakash Decl.

Service, to update contact information for class members, deferring to contact information given by Class Counsel where so directed.  (Wickersham Decl. ¶ 4; *see* Agreement, ¶ 106, ECF No. 732-1.)

Throughout the notice period, Class Members updated their contact information with Class Counsel and the Class Administrator by calling or emailing and providing social security numbers for verification per the settlement agreement.  (Wickersham Decl. ¶ 5; Prakash Decl. ¶ 10; *see* Agreement, Pt. V, ECF No. 732-1.)

> **2. The Pre-Notice Postcard was sent to all Class Members who were required to submit a Verification Form, informing them of the deadline to submit a Verification Form**

Pursuant to the settlement agreement, on April 23, 2015, the Class Administrator mailed a Pre-Notice Postcard to the 288 Verification Class Members.  (Wickersham Decl. ¶ 6; Agreement, ¶¶ 43-35, 61, 77, 86, 88, 102, ECF No. 732-1.)  The Pre-Notice Postcard, which was sent in English, Spanish, and Russian, informed recipients that they would be receiving additional information regarding the settlement.  (Wickersham Decl. ¶ 6; Agreement Ex. Q, ECF No. 732-20.)

> **3. The Long Form Notices were mailed to all Class Members**

On May 7, 2015, pursuant to the settlement agreement, all Class Members were sent the Court-approved long form notice in English, Spanish, and Russian, which thoroughly explained the settlement and listed, among other things: (1) the total amount the Class Member was expected to receive; (2) explained options of opting out and objecting; (3) explained the process for requesting a name or address change; and (4), for the 288 Verification Class Members, explained the deadline and requirement to submit a Verification Form.  (Wickersham Decl. ¶ 7; *see* Agreement, ¶¶ 61, 99, 101-102, ECF No. 732-1; *see e.g.*, Agreement Ex. L, ECF No. 732-15;

6

Agreement Ex. K, ECF No. 732-14.)

Specifically, as to the verification form deadline, the notice made clear that the receipt deadline or, if sent by mail, postmark deadline for verification forms was July 22, 2015. (Wickersham Decl. ¶ 8.)   Verification forms received or, if sent by mail, postmarked after July 22 and by August 1, 2015, will be accepted if, pursuant to the settlement agreement, the Class Member explains through a declaration that she had not received notice prior to two week before the July 22 deadline due to an address change and provides proof of that address change. (Agreement, ¶¶ 75, 115-117, ECF No. 732-1.) This was explained via "Late Verification Form Letter" (*see e.g.*, Agreement Ex. J, ECF No. 732-13), sent by the Class Administrator. (Wickersham Decl. ¶ 9.)

Additionally, as explained above, during this time, Class Members updated their contact information with Class Counsel and the Class Administrator.   If Class Members indicated that they had not received notice due to a change in address, notice was re-mailed to the address provided.  (Wickersham Decl. ¶ 10.)

Similarly, if notice was returned to the Class Administrator due an invalid or incorrect address, the Class Administrator searched public databases in an attempt to update the address. (*Id.*)  In 889 of these 1,013 instances, the Class Administrator was able to re-mail to a valid address.  (Wickersham Decl. ¶ 11.)

### 4.  A reminder postcard was mailed to class members who were required to submit verification forms

On June 22, 2015, pursuant to the settlement agreement, the Class Administrator mailed a reminder postcard to Class Members who were required to submit verification forms but had not done so.  (Wickersham Decl. ¶ 12; *see* Agreement, ¶ 102(c), ECF No. 732-1.)  The postcard, sent in English, Spanish, and Russian, reminded class members of the verification deadline.

(Wickersham Decl. ¶ 12; *see e.g.*, Agreement Ex. O, ECF No. 732-18.)

### 5.  A reminder text message was sent to class members who were required to submit verification forms

On July 8, 2015, pursuant to the settlement agreement, the Class Administrator caused a reminder text message to be sent to Class Members who were required to submit verification forms but had not yet done so.  (Wickersham Decl. ¶ 13; *see* Agreement, ¶ 102(d), ECF No. 732-1; *see e.g.*, Agreement Ex. P, ECF No. 732-19.)

