UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                               :

SABRINA HART and REKA FUREDI, *on behalf of*   :
*themselves and all others similarly situated, and the New*  :
*York Rule 23 Class,*                               :

                                       Plaintiffs,   :

                        -v-                    :

RCI HOSPITALITY HOLDINGS, INC. (F/K/A RICK'S  :
CABARET INTERNATIONAL, INC.), RCI          :
ENTERTAINMENT (NEW YORK), INC., and       :
PEREGRINE ENTERPRISES, INC.,           :

                                 Defendants.  :

------------------------------------------------------------------X

09 Civ. 3043 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      This decision approves the proposed settlement of this lawsuit, brought on behalf of a class of exotic dancers.

      Since 2009, the class has pursued wage claims against a New York strip club under federal and state law. On April 1, 2015, less than four weeks before trial was scheduled to begin on the outstanding issues in this case, the parties entered into a settlement agreement, which the Court preliminarily approved. Named plaintiffs Sabrina Hart and Reka Furedi ("plaintiffs") now move for an order finally approving the proposed settlement and plan to allocate its proceeds among the class. They also move for approval of attorneys' fees, expenses, and service awards to themselves and discovery participants. On September 18, 2015, a fairness hearing was held, at which the Court stated that it intended to rule shortly.

      The Court today is issuing an order granting in its entirety the relief sought by plaintiffs. This Opinion and Order sets out the Court's reasons for doing so.

## I.      Background[1]

### A.      The Parties

Rick's Cabaret ("Rick's NY" or "the Club") is a strip club located at 50 West 33rd Street, New York, NY. Dkt. 454 ("Stipulated Facts") ¶ 6. At all relevant times, Rick's NY was owned and operated by defendant Peregrine Enterprises, Inc. ("Peregrine"), *id.* ¶ 8, which is a wholly owned subsidiary of defendant RCI Entertainment (New York), Inc. ("RCI New York"), *id.* ¶ 31. RCI New York, in turn, was wholly owned at all relevant times by defendant Rick's Cabaret International, Inc. ("RCII")[2], a Texas corporation. *Id.* ¶¶ 32, 34. (For purposes of identifying litigation positions taken by the defendants, the Court refers to the defendants collectively as "defendants.")

The plaintiffs in this case were exotic dancers, also known as entertainers, at Rick's NY. At all relevant times, Rick's NY classified the dancers who performed at the Club as independent

---

[1] The Court's account of the case background draws heavily from its decision on the parties' cross-motions for summary judgment. *See* Dkt. 460 ("September 2013 Decision"), *reported at Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013). That decision set out the relevant facts and law in detail. Because those topics are reviewed at only a general level here, a reader seeking a more thorough summary is directed to that decision, and the others in this case. *See* Dkt. 504 ("January 2014 Decision"), *reported at Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 955 (S.D.N.Y. 2014); Dkt. 600 ("November 2014 Decision"), *reported at Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447 (S.D.N.Y. 2014); Dkt. 724 ("March 2015 Decision"), *reported at Hart v. RCI Hospitality Holdings, Inc.*, No. 09 Civ. 3043 (PAE), 2015 WL 1061501 (S.D.N.Y. Mar. 11, 2015). The Court also draws upon other entries in the extensive case docket, and upon the submissions (including attached exhibits) made in connection with the motions resolved here. These include the affidavit of Anna Prakash in support of plaintiffs' motion for preliminary settlement approval, Dkt. 732; the declaration of Anna Prakash in support of plaintiffs' motion for final settlement approval, Dkt. 755; and the affidavit of E. Michelle Drake in support of plaintiffs' motion for attorneys' fees, costs, and service payments, Dkt. 743. This decision also incorporates representations by counsel during the fairness hearing. Except where specifically quoted or referenced, no further citations to these sources will be made.

[2] RCII is now known as RCI Hospitality Holdings, Inc. For the sake of consistency with prior opinions, the Court continues to refer to it as RCII. *See* March 2015 Decision at 1 n.1.

contractors. *Id.* ¶ 19. Rick's NY had three stages on which dancers performed, *id.* ¶ 13, and a number of semi-private rooms, *id.* ¶ 17. Dancers' duties at the Club included public performances on stage. Dancers also gave personal dances (lap dances or table dances) to the Club's customers, and entertained customers in the Club's semi-private rooms. *Id.* ¶¶ 15–17.

Dancers were not paid any wage by Rick's NY; rather, they received various fees paid by customers. *Id.* ¶¶ 20, 181. A personal dance cost $20, although customers were permitted to pay dancers more. *Id.* ¶¶ 180, 182. If the customer paid the dancer in cash, the customer did so by paying the dancer directly, and the dancer retained the entire performance fee. If a customer wished to pay by credit card, he or she could purchase, for $24 each, vouchers worth $20 and known as "Dance Dollars" from Rick's NY. *Id.* ¶ 185. The customer could then give the dancer the Dance Dollar as payment for a personal dance. *Id.* ¶¶ 181, 183. The dancer later redeemed, from Rick's NY, the Dance Dollar that she had received. Rick's NY paid dancers $18 for each Dance Dollar that they redeemed; Rick's NY retained the remaining $6. Id. ¶¶ 185, 190. The dancers were also subject to a variety of mandatory fees, including nightly "tip-out" fees of $20 each for the "house mom," the DJ, and club management, although the frequency with which such tip-outs were actually paid—and the damages traceable to this practice—were disputed issues that, but for the settlement, would have been resolved at trial. *See* November 2014 Decision at 46–47 (denying summary judgment on this issue).

Plaintiffs brought claims for: (1) failure to pay minimum wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* ("Claim One"); (2) failure to pay minimum wages under the New York Labor Law ("NYLL"), § 190 *et seq.* ("Claim Two"); (3) unlawful

requesting and receiving portions of wages under NYLL § 198–b ("Claim Three")[3]; (4) unlawful retention of gratuities under NYLL § 196–d ("Claim Four"); and (5) unlawful deductions from wages under NYLL § 193(3)(a) ("Claim Five").

The Court has certified this as a collective action under the FLSA and has certified a class on the NYLL claims under Federal Rule of Civil Procedure 23. *See* Dkt. 253 ("Cert. Op.") (granting motion for class certification); November 2014 Decision (denying motion to decertify class). The class period runs from September 2005 to October 31, 2012. Dkt. 487, at 2. The class now consists of 2,208 members.

### B.   Procedural History of This Litigation

This litigation spans more than six years and was punctuated by a number of rounds of hard-fought motions practice. The Court recounts this history to illustrate the complexity, expense, and duration of the litigation, and to highlight the significant legal issues that would have been subject to trial and/or appeal had the case not settled.