### 6.  Corrective notice was sent to certain class members

In June 2015, partway through the notice period, Class Counsel learned that Rick's Cabaret in New York had distributed entertainer license agreements to entertainers for signature during the period of June 15, 2015-June 23, 2015.  Among other things, the agreement stated, that the entertainer agreed to "waive any right to participate in any class action or collective action as against the other party and if at any time licensee is deemed a member of any class created by any court, arbitrator or any tribunal, she will 'opt out' of such class at the first opportunity, and should any third party pursue any claims on her behalf licensee shall waive her rights to any such monetary recovery." (*See* ECF No. 751.)

Class Counsel promptly contacted Defense Counsel and determined that corrective notice should be issued to the Class Members who had been provided with the agreement and had not submitted Verification Forms.  (Prakash Decl. ¶ 11.)  Defense Counsel confirmed that the club would not continue to distribute the agreement to Class Members during the notice period.  (*Id.* ¶ 12.)  With the Court's approval (ECF No. 751), on July 2, 2015, the Class Administrator mailed corrective notice to the 35 Class Members who had been provided with the agreement and had not submitted Verification Forms, and the club distributed the corrective notice in person.  (*See*

*id.*; Wickersham Decl. ¶ 14.)[6]

The corrective notice stated, in part, "Rick's agrees that the waiver contained in the license agreement distributed at the club was not intended to and does not apply to this settlement.  As such, the Court in this case has authorized me to inform you that you can participate in this settlement even if you signed a license agreement at Rick's Cabaret in New York." (ECF No. 751.)  For Class Members who were required to submit verification forms, the agreement then went on to restate the deadline to submit a form and, for all Class Members, provided information on how to learn more about the settlement.  (*Id.*)

Importantly, only 1 of the 35 Class Members referenced above has requested to be excluded from the settlement.  (Prakash Decl. ¶ 14), and it is not yet known whether her exclusion request was related in any way to the license agreement.[7]

### 7.  Phone and email support, as well as a settlement website, were made available to class members

Throughout the notice process, Class Counsel and the Class Administrator were available to and did receive and respond to phone and email inquiries from Class Members.  (Wickersham Decl. ¶ 15; Prakash Decl. ¶ 15.)

---

[6] The parties' request to the Court regarding corrective notice incorrectly referenced 41 Class Members.  In fact, at the time that Class Counsel learned that the license agreement as being distributed, only 35 Class Members had been provided with the license agreement and had not submitted Verification Forms. (Prakash Decl. ¶ 13.)

[7] Specifically, the Class Member actually submitted a Verification Form after signing the License Agreement. Over a week after she submitted a timely Verification Form, on July 30, 2015, well after the July 6 exclusion deadline, she left a message for the Class Administrator and requested that her previously submitted Verification Form be withdrawn and that she be permitted to exclude herself from the settlement.  (Prakash Decl. ¶ 14.)  Per the Court's Order (ECF No. 751), Counsel submitted a joint letter to the Court regarding this issue, and the Court authorized the Class Administrator to contact the Class Member to obtain clarification regarding her request for exclusion.

Additionally, on April 23, 2015, pursuant to the settlement agreement, the Class Administrator made the settlement website, www.ricksnywagesettlement.com, operational and posted there: (1) the operative complaint; (2) settlement agreement; (3) Plaintiffs' motion for preliminary settlement approval and brief, statements, and exhibits in support; and this Court's Preliminary Approval Order.  (Wickersham Decl. ¶ 16; *see* Agreement, ¶¶ 97, 103, ECF No. 732-1.)  Plaintiffs' Motion for Attorneys' Fees and Costs and for Service Payments, along with supporting materials, were posted following their filing.  (Wickersham Decl. ¶ 17.)

## C. CLASS MEMBERS' RESPONSE TO THE SETTLEMENT HAS BEEN FAVORABLE AND THE RESULTANT ANTICIPATED PAYMENTS TO CLASS MEMBERS IS HIGH

### 1. No Class Member has objected to this settlement

The objection deadline of July 6, 2015, was clearly stated in the notices sent to class members and made available on the settlement website.  (Wickersham Decl. ¶ 7; *see* Agreement, ¶¶ 61, 99, 101-102, ECF No. 732-1; *see e.g.*, Agreement Ex. L, ECF No. 732-15; Agreement Ex. K, ECF No. 732-14.)  Moreover, the long form notices sent to Class Members thoroughly described the settlement, including the method of allocation and proposed fees and incentive awards.  (*See e.g.*, Agreement Ex. L, ECF No. 732-15; Agreement Ex. K, ECF No. 732-14.) Critically, no Class Member has objected to any portion of the settlement. (Wickersham Decl. ¶ 18; Prakash Decl. ¶ 16.)