The initial Complaint was filed on March 30, 2009. Dkt. 1. On June 15, 2009, the plaintiffs moved for conditional certification of an FLSA collective class composed of dancers who had performed at Rick's Cabaret in New York. Dkt. 15. On August 11, 2009, plaintiffs filed an Amended Complaint. Dkt. 42. On August 27, 2009, defendants moved to dismiss the Amended Complaint as against RCII for failure to state a claim. Dkt. 45. While the motion was pending, plaintiffs filed a Second Amended Complaint. Dkt. 71.

On December 17, 2009, the Honorable John G. Koeltl, to whom this case was then assigned, granted the motion to conditionally certify an FLSA collective class. Dkt. 79. In the

---

[3] On November 21, 2014, the plaintiffs stated that they would not further pursue Claim Three, *see* Dkt. 606, because Claim Three was coextensive with Claim Five, on which plaintiffs had already won summary judgment. *See* Dkt. 541, at 84; November 2014 Decision, at 4 n.2.

same order, he also dismissed plaintiffs' claims as to RCII without prejudice. *Id.*

On May 28, 2010, plaintiffs filed a Third Amended Complaint, the operative pleading here. Dkt. 153 ("TAC"). Among other modifications, the TAC contained amended allegations as to RCII. On June 1, 2010, the plaintiffs moved to certify, under Rule 23, a class as to the NYLL claims. Dkt. 154.

On December 20, 2010, Judge Koeltl denied the motion to dismiss and certified a Rule 23 class, consisting of:

> All persons who worked at Rick's New York or were employed by Defendant Rick's Cabaret International Inc., RCI Entertainment (New York) Inc. and/or Peregrine Enterprises, Inc. in the state of New York as "entertainers" at any time six years prior to the filing of the Complaint to the entry of judgment in this case.

Cert. Op. at 3, 20.

On February 3, 2011, defendants filed an Answer, including a counterclaim for unjust enrichment. Dkt. 254. On June 21, 2011, defendants filed an Amended Answer. Dkt. 279. On October 5, 2011, the case was reassigned to this Court. Dkt. 300.

On October 31, 2012, after numerous extensions, fact discovery closed, and summary judgment briefing commenced. The principal issue was whether plaintiffs were employees of Rick's NY, under federal and/or state law, and therefore entitled to the protections of the FLSA and NYLL, although other issues were briefed, including whether the payments that dancers received from customers could offset any wages due under the FLSA. On February 1, 2013, the parties submitted joint stipulated facts relevant to these motions, as the Court had directed. On April 2–3, 2013, the parties submitted briefs on their cross-motions for summary judgment. On July 31, 2013, the Court heard oral argument.

In a 65-page decision issued on September 10, 2013, the Court held that plaintiffs were employees of Rick's NY under both federal and state law, that they were therefore entitled to be

5

paid a minimum wage under both statutes, and that any defendant found to be an employer of plaintiffs was thus liable on Claims One and Two. It further held that the Club's duty under the FLSA to pay such a wage was not discharged or offset by the payment to the dancers, by customers, of "performance fees" for dances. The Court also held that defendant Peregrine was an employer of plaintiffs and therefore liable to the extent of any liability. But, the Court held, whether the other two defendants—RCI New York and RCII—were also plaintiffs' employers turned on material factual disputes and could not be resolved on summary judgment. The Court also granted summary judgment to plaintiffs on defendants' counterclaim for unjust enrichment.

In a 20-page decision issued on November 18, 2013, following a new round of briefing, the Court: (1) denied defendants' motion for reconsideration of the Court's holding that, even after February 28, 2010, plaintiffs were employees of Rick's NY; (2) denied defendants' motion to set the class period end-date as February 28, 2010, or alternatively as December 20, 2010; the Court instead set the class period end-date as October 31, 2012; and (3) granted plaintiffs' motion for summary judgment on Claim Five, holding that the Club's fines, fees, and tip-out requirements violated NYLL § 193. Dkt. 487.

In a 20-page decision issued on January 28, 2014, again following briefing, the Court held that it had original jurisdiction over plaintiffs' NYLL claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA") such that, even if the FLSA claims were resolved first, the Court would retain jurisdiction over the NYLL claims.

In mid-2014, the parties filed motions on additional issues. Specifically, defendants moved to decertify the class and FLSA collective, Dkt. 509, and to strike plaintiffs' damages expert, Dr. David L. Crawford, Dkt. 512; both parties cross-moved for summary judgment on the issue, relevant to Count Two, of whether customer-paid performance fees offset the defendants'

NYLL minimum-wage obligations, and for summary judgment on Claim Four, Dkt. 544, 550; and plaintiffs moved for summary judgment as to damages on all claims as to which liability had been found. Dkt. 554.

In a 51-page decision issued on November 14, 2014, the Court: (1) held that performance fees paid by customers to dancers do not offset defendants' minimum-wage obligations under the NYLL; (2) held Peregrine liable on Claim Four for retaining gratuities in violation of NYLL § 196–d—specifically, the $2 that defendants systematically retained, without disclosure to customers, from each $24 "Dance Dollar" purchased by customers using credit cards; (3) denied defendants' motion to strike the expert reports and testimony of Dr. Crawford; (4) denied defendants' motion to decertify the Rule 23(b)(3) class; (5) denied plaintiffs' motion for summary judgment on the tip-out fee issue, concluding that there was a material factual dispute as to whether plaintiffs paid $60 in mandatory tip-out fees during every shift worked; and (6) as to damages, granted plaintiffs partial summary judgment against Peregrine on Count One (FLSA minimum-wage claims), Count Two (NYLL minimum-wage claims), and Count Five (NYLL unlawful fines and fees), and full summary judgment as to Count Four (NYLL unlawful retention of gratuities). These holdings combined to grant plaintiffs approximately $10.87 million in damages.

These rulings left the following issues to be resolved at trial: (1) whether plaintiffs are entitled to additional damages on Claims One, Two, and Five, beyond those which the Court held could properly be awarded on summary judgment, including damages for the tip-outs that plaintiffs paid to the house mom, DJ, and club management, and for the work days not covered by the summary judgment order; (2) whether the violations of the FLSA (Claim One) and the NYLL (Claims Two, Four and Five) were willful and/or made other than in good faith; and (3)

7

whether RCI New York and RCII are, along with Peregrine, employers of plaintiffs and, thus, jointly liable with Peregrine for all damages.

Finally, with a four-week trial scheduled to commence on April 27, 2015, the parties filed a combined 17 motions *in limine.* In a 56-page decision issued on March 11, 2015, the Court resolved these motions.[4]

### C.     The Proposed Class Settlement

After the Court's November 14, 2014 decision awarding approximately $10.87 million to the plaintiffs in partial damages, the parties engaged in extensive settlement negotiations. These eventually resulted in the settlement agreement at issue here.