### 2. The exclusion rate is minimal

As with the objection deadline, the exclusion deadline of July 6, 2015, was clearly stated in the notices sent to Class Members and made available on the settlement website. (Wickersham Decl. ¶ 7; *see* Agreement, ¶¶ 61, 99, 101-102, ECF No. 732-1; *see e.g.*, Agreement Ex. L, ECF No. 732-15; Agreement Ex. K, ECF No. 732-14.) After receiving the notices

described above, only 18 members[8] of the 2,208-person class have elected to exclude themselves from this settlement.  (*See* Wickersham Decl. ¶ 19; Prakash Decl. ¶ 17.)   The total value of allocations attributable to class members who have opted out is $83,586.62, comprised of only $15,867.88 for Non-Verification Class Members.  (Prakash Decl. ¶ 18.)

### 3. The rate of claims (i.e., Verification Form submitted) is strong, and resultant anticipated total payments to class members is high

To date, 164 or 56.94% of all Verification Class Members have returned verification forms.[9]  (*See* Wickersham Decl. ¶ 20; Prakash Decl. ¶ 19.)  Notably, of the $9,395,000 allocated to Class Members, the amount of $6,352,961 was allocated to Verification Class Members and $3,042,039 was allocated to Non-Verification Class Members.  (Prakash Decl. ¶ 20; Ex. 1.)  As of the date of this filing, $3,844,925.95 or 60.52% of the $6,352,961 made available to Verification Class Members had been claimed through the submission of a Verification Form.  (Prakash Decl. ¶ 21.)  Based on the foregoing, and excluding the allocations attributable to Class Members who have opted out (*see supra*), $6,871,097.07 will be distributed to Class Members via check should this settlement be approved as proffered. (Prakash Decl. ¶ 22.) In sum:

- – Amount allocated to Class Member: $9,395,000
- – Amount allocated to Verification Class Members: $6,352,961
- – Amount claimed by Verification Class Members: $3,844,925.95
- – Amount allocated to Non-Verification Class Members: $3,042,039
- – Amount allocated to the Non-Verification Class Members who opted out: $15,867.88
- – Amount to be mailed to Class Members via check following final settlement approval: **$6,871,097.07**

---

[8] This number includes 3 people who exclusion requests were late but are being honored by agreement of the parties.  (Wickersham Decl. ¶ 19; Prakash Decl. ¶ 17.)

[9] Given the August 1 postmark deadline for Late Verification Forms that may be accepted if proper documentation is provided, this number may slightly increase.  (*See supra* Relevant Background, Pt. II.B.3.)

III.    **AGREED UPON PAYMENT PROGRAM FOLLOWING FINAL SETTLEMENT
        APPROVAL**

Should the Court approve this settlement, within seven days of approval, Defendant
Peregrine will deposit the amounts to be paid to class members into a Qualified Settlement Fund
established by the Class Administrator.  (Agreement, ¶ 144, ECF No. 732-1.)  Within fourteen
days of approval, the Class Administrator will mail checks to Verification Class Members who
submitted a timely verification form and to all Non-Verification class members who did not opt
out of this settlement.  (*Id.*, ¶ 145.)  Uncashed checks shall be cancelled within sixty days of
mailing.  (*Id.*, ¶ 146.)

Importantly, if informed within the sixty day check-cashing period that a Participating
Class Member did not receive an uncashed/undeposited check, the Class Administrator shall stop
payment on the check and reissue and mail a check to the Participating Class Member within one
(1) week of receiving such notice.  The reissued check shall be voided on the later of fourteen
(14) days after of re-issuance (if not cashed) or the expiration of the initial sixty day period.  (*Id.*,
¶ 148.)

What is more, thirty days after checks are mailed, the Class Administrator will send class
members a reminder postcard reminding them of the deadline to cash checks.  (*Id.*, ¶ 146; *see
e.g.*, Agreement Ex. C, ECF No. 732-5.)