On April 1, 2015, plaintiffs moved for preliminary approval of the settlement. Dkt. 730. That motion explained, *inter alia,* the settlement terms and the forms of notice that the parties planned to use to reach and convey, to class members, those terms and their rights.

The key terms of the settlement are as follows:

*Gross settlement*: Defendants agreed to pay $15 million into a settlement fund. Although Peregrine is responsible for this sum in the first instance, both Peregrine and RCI New York will consent to judgment in the amount of $15 million, and corporate parent RCII has agreed to guarantee the payments to be made by Peregrine.

*Net settlement*: Of the $15 million gross settlement, up to $5.5 million was designated for attorneys' fees and litigation expenses. After further reductions for administrative costs ($25,000) and anticipated service payments to the class representatives and class members who participated in discovery ($80,000), a total of $9,395,000 would be designated for class

---

[4] One of these 17 motions was previously resolved in a short opinion on March 6, 2015. Dkt. 720.

members.  Assuming complete participation by all 2,208 class members, the average class

member would receive $4,254.98.  The settlement fund would be allocated among class

members pro rata, based on each member's proportionate share of the "total damages"

(excluding interest and liquidated damages) calculated by plaintiffs' expert, Dr. Crawford, who

tabulated the maximum attainable class damages, taking account of all claims, as $22,852,841.

Dkt. 733 ("Third Crawford Decl.") ¶ 6.

   *Verification process*:  To prevent fraud,[5] the settlement provided that the 2,208-member

class would be divided into "verification" and "non-verification" class members.  The 288 class

members[6] who were expected to receive more than $10,000 under the settlement (referred to as

the "verification class" members) were required to submit a verification form within 111 days of

preliminary settlement approval.  The form required such verification class members to provide

the last four digits of their Social Security number (or similar proof of identity) and to sign under

penalty of perjury.  The remaining 1,920 class members, for whom payments under $10,000

were earmarked, were not required to submit such verification, and would simply be sent checks

following final settlement approval.

   *Notification of class members*:  The settlement agreement provided that, 21 days after

preliminary approval, verification class members would be sent a postcard notifying them that

the full settlement notice was forthcoming and that they would need to return a verification form.

And, 35 days after preliminary approval, all class members would be sent a personalized "long-

---

[5] Counsel have explained that there was a significant risk of fraud because many settlement
checks are large, and class members, who may be itinerant, may no longer live at the last address
identified for them.  Counsel's concern was that others at the address—whether family of the
class member or a stranger—would be tempted to fraudulently negotiate the check.

[6] With the Court's approval, this figure has been revised down from 289, and the total number of
class members has been revised down from 2,212 to 2,208.  *See* Dkt. 739.

form" notice, which would explain the options for opting out of or objecting to the settlement, either of which class members would have 60 days to do. Another 46 days after being sent the long-form notice, the verification class would be sent a reminder postcard, followed, 16 days later, by a reminder text message. Throughout this period, the class would have access to a website regarding the settlement and phone support.

*Mechanics of payment*: Within seven days after final court approval of the settlement, Peregrine will deposit the amounts to be paid to class members into a fund established by the class administrator. Within 14 days, the administrator will mail checks to those verification class members who returned their verification forms and to all non-verification class members who did not opt out. Thirty days after checks are mailed, the administrator will send class members a reminder postcard; after another 30 days, the amount allocated to class members who failed to cash their checks will revert to Peregrine. Any amounts allocated to verification class members who failed to return timely verification forms will similarly revert to Peregrine. Participating class members would release any and all claims against the defendants (including their directors, officers, employees, and affiliates).

*Attorneys' fees and costs*: The settlement provided for up to $5.5 million in attorneys' fees and costs, which, in recognition of defendants' cash-flow limitations, will be paid out in three equal installments: one soon after final settlement approval, one after a year, and another after two years.

### D. Subsequent Events

On April 2, 2015, the Court issued an order preliminarily approving the terms of the settlement and the form of the notice. Dkt. 735.

On June 22, 2015, plaintiffs' counsel filed a motion seeking $5.5 million in attorneys'

10

fees and litigation expenses, $15,000 in service fees for each of the two named plaintiffs, and $2,000 in service payments for each of the 25 FLSA opt-in class members who participated in discovery. Dkt. 743. On August 5, 2015, plaintiffs moved for final settlement approval. Dkt. 753.

After the preliminary approval order, the class administrator, RG/2 Claims Administration, LLC ("RG/2"), sent notices to class members. Initially, 1,013 of the 2,208 notices were returned to RG/2 because of invalid or incorrect addresses, but RG/2 eventually was able to re-mail 860 of these 1,013 notices to a valid address. Dkt. 763 ("Wickersham Decl.") ¶ 8. This was accomplished, as counsel explained at the fairness hearing, through a process known as "skip tracing" whereby RG/2 used various databases to find a valid address for class members. Of the 288 verification class members, 165 (or 57.3%) returned verification forms, corresponding to $3,856,062.95 (60.7%) of the $6,352,961 allocated to those class members.[7] *Id.* ¶ 7. No class members objected to the settlement. Nineteen members of the 2,208-member class opted out.[8] *Id.* ¶ 6.

_____

[7] In June 2015, during the notification period, plaintiffs' counsel learned that Rick's NY had distributed license agreements to 35 class members who remained employees of the Club; the agreements purported to waive "any right to participate in any class action or collective action as against the other party" and to require the class members to opt out of any such class. Dkt. 751. The parties notified the Court of this, explaining that Rick's NY had intended it to operate prospectively, not to undermine the settlement. The Court approved a corrective notice to be distributed to these 35 class members, which informed them that they may participate in this settlement notwithstanding the license agreement. *Id.* Only one class member out of the 35 who received the agreement has requested to be excluded from the settlement.

[8] In a September 16, 2015 letter, plaintiffs' counsel revised earlier figures in light of events following the submission of the motion for final settlement approval. Dkt. 763. The parties agreed to honor a verification class member's untimely submission of her verification form because of the class administrator's mistake; this member was allocated $11,137. Wickersham Decl. ¶ 5. The class administrator also informed the parties of another timely exclusion request, bringing the total number of excluded class members to 19. *Id.* ¶ 6. These developments increased the sum to be disbursed to the class after final approval to $6,874,685.07. *Id.* ¶ 7.

On September 18, 2015, a fairness hearing was held, at which plaintiffs' counsel presented in support of the settlement, and counsel for both sides responded to the Court's questions. No class member appeared at the conference to oppose the settlement, or otherwise communicated opposition to it (or to counsel's application for fees and expenses).