The amount allocated to Class Members who were required to but did not timely return
completed Verification Forms and to Class Members who do not cash their checks within sixty
(60) days of being mailed, will revert back to Defendant Peregrine.  (Agreement, ¶¶ 89, 144-145,
147, Art. IV, ECF No. 732-1.)  However, as is apparent from the foregoing discussion, the
parties have structured their settlement to reach as many Class Members as possible, to make
Class Members aware of applicable deadlines and requirements under the settlement, and to

12

ensure that there are no unnecessary hindrances to Class Members receiving and negotiating their checks.  All of this, and the Class' favorable response, strongly support final settlement approval.

## ARGUMENT

### I.     LEGAL STANDARDS

The law favors compromise and settlement of class action suits.  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).  Courts may approve proposed settlements of class actions upon a determination that the settlement is "fair, adequate, and reasonable, and not a product of collusion."  *Meredith Corp. v. SESAC, LLC*, No. 09 CIV. 9177 PAE, 2015 WL 728026, at *8 (S.D.N.Y. Feb. 19, 2015) (quoting *Joel V. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)); *see* Fed. R. Civ. P. 23(e).  Proposed settlements under the FLSA are "examined with less scrutiny than a class action settlement; the court simply asks whether the proposed settlement reflects a fair and reasonable compromise of disputed issues that were reached as a result of contested litigation."  *Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 179 (S.D.N.Y. 2014) (citation omitted).  The settlement in this case is fair, adequate, and reasonable, not a product of collusion, and is a fair and reasonable resolution of a bona fide dispute.  It should be approved.

### II.    THE SETTLEMENT IS PROCEDURALLY FAIR

"A presumption of fairness, adequacy, and reasonableness' may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."  *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 184 (W.D.N.Y. 2005) (quoting *Wal-Mart Stores*, 396 F.3d at 116); *see SESAC, LLC*, 2015 WL 728026, at *8. "'[G]reat weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation."  *In Re Telik, Inc. Sec. Litig.*, 576 F. Supp.

2d 570 (S.D.N.Y. 2008) (quotation omitted).

Here, the presumption of procedural fairness is plainly warranted. The settlement at issue was reached after almost six years of hard-fought litigation and only one month prior to trial. (*See* Prelim. Approval Br. at 1-7, ECF No. 731.) Further, both counsel are experienced in litigating complex class actions, including wage-and-hour suits like the instant case. (*See* Nichols Kaster Firm Resume, ECF No. 732-22.) *See also* http://meisterseelig.com/law/employment. These experienced counsel have been intermittently discussing settlement at arms-length since their unsuccessful formal mediation in 2011. (*See* Prelim. Approval Br. at 7-8, ECF No. 731.) The most recent negotiations began in November 2011, with the parties exchanging written demands and counters and continuing their discussion over phone and email for several months before reaching a final agreement on March 27, 2015. (*See id*.) Counsel—who evaluated the risks attendant with continued litigation and collection on any judgment (*see* Affidavit of Anna P. Prakash, ¶ 25, ECF No. 732)—believe this is fair, adequate, and reasonable. It is procedurally fair.

## III.    THE SETTLEMENT IS SUBSTANTIVELY FAIR

Courts analyze the substantive fairness of a class action settlement by evaluating nine factors previously set forth by the Second Circuit Court of Appeals. *See SESAC, LLC*, 2015 WL 728026, at *9 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). The factors include: (A) the reaction of the class to the settlement; (B) the complexity, expense and likely duration of the litigation; (C) the stage of the proceedings and the amount of discovery completed; (D) the risks of establishing liability; (E) the risks of establishing damages; (F) the risks of maintaining the class action through the trial; (G) the ability of the defendants to withstand greater judgment; (H) the range of reasonableness of the settlement fund in light of the

best possible recovery; and (I) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Id.*  With the exception of the factor evaluating the reaction of the class, these factors were discussed at length in Plaintiffs' brief in support of preliminary settlement approval.  (ECF No. 731.)   Accordingly, Plaintiffs discuss the reaction of the class below and summarize the remaining factors, highlighting any recent and relevant developments.  Without question, these factors warrant final settlement approval.