## II.    Discussion

### A.    Approval of the Settlement

A court may approve a proposed class action settlement, provided it determines that the settlement is "fair, adequate, and reasonable, and not a product of collusion." *Meredith Corp. v. SESAC, LLC*, No. 09 Civ. 9177 (PAE), 2015 WL 728026, at *8 (S.D.N.Y. Feb. 19, 2015) (quoting *Joel V. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)) (citation omitted). Such approval "is within the Court's discretion, which 'should be exercised in light of the general judicial policy favoring settlement.'" *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) (citation omitted); *accord Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 361 (S.D.N.Y. 2002). In undertaking this evaluation, a Court must review the settlement for both procedural and substantive fairness; in other words, it must make sure that both the negotiating process and the terms of the settlement are fair. *See Wal-Mart Stores, Inc. v. VISA U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).

### 1.    Procedural fairness

A presumption of fairness may attach to a proposed settlement when the terms of that settlement were reached by experienced counsel during arm's-length negotiations undertaken after meaningful discovery. *See Meredith*, 2015 WL 728026, at *8; *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *3–4 (S.D.N.Y. July 27, 2007); *see also In re Alloy, Inc., Sec. Litig.*, 2004 WL 2750089, at *1 (S.D.N.Y. Dec. 2, 2004) (citing *D'Amato v.*

*Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).  That presumption of fairness is amply warranted here.

All parties to this case were represented by estimable and energetic counsel with significant experience in litigating class actions.  And the case had proceeded far at the point when the parties reached a settlement.  Not only had meaningful discovery long since been conducted, but trial was set to commence less than a month later.  The parties had litigated, and the Court had resolved, a range of motions, including motions for summary judgment whose resolution significantly narrowed the issues remaining in dispute.  The Court had also resolved numerous motions *in limine*, thereby defining clear ground rules pursuant to which the trial would be conducted.  And the settlement itself arose out of months of arm's-length negotiations.

In sum, counsel on both sides were unusually well-positioned to assess the potential outcomes of the case and to weigh the various risks and rewards presented to each side.  Thus, there is no basis to rebut the presumption of procedural fairness, and the Court finds the settlement procedurally fair.

### 2.    Substantive fairness

Courts in this Circuit use the nine-factor test set out in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), to evaluate whether a settlement is substantively fair, reasonable, and adequate.  *See, e.g.*, *In re Sony Corp. SXRD*, 448 F. App'x 85, 86–87 (2d Cir. 2011) (summary order); *McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009). The "*Grinnell* factors" are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible

13

recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463.   The Court considers each factor in turn.

> (a)      *The complexity, expense, and likely duration of the litigation*

The greater the "complexity, expense and likely duration of the litigation," *id.*, the stronger the basis for approving a settlement.  *See In re Drexel Burnham Lambert Group Inc.*, 130 B.R. 910, 927 (S.D.N.Y. 1991).  Here, this factor strongly favor approving the settlement.

As the foregoing summary of pretrial motions practice—and the lengthy written decisions on these motions—reflects, this litigation has been quite complex.  It has raised challenging issues, legal and factual, arising under the FLSA and the NYLL.  This litigation has also been expensive for plaintiffs, as reflected in the time and expense records submitted in support of plaintiffs' counsel's fee application, and no doubt for defendants as well.  These costs would have continued to mount had the case proceeded to an anticipated four-week trial in April and May 2015 and, thereafter, to an all-but-certain appeal (and potentially, too, a cross-appeal).  Indeed, throughout negotiations, defendants maintained that they would appeal any adverse judgment.  It is reasonable to project that a final resolution of an appeal might not have been reached until two years after the date of the settlement agreement (*i.e.*, spring 2017).

The settlement eliminates these costs and risks.  And it obtains for the large class, or at least those members who have chosen or choose to participate, prompt monetary compensation for their injuries.  Given the itinerant nature of the class, settling now—as opposed to receiving relief after a final appeal—also increases the chances that class members can be found.  These benefits weigh heavily in favor of approving the settlement.  *See Maley*, 186 F. Supp. 2d at 362 ("Delay, not just at the trial stage but through post-trial motions and the appellate process, would cause Class Members to wait years for any recovery, further reducing its value."); *see also In re*

14

*Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 124 (S.D.N.Y. 2009) (granting final approval where, absent settlement, the "action would have continued for years with . . . a possible trial, and the inevitable post-trial motions and further appeals").

> (b)    *The reaction of the class to the settlement*

A positive reaction of the class to the proposed settlement favors its approval by the Court. *See Grinnell*, 495 F.2d at 462; *Maley*, 186 F. Supp. 2d at 362 ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001). "Where relatively few class members opt-out of or object to the settlement, the lack of opposition supports court approval of the settlement." *Tiro v. Pub. House Inv., LLC*, No. 11 Civ. 7679 (CM), 2013 WL 4830949, at *7 (S.D.N.Y. Sept. 10, 2013).

Here, the reaction of the class can properly be described as positive. No class member has objected to the settlement, and only 19 members of the 2,208-person class (less than 1%) have chosen to exclude themselves from the settlement.

To be sure, out of the 288 verification class members, each of whom by definition was entitled to $10,000 or more from the settlement, 165 (57.3%) returned timely verification forms, whereas 123 (42.7%) did not. As a result, of the $9,395,000 allocated to class members according to the terms of the settlement, $6,874,685.07 (73.2%) will be mailed to class members following final settlement approval, whereas $2,520,314.93 (26.8%) has already been foregone.[9] *See* Wickersham Decl. ¶ 7.

---

[9] Assuming that the rate of non-participation among non-verification class members is in line with the rate among verification class members, an assumption which counsel at the fairness hearing stated was reasonable, the size of the foregone recovery will rise substantially. If 60% of the amount allocated to the class ($9,395,000) is eventually claimed, defendants will end up paying class members $5,637,000 and the class will have forgone $3,758,000.

However, as counsel have explained, the approximately 60% participation rate for the verification class cannot fairly be read to bespeak lack of enthusiasm for the settlement terms. A class member's non-participation instead may reflect other factors.

First, notwithstanding the class administrator's efforts and the multiple means of notice attempted, many class members likely never received actual notice of the settlement. The class administrator was unable to mail a notice to a valid address in 153 cases out of 2,208 (6.9%). *Id.* ¶ 8. And other mailings likely reached addresses where dancers no longer lived. Some dancers worked for the Club long ago (the class period covers 2005 through 2012). And the dancers who worked at the Club at some point during that period were young and, it is fair to assume, often itinerant. As counsel explained, many dancers were non-citizens,[10] including a large number from eastern Europe, and may have had worked at the Club only briefly. Some were present in the United States on temporary visas (*e.g.*, student visas) or otherwise may have held only temporary work authorization.

Second, class members who did receive actual notice may have moved on in their lives in various ways, such that, as of 2015, they did not wish to associate themselves with a strip club (including by having to file tax returns reflecting wage earnings from Rick's NY). The named plaintiffs captured this sentiment in their declarations seeking service payments. Hart attested:

> I do not consider myself associated with or involved in the adult entertainment industry anymore. I haven't worked in the industry for years and I have a fulfilling life which includes my husband and children. Aside from this case, I don't make known that I used to work in the industry. I think there is still a stigma associated with the industry, and I definitely do not want to return to that part of my life.