### A. THE POSITIVE REACTION OF THE CLASS TO THE SETTLEMENT SUPPORTS FINAL SETTLEMENT APPROVAL

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Tiro v. Pub. House Investments, LLC*, No. 11 CIV. 7679 CM, 2013 WL 4830949, at *7 (S.D.N.Y. Sept. 10, 2013) (quoting *Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002).  Indeed, "[t]he lack of class member objections 'may itself be taken as evidencing the fairness of a settlement.'" *Johnson v. Brennan*, No. 10 CIV. 4712 CM, 2011 WL 4357376, at *9 (S.D.N.Y. Sept. 16, 2011) (quoting *RMED Int'l, Inc. v. Sloan's Supermkts., Inc.*, No. 94 Civ. 5587, 2003 WL 21136726, at *1 (S.D.N.Y. May 15, 2003)).  Similarly, the presence of "relatively few" requests for exclusion supports a settlement.  *Tiro*, 2013 WL 4830949, at *7.

The reaction of the Class in this case weighs in favor of settlement approval.  After the thorough and detailed notice process described above, no class members has objected and only a small fraction—18 of 2,208 Class Members (less than 1% of the Class)—has requested exclusion.  (*See supra* Relevant Background, Pt. II.C)  This strongly supports settlement approval.  *See e.g.*, *Tiro*, 2013 WL 4830949, at *7 (approving settlement where no class member objected and less than 1% of the class requested exclusion); *Chavarria v. New York Airport Serv., LLC*, 875 F. Supp. 2d 164, 173 (E.D.N.Y. 2012) (approving settlement where no class

member objected and 1.8% of class requested exclusion);  *Henry v. Little Mint, Inc.*, No. 12 CIV. 3996 CM, 2014 WL 2199427, at *2-4 (S.D.N.Y. May 23, 2014) (approving settlement where no class member objected and 1% of class requested exclusion).[10]

Additionally, the response rate from Verification Class Members has been enthusiastic, reaching a nearly 60% claims rate.  (*See supra* Relevant Background, Pt. II.C.)  This is an exceptional result.  *See e.g.*, *Flores v. One Hanover, LLC*, No. 13 CIV. 5184 AJP, 2014 WL 2567912, at *4 (S.D.N.Y. June 9, 2014) (stating, "This favorable response demonstrates that the class approves of the settlement and supports final approval," where "31 percent of FLSA settlement class opted-in to the settlement.") (quoting *Matheson v. T-Bone Restaurant, LLC*, No. 09 Civ. 4214 DAB, 2011 WL 6268216, at *5 (S.D.N.Y. Dec. 13, 2011); *Chavarria, LLC*, 875 F. Supp. 2d at 173 (approving settlement where 41% of class members affirmatively opted into FLSA collective that had been certified for settlement purposes); *see also* 2 McLaughlin on Class Actions § 6:24 (11th ed.) ("Claims-made settlements typically have a participation rate in the 10-15 percent range.") (citing cases); *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 44 (D. Me. 2005) (quoting a claims administrator opining that "claim return rates are 10% or less in the vast majority of settlements that require filing a notice of claim."); *Rubin v. Assicurazioni Generali S.P.A.*, 290 F. App'x 376, 377 (2d Cir. 2008) (affirming settlement approval over argument that settlement "releases claims held by class members who will not be compensated under the settlement because they have not filed claims.").

---

[10]  That valid addresses could not be found for some Class Members (*see supra* Relevant Background, Pt. II.B) does not detract from the reasonable, adequacy, or fairness of the settlement—particularly in light of the efforts taken to locate and re-mail notices.  *See  Henry*, 2014 WL 2199427, at *2-4 (where 1,553 on class list were updated through the National Change of Address database, re-mailed to forwarding addresses or addresses found through publically available databases, and where 297 addresses remained undeliverable).

In sum, Class Members' reaction to the settlement has been overwhelmingly positive and supports settlement approval.

## B. THE COMPLEXITY, EXPENSE AND LIKELY DURATION OF LITIGATION SUPPORT SETTLEMENT APPROVAL

"The greater the 'complexity, expense and likely duration of the litigation,' *Grinnell*, 495 F.2d at 463, the stronger the basis for approving a settlement." *SESAC, LLC*, 2015 WL 728026, at *9.