Dkt. 746 ("Hart. Decl.") ¶ 4. Furedi similarly stated:

---

[10] Counsel for defendants represented that Rick's NY verified the dancer's legal immigration status as the outset of her employment.

> Now, I have a life outside of the industry and am focused on my baby daughter
> and her father.  Aside from this case, I don't tell people what I used to do.  I think
> there are bad feelings associated with the industry, and I do not want to go back to
> that. . . .  I do not like remembering working in the industry.

Dkt. 747 ("Furedi Decl.") ¶ 4.  Although Hart and Furedi stepped forward despite these factors,

other class members, as plaintiffs' counsel represented at the hearing, communicated concerns

about their current partners or families learning of their past work at the Club.

Finally, it is possible that some class members, including those still employed at Rick's

NY, may have declined to participate in their settlement believing that they did not deserve, or

that Rick's NY ought not pay them, additional money on top of the performance fees received

from customers.

Considering these factors, which presumably would have equally held down the class

participation rate following a jury verdict, the class's response rate—particularly the absence of

objectors and the limited number of opt-outs—supports final approval.

### (c)     The stage of the proceedings and discovery completed

This *Grinnell* factor inquires "whether the parties had adequate information about their

claims," *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004), such

that counsel "possessed a record sufficient to permit evaluation of the merits of Plaintiffs'

claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes

of action for purposes of settlement," *Maley*, 186 F. Supp. 2d at 364.  Such was clearly the case

here.  As of the time of settlement, litigation had been ongoing for six years, most claims had

been resolved in lengthy decisions that counsel were well-situated to evaluate, and the remaining

claims were on the brink of trial.  The parties thus were in an excellent position to assess the

strengths and weaknesses of their positions and the risks and rewards presented by continued

litigation versus settlement.

        (d)     *The risks of establishing liability, of establishing damages, and*
                  *of maintaining the class action through trial*

At the point when settlement was reached, the Court had already decided a number of key issues in plaintiffs' favor, including that the class was properly certified, that Peregrine was liable on Counts One, Two, Four, and Five, and that the class was entitled to, at a minimum, some $10.87 million in partial damages. But continued litigation still presented significant risks, which settlement eliminates.

Most significant was the risk that plaintiffs would not be able to collect, or fully collect, on a judgment. The Court had left open for trial the issue whether Peregrine's corporate parents, RCI New York and RCII, were, with Peregrine, joint employers of plaintiffs. The Court's initial appraisal had been that, although a jury could resolve this issue either way, the evidence on this point tipped toward the defendants. September 2013 Decision, at 63 ("The weight of the evidence, fairly considered, tends to favor the defense claim that Peregrine alone, and not RCII and RCI NY, was plaintiffs' employer."). Had Peregrine alone been held liable, a substantial question would have been presented as to how much of the judgment Peregrine could have footed. Crucially, the settlement eliminates this risk. It guarantees recovery from the other two defendants in the event that Peregrine proves unable to pay the entire settlement amount.

Second, as all parties appreciated, defendants were highly likely to appeal. There was, therefore, some risk of reversal as to, among other rulings, the critical pretrial rulings favoring plaintiffs (*e.g.*, the Court's holdings that the dancers were employees, and that the payments the dancers received from customers could not offset the Club's minimum-wage liability). An appeal also could have put at issue any jury verdicts favoring plaintiffs.

Finally, on the issues left for trial, there was no assurance that plaintiffs would prevail. If, for example, the jury did not credit plaintiffs' claim that they consistently paid $60 in daily

"tip-outs" to the house mom, the DJ, and the club management, this would have imperiled plaintiffs' claim for damages based on such payments, which plaintiffs' expert attested would potentially add more than $7 million in damages.  *See* Dkt. 558 ("First Crawford Decl.") ¶ 20.

> (e)   *The ability of the defendants to withstand a greater judgment*

Even assuming RCI NY and RCII were found to be joint employers, it is not clear that the defendants could withstand a substantially greater judgment.  The defendants' consolidated net income was less than the settlement amount in each of the last three fiscal years.  The settlement amount thus represents a significant sum for defendants to pay.  And, under the case law, the possibility that a defendant could have sustained a greater judgment is not determinative of substantive unfairness "where, as here, the other *Grinnell* factors weigh in favor of approval." *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008).  "Class actions are strong medicine.  They may confront defendants with potentially ruinous financial exposure."  *In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648 (LAK), 2001 WL 170792, at *5 (S.D.N.Y. Feb. 22, 2001).  "[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate." *Sony*, 2008 WL 1956267, at *8.

> (f)   *The range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation*

The adequacy of the amount achieved in settlement is not to be judged "in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).  The Court instead need only find that the settlement falls within a "range of reasonableness."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997) (citation

omitted). That range must recognize "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent" in litigation. *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman*, 464 F.2d at 693).

Here, the settlement amount falls well within the range of the reasonable. The class will receive a significant monetary recovery. The $15 million settlement amount, in fact, represents nearly 66% of the total economic damages calculated by the plaintiffs' expert, Dr. Crawford, assuming plaintiffs had prevailed on all claims. *See* Third Crawford Decl. ¶ 6. Even if one were to exclude the $5.5 million in attorneys' fees and expenses from the numerator, plaintiffs would still collect over 40% of their maximum damages. And Dr. Crawford's tabulation of total damages included more than $7 million in damages traceable to the disputed "tip-outs" to the house mom, DJ, and club management. *See* First Crawford Decl. ¶ 20; Dkt. 731, at 23.

The Court therefore finds that the recovery here is highly reasonable, particularly when measured against plaintiffs' potential recovery, and the meaningful risks that further litigation presented for the plaintiff class.

It is also worth noting that—unlike in conventional cases in which employees bring minimum-wage claims—the dancers here likely did not subjectively expect at the time they were hired by Rick's NY to receive any compensation in the form of statutory minimum wages. Rick's NY took the position that the dancers were independent contractors, the dancers did not resist that classification at the time, and the dancers' economic motive for working at the Club was assuredly the significant performance fees they stood to receive from customers, whether in Dance Dollars or cash. It assuredly was not the prospect that the courts would one day hold that Rick's NY's characterization of them was wrong such that they were entitled to an award reflecting unpaid minimum wages. In a real sense, for the dancers, the settlement here is "found

20

money." This reinforces the reasonableness of the dancers' recovery.

Considering the *Grinnell* factors in totality, the Court finds that the settlement is fair, reasonable, and adequate. The Court therefore approves the settlement.