The complexity of this case is highlighted by its lengthy history. (*See* Prelim. Approval. Br. at 1-7, ECF No. 731.) What is more, the costs associated with the litigation have been significant, with Class Counsel incurring over $5 million in fees and costs. (*See* Fee Petition at 7, ECF No. 744.) Moreover, if litigation were to continue, final judgment would likely not occur for years given that a trial date would have to be set, the case would have to be tried, and the appeals promised by Defendants decided. For these reasons, this factor clearly weighs in favor of settlement approval. *See SESAC, LLC*, 2015 WL 728026, at *9 ("Here, these factors strongly favor approving the settlement. Prosecuting this case against [defendant] for the past five years has already imposed significant monetary costs on plaintiffs; these costs would have continued to mount had the case proceeded to trial . . . and, potentially, appeal. It is reasonable to project that the path to a final resolution on appeal would have taken two years or more from the point at which the parties entered into the settlement agreement.).

## C. THE ADVANCED STAGE OF PROCEEDINGS AND COMPLETION OF THOROUGH DISCOVERY SUPPORT SETTLEMENT APPROVAL

"This *Grinnell* factor inquires whether the parties had adequate information about their claims, such that counsel possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of

Plaintiffs' causes of action for purposes of settlement." *Id.* at *10 (internal quotations and citations omitted).

There is no question that the parties were fully informed by an extensive factual record at the time settlement was reached. Indeed, every major liability issue in the case was briefed at the summary judgment stage and after years of discovery and the parties only settled a mere month prior to trial. (*See* Prelim. Approval Br. at 1-7, ECF No. 731.) All of this, too, supports settlement approval. *See SESAC, LLC*, 2015 WL 728026, at *10 (approving settlement where "[t]he case progressed past protracted discovery and hard-fought motions practice on summary judgment. The parties also each retained multiple experts and conducted expert discovery. And, as noted, the parties had the benefit of the Court's assessment of the case, at least to the extent that evidence was brought to bear in connection with [defendant]'s motion for summary judgment.").

### D.  THE RISKS OF ESTABLISHING REMAINING LIABILITY AND DAMAGES ISSUES SUPPORT SETTLEMENT APPROVAL

While numerous liability and damages issues have already been decided in Plaintiffs' favor, there are risks attendant with continued litigation—particularly the risk of issues to be tried and the potential for unfavorable case law developments to negatively impact Plaintiffs on appeal.

As to issues remaining to be tried, if litigation were to continue, the jury would be tasked with determining how much in "tip-outs" was paid and how many additional hours were worked than have already been determined. With no documentary evidence on amounts actually paid and given the likelihood of conflicting testimony on this issue at trial, there is a substantial risk that the jury will discount Plaintiffs' good-faith estimates or fail to credit them in any meaningful way. Critically, this claim alone accounts for over $7 million of the amount included in Dr.

18

Crawford's damages calculations from which pro rata settlement amounts were derived, all of which would be at risk at trial. Settlement eliminates that risk. Similar fact questions remain with respect to the issues of willfulness, good faith, and employer status. (Prelim. Approval Br. at 23-24, ECF No. 731.) Notably, the prospect of a loss on employer status for Defendant RCII is a significant risk for Plaintiffs. (*See* Excerpts from 10-K and 10-Q, ECF No. 732-4.) Without securing RCII as a Defendant, there is a risk that any recovery by Plaintiffs would be extremely limited and/or that any recovery would be delayed further by bankruptcy or other proceedings aimed at uncovering additional resources or piercing the corporate veil.

Additionally, while Plaintiffs have prevailed on many issues already and could prevail on the remaining issues at trial, there is a risk that an appeal could undo all or part of any judgment. This is particularly so given the ever-evolving state of the law on wage and hour issues such as these. *See Tyson Foods, Inc. v. Bouphakeo*, No. 14-1146, 83 U.S.L.W. 3765 (June 8, 2015) (granting certiorari on questions related to formulaic damage determinations in hybrid wage-and-hour case); *Glatt v. Fox Searchlight Pictures, Inc.*, Nos. 13-4478-cv, 1304481-cv, 2015 WL 4033018 (July 2, 2015) (reversing summary judgment, conditional certification of FLSA collective, and class certification of NYLL class).

Settling now avoids all of these risks. Thus, this factor, too, weighs in favor of settlement approval.