### B.    Approval of the Plan of Allocation

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized—namely, it must be fair and adequate." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (quoting *Maley*, 186 F. Supp. 2d at 367) (citation omitted). As many courts have held, a plan of allocation need not be perfect. Instead, "[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Id.* (quoting *Maley*, 186 F. Supp. 2d at 367) (citation omitted); *In re NASDAQ Market-Makers Antitrust Litig.*, No. 94 Civ. 3996 (RWS), 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000). Thus, "[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel." *EVCI*, 2007 WL 2230177, at *11.

Under the plan of allocation here, the class administrator will allocate the settlement funds among the class members on a *pro rata* basis. To arrive at the allocations, Dr. Crawford calculated (1) each class member's maximum individual damages and (2) the maximum damages that the class in the aggregate could receive, each assuming success on all claims. Dividing each class member's damage figure by the aggregate maximum ($22,852,841) yielded the percentage of the net settlement (*i.e.*, the $15 million settlement, less fees and expenses, administrative costs, and service payments) to which each class member is entitled. Any funds allocated to class members who opted out, objected, failed to cash their checks, or, if in the verification class, failed to return timely verification forms would be returned to Peregrine.

21

The Court finds that this plan of allocation is rational, equitable, fair, and adequate. To be sure, the settlement plan alternatively could have provided for those payments unclaimed by individual class members to be retained by the class, and distributed in a second wave to the participating class members. Such a provision would have been more generous to the class. Given the roughly 40% non-participation rate among the verification class, this provision did give the Court a degree of hesitation, insofar as it causes the stated value of the settlement ($15 million) to overstate by at least $2,520,314.93 (plus the value of any checks not cashed by non-verification class members) the out-of-pocket cost to defendants.

However, after careful review, the Court concludes that this feature does not make the plan inadequate. From the perspective of the participating class members, the Club's payout is substantial, horizontally equitable among the class, and likely to be experienced as "found money." Defendants, for their part, exposed themselves to the duty to pay a full $15 million, with no assurance that a significant minority of class members would not collect. And, as counsel candidly explained at the hearing, they projected at the time of settlement that there would be significant unclaimed funds that would revert to the Club, and the parties negotiated the settlement based on the expectation of such a reversion. Absent the reversion feature, the Club's counsel represented, defendants would not have agreed to a $15 million settlement.

Therefore, the Court approves the plan of allocation.

## C.    Attorneys' Fees

The plaintiff class has been represented throughout this litigation by the law firm of Nichols Kaster, LLP ("Nichols Kaster" or "the firm"). Nichols Kaster has applied for an award of attorneys' fees and expenses totaling $5.5 million. This figure represents approximately 36.7% of the $15 million settlement fund. The $5.5 million figure is comprised of $571,050.26

in out-of-pocket expenses and the balance ($4,928,949.74) in legal fees, meaning that the legal fees would represent 32.9% of the gross settlement and 34.2% of the gross settlement less out-of-pocket expenses. Nichols Kaster represents, supported by time records, that its "lodestar"—its hours worked multiplied by the hourly rate of the timekeeper—is $4,557,927.50.

It is black letter law that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The Second Circuit has authorized district courts to employ a percentage-of-the-fund method when awarding fees in common fund cases. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). The Circuit has also encouraged district courts, in assessing the reasonableness of the fee request, to cross-check the percentage fee against counsel's "lodestar." *Id.* at 50. "It bears emphasis that whether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances." *Id.* at 47. In considering the reasonableness of such an award, the Court must also consider the following familiar "*Goldberger*" factors:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Id.* at 50; *see also Mba v. World Airways, Inc.*, 369 F. App'x 194, 199 (2d Cir. 2010) (summary order); *Central States S.E. & S.W. Areas Health & Welfare Fund, v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 249 (2d Cir. 2007). The Court considers the *Goldberger* factors in turn, taking account of the lodestar and the percentage-of-the-fund methods as appropriate.

### 1.    The time and labor expended by counsel

Nichols Kaster's lawyers have put vast time and effort into this case since its inception

23

more than six years ago.  The firm represents, and its time records reflect, that its lawyers have devoted approximately 11,768.5 hours to this matter.  The projects these lawyers undertook included (1) drafting the complaint and amended complaints, (2) opposing defendants' motions to dismiss, (3) conducting extensive document discovery, (4) taking or defending more than 30 depositions, (4) retaining an outside expert on damages, Dr. Crawford, and consulting with other experts, (5) litigating, and overwhelmingly winning, motions for summary judgment, including as to liability, partial damages, and defendants' counterclaims, (6) moving for class certification and defeating defendants' motion to decertify, (7) briefing 17 motions *in limine*, (8) participating in numerous arguments and hearings, (9) participating in mediation and negotiation sessions to resolve this matter, and (10) drafting the settlement agreement and preliminary approval papers.

The lodestar cross-check, which relates the requested fee to the time and labor actually expended by counsel, strongly supports the fee request here.  It is not at all uncommon for fees to be awarded that reflect multiples of plaintiffs' counsel's lodestar.  *See, e.g.*, *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2014 WL 7323417, at *18 (S.D.N.Y. Dec. 19, 2014) (multiplier of 1.41); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003) (multiplier of 3.5); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d. 369, 401 (S.D.N.Y. 2013) (multiplier of 2.8).  This practice is commonly justified on the ground that counsel risked money and time, and may have foregone other engagements and clients, to pursue an uncertain representation of the class.  *See In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 441 (E.D.N.Y. 2014) ("If not for the attorneys' willingness to endure for many years the risk that their extraordinary efforts would go uncompensated, the settlement would not exist."); *Am. Bank Note*, 127 F. Supp. 2d at 432–33 (granting 25% of the settlement fund for attorneys' fees, in part, because "[t]he significant outlay

of cash and personnel resources by Plaintiffs' Counsel has been completely at risk," *id.* at 432);

*In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 488 (S.D.N.Y. 1998) ("From the

inception of the action, there existed a significant possibility that Class Counsel would achieve

no recovery, and thus no compensation.").

Here, Nichols Kaster requests fees of $4,928,949.74 against its lodestar of $4,557,927.50.

Thus, its multiplier is around 1.08, a figure which, in the Court's experience, is quite low relative

to the multipliers in many cases in which fees have been approved in this District.

In light of the firm's efforts and the size of the settlement fund, and based on the Court's

close familiarity with the history and record in this case, the Court finds that this *Goldberger*

factor strongly supports the fee award requested, as does the lodestar cross-check.