### E. THE QUESTION OF DEFENDANTS' ABILITY TO WITHSTAND A GREATER JUDGMENT SUPPORTS SETTLEMENT APPROVAL

While Defendants could possibly withstand a greater judgment than the $15,000,000 gross settlement amount, it is extremely unlikely that they would be able to pay that judgment in a lump sum or even over the course of a few years, let alone one. As it is, the settlement provides for payments over time, with class members all being paid this year, and any awarded

fees and costs being paid over the course of this year and the next two years.  (Agreement, ¶ 154, ECF No. 732-1.)   Further, the gross settlement amount exceeds Defendants' past annual consolidated net income—in fiscal year 2014, Defendants' consolidated net income was $11.2 million; in 2013 and 2012, it was $9.2 million and $7.6 million, respectively.  (*See* Excerpts from 10-K and 10-Q, ECF No. 732-4.)   In short, the gross settlement amount is significant for Defendants and a greater settlement or judgment may well pose collection risks for Plaintiffs. For these reasons, and those discussed in Plaintiffs' Preliminary Approval Brief, settling now and for the amount agreed upon avoids these risks.  This weighs in favor of settlement approval.

### F.  THE RANGE OF REASONABLENESS OF SETTLEMENT FUND IN LIGHT OF BEST POSSIBLE RECOVERY AND THE ATTENDANT RISKS OF LITIGATION SUPPORT SETTLEMENT APPROVAL

"The adequacy of the amount achieved in settlement is not to be judged 'in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.'"  *SESAC, LLC*, 2015 WL 728026, at *12 (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd,* 818 F.2d 145 (2d Cir. 1987)).   The ultimate question is whether the settlement falls within a "range of reasonableness" in light of "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent" in litigation.  *SESAC, LLC*, 2015 WL 728026, at *12 (quoting *Wal–Mart Stores*, 396 F.3d at 119).  Here, the settlement does.

Under the parties' settlement, class members' recoveries range from $11 to over $83,000, with class members who worked more hours and paid more in fines, fees, and tip outs as estimated by Plaintiffs' expert receiving more than class members who worked less.  (*See* Prelim. Approval Br. at 8-9, ECF No. 731.) The Gross Settlement Amount exceeds the amounts awarded by the Court to date by over $4 million and represents approximately 66% of total

economic damages of $22,852,841 calculated by Plaintiffs' expert.   (*See supra* <u>Relevant Background</u>, Pt. I.B; Opinion and Order, ECF No. 600 (awarding $10.8M in damages).  These results fall well within the range of reasonableness.  *See Chambery v. Tuxedo Junction Inc.*, No. 12-CV-06539 EAW, 2014 WL 3725157, at *7 (W.D.N.Y. July 25, 2014) (finding wage-and-hour class and collective settlement to fall within the range of reasonableness where settlement amount represented 7-11% of best day recovery); *Odom v. Hazen Transp., Inc.*, 275 F.R.D. 400, 412 (W.D.N.Y. 2011) (finding wage-and-hour class and collective settlement to fall within the range of reasonableness where settlement amount represented one-third of best day recovery).

For all of these reasons, and those discussed in Plaintiffs' Preliminary Approval Brief, the proposed settlement is substantively fair, reasonable, and adequate and should be finally approved.[11]

## <u>CONCLUSION</u>

The Settlement Agreement is a product of an arm's-length negotiation among the parties and is a fair, adequate and reasonable resolution of a lengthy and hotly contested dispute.  As such, this Court should grant Plaintiffs' Unopposed Motion for Final Settlement Approval.

---

[11] Based on the foregoing, this settlement is also "a fair and reasonable compromise of disputed issues that were reached as a result of contested litigation," thus warranting approval under the FLSA, as under Rule 23.  *See Lizondro-Garcia*, 300 F.R.D. at 179 (citing *Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012).

Dated:  August 5, 2015     NICHOLS KASTER, PLLP

             s/ Anna P. Prakash     _
             Michele R. Fisher (MF 4600)
             Steven Andrew Smith, MN Bar No. 260836
              (*admitted pro hac vice*)
             E. Michelle Drake, MN Bar No. 0387366
              (*admitted pro hac vice*)
             Anna P. Prakash, MN Bar No. 0351362
              (*admitted pro hac vice*)
             John G. Albanese, MN Bar No. 395882
              (*admitted pro hac vice*)
             4600 IDS Center, 80 South 8th Street
             Minneapolis, MN 55402
             Telephone: (612) 256-3200

             ATTORNEYS FOR PLAINTIFFS