### 2.      The magnitude and complexities of the litigation

Courts have recognized that FLSA cases can be complex, and that "hybrid" cases

involving an FLSA "opt-in" collective action and a NYLL "opt-out" class action brought under

Rule 23 may add complexity. *Febus v. Guardian First Funding Grp., LLC*, 870 F. Supp. 2d 337,

340 (S.D.N.Y. 2012) (citing *Johnson v. Brennan*, No. 10 Civ. 4712 (CM), 2011 WL 4357376, at

*17 (S.D.N.Y. Sept. 16, 2011)).  Such is, of course, not always the case.  Many FLSA collective

and NYLL class action cases are relatively quotidian, turning on the application of established

principles of law to unexceptional factual disputes regarding hours worked and/or wages paid.

But not this case.  As reflected in the sheer number and length of the decisions rendered by this

Court, and by the range of legal issues addressed therein, this litigation was as challenging and

complex as any reported FLSA and/or NYLL case.  At every turn, it presented difficult questions

of fact, law, and strategy, including multiple questions of first impression.  This *Goldberger*

factor also strongly supports Nichols Kaster's fee request.

### 3.    The risk of the litigation

Nichols Kaster took large risks by bringing this case.  The firm took this case on a

contingency fee basis, meaning that it expended thousands of hours of effort over a six-year

period with the real chance that it would never be compensated at all.  Although this effort in the

end proved successful—no doubt due to the firm's effort and skill—that success was no foregone

conclusion.  It should not obscure the risks the firm took.  Three in particular warrant

highlighting.

The first risk was of adverse, potentially dispositive, legal rulings.  There was no

assurance that this Court (or the Second Circuit) would rule that the dancers were employees,

entitled to the protections of the FLSA and NYLL.  Although courts in FLSA cases have divided

on the point, with most holding that exotic dancers are employees, the determinations in these

cases have turned on club-specific facts, and several cases have held such dancers to be

independent contractors.  *See Hilborn v. Prime Time Club, Inc.*, No. 11 Civ. 197 (BSM), 2012

WL 9187581 (E.D. Ark. July 12, 2012); *Matson v. 7455, Inc.*, No. 98 Civ. 788 (HA), 2000 WL

1132110 (D. Or. Jan. 14, 2000).  A substantial legal question was also presented by defendants'

argument that the ample performance fees that customers paid in Dance Dollars pursuant to a fee

schedule set by the Club, to the extent demonstrated to have been received by the dancer, should

offset the Club's statutory minimum-wage obligations.  A holding in defendants' favor on either

point would have eliminated altogether, or severely impaired, the class's recovery.  Other

significant legal questions—which had the potential to materially diminish the class's

recovery—were presented in connection with class certification and the pretrial motions *in

limine*.

The second risk involved collectability.  As discussed, plaintiffs faced a significant risk

26

that they would obtain a judgment against only one defendant, Peregrine, which could not pay, or significantly pay, towards a judgment. Had this risk transpired, plaintiffs' victory would largely have been Pyrrhic, and the consequences would have been felt by plaintiffs' counsel as well as the class.

The third risk involved expenses and opportunity cost. Nichols Kaster invested more than 11,000 attorney hours, more than $500,000 in expenses, and more than six years of time, in this case, with no recovery guaranteed. During this period, the firm retained its obligations to pay salaries and overhead, and assuredly forewent other potential clients and cases. A law firm is a business, too. A substantial fee award is merited here, to recognize the outsize risks that Nichols Kaster took in investing in this uncertain lawsuit.

### 4. The quality of representation

The high quality of Nichols Kaster's representation strongly supports approval of the requested fees. The Court has previously commended counsel for their excellent lawyering. *See* Dkt. 541 at 98 ("I have benefited by very high-quality briefing from both of you."). The point is worth reiterating here. Nichols Kaster was energetic, effective, and creative throughout this long litigation. The Court found Nichols Kaster's briefs and arguments first-rate. And the documents and deposition transcripts which the Court reviewed in the course of resolving motions revealed the firm's far-sighted and strategic approach to discovery. And Nichols Kaster's success was attained in the face of tenacious opposition by a highly capable adversary. Defense counsel, the firm of Meister Seelig & Fein, LLP, vigorously pursued all potential defenses, legal and factual. Further, unlike in many class actions, plaintiffs' counsel did not build their case by piggybacking on regulatory investigation or settlement. "[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or

27

administrative agency has made the kill.  They did all the work on their own."  *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992).  The lawyers at Nichols Kaster can genuinely claim to have been the authors of their clients' success.

The Court, therefore, finds that the quality of representation also strongly supports the award of the requested fee.

### 5.   The requested fee in relation to the settlement

As noted above, the Second Circuit has authorized district courts to use the percentage-of-the-fund method for calculating attorneys' fees.  *See Goldberger*, 209 F.3d at 49.  The percentage-of-the-fund must also be considered in relation to the overall size of the settlement "to ensure that the percentage awarded does not constitute a windfall."  *Beckman v. Key Bank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013).  Even a modest percentage of a large settlement might result in unduly generous attorneys' fees, while a large percentage of a small settlement may be necessary for counsel to recoup their costs.  *See In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ 6689 (SAS), 2003 WL 22244676, at *6 (S.D.N.Y. Sept. 29, 2003) (recommending a "sliding-scale" approach and an "inverse relationship" between percentage and size).

Plaintiffs' counsel request a fee ($4,928,949.74) that represents 32.9% of the gross settlement ($15 million).  While substantial, this percentage-of-the-fund is consistent with other fee awards approved for class counsel in this District.  In numerous such common fund cases, fees have been awarded that represent one-third of the settlement fund.  *See, e.g., Strougo v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003); *Maley*, 186 F. Supp. at 370; *Maywalt v. Parker & Parsley Petroleum Co.*, 963 F. Supp. 310, 313 (S.D.N.Y. 1997).  Of particular relevance, Nichols Kaster's fee request is in line with the fees awarded in particular complex and

28

challenging class actions in this District.  *See, e.g., City of Providence v. Aeropostale, Inc.*, No.

11 Civ. 7132 (CM) (GWG), 2014 WL 1883494, at *12–13 (S.D.N.Y. May 9, 2014) (33%); *In re*

*Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 165 (S.D.N.Y. 2011) (33%); *In re Initial*

*Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (33%).

To be sure, a fair question can be raised whether the fee request should be measured

against the gross settlement, given that counsel foresaw at the time the settlement was reached

that a substantial portion (approximately 40%) of the class recovery would go unclaimed and

would revert to defendants.[11]  The unclaimed funds could instead have been distributed in a

second wave to participating class members or repurposed to a *cy pres* fund.  Were plaintiffs'

counsel fee request measured against the settlement net of unclaimed funds, the request would

represent 40% or more of the net settlement.  For example, if one assumes that $3 million of

funds will go unclaimed, the $4,928,949.74 that counsel seeks would represent about 41% of the

$12 million (net-of-reversion) settlement.

For several reasons, however, the Court's judgment is that the anticipated reversion here

does not justify rejecting or lowering the fees requested.  First, Circuit precedent supports taking

the gross monetary settlement into account when calculating the percentage of the fund.  *See*

*Masters v. Wilhemina Model Agency, Inc.*, 473 F.3d 423, 437 (2d. Cir. 2007) ("An allocation of

fees by percentage should therefore be awarded on the basis of the total funds made available,

whether claimed or not.")  And other courts in this Circuit have applied this approach even when

unclaimed funds were to revert to the defendants.  *See Alleyne v. Time Moving & Storage, Inc.*,

264 F.R.D. 41, 59 (E.D.N.Y. 2010) ("[T]he value of legal service rendered in the creation of a

---

[11] Counsel represented at the fairness hearing that the 60% participation rate is in line with their expectations at the time they negotiated the settlement.

settlement fund [is not] diminished by the failure of beneficiaries to cash in, regardless of what happens to the surplus."); *see also In re Penthouse Executive Club Comp. Litig.*, No. 10 Civ. 1145 (KMW), 2014 WL 185628, at *11 (S.D.N.Y. Jan. 14, 2014); *Diaz v. E. Locating Serv. Inc.*, No. 10 Civ. 4082 (JCF), 2010 WL 5507912, at *8 (S.D.N.Y. Nov. 29, 2010).

Moreover, as reviewed earlier, all other factors—including the quality of counsels' work, the risk taken, and the lodestar—strongly support upholding counsels' fee request as reasonable. And the recovery, measured both in the aggregate and per-dancer, is by any measure objectively reasonable. It results in a substantial payout for dancers who were already paid handsomely by customers in the form of performance fees and tips and who, denoted as they were by the Club as independent contractors, could not have expected to receive such an award.

Furthermore, the Court is mindful that the reversion feature was part of an integrated settlement. The settlement alternative to it, if any, would have been a smaller settlement without a reversion feature. Such a settlement would not necessarily have done any more for the class. This settlement vests each class member who receives notice with the opportunity to decide whether or not to participate.

For these reasons, the relationship of the fee request to the overall settlement, particularly in light of the Second Circuit's directive that the relevant barometer is the gross and not the net settlement, *see Masters*, 473 F.3d at 437, favors approving that fee request here.

### 6.      Public policy considerations

Public policy weighs in favor the requested fees. The goals of the FLSA and NYLL are served only if capable, experienced attorneys stand ready to help prosecute violations. Without such attorneys, plaintiffs pleading FLSA and NYLL violations will be left without recourse even when they have valid claims. *See Johnson*, 2011 WL 4357376, at *19. Indeed, the FLSA and

NYLL provide for the payment of attorneys' fees to successful plaintiffs' counsel, so as to encourage counsel to prosecute such actions. *See* 29 U.S.C. § 216(b); N.Y. Lab. Law § 663(4).

A generous fee award along the lines sought here may serve to incent counsel to bring meritorious FLSA and NYLL claims. In approving the substantial fee award here, the Court also intends to send the message that significant factors bearing on approval of attorneys' fee requests in class-action settlements include the substantive quality of counsel's legal work, the degree of difficulty presented by the case, and the risks that counsel undertook.

For the foregoing reasons, the Court is today granting the application of plaintiffs' counsel for attorneys' fees in the amount sought of $4,928,949.74, to be paid from the settlement fund. The Court finds this award fair and reasonable.

**D.    Expenses for Plaintiffs' Counsel**

Nichols Kaster also requests an award of $571,050.26 to recompense it for expenses incurred in this action. It is well established that counsel who obtain a common settlement fund for a class are entitled to the reimbursement of expenses that they advance to a class. *See, e.g., Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, No. 01 Civ. 11814 (MP), 2004 WL 1087261, at *6–7 (S.D.N.Y. May 14, 2004) (citation omitted). "Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." *EVCI*, 2007 WL 2230177, at *18 (citation omitted); *see also Am. Bank Note*, 127 F. Supp. 2d at 433.

Here, substantial out-of-pocket expenses were necessary in this long-running case. These include expert fees, travel costs, and transcription and translation costs. Reviewing the affidavits submitted by Nichols Kaster, the Court finds the expense requests to be reasonable and justified.

Accordingly, the Court grants the application of plaintiffs' counsel for payment of expenses in the amount of $571,050.26.

31

E.    **Service Awards**

Nichols Kaster also requests $15,000 service payments for the two named plaintiffs and

class representatives, Sabrina Hart and Reka Furedi, and $2,000 service payments for each of the

25 opt-in discovery participants.

Service payments compensate class representatives for their time and effort and for the

risks and burdens they bear in bringing a class action lawsuit. *See Mohney v. Shelly's Prime

Steak, Stone Crab & Oyster Bar*, No. 06 Civ. 4270 (PAC), 2009 WL 5851465, at *6 (S.D.N.Y.

2009). Here, the Court finds that Hart and Furedi both have devoted substantial time and effort

to this case. The Court is also mindful that Hart and Furedi no longer work in the adult

entertainment industry and that, in litigating this action in their own names and not

pseudonymously over six years, they have risked stigma and invited unwanted scrutiny. *See*

Hart Decl. ¶ 4; Furedi Decl. ¶ 4. Therefore, the requested service payments are reasonable.

Similarly, the requested $2,000 payments for the 25 discovery participants are reasonable

based on the time each spent preparing for and giving deposition testimony, providing discovery

responses, and otherwise assisting counsel, as well as the risks they bore associating with this

case publicly. Overall, the $80,000 that has been allocated to service payments is reasonable.

*See Hernandez v. Merrill Lynch & Co.*, No. 11 Civ. 8472, 2013 WL 1209563, at *10 (S.D.N.Y.

2013) (approving aggregate service payments of $91,500 in context of $7 million settlement).

## CONCLUSION

In summary, and as reflected in more detail in a separate order that is being issued

contemporaneously with this decision:

It is hereby ORDERED that the settlement and plan of allocation of the proceeds are

approved as fair, reasonable, and adequate.

32

It is FURTHER ORDERED that the Court hereby awards attorneys' fees of $4,928,949.74, of the Settlement Fund after payment of expenses of $571,050.26. The awarded attorneys' fees and all of the awarded expenses shall be paid to plaintiffs' counsel from the Settlement Fund pursuant to the terms of the settlement.

It is FURTHER ORDERED that the Court hereby awards plaintiffs' counsel expenses in an aggregate amount of $571,050.26.

It is FURTHER ORDERED that the Court hereby awards $15,000 each to Sabrina Hart and Reka Furedi, the named plaintiffs in this action, and $2,000 each to the 25 opt-in discovery participants.

The Court will enter Judgment in this case forthwith. The Clerk of Court is respectfully directed to close this case.


SO ORDERED.

_____
Paul A. Engelmayer
United States District Judge


Dated: September 22, 2015
　　　　New York, New York